UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF MICHIGAN

SOUTHERN DIVISION

IN RE CHRYSLER-DODGE-
JEEP ECODIESEL®
MARKETING, SALES
PRACTICES, AND PRODUCTS
LIABILITY LITIGATION

**CONSUMER COMPLAINT**

AND

**JURY TRIAL DEMAND**

This Document
Relates to:

ALL ACTIONS

BRYAN SCHNEIDER, *et al.*, on behalf of
themselves and all others similarly
situated,

Plaintiffs,

v.

FIAT CHRYSLER AUTOMOBILES N.V.;
FCA US LLC; SERGIO MARCHIONNE,
FORMER CEO OF FCA, FIAT and FIAT
SUBSIDIARIES and CHAIRMAN OF FCA
and FIAT SUBSIDIARIES, DECEASED,
AND HIS SUCCESSOR, MICHAEL
MANLEY; VM MOTORI S.p.A.; VM
NORTH AMERICA, INC.; ROBERT
BOSCH GmbH, and ROBERT BOSCH
LLC,

## **TABLE OF CONTENTS**

INTRODUCTION .......................................................................... 1

PARTIES ................................................................................... 5

   I.    DEFENDANTS ................................................................ 5
      A. Fiat Chrysler Defendants.............................................. 5
      B. VM Motori Defendants ................................................ 7
      C. Bosch Defendants ...................................................... 8

   II.   PLAINTIFFS ................................................................ 10

JURISDICTION AND VENUE ..................................................... 145

INTRADISTRICT ASSIGNMENT ................................................ 146

FACTUAL ALLEGATIONS COMMON TO ALL CLAIMS ...................... 147

   I.    FIAT CHRYSLER SEEKS TO CAPITALIZE ON THE GROW-
       ING U.S. "CLEAN" DIESEL MARKET ......................... 147
   II.   DEFENDANTS' DIRTY "ECODIESEL ®" SCHEME ................ 151
   III.  FCA'S MISLEADING MARKETING ............................. 163

      A. Fiat Chrysler Identifies and Combats the "Dirty Diesel" Stigma. 163
      B. The Eco Diesel Name and Badge Communicate Environ-
        mental Friendliness and Fuel Efficiency ...................... 165
      C. FCA Misrepresents the Subject Vehicles to Consumers in a
        Consistent and Pervasive Marketing Campaign ......... 169
          1.    Press Releases and Media Communications
          2.    Dealer Training Materials
          3.    Vehicle Brochures
          4.    FCA Websites
          5.    Print Media and Television
      D. The Defendants Knew These Representations Were False
        and Misleading .......................................................... 190
          1.    EGR AECD Strategy: EGR Rate Reduction
          2.    SCR AECD Strategy: Dosing Disablement

i

IV.    "DIESELGATE" SCANDALIZES THE GLOBAL AUTO INDUSTRY ................................................................. 197

V.     DEFENDANTS ARE CAUGHT CHEATING ................................ 200
       A. Plaintiffs' Testing Reveals Cheating ........................................... 200
       B. The EPA Issues a Notice of Violation to Fiat and FCA ............. 202
       C. Bosch Software Documentation Further Verifies the Violations 204
              1.     AECDs 1 and 2: Reducing or Disabling EGR at Highway Speeds
              2.     AECD 3: EGR Shut-Off for Exhaust Valve Cleaning
              3.     AECD 7: Alternative SCR Dosing Modes
       D. West Virginia University Testing of the Subject Vehicles ......... 206
       E. European Investigation and Testing ............................................ 207
       F. Joint University of California, San Diego and German Study of the Fiat 500X ........................................................................ 209

VI.    THE DAMAGE CAUSED BY DEFENDANTS' DIRTY DIESEL SCHEME ........................................................................ 210

       ACTION ALLEGATIONS ............................................................. 211
       I      DEFINITIONS .................................................................. 211
       II.    ESTOPPEL ....................................................................... 216

CLAIMS FOR RELIEF ............................................................................. 217

       I.     CLAIMS ASSERTED ON BEHALF OF THE NATION-WIDE ............................................................................... 217

NATIONWIDE COUNT I RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT ("RICO") Violation of 18 U.S.C. § 1962(c)-(d)         ........................................................................ 217

       A. Description of the EcoDiesel® RICO Enterprise .............. 220

              1.    The Fiat Chrysler Defendants
              2.    The VM Motori Defendants
              3.    The Bosch Defendants
       B. The EcoDiesel® RICO Enterprise Sought to Increase Defendants' Profits and Revenues ..................................... 224
       C. Mail and Wire Fraud ........................................................ 228

NATIONWIDE COUNT II FRAUD (Common Law) .................................... 236
    A. Affirmative Misrepresentation ............................................... 236
    B. Fraudulent Concealment: Fuel Economy and Per-
       formance Representations .................................. 237
    C. Fraudulent Concealment: Installing and Concealing the
       Defeat Devices .................................................. 238

NATIONWIDE COUNT III IMPLIED AND WRITTEN WARRANTY
Magnuson – Moss Warranty Act (15 U.S.C. §§ 2301m et seq.) .................... 241

    1.     Alabama .............................................................. 243

         BREACH OF EXPRESS WARRANTY (Ala.Code §§ 7-2A-
         210

         BREACH OF IMPLIED WARRANTY OF
         MERCHANTABILITY (Ala. Code §§ 7-2-314 and 7-2A-
         212)

    2.     Alaska .............................................................. 246

         BREACH OF EXPRESS WARRANTY (Alaska Stat. Ann.
         §§ 45.02.313 and 45.12.210)

         BREACH OF THE IMPLIED WARRANTY OF
         MERCHANTABILITY (Alaska Stat. Ann. §§ 45.02.314
         and 45.12.212)

    3.     Arizona .............................................................. 249

         BREACH OF EXPRESS WARRANTY (Ariz. Rev. Stat.
         §§ 47.2313 and 47-2A210)

         BREACH OF IMPLIED WARRANTY OF
         MERCHANTABILITY (Ariz. Rev. Stat. §§ 47-2314 and
         47-2A212)

4.       Arkansas ........................................................................... 252

           BREACH OF EXPRESS WARRANTY (Ark. Code Ann. §§4-2-313 and 4-2A-210

           BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY (Ark. Code Ann. §§ 4-2-314 and 4-2A-212)

5.       California ........................................................................ 255

           BREACH OF EXPRESS WARRANTY (Cal. Com. Code §§ 2313 and 10210)

           BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY (Cal. Com. Code §§ 2341 and 10212)

           VIOLATIONS OF SONG-BEVERLY CONSUMER WARRANTY ACT FOR BREACH OF EXPRESS WARRANTIES (Cal. Civ. Code §§ 1791.2 & 1793.2(d))

           VIOLATIONS OF SONG-BEVERLY CONSUMER WARRANTY ACT FOR BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY (Cal. Civ. Code §§ 1791.1 and 1792)

           BREACH OF EXPRESS CALIFORNIA EMISSIONS WARRANTIES (Cal. Civ. Code § 1793.2 et. seq.)

6.       Colorado ........................................................................ 263

           BREACH OF EXPRESS WARRANTY (Colo. Rev. Stat. §§ 4-2-313 and 4-2.5-210)

           BREACH OF THE IMPLIED WARRANTY OF MERCHANTABILITY (Colo. Rev. Stat. §§ 4-2-313 and 4-2.5-212)

7.      Connecticut ........................................................................ 266

        BREACH OF EXPRESS WARRANTY (Conn. Gen. Stat. Ann. § 42A-2-313)

        BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY (Conn. Gen. Stat. Ann. § 42A-2-314)

8.      Delaware ........................................................................... 269

        BREACH OF EXPRESS WARRANTY (6 Del. Code §§ 2-313 and 2A-210)

        BREACH OF THE IMPLIED WARRANTY OF MERCHANTABILITY (6 Del. Code §§ 2-314 and 2A-212)

9.      District of Columbia ......................................................... 272

        BREACH OF EXPRESS WARRANTY (D.C. Code §§ 28:2-313 and 28:2A-210)

        BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY (D.C. Code §§ 28:2-314 and 28:2A-212)

10.     Florida .............................................................................. 275

        BREACH OF EXPRESS WARRANTY (Fla. Stat. §§ 672.313 and 680.21)

        BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY (Fla. Stat. §§ 672.314 and 680.212)

11.      Georgia ............................................................................ 278

          BREACH OF EXPRESS WARRANTY (Ga. Code. Ann.
          §§ 11-2-313 and 11-2A-210)

          BREACH OF IMPLIED WARRANTY OF
          MERCHANTABILITY (Ga. Code. Ann. §§ 11-2-314 and
          11-2A-212)

12.      Hawaii ............................................................................ 281

          BREACH OF EXPRESS WARRANTY (Haw. Rev. Stat.
          §§ 490:2-313 and 490:2A-210)

          BREACH OF THE IMPLIED WARRANTY OF
          MERCHANTABILITY (Haw. Rev. Stat. §§ 490:2-314
          and 490:2A-212)

13.      Idaho ............................................................................ 284

          BREACH OF EXPRESS WARRANTY (Idaho Code §§
          28-2-313 and 28-12-210))

          BREACH OF IMPLIED WARRANTY OF
          MERCHANTABILITY (Idaho Code §§ 28-2-314 and
          28-12-212)

14.      Illinois ............................................................................ 287

          BREACH OF EXPRESS WARRANTY (810 Ill. Comp. Stat.
          §§ 5/2-313 and 5/2A-210)

          BREACH OF IMPLIED WARRANTY OF
          MERCHANTABILITY (810 Ill. Comp. Stat. §§ 5/2-314
          and 5/2A-212)

15.     Indiana ............................................................................ 290

    BREACH OF EXPRESS WARRANTY (Ind. Code §§ 26-1-2-313 and 26-1-2.1-210)

    BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY (Ind. Code §§ 26-1-2-314 and 26-1-2.1-212)

16.     Iowa     ............................................................................ 293

    BREACH OF EXPRESS WARRANTY (Iowa Code §§ 554.2313 and 554.13210)

    BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY (Iowa Code §§ 554.2314 and 554.13212)

17.     Kansas ............................................................................ 295

    BREACH OF EXPRESS WARRANTY (Kan. Stat. Ann. §§ 84-2-314 and 84-2A-210)

    BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY (Kan. Stat. Ann. §§ 84-2-314 and 84-2A-212)

18.     Kentucky ......................................................................... 299

    BREACH OF EXPRESS WARRANTY (Ky. Rev. Stat. §§ 335.2-313 and 355.2A-210)

    BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY (Ky. Rev. Stat. §§ 335.2-314 and 355.2A-212)

19.    Louisiana .......................................................................... 302

    BREACH OF IMPLIED WARRANTY OF
    MERCHANTABILITY / WARRANTY AGAINST
    REDHIBITORY DEFECTS (La. Civ. Code Art. 2520, 2524)

20.    Maine ................................................................................. 303

    BREACH OF EXPRESS WARRANTY (Ma. Rev. Stat. Tit.
    11 §§ 2-313 and 2-1210)

    BREACH OF IMPLIED WARRANTY OF
    MERCHANTABILITY (Me. Rev. Stat. Tit. 11 §§ 2-314
    and 2-1212

21.    Maryland .......................................................................... 306

    BREACH OF EXPRESS WARRANTY (Md. Code, Com.
    Law §§ 2-313 and 2a210)

    BREACH OF IMPLIED WARRANTY OF
    MERCHANTABILITY (Md. Code Com. Law §§ 2-314
    and 2A-212)

22.    Massachusetts ................................................................... 309

    BREACH OF EXPRESS WARRANTY (Mass. Gen.
    Laws Ch. 106 §§ 2-313 and 2A-210)

    BREACH OF IMPLIED WARRANTY OF
    MERCHANTABILITY (Mass. Gen. Laws Ch. 106 §§ 2-314
    and 2A-212)

23.      Michigan ........................................................................... 312

BREACH OF EXPRESS WARRANTY (Mich. Comp.
Laws §§ 440.2313 and 440.2860)

BREACH OF IMPLIED WARRANTY OF
MERCHANTABILITY (Mich. Comp. Laws §§ 440.2314
and 440.2860)

24.      Minnesota ......................................................................... 315

BREACH OF EXPRESS WARRANTY (Minn. Stat. §§
336.2-313 and 336.2A-210)

BREACH OF IMPLIED WARRANTY OF
MERCHANTABILITY (Minn. Stat. §§ 336.2-314 and
336.2A-212)

25.      Mississippi ........................................................................ 317

BREACH OF EXPRESS WARRANTY (Miss. Code §§
75-2-313 and 75-2A-210)


BREACH OF IMPLIED WARRANTY OF
MERCHANTABILITY (Miss. Code §§ 75-2-314 and
75-2A-212)

26.      Missouri ............................................................................ 320

BREACH OF EXPRESS WARRANTY (Mo. Stat. §§
400.2-313 and 400.2A-210)

BREACH OF IMPLIED WARRANTY OF
MERCHANTABILITY (Mo. Stat. §§ 400.2-314 and
400.2A-212)

27.	Montana ........................................................................ 322

	BREACH OF EXPRESS WARRANTY (Mont. Code §§
	30-2-313 and 30-2A-210)

	BREACH OF IMPLIED WARRANTY OF
	MERCHANTABILITY (Mont. Code §§ 30-2-314 and
	30-2A-212)

28.	Nebraska ....................................................................... 326

	BREACH OF EXPRESS WARRANTY (Neb. Rev. St.
	U.C.C. §§ 2-313 and 2A-210)

	BREACH OF IMPLIED WARRANTY OF
	MERCHANTABILITY Neb. Rev. St. U.C.C. §§ 2-314 and
	2A-212)

29.	Nevada ......................................................................... 329

	BREACH OF EXPRESS WARRANTY (Nev. Rev. Stat.
	§§ 104.2313 and 104A.2210)

	BREACH OF IMPLIED WARRANTY OF
	MERCHANTABILITY (Nev. Rev. Stat. §§ 104.2314 and
	104A.2212)

30.	New Hampshire ................................................................ 333

	BREACH OF EXPRESS WARRANTY (N.H. Rev. Stat.
	§§ 382-A:2-313 and 2A-210)

	BREACH OF IMPLIED WARRANTY OF
	MERCHANTABILITY (N.H. Rev. Stat. §§ 382-A:2-314
	and 2A-212)

31.     New Jersey ........................................................................ 335

        BREACH OF EXPRESS WARRANTY (N.J. Stat. Ann. §
        12A:2-313 and 2A-210)

        BREACH OF IMPLIED WARRANTY OF
        MERCHANTABILITY (N.J. Stat. Ann. § 12A:2-314 and
        2A-212)

32.     New Mexico ....................................................................... 338

        BREACH OF EXPRESS WARRANTY (N.M. Stat.
        §§ 55-2-313 and 55-2A-210)

        BREACH OF IMPLIED WARRANTY OF
        MERCHANTABILITY (N.M. Stat. §§ 55-2-314 and
        55-2A-212)

33.     New York .......................................................................... 341

        BREACH OF EXPRESS WARRANTY (N.Y. U.C.C. Law
        §§ 2-313 and 2A-210)

        BREACH OF IMPLIED WARRANTY OF
        MERCHANTABILITY (N.Y. U.C.C. Law §§ 2-314 and
        2A-212)

34.     North Carolina ................................................................... 343

        BEACH OF EXPRESS WARRANTY (N.C. Gen. Stat.
        §§ 25-2-313 and 252A-210)

        BREACH OF IMPLIED WARRANTY OF
        MERCHANTABILITY (N.C. §§ 25-2-314 and 252A-212)

35.    North Dakota ...................................................................... 346

BREACH OF EXPRESS WARRANTY (N.D. Cent. Code
§§ 41-02-30 and 41-02.1-19)

BREACH OF IMPLIED WARRANTY OF
MERCHANTABILITY (N.D. Cent. Code §§ 41-02-31 and
41-02.1-21)

36.    Ohio    .................................................................................. 349

BREACH OF EXPRESS WARRANTY (Ohio Rev.
Code § 1302.26 et. seq. (U.C.C. §2.313))

BREACH OF IMPLIED WARRANTY OF
MERCHANTABILITY (Ohio Rev. Code Ann. §§ 1302.27
and 1310.19)

37.    Oklahoma .......................................................................... 352

BREACH OF EXPRESS WARRANTY (Okla. Stat. Tit.
12A §§ 2-313 and 2A-210)

BREACH OF IMPLIED WARRANTY OF
MERCHANTABILITY (Okla. Stat. Tit. 12A §§ 2-314 and
2A-212)

38.    Oregon .............................................................................. 355

BREACH OF EXPRESS WARRANTY (Or. Rev. Stat.
§§ 72.3130 and 72A.2100)

BREACH OF IMPLIED WARRANTY OF
MERCHANTABILITY (Or. Rev. Stat. §§72.3140 and
72A.2120)

39.     Pennsylvania ..................................................................... 358

        BREACH OF EXPRESS WARRANTY (13 Pa. Cons.
        Stat. §§2313 and 2A210)

        BREACH OF IMPLIED WARRANTY OF
         MERCHANTABILITY (13 Pa. Cons. Stat. §§ 2314 and
        2A212)

40.     Rhode Island ..................................................................... 361

        BREACH OF EXPRESS WARRANTY (R.I. Gen. Laws
        §§ 6A-2-313 and 6A-2.1-210)

        BREACH OF IMPLIED WARRANTY OF
        MERCHANTABILITY (R.I. Gen. Laws §§ 6A-2-314 and
        6A-2.1-212)

41.     South Carolina ................................................................... 364

        BREACH OF EXPRESS WARRANTY (S.C. Code §§
        36-2-313 and 36-2A-210)

        BREACH OF IMPLIED WARRANTY OF
        MERCHANTABILITY (S.C. Code §§36-2-314 and
        36-2A-212)

42.     South Dakota ..................................................................... 367

        BREACH OF EXPRESS WARRANTY (S.D. Codified
        Laws §§ 57A-2-313 and 57A-2A-210)

        BREACH OF IMPLIED WARRANTY OF
        MERCHANTABILITY (S.D. Codified Laws §§ 57A-2-314
        and 57A-2A-212)

43.     Tennessee .......................................................................... 369

        BREACH OF EXPRESS WARRANTY (Tenn. Code §§
        47-2-313 and 47-2A-210)

BREACH OF IMPLIED WARRANTY OF
MERCHANTABILITY (Tenn. Code §§ 47-2-314 and
47-2A-212)

44.    Texas  ................................................................. 372

BREACH OF EXPRESS WARRANTY (Tex. Bus. & Com.
Code §§ 2.313 and 2A.210)

BREACH OF IMPLIED WARRANTY OF
MERCHANTABILITY (Tex. Bus. & Com. Code §§ 2.314
and 2A.212)

45.    Utah  ................................................................. 375

BREACH OF EXPRESS WARRANTY (Utah Code Ann.
§§ 70A-2-313 and 70A-2A-210)

BREACH OF IMPLIED WARRANTY OF
MERCHANTABILITY (Utah Code Ann. §§ 70A-2-314 and
70A-2A-212)

46.    Vermont  ............................................................ 378

BREACH OF EXPRESS WARRANTY (Vt. Stat. Tit. Ann.
9A, §§ 2-313 and 2A-210)

BREACH OF IMPLIED WARRANTY OF
MERCHANTABILITY (Vt. Stat. Ann. Tit. 9A, §§ 2-314
and 2A-212)

47.    Virginia  ............................................................ 381

BREACH OF EXPRESS WARRANTY (Va. Code Ann.
§§ 8.2-313 and 8.2A-210)

BREACH OF IMPLIED WARRANTY OF
MERCHANTABILITY (Va. Code Ann. §§ 8.2-314
and 8.2A-212)

48.      Washington ........................................................ 384

         BREACH OF EXPRESS WARRANTY (Wash. Rev.
         Code §§ 62A.2-313 and 62A.2A-210)

         BREACH OF IMPLIED WARRANTY OF
         MERCHANTABILITY (Wash. Rev. Code §§ 62A.2-314
         and 62A.2A-212)

49.      West Virginia .................................................... 387

         BREACH OF EXPRESS WARRANTY (W.Va. Code
         §§ 46-2-313 and 46-2A-210)

         BREACH OF IMPLIED WARRANTY OF
         MERCHANTABILITY (W. Va. Code §§ 46-2-314 and
         46-2A-212)

50.      Wisconsin ........................................................ 391

         BREACH OF EXPRESS WARRANTY (Wis. Stat. §§
         402.313 and 411.210)

         BREACH OF IMPLIED WARRANTY OF
         MERCHANTABILITY (Wis. Stat. §§ 402.314 and
         411.212)

51.      Wyoming .......................................................... 393

         BREACH OF EXPRESS WARRANTY (Wyo. Stat. §
         34.1-2-313)

         BREACH OF IMPLIED WARRANTY OF
         MERCHANTABILITY (Wyo. Stat. §§ 34.1-2-314 and
         34.1-2A-212)

II.    STATE CONSUMER PROTECTION CLAIMS ........................... 396

VIOLATION OF ALABAMA DECEPTIVE TRADE PRACTICES
ACT (Ala. Code § 8-19-1, et seq.) ......................................... 396

VIOLATIOIN OF THE ALASKA UNFAIR TRADE PRACTICES
AND CONSUMER PROTECTION ACT (Alaska Stat. Ann. §
45.50.471, et. seq.) ................................................................ 400

VIOLATIOINS OF CONSUMER FRAUD ACT (Ariz. Rev. Stat. § 44-
1521, et. seq.) ........................................................................ 403

ARKANSAS COUNT I VIOLATIONS OF THE DECEPTIVE
TRADE PRACTICE ACT (Ark. Code Ann. § 4-88-101, et. seq.) ....... 405

VIOLATIONS OF THE CONSUMER LEGAL REMEDIES ACT
(Cal. Civ. Code § 1750, et. seq.) ........................................... 408

UNLAWFUL, UNFAIR, OR FRAUDULENT BUSINESS
PRACTICES UNDER THE CALIFORNIA UNFAIR COMPETITION
LAW (Cal. Bus. & Prof. Code § 17200, et. seq.) ................... 412

FALSE ADVERTISING UNDER THE CALIFORNIA UNFAIR
COMPETITION LAW (Cal. Bus. & Prof. Code § 17500, et. seq.) ...... 414

FAILURE TO RECALL/RETROFIT UNDER CALIFORNIA LAW
VIOLATIONS OF THE COLORADO CONSUMER PROTECTION
ACT (Colo. Rev. Stat. § 6-1-101, et. seq.) ............................. 415

VIOLATIONS OF THE COLORADO CONSUMER PROTECTION
ACT……… ........................................................................... 417

VIOLATION OF CONNECTICUT UNLAWFUL TRADE
PRACTICES ACT (Conn. Gen. Stat. § 42-110a, et. seq.) .................... 420

VIOLATIONS OF THE DELAWARE CONSUMER FRAUD ACT
AND DECEPTIVE TRADE PRACTICES ACT (6 Del. Code § 2513,
et. seq., and 6 Del. Code 2531, et. seq.) ............................... 423

VIOLATION OF THE CONSUMER PROTECTION PROCEDURES
ACT (D.C. Code § 28-3901, et.seq. .................................... 426

VIOLATION OF FLORIDA'S UNFAIR & DECEPTIVE TRADE PRACTICES ACT (Fla. Stat. § 501.201, et. seq.) ................................ 428

VIOLATIONS OF GEORGIA'S UNIFORM DECEPTIVE TRADE PRACTICES ACT (Ga. Code Ann. § 10-1-370, et. seq.) .................... 431

VIOLATIONS OF GEORGIA'S FAIR BUSINESS PRACTICES ACT (Ga. Code Ann. § 10-1-390, et. seq.) ...................................... 433

UNFAIR AND DECEPTIVE ACTS IN VIOLATION OF HAWAII LAW (Haw. Rev. Stat. § 480, et. seq.) .................................. 436

VIOLATIONS OF THE IDAHO CONSUMER PROTECTION ACT (Idaho Code § 48-601, et. seq.) ............................................ 440

VIOLATIONS OF ILLINOIS CONSUMER FRAUD AND DECEPTIVE BUSINESS PRACTICES ACT (815 ILCS 505/1, et. seq. and 510/2) ........................................................... 442

VIOLATION OF THE INDIANA DECEPTIVE CONSUMER SALES ACT (Ind. Code § 24-5-0.5-3) ............................................ 445

VIOLATIONS OF THE PRIVATE RIGHT OF ACTION FOR CONSUMER FRAUDS ACT (Iowa Code § 714h.1, et. seq.) ............. 448

VIOLATIONS OF THE KANSAS CONSUMER PROTECTION ACT (Kan. Stat. Ann. § 50-623, et. seq.) ...................................... 451

VIOLATIONS OF THE LOUISIANA UNFAIR TRADE PRACTICES AND CONSUMER PROTECTION LAW (La. Rec. Stat. § 51:1401, et. seq.) ................................................ 453

VIOLATION OF MAINE UNFAIR TRADE PRACTICES ACT (Me. Rev. Stat. Ann. Tit. 5 § 205-a, et. seq.) ................................ 456

VIOLATIONS OF THE MARYLAND CONSUMER PROTECTION ACT (Md. Code Com. Law § 13-101, et. seq.) ..................................... 459

DECEPTIVE ACTS OR PRACTICES PROHIBITED BY MASSACHUSETTS LAW (Mass. Gen. Laws Ch. 93a, § 1, et. seq.) .. 462

VIOLATION OF THE MICHIGAN CONSUMER PROTECTION ACT (Mich. Comp. Laws § 445.903, et. seq.) ...................................... 465

VIOLATIONS OF THE MINNESOTA PREVENTION OF CONSUMER FRAUD ACT (Minn. Stat. § 325f.68, et. seq.) .............. 467

VIOLATIONS OF THE MINNESOTA UNIFORM DECEPTIVE TRADE PRACTICES ACT (Minn. Stat. § 325d.43, et. seq.) .............. 470

VIOLATION OF MISSISSIPPI CONSUMER PROTECTION ACT (Miss. Code Ann. § 75.24-1, et. seq.) .................................... 472

VIOLATION OF MISSOURI MERCHANDISING PRACTICES ACT (Mo. Rev. Stat. § 407.010, et. seq.) ...................................... 475

VIOLATION OF MONTANA UNFAIR TRADE PRACTICES AND CONSUMER PROTECTION ACT OF 1973 (Mont. Code Ann. § 30-14-101, et. seq.) ................................................................. 478

VIOLATION OF THE NEBRASKA CONSUMER PROTECTION ACT (Neb. Rev. Stat. § 59-1601, et. seq.) ............................. 480

VIOLATION OF THE NEVADA DECEPTIVE TRADE PRACTICES ACT (Nev. Rev. Stat. § 598.0903, et. seq.) ........................... 483

VIOLATION OF N.H. CONSUMER PROTECTION ACT (N.H. Rev. Stat. Ann. § 358-a:1, et. seq.) ................................................ 485

VIOLATIONS OF THE NEW JERSEY CONSUMER FRAUD ACT (N.J. Stat. Ann. § 56:8-1, et. seq.) ......................................... 488

VIOLATIONS OF THE NEW MEXICO UNFAIR PRACTICES ACT (N.M. Stat. Ann. §§ 57-12-1, et. seq.) .................................... 491

VIOLATION OF NEW YORK GENERAL BUSINESS LAW § 349 (N.Y. Gen. Bus. Law § 349) ................................................. 493

VIOLATIONS OF NEW YORK GENERAL BUSINESS LAW § 350 (N.Y. Gen. Bus. Law § 350) ................................................. 496

VIOLATIONS OF THE NORTH CAROLINA UNFAIR AND DECEPTIVE TRADE PRACTICES ACT (N.C. Gen. Stat. §§ 75-1.1, et. seq.) ............................................................................... 498

VIOLATION OF THE NORTH DAKOTA CONSUMER FRAUD ACT (N.D. Cent. Code § 51-15-02) ...................................................... 501

VIOLATIONS OF THE OHIO CONSUMER SALES PRACTICES ACT (Ohio Rev. Code §§ 1345.01, et. seq.) ........................................ 503

VIOLATIONS OF THE OHIO DECEPTIVE TRADE PRACTICES ACT (Ohio Rev. Code § 4165.01, et. seq.) ........................................... 506

VIOLATION OF OKLAHOMA CONSUMER PROTECTION ACT (Okla. Stat. Tit. 15 § 751, et. seq.) ........................................................ 508

VIOLATIONS OF THE OREGON UNLAWFUL TRADE PRACTICES ACT (Or. Rev. Stat. §§ 646.605, et. seq.) ...................... 511

VIOLATION OF THE PENNSYLVANIA UNFAIR TRADE PRACTICES AND CONSUMER PROTECTION LAW (73 Pa. Stat. Ann. § 201-1, et. seq.) .......................................................................... 513

VIOLATION OF THE RHODE ISLAND DECEPTIVE TRADE PRACTICES ACT (R.I. Gen. Laws § 6-13.1, et. seq.) ........................ 516

VIOLATIONS OF THE SOUTH CAROLINA UNFAIR TRADE PRACTICES ACT (S.C. Code Ann. § 39-5-10, et. seq.) ...................... 519

VIOLATIONS OF THE SOUTH CAROLINA REGULATION OF MANUFACTURERS, DISTRIBUTORS, AND DEALERS ACT (S.C. Code Ann. § 56-15-10, et. seq.) ............................................................ 522

VIOLATION OF THE SOUTH DAKOTA DECEPTIVE TRADE PRACTICES AND CONSUMER PROTECTION LAW (S.D. Codified Laws § 37-24-6) ...................................................................... 524

VIOLATIONS OF TENNESSEE CONSUMER PROTECTION ACT OF 1977 (Tenn. Code Ann. § 47-18-101, et. seq.) ................................ 526

VIOLATIONS OF THE DECEPTIVE TRADE PRACTICES ACT – CONSUMER PROTECTION ACT (Tex. Business & Commercial Code §§ 17.41, et. seq.) ........................................................................ 529

VIOLATIONS OF UTAH CONSUMER SALES PRACTICES ACT (Utah Code Ann. § 13-11-1, et. seq.) ...................................................... 532

VIOLATION OF UTAH TRUTH IN ADVERTISING LAW (Utah Code Ann. § 13-11a-1, et. seq.) ............................................................. 534

VIOLATION OF VERMONT CONSUMER PROTECTION ACT (Vt. Stat. Ann. Tit. 9, § 2451, et. seq.) ........................................................... 537

VIOLATIONS OF THE VIRGINIA CONSUMER PROTECTION ACT (Va. Code Ann. §§ 59.1-196, et. seq.) .......................................... 539

VIOLATIONS OF THE WASHINGTON CONSUMER PROTECTION ACT (Wash. Rev. Code Ann. §§ 19.86.010, et. seq.) . 542

VIOLATIONS OF THE CONSUMER CREDIT AND PROTECTION ACT (W. Va. Code § 46A-1-101, et. seq.) ........................................... 545

VIOLATIONS OF THE WISCONSIN DECEPTIVE TRADE PRACTICES ACT (Wis. Stat. § 101.18) ............................................... 548

VIOLATION OF THE WYOMING CONSUMER PROTECTION ACT (Wyo. Stat. §§ 40-12-101, et. seq.) ............................................... 550

III.    PRAYER FOR RELIEF .................................................................. 553

IV.    RELIANCE UPON DEMAND FOR JURY TRIAL ....................... 555

Plaintiffs herein described bring this action on behalf of themselves and all others similarly situated, against (1) the Defendants collectively referred to as "Fiat Chrysler": FCA US LLC ("FCA"), Fiat Chrysler Automobiles N.V. ("Fiat"), and Sergio Marchionne ("Marchionne"); (2) the Defendants collectively referred to as "VM Motori": VM Motori S.p.A. ("VM Italy") and VM North America, Inc. ("VM America"); and (3) the Defendants collectively referred to as "Bosch": Robert Bosch GmbH ("Bosch GmbH"), and Robert Bosch, LLC ("Bosch LLC"). Plaintiffs allege the following based upon information and belief, the investigation of counsel, and personal knowledge as to the factual allegations pertaining to themselves.

## INTRODUCTION

1.      This nationwide action arises out of an international race to the bottom. Fiat Chrysler, a rival of automaker Volkswagen struggling to compete on the world stage, sought to grab a piece of the U.S. "clean" diesel market with 2014-2016 EcoDiesel® trucks marketed under the Jeep Grand Cherokee and Ram 1500 model names (the "Subject Vehicles"). But like Volkswagen, Fiat Chrysler fought dirty. That is, like Volkswagen did with its "clean diesels," Fiat Chrysler concealed from regulators and consumers alike that the EcoDiesel® trucks were far from "Eco."

2.      As the Environmental Protection Agency ("EPA") has since discovered, Fiat Chrysler, by and through FCA, concealed emission treatment software features in the Subject Vehicle engine's diesel controls on applications for EPA Certificates of Conformity ("COCs") and California Air Resources Board ("CARB") Executive Orders ("EOs"). This hidden software, designed and implemented by Bosch GmbH and Bosch LLC, allowed the Subject Vehicles to "pass" emission testing and obtain COCs and EOs so that Fiat Chrysler could import and sell the

1

Subject Vehicles in the U.S. and California, respectively. Once on America's roads, however, the emission controls are de-activated or severely restricted such that the Subject Vehicles spew much higher amounts of polluting nitrogen oxides ("NOx") than permitted by law.

3.      On January 12, 2017, the EPA issued a Notice of Violation ("NOV") against Fiat and FCA for failing "to disclose [eight] Auxiliary Emission Control Devices (AECDs)" in the 2014-2016 FCA Ram 1500s and Jeep Grand Cherokees.[1] In the NOV, the EPA explained that, despite having the opportunity to do so, Fiat and FCA failed to refute that the "principal effect of one or more of these AECDs was to bypass, defeat, or render inoperative one or more elements of design installed to comply with emissions standards under the [Clean Air Act]."

4.      The same day, CARB publicly announced that it, too, had notified Fiat and FCA of its violations after detecting the AECDs in their 2014, 2015, and 2016 Jeep Grand Cherokee and Ram 1500 EcoDiesel® vehicles. CARB also said Fiat and FCA failed to disclose the devices, which can significantly increase NOx emissions when activated. "Once again," observed CARB Chair Mary D. Nichols, "a major automaker made the business decision to skirt the rules and got caught."[2]

5.      The U.S. has since sued FCA, Fiat, VM Italy, and VM America for violating the Clean Air Act ("CAA") and applicable regulations, seeking injunctive relief and civil penalties.[3] As the U.S. has found, "one or more of these undisclosed software features, alone or in combination with one or more of the others, bypass, defeat and/or render inoperative the [Subject]

---

[1]   EPA's January 12, 2017 Notice of Violation to Fiat Chrysler Automobiles, https://www.epa.gov/sites/production/files/2017-01/documents/fca-caa-nov-2017-01-12.pdf.
[2]   EPA News Release, *EPA Notifies Fiat Chrysler of Clean Air Act Violations* (Jan. 12, 2017), https://www.epa.gov/newsreleases/epa-notifies-fiat-chrysler-clean-air-act-violations.
[3]   *United States v. Fiat US LLC, et al.*, No. 2:17-cv-11633-JCO-EAS (E.D. Mich. filed May 23, 2017) (Dkt. No. 1). The action has since been transferred to this Court for coordination with this MDL.

Vehicles' emission control system, causing the vehicles to emit substantially higher levels of NOx during certain normal real world driving conditions than during federal emission tests."[4]

6.    American consumers were caught in the middle of Fiat Chrysler's scheme. Consumers have been wary of diesel engines as a relic of the past: noisy and spewing thick, toxic smoke. This was an understandable concern. A byproduct of diesel combustion is NOx, a pollutant linked with serious health dangers and climate change. Seeking to expand the diesel market in the U.S., large automakers in the late 2000's sought to reimagine diesel for regulators and consumers alike. For its part, Fiat Chrysler touted its "EcoDiesel" technology as the best of both worlds: a "green" alternative to gasoline with reduced emissions coupled with diesel's benefits of greater torque, power, and fuel efficiency. Fiat Chrysler extracted a premium for these "EcoDiesel" trucks, selling them for thousands of dollars more than the cost of otherwise-comparable gasoline trucks.

7.    Contrary to its public representations, and concealed from consumers and regulators alike, Fiat Chrysler secretly programmed its EcoDiesel® vehicles with hidden software features that significantly reduced the effectiveness of the NOx reduction technology during real-world driving conditions. As a result, the Subject Vehicles emitted harmful pollutants at levels that were illegally high and far in excess of what a reasonable consumer would expect from an "Eco" vehicle. Plaintiffs confirmed that the Subject Vehicles produced NOx emissions at an average of 222 mg/mile in city driving (four times the Federal Test Procedure ("FTP") standard of 50 mg/mile) and 353 mg/mile in highway driving (five times higher than the U.S. highway standard of 70 mg/mile). In many instances, NOx values were in excess of 1,600 mg/mile—*more than 20 times governmental standards*.

8.    Compounding this problem is the interplay between performance and emissions in

---

[4] *Id.* at ¶ 2.

diesel engines. Fiat Chrysler could not achieve the fuel economy and performance that it promises for the Subject Vehicles without cheating on emissions—a fact that it concealed from consumers around the country.

9. Fiat Chrysler did not act alone. At the heart of the diesel scandal is Bosch. Bosch GmbH and Bosch LLC, along with CEO Volkmar Denner ("Denner"), were active and knowing participants in the scheme. Bosch designed, created, and tested the electronic diesel control ("EDC") units that allowed Fiat Chrysler to "pass" emission tests for its COC and EO applications. Bosch went so far as to boast that the "2014 Jeep Grand Cherokee features a Bosch emission system compliant with the most stringent emission regulations in the world. From fuel tank to tailpipe, Bosch is pleased to equip this vehicle with top technologies to give consumers a great driving experience requiring fewer stops at the pump."[5] Bosch has since, however, acknowledged its role in the creation of defeat devices in certain Fiat Chrysler diesel vehicles sold in the European Union ("EU"). VM Italy and VM America also knowingly participated in the scheme by designing, manufacturing, and calibrating the "EcoDiesel" engines in the Subject Vehicles.

10. On behalf of themselves, the Nationwide, and the respective State Plaintiffs, Plaintiffs hereby bring this action for violations of the federal Racketeer Influenced and Corrupt Organizations Act (18 U.S.C. § 1961, *et seq.* ("RICO")); the federal Magnuson-Moss Warranty Act (15 U.S.C. § 2301, *et seq.* ("MMWA")); common law fraud; and the consumer laws of all 50 states and the District of Columbia.

11. Plaintiffs bring this action individually as current and former owners or lessees of

---

[5] *Bosch Announces Clean Diesel Technology On 2014 Jeep Grand Cherokee*, PRNewswire (Jan.24,2013), http://www.prnewswire.com/news-releases/bosch-announces-clean-diesel technology-on-2014-jeep-grand-cherokee-188243051.html;http://us.bosch-press.com/ tbwebdb/bosch-usa/enUS/PressText.cfm?CFID=61223175&CFTOKEN=a16399a1447f6b98-4B6F7D4B-A8E6-F415F31B16E0E13CB96A&nh=00&Search=0&id=532

4

the Subject Vehicles as defined herein. Plaintiffs seek a buyback program for the Subject Vehicles, monetary damages (including treble damages under RICO), pollution mitigation, business reforms, and injunctive and other equitable relief for Defendants' misconduct related to the design, manufacture, marketing, sale, and lease of the Subject Vehicles, as alleged in this Complaint. Plaintiffs are also entitled to a significant award of punitive or exemplary damages, given that Defendants deliberately deceived Plaintiffs, disregarded their rights to make free and informed consumer choices, damaged them economically, and used them as unwitting puppets in a scheme that impaired the public health for the financial betterment of Defendants.

**PARTIES**

**I. DEFENDANTS**

**A.**           **Fiat Chrysler Defendants**

12.     Defendant **FCA US LLC ("FCA")** is a Delaware limited liability company. Defendant Fiat Chrysler Automobiles N.V. ("Fiat" or, together with FCA, "Fiat Chrysler") is FCA's corporate parent. Fiat's predecessor, Fiat S.p.A., began its acquisition of FCA's predecessor, Chrysler Group LLC, in 2009 and completed it in January 2014, at which time Chrysler Group LLC became a wholly-owned indirect subsidiary of Fiat and was renamed FCA US LLC. FCA's principal place of business and headquarters is located at 1000 Chrysler Drive, Auburn Hills, Michigan 48326.

13.     FCA is a motor vehicle manufacturer and a licensed distributor of new, previously untitled motor vehicles. FCA (like its predecessor, Chrysler) is one of the "Big Three" American automakers (with Ford and General Motors). FCA engages in commerce by distributing and selling new and unused passenger cars and motor vehicles under the Chrysler, Dodge, Jeep, Ram, and Fiat brands. Other major divisions of FCA include Mopar, its automotive parts and accessories division,

5

and SRT, its performance automobile division.

14.     FCA has designed, manufactured, imported, distributed, offered for sale, sold, and leased two models of vehicle for which the EcoDiesel® option is available—the Ram 1500 and the Jeep Grand Cherokee—with the knowledge and intent to market, sell, and lease them in all 50 states, including California. Moreover, FCA and its agents designed, manufactured, marketed, distributed, warranted, sold and leased the Subject Vehicles in California and throughout the United States. Dealers act as FCA's agents in selling automobiles under the Fiat Chrysler name and disseminating vehicle information provided by Fiat Chrysler to customers.

15.     Fiat, the corporate parent of FCA, is a Dutch corporation headquartered in London, United Kingdom. Fiat owns numerous European automotive brands in addition to FCA's American brands, including Maserati, Alfa Romeo, Fiat Automobiles, Fiat Professional, Lancia, and Abarth. As of 2015, Fiat Chrysler is the seventh largest automaker in the world by unit production.

16.     Subject to a reasonable opportunity for further investigation or discovery, Plaintiffs allege that Fiat employees oversaw or were responsible for approving elements of design and/or strategies related to emission compliance for the Subject Vehicles. Fiat also imported into the United States, sold, offered for sale, introduced into commerce, or delivered the Subject Vehicles, with the intent to market or sell them in all fifty states, including California.

17.     Fiat Chrysler developed and disseminated the owners' manuals, warranty booklets, product brochures, advertisements, and other promotional materials relating to the Subject Vehicles, with the intent that such documents should be purposely distributed throughout all fifty states, including California. Fiat Chrysler is engaged in interstate commerce, selling vehicles through its network in every state of the United States.

18.     Defendant **Sergio Marchionne ("Marchionne")** was the CEO and Chairman of FCA, the CEO of Fiat, and the Chairman and/or CEO of several other Fiat subsidiaries, including FCA Italy S.p.A., the Italian subsidiary of Fiat headquartered in Turin, Italy at the time and, Michael Manley as his successor and current CEO. Since 2004, Mr. Marchionne was the CEO of Fiat S.p.A., the predecessor of Fiat, and thus, oversaw Fiat's acquisition of both VM Motori and Chrysler Group LLC, the transformation to the current corporate structure, and the creation of FCA. Mr. Marchionne made numerous public statements on behalf of Fiat Chrysler concerning the Subject Vehicles, their EcoDiesel® engines, and their emissions and performance characteristics. In addition to managing and controlling FCA, Mr. Marchionne had a home in the United States, regularly transacted business in the United States, and regularly promoted Fiat Chrysler in the United States. Mr. Marchinonne has since passed away and his successor is current CEO Michael Manley.

**B.        VM Motori Defendants**

19.     Fiat also owns several auto parts manufacturers, including Defendant **VM Motori S.p.A. ("VM Italy")**, an Italian corporation headquartered in Cento, Italy, which designs and manufactures diesel engines for automobiles, including the Subject Vehicles. Fiat partially acquired VM Italy in early 2011 by purchasing a 50% stake, and took full ownership by acquiring the remaining 50% from General Motors in October 2013.

20.     Defendant VM North America, Inc. ("VM America" or, together with VM Italy, "VM Motori") is or was a Delaware corporation and wholly-owned subsidiary of Fiat. VM America existed, at all relevant times, to support VM Italy customers and activities in North America. VM America's principal place of business is located at 1000 Chrysler Drive, Auburn Hills, Michigan 48326. Both VM Italy and VM America conduct business at that address and

report to management at both VM Italy and VM America, including while working on the Subject Vehicles.

21.     VM Italy transacts business in the United States. VM Italy employees have been physically present in Auburn Hills, Michigan, while working on engine calibration and air emissions issues related to the Subject Vehicles. Some VM America employees working in Auburn Hills are also employees of VM Italy. VM Italy employees in Italy communicated regularly about the Subject Vehicles with the VM America and VM Italy employees located in Auburn Hills. VM Italy also communicated frequently with FCA about the Subject Vehicles.

22.     VM Motori designed, manufactured, calibrated, and delivered the EcoDiesel® engine system for inclusion in the Subject Vehicles, knowing and intending that the Subject Vehicles, along with their engine system, would be marketed, distributed, warranted, sold and leased throughout all 50 states, including California.

**C.          Bosch Defendants**

23.     Defendant **Robert Bosch GmbH ("Bosch GmbH")**—a German multinational engineering and electronics company headquartered in Gerlingen, Germany—is the parent company of Defendant **Robert Bosch LLC ("Bosch LLC" or, with Bosch GmbH, "Bosch")**, a Delaware limited liability company with its principal place of business located at 38000 Hills Tech Drive, Farmington Hills, Michigan 48331.

24.     Both Bosch GmbH and Bosch LLC operate under the umbrella of the Bosch Group, which encompasses some 340 subsidiaries and companies. Volkmar Denner ("Denner") is the Chairman and CEO of Bosch GmbH and leader of The Bosch Group. Denner has been Chairman and CEO of Bosch since July 2012, after decades of working in Bosch's Engine ECU Development division, managing the development and sale of automotive engine computers, such as the EDC

units that were installed in the Subject Vehicles.

25.     The Bosch Group is divided into four business sectors: Mobility Solutions (formerly Automotive Technology), Industrial Technology, Consumer Goods, and Energy and Building Technology. Bosch's sectors and divisions are grouped not by location, but by function. In other words, Mobility Solutions includes knowledgeable individuals at both Bosch GmbH and Bosch LLC. Regardless of whether an individual works for Bosch in Germany or the United States, the employee holds him or herself out as working for Bosch. This collective identity is captured by Bosch's mission statement: "We are Bosch," a unifying principle that links each entity and person within the Bosch Group.

26.     Mobility Solutions is the largest Bosch Group business sector. In 2014, the first full year of Subject Vehicle sales, it generated sales of €33.3 billion, amounting to 68% of total group sales.

27.     The Bosch Group is one of the leading automotive suppliers globally. In 2015, Mobility Solutions generated sales of $9.5 billion in North America alone.

28.     Bosch embeds sales and engineering personnel at customer offices and facilities throughout the world, including automakers like Fiat Chrysler, to work directly on the design, sale, calibration, and configuration of the parts it supplies.

29.     Bosch operates 70 locations in the United States, with over 31,000 employees. One of these locations is the Bosch LLC Research and Technology Center North America in Palo Alto, California. One of Bosch's research focuses there is application-specific integrated circuit (ASIC) design and MEMS (microelectromechanical-system) technology. These technologies are used in a variety of automotive applications. Bosch LLC also operates Research and Technology Centers in Pittsburgh, Pennsylvania, and Cambridge, Massachusetts.

30.     Bosch developed, tested, configured, manufactured, and supplied the EDC Unit 17, which is the EDC system used in the Subject Vehicles, knowing and intending that the Subject Vehicles, along with the device, would be marketed, distributed, warranted, sold and leased throughout all 50 states, including in California. As set forth in detail herein, at all relevant times, Bosch, VM Motori, and Fiat Chrysler worked collaboratively to program the EDC Unit 17 in the Subject Vehicles.

31.     From at least 2005 to 2015, Bosch and its employees were knowing and active participants in the creation, development, marketing, and sale of engine and emission control software designed to evade emission requirements in vehicles sold in the United States.  These vehicles include the Ram 1500 EcoDiesel® and Jeep Grand Cherokee EcoDiesel®, as well as diesels made by other automakers such as Volkswagen, Audi, and Porsche.

32.     Bosch participated not just in the development of these devices, but also in the scheme to prevent U.S. regulators from uncovering their true functionality. Moreover, Bosch's participation was not limited to engineering these devices. In fact, Bosch marketed "clean diesel" technology in the United States. Bosch was therefore a knowing and active participant in the scheme or common course of conduct with Fiat Chrysler and VM Motori and others to defraud regulators and consumers in the United States.

## II.     PLAINTIFFS

33.     For ease of reference, the following chart identifies the representative Plaintiffs and the state(s) in which they reside and purchased their Subject Vehicles:

| Plaintiff - First Name | Plaintiff - Last Name | State of Residence | State of Purchase | Model Year | Make/Model |
|---|---|---|---|---|---|
| Bryan | Schneider | CO | CO | 2015 | Dodge Ram 1500 EcoDiesel |
| Don and Kathern | Wells | MO | OK | 2014 | Jeep Grand Cherokee EcoDiesel |
| Richard | Kittok | LA | LA | 2015 | Dodge Ram 1500 EcoDiesel |
| Annabell and Jerry | Gibson | TN | VA | 2015 | Dodge Ram 1500 EcoDiesel |
| Annabell and Jerry | Gibson | TN | VA | 2015 | Dodge Ram 1500 EcoDiesel |
| William R and Briea N | Willaford | OK | OK | 2016 | Dodge Ram 1500 EcoDiesel |
| Thomas | Gengler | IA | SD | 2016 | Dodge Ram 1500 EcoDiesel |
| Robert B. | Luper | LA | LA | 2015 | Dodge Ram 1500 EcoDiesel |
| Robert | Thomas | TX | TX | 2015 | Dodge Ram 1500 EcoDiesel |
| Dakota J | Ethriedge | GA | GA | 2016 | Dodge Ram 1500 EcoDiesel |
| Shane | Filipovic | FL | FL | 2016 | Dodge Ram 1500 EcoDiesel |
| Ronda and Rick | Brewer | TX | TX | 2015 | Dodge Ram 1500 EcoDiesel |
| Steve | Reeves | PA | PA | 2015 | Dodge Ram 1500 EcoDiesel |
| Andrew and Ashley | Malburg | MI | MI | 2015 | Jeep Grand Cherokee EcoDiesel |
| Andrew and Ashley | Malburg | MI | MI | 2016 | Dodge Ram 1500 EcoDiesel |
| Tom | Sayers | UT | UT | 2015 | Dodge Ram 1500 EcoDiesel |
| Robert | Richardson | WA | ID | 2015 | Jeep Grand Cherokee EcoDiesel |
| Isreal | Cantu | FL | FL | 2015 | Dodge Ram 1500 EcoDiesel |
| William | Jones | CO | SC | 2015 | Jeep Grand Cherokee EcoDiesel |
| Tracena Trey | Colunga | TX | TX | 2015 | Dodge Ram 1500 EcoDiesel |
| Darryl | Saucier | AL | AL | 2016 | Dodge Ram 1500 EcoDiesel |

| | | | | | |
|---|---|---|---|---|---|
| Kile Matthew Lee | O'Connor | MI | MI | 2014 | Dodge Ram 1500 EcoDiesel |
| Kyle Wingate | Underhill | NC | NC | 2014 | Jeep Grand Cherokee EcoDiesel |
| David | McCauley | IL | IL | 2015 | Dodge Ram 1500 EcoDiesel |
| Kevin | Suhrie | PA | NC | 2015 | Dodge Ram 1500 EcoDiesel |
| Carlos | Garcia | KS | CO | 2014 | Jeep Grand Cherokee EcoDiesel |
| Jerry | Nelson | MI | WI | 2014 | Jeep Grand Cherokee EcoDiesel |
| Rejean | Fecteau | FL | FL | 2016 | Dodge Ram 1500 EcoDiesel |
| John Benjamin | Fox | LA | LA | 2014 | Dodge Ram 1500 EcoDiesel |
| Sebastian | Korzec | NJ | NY | 2015 | Dodge Ram 1500 EcoDiesel |
| Edwin and Carmen | Rivera | FL | FL | 2015 | Dodge Ram 1500 EcoDiesel |
| Jeff | Simmonds | AZ | AZ | 2015 | Dodge Ram 1500 EcoDiesel |
| Matthew | Cole | AL | AL | 2014 | Dodge Ram 1500 EcoDiesel |
| Milburn | Markle | CO | CO | 2014 | Dodge Ram 1500 EcoDiesel |
| Alton Young and Kim | Daigle | LA | LA | 2015 | Dodge Ram 1500 EcoDiesel |
| Heinz and Elenore | Daub | WI | WI | 2015 | Dodge Ram 1500 EcoDiesel |
| Joshua and Amanda | Trepl | MN | ND | 2015 | Dodge Ram 1500 EcoDiesel |
| Jason and Kristin | Skoland | IA | IA | 2015 | Dodge Ram 1500 EcoDiesel |
| Brian | Lencho | WA | WA | 2016 | Dodge Ram 1500 EcoDiesel |
| Angela | Graham | WV | WV | 2016 | Dodge Ram 1500 EcoDiesel |
| Steven | Avery | TX | TX | 2014 | Dodge Ram 1500 EcoDiesel |
| Steve | Rosenthal | WI | IL | 2016 | Dodge Ram 1500 EcoDiesel |
| Brian Bohring d/b/a | Rohrig Farms LLC | IA | IA | 2015 | Dodge Ram 1500 EcoDiesel |
| Randy | Crawford | NY | NY | 2014 | Dodge Ram 1500 EcoDiesel |

| Nicholas | DeJohn | VA | WV | 2015 | Dodge Ram 1500 EcoDiesel |
|---|---|---|---|---|---|
| Robin | Simmons | AL | MS | 2014 | Dodge Ram 1500 EcoDiesel |
| Chase | Mintrone | FL | FL | 2015 | Dodge Ram 1500 EcoDiesel |
| Robert and Cheryl | Boyd | WV | PA | 2015 | Dodge Ram 1500 EcoDiesel |
| Hector Vlides d/b/a | Infinity Enterprises | FL | FL | 2014 | Dodge Ram 1500 EcoDiesel |
| Arthur | Alfinito | OR | OR | 2014 | Dodge Ram 1500 EcoDiesel |
| Felix | Hernandez | PA | MD | 2016 | Dodge Ram 1500 EcoDiesel |
| Jason | Cornetto | NY | NY | 2015 | Dodge Ram 1500 EcoDiesel |
| Chris and Carrie | Frank | TX | TX | 2015 | Dodge Ram 1500 EcoDiesel |
| Thomas Joseph | Cummins III | FL | FL | 2016 | Dodge Ram 1500 EcoDiesel |
| Robert | Heinzman | TX | MS | 2014 | Dodge Ram 1500 EcoDiesel |
| Russell | Wagoner | LA | MS | 2015 | Dodge Ram 1500 EcoDiesel |
| Chuck | Six | FL | FL | 2015 | Dodge Ram 1500 EcoDiesel |
| Sean | McCaffery | OR | OR | 2015 | Jeep Grand Cherokee EcoDiesel |
| Lindsey | Smith | AR | TX | 2014 | Dodge Ram 1500 EcoDiesel |
| Jim | Laney | MI | MI | 2016 | Dodge Ram 1500 EcoDiesel |
| Andrew | Waters | OK | OK | 2014 | Dodge Ram 1500 EcoDiesel |
| Samuel | Robinson | WV | WV | 2014 | Dodge Ram 1500 EcoDiesel |
| Klayton | Costanzo | CO | CO | 2016 | Dodge Ram 1500 EcoDiesel |
| Robert | Brinkley | MO | MO | 2016 | Dodge Ram 1500 EcoDiesel |
| Robert J. | Reich | MT | MT | 2014 | Jeep Grand Cherokee EcoDiesel |
| Marcus | Spencer | CO | CO | 2015 | Dodge Ram 1500 EcoDiesel |
| Aaron | O'Brien | IL | IL | 2016 | Dodge Ram 1500 EcoDiesel |

13

| | | | | | |
|---|---|---|---|---|---|
| Bruce | Johnson | MN | MN | 2014 | Jeep Grand Cherokee EcoDiesel |
| Richard and Susanna | Bladl | WA | WA | 2015 | Dodge Ram 1500 EcoDiesel |
| Richard | Bayly | NY | NY | 2016 | Dodge Ram 1500 EcoDiesel |
| Greg and Lucia | Dubas | NJ | NJ | 2014 | Jeep Grand Cherokee EcoDiesel |
| Jody | Bergheim | SD | IA | 2015 | Dodge Ram 1500 EcoDiesel |
| Daniel | Gonzales | OK | OK | 2015 | Dodge Ram 1500 EcoDiesel |
| Craig | Faircloth | FL | FL | 2016 | Dodge Ram 1500 EcoDiesel |
| Dominick | Melfi | PA | PA | 2016 | Jeep Grand Cherokee EcoDiesel |
| Thomas | Banks | NY | NY | 2014 | Dodge Ram 1500 EcoDiesel |
| Dawn and Edward | Nelson | AR | AR | 2016 | Dodge Ram 1500 EcoDiesel |
| William J and Sherry A | Coomes | IN | OH | 2015 | Jeep Grand Cherokee EcoDiesel |
| Greg A | Gouker | TX | TX | 2015 | Dodge Ram 1500 EcoDiesel |
| Yuriy | Mayurov | UT | UT | 2014 | Dodge Ram 1500 EcoDiesel |
| Kressy | Carlile | NM | TX | 2014 | Dodge Ram 1500 EcoDiesel |
| Juan Carlos | Soto | AZ | AZ | 2015 | Dodge Ram 1500 EcoDiesel |
| Tia | Shubert | FL | FL | 2015 | Dodge Ram 1500 EcoDiesel |
| Ronnie | Vincent | OR | OR | 2016 | Dodge Ram 1500 EcoDiesel |
| George and Sheri | Bunker Jr | KY | KY | 2016 | Dodge Ram 1500 EcoDiesel |
| James | Greene | GA | GA | 2015 | Dodge Ram 1500 EcoDiesel |
| Michael | Miller | MI | MI | 2015 | Dodge Ram 1500 EcoDiesel |
| Robert | Acevedo | TX | TX | 2016 | Dodge Ram 1500 EcoDiesel |
| Jeremy | Delong | NH | NH | 2014 | Dodge Ram 1500 EcoDiesel |
| Gary | Smith | NC | VA | 2015 | Dodge Ram 1500 EcoDiesel |

| | | | | | |
|---|---|---|---|---|---|
| Gerald and Christine | Good | OK | OK | 2015 | Dodge Ram 1500 EcoDiesel |
| Theodore | Klein | WA | WA | 2015 | Dodge Ram 1500 EcoDiesel |
| Michael L. | Goff | WV | WV | 2016 | Dodge Ram 1500 EcoDiesel |
| Tom and Julie | Bisselle | NY | NY | 2016 | Dodge Ram 1500 EcoDiesel |
| Jeffrey Francis | Kernan | IA | ID | 2016 | Dodge Ram 1500 EcoDiesel |
| Brad | Scott | GA | GA | 2015 | Dodge Ram 1500 EcoDiesel |
| Matthew | Robertson | VA | VA | 2016 | Jeep Grand Cherokee EcoDiesel |
| Courtney Gayle | Coleman | MD | MD | 2015 | Dodge Ram 1500 EcoDiesel |
| Antiman | Salinas | TX | TX | 2015 | Dodge Ram 1500 EcoDiesel |
| Christopher | Harper | CO | CO | 2015 | Dodge Ram 1500 EcoDiesel |
| Zina | Bryson | WA | WA | 2016 | Jeep Grand Cherokee EcoDiesel |
| Dwight | Lindstrom | MI | MI | 2014 | Dodge Ram 1500 EcoDiesel |
| Christopher | Barbour | CT | CT | 2014 | Dodge Ram 1500 EcoDiesel |
| Donald and Beverly | Young | MO | MO | 2015 | Dodge Ram 1500 EcoDiesel |
| Mark | King | FL | AL | 2016 | Dodge Ram 1500 EcoDiesel |
| Nicholas | Selchert | SD | SD | 2015 | Dodge Ram 1500 EcoDiesel |
| James | Beemer | MO | MO | 2015 | Dodge Ram 1500 EcoDiesel |
| Ron | Naasz | ND | ND | 2015 | Dodge Ram 1500 EcoDiesel |
| Sergio | Medina | NE | KS | 2015 | Dodge Ram 1500 EcoDiesel |
| James and Deborah | Andreasen | AL | AL | 2015 | Dodge Ram 1500 EcoDiesel |
| Eric | Croke | CO | CO | 2015 | Dodge Ram 1500 EcoDiesel |
| Scott and Nancy | Eastland | TX | TX | 2016 | Dodge Ram 1500 EcoDiesel |
| Joe | Kralik | NY | NY | 2015 | Dodge Ram 1500 EcoDiesel |

| | | | | | |
|---|---|---|---|---|---|
| Raymond | Croisetiere | WY | WY | 2016 | Dodge Ram 1500 EcoDiesel |
| Doolie | Molzof | WI | WI | 2016 | Dodge Ram 1500 EcoDiesel |
| George | Nuesse | ID | ID | 2016 | Dodge Ram 1500 EcoDiesel |
| Andrew | Prztarski | AR | AR | 2015 | Dodge Ram 1500 EcoDiesel |
| Cody and Shellie | Stephens | TX | TX | 2015 | Dodge Ram 1500 EcoDiesel |
| Benjamin | Matthews | TN | TN | 2015 | Dodge Ram 1500 EcoDiesel |
| Brian | Gray | TX | TX | 2015 | Dodge Ram 1500 EcoDiesel |
| Timothy | Kawacin | IN | IL | 2014 | Jeep Grand Cherokee EcoDiesel |
| Don and Margaret | Vincent | TX | TX | 2015 | Jeep Grand Cherokee EcoDiesel |
| William | Barnett | KS | TX | 2015 | Dodge Ram 1500 EcoDiesel |
| Dennis and Mary | Carlson | IN | IN | 2016 | Dodge Ram 1500 EcoDiesel |
| Zachary Austin | Pearson | OK | OK | 2015 | Dodge Ram 1500 EcoDiesel |
| Brian | Schmidt | GA | GA | 2015 | Dodge Ram 1500 EcoDiesel |
| Theodore Brayfield d/b/a | Carpet Plus | MO | MO | 2016 | Dodge Ram 1500 EcoDiesel |
| Steven | Campbell | MO | MO | 2016 | Dodge Ram 1500 EcoDiesel |
| Robert and Darla | Jones | WY | UT | 2014 | Dodge Ram 1500 EcoDiesel |
| Matthew | Trainor | FL | FL | 2014 | Dodge Ram 1500 EcoDiesel |

34.     Plaintiff, Bryan Schneider (for the purpose of this paragraph, "Plaintiff"), a citizen of the State of Colorado residing in the City of Northglen, bought a 2015 Dodge Ram 1500 EcoDiesel® (for the purpose of this paragraph, the "Subject Vehicle") on or about January 1, 2015, at Ethio Motors, an authorized FCA dealer in Aurora, Colorado. Plaintiff decided to buy the Subject Vehicle based in part on FCA's representations that it was an "EcoDiesel" vehicle (i.e.,

reduced emissions and fuel efficient). Plaintiff recalls visiting the Ram website, on which the Subject Vehicles were represented as environmentally friendly, having low emissions and good fuel economy. Plaintiff also recalls seeing television commercials about the Subject Vehicles. When Plaintiff went to Ethio Motors to purchase the Subject Vehicle, the sales associate touted the Subject Vehicle's EcoDiesel® attributes, including its fuel economy and performance. These representations, along with the advertised fuel economy, were among the primary reasons Plaintiff chose the Subject Vehicle. At the time of purchase, Plaintiff did not know that the Subject Vehicle could perform as advertised only by emitting NOx at levels that are greater than advertised and above legal limits. Nor was Plaintiff aware that his/her Subject Vehicle was equipped with undisclosed and unauthorized emission control devices designed to cheat emission tests and to deceive consumers and regulators. Plaintiff would not have purchased the Subject Vehicle, or would have paid less for it, had he/she known that it did not comply with emission standards; that its emission treatment system was designed to de-activate during real-world driving conditions; and that it could not achieve the advertised towing power, performance, and/or fuel economy without cheating emission tests. Plaintiff has suffered a concrete injury as a direct and proximate result of Defendants' misconduct, and would not have purchased the Subject Vehicle, or would have paid less for it, had Defendants not concealed the unauthorized emission control devices.

35.     Plaintiffs, Don and Kathern Wells (for the purpose of this paragraph, "Plaintiffs"), are citizens of the State of Missouri residing in the City of Cabool, bought a 2014 Jeep Grand Cherokee EcoDiesel® (for the purpose of this paragraph, the "Subject Vehicle") on or about February 7, 2015, at Dick Baily Motors Inc-Chrysler, an authorized FCA dealer in Okmulgee, Oklahoma. Plaintiffs decided to buy the Subject Vehicle based in part on FCA's representations that it was an "EcoDiesel" vehicle (i.e., reduced emissions and fuel efficient). Plaintiff recall

visiting the Jeep website, on which the Subject Vehicles were represented as environmentally friendly, having low emissions and good fuel economy. Plaintiffs also recall seeing television commercials about the Subject Vehicles. When Plaintiffs went to Dick Baily Motors Inc-Chrysler to purchase the Subject Vehicle, the sales associate touted the Subject Vehicle's EcoDiesel® attributes, including its fuel economy and performance. These representations, along with the advertised fuel economy, were among the primary reasons Plaintiffs chose the Subject Vehicle. At the time of purchase, Plaintiffs did not know that the Subject Vehicle could perform as advertised only by emitting NOx at levels that are greater than advertised and above legal limits. Nor were Plaintiffs aware that their Subject Vehicle was equipped with undisclosed and unauthorized emission control devices designed to cheat emission tests and to deceive consumers and regulators. Plaintiffs would not have purchased the Subject Vehicle, or would have paid less for it, had they known that it did not comply with emission standards; that its emission treatment system was designed to de-activate during real-world driving conditions; and that it could not achieve the advertised towing power, performance, and/or fuel economy without cheating emission tests. Plaintiff have suffered a concrete injury as a direct and proximate result of Defendants' misconduct, and would not have purchased the Subject Vehicle, or would have paid less for it, had Defendants not concealed the unauthorized emission control devices.

36. Plaintiff, Richard Kittok (for the purpose of this paragraph, "Plaintiff"), a citizen of the State of Louisiana residing in the City of New Orleans, bought a 2015 Dodge Ram 1500 EcoDiesel® (for the purpose of this paragraph, the "Subject Vehicle") on or about February 13, 2015, at Vaughn Motors, an authorized FCA dealer in Bunke, Louisiana. Plaintiff decided to buy the Subject Vehicle based in part on FCA's representations that it was an "EcoDiesel" vehicle (i.e., reduced emissions and fuel efficient). Plaintiff recalls visiting the Ram website, on which the

Subject Vehicles were represented as environmentally friendly, having low emissions and good fuel economy. Plaintiff also recalls seeing television commercials about the Subject Vehicles. When Plaintiff went to Vaughn Motors to purchase the Subject Vehicle, the sales associate touted the Subject Vehicle's EcoDiesel® attributes, including its fuel economy and performance. These representations, along with the advertised fuel economy, were among the primary reasons Plaintiff chose the Subject Vehicle. At the time of purchase, Plaintiff did not know that the Subject Vehicle could perform as advertised only by emitting NOx at levels that are greater than advertised and above legal limits. Nor was Plaintiff aware that his/her Subject Vehicle was equipped with undisclosed and unauthorized emission control devices designed to cheat emission tests and to deceive consumers and regulators. Plaintiff would not have purchased the Subject Vehicle, or would have paid less for it, had he/she known that it did not comply with emission standards; that its emission treatment system was designed to de-activate during real-world driving conditions; and that it could not achieve the advertised towing power, performance, and/or fuel economy without cheating emission tests. Plaintiff has suffered a concrete injury as a direct and proximate result of Defendants' misconduct, and would not have purchased the Subject Vehicle, or would have paid less for it, had Defendants not concealed the unauthorized emission control devices.

37.     Plaintiffs, Annabel and Jerry Gibson (for the purpose of this paragraph, "Plaintiffs"), are citizens of the State of Tennessee residing in the City of Greeneville, bought a 2015 Dodge Ram 1500 EcoDiesel® (for the purpose of this paragraph, the "Subject Vehicle") on or about December 4, 2015, at AUTOWORLD, an authorized FCA dealer in Big Stone Gap, Virginia. Plaintiffs decided to buy the Subject Vehicle based in part on FCA's representations that it was an "EcoDiesel" vehicle (i.e., reduced emissions and fuel efficient). Plaintiffs recall visiting the Dodge website, on which the Subject Vehicles were represented as environmentally friendly,

having low emissions and good fuel economy. Plaintiffs also recall seeing television commercials about the Subject Vehicles. When Plaintiffs went to AUTOWORLD to purchase the Subject Vehicle, the sales associate touted the Subject Vehicle's EcoDiesel® attributes, including its fuel economy and performance. These representations, along with the advertised fuel economy, were among the primary reasons Plaintiffs chose the Subject Vehicle. At the time of purchase, Plaintiffs did not know that the Subject Vehicle could perform as advertised only by emitting NOx at levels that are greater than advertised and above legal limits. Nor were Plaintiffs aware that their Subject Vehicle was equipped with undisclosed and unauthorized emission control devices designed to cheat emission tests and to deceive consumers and regulators. Plaintiffs would not have purchased the Subject Vehicle, or would have paid less for it, had they known that it did not comply with emission standards; that its emission treatment system was designed to de-activate during real-world driving conditions; and that it could not achieve the advertised towing power, performance, and/or fuel economy without cheating emission tests. Plaintiffs have suffered a concrete injury as a direct and proximate result of Defendants' misconduct, and would not have purchased the Subject Vehicle, or would have paid less for it, had Defendants not concealed the unauthorized emission control devices.

38.     Plaintiffs, Annabel and Jerry Gibson (for the purpose of this paragraph, "Plaintiffs"), are citizens of the State of Tennessee residing in the City of Greeneville, bought a 2015 Dodge Ram 1500 EcoDiesel® (for the purpose of this paragraph, the "Subject Vehicle") on or about May 21, 2015, at AUTOWORLD, an authorized FCA dealer in Big Stone Gap, Virginia. Plaintiffs decided to buy the Subject Vehicle based in part on FCA's representations that it was an "EcoDiesel" vehicle (i.e., reduced emissions and fuel efficient). Plaintiffs recall visiting the Dodge website, on which the Subject Vehicles were represented as environmentally friendly, having low

emissions and good fuel economy. Plaintiffs also recall seeing television commercials about the Subject Vehicles. When Plaintiffs went to AUTOWORLD to purchase the Subject Vehicle, the sales associate touted the Subject Vehicle's EcoDiesel® attributes, including its fuel economy and performance. These representations, along with the advertised fuel economy, were among the primary reasons Plaintiffs chose the Subject Vehicle. At the time of purchase, Plaintiffs did not know that the Subject Vehicle could perform as advertised only by emitting NOx at levels that are greater than advertised and above legal limits. Nor were Plaintiffs aware that their Subject Vehicle was equipped with undisclosed and unauthorized emission control devices designed to cheat emission tests and to deceive consumers and regulators. Plaintiffs would not have purchased the Subject Vehicle, or would have paid less for it, had they known that it did not comply with emission standards; that its emission treatment system was designed to de-activate during real-world driving conditions; and that it could not achieve the advertised towing power, performance, and/or fuel economy without cheating emission tests. Plaintiffs have suffered a concrete injury as a direct and proximate result of Defendants' misconduct, and would not have purchased the Subject Vehicle, or would have paid less for it, had Defendants not concealed the unauthorized emission control devices.

39.     Plaintiffs, William R and  Breia N Willaford (for the purpose of this paragraph, "Plaintiffs"), are citizens of the State of Oklahoma residing in the City of Ponca City, bought a 2016 Dodge Ram 1500 EcoDiesel® (for the purpose of this paragraph, the "Subject Vehicle") on or about January 15, 2018, at Bob Hurley Chrysler, Jeep, Dodge, Ram, an authorized FCA dealer in Ponca City, Oklahoma. Plaintiffs decided to buy the Subject Vehicle based in part on FCA's representations that it was an "EcoDiesel" vehicle (i.e., reduced emissions and fuel efficient). Plaintiffs recall visiting the Ram website, on which the Subject Vehicles were represented as

environmentally friendly, having low emissions and good fuel economy. Plaintiffs also recall seeing television commercials about the Subject Vehicles. When Plaintiffs went to Bob Hurley Chrysler, Jeep, Dodge, Ram to purchase the Subject Vehicle, the sales associate touted the Subject Vehicle's EcoDiesel® attributes, including its fuel economy and performance. These representations, along with the advertised fuel economy, were among the primary reasons Plaintiffs chose the Subject Vehicle. At the time of purchase, Plaintiffs did not know that the Subject Vehicle could perform as advertised only by emitting NOx at levels that are greater than advertised and above legal limits. Nor were Plaintiffs aware that their Subject Vehicle was equipped with undisclosed and unauthorized emission control devices designed to cheat emission tests and to deceive consumers and regulators. Plaintiffs would not have purchased the Subject Vehicle, or would have paid less for it, had they known that it did not comply with emission standards; that its emission treatment system was designed to de-activate during real-world driving conditions; and that it could not achieve the advertised towing power, performance, and/or fuel economy without cheating emission tests. Plaintiffs have suffered a concrete injury as a direct and proximate result of Defendants' misconduct, and would not have purchased the Subject Vehicle, or would have paid less for it, had Defendants not concealed the unauthorized emission control devices.

40.     Plaintiff, Thomas Gengler (for the purpose of this paragraph, "Plaintiff"), a citizen of the State of Iowa residing in the City of Sioux City, bought a 2016 Dodge Ram 1500 EcoDiesel® (for the purpose of this paragraph, the "Subject Vehicle") on or about November 30, 2015, at Billion Auto - Chrysler Jeep Dodge RAM an authorized FCA dealer in Sioux Falls, South Dakota. Plaintiff decided to buy the Subject Vehicle based in part on FCA's representations that it was an "EcoDiesel" vehicle (i.e., reduced emissions and fuel efficient). Plaintiff recalls visiting the Ram

website, on which the Subject Vehicles were represented as environmentally friendly, having low emissions and good fuel economy. Plaintiff also recalls seeing television commercials about the Subject Vehicles. When Plaintiff went to Billions Auto - Chrysler Jeep Dodge RAM to purchase the Subject Vehicle, the sales associate touted the Subject Vehicle's EcoDiesel® attributes, including its fuel economy and performance. These representations, along with the advertised fuel economy, were among the primary reasons Plaintiff chose the Subject Vehicle. At the time of purchase, Plaintiff did not know that the Subject Vehicle could perform as advertised only by emitting NOx at levels that are greater than advertised and above legal limits. Nor was Plaintiff aware that his/her Subject Vehicle was equipped with undisclosed and unauthorized emission control devices designed to cheat emission tests and to deceive consumers and regulators. Plaintiff would not have purchased the Subject Vehicle, or would have paid less for it, had he/she known that it did not comply with emission standards; that its emission treatment system was designed to de-activate during real-world driving conditions; and that it could not achieve the advertised towing power, performance, and/or fuel economy without cheating emission tests. Plaintiff has suffered a concrete injury as a direct and proximate result of Defendants' misconduct, and would not have purchased the Subject Vehicle, or would have paid less for it, had Defendants not concealed the unauthorized emission control devices.

41.     Plaintiff, Robert B. Luper (for the purpose of this paragraph, "Plaintiff"), a citizen of the State of Louisiana residing in the City of Franklinton, bought a 2015 Dodge Ram 1500 EcoDiesel® (for the purpose of this paragraph, the "Subject Vehicle") on or about December 6, 2014, at Rainbow Chrysler Dodge Jeep LLC, an authorized FCA dealer in Covington, Louisiana. Plaintiff decided to buy the Subject Vehicle based in part on FCA's representations that it was an "EcoDiesel" vehicle (i.e., reduced emissions and fuel efficient). Plaintiff recalls visiting the Ram

website, on which the Subject Vehicles were represented as environmentally friendly, having low emissions and good fuel economy. Plaintiff also recalls seeing television commercials about the Subject Vehicles. When Plaintiff went to Rainbow Chrysler Dodge Jeep LLC to purchase the Subject Vehicle, the sales associate touted the Subject Vehicle's EcoDiesel® attributes, including its fuel economy and performance. These representations, along with the advertised fuel economy, were among the primary reasons Plaintiff chose the Subject Vehicle. At the time of purchase, Plaintiff did not know that the Subject Vehicle could perform as advertised only by emitting NOx at levels that are greater than advertised and above legal limits. Nor was Plaintiff aware that his/her Subject Vehicle was equipped with undisclosed and unauthorized emission control devices designed to cheat emission tests and to deceive consumers and regulators. Plaintiff would not have purchased the Subject Vehicle, or would have paid less for it, had he/she known that it did not comply with emission standards; that its emission treatment system was designed to de-activate during real-world driving conditions; and that it could not achieve the advertised towing power, performance, and/or fuel economy without cheating emission tests. Plaintiff has suffered a concrete injury as a direct and proximate result of Defendants' misconduct, and would not have purchased the Subject Vehicle, or would have paid less for it, had Defendants not concealed the unauthorized emission control devices.

42.     Plaintiff, Robert Thomas (for the purpose of this paragraph, "Plaintiff"), a citizen of the State of Texas residing in the City of Midlothian, bought a 2015 Dodge Ram 1500 EcoDiesel® (for the purpose of this paragraph, the "Subject Vehicle") on or about June 12, 2016, at Huffins Lewisville, an authorized FCA dealer in Lewisville, Texas. Plaintiff decided to buy the Subject Vehicle based in part on FCA's representations that it was an "EcoDiesel" vehicle (i.e., reduced emissions and fuel efficient). Plaintiff recalls visiting the Ram website, on which the

Subject Vehicles were represented as environmentally friendly, having low emissions and good fuel economy. Plaintiff also recalls seeing television commercials about the Subject Vehicles. When Plaintiff went to Huffins Lewisville to purchase the Subject Vehicle, the sales associate touted the Subject Vehicle's EcoDiesel® attributes, including its fuel economy and performance. These representations, along with the advertised fuel economy, were among the primary reasons Plaintiff chose the Subject Vehicle. At the time of purchase, Plaintiff did not know that the Subject Vehicle could perform as advertised only by emitting NOx at levels that are greater than advertised and above legal limits. Nor was Plaintiff aware that his/her Subject Vehicle was equipped with undisclosed and unauthorized emission control devices designed to cheat emission tests and to deceive consumers and regulators. Plaintiff would not have purchased the Subject Vehicle, or would have paid less for it, had he/she known that it did not comply with emission standards; that its emission treatment system was designed to de-activate during real-world driving conditions; and that it could not achieve the advertised towing power, performance, and/or fuel economy without cheating emission tests. Plaintiff has suffered a concrete injury as a direct and proximate result of Defendants' misconduct, and would not have purchased the Subject Vehicle, or would have paid less for it, had Defendants not concealed the unauthorized emission control devices.

43.     Plaintiff, Dakota J Ethriedge (for the purpose of this paragraph, "Plaintiff"), a citizen of the State of Georgia residing in the City of Hortense, bought a 2016 Dodge Ram 1500 EcoDiesel® (for the purpose of this paragraph, the "Subject Vehicle") on or about July 8, 2016, at Woody Folsom-RAM Truck Center, an authorized FCA dealer in Hazelhurst, Georgia. Plaintiff decided to buy the Subject Vehicle based in part on FCA's representations that it was an "EcoDiesel" vehicle (i.e., reduced emissions and fuel efficient). Plaintiff recalls visiting the Ram website, on which the Subject Vehicles were represented as environmentally friendly, having low

emissions and good fuel economy. Plaintiff also recalls seeing television commercials about the Subject Vehicles. When Plaintiff went to Woody Folsom-RAM Truck Center to purchase the Subject Vehicle, the sales associate touted the Subject Vehicle's EcoDiesel® attributes, including its fuel economy and performance. These representations, along with the advertised fuel economy, were among the primary reasons Plaintiff chose the Subject Vehicle. At the time of purchase, Plaintiff did not know that the Subject Vehicle could perform as advertised only by emitting NOx at levels that are greater than advertised and above legal limits. Nor was Plaintiff aware that his/her Subject Vehicle was equipped with undisclosed and unauthorized emission control devices designed to cheat emission tests and to deceive consumers and regulators. Plaintiff would not have purchased the Subject Vehicle, or would have paid less for it, had he/she known that it did not comply with emission standards; that its emission treatment system was designed to de-activate during real-world driving conditions; and that it could not achieve the advertised towing power, performance, and/or fuel economy without cheating emission tests. Plaintiff has suffered a concrete injury as a direct and proximate result of Defendants' misconduct, and would not have purchased the Subject Vehicle, or would have paid less for it, had Defendants not concealed the unauthorized emission control devices.

44.    Plaintiff, Shane Filipovic (for the purpose of this paragraph, "Plaintiff"), a citizen of the State of Florida residing in the City of Homestead, bought a 2016 Dodge Ram 1500 EcoDiesel® (for the purpose of this paragraph, the "Subject Vehicle") on or about February 1, 2016, at Spitzer Dodge, an authorized FCA dealer in Homestead, Florida. Plaintiff decided to buy the Subject Vehicle based in part on FCA's representations that it was an "EcoDiesel" vehicle (i.e., reduced emissions and fuel efficient). Plaintiff recalls visiting the Ram website, on which the Subject Vehicles were represented as environmentally friendly, having low emissions and good

fuel economy. Plaintiff also recalls seeing television commercials about the Subject Vehicles. When Plaintiff went to Spitzer, Dodge to purchase the Subject Vehicle, the sales associate touted the Subject Vehicle's EcoDiesel® attributes, including its fuel economy and performance. These representations, along with the advertised fuel economy, were among the primary reasons Plaintiff chose the Subject Vehicle. At the time of purchase, Plaintiff did not know that the Subject Vehicle could perform as advertised only by emitting NOx at levels that are greater than advertised and above legal limits. Nor was Plaintiff aware that his/her Subject Vehicle was equipped with undisclosed and unauthorized emission control devices designed to cheat emission tests and to deceive consumers and regulators. Plaintiff would not have purchased the Subject Vehicle, or would have paid less for it, had he/she known that it did not comply with emission standards; that its emission treatment system was designed to de-activate during real-world driving conditions; and that it could not achieve the advertised towing power, performance, and/or fuel economy without cheating emission tests. Plaintiff has suffered a concrete injury as a direct and proximate result of Defendants' misconduct, and would not have purchased the Subject Vehicle, or would have paid less for it, had Defendants not concealed the unauthorized emission control devices.

45.    Plaintiffs, Ronda and Rick Brewer (for the purpose of this paragraph, "Plaintiffs"), are citizens of the State of Texas residing in the City of Whitney, bought a 2015 Dodge Ram 1500 EcoDiesel® (for the purpose of this paragraph, the "Subject Vehicle") on or about August 1, 2015, at Meador Dodge Chrysler Jeep Ram, an authorized FCA dealer in Ft Worth, Texas. Plaintiffs decided to buy the Subject Vehicle based in part on FCA's representations that it was an "EcoDiesel" vehicle (i.e., reduced emissions and fuel efficient). Plaintiffs recall visiting the Ram website, on which the Subject Vehicles were represented as environmentally friendly, having low emissions and good fuel economy. Plaintiffs also recall seeing television commercials about the

Subject Vehicles. When Plaintiffs went to Meador Dodge Chrysler Jeep Ram to purchase the Subject Vehicle, the sales associate touted the Subject Vehicle's EcoDiesel® attributes, including its fuel economy and performance. These representations, along with the advertised fuel economy, were among the primary reasons Plaintiffs chose the Subject Vehicle. At the time of purchase, Plaintiffs did not know that the Subject Vehicle could perform as advertised only by emitting NOx at levels that are greater than advertised and above legal limits. Nor were Plaintiffs aware that they Subject Vehicle was equipped with undisclosed and unauthorized emission control devices designed to cheat emission tests and to deceive consumers and regulators. Plaintiffs would not have purchased the Subject Vehicle, or would have paid less for it, had they known that it did not comply with emission standards; that its emission treatment system was designed to de-activate during real-world driving conditions; and that it could not achieve the advertised towing power, performance, and/or fuel economy without cheating emission tests. Plaintiffs have suffered a concrete injury as a direct and proximate result of Defendants' misconduct, and would not have purchased the Subject Vehicle, or would have paid less for it, had Defendants not concealed the unauthorized emission control devices.

46.     Plaintiff, Steve Reeves (for the purpose of this paragraph, "Plaintiff"), a citizen of the State of Pennsylvania residing in the City of Kirkwood, bought a 2015 Dodge Ram 1500 EcoDiesel® (for the purpose of this paragraph, the "Subject Vehicle") on or about February 21, 2018, at Providence Auto, an authorized FCA dealer in Quaryville, Pennsylvania. Plaintiff decided to buy the Subject Vehicle based in part on FCA's representations that it was an "EcoDiesel" vehicle (i.e., reduced emissions and fuel efficient). Plaintiff recalls visiting the Ram website, on which the Subject Vehicles were represented as environmentally friendly, having low emissions and good fuel economy. Plaintiff also recalls seeing television commercials about the Subject

Vehicles. When Plaintiff went to Providence Auto to purchase the Subject Vehicle, the sales associate touted the Subject Vehicle's EcoDiesel® attributes, including its fuel economy and performance. These representations, along with the advertised fuel economy, were among the primary reasons Plaintiff chose the Subject Vehicle. At the time of purchase, Plaintiff did not know that the Subject Vehicle could perform as advertised only by emitting NOx at levels that are greater than advertised and above legal limits. Nor was Plaintiff aware that his/her Subject Vehicle was equipped with undisclosed and unauthorized emission control devices designed to cheat emission tests and to deceive consumers and regulators. Plaintiff would not have purchased the Subject Vehicle, or would have paid less for it, had he/she known that it did not comply with emission standards; that its emission treatment system was designed to de-activate during real-world driving conditions; and that it could not achieve the advertised towing power, performance, and/or fuel economy without cheating emission tests. Plaintiff has suffered a concrete injury as a direct and proximate result of Defendants' misconduct, and would not have purchased the Subject Vehicle, or would have paid less for it, had Defendants not concealed the unauthorized emission control devices.

47.     Plaintiffs, Andrew and Ashley Malburg (for the purpose of this paragraph, "Plaintiffs"), are citizens of the State of Michigan residing in the City of Grand Haven, bought a 2015 Jeep Grand Cherokee EcoDiesel® (for the purpose of this paragraph, the "Subject Vehicle") on or about April 30, 2016, at K and M, an authorized FCA dealer in Grand Rapids, Michigan. Plaintiffs decided to buy the Subject Vehicle based in part on FCA's representations that it was an "EcoDiesel" vehicle (i.e., reduced emissions and fuel efficient). Plaintiffs recall visiting the Jeep website, on which the Subject Vehicles were represented as environmentally friendly, having low emissions and good fuel economy. Plaintiffs also recall seeing television commercials about the

Subject Vehicles. When Plaintiffs went to K and M to purchase the Subject Vehicle, the sales associate touted the Subject Vehicle's EcoDiesel® attributes, including its fuel economy and performance. These representations, along with the advertised fuel economy, were among the primary reasons Plaintiffs chose the Subject Vehicle. At the time of purchase, Plaintiffs did not know that the Subject Vehicle could perform as advertised only by emitting NOx at levels that are greater than advertised and above legal limits. Nor were Plaintiffs aware that their Subject Vehicle was equipped with undisclosed and unauthorized emission control devices designed to cheat emission tests and to deceive consumers and regulators. Plaintiffs would not have purchased the Subject Vehicle, or would have paid less for it, had they known that it did not comply with emission standards; that its emission treatment system was designed to de-activate during real-world driving conditions; and that it could not achieve the advertised towing power, performance, and/or fuel economy without cheating emission tests. Plaintiffs have suffered a concrete injury as a direct and proximate result of Defendants' misconduct, and would not have purchased the Subject Vehicle, or would have paid less for it, had Defendants not concealed the unauthorized emission control devices.

48.     Plaintiffs, Andrew and Ashley Malburg (for the purpose of this paragraph, "Plaintiffs"), are citizens of the State of Michigan residing in the City of Grand Haven, bought a 2016 Dodge Ram 1500 EcoDiesel® (for the purpose of this paragraph, the "Subject Vehicle") on or about May 5, 2016, at K and M, an authorized FCA dealer in Grand Rapids. Plaintiffs decided to buy the Subject Vehicle based in part on FCA's representations that it was an "EcoDiesel" vehicle (i.e., reduced emissions and fuel efficient). Plaintiffs recall visiting the Ram website, on which the Subject Vehicles were represented as environmentally friendly, having low emissions and good fuel economy. Plaintiffs also recall seeing television commercials about the Subject

Vehicles. When Plaintiffs went to K and M to purchase the Subject Vehicle, the sales associate touted the Subject Vehicle's EcoDiesel® attributes, including its fuel economy and performance. These representations, along with the advertised fuel economy, were among the primary reasons Plaintiffs chose the Subject Vehicle. At the time of purchase, Plaintiffs did not know that the Subject Vehicle could perform as advertised only by emitting NOx at levels that are greater than advertised and above legal limits. Nor were Plaintiff aware that theirr Subject Vehicle was equipped with undisclosed and unauthorized emission control devices designed to cheat emission tests and to deceive consumers and regulators. Plaintiffs would not have purchased the Subject Vehicle, or would have paid less for it, had they known that it did not comply with emission standards; that its emission treatment system was designed to de-activate during real-world driving conditions; and that it could not achieve the advertised towing power, performance, and/or fuel economy without cheating emission tests. Plaintiffs have suffered a concrete injury as a direct and proximate result of Defendants' misconduct, and would not have purchased the Subject Vehicle, or would have paid less for it, had Defendants not concealed the unauthorized emission control devices.

49.     Plaintiff, Tom Sayers (for the purpose of this paragraph, "Plaintiff"), a citizen of the State of Utah residing in the City of Layton, bought a 2015 Dodge Ram 1500 EcoDiesel® (for the purpose of this paragraph, the "Subject Vehicle") on or about August 31, 2015, at Larry H Miller Chrysler Jeep Dodge Ram Sandy, an authorized FCA dealer in Sandy, Utah. Plaintiff decided to buy the Subject Vehicle based in part on FCA's representations that it was an "EcoDiesel" vehicle (i.e., reduced emissions and fuel efficient). Plaintiff recalls visiting the Ram website, on which the Subject Vehicles were represented as environmentally friendly, having low emissions and good fuel economy. Plaintiff also recalls seeing television commercials about the

Subject Vehicles. When Plaintiff went to Larry H Miller Chrysler Jeep Dodge Ram Sandy to purchase the Subject Vehicle, the sales associate touted the Subject Vehicle's EcoDiesel® attributes, including its fuel economy and performance. These representations, along with the advertised fuel economy, were among the primary reasons Plaintiff chose the Subject Vehicle. At the time of purchase, Plaintiff did not know that the Subject Vehicle could perform as advertised only by emitting NOx at levels that are greater than advertised and above legal limits. Nor was Plaintiff aware that his/her Subject Vehicle was equipped with undisclosed and unauthorized emission control devices designed to cheat emission tests and to deceive consumers and regulators. Plaintiff would not have purchased the Subject Vehicle, or would have paid less for it, had he/she known that it did not comply with emission standards; that its emission treatment system was designed to de-activate during real-world driving conditions; and that it could not achieve the advertised towing power, performance, and/or fuel economy without cheating emission tests. Plaintiff has suffered a concrete injury as a direct and proximate result of Defendants' misconduct, and would not have purchased the Subject Vehicle, or would have paid less for it, had Defendants not concealed the unauthorized emission control devices.

50. Plaintiff, Robert Richardson (for the purpose of this paragraph, "Plaintiff"), a citizen of the State of Washington residing in the City of Sammamish, bought a 2015 Jeep Grand Cherokee EcoDiesel® (for the purpose of this paragraph, the "Subject Vehicle") on or about April 21, 2018, at Lithia Ford of Boise, an authorized FCA dealer in Boise, Idaho. Plaintiff decided to buy the Subject Vehicle based in part on FCA's representations that it was an "EcoDiesel" vehicle (i.e., reduced emissions and fuel efficient). Plaintiff recalls visiting the Jeep website, on which the Subject Vehicles were represented as environmentally friendly, having low emissions and good fuel economy. Plaintiff also recalls seeing television commercials about the Subject Vehicles.

When Plaintiff went to Lithia Ford of Boise to purchase the Subject Vehicle, the sales associate touted the Subject Vehicle's EcoDiesel® attributes, including its fuel economy and performance. These representations, along with the advertised fuel economy, were among the primary reasons Plaintiff chose the Subject Vehicle. At the time of purchase, Plaintiff did not know that the Subject Vehicle could perform as advertised only by emitting NOx at levels that are greater than advertised and above legal limits. Nor was Plaintiff aware that his/her Subject Vehicle was equipped with undisclosed and unauthorized emission control devices designed to cheat emission tests and to deceive consumers and regulators. Plaintiff would not have purchased the Subject Vehicle, or would have paid less for it, had he/she known that it did not comply with emission standards; that its emission treatment system was designed to de-activate during real-world driving conditions; and that it could not achieve the advertised towing power, performance, and/or fuel economy without cheating emission tests. Plaintiff has suffered a concrete injury as a direct and proximate result of Defendants' misconduct, and would not have purchased the Subject Vehicle, or would have paid less for it, had Defendants not concealed the unauthorized emission control devices.

51.     Plaintiff, Israel Cantu (for the purpose of this paragraph, "Plaintiff"), a citizen of the State of Florida residing in the City of Hialeah, bought a 2015 Dodge Ram 1500 EcoDiesel® (for the purpose of this paragraph, the "Subject Vehicle") on or about March 13, 2018, at Planet Dodge, an authorized FCA dealer in Miami, Florida. Plaintiff decided to buy the Subject Vehicle based in part on FCA's representations that it was an "EcoDiesel" vehicle (i.e., reduced emissions and fuel efficient). Plaintiff recalls visiting the Ram website, on which the Subject Vehicles were represented as environmentally friendly, having low emissions and good fuel economy. Plaintiff also recalls seeing television commercials about the Subject Vehicles. When Plaintiff went to Planet Dodge to purchase the Subject Vehicle, the sales associate touted the Subject Vehicle's

EcoDiesel® attributes, including its fuel economy and performance. These representations, along with the advertised fuel economy, were among the primary reasons Plaintiff chose the Subject Vehicle. At the time of purchase, Plaintiff did not know that the Subject Vehicle could perform as advertised only by emitting NOx at levels that are greater than advertised and above legal limits. Nor was Plaintiff aware that his/her Subject Vehicle was equipped with undisclosed and unauthorized emission control devices designed to cheat emission tests and to deceive consumers and regulators. Plaintiff would not have purchased the Subject Vehicle, or would have paid less for it, had he/she known that it did not comply with emission standards; that its emission treatment system was designed to de-activate during real-world driving conditions; and that it could not achieve the advertised towing power, performance, and/or fuel economy without cheating emission tests. Plaintiff has suffered a concrete injury as a direct and proximate result of Defendants' misconduct, and would not have purchased the Subject Vehicle, or would have paid less for it, had Defendants not concealed the unauthorized emission control devices.

52.     Plaintiff, William Jones (for the purpose of this paragraph, "Plaintiff"), a citizen of the State of Colorado residing in the City of Pagosa Springs, bought a 2015 Jeep Grand Cherokee EcoDiesel® (for the purpose of this paragraph, the "Subject Vehicle") on or about September 1, 2015, at William Jones Spartanburg Chrysler Dodge Jeep Ram, an authorized FCA dealer in Spartanburg, South Carolina. Plaintiff decided to buy the Subject Vehicle based in part on FCA's representations that it was an "EcoDiesel" vehicle (i.e., reduced emissions and fuel efficient). Plaintiff recalls visiting the Jeep website, on which the Subject Vehicles were represented as environmentally friendly, having low emissions and good fuel economy. Plaintiff also recalls seeing television commercials about the Subject Vehicles. When Plaintiff went to William Jones Spartanburg Chrysler Dodge Jeep Ram to purchase the Subject Vehicle, the sales associate touted

34

the Subject Vehicle's EcoDiesel® attributes, including its fuel economy and performance. These representations, along with the advertised fuel economy, were among the primary reasons Plaintiff chose the Subject Vehicle. At the time of purchase, Plaintiff did not know that the Subject Vehicle could perform as advertised only by emitting NOx at levels that are greater than advertised and above legal limits. Nor was Plaintiff aware that his/her Subject Vehicle was equipped with undisclosed and unauthorized emission control devices designed to cheat emission tests and to deceive consumers and regulators. Plaintiff would not have purchased the Subject Vehicle, or would have paid less for it, had he/she known that it did not comply with emission standards; that its emission treatment system was designed to de-activate during real-world driving conditions; and that it could not achieve the advertised towing power, performance, and/or fuel economy without cheating emission tests. Plaintiff has suffered a concrete injury as a direct and proximate result of Defendants' misconduct, and would not have purchased the Subject Vehicle, or would have paid less for it, had Defendants not concealed the unauthorized emission control devices.

53.     Plaintiff, Tracena Colunga (for the purpose of this paragraph, "Plaintiff"), a citizen of the State of Texas residing in the City of Royse City, bought a 2015 Dodge Ram 1500 EcoDiesel® (for the purpose of this paragraph, the "Subject Vehicle") on or about November 1, 2016, at Greenville Chrysler, an authorized FCA dealer in Greenville, Texas. Plaintiff decided to buy the Subject Vehicle based in part on FCA's representations that it was an "EcoDiesel" vehicle (i.e., reduced emissions and fuel efficient). Plaintiff recalls visiting the Ram website, on which the Subject Vehicles were represented as environmentally friendly, having low emissions and good fuel economy. Plaintiff also recalls seeing television commercials about the Subject Vehicles. When Plaintiff went to Greenville Chrysler to purchase the Subject Vehicle, the sales associate touted the Subject Vehicle's EcoDiesel® attributes, including its fuel economy and performance.

These representations, along with the advertised fuel economy, were among the primary reasons Plaintiff chose the Subject Vehicle. At the time of purchase, Plaintiff did not know that the Subject Vehicle could perform as advertised only by emitting NOx at levels that are greater than advertised and above legal limits. Nor was Plaintiff aware that his/her Subject Vehicle was equipped with undisclosed and unauthorized emission control devices designed to cheat emission tests and to deceive consumers and regulators. Plaintiff would not have purchased the Subject Vehicle, or would have paid less for it, had he/she known that it did not comply with emission standards; that its emission treatment system was designed to de-activate during real-world driving conditions; and that it could not achieve the advertised towing power, performance, and/or fuel economy without cheating emission tests. Plaintiff has suffered a concrete injury as a direct and proximate result of Defendants' misconduct, and would not have purchased the Subject Vehicle, or would have paid less for it, had Defendants not concealed the unauthorized emission control devices.

54.    Plaintiff, Darryl Saucier (for the purpose of this paragraph, "Plaintiff"), a citizen of the State of Alabama residing in the City of Tallassee, bought a 2016 Dodge Ram 1500 EcoDiesel® (for the purpose of this paragraph, the "Subject Vehicle") on or about November 1, 2016, at Tallasee Automotive, an authorized FCA dealer in Tallasee Automotive. Plaintiff decided to buy the Subject Vehicle based in part on FCA's representations that it was an "EcoDiesel" vehicle (i.e., reduced emissions and fuel efficient). Plaintiff recalls visiting the Ram website, on which the Subject Vehicles were represented as environmentally friendly, having low emissions and good fuel economy. Plaintiff also recalls seeing television commercials about the Subject Vehicles. When Plaintiff went to Tallasee Automotive to purchase the Subject Vehicle, the sales associate touted the Subject Vehicle's EcoDiesel® attributes, including its fuel economy and performance. These representations, along with the advertised fuel economy, were among the

primary reasons Plaintiff chose the Subject Vehicle. At the time of purchase, Plaintiff did not know that the Subject Vehicle could perform as advertised only by emitting NOx at levels that are greater than advertised and above legal limits. Nor was Plaintiff aware that his/her Subject Vehicle was equipped with undisclosed and unauthorized emission control devices designed to cheat emission tests and to deceive consumers and regulators. Plaintiff would not have purchased the Subject Vehicle, or would have paid less for it, had he/she known that it did not comply with emission standards; that its emission treatment system was designed to de-activate during real-world driving conditions; and that it could not achieve the advertised towing power, performance, and/or fuel economy without cheating emission tests. Plaintiff has suffered a concrete injury as a direct and proximate result of Defendants' misconduct, and would not have purchased the Subject Vehicle, or would have paid less for it, had Defendants not concealed the unauthorized emission control devices.

55.     Plaintiff, Kile Matthew Lee O'Connor (for the purpose of this paragraph, "Plaintiff"), a citizen of the State of Michigan residing in the City of Attica, bought a 2014 Dodge Ram 1500 EcoDiesel® (for the purpose of this paragraph, the "Subject Vehicle") on or about October 13, 2018, at LaLonde Chrysler Dodge Jeep Ram, an authorized FCA dealer in Imlay City, Michigan. Plaintiff decided to buy the Subject Vehicle based in part on FCA's representations that it was an "EcoDiesel" vehicle (i.e., reduced emissions and fuel efficient). Plaintiff recalls visiting the Ram website, on which the Subject Vehicles were represented as environmentally friendly, having low emissions and good fuel economy. Plaintiff also recalls seeing television commercials about the Subject Vehicles. When Plaintiff went to LaLonde Chrysler Dodge Jeep Ram to purchase the Subject Vehicle, the sales associate touted the Subject Vehicle's EcoDiesel® attributes, including its fuel economy and performance. These representations, along with the advertised fuel

economy, were among the primary reasons Plaintiff chose the Subject Vehicle. At the time of purchase, Plaintiff did not know that the Subject Vehicle could perform as advertised only by emitting NOx at levels that are greater than advertised and above legal limits. Nor was Plaintiff aware that his/her Subject Vehicle was equipped with undisclosed and unauthorized emission control devices designed to cheat emission tests and to deceive consumers and regulators. Plaintiff would not have purchased the Subject Vehicle, or would have paid less for it, had he/she known that it did not comply with emission standards; that its emission treatment system was designed to de-activate during real-world driving conditions; and that it could not achieve the advertised towing power, performance, and/or fuel economy without cheating emission tests. Plaintiff has suffered a concrete injury as a direct and proximate result of Defendants' misconduct, and would not have purchased the Subject Vehicle, or would have paid less for it, had Defendants not concealed the unauthorized emission control devices.

56.     Plaintiff, Kyle Wingate Underhill (for the purpose of this paragraph, "Plaintiff"), a citizen of the State of North Carolina residing in the City of Greensboro, bought a 2014 Jeep Grand Cherokee EcoDiesel® (for the purpose of this paragraph, the "Subject Vehicle") on or about January 31, 2017, at Vista Buick GMC, an authorized FCA dealer in Kernersville, North Carolina. Plaintiff decided to buy the Subject Vehicle based in part on FCA's representations that it was an "EcoDiesel" vehicle (i.e., reduced emissions and fuel efficient). Plaintiff recalls visiting the Jeep website, on which the Subject Vehicles were represented as environmentally friendly, having low emissions and good fuel economy. Plaintiff also recalls seeing television commercials about the Subject Vehicles. When Plaintiff went to Kernersville, North Carolina to purchase the Subject Vehicle, the sales associate touted the Subject Vehicle's EcoDiesel® attributes, including its fuel economy and performance. These representations, along with the advertised fuel economy, were

among the primary reasons Plaintiff chose the Subject Vehicle. At the time of purchase, Plaintiff did not know that the Subject Vehicle could perform as advertised only by emitting NOx at levels that are greater than advertised and above legal limits. Nor was Plaintiff aware that his/her Subject Vehicle was equipped with undisclosed and unauthorized emission control devices designed to cheat emission tests and to deceive consumers and regulators. Plaintiff would not have purchased the Subject Vehicle, or would have paid less for it, had he/she known that it did not comply with emission standards; that its emission treatment system was designed to de-activate during real-world driving conditions; and that it could not achieve the advertised towing power, performance, and/or fuel economy without cheating emission tests. Plaintiff has suffered a concrete injury as a direct and proximate result of Defendants' misconduct, and would not have purchased the Subject Vehicle, or would have paid less for it, had Defendants not concealed the unauthorized emission control devices.

57.     Plaintiff, David McCauley (for the purpose of this paragraph, "Plaintiff"), a citizen of the State of Illinois residing in the City of Geneva, bought a 2015 Dodge Ram 1500 EcoDiesel® (for the purpose of this paragraph, the "Subject Vehicle") on or about August 1, 2018, at St. Charles Chrysler Dodge Jeep Ram, an authorized FCA dealer in St. Charles, Illinois. Plaintiff decided to buy the Subject Vehicle based in part on FCA's representations that it was an "EcoDiesel" vehicle (i.e., reduced emissions and fuel efficient). Plaintiff recalls visiting the Ram website, on which the Subject Vehicles were represented as environmentally friendly, having low emissions and good fuel economy. Plaintiff also recalls seeing television commercials about the Subject Vehicles. When Plaintiff went to St. Charles Chrysler Dodge Jeep Ram to purchase the Subject Vehicle, the sales associate touted the Subject Vehicle's EcoDiesel® attributes, including its fuel economy and performance. These representations, along with the advertised fuel economy, were among the

primary reasons Plaintiff chose the Subject Vehicle. At the time of purchase, Plaintiff did not know that the Subject Vehicle could perform as advertised only by emitting NOx at levels that are greater than advertised and above legal limits. Nor was Plaintiff aware that his/her Subject Vehicle was equipped with undisclosed and unauthorized emission control devices designed to cheat emission tests and to deceive consumers and regulators. Plaintiff would not have purchased the Subject Vehicle, or would have paid less for it, had he/she known that it did not comply with emission standards; that its emission treatment system was designed to de-activate during real-world driving conditions; and that it could not achieve the advertised towing power, performance, and/or fuel economy without cheating emission tests. Plaintiff has suffered a concrete injury as a direct and proximate result of Defendants' misconduct, and would not have purchased the Subject Vehicle, or would have paid less for it, had Defendants not concealed the unauthorized emission control devices.

58.     Plaintiff, Kevin Suhrie (for the purpose of this paragraph, "Plaintiff"), a citizen of the State of Pennsylvania residing in the City of Mercer, bought a 2015 Dodge Ram 1500 EcoDiesel® (for the purpose of this paragraph, the "Subject Vehicle") on or about May 17, 2015, at Vestal Buick GMC, an authorized FCA dealer in Kernersville, North Carolina. Plaintiff decided to buy the Subject Vehicle based in part on FCA's representations that it was an "EcoDiesel" vehicle (i.e., reduced emissions and fuel efficient). Plaintiff recalls visiting the Ram website, on which the Subject Vehicles were represented as environmentally friendly, having low emissions and good fuel economy. Plaintiff also recalls seeing television commercials about the Subject Vehicles. When Plaintiff went to Vestal Buick GMC to purchase the Subject Vehicle, the sales associate touted the Subject Vehicle's EcoDiesel® attributes, including its fuel economy and performance. These representations, along with the advertised fuel economy, were among the

primary reasons Plaintiff chose the Subject Vehicle. At the time of purchase, Plaintiff did not know that the Subject Vehicle could perform as advertised only by emitting NOx at levels that are greater than advertised and above legal limits. Nor was Plaintiff aware that his/her Subject Vehicle was equipped with undisclosed and unauthorized emission control devices designed to cheat emission tests and to deceive consumers and regulators. Plaintiff would not have purchased the Subject Vehicle, or would have paid less for it, had he/she known that it did not comply with emission standards; that its emission treatment system was designed to de-activate during real-world driving conditions; and that it could not achieve the advertised towing power, performance, and/or fuel economy without cheating emission tests. Plaintiff has suffered a concrete injury as a direct and proximate result of Defendants' misconduct, and would not have purchased the Subject Vehicle, or would have paid less for it, had Defendants not concealed the unauthorized emission control devices.

59.     Plaintiff, Carlos Garcia (for the purpose of this paragraph, "Plaintiff"), a citizen of the State of Kansas residing in the City of Hugoton, bought a 2014 Jeep Grand Cherokee EcoDiesel® (for the purpose of this paragraph, the "Subject Vehicle") on or about May 18, 2018, at Mountain Star Motors, an authorized FCA dealer in Aurora, Colorado. Plaintiff decided to buy the Subject Vehicle based in part on FCA's representations that it was an "EcoDiesel" vehicle (i.e., reduced emissions and fuel efficient). Plaintiff recalls visiting the Jeep website, on which the Subject Vehicles were represented as environmentally friendly, having low emissions and good fuel economy. Plaintiff also recalls seeing television commercials about the Subject Vehicles. When Plaintiff went to Mountain Star Motors to purchase the Subject Vehicle, the sales associate touted the Subject Vehicle's EcoDiesel® attributes, including its fuel economy and performance. These representations, along with the advertised fuel economy, were among the primary reasons

41

Plaintiff chose the Subject Vehicle. At the time of purchase, Plaintiff did not know that the Subject Vehicle could perform as advertised only by emitting NOx at levels that are greater than advertised and above legal limits. Nor was Plaintiff aware that his/her Subject Vehicle was equipped with undisclosed and unauthorized emission control devices designed to cheat emission tests and to deceive consumers and regulators. Plaintiff would not have purchased the Subject Vehicle, or would have paid less for it, had he/she known that it did not comply with emission standards; that its emission treatment system was designed to de-activate during real-world driving conditions; and that it could not achieve the advertised towing power, performance, and/or fuel economy without cheating emission tests. Plaintiff has suffered a concrete injury as a direct and proximate result of Defendants' misconduct, and would not have purchased the Subject Vehicle, or would have paid less for it, had Defendants not concealed the unauthorized emission control devices.

60.     Plaintiff, Jerry Nelson (for the purpose of this paragraph, "Plaintiff"), a citizen of the State of Michigan residing in the City of Grand Blanc, bought a 2014 Jeep Grand Cherokee EcoDiesel® (for the purpose of this paragraph, the "Subject Vehicle") on or about February 24, 2015, at Bergstrom Chrysler Jeep Dodge Ram FIAT of Kaukauna, an authorized FCA dealer in Kaukauna, Wisconsin. Plaintiff decided to buy the Subject Vehicle based in part on FCA's representations that it was an "EcoDiesel" vehicle (i.e., reduced emissions and fuel efficient). Plaintiff recalls visiting the Jeep website, on which the Subject Vehicles were represented as environmentally friendly, having low emissions and good fuel economy. Plaintiff also recalls seeing television commercials about the Subject Vehicles. When Plaintiff went to Bergstrom Chrysler Jeep Dodge Ram FIAT of Kaukauna to purchase the Subject Vehicle, the sales associate touted the Subject Vehicle's EcoDiesel® attributes, including its fuel economy and performance. These representations, along with the advertised fuel economy, were among the primary reasons

Plaintiff chose the Subject Vehicle. At the time of purchase, Plaintiff did not know that the Subject Vehicle could perform as advertised only by emitting NOx at levels that are greater than advertised and above legal limits. Nor was Plaintiff aware that his/her Subject Vehicle was equipped with undisclosed and unauthorized emission control devices designed to cheat emission tests and to deceive consumers and regulators. Plaintiff would not have purchased the Subject Vehicle, or would have paid less for it, had he/she known that it did not comply with emission standards; that its emission treatment system was designed to de-activate during real-world driving conditions; and that it could not achieve the advertised towing power, performance, and/or fuel economy without cheating emission tests. Plaintiff has suffered a concrete injury as a direct and proximate result of Defendants' misconduct, and would not have purchased the Subject Vehicle, or would have paid less for it, had Defendants not concealed the unauthorized emission control devices.

61.     Plaintiff, Rejean Fecteau (for the purpose of this paragraph, "Plaintiff"), a citizen of the State of Florida residing in the City of Fort Lauderdale, bought a 2016 Dodge Ram 1500 EcoDiesel® (for the purpose of this paragraph, the "Subject Vehicle") on or about May 4, 2016, at Atlantic Coast Automotive, an authorized FCA dealer in Davie, Florida. Plaintiff decided to buy the Subject Vehicle based in part on FCA's representations that it was an "EcoDiesel" vehicle (i.e., reduced emissions and fuel efficient). Plaintiff recalls visiting the Ram website, on which the Subject Vehicles were represented as environmentally friendly, having low emissions and good fuel economy. Plaintiff also recalls seeing television commercials about the Subject Vehicles. When Plaintiff went to Atlantic Coast Automotive to purchase the Subject Vehicle, the sales associate touted the Subject Vehicle's EcoDiesel® attributes, including its fuel economy and performance. These representations, along with the advertised fuel economy, were among the primary reasons Plaintiff chose the Subject Vehicle. At the time of purchase, Plaintiff did not know

that the Subject Vehicle could perform as advertised only by emitting NOx at levels that are greater than advertised and above legal limits. Nor was Plaintiff aware that his/her Subject Vehicle was equipped with undisclosed and unauthorized emission control devices designed to cheat emission tests and to deceive consumers and regulators. Plaintiff would not have purchased the Subject Vehicle, or would have paid less for it, had he/she known that it did not comply with emission standards; that its emission treatment system was designed to de-activate during real-world driving conditions; and that it could not achieve the advertised towing power, performance, and/or fuel economy without cheating emission tests. Plaintiff has suffered a concrete injury as a direct and proximate result of Defendants' misconduct, and would not have purchased the Subject Vehicle, or would have paid less for it, had Defendants not concealed the unauthorized emission control devices.

62.     Plaintiff, John Benjamin Fox (for the purpose of this paragraph, "Plaintiff"), a citizen of the State of Louisiana residing in the City of West Monroe, bought a 2014 Dodge Ram 1500 EcoDiesel® (for the purpose of this paragraph, the "Subject Vehicle") on or about December 28, 2017, at Car Town of Monroe, an authorized FCA dealer in Monroe, Louisiana. Plaintiff decided to buy the Subject Vehicle based in part on FCA's representations that it was an "EcoDiesel" vehicle (i.e., reduced emissions and fuel efficient). Plaintiff recalls visiting the Ram website, on which the Subject Vehicles were represented as environmentally friendly, having low emissions and good fuel economy. Plaintiff also recalls seeing television commercials about the Subject Vehicles. When Plaintiff went to Cart Town of Monroe to purchase the Subject Vehicle, the sales associate touted the Subject Vehicle's EcoDiesel® attributes, including its fuel economy and performance. These representations, along with the advertised fuel economy, were among the primary reasons Plaintiff chose the Subject Vehicle. At the time of purchase, Plaintiff did not know

that the Subject Vehicle could perform as advertised only by emitting NOx at levels that are greater than advertised and above legal limits. Nor was Plaintiff aware that his/her Subject Vehicle was equipped with undisclosed and unauthorized emission control devices designed to cheat emission tests and to deceive consumers and regulators. Plaintiff would not have purchased the Subject Vehicle, or would have paid less for it, had he/she known that it did not comply with emission standards; that its emission treatment system was designed to de-activate during real-world driving conditions; and that it could not achieve the advertised towing power, performance, and/or fuel economy without cheating emission tests. Plaintiff has suffered a concrete injury as a direct and proximate result of Defendants' misconduct, and would not have purchased the Subject Vehicle, or would have paid less for it, had Defendants not concealed the unauthorized emission control devices.

63.    Plaintiff, Sebastian Korzec (for the purpose of this paragraph, "Plaintiff"), a citizen of the State of New Jersey residing in the City of Bayonne, bought a 2015 Dodge Ram 1500 EcoDiesel® (for the purpose of this paragraph, the "Subject Vehicle") on or about June 20, 2015, at Healey Chrysler Dodge Jeep, LLC, an authorized FCA dealer in Beacon, New York. Plaintiff decided to buy the Subject Vehicle based in part on FCA's representations that it was an "EcoDiesel" vehicle (i.e., reduced emissions and fuel efficient). Plaintiff recalls visiting the Ram website, on which the Subject Vehicles were represented as environmentally friendly, having low emissions and good fuel economy. Plaintiff also recalls seeing television commercials about the Subject Vehicles. When Plaintiff went to Healey Chrysler Dodge Jeep, LLC to purchase the Subject Vehicle, the sales associate touted the Subject Vehicle's EcoDiesel® attributes, including its fuel economy and performance. These representations, along with the advertised fuel economy, were among the primary reasons Plaintiff chose the Subject Vehicle. At the time of purchase,

Plaintiff did not know that the Subject Vehicle could perform as advertised only by emitting NOx at levels that are greater than advertised and above legal limits. Nor was Plaintiff aware that his/her Subject Vehicle was equipped with undisclosed and unauthorized emission control devices designed to cheat emission tests and to deceive consumers and regulators. Plaintiff would not have purchased the Subject Vehicle, or would have paid less for it, had he/she known that it did not comply with emission standards; that its emission treatment system was designed to de-activate during real-world driving conditions; and that it could not achieve the advertised towing power, performance, and/or fuel economy without cheating emission tests. Plaintiff has suffered a concrete injury as a direct and proximate result of Defendants' misconduct, and would not have purchased the Subject Vehicle, or would have paid less for it, had Defendants not concealed the unauthorized emission control devices.

64.    Plaintiffs, Edwin and Carmen Rivera (for the purpose of this paragraph, "Plaintiffs"), are citizens of the State of Florida residing in the City of Loxahatchee, bought a 2015 Dodge Ram 1500 EcoDiesel® (for the purpose of this paragraph, the "Subject Vehicle") on or about April 15, 2016, at Arrigo Dodge, an authorized FCA dealer in West Palm Beach, Florida. Plaintiffs decided to buy the Subject Vehicle based in part on FCA's representations that it was an "EcoDiesel" vehicle (i.e., reduced emissions and fuel efficient). Plaintiffs recall visiting the Ram website, on which the Subject Vehicles were represented as environmentally friendly, having low emissions and good fuel economy. Plaintiffs also recall seeing television commercials about the Subject Vehicles. When Plaintiffs went to Arrigo Dodge to purchase the Subject Vehicle, the sales associate touted the Subject Vehicle's EcoDiesel® attributes, including its fuel economy and performance. These representations, along with the advertised fuel economy, were among the primary reasons Plaintiffs chose the Subject Vehicle. At the time of purchase, Plaintiffs did not

know that the Subject Vehicle could perform as advertised only by emitting NOx at levels that are greater than advertised and above legal limits. Nor were Plaintiffs aware that their Subject Vehicle was equipped with undisclosed and unauthorized emission control devices designed to cheat emission tests and to deceive consumers and regulators. Plaintiffs would not have purchased the Subject Vehicle, or would have paid less for it, had they known that it did not comply with emission standards; that its emission treatment system was designed to de-activate during real-world driving conditions; and that it could not achieve the advertised towing power, performance, and/or fuel economy without cheating emission tests. Plaintiffs have suffered a concrete injury as a direct and proximate result of Defendants' misconduct, and would not have purchased the Subject Vehicle, or would have paid less for it, had Defendants not concealed the unauthorized emission control devices.

65.     Plaintiff, Jeff Simmonds (for the purpose of this paragraph, "Plaintiff"), a citizen of the State of Arizona residing in the City of Lake Havasu City, bought a 2015 Ddoge Ram 1500 EcoDiesel® (for the purpose of this paragraph, the "Subject Vehicle") on or about March 15, 2018, at Andetson Chrysler/Dodge, an authorized FCA dealer in Lake Havaso, Arizona. Plaintiff decided to buy the Subject Vehicle based in part on FCA's representations that it was an "EcoDiesel" vehicle (i.e., reduced emissions and fuel efficient). Plaintiff recalls visiting the Ram website, on which the Subject Vehicles were represented as environmentally friendly, having low emissions and good fuel economy. Plaintiff also recalls seeing television commercials about the Subject Vehicles. When Plaintiff went to Andetson Chrysler/Dodge to purchase the Subject Vehicle, the sales associate touted the Subject Vehicle's EcoDiesel® attributes, including its fuel economy and performance. These representations, along with the advertised fuel economy, were among the primary reasons Plaintiff chose the Subject Vehicle. At the time of purchase, Plaintiff did not know

that the Subject Vehicle could perform as advertised only by emitting NOx at levels that are greater than advertised and above legal limits. Nor was Plaintiff aware that his/her Subject Vehicle was equipped with undisclosed and unauthorized emission control devices designed to cheat emission tests and to deceive consumers and regulators. Plaintiff would not have purchased the Subject Vehicle, or would have paid less for it, had he/she known that it did not comply with emission standards; that its emission treatment system was designed to de-activate during real-world driving conditions; and that it could not achieve the advertised towing power, performance, and/or fuel economy without cheating emission tests. Plaintiff has suffered a concrete injury as a direct and proximate result of Defendants' misconduct, and would not have purchased the Subject Vehicle, or would have paid less for it, had Defendants not concealed the unauthorized emission control devices.

66.     Plaintiff, Matthew Cole (for the purpose of this paragraph, "Plaintiff"), a citizen of the State of Alabama residing in the City of Athens, bought a 2014 Dodge Ram 1500 EcoDiesel® (for the purpose of this paragraph, the "Subject Vehicle") on or about November 19, 2014, at University Chrysler Dodge Jeep Ram of Florence, an authorized FCA dealer in Florence, Alabama. Plaintiff decided to buy the Subject Vehicle based in part on FCA's representations that it was an "EcoDiesel" vehicle (i.e., reduced emissions and fuel efficient). Plaintiff recalls visiting the Ram website, on which the Subject Vehicles were represented as environmentally friendly, having low emissions and good fuel economy. Plaintiff also recalls seeing television commercials about the Subject Vehicles. When Plaintiff went to University Chrysler Dodge Jeep Ram of Florence to purchase the Subject Vehicle, the sales associate touted the Subject Vehicle's EcoDiesel® attributes, including its fuel economy and performance. These representations, along with the advertised fuel economy, were among the primary reasons Plaintiff chose the Subject Vehicle. At

the time of purchase, Plaintiff did not know that the Subject Vehicle could perform as advertised only by emitting NOx at levels that are greater than advertised and above legal limits. Nor was Plaintiff aware that his/her Subject Vehicle was equipped with undisclosed and unauthorized emission control devices designed to cheat emission tests and to deceive consumers and regulators. Plaintiff would not have purchased the Subject Vehicle, or would have paid less for it, had he/she known that it did not comply with emission standards; that its emission treatment system was designed to de-activate during real-world driving conditions; and that it could not achieve the advertised towing power, performance, and/or fuel economy without cheating emission tests. Plaintiff has suffered a concrete injury as a direct and proximate result of Defendants' misconduct, and would not have purchased the Subject Vehicle, or would have paid less for it, had Defendants not concealed the unauthorized emission control devices.

67.    Plaintiff, Milburn Markle (for the purpose of this paragraph, "Plaintiff"), a citizen of the State of Colorado residing in the City of Craig, bought a 2014 Dodge Ram 1500 EcoDiesel® (for the purpose of this paragraph, the "Subject Vehicle") on or about June 1, 2014, at Victory Motors of Craig, Inc., an authorized FCA dealer in Craig, Colorado. Plaintiff decided to buy the Subject Vehicle based in part on FCA's representations that it was an "EcoDiesel" vehicle (i.e., reduced emissions and fuel efficient). Plaintiff recalls visiting the Ram website, on which the Subject Vehicles were represented as environmentally friendly, having low emissions and good fuel economy. Plaintiff also recalls seeing television commercials about the Subject Vehicles. When Plaintiff went to Victory Motors of Craig, Inc. to purchase the Subject Vehicle, the sales associate touted the Subject Vehicle's EcoDiesel® attributes, including its fuel economy and performance. These representations, along with the advertised fuel economy, were among the primary reasons Plaintiff chose the Subject Vehicle. At the time of purchase, Plaintiff did not know

that the Subject Vehicle could perform as advertised only by emitting NOx at levels that are greater than advertised and above legal limits. Nor was Plaintiff aware that his/her Subject Vehicle was equipped with undisclosed and unauthorized emission control devices designed to cheat emission tests and to deceive consumers and regulators. Plaintiff would not have purchased the Subject Vehicle, or would have paid less for it, had he/she known that it did not comply with emission standards; that its emission treatment system was designed to de-activate during real-world driving conditions; and that it could not achieve the advertised towing power, performance, and/or fuel economy without cheating emission tests. Plaintiff has suffered a concrete injury as a direct and proximate result of Defendants' misconduct, and would not have purchased the Subject Vehicle, or would have paid less for it, had Defendants not concealed the unauthorized emission control devices.

68.    Plaintiffs, Alton Young and Kim Daigle (for the purpose of this paragraph, "Plaintiffs"), are citizens of the State of Louisiana residing in the City of Sulphur, bought a 2015 Dodge Ram 1500 EcoDiesel® (for the purpose of this paragraph, the "Subject Vehicle") on or about October 1, 2016, at Go Autoplex, an authorized FCA dealer in Sulphur, Louisiana. Plaintiffs decided to buy the Subject Vehicle based in part on FCA's representations that it was an "EcoDiesel" vehicle (i.e., reduced emissions and fuel efficient). Plaintiffs recall visiting the Ram website, on which the Subject Vehicles were represented as environmentally friendly, having low emissions and good fuel economy. Plaintiffs also recall seeing television commercials about the Subject Vehicles. When Plaintiffs went to Go Autoplex to purchase the Subject Vehicle, the sales associate touted the Subject Vehicle's EcoDiesel® attributes, including its fuel economy and performance. These representations, along with the advertised fuel economy, were among the primary reasons Plaintiffs chose the Subject Vehicle. At the time of purchase, Plaintiffs did not

know that the Subject Vehicle could perform as advertised only by emitting NOx at levels that are greater than advertised and above legal limits. Nor were Plaintiffs aware that their Subject Vehicle was equipped with undisclosed and unauthorized emission control devices designed to cheat emission tests and to deceive consumers and regulators. Plaintiffs would not have purchased the Subject Vehicle, or would have paid less for it, had they known that it did not comply with emission standards; that its emission treatment system was designed to de-activate during real-world driving conditions; and that it could not achieve the advertised towing power, performance, and/or fuel economy without cheating emission tests. Plaintiffs have suffered a concrete injury as a direct and proximate result of Defendants' misconduct, and would not have purchased the Subject Vehicle, or would have paid less for it, had Defendants not concealed the unauthorized emission control devices.

69.    Plaintiffs, Heinz and Eleonore Daub (for the purpose of this paragraph, "Plaintiffs"), are citizens of the State of Wisconsin residing in the City of Neillsville, bought a 2015 Dodge Ram 1500 EcoDiesel® (for the purpose of this paragraph, the "Subject Vehicle") on or about April 27, 2015, at Chilson Auto, an authorized FCA dealer in Chippewa Falls, Wisconsin. Plaintiffs decided to buy the Subject Vehicle based in part on FCA's representations that it was an "EcoDiesel" vehicle (i.e., reduced emissions and fuel efficient). Plaintiffs recall visiting the Ram website, on which the Subject Vehicles were represented as environmentally friendly, having low emissions and good fuel economy. Plaintiffs also recall seeing television commercials about the Subject Vehicles. When Plaintiffs went to Chilson Auto to purchase the Subject Vehicle, the sales associate touted the Subject Vehicle's EcoDiesel® attributes, including its fuel economy and performance. These representations, along with the advertised fuel economy, were among the primary reasons Plaintiffs chose the Subject Vehicle. At the time of purchase, Plaintiffs did not

know that the Subject Vehicle could perform as advertised only by emitting NOx at levels that are greater than advertised and above legal limits. Nor were Plaintiffs aware that their Subject Vehicle was equipped with undisclosed and unauthorized emission control devices designed to cheat emission tests and to deceive consumers and regulators. Plaintiffs would not have purchased the Subject Vehicle, or would have paid less for it, had they known that it did not comply with emission standards; that its emission treatment system was designed to de-activate during real-world driving conditions; and that it could not achieve the advertised towing power, performance, and/or fuel economy without cheating emission tests. Plaintiff have suffered a concrete injury as a direct and proximate result of Defendants' misconduct, and would not have purchased the Subject Vehicle, or would have paid less for it, had Defendants not concealed the unauthorized emission control devices.

70.     Plaintiffs, Joshua and Amanda Trepl (for the purpose of this paragraph, "Plaintiffs"), are citizens of the State of Minnesota residing in the City of Brainerd, bought a 2015 Dodge Ram 1500 EcoDiesel® (for the purpose of this paragraph, the "Subject Vehicle") on or about January 7, 2017, at Lithia Chrysler Jeep Dodge of Grand Forks, an authorized FCA dealer in Grand Forks, North Dakota. Plaintiffs decided to buy the Subject Vehicle based in part on FCA's representations that it was an "EcoDiesel" vehicle (i.e., reduced emissions and fuel efficient). Plaintiffs recall visiting the Ram website, on which the Subject Vehicles were represented as environmentally friendly, having low emissions and good fuel economy. Plaintiffs also recalls seeing television commercials about the Subject Vehicles. When Plaintiffs went to Lithia Chrysler Jeep Dodge of Grand Forks to purchase the Subject Vehicle, the sales associate touted the Subject Vehicle's EcoDiesel® attributes, including its fuel economy and performance. These representations, along with the advertised fuel economy, were among the primary reasons

Plaintiffs chose the Subject Vehicle. At the time of purchase, Plaintiffs did not know that the Subject Vehicle could perform as advertised only by emitting NOx at levels that are greater than advertised and above legal limits. Nor were Plaintiff aware that their Subject Vehicle was equipped with undisclosed and unauthorized emission control devices designed to cheat emission tests and to deceive consumers and regulators. Plaintiffs would not have purchased the Subject Vehicle, or would have paid less for it, had they known that it did not comply with emission standards; that its emission treatment system was designed to de-activate during real-world driving conditions; and that it could not achieve the advertised towing power, performance, and/or fuel economy without cheating emission tests. Plaintiffs have suffered a concrete injury as a direct and proximate result of Defendants' misconduct, and would not have purchased the Subject Vehicle, or would have paid less for it, had Defendants not concealed the unauthorized emission control devices.

71.     Plaintiffs, Jason and Kristin Skoland (for the purpose of this paragraph, "Plaintiffs"), are citizens of the State of Iowa residing in the City of Clemons, bought a 2015 Dodge Ram 1500 EcoDiesel® (for the purpose of this paragraph, the "Subject Vehicle") on or about March 22, 2016, at Granger Motors, an authorized FCA dealer in Granger, Iowa. Plaintiffs decided to buy the Subject Vehicle based in part on FCA's representations that it was an "EcoDiesel" vehicle (i.e., reduced emissions and fuel efficient). Plaintiffs recall visiting the Ram website, on which the Subject Vehicles were represented as environmentally friendly, having low emissions and good fuel economy. Plaintiffs also recall seeing television commercials about the Subject Vehicles. When Plaintiffs went to Granger Motors to purchase the Subject Vehicle, the sales associate touted the Subject Vehicle's EcoDiesel® attributes, including its fuel economy and performance. These representations, along with the advertised fuel economy, were among the primary reasons Plaintiffs chose the Subject Vehicle. At the time of purchase, Plaintiffs did not

know that the Subject Vehicle could perform as advertised only by emitting NOx at levels that are greater than advertised and above legal limits. Nor were Plaintiffs aware that their Subject Vehicle was equipped with undisclosed and unauthorized emission control devices designed to cheat emission tests and to deceive consumers and regulators. Plaintiffs would not have purchased the Subject Vehicle, or would have paid less for it, had they known that it did not comply with emission standards; that its emission treatment system was designed to de-activate during real-world driving conditions; and that it could not achieve the advertised towing power, performance, and/or fuel economy without cheating emission tests. Plaintiffs have suffered a concrete injury as a direct and proximate result of Defendants' misconduct, and would not have purchased the Subject Vehicle, or would have paid less for it, had Defendants not concealed the unauthorized emission control devices.

72.     Plaintiff, Brian Lencho (for the purpose of this paragraph, "Plaintiff"), a citizen of the State of Washington residing in the City of Bothell, bought a 2016 Dodge Ram 1500 EcoDiesel® (for the purpose of this paragraph, the "Subject Vehicle") on or about November 25, 2016, at Karmart, an authorized FCA dealer in Burlington, Washington. Plaintiff decided to buy the Subject Vehicle based in part on FCA's representations that it was an "EcoDiesel" vehicle (i.e., reduced emissions and fuel efficient). Plaintiff recalls visiting the Ram website, on which the Subject Vehicles were represented as environmentally friendly, having low emissions and good fuel economy. Plaintiff also recalls seeing television commercials about the Subject Vehicles. When Plaintiff went to Karmart to purchase the Subject Vehicle, the sales associate touted the Subject Vehicle's EcoDiesel® attributes, including its fuel economy and performance. These representations, along with the advertised fuel economy, were among the primary reasons Plaintiff chose the Subject Vehicle. At the time of purchase, Plaintiff did not know that the Subject Vehicle

could perform as advertised only by emitting NOx at levels that are greater than advertised and above legal limits. Nor was Plaintiff aware that his/her Subject Vehicle was equipped with undisclosed and unauthorized emission control devices designed to cheat emission tests and to deceive consumers and regulators. Plaintiff would not have purchased the Subject Vehicle, or would have paid less for it, had he/she known that it did not comply with emission standards; that its emission treatment system was designed to de-activate during real-world driving conditions; and that it could not achieve the advertised towing power, performance, and/or fuel economy without cheating emission tests. Plaintiff has suffered a concrete injury as a direct and proximate result of Defendants' misconduct, and would not have purchased the Subject Vehicle, or would have paid less for it, had Defendants not concealed the unauthorized emission control devices.

73.     Plaintiff, Angela Graham (for the purpose of this paragraph, "Plaintiff"), a citizen of the State of West Virginia residing in the City of Peterstown, bought a 2016 Dodge Ram 1500 EcoDiesel® (for the purpose of this paragraph, the "Subject Vehicle") on or about April 7, 2018, at Ramey Auto Group, an authorized FCA dealer in Princeton, West Virginia. Plaintiff decided to buy the Subject Vehicle based in part on FCA's representations that it was an "EcoDiesel" vehicle (i.e., reduced emissions and fuel efficient). Plaintiff recalls visiting the Ram website, on which the Subject Vehicles were represented as environmentally friendly, having low emissions and good fuel economy. Plaintiff also recalls seeing television commercials about the Subject Vehicles. When Plaintiff went to Ramey Auto Group to purchase the Subject Vehicle, the sales associate touted the Subject Vehicle's EcoDiesel® attributes, including its fuel economy and performance. These representations, along with the advertised fuel economy, were among the primary reasons Plaintiff chose the Subject Vehicle. At the time of purchase, Plaintiff did not know that the Subject Vehicle could perform as advertised only by emitting NOx at levels that are greater than advertised

and above legal limits. Nor was Plaintiff aware that his/her Subject Vehicle was equipped with undisclosed and unauthorized emission control devices designed to cheat emission tests and to deceive consumers and regulators. Plaintiff would not have purchased the Subject Vehicle, or would have paid less for it, had he/she known that it did not comply with emission standards; that its emission treatment system was designed to de-activate during real-world driving conditions; and that it could not achieve the advertised towing power, performance, and/or fuel economy without cheating emission tests. Plaintiff has suffered a concrete injury as a direct and proximate result of Defendants' misconduct, and would not have purchased the Subject Vehicle, or would have paid less for it, had Defendants not concealed the unauthorized emission control devices.

74.     Plaintiff, Steven Avery (for the purpose of this paragraph, "Plaintiff"), a citizen of the State of Texas residing in the City of Plano, bought a 2014 Dodge Ram 1500 EcoDiesel® (for the purpose of this paragraph, the "Subject Vehicle") on or about June 14, 2014, at Chrysler Jeep Dodge City of McKinney, an authorized FCA dealer in McKinney, Texas. Plaintiff decided to buy the Subject Vehicle based in part on FCA's representations that it was an "EcoDiesel" vehicle (i.e., reduced emissions and fuel efficient). Plaintiff recalls visiting the Ram website, on which the Subject Vehicles were represented as environmentally friendly, having low emissions and good fuel economy. Plaintiff also recalls seeing television commercials about the Subject Vehicles. When Plaintiff went to Chrysler Jeep Dodge City of McKinney to purchase the Subject Vehicle, the sales associate touted the Subject Vehicle's EcoDiesel® attributes, including its fuel economy and performance. These representations, along with the advertised fuel economy, were among the primary reasons Plaintiff chose the Subject Vehicle. At the time of purchase, Plaintiff did not know that the Subject Vehicle could perform as advertised only by emitting NOx at levels that are greater than advertised and above legal limits. Nor was Plaintiff aware that his/her Subject Vehicle was

equipped with undisclosed and unauthorized emission control devices designed to cheat emission tests and to deceive consumers and regulators. Plaintiff would not have purchased the Subject Vehicle, or would have paid less for it, had he/she known that it did not comply with emission standards; that its emission treatment system was designed to de-activate during real-world driving conditions; and that it could not achieve the advertised towing power, performance, and/or fuel economy without cheating emission tests. Plaintiff has suffered a concrete injury as a direct and proximate result of Defendants' misconduct, and would not have purchased the Subject Vehicle, or would have paid less for it, had Defendants not concealed the unauthorized emission control devices.

75.     Plaintiff, Steve Rosenthal (for the purpose of this paragraph, "Plaintiff"), a citizen of the State of Wisconsin residing in the City of Kenosha, bought a 2016 Dodge Ram 1500 EcoDiesel® (for the purpose of this paragraph, the "Subject Vehicle") on or about July 5, 2018, at Auto Villa Custom Trucks, an authorized FCA dealer in McHenry, Illinois. Plaintiff decided to buy the Subject Vehicle based in part on FCA's representations that it was an "EcoDiesel" vehicle (i.e., reduced emissions and fuel efficient). Plaintiff recalls visiting the Ram website, on which the Subject Vehicles were represented as environmentally friendly, having low emissions and good fuel economy. Plaintiff also recalls seeing television commercials about the Subject Vehicles. When Plaintiff went to Auto Villa Custom Trucks to purchase the Subject Vehicle, the sales associate touted the Subject Vehicle's EcoDiesel® attributes, including its fuel economy and performance. These representations, along with the advertised fuel economy, were among the primary reasons Plaintiff chose the Subject Vehicle. At the time of purchase, Plaintiff did not know that the Subject Vehicle could perform as advertised only by emitting NOx at levels that are greater than advertised and above legal limits. Nor was Plaintiff aware that his/her Subject Vehicle was

equipped with undisclosed and unauthorized emission control devices designed to cheat emission tests and to deceive consumers and regulators. Plaintiff would not have purchased the Subject Vehicle, or would have paid less for it, had he/she known that it did not comply with emission standards; that its emission treatment system was designed to de-activate during real-world driving conditions; and that it could not achieve the advertised towing power, performance, and/or fuel economy without cheating emission tests. Plaintiff has suffered a concrete injury as a direct and proximate result of Defendants' misconduct, and would not have purchased the Subject Vehicle, or would have paid less for it, had Defendants not concealed the unauthorized emission control devices.

76.    Plaintiff, Brian Rohig DBA Rohig Farms LLC (for the purpose of this paragraph, "Plaintiff"), a citizen of the State of Iowa residing in the City of Orient, bought a 2015 Dodge Ram 1500 EcoDiesel® (for the purpose of this paragraph, the "Subject Vehicle") on or about October 10, 2017, at Woodhouse Auto Family, an authorized FCA dealer in Missouri Valley, Iowa. Plaintiff decided to buy the Subject Vehicle based in part on FCA's representations that it was an "EcoDiesel" vehicle (i.e., reduced emissions and fuel efficient). Plaintiff recalls visiting the Ram website, on which the Subject Vehicles were represented as environmentally friendly, having low emissions and good fuel economy. Plaintiff also recalls seeing television commercials about the Subject Vehicles. When Plaintiff went to Woodhouse Auto Family to purchase the Subject Vehicle, the sales associate touted the Subject Vehicle's EcoDiesel® attributes, including its fuel economy and performance. These representations, along with the advertised fuel economy, were among the primary reasons Plaintiff chose the Subject Vehicle. At the time of purchase, Plaintiff did not know that the Subject Vehicle could perform as advertised only by emitting NOx at levels that are greater than advertised and above legal limits. Nor was Plaintiff aware that his/her Subject

Vehicle was equipped with undisclosed and unauthorized emission control devices designed to cheat emission tests and to deceive consumers and regulators. Plaintiff would not have purchased the Subject Vehicle, or would have paid less for it, had he/she known that it did not comply with emission standards; that its emission treatment system was designed to de-activate during real-world driving conditions; and that it could not achieve the advertised towing power, performance, and/or fuel economy without cheating emission tests. Plaintiff has suffered a concrete injury as a direct and proximate result of Defendants' misconduct, and would not have purchased the Subject Vehicle, or would have paid less for it, had Defendants not concealed the unauthorized emission control devices.

77.     Plaintiff, Randy Crawford (for the purpose of this paragraph, "Plaintiff"), a citizen of the State of New York residing in the City of Salamanca, bought a 2014 Dodge Ram 1500 EcoDiesel® (for the purpose of this paragraph, the "Subject Vehicle") on or about November 10, 2014, at Emerling Chrysler Dodge Jeep Ram, an authorized FCA dealer in Springville, New York. Plaintiff decided to buy the Subject Vehicle based in part on FCA's representations that it was an "EcoDiesel" vehicle (i.e., reduced emissions and fuel efficient). Plaintiff recalls visiting the Ram website, on which the Subject Vehicles were represented as environmentally friendly, having low emissions and good fuel economy. Plaintiff also recalls seeing television commercials about the Subject Vehicles. When Plaintiff went to Emerling Chrysler Dodge Jeep Ram to purchase the Subject Vehicle, the sales associate touted the Subject Vehicle's EcoDiesel® attributes, including its fuel economy and performance. These representations, along with the advertised fuel economy, were among the primary reasons Plaintiff chose the Subject Vehicle. At the time of purchase, Plaintiff did not know that the Subject Vehicle could perform as advertised only by emitting NOx at levels that are greater than advertised and above legal limits. Nor was Plaintiff aware that his/her

Subject Vehicle was equipped with undisclosed and unauthorized emission control devices designed to cheat emission tests and to deceive consumers and regulators. Plaintiff would not have purchased the Subject Vehicle, or would have paid less for it, had he/she known that it did not comply with emission standards; that its emission treatment system was designed to de-activate during real-world driving conditions; and that it could not achieve the advertised towing power, performance, and/or fuel economy without cheating emission tests. Plaintiff has suffered a concrete injury as a direct and proximate result of Defendants' misconduct, and would not have purchased the Subject Vehicle, or would have paid less for it, had Defendants not concealed the unauthorized emission control devices.

78.     Plaintiff, Nicholas DeJohn (for the purpose of this paragraph, "Plaintiff"), a citizen of the State of Virginia residing in the City of Berryville, bought a 2015 Dodge Ram 1500 EcoDiesel® (for the purpose of this paragraph, the "Subject Vehicle") on or about July 1, 2015, at Miller's Chrysler Dodge Jeep Ram, an authorized FCA dealer in Martinsburg, West Virginia. Plaintiff decided to buy the Subject Vehicle based in part on FCA's representations that it was an "EcoDiesel" vehicle (i.e., reduced emissions and fuel efficient). Plaintiff recalls visiting the Ram website, on which the Subject Vehicles were represented as environmentally friendly, having low emissions and good fuel economy. Plaintiff also recalls seeing television commercials about the Subject Vehicles. When Plaintiff went to Miller's Chrysler Dodge Jeep Ram to purchase the Subject Vehicle, the sales associate touted the Subject Vehicle's EcoDiesel® attributes, including its fuel economy and performance. These representations, along with the advertised fuel economy, were among the primary reasons Plaintiff chose the Subject Vehicle. At the time of purchase, Plaintiff did not know that the Subject Vehicle could perform as advertised only by emitting NOx at levels that are greater than advertised and above legal limits. Nor was Plaintiff aware that his/her

Subject Vehicle was equipped with undisclosed and unauthorized emission control devices designed to cheat emission tests and to deceive consumers and regulators. Plaintiff would not have purchased the Subject Vehicle, or would have paid less for it, had he/she known that it did not comply with emission standards; that its emission treatment system was designed to de-activate during real-world driving conditions; and that it could not achieve the advertised towing power, performance, and/or fuel economy without cheating emission tests. Plaintiff has suffered a concrete injury as a direct and proximate result of Defendants' misconduct, and would not have purchased the Subject Vehicle, or would have paid less for it, had Defendants not concealed the unauthorized emission control devices.

79.     Plaintiff, Robin Simmons (for the purpose of this paragraph, "Plaintiff"), a citizen of the State of Alabama residing in the City of Mobile, bought a 2014 Dodge Ram 1500 EcoDiesel® (for the purpose of this paragraph, the "Subject Vehicle") on or about February 9, 2018, at Crown Dodge Chrysler Inc., an authorized FCA dealer in Pascagoula, Mississippi. Plaintiff decided to buy the Subject Vehicle based in part on FCA's representations that it was an "EcoDiesel" vehicle (i.e., reduced emissions and fuel efficient). Plaintiff recalls visiting the Ram website, on which the Subject Vehicles were represented as environmentally friendly, having low emissions and good fuel economy. Plaintiff also recalls seeing television commercials about the Subject Vehicles. When Plaintiff went to Crown Dodge Chrysler Inc. to purchase the Subject Vehicle, the sales associate touted the Subject Vehicle's EcoDiesel® attributes, including its fuel economy and performance. These representations, along with the advertised fuel economy, were among the primary reasons Plaintiff chose the Subject Vehicle. At the time of purchase, Plaintiff did not know that the Subject Vehicle could perform as advertised only by emitting NOx at levels that are greater than advertised and above legal limits. Nor was Plaintiff aware that his/her Subject

Vehicle was equipped with undisclosed and unauthorized emission control devices designed to cheat emission tests and to deceive consumers and regulators. Plaintiff would not have purchased the Subject Vehicle, or would have paid less for it, had he/she known that it did not comply with emission standards; that its emission treatment system was designed to de-activate during real-world driving conditions; and that it could not achieve the advertised towing power, performance, and/or fuel economy without cheating emission tests. Plaintiff has suffered a concrete injury as a direct and proximate result of Defendants' misconduct, and would not have purchased the Subject Vehicle, or would have paid less for it, had Defendants not concealed the unauthorized emission control devices.

80.     Plaintiff, Chase Mintrone (for the purpose of this paragraph, "Plaintiff"), a citizen of the State of Florida residing in the City of Saint Cloud, bought a 2015 Dodge Ram 1500 EcoDiesel® (for the purpose of this paragraph, the "Subject Vehicle") on or about December 26, 2017, from an individual in Harmony, Florida. Plaintiff decided to buy the Subject Vehicle based in part on FCA's representations that it was an "EcoDiesel" vehicle (i.e., reduced emissions and fuel efficient). Plaintiff recalls visiting the Ram website, on which the Subject Vehicles were represented as environmentally friendly, having low emissions and good fuel economy. Plaintiff also recalls seeing television commercials about the Subject Vehicles. When Plaintiff went to purchase the Subject Vehicle, the individual touted the Subject Vehicle's EcoDiesel® attributes, including its fuel economy and performance. These representations, along with the advertised fuel economy, were among the primary reasons Plaintiff chose the Subject Vehicle. At the time of purchase, Plaintiff did not know that the Subject Vehicle could perform as advertised only by emitting NOx at levels that are greater than advertised and above legal limits. Nor was Plaintiff aware that his/her Subject Vehicle was equipped with undisclosed and unauthorized emission

control devices designed to cheat emission tests and to deceive consumers and regulators. Plaintiff would not have purchased the Subject Vehicle, or would have paid less for it, had he/she known that it did not comply with emission standards; that its emission treatment system was designed to de-activate during real-world driving conditions; and that it could not achieve the advertised towing power, performance, and/or fuel economy without cheating emission tests. Plaintiff has suffered a concrete injury as a direct and proximate result of Defendants' misconduct, and would not have purchased the Subject Vehicle, or would have paid less for it, had Defendants not concealed the unauthorized emission control devices.

81. Plaintiffs, Robert  and Cheryl Boyd (for the purpose of this paragraph, "Plaintiffs"), are citizens of the State of West Virginia residing in the City of Wheeling, bought a 2015 Dodge Ram 1500 EcoDiesel® (for the purpose of this paragraph, the "Subject Vehicle") on or about July 9, 2018, at Bobby Rahal Motorcar Company, an authorized FCA dealer in Wexford, Pennsylvania. Plaintiffs decided to buy the Subject Vehicle based in part on FCA's representations that it was an "EcoDiesel" vehicle (i.e., reduced emissions and fuel efficient). Plaintiffs recall visiting the Ram website, on which the Subject Vehicles were represented as environmentally friendly, having low emissions and good fuel economy. Plaintiffs also recall seeing television commercials about the Subject Vehicles. When Plaintiffs went to Bobby Rahal Motorcar Company to purchase the Subject Vehicle, the sales associate touted the Subject Vehicle's EcoDiesel® attributes, including its fuel economy and performance. These representations, along with the advertised fuel economy, were among the primary reasons Plaintiffs chose the Subject Vehicle. At the time of purchase, Plaintiffs did not know that the Subject Vehicle could perform as advertised only by emitting NOx at levels that are greater than advertised and above legal limits. Nor were Plaintiffs aware that their Subject Vehicle was equipped with undisclosed and unauthorized emission control devices

designed to cheat emission tests and to deceive consumers and regulators. Plaintiffs would not have purchased the Subject Vehicle, or would have paid less for it, had they known that it did not comply with emission standards; that its emission treatment system was designed to de-activate during real-world driving conditions; and that it could not achieve the advertised towing power, performance, and/or fuel economy without cheating emission tests. Plaintiffs have suffered a concrete injury as a direct and proximate result of Defendants' misconduct, and would not have purchased the Subject Vehicle, or would have paid less for it, had Defendants not concealed the unauthorized emission control devices.

82.     Plaintiff, Hector Vldes DBA Infinity Enterprises (for the purpose of this paragraph, "Plaintiff"), a citizen of the State of Florida residing in the City of Miami, bought a 2014 Dodge Ram 1500 EcoDiesel® (for the purpose of this paragraph, the "Subject Vehicle") on or about April 27, 2014, at Arrigo Dodge, Ram, Chrysler, Jeep, an authorized FCA dealer in West Palm Beach, Florida. Plaintiff decided to buy the Subject Vehicle based in part on FCA's representations that it was an "EcoDiesel" vehicle (i.e., reduced emissions and fuel efficient). Plaintiff recalls visiting the Ram website, on which the Subject Vehicles were represented as environmentally friendly, having low emissions and good fuel economy. Plaintiff also recalls seeing television commercials about the Subject Vehicles. When Plaintiff went to Arrigo Dodge, Ram, Chrysler, Jeep to purchase the Subject Vehicle, the sales associate touted the Subject Vehicle's EcoDiesel® attributes, including its fuel economy and performance. These representations, along with the advertised fuel economy, were among the primary reasons Plaintiff chose the Subject Vehicle. At the time of purchase, Plaintiff did not know that the Subject Vehicle could perform as advertised only by emitting NOx at levels that are greater than advertised and above legal limits. Nor was Plaintiff aware that his/her Subject Vehicle was equipped with undisclosed and unauthorized emission

control devices designed to cheat emission tests and to deceive consumers and regulators. Plaintiff would not have purchased the Subject Vehicle, or would have paid less for it, had he/she known that it did not comply with emission standards; that its emission treatment system was designed to de-activate during real-world driving conditions; and that it could not achieve the advertised towing power, performance, and/or fuel economy without cheating emission tests. Plaintiff has suffered a concrete injury as a direct and proximate result of Defendants' misconduct, and would not have purchased the Subject Vehicle, or would have paid less for it, had Defendants not concealed the unauthorized emission control devices.

83.     Plaintiff, Arthur Alfinito (for the purpose of this paragraph, "Plaintiff"), a citizen of the State of Oregon residing in the City of Medford, bought a 2014 Dodge Ram 1500 EcoDiesel® (for the purpose of this paragraph, the "Subject Vehicle") on or about September 5, 2015, at Grants Pass Lithia Jeep, an authorized FCA dealer in Grants Pass, Oregon. Plaintiff decided to buy the Subject Vehicle based in part on FCA's representations that it was an "EcoDiesel" vehicle (i.e., reduced emissions and fuel efficient). Plaintiff recalls visiting the Ram website, on which the Subject Vehicles were represented as environmentally friendly, having low emissions and good fuel economy. Plaintiff also recalls seeing television commercials about the Subject Vehicles. When Plaintiff went to Grants Pass Lithia Jeep to purchase the Subject Vehicle, the sales associate touted the Subject Vehicle's EcoDiesel® attributes, including its fuel economy and performance. These representations, along with the advertised fuel economy, were among the primary reasons Plaintiff chose the Subject Vehicle. At the time of purchase, Plaintiff did not know that the Subject Vehicle could perform as advertised only by emitting NOx at levels that are greater than advertised and above legal limits. Nor was Plaintiff aware that his/her Subject Vehicle was equipped with undisclosed and unauthorized emission control devices designed to cheat emission

tests and to deceive consumers and regulators. Plaintiff would not have purchased the Subject Vehicle, or would have paid less for it, had he/she known that it did not comply with emission standards; that its emission treatment system was designed to de-activate during real-world driving conditions; and that it could not achieve the advertised towing power, performance, and/or fuel economy without cheating emission tests. Plaintiff has suffered a concrete injury as a direct and proximate result of Defendants' misconduct, and would not have purchased the Subject Vehicle, or would have paid less for it, had Defendants not concealed the unauthorized emission control devices.

84.     Plaintiff, Felix Hernandez (for the purpose of this paragraph, "Plaintiff"), a citizen of the State of Pennsylvania residing in the City of Mount Wolf, bought a 2016 Dodge Ram 1500 EcoDiesel® (for the purpose of this paragraph, the "Subject Vehicle") on or about August 31, 2018, at Keene Dodge Chrysler Jeep, an authorized FCA dealer in Jarrettsville, Maryland. Plaintiff decided to buy the Subject Vehicle based in part on FCA's representations that it was an "EcoDiesel" vehicle (i.e., reduced emissions and fuel efficient). Plaintiff recalls visiting the Ram website, on which the Subject Vehicles were represented as environmentally friendly, having low emissions and good fuel economy. Plaintiff also recalls seeing television commercials about the Subject Vehicles. When Plaintiff went to Keene Dodge Chrysler Jeep to purchase the Subject Vehicle, the sales associate touted the Subject Vehicle's EcoDiesel® attributes, including its fuel economy and performance. These representations, along with the advertised fuel economy, were among the primary reasons Plaintiff chose the Subject Vehicle. At the time of purchase, Plaintiff did not know that the Subject Vehicle could perform as advertised only by emitting NOx at levels that are greater than advertised and above legal limits. Nor was Plaintiff aware that his/her Subject Vehicle was equipped with undisclosed and unauthorized emission control devices designed to

cheat emission tests and to deceive consumers and regulators. Plaintiff would not have purchased the Subject Vehicle, or would have paid less for it, had he/she known that it did not comply with emission standards; that its emission treatment system was designed to de-activate during real-world driving conditions; and that it could not achieve the advertised towing power, performance, and/or fuel economy without cheating emission tests. Plaintiff has suffered a concrete injury as a direct and proximate result of Defendants' misconduct, and would not have purchased the Subject Vehicle, or would have paid less for it, had Defendants not concealed the unauthorized emission control devices.

85.    Plaintiff, Jason Cornetto (for the purpose of this paragraph, "Plaintiff"), a citizen of the State of New York residing in the City of Islip, bought a 2015 Dodge Ram 1500 EcoDiesel® (for the purpose of this paragraph, the "Subject Vehicle") on or about February 15, 2015, at Security Dodge, an authorized FCA dealer in Amityville, New York. Plaintiff decided to buy the Subject Vehicle based in part on FCA's representations that it was an "EcoDiesel" vehicle (i.e., reduced emissions and fuel efficient). Plaintiff recalls visiting the Ram website, on which the Subject Vehicles were represented as environmentally friendly, having low emissions and good fuel economy. Plaintiff also recalls seeing television commercials about the Subject Vehicles. When Plaintiff went to Security Dodge to purchase the Subject Vehicle, the sales associate touted the Subject Vehicle's EcoDiesel® attributes, including its fuel economy and performance. These representations, along with the advertised fuel economy, were among the primary reasons Plaintiff chose the Subject Vehicle. At the time of purchase, Plaintiff did not know that the Subject Vehicle could perform as advertised only by emitting NOx at levels that are greater than advertised and above legal limits. Nor was Plaintiff aware that his/her Subject Vehicle was equipped with undisclosed and unauthorized emission control devices designed to cheat emission tests and to

deceive consumers and regulators. Plaintiff would not have purchased the Subject Vehicle, or would have paid less for it, had he/she known that it did not comply with emission standards; that its emission treatment system was designed to de-activate during real-world driving conditions; and that it could not achieve the advertised towing power, performance, and/or fuel economy without cheating emission tests. Plaintiff has suffered a concrete injury as a direct and proximate result of Defendants' misconduct, and would not have purchased the Subject Vehicle, or would have paid less for it, had Defendants not concealed the unauthorized emission control devices.

86.     Plaintiffs, Chris and Carrie Frank (for the purpose of this paragraph, "Plaintiffs"), are citizens of the State of Texas residing in the City of Kempner, bought a 2015 Dodge Ram 1500 EcoDiesel® (for the purpose of this paragraph, the "Subject Vehicle") on or about September 1, 2016, at AutoNation Chrysler Dodge Jeep Ram Houston, an authorized FCA dealer in Houston, Texas. Plaintiffs decided to buy the Subject Vehicle based in part on FCA's representations that it was an "EcoDiesel" vehicle (i.e., reduced emissions and fuel efficient). Plaintiff recalls visiting the Ram website, on which the Subject Vehicles were represented as environmentally friendly, having low emissions and good fuel economy. Plaintiffs also recall seeing television commercials about the Subject Vehicles. When Plaintiffs went to AutoNation Chrysler Dodge Jeep Ram Houston to purchase the Subject Vehicle, the sales associate touted the Subject Vehicle's EcoDiesel® attributes, including its fuel economy and performance. These representations, along with the advertised fuel economy, were among the primary reasons Plaintiffs chose the Subject Vehicle. At the time of purchase, Plaintiffs did not know that the Subject Vehicle could perform as advertised only by emitting NOx at levels that are greater than advertised and above legal limits. Nor were Plaintiffs aware that their Subject Vehicle was equipped with undisclosed and unauthorized emission control devices designed to cheat emission tests and to deceive consumers

and regulators. Plaintiffs would not have purchased the Subject Vehicle, or would have paid less for it, had they known that it did not comply with emission standards; that its emission treatment system was designed to de-activate during real-world driving conditions; and that it could not achieve the advertised towing power, performance, and/or fuel economy without cheating emission tests. Plaintiff have suffered a concrete injury as a direct and proximate result of Defendants' misconduct, and would not have purchased the Subject Vehicle, or would have paid less for it, had Defendants not concealed the unauthorized emission control devices.

87.     Plaintiff, Thomas Joseph Cummins IV (for the purpose of this paragraph, "Plaintiff"), a citizen of the State of Florida residing in the City of Davenport, bought a 2016 Dodge Ram 1500 EcoDiesel® (for the purpose of this paragraph, the "Subject Vehicle") in June 2016, at Posner Park Chrysler Dodge Jeep RAM Fiat, an authorized FCA dealer in Davenport, Florida. Plaintiff decided to buy the Subject Vehicle based in part on FCA's representations that it was an "EcoDiesel" vehicle (i.e., reduced emissions and fuel efficient). Plaintiff recalls visiting the Ram website, on which the Subject Vehicles were represented as environmentally friendly, having low emissions and good fuel economy. Plaintiff also recalls seeing television commercials about the Subject Vehicles. When Plaintiff went to Posner Park Chrysler Dodge Jeep RAM Fiat to purchase the Subject Vehicle, the sales associate touted the Subject Vehicle's EcoDiesel® attributes, including its fuel economy and performance. These representations, along with the advertised fuel economy, were among the primary reasons Plaintiff chose the Subject Vehicle. At the time of purchase, Plaintiff did not know that the Subject Vehicle could perform as advertised only by emitting NOx at levels that are greater than advertised and above legal limits. Nor was Plaintiff aware that his/her Subject Vehicle was equipped with undisclosed and unauthorized emission control devices designed to cheat emission tests and to deceive consumers and regulators.

Plaintiff would not have purchased the Subject Vehicle, or would have paid less for it, had he/she known that it did not comply with emission standards; that its emission treatment system was designed to de-activate during real-world driving conditions; and that it could not achieve the advertised towing power, performance, and/or fuel economy without cheating emission tests. Plaintiff has suffered a concrete injury as a direct and proximate result of Defendants' misconduct, and would not have purchased the Subject Vehicle, or would have paid less for it, had Defendants not concealed the unauthorized emission control devices.

88.     Plaintiff, Robert Heinzman (for the purpose of this paragraph, "Plaintiff"), a citizen of the State of Texas residing in the City of Cleburne, bought a 2014 Dodge Ram 1500 EcoDiesel® (for the purpose of this paragraph, the "Subject Vehicle") on or about May 1, 2015, at Howard Wilson Chrysler, an authorized FCA dealer in Flowood, Mississippi . Plaintiff decided to buy the Subject Vehicle based in part on FCA's representations that it was an "EcoDiesel" vehicle (i.e., reduced emissions and fuel efficient). Plaintiff recalls visiting the Ram website, on which the Subject Vehicles were represented as environmentally friendly, having low emissions and good fuel economy. Plaintiff also recalls seeing television commercials about the Subject Vehicles. When Plaintiff went to Howard Wilson Chrysler to purchase the Subject Vehicle, the sales associate touted the Subject Vehicle's EcoDiesel® attributes, including its fuel economy and performance. These representations, along with the advertised fuel economy, were among the primary reasons Plaintiff chose the Subject Vehicle. At the time of purchase, Plaintiff did not know that the Subject Vehicle could perform as advertised only by emitting NOx at levels that are greater than advertised and above legal limits. Nor was Plaintiff aware that his/her Subject Vehicle was equipped with undisclosed and unauthorized emission control devices designed to cheat emission tests and to deceive consumers and regulators. Plaintiff would not have purchased the Subject

Vehicle, or would have paid less for it, had he/she known that it did not comply with emission standards; that its emission treatment system was designed to de-activate during real-world driving conditions; and that it could not achieve the advertised towing power, performance, and/or fuel economy without cheating emission tests. Plaintiff has suffered a concrete injury as a direct and proximate result of Defendants' misconduct, and would not have purchased the Subject Vehicle, or would have paid less for it, had Defendants not concealed the unauthorized emission control devices.

89.     Plaintiff, Russell Wagoner (for the purpose of this paragraph, "Plaintiff"), a citizen of the State of Louisiana residing in the City of Vidalia, bought a 2015 Dodge Ram 1500 EcoDiesel® (for the purpose of this paragraph, the "Subject Vehicle") on or about October 24, 2017, at Natchez Toyota, an authorized FCA dealer in Natchez, Mississippi. Plaintiff decided to buy the Subject Vehicle based in part on FCA's representations that it was an "EcoDiesel" vehicle (i.e., reduced emissions and fuel efficient). Plaintiff recalls visiting the Ram website, on which the Subject Vehicles were represented as environmentally friendly, having low emissions and good fuel economy. Plaintiff also recalls seeing television commercials about the Subject Vehicles. When Plaintiff went to Natchez Toyota to purchase the Subject Vehicle, the sales associate touted the Subject Vehicle's EcoDiesel® attributes, including its fuel economy and performance. These representations, along with the advertised fuel economy, were among the primary reasons Plaintiff chose the Subject Vehicle. At the time of purchase, Plaintiff did not know that the Subject Vehicle could perform as advertised only by emitting NOx at levels that are greater than advertised and above legal limits. Nor was Plaintiff aware that his/her Subject Vehicle was equipped with undisclosed and unauthorized emission control devices designed to cheat emission tests and to deceive consumers and regulators. Plaintiff would not have purchased the Subject Vehicle, or

would have paid less for it, had he/she known that it did not comply with emission standards; that its emission treatment system was designed to de-activate during real-world driving conditions; and that it could not achieve the advertised towing power, performance, and/or fuel economy without cheating emission tests. Plaintiff has suffered a concrete injury as a direct and proximate result of Defendants' misconduct, and would not have purchased the Subject Vehicle, or would have paid less for it, had Defendants not concealed the unauthorized emission control devices.

90.     Plaintiff, Chuck Six (for the purpose of this paragraph, "Plaintiff"), a citizen of the State of Florida residing in the City of Panama City, bought a 2015 Dodge Ram 1500 EcoDiesel® (for the purpose of this paragraph, the "Subject Vehicle") on or about April 4, 2017, at Jacksonville Chrysler Jeep Dodge, an authorized FCA dealer in Jacksonville, Florida. Plaintiff decided to buy the Subject Vehicle based in part on FCA's representations that it was an "EcoDiesel" vehicle (i.e., reduced emissions and fuel efficient). Plaintiff recalls visiting the Ram website, on which the Subject Vehicles were represented as environmentally friendly, having low emissions and good fuel economy. Plaintiff also recalls seeing television commercials about the Subject Vehicles. When Plaintiff went to Jacksonville Chrysler Jeep Dodge to purchase the Subject Vehicle, the sales associate touted the Subject Vehicle's EcoDiesel® attributes, including its fuel economy and performance. These representations, along with the advertised fuel economy, were among the primary reasons Plaintiff chose the Subject Vehicle. At the time of purchase, Plaintiff did not know that the Subject Vehicle could perform as advertised only by emitting NOx at levels that are greater than advertised and above legal limits. Nor was Plaintiff aware that his/her Subject Vehicle was equipped with undisclosed and unauthorized emission control devices designed to cheat emission tests and to deceive consumers and regulators. Plaintiff would not have purchased the Subject Vehicle, or would have paid less for it, had he/she known that it did not comply with emission

standards; that its emission treatment system was designed to de-activate during real-world driving conditions; and that it could not achieve the advertised towing power, performance, and/or fuel economy without cheating emission tests. Plaintiff has suffered a concrete injury as a direct and proximate result of Defendants' misconduct, and would not have purchased the Subject Vehicle, or would have paid less for it, had Defendants not concealed the unauthorized emission control devices.

91.     Plaintiff, Sean McCaffery (for the purpose of this paragraph, "Plaintiff"), a citizen of the State of Oregon residing in the City of Beaverton, leased a 2015 Jeep Grand Cherokee EcoDiesel® (for the purpose of this paragraph, the "Subject Vehicle") on or about February 17, 2016, at NW Jeep Chrysler, an authorized FCA dealer in Beaverton, Oregon. Plaintiff decided to leased the Subject Vehicle based in part on FCA's representations that it was an "EcoDiesel" vehicle (i.e., reduced emissions and fuel efficient). Plaintiff recalls visiting the Jeep website, on which the Subject Vehicles were represented as environmentally friendly, having low emissions and good fuel economy. Plaintiff also recalls seeing television commercials about the Subject Vehicles. When Plaintiff went to NW Jeep Chrysler to lease the Subject Vehicle, the sales associate touted the Subject Vehicle's EcoDiesel® attributes, including its fuel economy and performance. These representations, along with the advertised fuel economy, were among the primary reasons Plaintiff chose the Subject Vehicle. At the time of purchase, Plaintiff did not know that the Subject Vehicle could perform as advertised only by emitting NOx at levels that are greater than advertised and above legal limits. Nor was Plaintiff aware that his/her Subject Vehicle was equipped with undisclosed and unauthorized emission control devices designed to cheat emission tests and to deceive consumers and regulators. Plaintiff would not have leased the Subject Vehicle, or would have paid less for it, had he/she known that it did not comply with emission standards; that its

emission treatment system was designed to de-activate during real-world driving conditions; and that it could not achieve the advertised towing power, performance, and/or fuel economy without cheating emission tests. Plaintiff has suffered a concrete injury as a direct and proximate result of Defendants' misconduct, and would not have purchased the Subject Vehicle, or would have paid less for it, had Defendants not concealed the unauthorized emission control devices.

92.    Plaintiff, Lindsey Smith (for the purpose of this paragraph, "Plaintiff"), a citizen of the State of Arizona residing in the City of Hot Springs National Park, bought a 2014 Dodge Ram 1500 EcoDiesel® (for the purpose of this paragraph, the "Subject Vehicle") on or about July 31, 2018, at Nissan of Alvin, an authorized FCA dealer in Alvin, Texas. Plaintiff decided to buy the Subject Vehicle based in part on FCA's representations that it was an "EcoDiesel" vehicle (i.e., reduced emissions and fuel efficient). Plaintiff recalls visiting the Ram website, on which the Subject Vehicles were represented as environmentally friendly, having low emissions and good fuel economy. Plaintiff also recalls seeing television commercials about the Subject Vehicles. When Plaintiff went to Nissan of Alvin to purchase the Subject Vehicle, the sales associate touted the Subject Vehicle's EcoDiesel® attributes, including its fuel economy and performance. These representations, along with the advertised fuel economy, were among the primary reasons Plaintiff chose the Subject Vehicle. At the time of purchase, Plaintiff did not know that the Subject Vehicle could perform as advertised only by emitting NOx at levels that are greater than advertised and above legal limits. Nor was Plaintiff aware that his/her Subject Vehicle was equipped with undisclosed and unauthorized emission control devices designed to cheat emission tests and to deceive consumers and regulators. Plaintiff would not have purchased the Subject Vehicle, or would have paid less for it, had he/she known that it did not comply with emission standards; that its emission treatment system was designed to de-activate during real-world driving conditions;

and that it could not achieve the advertised towing power, performance, and/or fuel economy without cheating emission tests. Plaintiff has suffered a concrete injury as a direct and proximate result of Defendants' misconduct, and would not have purchased the Subject Vehicle, or would have paid less for it, had Defendants not concealed the unauthorized emission control devices.

93.     Plaintiff, Jim Laney (for the purpose of this paragraph, "Plaintiff"), a citizen of the State of Michigan residing in the City of Waterford, bought a 2016 Dodge Ram 1500 EcoDiesel® (for the purpose of this paragraph, the "Subject Vehicle") on or about July 27, 2016, at Jim Riehl's an authorized FCA dealer in Lapeer, Michigan. Plaintiff decided to buy the Subject Vehicle based in part on FCA's representations that it was an "EcoDiesel" vehicle (i.e., reduced emissions and fuel efficient). Plaintiff recalls visiting the Ram website, on which the Subject Vehicles were represented as environmentally friendly, having low emissions and good fuel economy. Plaintiff also recalls seeing television commercials about the Subject Vehicles. When Plaintiff went to Jim Riehl's to purchase the Subject Vehicle, the sales associate touted the Subject Vehicle's EcoDiesel® attributes, including its fuel economy and performance. These representations, along with the advertised fuel economy, were among the primary reasons Plaintiff chose the Subject Vehicle. At the time of purchase, Plaintiff did not know that the Subject Vehicle could perform as advertised only by emitting NOx at levels that are greater than advertised and above legal limits. Nor was Plaintiff aware that his/her Subject Vehicle was equipped with undisclosed and unauthorized emission control devices designed to cheat emission tests and to deceive consumers and regulators. Plaintiff would not have purchased the Subject Vehicle, or would have paid less for it, had he/she known that it did not comply with emission standards; that its emission treatment system was designed to de-activate during real-world driving conditions; and that it could not achieve the advertised towing power, performance, and/or fuel economy without cheating

emission tests. Plaintiff has suffered a concrete injury as a direct and proximate result of Defendants' misconduct, and would not have purchased the Subject Vehicle, or would have paid less for it, had Defendants not concealed the unauthorized emission control devices.

94.     Plaintiff, Andrew Waters (for the purpose of this paragraph, "Plaintiff"), a citizen of the State of Oklahoma residing in the City of Norman, bought a 2014 Dodge Ram 1500 EcoDiesel® (for the purpose of this paragraph, the "Subject Vehicle") on or about July 31, 2018, at Bob Moore Chrysler Dodge Jeep Ram, an authorized FCA dealer in Oklahoma City, Oklahoma. Plaintiff decided to buy the Subject Vehicle based in part on FCA's representations that it was an "EcoDiesel" vehicle (i.e., reduced emissions and fuel efficient). Plaintiff recalls visiting the Ram website, on which the Subject Vehicles were represented as environmentally friendly, having low emissions and good fuel economy. Plaintiff also recalls seeing television commercials about the Subject Vehicles. When Plaintiff went to Bob Moore Chrysler Dodge Jeep Ram to purchase the Subject Vehicle, the sales associate touted the Subject Vehicle's EcoDiesel® attributes, including its fuel economy and performance. These representations, along with the advertised fuel economy, were among the primary reasons Plaintiff chose the Subject Vehicle. At the time of purchase, Plaintiff did not know that the Subject Vehicle could perform as advertised only by emitting NOx at levels that are greater than advertised and above legal limits. Nor was Plaintiff aware that his/her Subject Vehicle was equipped with undisclosed and unauthorized emission control devices designed to cheat emission tests and to deceive consumers and regulators. Plaintiff would not have purchased the Subject Vehicle, or would have paid less for it, had he/she known that it did not comply with emission standards; that its emission treatment system was designed to de-activate during real-world driving conditions; and that it could not achieve the advertised towing power, performance, and/or fuel economy without cheating emission tests. Plaintiff has suffered a

concrete injury as a direct and proximate result of Defendants' misconduct, and would not have purchased the Subject Vehicle, or would have paid less for it, had Defendants not concealed the unauthorized emission control devices.

95.     Plaintiff, Samuel Robinson (for the purpose of this paragraph, "Plaintiff"), a citizen of the State of West Virginia residing in the City of Center Point, bought a 2014 Dodge Ram 1500 EcoDiesel® (for the purpose of this paragraph, the "Subject Vehicle") on or about April 1, 2017, at Country Club Chrysler, an authorized FCA dealer in Clarksburg, West Virginia. Plaintiff decided to buy the Subject Vehicle based in part on FCA's representations that it was an "EcoDiesel" vehicle (i.e., reduced emissions and fuel efficient). Plaintiff recalls visiting the Ram website, on which the Subject Vehicles were represented as environmentally friendly, having low emissions and good fuel economy. Plaintiff also recalls seeing television commercials about the Subject Vehicles. When Plaintiff went to Country Club Chrysler to purchase the Subject Vehicle, the sales associate touted the Subject Vehicle's EcoDiesel® attributes, including its fuel economy and performance. These representations, along with the advertised fuel economy, were among the primary reasons Plaintiff chose the Subject Vehicle. At the time of purchase, Plaintiff did not know that the Subject Vehicle could perform as advertised only by emitting NOx at levels that are greater than advertised and above legal limits. Nor was Plaintiff aware that his/her Subject Vehicle was equipped with undisclosed and unauthorized emission control devices designed to cheat emission tests and to deceive consumers and regulators. Plaintiff would not have purchased the Subject Vehicle, or would have paid less for it, had he/she known that it did not comply with emission standards; that its emission treatment system was designed to de-activate during real-world driving conditions; and that it could not achieve the advertised towing power, performance, and/or fuel economy without cheating emission tests. Plaintiff has suffered a concrete injury as a direct and

proximate result of Defendants' misconduct, and would not have purchased the Subject Vehicle, or would have paid less for it, had Defendants not concealed the unauthorized emission control devices.

96.     Plaintiff, Klayton Costanzo (for the purpose of this paragraph, "Plaintiff"), a citizen of the State of Colorado residing in the City of Silt, bought a 2016 Dodge Ram 1500 EcoDiesel® (for the purpose of this paragraph, the "Subject Vehicle") on or about July 20, 2018, at Columbine Ford, an authorized FCA dealer in Rifle, Colorado. Plaintiff decided to buy the Subject Vehicle based in part on FCA's representations that it was an "EcoDiesel" vehicle (i.e., reduced emissions and fuel efficient). Plaintiff recalls visiting the Ram website, on which the Subject Vehicles were represented as environmentally friendly, having low emissions and good fuel economy. Plaintiff also recalls seeing television commercials about the Subject Vehicles. When Plaintiff went to Columbine Ford to purchase the Subject Vehicle, the sales associate touted the Subject Vehicle's EcoDiesel® attributes, including its fuel economy and performance. These representations, along with the advertised fuel economy, were among the primary reasons Plaintiff chose the Subject Vehicle. At the time of purchase, Plaintiff did not know that the Subject Vehicle could perform as advertised only by emitting NOx at levels that are greater than advertised and above legal limits. Nor was Plaintiff aware that his/her Subject Vehicle was equipped with undisclosed and unauthorized emission control devices designed to cheat emission tests and to deceive consumers and regulators. Plaintiff would not have purchased the Subject Vehicle, or would have paid less for it, had he/she known that it did not comply with emission standards; that its emission treatment system was designed to de-activate during real-world driving conditions; and that it could not achieve the advertised towing power, performance, and/or fuel economy without cheating emission tests. Plaintiff has suffered a concrete injury as a direct and proximate result of

Defendants' misconduct, and would not have purchased the Subject Vehicle, or would have paid less for it, had Defendants not concealed the unauthorized emission control devices.

97.     Plaintiff, Robert Brinkley (for the purpose of this paragraph, "Plaintiff"), a citizen of the State of Missouri residing in the City of Hillsboro, bought a 2016 Dodge Ram 1500 EcoDiesel® (for the purpose of this paragraph, the "Subject Vehicle") on or about August 1, 2016, at South County Dodge, an authorized FCA dealer in St. Louis, Missouri. Plaintiff decided to buy the Subject Vehicle based in part on FCA's representations that it was an "EcoDiesel" vehicle (i.e., reduced emissions and fuel efficient). Plaintiff recalls visiting the Ram website, on which the Subject Vehicles were represented as environmentally friendly, having low emissions and good fuel economy. Plaintiff also recalls seeing television commercials about the Subject Vehicles. When Plaintiff went to South County Dodge to purchase the Subject Vehicle, the sales associate touted the Subject Vehicle's EcoDiesel® attributes, including its fuel economy and performance. These representations, along with the advertised fuel economy, were among the primary reasons Plaintiff chose the Subject Vehicle. At the time of purchase, Plaintiff did not know that the Subject Vehicle could perform as advertised only by emitting NOx at levels that are greater than advertised and above legal limits. Nor was Plaintiff aware that his/her Subject Vehicle was equipped with undisclosed and unauthorized emission control devices designed to cheat emission tests and to deceive consumers and regulators. Plaintiff would not have purchased the Subject Vehicle, or would have paid less for it, had he/she known that it did not comply with emission standards; that its emission treatment system was designed to de-activate during real-world driving conditions; and that it could not achieve the advertised towing power, performance, and/or fuel economy without cheating emission tests. Plaintiff has suffered a concrete injury as a direct and proximate

result of Defendants' misconduct, and would not have purchased the Subject Vehicle, or would have paid less for it, had Defendants not concealed the unauthorized emission control devices.

98.     Plaintiff, Robert J. Reich (for the purpose of this paragraph, "Plaintiff"), a citizen of the State of Montana residing in the City of Whitefish, bought a 2014 Jeep Grand Cherokee EcoDiesel® (for the purpose of this paragraph, the "Subject Vehicle") on or about November 13, 2013, at Don K Chevrolet, an authorized FCA dealer in Whitefish, Montana. Plaintiff decided to buy the Subject Vehicle based in part on FCA's representations that it was an "EcoDiesel" vehicle (i.e., reduced emissions and fuel efficient). Plaintiff recalls visiting the Jeep website, on which the Subject Vehicles were represented as environmentally friendly, having low emissions and good fuel economy. Plaintiff also recalls seeing television commercials about the Subject Vehicles. When Plaintiff went to Don K Chevrolet to purchase the Subject Vehicle, the sales associate touted the Subject Vehicle's EcoDiesel® attributes, including its fuel economy and performance. These representations, along with the advertised fuel economy, were among the primary reasons Plaintiff chose the Subject Vehicle. At the time of purchase, Plaintiff did not know that the Subject Vehicle could perform as advertised only by emitting NOx at levels that are greater than advertised and above legal limits. Nor was Plaintiff aware that his/her Subject Vehicle was equipped with undisclosed and unauthorized emission control devices designed to cheat emission tests and to deceive consumers and regulators. Plaintiff would not have purchased the Subject Vehicle, or would have paid less for it, had he/she known that it did not comply with emission standards; that its emission treatment system was designed to de-activate during real-world driving conditions; and that it could not achieve the advertised towing power, performance, and/or fuel economy without cheating emission tests. Plaintiff has suffered a concrete injury as a direct and proximate

result of Defendants' misconduct, and would not have purchased the Subject Vehicle, or would have paid less for it, had Defendants not concealed the unauthorized emission control devices.

99.     Plaintiff, Marcus Spencer (for the purpose of this paragraph, "Plaintiff"), a citizen of the State of Colorado residing in the City of Limon, bought a 2015 Dodge Ram 1500 EcoDiesel® (for the purpose of this paragraph, the "Subject Vehicle") on or about August 25, 2018, at MEDVED, an authorized FCA dealer in Castle Rock, Colorado. Plaintiff decided to buy the Subject Vehicle based in part on FCA's representations that it was an "EcoDiesel" vehicle (i.e., reduced emissions and fuel efficient). Plaintiff recalls visiting the Ram website, on which the Subject Vehicles were represented as environmentally friendly, having low emissions and good fuel economy. Plaintiff also recalls seeing television commercials about the Subject Vehicles. When Plaintiff went to MEDVED to purchase the Subject Vehicle, the sales associate touted the Subject Vehicle's EcoDiesel® attributes, including its fuel economy and performance. These representations, along with the advertised fuel economy, were among the primary reasons Plaintiff chose the Subject Vehicle. At the time of purchase, Plaintiff did not know that the Subject Vehicle could perform as advertised only by emitting NOx at levels that are greater than advertised and above legal limits. Nor was Plaintiff aware that his/her Subject Vehicle was equipped with undisclosed and unauthorized emission control devices designed to cheat emission tests and to deceive consumers and regulators. Plaintiff would not have purchased the Subject Vehicle, or would have paid less for it, had he/she known that it did not comply with emission standards; that its emission treatment system was designed to de-activate during real-world driving conditions; and that it could not achieve the advertised towing power, performance, and/or fuel economy without cheating emission tests. Plaintiff has suffered a concrete injury as a direct and proximate

result of Defendants' misconduct, and would not have purchased the Subject Vehicle, or would have paid less for it, had Defendants not concealed the unauthorized emission control devices.

100.     Plaintiff, Aaron O'Brien (for the purpose of this paragraph, "Plaintiff"), a citizen of the State of Illinois residing in the City of McHenry, bought a 2016 Dodge Ram 1500 EcoDiesel® (for the purpose of this paragraph, the "Subject Vehicle") on or about February 18, 2017, at Crystal Lake Chrysler-Jeep-Dodge-Ram, an authorized FCA dealer in Crystal Lake, Illinois. Plaintiff decided to buy the Subject Vehicle based in part on FCA's representations that it was an "EcoDiesel" vehicle (i.e., reduced emissions and fuel efficient). Plaintiff recalls visiting the Ram website, on which the Subject Vehicles were represented as environmentally friendly, having low emissions and good fuel economy. Plaintiff also recalls seeing television commercials about the Subject Vehicles. When Plaintiff went to Crystal Lake Chrysler-Jeep-Dodge-Ram to purchase the Subject Vehicle, the sales associate touted the Subject Vehicle's EcoDiesel® attributes, including its fuel economy and performance. These representations, along with the advertised fuel economy, were among the primary reasons Plaintiff chose the Subject Vehicle. At the time of purchase, Plaintiff did not know that the Subject Vehicle could perform as advertised only by emitting NOx at levels that are greater than advertised and above legal limits. Nor was Plaintiff aware that his/her Subject Vehicle was equipped with undisclosed and unauthorized emission control devices designed to cheat emission tests and to deceive consumers and regulators. Plaintiff would not have purchased the Subject Vehicle, or would have paid less for it, had he/she known that it did not comply with emission standards; that its emission treatment system was designed to de-activate during real-world driving conditions; and that it could not achieve the advertised towing power, performance, and/or fuel economy without cheating emission tests. Plaintiff has suffered a concrete injury as a direct and proximate result of Defendants' misconduct,

and would not have purchased the Subject Vehicle, or would have paid less for it, had Defendants not concealed the unauthorized emission control devices.

101.    Plaintiff, Bruce Johnson (for the purpose of this paragraph, "Plaintiff"), a citizen of the State of Minnesota residing in the City of Minneapolis, bought a 2014 Jeep Grand Cherokee EcoDiesel® (for the purpose of this paragraph, the "Subject Vehicle") on or about March 21, 2017, at Luther Brookdale, an authorized FCA dealer in Brooklyn Park, Minnesota. Plaintiff decided to buy the Subject Vehicle based in part on FCA's representations that it was an "EcoDiesel" vehicle (i.e., reduced emissions and fuel efficient). Plaintiff recalls visiting the Jeep website, on which the Subject Vehicles were represented as environmentally friendly, having low emissions and good fuel economy. Plaintiff also recalls seeing television commercials about the Subject Vehicles. When Plaintiff went to Luther Brookdale to purchase the Subject Vehicle, the sales associate touted the Subject Vehicle's EcoDiesel® attributes, including its fuel economy and performance. These representations, along with the advertised fuel economy, were among the primary reasons Plaintiff chose the Subject Vehicle. At the time of purchase, Plaintiff did not know that the Subject Vehicle could perform as advertised only by emitting NOx at levels that are greater than advertised and above legal limits. Nor was Plaintiff aware that his/her Subject Vehicle was equipped with undisclosed and unauthorized emission control devices designed to cheat emission tests and to deceive consumers and regulators. Plaintiff would not have purchased the Subject Vehicle, or would have paid less for it, had he/she known that it did not comply with emission standards; that its emission treatment system was designed to de-activate during real-world driving conditions; and that it could not achieve the advertised towing power, performance, and/or fuel economy without cheating emission tests. Plaintiff has suffered a concrete injury as a direct and proximate

result of Defendants' misconduct, and would not have purchased the Subject Vehicle, or would have paid less for it, had Defendants not concealed the unauthorized emission control devices.

102.    Plaintiffs, Richard and Susan Bladl (for the purpose of this paragraph, "Plaintiffs"), are citizens of the State of Washington residing in the City of Wenatchee, bought a 2015 Dodge Ram 1500 EcoDiesel® (for the purpose of this paragraph, the "Subject Vehicle") on or about June 29, 2015, at Town Chrysler Jeep Dodge, an authorized FCA dealer in Wenatchee, Washington. Plaintiff decided to buy the Subject Vehicle based in part on FCA's representations that it was an "EcoDiesel" vehicle (i.e., reduced emissions and fuel efficient). Plaintiff recalls visiting the Ram website, on which the Subject Vehicles were represented as environmentally friendly, having low emissions and good fuel economy. Plaintiff also recalls seeing television commercials about the Subject Vehicles. When Plaintiff went to Town Chrysler Jeep Dodge to purchase the Subject Vehicle, the sales associate touted the Subject Vehicle's EcoDiesel® attributes, including its fuel economy and performance. These representations, along with the advertised fuel economy, were among the primary reasons Plaintiff chose the Subject Vehicle. At the time of purchase, Plaintiff did not know that the Subject Vehicle could perform as advertised only by emitting NOx at levels that are greater than advertised and above legal limits. Nor was Plaintiff aware that his/her Subject Vehicle was equipped with undisclosed and unauthorized emission control devices designed to cheat emission tests and to deceive consumers and regulators. Plaintiff would not have purchased the Subject Vehicle, or would have paid less for it, had he/she known that it did not comply with emission standards; that its emission treatment system was designed to de-activate during real-world driving conditions; and that it could not achieve the advertised towing power, performance, and/or fuel economy without cheating emission tests. Plaintiff has suffered a concrete injury as a direct and proximate result of Defendants' misconduct, and would not have purchased the Subject

Vehicle, or would have paid less for it, had Defendants not concealed the unauthorized emission control devices.

103.     Plaintiff, Richard Bayly (for the purpose of this paragraph, "Plaintiff"), a citizen of the State of New York residing in the City of Schaghticoke, bought a 2016 Dodge Ram 1500 EcoDiesel® (for the purpose of this paragraph, the "Subject Vehicle") on or about August 9, 2016, at Lia Dodge, an authorized FCA dealer in Schenectady, New York. Plaintiff decided to buy the Subject Vehicle based in part on FCA's representations that it was an "EcoDiesel" vehicle (i.e., reduced emissions and fuel efficient). Plaintiff recalls visiting the Ram website, on which the Subject Vehicles were represented as environmentally friendly, having low emissions and good fuel economy. Plaintiff also recalls seeing television commercials about the Subject Vehicles. When Plaintiff went to Lia Dodge to purchase the Subject Vehicle, the sales associate touted the Subject Vehicle's EcoDiesel® attributes, including its fuel economy and performance. These representations, along with the advertised fuel economy, were among the primary reasons Plaintiff chose the Subject Vehicle. At the time of purchase, Plaintiff did not know that the Subject Vehicle could perform as advertised only by emitting NOx at levels that are greater than advertised and above legal limits. Nor was Plaintiff aware that his/her Subject Vehicle was equipped with undisclosed and unauthorized emission control devices designed to cheat emission tests and to deceive consumers and regulators. Plaintiff would not have purchased the Subject Vehicle, or would have paid less for it, had he/she known that it did not comply with emission standards; that its emission treatment system was designed to de-activate during real-world driving conditions; and that it could not achieve the advertised towing power, performance, and/or fuel economy without cheating emission tests. Plaintiff has suffered a concrete injury as a direct and proximate

85

result of Defendants' misconduct, and would not have purchased the Subject Vehicle, or would have paid less for it, had Defendants not concealed the unauthorized emission control devices.

104.    Plaintiffs, Greg and Lucia Dubas (for the purpose of this paragraph, "Plaintiffs"), are citizens of the State of New Jersey residing in the City of Warren, leased a 2014 Jeep Grand Cherokee EcoDiesel® (for the purpose of this paragraph, the "Subject Vehicle") on or about September 6, 2014, at Fullerton Jeep, an authorized FCA dealer in Somerville, New Jersey. Plaintiffs decided to lease the Subject Vehicle based in part on FCA's representations that it was an "EcoDiesel" vehicle (i.e., reduced emissions and fuel efficient). Plaintiffs recall visiting the Jeep website, on which the Subject Vehicles were represented as environmentally friendly, having low emissions and good fuel economy. Plaintiffs also recall seeing television commercials about the Subject Vehicles. When Plaintiffs went to Fullerton Jeep to lease the Subject Vehicle, the sales associate touted the Subject Vehicle's EcoDiesel® attributes, including its fuel economy and performance. These representations, along with the advertised fuel economy, were among the primary reasons Plaintiffs chose the Subject Vehicle. At the time of purchase, Plaintiffs did not know that the Subject Vehicle could perform as advertised only by emitting NOx at levels that are greater than advertised and above legal limits. Nor were Plaintiffs aware that their Subject Vehicle was equipped with undisclosed and unauthorized emission control devices designed to cheat emission tests and to deceive consumers and regulators. Plaintiffs would not have leased the Subject Vehicle, or would have paid less for it, had they known that it did not comply with emission standards; that its emission treatment system was designed to de-activate during real-world driving conditions; and that it could not achieve the advertised towing power, performance, and/or fuel economy without cheating emission tests. Plaintiffs have suffered a concrete injury as a direct and proximate result of Defendants' misconduct, and would not have purchased the Subject Vehicle,

or would have paid less for it, had Defendants not concealed the unauthorized emission control devices.

105.    Plaintiff, Jody Bergheim (for the purpose of this paragraph, "Plaintiff"), a citizen of the State of South Dakota residing in the City of Madison, bought a 2015 Dodge Ram 1500 EcoDiesel® (for the purpose of this paragraph, the "Subject Vehicle") on or about December 20, 2016, at Champion Chrysler Center, an authorized FCA dealer in Rockwell City, Iowa. Plaintiff decided to buy the Subject Vehicle based in part on FCA's representations that it was an "EcoDiesel" vehicle (i.e., reduced emissions and fuel efficient). Plaintiff recalls visiting the Ram website, on which the Subject Vehicles were represented as environmentally friendly, having low emissions and good fuel economy. Plaintiff also recalls seeing television commercials about the Subject Vehicles. When Plaintiff went to Champion Chrysler Center to purchase the Subject Vehicle, the sales associate touted the Subject Vehicle's EcoDiesel® attributes, including its fuel economy and performance. These representations, along with the advertised fuel economy, were among the primary reasons Plaintiff chose the Subject Vehicle. At the time of purchase, Plaintiff did not know that the Subject Vehicle could perform as advertised only by emitting NOx at levels that are greater than advertised and above legal limits. Nor was Plaintiff aware that his/her Subject Vehicle was equipped with undisclosed and unauthorized emission control devices designed to cheat emission tests and to deceive consumers and regulators. Plaintiff would not have purchased the Subject Vehicle, or would have paid less for it, had he/she known that it did not comply with emission standards; that its emission treatment system was designed to de-activate during real-world driving conditions; and that it could not achieve the advertised towing power, performance, and/or fuel economy without cheating emission tests. Plaintiff has suffered a concrete injury as a direct and proximate result of Defendants' misconduct, and would not have purchased the Subject

Vehicle, or would have paid less for it, had Defendants not concealed the unauthorized emission control devices.

106.    Plaintiff, Daniel Gonzales (for the purpose of this paragraph, "Plaintiff"), a citizen of the State of Oklahoma residing in the City of Sulphur, bought a 2015 Dodge Ram 1500 EcoDiesel® (for the purpose of this paragraph, the "Subject Vehicle") on or about May 16, 2015, at Carter County Hyundai, an authorized FCA dealer in Ardmore, Oklahoma. Plaintiff decided to buy the Subject Vehicle based in part on FCA's representations that it was an "EcoDiesel" vehicle (i.e., reduced emissions and fuel efficient). Plaintiff recalls visiting the Ram website, on which the Subject Vehicles were represented as environmentally friendly, having low emissions and good fuel economy. Plaintiff also recalls seeing television commercials about the Subject Vehicles. When Plaintiff went to Carter County Hyundai to purchase the Subject Vehicle, the sales associate touted the Subject Vehicle's EcoDiesel® attributes, including its fuel economy and performance. These representations, along with the advertised fuel economy, were among the primary reasons Plaintiff chose the Subject Vehicle. At the time of purchase, Plaintiff did not know that the Subject Vehicle could perform as advertised only by emitting NOx at levels that are greater than advertised and above legal limits. Nor was Plaintiff aware that his/her Subject Vehicle was equipped with undisclosed and unauthorized emission control devices designed to cheat emission tests and to deceive consumers and regulators. Plaintiff would not have purchased the Subject Vehicle, or would have paid less for it, had he/she known that it did not comply with emission standards; that its emission treatment system was designed to de-activate during real-world driving conditions; and that it could not achieve the advertised towing power, performance, and/or fuel economy without cheating emission tests. Plaintiff has suffered a concrete injury as a direct and proximate

result of Defendants' misconduct, and would not have purchased the Subject Vehicle, or would have paid less for it, had Defendants not concealed the unauthorized emission control devices.

107.    Plaintiff, Craig Faircloth (for the purpose of this paragraph, "Plaintiff"), a citizen of the State of Florida residing in the City of Groveland, bought a 2016 Dodge Ram 1500 EcoDiesel® (for the purpose of this paragraph, the "Subject Vehicle") on or about August 6, 2016, at Orlando Dodge, an authorized FCA dealer in Orlando, Florida. Plaintiff decided to buy the Subject Vehicle based in part on FCA's representations that it was an "EcoDiesel" vehicle (i.e., reduced emissions and fuel efficient). Plaintiff recalls visiting the Ram website, on which the Subject Vehicles were represented as environmentally friendly, having low emissions and good fuel economy. Plaintiff also recalls seeing television commercials about the Subject Vehicles. When Plaintiff went to Orlando Dodge to purchase the Subject Vehicle, the sales associate touted the Subject Vehicle's EcoDiesel® attributes, including its fuel economy and performance. These representations, along with the advertised fuel economy, were among the primary reasons Plaintiff chose the Subject Vehicle. At the time of purchase, Plaintiff did not know that the Subject Vehicle could perform as advertised only by emitting NOx at levels that are greater than advertised and above legal limits. Nor was Plaintiff aware that his/her Subject Vehicle was equipped with undisclosed and unauthorized emission control devices designed to cheat emission tests and to deceive consumers and regulators. Plaintiff would not have purchased the Subject Vehicle, or would have paid less for it, had he/she known that it did not comply with emission standards; that its emission treatment system was designed to de-activate during real-world driving conditions; and that it could not achieve the advertised towing power, performance, and/or fuel economy without cheating emission tests. Plaintiff has suffered a concrete injury as a direct and proximate

result of Defendants' misconduct, and would not have purchased the Subject Vehicle, or would have paid less for it, had Defendants not concealed the unauthorized emission control devices.

108.    Plaintiff, Dominick Melfi (for the purpose of this paragraph, "Plaintiff"), a citizen of the State of Pennsylvania residing in the City of Bethlehem, bought a 2016 Jeep Grand Cherokee EcoDiesel® (for the purpose of this paragraph, the "Subject Vehicle") on or about October 26, 2016, at Kelly Chrysler Dodge Jeep, an authorized FCA dealer in Emmaus, Pennsylvania. Plaintiff decided to buy the Subject Vehicle based in part on FCA's representations that it was an "EcoDiesel" vehicle (i.e., reduced emissions and fuel efficient). Plaintiff recalls visiting the Jeep website, on which the Subject Vehicles were represented as environmentally friendly, having low emissions and good fuel economy. Plaintiff also recalls seeing television commercials about the Subject Vehicles. When Plaintiff went to Kelly Chrysler Dodge Jeep to purchase the Subject Vehicle, the sales associate touted the Subject Vehicle's EcoDiesel® attributes, including its fuel economy and performance. These representations, along with the advertised fuel economy, were among the primary reasons Plaintiff chose the Subject Vehicle. At the time of purchase, Plaintiff did not know that the Subject Vehicle could perform as advertised only by emitting NOx at levels that are greater than advertised and above legal limits. Nor was Plaintiff aware that his/her Subject Vehicle was equipped with undisclosed and unauthorized emission control devices designed to cheat emission tests and to deceive consumers and regulators. Plaintiff would not have purchased the Subject Vehicle, or would have paid less for it, had he/she known that it did not comply with emission standards; that its emission treatment system was designed to de-activate during real-world driving conditions; and that it could not achieve the advertised towing power, performance, and/or fuel economy without cheating emission tests. Plaintiff has suffered a concrete injury as a direct and proximate result of Defendants' misconduct, and would not have purchased the Subject

Vehicle, or would have paid less for it, had Defendants not concealed the unauthorized emission control devices.

109.    Plaintiff, Thomas Banks (for the purpose of this paragraph, "Plaintiff"), a citizen of the State of New York residing in the City of Staten Island, bought a 2014 Dodge Ram 1500 EcoDiesel® (for the purpose of this paragraph, the "Subject Vehicle") on or about November 1, 2014, at Manfredi, an authorized FCA dealer in Staten Island, New York. Plaintiff decided to buy the Subject Vehicle based in part on FCA's representations that it was an "EcoDiesel" vehicle (i.e., reduced emissions and fuel efficient). Plaintiff recalls visiting the Ram website, on which the Subject Vehicles were represented as environmentally friendly, having low emissions and good fuel economy. Plaintiff also recalls seeing television commercials about the Subject Vehicles. When Plaintiff went to Manfredi to purchase the Subject Vehicle, the sales associate touted the Subject Vehicle's EcoDiesel® attributes, including its fuel economy and performance. These representations, along with the advertised fuel economy, were among the primary reasons Plaintiff chose the Subject Vehicle. At the time of purchase, Plaintiff did not know that the Subject Vehicle could perform as advertised only by emitting NOx at levels that are greater than advertised and above legal limits. Nor was Plaintiff aware that his/her Subject Vehicle was equipped with undisclosed and unauthorized emission control devices designed to cheat emission tests and to deceive consumers and regulators. Plaintiff would not have purchased the Subject Vehicle, or would have paid less for it, had he/she known that it did not comply with emission standards; that its emission treatment system was designed to de-activate during real-world driving conditions; and that it could not achieve the advertised towing power, performance, and/or fuel economy without cheating emission tests. Plaintiff has suffered a concrete injury as a direct and proximate

result of Defendants' misconduct, and would not have purchased the Subject Vehicle, or would have paid less for it, had Defendants not concealed the unauthorized emission control devices.

110.    Plaintiffs, Dawn and Edward Nelson (for the purpose of this paragraph, "Plaintiffs"), are citizens of the State of Arkansas residing in the City of Rison, bought a 2016 Dodge Ram 1500 EcoDiesel® (for the purpose of this paragraph, the "Subject Vehicle") on or about October 12, 2016, at Smart Chrysler, an authorized FCA dealer in Pine Bluff, Arkansas. Plaintiffs decided to buy the Subject Vehicle based in part on FCA's representations that it was an "EcoDiesel" vehicle (i.e., reduced emissions and fuel efficient). Plaintiffs recall visiting the Ram website, on which the Subject Vehicles were represented as environmentally friendly, having low emissions and good fuel economy. Plaintiffs also recall seeing television commercials about the Subject Vehicles. When Plaintiffs went to Smart Chrysler to purchase the Subject Vehicle, the sales associate touted the Subject Vehicle's EcoDiesel® attributes, including its fuel economy and performance. These representations, along with the advertised fuel economy, were among the primary reasons Plaintiffs chose the Subject Vehicle. At the time of purchase, Plaintiffs did not know that the Subject Vehicle could perform as advertised only by emitting NOx at levels that are greater than advertised and above legal limits. Nor were Plaintiffs aware that their Subject Vehicle was equipped with undisclosed and unauthorized emission control devices designed to cheat emission tests and to deceive consumers and regulators. Plaintiffs would not have purchased the Subject Vehicle, or would have paid less for it, had they known that it did not comply with emission standards; that its emission treatment system was designed to de-activate during real-world driving conditions; and that it could not achieve the advertised towing power, performance, and/or fuel economy without cheating emission tests. Plaintiffs have suffered a concrete injury as a direct and proximate result of Defendants' misconduct, and would not have purchased the Subject Vehicle,

or would have paid less for it, had Defendants not concealed the unauthorized emission control devices.

111.     Plaintiffs, William J and Sherry A Coomes (for the purpose of this paragraph, "Plaintiffs"), are citizens of the State of Indiana residing in the City of Greenfield, bought a 2015 Jeep Grand Cherokee EcoDiesel® (for the purpose of this paragraph, the "Subject Vehicle") on or about September 1, 2017, at Larkin Cobb Chevy-Buick-GMC, an authorized FCA dealer in Eaton, Ohio. Plaintiffs decided to buy the Subject Vehicle based in part on FCA's representations that it was an "EcoDiesel" vehicle (i.e., reduced emissions and fuel efficient). Plaintiffs recall visiting the Jeep website, on which the Subject Vehicles were represented as environmentally friendly, having low emissions and good fuel economy. Plaintiffs also recall seeing television commercials about the Subject Vehicles. When Plaintiffs went to Larkin Cobb Chevy-Buick-GMC to purchase the Subject Vehicle, the sales associate touted the Subject Vehicle's EcoDiesel® attributes, including its fuel economy and performance. These representations, along with the advertised fuel economy, were among the primary reasons Plaintiffs chose the Subject Vehicle. At the time of purchase, Plaintiffs did not know that the Subject Vehicle could perform as advertised only by emitting NOx at levels that are greater than advertised and above legal limits. Nor were Plaintiffs aware that their Subject Vehicle was equipped with undisclosed and unauthorized emission control devices designed to cheat emission tests and to deceive consumers and regulators. Plaintiffs would not have purchased the Subject Vehicle, or would have paid less for it, had they known that it did not comply with emission standards; that its emission treatment system was designed to de-activate during real-world driving conditions; and that it could not achieve the advertised towing power, performance, and/or fuel economy without cheating emission tests. Plaintiffs have suffered a concrete injury as a direct and proximate result of Defendants' misconduct, and would not have

purchased the Subject Vehicle, or would have paid less for it, had Defendants not concealed the unauthorized emission control devices.

112.    Plaintiff, Greg A Gouker (for the purpose of this paragraph, "Plaintiff"), a citizen of the State of Texas residing in the City of Cedar Creek, bought a 2015 Dodge Ram 1500 EcoDiesel® (for the purpose of this paragraph, the "Subject Vehicle") on or about July 1, 2017, at Nyle Maxwell Chrysler Dodge Jeep of Taylor, an authorized FCA dealer in Taylor, Texas. Plaintiff decided to buy the Subject Vehicle based in part on FCA's representations that it was an "EcoDiesel" vehicle (i.e., reduced emissions and fuel efficient). Plaintiff recalls visiting the Ram website, on which the Subject Vehicles were represented as environmentally friendly, having low emissions and good fuel economy. Plaintiff also recalls seeing television commercials about the Subject Vehicles. When Plaintiff went to Nyle Maxwell Chrysler Dodge Jeep of Taylor to purchase the Subject Vehicle, the sales associate touted the Subject Vehicle's EcoDiesel® attributes, including its fuel economy and performance. These representations, along with the advertised fuel economy, were among the primary reasons Plaintiff chose the Subject Vehicle. At the time of purchase, Plaintiff did not know that the Subject Vehicle could perform as advertised only by emitting NOx at levels that are greater than advertised and above legal limits. Nor was Plaintiff aware that his/her Subject Vehicle was equipped with undisclosed and unauthorized emission control devices designed to cheat emission tests and to deceive consumers and regulators. Plaintiff would not have purchased the Subject Vehicle, or would have paid less for it, had he/she known that it did not comply with emission standards; that its emission treatment system was designed to de-activate during real-world driving conditions; and that it could not achieve the advertised towing power, performance, and/or fuel economy without cheating emission tests. Plaintiff has suffered a concrete injury as a direct and proximate result of Defendants' misconduct, and would

not have purchased the Subject Vehicle, or would have paid less for it, had Defendants not concealed the unauthorized emission control devices.

113. Plaintiff, Yuriy Mayurov (for the purpose of this paragraph, "Plaintiff"), a citizen of the State of Utah residing in the City of Bountiful, bought a 2014 Dodge Ram 1500 EcoDiesel® (for the purpose of this paragraph, the "Subject Vehicle") on or about November 23, 2018, at Ken Garff West Valley Chrysler Jeep Dodge Ram FIAT, an authorized FCA dealer in West Valley City, Utah. Plaintiff decided to buy the Subject Vehicle based in part on FCA's representations that it was an "EcoDiesel" vehicle (i.e., reduced emissions and fuel efficient). Plaintiff recalls visiting the Ram website, on which the Subject Vehicles were represented as environmentally friendly, having low emissions and good fuel economy. Plaintiff also recalls seeing television commercials about the Subject Vehicles. When Plaintiff went to Ken Garff West Valley Chrysler Jeep Dodge Ram FIAT to purchase the Subject Vehicle, the sales associate touted the Subject Vehicle's EcoDiesel® attributes, including its fuel economy and performance. These representations, along with the advertised fuel economy, were among the primary reasons Plaintiff chose the Subject Vehicle. At the time of purchase, Plaintiff did not know that the Subject Vehicle could perform as advertised only by emitting NOx at levels that are greater than advertised and above legal limits. Nor was Plaintiff aware that his/her Subject Vehicle was equipped with undisclosed and unauthorized emission control devices designed to cheat emission tests and to deceive consumers and regulators. Plaintiff would not have purchased the Subject Vehicle, or would have paid less for it, had he/she known that it did not comply with emission standards; that its emission treatment system was designed to de-activate during real-world driving conditions; and that it could not achieve the advertised towing power, performance, and/or fuel economy without cheating emission tests. Plaintiff has suffered a concrete injury as a direct and proximate

result of Defendants' misconduct, and would not have purchased the Subject Vehicle, or would have paid less for it, had Defendants not concealed the unauthorized emission control devices.

114.    Plaintiff, Kressy Carlile (for the purpose of this paragraph, "Plaintiff"), a citizen of the State of New Mexico residing in the City of Maljamar, bought a 2014 Dodge Ram 1500 EcoDiesel® (for the purpose of this paragraph, the "Subject Vehicle") on or about October 9, 2014, at Frontier Dodge Chrysler Jeep, an authorized FCA dealer in Lubbock, Texas. Plaintiff decided to buy the Subject Vehicle based in part on FCA's representations that it was an "EcoDiesel" vehicle (i.e., reduced emissions and fuel efficient). Plaintiff recalls visiting the Ram website, on which the Subject Vehicles were represented as environmentally friendly, having low emissions and good fuel economy. Plaintiff also recalls seeing television commercials about the Subject Vehicles. When Plaintiff went to Frontier Dodge Chrysler Jeep to purchase the Subject Vehicle, the sales associate touted the Subject Vehicle's EcoDiesel® attributes, including its fuel economy and performance. These representations, along with the advertised fuel economy, were among the primary reasons Plaintiff chose the Subject Vehicle. At the time of purchase, Plaintiff did not know that the Subject Vehicle could perform as advertised only by emitting NOx at levels that are greater than advertised and above legal limits. Nor was Plaintiff aware that his/her Subject Vehicle was equipped with undisclosed and unauthorized emission control devices designed to cheat emission tests and to deceive consumers and regulators. Plaintiff would not have purchased the Subject Vehicle, or would have paid less for it, had he/she known that it did not comply with emission standards; that its emission treatment system was designed to de-activate during real-world driving conditions; and that it could not achieve the advertised towing power, performance, and/or fuel economy without cheating emission tests. Plaintiff has suffered a concrete injury as a direct and proximate result of Defendants' misconduct, and would not have purchased the Subject Vehicle,

or would have paid less for it, had Defendants not concealed the unauthorized emission control devices.

115. Plaintiff, Juan Carlos Soto (for the purpose of this paragraph, "Plaintiff"), a citizen of the State of Arizona residing in the City of Scottsdale, bought a 2015 Dodge Ram 1500 EcoDiesel® (for the purpose of this paragraph, the "Subject Vehicle") on or about October 25, 2016, from an individual in Phoenix, Arizona. Plaintiff decided to buy the Subject Vehicle based in part on FCA's representations that it was an "EcoDiesel" vehicle (i.e., reduced emissions and fuel efficient). Plaintiff recalls visiting the Ram website, on which the Subject Vehicles were represented as environmentally friendly, having low emissions and good fuel economy. Plaintiff also recalls seeing television commercials about the Subject Vehicles. When Plaintiff went to purchase the Subject Vehicle, the individual touted the Subject Vehicle's EcoDiesel® attributes, including its fuel economy and performance. These representations, along with the advertised fuel economy, were among the primary reasons Plaintiff chose the Subject Vehicle. At the time of purchase, Plaintiff did not know that the Subject Vehicle could perform as advertised only by emitting NOx at levels that are greater than advertised and above legal limits. Nor was Plaintiff aware that his/her Subject Vehicle was equipped with undisclosed and unauthorized emission control devices designed to cheat emission tests and to deceive consumers and regulators. Plaintiff would not have purchased the Subject Vehicle, or would have paid less for it, had he/she known that it did not comply with emission standards; that its emission treatment system was designed to de-activate during real-world driving conditions; and that it could not achieve the advertised towing power, performance, and/or fuel economy without cheating emission tests. Plaintiff has suffered a concrete injury as a direct and proximate result of Defendants' misconduct, and would

not have purchased the Subject Vehicle, or would have paid less for it, had Defendants not concealed the unauthorized emission control devices.

116.    Plaintiff, Tia Shubert (for the purpose of this paragraph, "Plaintiff"), a citizen of the State of Florida residing in the City of Miramar Beach, bought a 2015 Dodge Ram 1500 EcoDiesel® (for the purpose of this paragraph, the "Subject Vehicle") on or about September 5, 2015, at Lee Dodge, an authorized FCA dealer in Walton Beach, Florida. Plaintiff decided to buy the Subject Vehicle based in part on FCA's representations that it was an "EcoDiesel" vehicle (i.e., reduced emissions and fuel efficient). Plaintiff recalls visiting the Ram website, on which the Subject Vehicles were represented as environmentally friendly, having low emissions and good fuel economy. Plaintiff also recalls seeing television commercials about the Subject Vehicles. When Plaintiff went to Lee Dodge to purchase the Subject Vehicle, the sales associate touted the Subject Vehicle's EcoDiesel® attributes, including its fuel economy and performance. These representations, along with the advertised fuel economy, were among the primary reasons Plaintiff chose the Subject Vehicle. At the time of purchase, Plaintiff did not know that the Subject Vehicle could perform as advertised only by emitting NOx at levels that are greater than advertised and above legal limits. Nor was Plaintiff aware that his/her Subject Vehicle was equipped with undisclosed and unauthorized emission control devices designed to cheat emission tests and to deceive consumers and regulators. Plaintiff would not have purchased the Subject Vehicle, or would have paid less for it, had he/she known that it did not comply with emission standards; that its emission treatment system was designed to de-activate during real-world driving conditions; and that it could not achieve the advertised towing power, performance, and/or fuel economy without cheating emission tests. Plaintiff has suffered a concrete injury as a direct and proximate

result of Defendants' misconduct, and would not have purchased the Subject Vehicle, or would have paid less for it, had Defendants not concealed the unauthorized emission control devices.

117.    Plaintiff, Ronnie Vincent (for the purpose of this paragraph, "Plaintiff"), a citizen of the State of Oregon residing in the City of Portland, bought a 2016 Dodge Ram 1500 EcoDiesel® (for the purpose of this paragraph, the "Subject Vehicle") on or about June 14, 2016, at Ron Tonkin Dodge Inc, an authorized FCA dealer in Gladstone, Oregon. Plaintiff decided to buy the Subject Vehicle based in part on FCA's representations that it was an "EcoDiesel" vehicle (i.e., reduced emissions and fuel efficient). Plaintiff recalls visiting the Ram website, on which the Subject Vehicles were represented as environmentally friendly, having low emissions and good fuel economy. Plaintiff also recalls seeing television commercials about the Subject Vehicles. When Plaintiff went to Ron Tonkin Dodge Inc to purchase the Subject Vehicle, the sales associate touted the Subject Vehicle's EcoDiesel® attributes, including its fuel economy and performance. These representations, along with the advertised fuel economy, were among the primary reasons Plaintiff chose the Subject Vehicle. At the time of purchase, Plaintiff did not know that the Subject Vehicle could perform as advertised only by emitting NOx at levels that are greater than advertised and above legal limits. Nor was Plaintiff aware that his/her Subject Vehicle was equipped with undisclosed and unauthorized emission control devices designed to cheat emission tests and to deceive consumers and regulators. Plaintiff would not have purchased the Subject Vehicle, or would have paid less for it, had he/she known that it did not comply with emission standards; that its emission treatment system was designed to de-activate during real-world driving conditions; and that it could not achieve the advertised towing power, performance, and/or fuel economy without cheating emission tests. Plaintiff has suffered a concrete injury as a direct and proximate

result of Defendants' misconduct, and would not have purchased the Subject Vehicle, or would have paid less for it, had Defendants not concealed the unauthorized emission control devices.

118.    Plaintiffs, George and Sherri Bunker Jr (for the purpose of this paragraph, "Plaintiffs"), are citizens of the State of Kentucky residing in the City of Frankfort, bought a 2016 Dodge Ram 1500 EcoDiesel® (for the purpose of this paragraph, the "Subject Vehicle") on or about September 8, 2017, at Toyota of Frankfort, an authorized FCA dealer in Frankfort, Kentucky. Plaintiffs decided to buy the Subject Vehicle based in part on FCA's representations that it was an "EcoDiesel" vehicle (i.e., reduced emissions and fuel efficient). Plaintiffs recall visiting the Ram website, on which the Subject Vehicles were represented as environmentally friendly, having low emissions and good fuel economy. Plaintiffs also recall seeing television commercials about the Subject Vehicles. When Plaintiffs went to Toyota of Frankfort to purchase the Subject Vehicle, the sales associate touted the Subject Vehicle's EcoDiesel® attributes, including its fuel economy and performance. These representations, along with the advertised fuel economy, were among the primary reasons Plaintiffs chose the Subject Vehicle. At the time of purchase, Plaintiffs did not know that the Subject Vehicle could perform as advertised only by emitting NOx at levels that are greater than advertised and above legal limits. Nor were Plaintiffs aware that their Subject Vehicle was equipped with undisclosed and unauthorized emission control devices designed to cheat emission tests and to deceive consumers and regulators. Plaintiffs would not have purchased the Subject Vehicle, or would have paid less for it, had they known that it did not comply with emission standards; that its emission treatment system was designed to de-activate during real-world driving conditions; and that it could not achieve the advertised towing power, performance, and/or fuel economy without cheating emission tests. Plaintiffs have suffered a concrete injury as a direct and proximate result of Defendants' misconduct, and would not have

purchased the Subject Vehicle, or would have paid less for it, had Defendants not concealed the unauthorized emission control devices.

119.    Plaintiff, James Greene (for the purpose of this paragraph, "Plaintiff"), a citizen of the State of Georgia residing in the City of Locust Grove, bought a 2015 Dodge Ram 1500 EcoDiesel® (for the purpose of this paragraph, the "Subject Vehicle") in April 2015, at Countryside Dodge, an authorized FCA dealer in Jackson, Georgia. Plaintiff decided to buy the Subject Vehicle based in part on FCA's representations that it was an "EcoDiesel" vehicle (i.e., reduced emissions and fuel efficient). Plaintiff recalls visiting the Ram website, on which the Subject Vehicles were represented as environmentally friendly, having low emissions and good fuel economy. Plaintiff also recalls seeing television commercials about the Subject Vehicles. When Plaintiff went to Countryside Dodge to purchase the Subject Vehicle, the sales associate touted the Subject Vehicle's EcoDiesel® attributes, including its fuel economy and performance. These representations, along with the advertised fuel economy, were among the primary reasons Plaintiff chose the Subject Vehicle. At the time of purchase, Plaintiff did not know that the Subject Vehicle could perform as advertised only by emitting NOx at levels that are greater than advertised and above legal limits. Nor was Plaintiff aware that his/her Subject Vehicle was equipped with undisclosed and unauthorized emission control devices designed to cheat emission tests and to deceive consumers and regulators. Plaintiff would not have purchased the Subject Vehicle, or would have paid less for it, had he/she known that it did not comply with emission standards; that its emission treatment system was designed to de-activate during real-world driving conditions; and that it could not achieve the advertised towing power, performance, and/or fuel economy without cheating emission tests. Plaintiff has suffered a concrete injury as a direct and proximate

result of Defendants' misconduct, and would not have purchased the Subject Vehicle, or would have paid less for it, had Defendants not concealed the unauthorized emission control devices.

120.    Plaintiff, Michael Miller (for the purpose of this paragraph, "Plaintiff"), a citizen of the State of Michigan residing in the City of South Lyon, bought a 2015 Dodge Ram 1500 EcoDiesel® (for the purpose of this paragraph, the "Subject Vehicle") on or about May 30, 2015, at Suburban Chrysler Dodge Jeep Ram of Farmington Hills, an authorized FCA dealer in Farmington Hills, Michigan. Plaintiff decided to buy the Subject Vehicle based in part on FCA's representations that it was an "EcoDiesel" vehicle (i.e., reduced emissions and fuel efficient). Plaintiff recalls visiting the Ram website, on which the Subject Vehicles were represented as environmentally friendly, having low emissions and good fuel economy. Plaintiff also recalls seeing television commercials about the Subject Vehicles. When Plaintiff went to Suburban Chrysler Dodge Jeep Ram of Farmington Hills to purchase the Subject Vehicle, the sales associate touted the Subject Vehicle's EcoDiesel® attributes, including its fuel economy and performance. These representations, along with the advertised fuel economy, were among the primary reasons Plaintiff chose the Subject Vehicle. At the time of purchase, Plaintiff did not know that the Subject Vehicle could perform as advertised only by emitting NOx at levels that are greater than advertised and above legal limits. Nor was Plaintiff aware that his/her Subject Vehicle was equipped with undisclosed and unauthorized emission control devices designed to cheat emission tests and to deceive consumers and regulators. Plaintiff would not have purchased the Subject Vehicle, or would have paid less for it, had he/she known that it did not comply with emission standards; that its emission treatment system was designed to de-activate during real-world driving conditions; and that it could not achieve the advertised towing power, performance, and/or fuel economy without cheating emission tests. Plaintiff has suffered a concrete injury as a direct and proximate

result of Defendants' misconduct, and would not have purchased the Subject Vehicle, or would have paid less for it, had Defendants not concealed the unauthorized emission control devices.

121.    Plaintiff, Robert Acevedo (for the purpose of this paragraph, "Plaintiff"), a citizen of the State of Texas residing in the City of Olmito, bought a 2016 Dodge Ram 1500 EcoDiesel® (for the purpose of this paragraph, the "Subject Vehicle") on or about March 1, 2016, at Don Johnson Motors, an authorized FCA dealer in Brownsville, Texas. Plaintiff decided to buy the Subject Vehicle based in part on FCA's representations that it was an "EcoDiesel" vehicle (i.e., reduced emissions and fuel efficient). Plaintiff recalls visiting the Ram website, on which the Subject Vehicles were represented as environmentally friendly, having low emissions and good fuel economy. Plaintiff also recalls seeing television commercials about the Subject Vehicles. When Plaintiff went to Don Johnson Motors to purchase the Subject Vehicle, the sales associate touted the Subject Vehicle's EcoDiesel® attributes, including its fuel economy and performance. These representations, along with the advertised fuel economy, were among the primary reasons Plaintiff chose the Subject Vehicle. At the time of purchase, Plaintiff did not know that the Subject Vehicle could perform as advertised only by emitting NOx at levels that are greater than advertised and above legal limits. Nor was Plaintiff aware that his/her Subject Vehicle was equipped with undisclosed and unauthorized emission control devices designed to cheat emission tests and to deceive consumers and regulators. Plaintiff would not have purchased the Subject Vehicle, or would have paid less for it, had he/she known that it did not comply with emission standards; that its emission treatment system was designed to de-activate during real-world driving conditions; and that it could not achieve the advertised towing power, performance, and/or fuel economy without cheating emission tests. Plaintiff has suffered a concrete injury as a direct and proximate

result of Defendants' misconduct, and would not have purchased the Subject Vehicle, or would have paid less for it, had Defendants not concealed the unauthorized emission control devices.

122.    Plaintiff, Jeremy Delong (for the purpose of this paragraph, "Plaintiff"), a citizen of the State of New Hampshire residing in the City of Bethlehem, bought a 2014 Dodge Ram 1500 EcoDiesel® (for the purpose of this paragraph, the "Subject Vehicle") on or about September 24, 2018, at Tulley BMW, an authorized FCA dealer in Manchester, New Hampshire. Plaintiff decided to buy the Subject Vehicle based in part on FCA's representations that it was an "EcoDiesel" vehicle (i.e., reduced emissions and fuel efficient). Plaintiff recalls visiting the Ram website, on which the Subject Vehicles were represented as environmentally friendly, having low emissions and good fuel economy. Plaintiff also recalls seeing television commercials about the Subject Vehicles. When Plaintiff went to Tulley BMW to purchase the Subject Vehicle, the sales associate touted the Subject Vehicle's EcoDiesel® attributes, including its fuel economy and performance. These representations, along with the advertised fuel economy, were among the primary reasons Plaintiff chose the Subject Vehicle. At the time of purchase, Plaintiff did not know that the Subject Vehicle could perform as advertised only by emitting NOx at levels that are greater than advertised and above legal limits. Nor was Plaintiff aware that his/her Subject Vehicle was equipped with undisclosed and unauthorized emission control devices designed to cheat emission tests and to deceive consumers and regulators. Plaintiff would not have purchased the Subject Vehicle, or would have paid less for it, had he/she known that it did not comply with emission standards; that its emission treatment system was designed to de-activate during real-world driving conditions; and that it could not achieve the advertised towing power, performance, and/or fuel economy without cheating emission tests. Plaintiff has suffered a concrete injury as a direct and proximate

result of Defendants' misconduct, and would not have purchased the Subject Vehicle, or would have paid less for it, had Defendants not concealed the unauthorized emission control devices.

123.    Plaintiff, Gary Smith (for the purpose of this paragraph, "Plaintiff"), a citizen of the State of North Carolina residing in the City of Kitty Hawk, bought a 2015 Dodge Ram 1500 EcoDiesel® (for the purpose of this paragraph, the "Subject Vehicle") on or about November 11, 2015, at Greenbriar Dodge, an authorized FCA dealer in Chesapeake, Virginia. Plaintiff decided to buy the Subject Vehicle based in part on FCA's representations that it was an "EcoDiesel" vehicle (i.e., reduced emissions and fuel efficient). Plaintiff recalls visiting the Ram website, on which the Subject Vehicles were represented as environmentally friendly, having low emissions and good fuel economy. Plaintiff also recalls seeing television commercials about the Subject Vehicles. When Plaintiff went to Greenbriar Dodge to purchase the Subject Vehicle, the sales associate touted the Subject Vehicle's EcoDiesel® attributes, including its fuel economy and performance. These representations, along with the advertised fuel economy, were among the primary reasons Plaintiff chose the Subject Vehicle. At the time of purchase, Plaintiff did not know that the Subject Vehicle could perform as advertised only by emitting NOx at levels that are greater than advertised and above legal limits. Nor was Plaintiff aware that his/her Subject Vehicle was equipped with undisclosed and unauthorized emission control devices designed to cheat emission tests and to deceive consumers and regulators. Plaintiff would not have purchased the Subject Vehicle, or would have paid less for it, had he/she known that it did not comply with emission standards; that its emission treatment system was designed to de-activate during real-world driving conditions; and that it could not achieve the advertised towing power, performance, and/or fuel economy without cheating emission tests. Plaintiff has suffered a concrete injury as a direct and proximate result of Defendants' misconduct, and would not have purchased the Subject Vehicle,

or would have paid less for it, had Defendants not concealed the unauthorized emission control devices.

124.    Plaintiffs, Gerald and Christine Good (for the purpose of this paragraph, "Plaintiffs"), are citizens of the State of Oklahoma residing in the City of Claremore, bought a 2015 Dodge Ram 1500 EcoDiesel® (for the purpose of this paragraph, the "Subject Vehicle") on or about March 5, 2015, at Chris Nickle Dodge, an authorized FCA dealer in Broken Arrow, Oklahoma. Plaintiffs decided to buy the Subject Vehicle based in part on FCA's representations that it was an "EcoDiesel" vehicle (i.e., reduced emissions and fuel efficient). Plaintiffs recall visiting the Ram website, on which the Subject Vehicles were represented as environmentally friendly, having low emissions and good fuel economy. Plaintiffs also recall seeing television commercials about the Subject Vehicles. When Plaintiffs went to Chris Nickle Dodge to purchase the Subject Vehicle, the sales associate touted the Subject Vehicle's EcoDiesel® attributes, including its fuel economy and performance. These representations, along with the advertised fuel economy, were among the primary reasons Plaintiffs chose the Subject Vehicle. At the time of purchase, Plaintiffs did not know that the Subject Vehicle could perform as advertised only by emitting NOx at levels that are greater than advertised and above legal limits. Nor were Plaintiffs aware that their Subject Vehicle was equipped with undisclosed and unauthorized emission control devices designed to cheat emission tests and to deceive consumers and regulators. Plaintiffs would not have purchased the Subject Vehicle, or would have paid less for it, had they known that it did not comply with emission standards; that its emission treatment system was designed to de-activate during real-world driving conditions; and that it could not achieve the advertised towing power, performance, and/or fuel economy without cheating emission tests. Plaintiffs have suffered a concrete injury as a direct and proximate result of Defendants' misconduct, and would not have

purchased the Subject Vehicle, or would have paid less for it, had Defendants not concealed the unauthorized emission control devices.

125.    Plaintiff, Theodore Klein (for the purpose of this paragraph, "Plaintiff"), a citizen of the State of Washington residing in the City of Tacoma, bought a 2015 Dodge Ram 1500 EcoDiesel® (for the purpose of this paragraph, the "Subject Vehicle") on or about October 15, 2018, at Northwest Motorsport, an authorized FCA dealer in Puyallup, Washington. Plaintiff decided to buy the Subject Vehicle based in part on FCA's representations that it was an "EcoDiesel" vehicle (i.e., reduced emissions and fuel efficient). Plaintiff recalls visiting the Ram website, on which the Subject Vehicles were represented as environmentally friendly, having low emissions and good fuel economy. Plaintiff also recalls seeing television commercials about the Subject Vehicles. When Plaintiff went to Northwest Motorsport to purchase the Subject Vehicle, the sales associate touted the Subject Vehicle's EcoDiesel® attributes, including its fuel economy and performance. These representations, along with the advertised fuel economy, were among the primary reasons Plaintiff chose the Subject Vehicle. At the time of purchase, Plaintiff did not know that the Subject Vehicle could perform as advertised only by emitting NOx at levels that are greater than advertised and above legal limits. Nor was Plaintiff aware that his/her Subject Vehicle was equipped with undisclosed and unauthorized emission control devices designed to cheat emission tests and to deceive consumers and regulators. Plaintiff would not have purchased the Subject Vehicle, or would have paid less for it, had he/she known that it did not comply with emission standards; that its emission treatment system was designed to de-activate during real-world driving conditions; and that it could not achieve the advertised towing power, performance, and/or fuel economy without cheating emission tests. Plaintiff has suffered a concrete injury as a direct and proximate result of Defendants' misconduct, and would not have purchased the Subject Vehicle,

or would have paid less for it, had Defendants not concealed the unauthorized emission control devices.

126.    Plaintiff, Michael L Goff (for the purpose of this paragraph, "Plaintiff"), a citizen of the State of West Virginia residing in the City of Clendenin, bought a 2016 Dodge Ram 1500 EcoDiesel® (for the purpose of this paragraph, the "Subject Vehicle") on or about May 19, 2018, at Walker Chrysler Dodge Jeep Ram, an authorized FCA dealer in Hurricane, West Virginia. Plaintiff decided to buy the Subject Vehicle based in part on FCA's representations that it was an "EcoDiesel" vehicle (i.e., reduced emissions and fuel efficient). Plaintiff recalls visiting the Ram website, on which the Subject Vehicles were represented as environmentally friendly, having low emissions and good fuel economy. Plaintiff also recalls seeing television commercials about the Subject Vehicles. When Plaintiff went to Walker Chrysler Dodge Jeep Ram to purchase the Subject Vehicle, the sales associate touted the Subject Vehicle's EcoDiesel® attributes, including its fuel economy and performance. These representations, along with the advertised fuel economy, were among the primary reasons Plaintiff chose the Subject Vehicle. At the time of purchase, Plaintiff did not know that the Subject Vehicle could perform as advertised only by emitting NOx at levels that are greater than advertised and above legal limits. Nor was Plaintiff aware that his/her Subject Vehicle was equipped with undisclosed and unauthorized emission control devices designed to cheat emission tests and to deceive consumers and regulators. Plaintiff would not have purchased the Subject Vehicle, or would have paid less for it, had he/she known that it did not comply with emission standards; that its emission treatment system was designed to de-activate during real-world driving conditions; and that it could not achieve the advertised towing power, performance, and/or fuel economy without cheating emission tests. Plaintiff has suffered a concrete injury as a direct and proximate result of Defendants' misconduct, and would not have

purchased the Subject Vehicle, or would have paid less for it, had Defendants not concealed the unauthorized emission control devices.

127.    Plaintiffs, Tom and Julie Bisselle (for the purpose of this paragraph, "Plaintiffs"), are citizens of the State of New York residing in the City of New Russia, bought a 2015 Dodge Ram 1500 EcoDiesel® (for the purpose of this paragraph, the "Subject Vehicle") on or about January 1, 2016, at Adirondack Auto Service, an authorized FCA dealer in Elizabethtown, New York. Plaintiff decided to buy the Subject Vehicle based in part on FCA's representations that it was an "EcoDiesel" vehicle (i.e., reduced emissions and fuel efficient). Plaintiffs recall visiting the Ram website, on which the Subject Vehicles were represented as environmentally friendly, having low emissions and good fuel economy. Plaintiffs also recall seeing television commercials about the Subject Vehicles. When Plaintiffs went to Adirondack Auto Service to purchase the Subject Vehicle, the sales associate touted the Subject Vehicle's EcoDiesel® attributes, including its fuel economy and performance. These representations, along with the advertised fuel economy, were among the primary reasons Plaintiffs chose the Subject Vehicle. At the time of purchase, Plaintiffs did not know that the Subject Vehicle could perform as advertised only by emitting NOx at levels that are greater than advertised and above legal limits. Nor were Plaintiffs aware that their Subject Vehicle was equipped with undisclosed and unauthorized emission control devices designed to cheat emission tests and to deceive consumers and regulators. Plaintiffs would not have purchased the Subject Vehicle, or would have paid less for it, had they known that it did not comply with emission standards; that its emission treatment system was designed to de-activate during real-world driving conditions; and that it could not achieve the advertised towing power, performance, and/or fuel economy without cheating emission tests. Plaintiffs have suffered a concrete injury as a direct and proximate result of Defendants' misconduct, and would not have

purchased the Subject Vehicle, or would have paid less for it, had Defendants not concealed the unauthorized emission control devices.

128.    Plaintiff, Jeffrey Francis Kernan (for the purpose of this paragraph, "Plaintiff"), a citizen of the State of Iowa residing in the City of Dubuque, bought a 2016 Dodge Ram 1500 EcoDiesel® (for the purpose of this paragraph, the "Subject Vehicle") on or about August 29, 2016, at D & J Deliveries, an authorized FCA dealer in Kellogg, Idaho. Plaintiff decided to buy the Subject Vehicle based in part on FCA's representations that it was an "EcoDiesel" vehicle (i.e., reduced emissions and fuel efficient). Plaintiff recalls visiting the Ram website, on which the Subject Vehicles were represented as environmentally friendly, having low emissions and good fuel economy. Plaintiff also recalls seeing television commercials about the Subject Vehicles. When Plaintiff went to D & J Deliveries to purchase the Subject Vehicle, the sales associate touted the Subject Vehicle's EcoDiesel® attributes, including its fuel economy and performance. These representations, along with the advertised fuel economy, were among the primary reasons Plaintiff chose the Subject Vehicle. At the time of purchase, Plaintiff did not know that the Subject Vehicle could perform as advertised only by emitting NOx at levels that are greater than advertised and above legal limits. Nor was Plaintiff aware that his/her Subject Vehicle was equipped with undisclosed and unauthorized emission control devices designed to cheat emission tests and to deceive consumers and regulators. Plaintiff would not have purchased the Subject Vehicle, or would have paid less for it, had he/she known that it did not comply with emission standards; that its emission treatment system was designed to de-activate during real-world driving conditions; and that it could not achieve the advertised towing power, performance, and/or fuel economy without cheating emission tests. Plaintiff has suffered a concrete injury as a direct and proximate

result of Defendants' misconduct, and would not have purchased the Subject Vehicle, or would have paid less for it, had Defendants not concealed the unauthorized emission control devices.

129.    Plaintiff, Brad Scott (for the purpose of this paragraph, "Plaintiff"), a citizen of the State of Georgia residing in the City of Villa Rica, bought a 2015 Dodge Ram 1500 EcoDiesel® (for the purpose of this paragraph, the "Subject Vehicle") on or about February 22, 2017, at Jacky Jones Ford, an authorized FCA dealer in Cleveland, Georgia. Plaintiff decided to buy the Subject Vehicle based in part on FCA's representations that it was an "EcoDiesel" vehicle (i.e., reduced emissions and fuel efficient). Plaintiff recalls visiting the Ram website, on which the Subject Vehicles were represented as environmentally friendly, having low emissions and good fuel economy. Plaintiff also recalls seeing television commercials about the Subject Vehicles. When Plaintiff went to Jacky Jones Ford to purchase the Subject Vehicle, the sales associate touted the Subject Vehicle's EcoDiesel® attributes, including its fuel economy and performance. These representations, along with the advertised fuel economy, were among the primary reasons Plaintiff chose the Subject Vehicle. At the time of purchase, Plaintiff did not know that the Subject Vehicle could perform as advertised only by emitting NOx at levels that are greater than advertised and above legal limits. Nor was Plaintiff aware that his/her Subject Vehicle was equipped with undisclosed and unauthorized emission control devices designed to cheat emission tests and to deceive consumers and regulators. Plaintiff would not have purchased the Subject Vehicle, or would have paid less for it, had he/she known that it did not comply with emission standards; that its emission treatment system was designed to de-activate during real-world driving conditions; and that it could not achieve the advertised towing power, performance, and/or fuel economy without cheating emission tests. Plaintiff has suffered a concrete injury as a direct and proximate

result of Defendants' misconduct, and would not have purchased the Subject Vehicle, or would have paid less for it, had Defendants not concealed the unauthorized emission control devices.

130.    Plaintiff, Matthew Robertson (for the purpose of this paragraph, "Plaintiff"), a citizen of the State of Virginia residing in the City of Springfield, bought a 2016 Jeep Grand Cherokee EcoDiesel® (for the purpose of this paragraph, the "Subject Vehicle") on or about July 24, 2016, at Safford Jeep, an authorized FCA dealer in Springfield, Virginia. Plaintiff decided to buy the Subject Vehicle based in part on FCA's representations that it was an "EcoDiesel" vehicle (i.e., reduced emissions and fuel efficient). Plaintiff recalls visiting the Jeep website, on which the Subject Vehicles were represented as environmentally friendly, having low emissions and good fuel economy. Plaintiff also recalls seeing television commercials about the Subject Vehicles. When Plaintiff went to Safford Jeep to purchase the Subject Vehicle, the sales associate touted the Subject Vehicle's EcoDiesel® attributes, including its fuel economy and performance. These representations, along with the advertised fuel economy, were among the primary reasons Plaintiff chose the Subject Vehicle. At the time of purchase, Plaintiff did not know that the Subject Vehicle could perform as advertised only by emitting NOx at levels that are greater than advertised and above legal limits. Nor was Plaintiff aware that his/her Subject Vehicle was equipped with undisclosed and unauthorized emission control devices designed to cheat emission tests and to deceive consumers and regulators. Plaintiff would not have purchased the Subject Vehicle, or would have paid less for it, had he/she known that it did not comply with emission standards; that its emission treatment system was designed to de-activate during real-world driving conditions; and that it could not achieve the advertised towing power, performance, and/or fuel economy without cheating emission tests. Plaintiff has suffered a concrete injury as a direct and proximate

result of Defendants' misconduct, and would not have purchased the Subject Vehicle, or would have paid less for it, had Defendants not concealed the unauthorized emission control devices.

131.    Plaintiff, Courtney Gayle Coleman (for the purpose of this paragraph, "Plaintiff"), a citizen of the State of Maryland residing in the City of Charlotte Hall, bought a 2015 Dodge Ram 1500 EcoDiesel® (for the purpose of this paragraph, the "Subject Vehicle") on or about April 11, 2015, at Waldorf Dodge, an authorized FCA dealer in Waldorf, Maryland. Plaintiff decided to buy the Subject Vehicle based in part on FCA's representations that it was an "EcoDiesel" vehicle (i.e., reduced emissions and fuel efficient). Plaintiff recalls visiting the Ram website, on which the Subject Vehicles were represented as environmentally friendly, having low emissions and good fuel economy. Plaintiff also recalls seeing television commercials about the Subject Vehicles. When Plaintiff went to Waldorf Dodge to purchase the Subject Vehicle, the sales associate touted the Subject Vehicle's EcoDiesel® attributes, including its fuel economy and performance. These representations, along with the advertised fuel economy, were among the primary reasons Plaintiff chose the Subject Vehicle. At the time of purchase, Plaintiff did not know that the Subject Vehicle could perform as advertised only by emitting NOx at levels that are greater than advertised and above legal limits. Nor was Plaintiff aware that his/her Subject Vehicle was equipped with undisclosed and unauthorized emission control devices designed to cheat emission tests and to deceive consumers and regulators. Plaintiff would not have purchased the Subject Vehicle, or would have paid less for it, had he/she known that it did not comply with emission standards; that its emission treatment system was designed to de-activate during real-world driving conditions; and that it could not achieve the advertised towing power, performance, and/or fuel economy without cheating emission tests. Plaintiff has suffered a concrete injury as a direct and proximate

result of Defendants' misconduct, and would not have purchased the Subject Vehicle, or would have paid less for it, had Defendants not concealed the unauthorized emission control devices.

132.    Plaintiff, Antiman Salinas (for the purpose of this paragraph, "Plaintiff"), a citizen of the State of Texas residing in the City of Laredo, bought a 2015 Dodge Ram 1500 EcoDiesel® (for the purpose of this paragraph, the "Subject Vehicle") on or about March 2, 2015, at Laredo Dodge Chrysler Jeep Ram, an authorized FCA dealer in Laredo, Texas. Plaintiff decided to buy the Subject Vehicle based in part on FCA's representations that it was an "EcoDiesel" vehicle (i.e., reduced emissions and fuel efficient). Plaintiff recalls visiting the Ram website, on which the Subject Vehicles were represented as environmentally friendly, having low emissions and good fuel economy. Plaintiff also recalls seeing television commercials about the Subject Vehicles. When Plaintiff went to Laredo Dodge Chrysler Jeep Ram to purchase the Subject Vehicle, the sales associate touted the Subject Vehicle's EcoDiesel® attributes, including its fuel economy and performance. These representations, along with the advertised fuel economy, were among the primary reasons Plaintiff chose the Subject Vehicle. At the time of purchase, Plaintiff did not know that the Subject Vehicle could perform as advertised only by emitting NOx at levels that are greater than advertised and above legal limits. Nor was Plaintiff aware that his/her Subject Vehicle was equipped with undisclosed and unauthorized emission control devices designed to cheat emission tests and to deceive consumers and regulators. Plaintiff would not have purchased the Subject Vehicle, or would have paid less for it, had he/she known that it did not comply with emission standards; that its emission treatment system was designed to de-activate during real-world driving conditions; and that it could not achieve the advertised towing power, performance, and/or fuel economy without cheating emission tests. Plaintiff has suffered a concrete injury as a direct and proximate result of Defendants' misconduct, and would not have purchased the Subject Vehicle,

114

or would have paid less for it, had Defendants not concealed the unauthorized emission control devices.

133.    Plaintiff, Christopher Harper (for the purpose of this paragraph, "Plaintiff"), a citizen of the State of Colorado residing in the City of Centennial, leased a 2015 Dodge Ram 1500 EcoDiesel® (for the purpose of this paragraph, the "Subject Vehicle") on or about October 10, 2015, at Christopher's Dodge World, an authorized FCA dealer in Golden, Colorado. Plaintiff decided to buy the Subject Vehicle based in part on FCA's representations that it was an "EcoDiesel" vehicle (i.e., reduced emissions and fuel efficient). Plaintiff recalls visiting the Ram website, on which the Subject Vehicles were represented as environmentally friendly, having low emissions and good fuel economy. Plaintiff also recalls seeing television commercials about the Subject Vehicles. When Plaintiff went to Christopher's Dodge World to lease the Subject Vehicle, the sales associate touted the Subject Vehicle's EcoDiesel® attributes, including its fuel economy and performance. These representations, along with the advertised fuel economy, were among the primary reasons Plaintiff chose the Subject Vehicle. At the time of purchase, Plaintiff did not know that the Subject Vehicle could perform as advertised only by emitting NOx at levels that are greater than advertised and above legal limits. Nor was Plaintiff aware that his/her Subject Vehicle was equipped with undisclosed and unauthorized emission control devices designed to cheat emission tests and to deceive consumers and regulators. Plaintiff would not have leased the Subject Vehicle, or would have paid less for it, had he/she known that it did not comply with emission standards; that its emission treatment system was designed to de-activate during real-world driving conditions; and that it could not achieve the advertised towing power, performance, and/or fuel economy without cheating emission tests. Plaintiff has suffered a concrete injury as a direct and proximate result of Defendants' misconduct, and would not have purchased the Subject Vehicle,

or would have paid less for it, had Defendants not concealed the unauthorized emission control devices.

134.    Plaintiff, Zina Bryson (for the purpose of this paragraph, "Plaintiff"), a citizen of the State of Washington residing in the City of West Richland, bought a 2016 Jeep Grand Cherokee EcoDiesel® (for the purpose of this paragraph, the "Subject Vehicle") on or about October 2, 2018, at Tom Denchel Ford, an authorized FCA dealer in Prosser, Washington. Plaintiff decided to buy the Subject Vehicle based in part on FCA's representations that it was an "EcoDiesel" vehicle (i.e., reduced emissions and fuel efficient). Plaintiff recalls visiting the Jeep website, on which the Subject Vehicles were represented as environmentally friendly, having low emissions and good fuel economy. Plaintiff also recalls seeing television commercials about the Subject Vehicles. When Plaintiff went to Tom Denchel Ford to purchase the Subject Vehicle, the sales associate touted the Subject Vehicle's EcoDiesel® attributes, including its fuel economy and performance. These representations, along with the advertised fuel economy, were among the primary reasons Plaintiff chose the Subject Vehicle. At the time of purchase, Plaintiff did not know that the Subject Vehicle could perform as advertised only by emitting NOx at levels that are greater than advertised and above legal limits. Nor was Plaintiff aware that his/her Subject Vehicle was equipped with undisclosed and unauthorized emission control devices designed to cheat emission tests and to deceive consumers and regulators. Plaintiff would not have purchased the Subject Vehicle, or would have paid less for it, had he/she known that it did not comply with emission standards; that its emission treatment system was designed to de-activate during real-world driving conditions; and that it could not achieve the advertised towing power, performance, and/or fuel economy without cheating emission tests. Plaintiff has suffered a concrete injury as a direct and proximate

result of Defendants' misconduct, and would not have purchased the Subject Vehicle, or would have paid less for it, had Defendants not concealed the unauthorized emission control devices.

135.    Plaintiff, Dwight Lindstrom (for the purpose of this paragraph, "Plaintiff"), a citizen of the State of Michigan residing in the City of Harrison Township, bought a 2014 Dodge Ram 1500 EcoDiesel® (for the purpose of this paragraph, the "Subject Vehicle") on or about July 13, 2017, at Galeana's Van Dyke Dodge, an authorized FCA dealer in Warren, Michigan. Plaintiff decided to buy the Subject Vehicle based in part on FCA's representations that it was an "EcoDiesel" vehicle (i.e., reduced emissions and fuel efficient). Plaintiff recalls visiting the Ram website, on which the Subject Vehicles were represented as environmentally friendly, having low emissions and good fuel economy. Plaintiff also recalls seeing television commercials about the Subject Vehicles. When Plaintiff went to Galeana's Van Dyke Dodge to purchase the Subject Vehicle, the sales associate touted the Subject Vehicle's EcoDiesel® attributes, including its fuel economy and performance. These representations, along with the advertised fuel economy, were among the primary reasons Plaintiff chose the Subject Vehicle. At the time of purchase, Plaintiff did not know that the Subject Vehicle could perform as advertised only by emitting NOx at levels that are greater than advertised and above legal limits. Nor was Plaintiff aware that his/her Subject Vehicle was equipped with undisclosed and unauthorized emission control devices designed to cheat emission tests and to deceive consumers and regulators. Plaintiff would not have purchased the Subject Vehicle, or would have paid less for it, had he/she known that it did not comply with emission standards; that its emission treatment system was designed to de-activate during real-world driving conditions; and that it could not achieve the advertised towing power, performance, and/or fuel economy without cheating emission tests. Plaintiff has suffered a concrete injury as a direct and proximate result of Defendants' misconduct, and would not have purchased the Subject

Vehicle, or would have paid less for it, had Defendants not concealed the unauthorized emission control devices.

136.    Plaintiff, Chris Barbour (for the purpose of this paragraph, "Plaintiff"), a citizen of the State of Connecticut residing in the City of Plantsville, bought a 2014 Dodge Ram 1500 EcoDiesel® (for the purpose of this paragraph, the "Subject Vehicle") on or about March 18, 2017, at Terryville Chevrolet, an authorized FCA dealer in Plantsville, Connecticut. Plaintiff decided to buy the Subject Vehicle based in part on FCA's representations that it was an "EcoDiesel" vehicle (i.e., reduced emissions and fuel efficient). Plaintiff recalls visiting the Ram website, on which the Subject Vehicles were represented as environmentally friendly, having low emissions and good fuel economy. Plaintiff also recalls seeing television commercials about the Subject Vehicles. When Plaintiff went to Terryville Chevrolet to purchase the Subject Vehicle, the sales associate touted the Subject Vehicle's EcoDiesel® attributes, including its fuel economy and performance. These representations, along with the advertised fuel economy, were among the primary reasons Plaintiff chose the Subject Vehicle. At the time of purchase, Plaintiff did not know that the Subject Vehicle could perform as advertised only by emitting NOx at levels that are greater than advertised and above legal limits. Nor was Plaintiff aware that his/her Subject Vehicle was equipped with undisclosed and unauthorized emission control devices designed to cheat emission tests and to deceive consumers and regulators. Plaintiff would not have purchased the Subject Vehicle, or would have paid less for it, had he/she known that it did not comply with emission standards; that its emission treatment system was designed to de-activate during real-world driving conditions; and that it could not achieve the advertised towing power, performance, and/or fuel economy without cheating emission tests. Plaintiff has suffered a concrete injury as a direct and proximate

result of Defendants' misconduct, and would not have purchased the Subject Vehicle, or would have paid less for it, had Defendants not concealed the unauthorized emission control devices.

137.    Plaintiffs, Donald and Beverly M. Young (for the purpose of this paragraph, "Plaintiffs"), are citizens of the State of Missouri residing in the City of Kansas City, bought a 2015 Dodge Ram 1500 EcoDiesel® (for the purpose of this paragraph, the "Subject Vehicle") on or about April 11, 2015, at Landmark Dodge, an authorized FCA dealer in Belton, Missouri. Plaintiffs decided to buy the Subject Vehicle based in part on FCA's representations that it was an "EcoDiesel" vehicle (i.e., reduced emissions and fuel efficient). Plaintiffs recall visiting the Ram website, on which the Subject Vehicles were represented as environmentally friendly, having low emissions and good fuel economy. Plaintiffs also recall seeing television commercials about the Subject Vehicles. When Plaintiffs went to Landmark Dodge to purchase the Subject Vehicle, the sales associate touted the Subject Vehicle's EcoDiesel® attributes, including its fuel economy and performance. These representations, along with the advertised fuel economy, were among the primary reasons Plaintiffs chose the Subject Vehicle. At the time of purchase, Plaintiffs did not know that the Subject Vehicle could perform as advertised only by emitting NOx at levels that are greater than advertised and above legal limits. Nor were Plaintiffs aware that their Subject Vehicle was equipped with undisclosed and unauthorized emission control devices designed to cheat emission tests and to deceive consumers and regulators. Plaintiffs would not have purchased the Subject Vehicle, or would have paid less for it, had they known that it did not comply with emission standards; that its emission treatment system was designed to de-activate during real-world driving conditions; and that it could not achieve the advertised towing power, performance, and/or fuel economy without cheating emission tests. Plaintiffs have suffered a concrete injury as a direct and proximate result of Defendants' misconduct, and would not have purchased the Subject Vehicle,

or would have paid less for it, had Defendants not concealed the unauthorized emission control devices.

138.    Plaintiff, Mark King (for the purpose of this paragraph, "Plaintiff"), a citizen of the State of Florida residing in the City of Pensacola, bought a 2016 Dodge Ram 1500 EcoDiesel® (for the purpose of this paragraph, the "Subject Vehicle") on or about February 18, 2017, at Driver's Way, an authorized FCA dealer in Pelham, Alabama. Plaintiff decided to buy the Subject Vehicle based in part on FCA's representations that it was an "EcoDiesel" vehicle (i.e., reduced emissions and fuel efficient). Plaintiff recalls visiting the Ram website, on which the Subject Vehicles were represented as environmentally friendly, having low emissions and good fuel economy. Plaintiff also recalls seeing television commercials about the Subject Vehicles. When Plaintiff went to Driver's Way to purchase the Subject Vehicle, the sales associate touted the Subject Vehicle's EcoDiesel® attributes, including its fuel economy and performance. These representations, along with the advertised fuel economy, were among the primary reasons Plaintiff chose the Subject Vehicle. At the time of purchase, Plaintiff did not know that the Subject Vehicle could perform as advertised only by emitting NOx at levels that are greater than advertised and above legal limits. Nor was Plaintiff aware that his/her Subject Vehicle was equipped with undisclosed and unauthorized emission control devices designed to cheat emission tests and to deceive consumers and regulators. Plaintiff would not have purchased the Subject Vehicle, or would have paid less for it, had he/she known that it did not comply with emission standards; that its emission treatment system was designed to de-activate during real-world driving conditions; and that it could not achieve the advertised towing power, performance, and/or fuel economy without cheating emission tests. Plaintiff has suffered a concrete injury as a direct and proximate

result of Defendants' misconduct, and would not have purchased the Subject Vehicle, or would have paid less for it, had Defendants not concealed the unauthorized emission control devices.

139.    Plaintiff, Nicholas Selchert (for the purpose of this paragraph, "Plaintiff"), a citizen of the State of South Dakota residing in the City of Sioux Falls, bought a 2015 Dodge Ram 1500 EcoDiesel® (for the purpose of this paragraph, the "Subject Vehicle") on or about May 15, 2018, at Broadway Chrysler, Dodge, Jeep, Inc., an authorized FCA dealer in Yankton, South Dakota. Plaintiff decided to buy the Subject Vehicle based in part on FCA's representations that it was an "EcoDiesel" vehicle (i.e., reduced emissions and fuel efficient). Plaintiff recalls visiting the Ram website, on which the Subject Vehicles were represented as environmentally friendly, having low emissions and good fuel economy. Plaintiff also recalls seeing television commercials about the Subject Vehicles. When Plaintiff went to Broadway Chrysler, Dodge, Jeep, Inc. to purchase the Subject Vehicle, the sales associate touted the Subject Vehicle's EcoDiesel® attributes, including its fuel economy and performance. These representations, along with the advertised fuel economy, were among the primary reasons Plaintiff chose the Subject Vehicle. At the time of purchase, Plaintiff did not know that the Subject Vehicle could perform as advertised only by emitting NOx at levels that are greater than advertised and above legal limits. Nor was Plaintiff aware that his/her Subject Vehicle was equipped with undisclosed and unauthorized emission control devices designed to cheat emission tests and to deceive consumers and regulators. Plaintiff would not have purchased the Subject Vehicle, or would have paid less for it, had he/she known that it did not comply with emission standards; that its emission treatment system was designed to de-activate during real-world driving conditions; and that it could not achieve the advertised towing power, performance, and/or fuel economy without cheating emission tests. Plaintiff has suffered a concrete injury as a direct and proximate result of Defendants' misconduct, and would not have

purchased the Subject Vehicle, or would have paid less for it, had Defendants not concealed the unauthorized emission control devices.

140.     Plaintiff, James Beemer (for the purpose of this paragraph, "Plaintiff"), a citizen of the State of Missouri residing in the City of Maryville, bought a 2015 Dodge Ram 1500 EcoDiesel® (for the purpose of this paragraph, the "Subject Vehicle") on or about October 16, 2018, at Tri State Chrysler Jeep Ram, an authorized FCA dealer in Maryville, Missouri. Plaintiff decided to buy the Subject Vehicle based in part on FCA's representations that it was an "EcoDiesel" vehicle (i.e., reduced emissions and fuel efficient). Plaintiff recalls visiting the Ram website, on which the Subject Vehicles were represented as environmentally friendly, having low emissions and good fuel economy. Plaintiff also recalls seeing television commercials about the Subject Vehicles. When Plaintiff went to Tri State Chrysler Jeep Ram to purchase the Subject Vehicle, the sales associate touted the Subject Vehicle's EcoDiesel® attributes, including its fuel economy and performance. These representations, along with the advertised fuel economy, were among the primary reasons Plaintiff chose the Subject Vehicle. At the time of purchase, Plaintiff did not know that the Subject Vehicle could perform as advertised only by emitting NOx at levels that are greater than advertised and above legal limits. Nor was Plaintiff aware that his/her Subject Vehicle was equipped with undisclosed and unauthorized emission control devices designed to cheat emission tests and to deceive consumers and regulators. Plaintiff would not have purchased the Subject Vehicle, or would have paid less for it, had he/she known that it did not comply with emission standards; that its emission treatment system was designed to de-activate during real-world driving conditions; and that it could not achieve the advertised towing power, performance, and/or fuel economy without cheating emission tests. Plaintiff has suffered a concrete injury as a direct and proximate result of Defendants' misconduct, and would not have purchased the Subject

Vehicle, or would have paid less for it, had Defendants not concealed the unauthorized emission control devices.

141.    Plaintiff, Ron Naasz (for the purpose of this paragraph, "Plaintiff"), a citizen of the State of North Dakota residing in the City of Jamestown, bought a 2015 Dodge Ram 1500 EcoDiesel® (for the purpose of this paragraph, the "Subject Vehicle") on or about February 7, 2018, at R. M. Stoudt, Inc., an authorized FCA dealer in Jamestown, North Dakota. Plaintiff decided to buy the Subject Vehicle based in part on FCA's representations that it was an "EcoDiesel" vehicle (i.e., reduced emissions and fuel efficient). Plaintiff recalls visiting the Ram website, on which the Subject Vehicles were represented as environmentally friendly, having low emissions and good fuel economy. Plaintiff also recalls seeing television commercials about the Subject Vehicles. When Plaintiff went to R. M. Stoudt, Inc. to purchase the Subject Vehicle, the sales associate touted the Subject Vehicle's EcoDiesel® attributes, including its fuel economy and performance. These representations, along with the advertised fuel economy, were among the primary reasons Plaintiff chose the Subject Vehicle. At the time of purchase, Plaintiff did not know that the Subject Vehicle could perform as advertised only by emitting NOx at levels that are greater than advertised and above legal limits. Nor was Plaintiff aware that his/her Subject Vehicle was equipped with undisclosed and unauthorized emission control devices designed to cheat emission tests and to deceive consumers and regulators. Plaintiff would not have purchased the Subject Vehicle, or would have paid less for it, had he/she known that it did not comply with emission standards; that its emission treatment system was designed to de-activate during real-world driving conditions; and that it could not achieve the advertised towing power, performance, and/or fuel economy without cheating emission tests. Plaintiff has suffered a concrete injury as a direct and proximate result of Defendants' misconduct, and would not have purchased the Subject Vehicle,

or would have paid less for it, had Defendants not concealed the unauthorized emission control devices.

142.    Plaintiff, Sergio Medina (for the purpose of this paragraph, "Plaintiff"), a citizen of the State of Nebraska residing in the City of Grand Island, bought a 2015 Dodge Ram 1500 EcoDiesel® (for the purpose of this paragraph, the "Subject Vehicle") on or about March 31, 2018, at Bennett Buick GMC, an authorized FCA dealer in Salina, Kansas. Plaintiff decided to buy the Subject Vehicle based in part on FCA's representations that it was an "EcoDiesel" vehicle (i.e., reduced emissions and fuel efficient). Plaintiff recalls visiting the Ram website, on which the Subject Vehicles were represented as environmentally friendly, having low emissions and good fuel economy. Plaintiff also recalls seeing television commercials about the Subject Vehicles. When Plaintiff went to Bennett Buick GMC to purchase the Subject Vehicle, the sales associate touted the Subject Vehicle's EcoDiesel® attributes, including its fuel economy and performance. These representations, along with the advertised fuel economy, were among the primary reasons Plaintiff chose the Subject Vehicle. At the time of purchase, Plaintiff did not know that the Subject Vehicle could perform as advertised only by emitting NOx at levels that are greater than advertised and above legal limits. Nor was Plaintiff aware that his/her Subject Vehicle was equipped with undisclosed and unauthorized emission control devices designed to cheat emission tests and to deceive consumers and regulators. Plaintiff would not have purchased the Subject Vehicle, or would have paid less for it, had he/she known that it did not comply with emission standards; that its emission treatment system was designed to de-activate during real-world driving conditions; and that it could not achieve the advertised towing power, performance, and/or fuel economy without cheating emission tests. Plaintiff has suffered a concrete injury as a direct and proximate

result of Defendants' misconduct, and would not have purchased the Subject Vehicle, or would have paid less for it, had Defendants not concealed the unauthorized emission control devices.

143.    Plaintiffs, James and Deborah Andreasen (for the purpose of this paragraph, "Plaintiffs"), are citizens of the State of Alabama residing in the City of Mobile, bought a 2015 Dodge Ram 1500 EcoDiesel® (for the purpose of this paragraph, the "Subject Vehicle") on or about June 24, 2015, at AutoNation Chrysler Dodge Jeep Ram Mobile, an authorized FCA dealer in Mobile, Alabama. Plaintiffs decided to buy the Subject Vehicle based in part on FCA's representations that it was an "EcoDiesel" vehicle (i.e., reduced emissions and fuel efficient). Plaintiffs recall visiting the Ram website, on which the Subject Vehicles were represented as environmentally friendly, having low emissions and good fuel economy. Plaintiffs also recall seeing television commercials about the Subject Vehicles. When Plaintiffs went to AutoNation Chrysler Dodge Jeep Ram Mobile to purchase the Subject Vehicle, the sales associate touted the Subject Vehicle's EcoDiesel® attributes, including its fuel economy and performance. These representations, along with the advertised fuel economy, were among the primary reasons Plaintiffs chose the Subject Vehicle. At the time of purchase, Plaintiffs did not know that the Subject Vehicle could perform as advertised only by emitting NOx at levels that are greater than advertised and above legal limits. Nor were Plaintiffs aware that their Subject Vehicle was equipped with undisclosed and unauthorized emission control devices designed to cheat emission tests and to deceive consumers and regulators. Plaintiffs would not have purchased the Subject Vehicle, or would have paid less for it, had they known that it did not comply with emission standards; that its emission treatment system was designed to de-activate during real-world driving conditions; and that it could not achieve the advertised towing power, performance, and/or fuel economy without cheating emission tests. Plaintiffs have suffered a concrete injury as a direct and

proximate result of Defendants' misconduct, and would not have purchased the Subject Vehicle, or would have paid less for it, had Defendants not concealed the unauthorized emission control devices.

144.   Plaintiff, Eric Croke (for the purpose of this paragraph, "Plaintiff"), a citizen of the State of Colorado residing in the City of Cortez, bought a 2015 Dodge Ram 1500 EcoDiesel® (for the purpose of this paragraph, the "Subject Vehicle") on or about July 2, 2015, at New Country Auto Center, an authorized FCA dealer in Cortez, Colorado. Plaintiff decided to buy the Subject Vehicle based in part on FCA's representations that it was an "EcoDiesel" vehicle (i.e., reduced emissions and fuel efficient). Plaintiff recalls visiting the Ram website, on which the Subject Vehicles were represented as environmentally friendly, having low emissions and good fuel economy. Plaintiff also recalls seeing television commercials about the Subject Vehicles. When Plaintiff went to New Country Auto Center to purchase the Subject Vehicle, the sales associate touted the Subject Vehicle's EcoDiesel® attributes, including its fuel economy and performance. These representations, along with the advertised fuel economy, were among the primary reasons Plaintiff chose the Subject Vehicle. At the time of purchase, Plaintiff did not know that the Subject Vehicle could perform as advertised only by emitting NOx at levels that are greater than advertised and above legal limits. Nor was Plaintiff aware that his/her Subject Vehicle was equipped with undisclosed and unauthorized emission control devices designed to cheat emission tests and to deceive consumers and regulators. Plaintiff would not have purchased the Subject Vehicle, or would have paid less for it, had he/she known that it did not comply with emission standards; that its emission treatment system was designed to de-activate during real-world driving conditions; and that it could not achieve the advertised towing power, performance, and/or fuel economy without cheating emission tests. Plaintiff has suffered a concrete injury as a direct and proximate

result of Defendants' misconduct, and would not have purchased the Subject Vehicle, or would have paid less for it, had Defendants not concealed the unauthorized emission control devices.

145. Plaintiffs, Scott and Nancy Eastland (for the purpose of this paragraph, "Plaintiffs"), are citizens of the State of Texas residing in the City of Hearne, bought a 2016 Dodge Ram 1500 EcoDiesel® (for the purpose of this paragraph, the "Subject Vehicle") on or about February 13, 2016, at Lithia Chrysler Jeep Dodge, an authorized FCA dealer in Bryan, Texas. Plaintiffs decided to buy the Subject Vehicle based in part on FCA's representations that it was an "EcoDiesel" vehicle (i.e., reduced emissions and fuel efficient). Plaintiffs recall visiting the Ram website, on which the Subject Vehicles were represented as environmentally friendly, having low emissions and good fuel economy. Plaintiffs also recall seeing television commercials about the Subject Vehicles. When Plaintiffs went to Lithia Chrysler Jeep Dodge to purchase the Subject Vehicle, the sales associate touted the Subject Vehicle's EcoDiesel® attributes, including its fuel economy and performance. These representations, along with the advertised fuel economy, were among the primary reasons Plaintiffs chose the Subject Vehicle. At the time of purchase, Plaintiffs did not know that the Subject Vehicle could perform as advertised only by emitting NOx at levels that are greater than advertised and above legal limits. Nor were Plaintiffs aware that their Subject Vehicle was equipped with undisclosed and unauthorized emission control devices designed to cheat emission tests and to deceive consumers and regulators. Plaintiffs would not have purchased the Subject Vehicle, or would have paid less for it, had they known that it did not comply with emission standards; that its emission treatment system was designed to de-activate during real-world driving conditions; and that it could not achieve the advertised towing power, performance, and/or fuel economy without cheating emission tests. Plaintiffs have suffered a concrete injury as a direct and proximate result of Defendants' misconduct, and would not have purchased the

Subject Vehicle, or would have paid less for it, had Defendants not concealed the unauthorized emission control devices.

146.    Plaintiff, Joe Kralik (for the purpose of this paragraph, "Plaintiff"), a citizen of the State of New York residing in the City of Marlboro, bought a 2015 Dodge Ram 1500 EcoDiesel® (for the purpose of this paragraph, the "Subject Vehicle") on or about March 2, 2015, at Youngs Motors, an authorized FCA dealer in Marlboro, New York. Plaintiff decided to buy the Subject Vehicle based in part on FCA's representations that it was an "EcoDiesel" vehicle (i.e., reduced emissions and fuel efficient). Plaintiff recalls visiting the Ram website, on which the Subject Vehicles were represented as environmentally friendly, having low emissions and good fuel economy. Plaintiff also recalls seeing television commercials about the Subject Vehicles. When Plaintiff went to Youngs Motors to purchase the Subject Vehicle, the sales associate touted the Subject Vehicle's EcoDiesel® attributes, including its fuel economy and performance. These representations, along with the advertised fuel economy, were among the primary reasons Plaintiff chose the Subject Vehicle. At the time of purchase, Plaintiff did not know that the Subject Vehicle could perform as advertised only by emitting NOx at levels that are greater than advertised and above legal limits. Nor was Plaintiff aware that his/her Subject Vehicle was equipped with undisclosed and unauthorized emission control devices designed to cheat emission tests and to deceive consumers and regulators. Plaintiff would not have purchased the Subject Vehicle, or would have paid less for it, had he/she known that it did not comply with emission standards; that its emission treatment system was designed to de-activate during real-world driving conditions; and that it could not achieve the advertised towing power, performance, and/or fuel economy without cheating emission tests. Plaintiff has suffered a concrete injury as a direct and proximate

result of Defendants' misconduct, and would not have purchased the Subject Vehicle, or would have paid less for it, had Defendants not concealed the unauthorized emission control devices.

147. Plaintiff, Raymond Croisetiere (for the purpose of this paragraph, "Plaintiff"), a citizen of the State of Wyoming residing in the City of Gillette, bought a 2016 Dodge Ram 1500 EcoDiesel® (for the purpose of this paragraph, the "Subject Vehicle") on or about May 22, 2018, at Brower Brother's Nissan, an authorized FCA dealer in Rock Springs, Wyoming. Plaintiff decided to buy the Subject Vehicle based in part on FCA's representations that it was an "EcoDiesel" vehicle (i.e., reduced emissions and fuel efficient). Plaintiff recalls visiting the Ram website, on which the Subject Vehicles were represented as environmentally friendly, having low emissions and good fuel economy. Plaintiff also recalls seeing television commercials about the Subject Vehicles. When Plaintiff went to Brower Brother's Nissan to purchase the Subject Vehicle, the sales associate touted the Subject Vehicle's EcoDiesel® attributes, including its fuel economy and performance. These representations, along with the advertised fuel economy, were among the primary reasons Plaintiff chose the Subject Vehicle. At the time of purchase, Plaintiff did not know that the Subject Vehicle could perform as advertised only by emitting NOx at levels that are greater than advertised and above legal limits. Nor was Plaintiff aware that his/her Subject Vehicle was equipped with undisclosed and unauthorized emission control devices designed to cheat emission tests and to deceive consumers and regulators. Plaintiff would not have purchased the Subject Vehicle, or would have paid less for it, had he/she known that it did not comply with emission standards; that its emission treatment system was designed to de-activate during real-world driving conditions; and that it could not achieve the advertised towing power, performance, and/or fuel economy without cheating emission tests. Plaintiff has suffered a concrete injury as a direct and proximate result of Defendants' misconduct, and would not have purchased the Subject Vehicle,

or would have paid less for it, had Defendants not concealed the unauthorized emission control devices.

148.    Plaintiff, Doolie Molzof (for the purpose of this paragraph, "Plaintiff"), a citizen of the State of Wisconsin residing in the City of Woodman, bought a 2016 Dodge Ram 1500 EcoDiesel® (for the purpose of this paragraph, the "Subject Vehicle") on or about September 9, 2016, at Fillback Automotive, an authorized FCA dealer in Boscobel, Wisconsin. Plaintiff decided to buy the Subject Vehicle based in part on FCA's representations that it was an "EcoDiesel" vehicle (i.e., reduced emissions and fuel efficient). Plaintiff recalls visiting the Ram website, on which the Subject Vehicles were represented as environmentally friendly, having low emissions and good fuel economy. Plaintiff also recalls seeing television commercials about the Subject Vehicles. When Plaintiff went to Fillback Automotive to purchase the Subject Vehicle, the sales associate touted the Subject Vehicle's EcoDiesel® attributes, including its fuel economy and performance. These representations, along with the advertised fuel economy, were among the primary reasons Plaintiff chose the Subject Vehicle. At the time of purchase, Plaintiff did not know that the Subject Vehicle could perform as advertised only by emitting NOx at levels that are greater than advertised and above legal limits. Nor was Plaintiff aware that his/her Subject Vehicle was equipped with undisclosed and unauthorized emission control devices designed to cheat emission tests and to deceive consumers and regulators. Plaintiff would not have purchased the Subject Vehicle, or would have paid less for it, had he/she known that it did not comply with emission standards; that its emission treatment system was designed to de-activate during real-world driving conditions; and that it could not achieve the advertised towing power, performance, and/or fuel economy without cheating emission tests. Plaintiff has suffered a concrete injury as a direct and proximate result of Defendants' misconduct, and would not have purchased the Subject Vehicle,

or would have paid less for it, had Defendants not concealed the unauthorized emission control devices.

149.    Plaintiff, George Nuesse (for the purpose of this paragraph, "Plaintiff"), a citizen of the State of Idaho residing in the City of Eagle, bought a 2016 Dodge Ram 1500 EcoDiesel® (for the purpose of this paragraph, the "Subject Vehicle") on or about October 15, 2016, at Dave Smith Motors, an authorized FCA dealer in Kellogg, Idaho. Plaintiff decided to buy the Subject Vehicle based in part on FCA's representations that it was an "EcoDiesel" vehicle (i.e., reduced emissions and fuel efficient). Plaintiff recalls visiting the Ram website, on which the Subject Vehicles were represented as environmentally friendly, having low emissions and good fuel economy. Plaintiff also recalls seeing television commercials about the Subject Vehicles. When Plaintiff went to Dave Smith Motors to purchase the Subject Vehicle, the sales associate touted the Subject Vehicle's EcoDiesel® attributes, including its fuel economy and performance. These representations, along with the advertised fuel economy, were among the primary reasons Plaintiff chose the Subject Vehicle. At the time of purchase, Plaintiff did not know that the Subject Vehicle could perform as advertised only by emitting NOx at levels that are greater than advertised and above legal limits. Nor was Plaintiff aware that his/her Subject Vehicle was equipped with undisclosed and unauthorized emission control devices designed to cheat emission tests and to deceive consumers and regulators. Plaintiff would not have purchased the Subject Vehicle, or would have paid less for it, had he/she known that it did not comply with emission standards; that its emission treatment system was designed to de-activate during real-world driving conditions; and that it could not achieve the advertised towing power, performance, and/or fuel economy without cheating emission tests. Plaintiff has suffered a concrete injury as a direct and proximate

result of Defendants' misconduct, and would not have purchased the Subject Vehicle, or would have paid less for it, had Defendants not concealed the unauthorized emission control devices.

150.    Plaintiff, Andrew Prztarski (for the purpose of this paragraph, "Plaintiff"), a citizen of the State of Arkansas residing in the City of Royal, bought a 2015 Dodge Ram 1500 EcoDiesel® (for the purpose of this paragraph, the "Subject Vehicle") on or about August 14, 2015, at Red River Dodge, an authorized FCA dealer in Malvern, Arkansas. Plaintiff decided to buy the Subject Vehicle based in part on FCA's representations that it was an "EcoDiesel" vehicle (i.e., reduced emissions and fuel efficient). Plaintiff recalls visiting the Ram website, on which the Subject Vehicles were represented as environmentally friendly, having low emissions and good fuel economy. Plaintiff also recalls seeing television commercials about the Subject Vehicles. When Plaintiff went to Red River Dodge to purchase the Subject Vehicle, the sales associate touted the Subject Vehicle's EcoDiesel® attributes, including its fuel economy and performance. These representations, along with the advertised fuel economy, were among the primary reasons Plaintiff chose the Subject Vehicle. At the time of purchase, Plaintiff did not know that the Subject Vehicle could perform as advertised only by emitting NOx at levels that are greater than advertised and above legal limits. Nor was Plaintiff aware that his/her Subject Vehicle was equipped with undisclosed and unauthorized emission control devices designed to cheat emission tests and to deceive consumers and regulators. Plaintiff would not have purchased the Subject Vehicle, or would have paid less for it, had he/she known that it did not comply with emission standards; that its emission treatment system was designed to de-activate during real-world driving conditions; and that it could not achieve the advertised towing power, performance, and/or fuel economy without cheating emission tests. Plaintiff has suffered a concrete injury as a direct and proximate

result of Defendants' misconduct, and would not have purchased the Subject Vehicle, or would have paid less for it, had Defendants not concealed the unauthorized emission control devices.

151.    Plaintiffs, Cody and Shelly Stephens (for the purpose of this paragraph, "Plaintiffs"), are citizens of the State of Texas residing in the City of Paris, bought a 2015 Dodge Ram 1500 EcoDiesel® (for the purpose of this paragraph, the "Subject Vehicle") on or about July 1, 2015, at James Hodge Motors, an authorized FCA dealer in Paris, Texas. Plaintiffs decided to buy the Subject Vehicle based in part on FCA's representations that it was an "EcoDiesel" vehicle (i.e., reduced emissions and fuel efficient). Plaintiffs recall visiting the Ram website, on which the Subject Vehicles were represented as environmentally friendly, having low emissions and good fuel economy. Plaintiffs also recall seeing television commercials about the Subject Vehicles. When Plaintiffs went to James Hodge Motors to purchase the Subject Vehicle, the sales associate touted the Subject Vehicle's EcoDiesel® attributes, including its fuel economy and performance. These representations, along with the advertised fuel economy, were among the primary reasons Plaintiffs chose the Subject Vehicle. At the time of purchase, Plaintiffs did not know that the Subject Vehicle could perform as advertised only by emitting NOx at levels that are greater than advertised and above legal limits. Nor were Plaintiffs aware that their Subject Vehicle was equipped with undisclosed and unauthorized emission control devices designed to cheat emission tests and to deceive consumers and regulators. Plaintiffs would not have purchased the Subject Vehicle, or would have paid less for it, had they known that it did not comply with emission standards; that its emission treatment system was designed to de-activate during real-world driving conditions; and that it could not achieve the advertised towing power, performance, and/or fuel economy without cheating emission tests. Plaintiffs have suffered a concrete injury as a direct and proximate result of Defendants' misconduct, and would not have purchased the Subject Vehicle,

or would have paid less for it, had Defendants not concealed the unauthorized emission control devices.

152.     Plaintiff, Benjamin Matthews (for the purpose of this paragraph, "Plaintiff"), a citizen of the State of Tennessee residing in the City of Cookeville, bought a 2015 Dodge Ram 1500 EcoDiesel® (for the purpose of this paragraph, the "Subject Vehicle") on or about June 23, 2015, at Cumberland Chrysler Center, INC., an authorized FCA dealer in Cookeville, Tennessee. Plaintiff decided to buy the Subject Vehicle based in part on FCA's representations that it was an "EcoDiesel" vehicle (i.e., reduced emissions and fuel efficient). Plaintiff recalls visiting the Ram website, on which the Subject Vehicles were represented as environmentally friendly, having low emissions and good fuel economy. Plaintiff also recalls seeing television commercials about the Subject Vehicles. When Plaintiff went to Cumberland Chrysler Center, INC. to purchase the Subject Vehicle, the sales associate touted the Subject Vehicle's EcoDiesel® attributes, including its fuel economy and performance. These representations, along with the advertised fuel economy, were among the primary reasons Plaintiff chose the Subject Vehicle. At the time of purchase, Plaintiff did not know that the Subject Vehicle could perform as advertised only by emitting NOx at levels that are greater than advertised and above legal limits. Nor was Plaintiff aware that his/her Subject Vehicle was equipped with undisclosed and unauthorized emission control devices designed to cheat emission tests and to deceive consumers and regulators. Plaintiff would not have purchased the Subject Vehicle, or would have paid less for it, had he/she known that it did not comply with emission standards; that its emission treatment system was designed to de-activate during real-world driving conditions; and that it could not achieve the advertised towing power, performance, and/or fuel economy without cheating emission tests. Plaintiff has suffered a concrete injury as a direct and proximate result of Defendants' misconduct, and would not have

purchased the Subject Vehicle, or would have paid less for it, had Defendants not concealed the unauthorized emission control devices.

153.     Plaintiff, Brian Gray (for the purpose of this paragraph, "Plaintiff"), a citizen of the State of Texas residing in the City of Kirbyville, bought a 2015 Dodge Ram 1500 EcoDiesel® (for the purpose of this paragraph, the "Subject Vehicle") on or about November 9, 2017, at Weaver Motors, an authorized FCA dealer in Kirbyville, Texas. Plaintiff decided to buy the Subject Vehicle based in part on FCA's representations that it was an "EcoDiesel" vehicle (i.e., reduced emissions and fuel efficient). Plaintiff recalls visiting the Ram website, on which the Subject Vehicles were represented as environmentally friendly, having low emissions and good fuel economy. Plaintiff also recalls seeing television commercials about the Subject Vehicles. When Plaintiff went to Weaver Motors to purchase the Subject Vehicle, the sales associate touted the Subject Vehicle's EcoDiesel® attributes, including its fuel economy and performance. These representations, along with the advertised fuel economy, were among the primary reasons Plaintiff chose the Subject Vehicle. At the time of purchase, Plaintiff did not know that the Subject Vehicle could perform as advertised only by emitting NOx at levels that are greater than advertised and above legal limits. Nor was Plaintiff aware that his/her Subject Vehicle was equipped with undisclosed and unauthorized emission control devices designed to cheat emission tests and to deceive consumers and regulators. Plaintiff would not have purchased the Subject Vehicle, or would have paid less for it, had he/she known that it did not comply with emission standards; that its emission treatment system was designed to de-activate during real-world driving conditions; and that it could not achieve the advertised towing power, performance, and/or fuel economy without cheating emission tests. Plaintiff has suffered a concrete injury as a direct and proximate

result of Defendants' misconduct, and would not have purchased the Subject Vehicle, or would have paid less for it, had Defendants not concealed the unauthorized emission control devices.

154.    Plaintiff, Timothy Kawacin (for the purpose of this paragraph, "Plaintiff"), a citizen of the State of Indiana residing in the City of La Porte, leased a 2014 Jeep Grand Cherokee EcoDiesel® (for the purpose of this paragraph, the "Subject Vehicle") on or about February 24, 2014, at Dupage Dodge, an authorized FCA dealer in Glendale Heights, Illinois. Plaintiff decided to lease the Subject Vehicle based in part on FCA's representations that it was an "EcoDiesel" vehicle (i.e., reduced emissions and fuel efficient). Plaintiff recalls visiting the Jeep website, on which the Subject Vehicles were represented as environmentally friendly, having low emissions and good fuel economy. Plaintiff also recalls seeing television commercials about the Subject Vehicles. When Plaintiff went to Dupage Dodge to lease the Subject Vehicle, the sales associate touted the Subject Vehicle's EcoDiesel® attributes, including its fuel economy and performance. These representations, along with the advertised fuel economy, were among the primary reasons Plaintiff chose the Subject Vehicle. At the time of purchase, Plaintiff did not know that the Subject Vehicle could perform as advertised only by emitting NOx at levels that are greater than advertised and above legal limits. Nor was Plaintiff aware that his/her Subject Vehicle was equipped with undisclosed and unauthorized emission control devices designed to cheat emission tests and to deceive consumers and regulators. Plaintiff would not have leased the Subject Vehicle, or would have paid less for it, had he/she known that it did not comply with emission standards; that its emission treatment system was designed to de-activate during real-world driving conditions; and that it could not achieve the advertised towing power, performance, and/or fuel economy without cheating emission tests. Plaintiff has suffered a concrete injury as a direct and proximate result of

Defendants' misconduct, and would not have purchased the Subject Vehicle, or would have paid less for it, had Defendants not concealed the unauthorized emission control devices.

155.    Plaintiffs, Donald and Margaret Vincent (for the purpose of this paragraph, "Plaintiffs"), are citizens of the State of Texas residing in the City of Pearland, bought a 2015 Jeep Grand Cherokee EcoDiesel® (for the purpose of this paragraph, the "Subject Vehicle") on or about November 10, 2018, at Texan Dodge Chrysler Jeep, an authorized FCA dealer in Humble, Texas. Plaintiff decided to buy the Subject Vehicle based in part on FCA's representations that it was an "EcoDiesel" vehicle (i.e., reduced emissions and fuel efficient). Plaintiffs recall visiting the Jeep website, on which the Subject Vehicles were represented as environmentally friendly, having low emissions and good fuel economy. Plaintiffs also recall seeing television commercials about the Subject Vehicles. When Plaintiffs went to Texan Dodge Chrysler Jeep to purchase the Subject Vehicle, the sales associate touted the Subject Vehicle's EcoDiesel® attributes, including its fuel economy and performance. These representations, along with the advertised fuel economy, were among the primary reasons Plaintiffs chose the Subject Vehicle. At the time of purchase, Plaintiffs did not know that the Subject Vehicle could perform as advertised only by emitting NOx at levels that are greater than advertised and above legal limits. Nor were Plaintiffs aware that his/her Subject Vehicle was equipped with undisclosed and unauthorized emission control devices designed to cheat emission tests and to deceive consumers and regulators. Plaintiffs would not have purchased the Subject Vehicle, or would have paid less for it, had they known that it did not comply with emission standards; that its emission treatment system was designed to de-activate during real-world driving conditions; and that it could not achieve the advertised towing power, performance, and/or fuel economy without cheating emission tests. Plaintiffs have suffered a concrete injury as a direct and proximate result of Defendants' misconduct, and would not have

purchased the Subject Vehicle, or would have paid less for it, had Defendants not concealed the unauthorized emission control devices.

156.    Plaintiff, William Barnett (for the purpose of this paragraph, "Plaintiff"), a citizen of the State of Kansas residing in the City of Derby, bought a 2015 Dodge Ram 1500 EcoDiesel® (for the purpose of this paragraph, the "Subject Vehicle") on or about January 31, 2018, at Holiday Ford, an authorized FCA dealer in Whitesboro, Texas. Plaintiff decided to buy the Subject Vehicle based in part on FCA's representations that it was an "EcoDiesel" vehicle (i.e., reduced emissions and fuel efficient). Plaintiff recalls visiting the Ram website, on which the Subject Vehicles were represented as environmentally friendly, having low emissions and good fuel economy. Plaintiff also recalls seeing television commercials about the Subject Vehicles. When Plaintiff went to Holiday Ford to purchase the Subject Vehicle, the sales associate touted the Subject Vehicle's EcoDiesel® attributes, including its fuel economy and performance. These representations, along with the advertised fuel economy, were among the primary reasons Plaintiff chose the Subject Vehicle. At the time of purchase, Plaintiff did not know that the Subject Vehicle could perform as advertised only by emitting NOx at levels that are greater than advertised and above legal limits. Nor was Plaintiff aware that his/her Subject Vehicle was equipped with undisclosed and unauthorized emission control devices designed to cheat emission tests and to deceive consumers and regulators. Plaintiff would not have purchased the Subject Vehicle, or would have paid less for it, had he/she known that it did not comply with emission standards; that its emission treatment system was designed to de-activate during real-world driving conditions; and that it could not achieve the advertised towing power, performance, and/or fuel economy without cheating emission tests. Plaintiff has suffered a concrete injury as a direct and proximate result of

Defendants' misconduct, and would not have purchased the Subject Vehicle, or would have paid less for it, had Defendants not concealed the unauthorized emission control devices.

157.    Plaintiffs, Dennis and Mary Carlson (for the purpose of this paragraph, "Plaintiffs"), are citizens of the State of Indiana residing in the City of Rochester, bought a 2016 Dodge Ram 1500 EcoDiesel® (for the purpose of this paragraph, the "Subject Vehicle") on or about November 16, 2015, at Mike Anderson CDJ Inc., an authorized FCA dealer in Rochester, Indiana. Plaintiffs decided to buy the Subject Vehicle based in part on FCA's representations that it was an "EcoDiesel" vehicle (i.e., reduced emissions and fuel efficient). Plaintiffs recall visiting the Ram website, on which the Subject Vehicles were represented as environmentally friendly, having low emissions and good fuel economy. Plaintiffs also recall seeing television commercials about the Subject Vehicles. When Plaintiffs went to Mike Anderson CDJ Inc. to purchase the Subject Vehicle, the sales associate touted the Subject Vehicle's EcoDiesel® attributes, including its fuel economy and performance. These representations, along with the advertised fuel economy, were among the primary reasons Plaintiffs chose the Subject Vehicle. At the time of purchase, Plaintiffs did not know that the Subject Vehicle could perform as advertised only by emitting NOx at levels that are greater than advertised and above legal limits. Nor were Plaintiffs aware that their Subject Vehicle was equipped with undisclosed and unauthorized emission control devices designed to cheat emission tests and to deceive consumers and regulators. Plaintiffs would not have purchased the Subject Vehicle, or would have paid less for it, had they known that it did not comply with emission standards; that its emission treatment system was designed to de-activate during real-world driving conditions; and that it could not achieve the advertised towing power, performance, and/or fuel economy without cheating emission tests. Plaintiffs have suffered a concrete injury as a direct and proximate result of Defendants' misconduct, and would not have

purchased the Subject Vehicle, or would have paid less for it, had Defendants not concealed the unauthorized emission control devices.

158.   Plaintiff, Zachary Austin Pearson (for the purpose of this paragraph, "Plaintiff"), a citizen of the State of Oklahoma residing in the City of Norman, bought a 2015 Dodge Ram 1500 EcoDiesel® (for the purpose of this paragraph, the "Subject Vehicle") on or about July 15, 2015, at Bob Moore, an authorized FCA dealer in Oklahoma City, Oklahoma. Plaintiff decided to buy the Subject Vehicle based in part on FCA's representations that it was an "EcoDiesel" vehicle (i.e., reduced emissions and fuel efficient). Plaintiff recalls visiting the Ram website, on which the Subject Vehicles were represented as environmentally friendly, having low emissions and good fuel economy. Plaintiff also recalls seeing television commercials about the Subject Vehicles. When Plaintiff went to Bob Moore to purchase the Subject Vehicle, the sales associate touted the Subject Vehicle's EcoDiesel® attributes, including its fuel economy and performance. These representations, along with the advertised fuel economy, were among the primary reasons Plaintiff chose the Subject Vehicle. At the time of purchase, Plaintiff did not know that the Subject Vehicle could perform as advertised only by emitting NOx at levels that are greater than advertised and above legal limits. Nor was Plaintiff aware that his/her Subject Vehicle was equipped with undisclosed and unauthorized emission control devices designed to cheat emission tests and to deceive consumers and regulators. Plaintiff would not have purchased the Subject Vehicle, or would have paid less for it, had he/she known that it did not comply with emission standards; that its emission treatment system was designed to de-activate during real-world driving conditions; and that it could not achieve the advertised towing power, performance, and/or fuel economy without cheating emission tests. Plaintiff has suffered a concrete injury as a direct and proximate

result of Defendants' misconduct, and would not have purchased the Subject Vehicle, or would have paid less for it, had Defendants not concealed the unauthorized emission control devices.

159.    Plaintiff, Brian C. Schmidt (for the purpose of this paragraph, "Plaintiff"), a citizen of the State of Georgia residing in the City of Cumming, bought a 2015 Dodge Ram 1500 EcoDiesel® (for the purpose of this paragraph, the "Subject Vehicle") on or about June 30, 2017, at Palmer Dodge, an authorized FCA dealer in Roswell, Georgia. Plaintiff decided to buy the Subject Vehicle based in part on FCA's representations that it was an "EcoDiesel" vehicle (i.e., reduced emissions and fuel efficient). Plaintiff recalls visiting the Ram website, on which the Subject Vehicles were represented as environmentally friendly, having low emissions and good fuel economy. Plaintiff also recalls seeing television commercials about the Subject Vehicles. When Plaintiff went to Palmer Dodge to purchase the Subject Vehicle, the sales associate touted the Subject Vehicle's EcoDiesel® attributes, including its fuel economy and performance. These representations, along with the advertised fuel economy, were among the primary reasons Plaintiff chose the Subject Vehicle. At the time of purchase, Plaintiff did not know that the Subject Vehicle could perform as advertised only by emitting NOx at levels that are greater than advertised and above legal limits. Nor was Plaintiff aware that his/her Subject Vehicle was equipped with undisclosed and unauthorized emission control devices designed to cheat emission tests and to deceive consumers and regulators. Plaintiff would not have purchased the Subject Vehicle, or would have paid less for it, had he/she known that it did not comply with emission standards; that its emission treatment system was designed to de-activate during real-world driving conditions; and that it could not achieve the advertised towing power, performance, and/or fuel economy without cheating emission tests. Plaintiff has suffered a concrete injury as a direct and proximate

result of Defendants' misconduct, and would not have purchased the Subject Vehicle, or would have paid less for it, had Defendants not concealed the unauthorized emission control devices.

160.    Plaintiff, Theodore Brayfield d/b/a Carpet Plus (for the purpose of this paragraph, "Plaintiff"), a citizen of the State of Missouri residing in the City of Hollister, bought a 2016 Dodge Ram 1500 EcoDiesel® (for the purpose of this paragraph, the "Subject Vehicle") on or about February 21, 2017, at Tri Lakes Motors, an authorized FCA dealer in Branson, Missouri. Plaintiff decided to buy the Subject Vehicle based in part on FCA's representations that it was an "EcoDiesel" vehicle (i.e., reduced emissions and fuel efficient). Plaintiff recalls visiting the Ram website, on which the Subject Vehicles were represented as environmentally friendly, having low emissions and good fuel economy. Plaintiff also recalls seeing television commercials about the Subject Vehicles. When Plaintiff went to Tri Lakes Motors to purchase the Subject Vehicle, the sales associate touted the Subject Vehicle's EcoDiesel® attributes, including its fuel economy and performance. These representations, along with the advertised fuel economy, were among the primary reasons Plaintiff chose the Subject Vehicle. At the time of purchase, Plaintiff did not know that the Subject Vehicle could perform as advertised only by emitting NOx at levels that are greater than advertised and above legal limits. Nor was Plaintiff aware that his/her Subject Vehicle was equipped with undisclosed and unauthorized emission control devices designed to cheat emission tests and to deceive consumers and regulators. Plaintiff would not have purchased the Subject Vehicle, or would have paid less for it, had he/she known that it did not comply with emission standards; that its emission treatment system was designed to de-activate during real-world driving conditions; and that it could not achieve the advertised towing power, performance, and/or fuel economy without cheating emission tests. Plaintiff has suffered a concrete injury as a direct and proximate result of Defendants' misconduct, and would not have purchased the Subject Vehicle,

or would have paid less for it, had Defendants not concealed the unauthorized emission control devices.

161.     Plaintiff, Steven Campbell (for the purpose of this paragraph, "Plaintiff"), a citizen of the State of Missouri residing in the City of Branson, bought a 2016 Dodge Ram 1500 EcoDiesel® (for the purpose of this paragraph, the "Subject Vehicle") on or about September 17, 2018, at Tri Lakes Ford, an authorized FCA dealer in Branson, Missouri. Plaintiff decided to buy the Subject Vehicle based in part on FCA's representations that it was an "EcoDiesel" vehicle (i.e., reduced emissions and fuel efficient). Plaintiff recalls visiting the Ram website, on which the Subject Vehicles were represented as environmentally friendly, having low emissions and good fuel economy. Plaintiff also recalls seeing television commercials about the Subject Vehicles. When Plaintiff went to Tri Lakes Ford to purchase the Subject Vehicle, the sales associate touted the Subject Vehicle's EcoDiesel® attributes, including its fuel economy and performance. These representations, along with the advertised fuel economy, were among the primary reasons Plaintiff chose the Subject Vehicle. At the time of purchase, Plaintiff did not know that the Subject Vehicle could perform as advertised only by emitting NOx at levels that are greater than advertised and above legal limits. Nor was Plaintiff aware that his/her Subject Vehicle was equipped with undisclosed and unauthorized emission control devices designed to cheat emission tests and to deceive consumers and regulators. Plaintiff would not have purchased the Subject Vehicle, or would have paid less for it, had he/she known that it did not comply with emission standards; that its emission treatment system was designed to de-activate during real-world driving conditions; and that it could not achieve the advertised towing power, performance, and/or fuel economy without cheating emission tests. Plaintiff has suffered a concrete injury as a direct and proximate

result of Defendants' misconduct, and would not have purchased the Subject Vehicle, or would have paid less for it, had Defendants not concealed the unauthorized emission control devices.

162.    Plaintiffs, Robert and Darla Jones (for the purpose of this paragraph, "Plaintiffs"), are citizens of the State of Wyoming residing in the City of Evanston, bought a 2014 Dodge Ram 1500 EcoDiesel® (for the purpose of this paragraph, the "Subject Vehicle") on or about April 1, 2014, at Young Dodge, an authorized FCA dealer in Morgan, Utah. Plaintiffs decided to buy the Subject Vehicle based in part on FCA's representations that it was an "EcoDiesel" vehicle (i.e., reduced emissions and fuel efficient). Plaintiffs recall visiting the Ram website, on which the Subject Vehicles were represented as environmentally friendly, having low emissions and good fuel economy. Plaintiffs also recall seeing television commercials about the Subject Vehicles. When Plaintiffs went to Young Dodge to purchase the Subject Vehicle, the sales associate touted the Subject Vehicle's EcoDiesel® attributes, including its fuel economy and performance. These representations, along with the advertised fuel economy, were among the primary reasons Plaintiffs chose the Subject Vehicle. At the time of purchase, Plaintiffs did not know that the Subject Vehicle could perform as advertised only by emitting NOx at levels that are greater than advertised and above legal limits. Nor were Plaintiffs aware that their Subject Vehicle was equipped with undisclosed and unauthorized emission control devices designed to cheat emission tests and to deceive consumers and regulators. Plaintiffs would not have purchased the Subject Vehicle, or would have paid less for it, had they known that it did not comply with emission standards; that its emission treatment system was designed to de-activate during real-world driving conditions; and that it could not achieve the advertised towing power, performance, and/or fuel economy without cheating emission tests. Plaintiff have suffered a concrete injury as a direct and proximate result of Defendants' misconduct, and would not have purchased the Subject Vehicle,

or would have paid less for it, had Defendants not concealed the unauthorized emission control devices.

163.    Plaintiff, Matthew Trainor (for the purpose of this paragraph, "Plaintiff"), a citizen of the State of Florida residing in the City of West Palm Beach, bought a 2014 Dodge Ram 1500 EcoDiesel® (for the purpose of this paragraph, the "Subject Vehicle") on or about April 17, 2018, at Arrigo Dodge, an authorized FCA dealer in West Palm Beach, Florida. Plaintiff decided to buy the Subject Vehicle based in part on FCA's representations that it was an "EcoDiesel" vehicle (i.e., reduced emissions and fuel efficient). Plaintiff recalls visiting the Ram website, on which the Subject Vehicles were represented as environmentally friendly, having low emissions and good fuel economy. Plaintiff also recalls seeing television commercials about the Subject Vehicles. When Plaintiff went to Arrigo Dodge to purchase the Subject Vehicle, the sales associate touted the Subject Vehicle's EcoDiesel® attributes, including its fuel economy and performance. These representations, along with the advertised fuel economy, were among the primary reasons Plaintiff chose the Subject Vehicle. At the time of purchase, Plaintiff did not know that the Subject Vehicle could perform as advertised only by emitting NOx at levels that are greater than advertised and above legal limits. Nor was Plaintiff aware that his/her Subject Vehicle was equipped with undisclosed and unauthorized emission control devices designed to cheat emission tests and to deceive consumers and regulators. Plaintiff would not have purchased the Subject Vehicle, or would have paid less for it, had he/she known that it did not comply with emission standards; that its emission treatment system was designed to de-activate during real-world driving conditions; and that it could not achieve the advertised towing power, performance, and/or fuel economy without cheating emission tests. Plaintiff has suffered a concrete injury as a direct and proximate result of Defendants' misconduct, and would not have purchased the Subject Vehicle, or would have paid less for it, had Defendants not concealed the unauthorized emission control devices.

## JURISDICTION AND VENUE

164.    This Court has jurisdiction over the lawsuit because Plaintiffs and FCA are

citizens of different states and because the matter in controversy exceeds $75,000.00 pursuant to 28 U.S.C. §1332(a). Declaratory relief is available pursuant to 28 U.S.C. § § 2201 and 2202. The Court had supplemental jurisdiction under U.S.C. § 1367 over Plaintiffs' state law claims because said claims are so related to the claims within the Court's jurisdiction that they form part of the same case or controversy under Article 3 of the United States Constitution. In addition, subject-matter jurisdiction over this action under 28 U.S.C. § 1331 (federal question) and 18 U.S.C. § 1964 (RICO). The Court also has original subject-matter jurisdiction over this action under 28 U.S.C. § 1332(d), because there are numerous Plaintiffs the amount in controversy exceeds $5,000,000, and there is the required diversity of citizenship pursuant to 28 U.S.C. § 1332(d)(2).

165.    Venue is proper in this district under 28 U.S.C. § 1391(a)(3) because FCA is subject to personal jurisdiction in this district and there is no other district where the suit may be brought. In addition, venue is proper in this district under 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred in this District. Defendants have marketed, advertised, sold, and leased the Subject Vehicles, and otherwise conducted extensive business, within this District. In addition, or in the alternative, venue is proper under 28 U.S.C. § 1407(a), which authorizes the Judicial Panel on Multidistrict Litigation to transfer consolidated multidistrict litigation "to any district."

## INTRADISTRICT ASSIGNMENT

166.    This action is properly assigned to the Eastern District of Michigan Southern Division pursuant to Civ. L.R. 3-2 because a substantial part of the events or omissions giving rise to Plaintiffs' claims arose in the counties served by the Eastern District of Michigan. Several named Plaintiffs purchased and maintain their EcoDiesel Vehicles in the counties served by this

Division. Moreover, FCA conducts substantial business in the counties served by this Division, has marketed, advertised, sold and leased the EcoDiesel Vehicles in those counties, and has caused harm to Plaintiffs residing in those counties. Furthermore, there is a similarly filed Complaint which was filed with the United States District Court Northern District of California San Francisco Division identified as Case No. 3:17-md-02777 and currently before presiding Judge Edward M. Chen.

## FACTUAL ALLEGATIONS COMMON TO ALL CLAIMS

### I.  FIAT CHRYSLER SEEKS TO CAPITALIZE ON THE GROWING U.S. "CLEAN" DIESEL MARKET

167.    As part of a strategy to expand its North American presence, in 2009, Fiat began its acquisition of one of the "Big 3" U.S. automakers, Chrysler. In November of that year, CEO Marchionne unveiled an ambitious five-year plan to, among other things, roll out "more diesel variants" under the Jeep brand and to give Ram's "Light duty (1500)" pickup truck a "refresh/facelift."[6]

168.    By 2014, Fiat had become Fiat Chrysler Automobiles, Chrysler had become FCA, and VM Motori, a long-time supplier, was now part of the Fiat Chrysler sprawling family of affiliated companies. In May of that year, Marchionne announced another five-year plan at FCA's headquarters in Auburn Hills, Michigan, to increase Fiat Chrysler's competitiveness against global auto giants, such as Toyota, Volkswagen, and General Motors, by increasing annual sales to seven million vehicles by 2018, up from 4.4 million in 2013.[7] Integral to the strategy was the expansion of the "Jeep portfolio" and updates to the "bread-and-butter Ram 1500," including "diesel

---

[6] Todd Lassa, *Fiatopolooza! Chyrsler's Five-Year Plan*, MotorTrend (Nov. 6, 2009), http://www.motortrend.com/news/Chrysler-five-year-plan/.
[7] Jerry Hirsch and David Undercoffler, *Fiat Chrysler Unveils Aggressive Five-Year Plan*, Los Angeles Times (May 6, 2014), http://www.latimes.com/business/la-fi-chrysler-revamp-20140507-story.html.

engines."[8]

169.    During this same time frame, emission standards in the United States were ratcheting up. In contrast to other global automakers, like Toyota and Ford, which were focusing on developing hybrid and electric cars, Chrysler—now FCA and under the control of Fiat—took another path: "[r]eflecting its ties with Europe-based Fiat, Chrysler appears to be taking yet another route that focuses less on electrification and more heavily on light-duty diesels and compressed natural gas."[9]

170.    Indeed, as early as July 2010, Chrysler commissioned and presented research to "[i]dentify the trade-offs that consumers make relative to powertrain technologies"—including diesel—and "[i]dentify possible conquest opportunities associated with offering a RAM light- duty Diesel engine." FCA-MDL-001184465-524. Among other things, the study "recommend[ed] ... [c]apitalizing on improved fuel economy to increase interest in a Light Duty Diesel engine among L[ight] D[uty] owners." Id.

171.    In December 2010, Chrysler requested a meeting with Bosch and Fiat to discuss "Chrysler's main motivation" of "captur[ing] the developing N[orth] A[merican] diesel market." RBL-MDL2777-PE-300169862-64. Bosch's notes of the meeting indicate that the projected "profitability status" for SUVs (and other vehicle segments) was "medium to high (+$300 to 14+$800 margin per diesel vehicle)." Id. An additional meeting was planned for December 8, 2010 with "Chrysler, VM, [and] Bosch" to "discuss further," and a "Chrysler NA diesel decision meeting with Marchionne" was "scheduled for" December 11, 2010. Id.

---

[8] Christian Seabaugh, *Ram and Ferrari's Place in Fiat Chrysler's Five-Year Plan*, MotorTrend (May 6, 2014), http://www.motortrend.com/news/ram-and-ferraris-place-in-fiat chryslers-five- year-plan/.
[9] Drew Winter, *Chrysler Eyes Different Path to Meeting New CAFE Standards*, WardsAuto (Aug. 29, 2012), http://wardsauto.com/technology/chrysler-eyes-different-path-meeting-new-cafe-standards.

172.    In 2012, Marchionne was quoted as saying, "with 2016 'just around the corner' and 2025 not far away given the auto industry's long product-development lead times, 'there are big choices to be made[.]'"[10] Marchionne explained that "Chrysler, which is starting to share platforms and powertrains with Fiat, wants to leverage the European auto maker's strengths in diesels and CNG-powered vehicles."[11] As one commentator put it at the time, "[f]uel-efficient towing remains a strong point of diesels, and Marchionne says he still is optimistic about the potential of light-duty diesels in the U.S. despite significant emissions challenges."[12]

173.    This is further reflected in a March 2013 Chrysler research document entitled "Alternative Powertrain" in which the company sought to better understand the "needs, wants, expectations and functional requirements relative to . . . alternative powertrain technologies such as hybrids, electric, diesel, and compressed natural gas." FCA-MDL-001239766-774. The research concluded that "consumers want their next vehicle to do everything their current vehicle does, with better fuel economy and no sacrifice in usability," and further noted that "[l]arge segments (Pickups) with a need to tow and haul show most interest in Alternative fuels/technology for internal combustion engines." Id. at 9.

174.    FCA ultimately decided to push into this market beyond its existing heavy-duty diesel trucks (which use engines from a different supplier, Cummins) and, in 2014, it introduced both the light-duty Ram 1500 "EcoDiesel®" and the Jeep Grand Cherokee "EcoDiesel®." These are the Subject Vehicles at issue here.

175.    Fiat Chrysler was not alone. Seeing an opportunity for growth in the U.S. market,

---

[10] Id.
[11] Id. (emphasis added).
[12] Id.

other major automakers rushed to develop and market "clean diesel" engines. Volkswagen, Mercedes-Benz, Ford, General Motors, and other manufacturers also began selling diesel cars and trucks as a more efficient (and thus environmentally-friendly) alternative to gasoline vehicles with no loss of power or performance: the advertised difference was that new emission control technology could make small diesel engines (long regarded by American consumers as fuel efficient but foul-smelling polluters) powerful and clean in addition to fuel-efficient. The marketing worked, and millions of diesel vehicles were sold and leased in the United States between 2007 and 2016.

176.    The green bubble for diesel vehicles first popped on September 18, 2015, when the EPA issued a Notice of Violation of the CAA to Volkswagen and Audi for installing illegal "defeat devices" in 2009–2015 2.0-liter diesel vehicles. A defeat device, as defined by the EPA, is any apparatus or technology that unduly reduces the effectiveness of emission control systems under normal driving conditions. The EPA found that the Volkswagen/Audi defeat device allowed the vehicles to pass emission testing while polluting far in excess of emission standards, revealing the new "clean diesel" technology to be illusory. CARB also announced that it had initiated an enforcement investigation of Volkswagen pertaining to the vehicles at issue in the Notice of Violation. On September 22, 2015, Volkswagen admitted that 11 million diesel cars worldwide were installed with the same defeat device software.[13] Volkswagen wasn't alone as, soon after, government agencies began to reveal that other automakers sold dozens of models exceeding allowable emission levels under applicable standards. Nevertheless, the Defendants in this action continued with business as usual, concealing from regulators and consumers their Subject

---

[13] *See Nathan Bomey, Volkswagen Emission Scandal Widens: 11 Million Cars Affected, USA Today (Sept. 22, 2015),* http://www.usatoday.com/story/money/ cars/2015/09/22/volkswagen- emissions-scandal/72605874/.*at a higher compression ratio than gasoline engines and because diesel fuel contains more energy than gasoline.*

Vehicles' emissions-related behavior and performance.

## II.      DEFENDANTS' DIRTY "ECODIESEL®" SCHEME

177.    Federal and state emission standards are in place to protect Americans from pollution and certain chemicals known to cause disease in humans. Automobile manufacturers must abide by applicable laws and adhere to EPA rules and regulations (and those of CARB in California and 14 other states that have adopted California's standards). The CAA requires vehicle manufacturers to certify to the EPA that the vehicles sold in the United States meet applicable federal emission standards to control air pollution. Every vehicle sold in the United States must be covered by an EPA-issued COC, and every vehicle sold in the State of California must be covered by a CARB-issued EO.

178.    There is a very good reason that these laws and regulations exist and apply to vehicles with diesel engines: in 2012, the World Health Organization declared diesel vehicle emissions to be carcinogenic and about as dangerous as asbestos.

179.    Diesel engines pose a unique challenge because they have an inherent trade-off between power, fuel efficiency, and emissions: the greater the power and fuel efficiency, the dirtier and more harmful the emissions. Instead of using a spark plug to combust highly refined fuel with short hydrocarbon chains, as gasoline engines do, diesel engines compress a mist of liquid fuel and air to very high temperatures and pressures, which causes the fuel/air mixture to combust. This causes a more powerful compression of the pistons, which can produce greater engine torque (that is, more power). Diesel engines are able to do this both because they operate at a higher compression ratio than gasoline engines and because fuel contains more energy than gasoline.

180.    But this greater energy and fuel efficiency comes at a cost: diesel produces dirtier

and more dangerous emissions. Diesel combustion produces NOx, a variety of nitrogen and oxygen chemical compounds that only form at high temperatures. NOx pollution contributes to nitrogen dioxide, particulate matter in the air, and reacts with sunlight in the atmosphere to form ozone. Exposure to these pollutants has been linked with serious health dangers, including asthma attacks and other respiratory illnesses serious enough to send people to the hospital. Ozone and particulate matter exposure have been associated with premature death due to respiratory-related or cardiovascular-related effects. Children, the elderly, and people respiratory illnesses are at acute risk of health effects from these pollutants.

181.    Given the risks, minimizing NOx is paramount. But removing these pollutants from untreated exhaust is difficult, and diesel automakers have reacted by trying to remove NOx from the exhaust using catalysts. Modern turbodiesel engines use ceramic diesel filters to trap particulates before they are emitted. Many also use a technology called "selective catalytic reduction" ("SCR") to reduce NOx emissions. SCR systems inject a measured amount of urea solution into the exhaust stream, which breaks oxides of nitrogen down into to less noxious substances before they are emitted. SCR-equipped vehicles must carry an onboard tank of fluid for this purpose, and injection of the fluid is controlled by the same engine control module that manages the fuel-air mixture and other aspects of engine operation.

182.    FCA's response to this challenge was the EcoDiesel® engine.  Emission reductions start in the cylinder with advanced fuel injection strategies. After the byproducts of combustion leave the engine, the EcoDiesel® technology treats these emissions using a diesel oxidation catalyst, diesel particulate filter, and SCR.

183.    The Subject Vehicles use engine management computers to monitor sensors

throughout the vehicle and operate nearly all of the vehicle's systems according to sophisticated programming that can sense and vary factors like steering, combustion, and emissions performance for different driving situations. To manage engine and emission controls, the Subject Vehicles use a Bosch EDC system. Bosch GmbH and Bosch LLC designed, tested, customized, manufactured, and sold these EDC systems, including software code, to Fiat Chrysler (along with other automakers including Volkswagen, Mercedes, and General Motors) for use in the Subject Vehicles.

184.    The system used in the Subject Vehicles is Bosch's EDC Unit 17 (also called "EDC17"). A February 28, 2006, Bosch press release introduced the "New Bosch EDC17 engine management system" as the "brain of diesel injection" which "controls every parameter that is important for effective, low-emission combustion." The EDC17 offered "[e]ffective control of combustion" and a "[c]oncept tailored for all vehicle classes and markets." In the press release, Bosch touted the EDC17 as follows:

> **EDC17: Ready for future demands**
> Because the computing power and functional scope of the new EDC17 can be adapted to match particular requirements, it can be used very flexibly in any vehicle segment on all the world's markets. In addition to controlling the precise timing and quantity of injection, exhaust gas recirculation, and manifold pressure regulation, it also offers a large number of options such as the control of particulate filters or systems for reducing nitrogen oxides. The Bosch EDC17 determines the injection parameters for each cylinder, making specific adaptations if necessary. This improves the precision of injection throughout the vehicle's entire service life. The system therefore makes an important contribution to observing future exhaust gas emission limits.[14]

185.    Bosch's EDC Unit 17 controls emissions by periodically reading sensor values, evaluating a control function, and controlling actuators based on the control signal.[15] Sensor

---

[14] *See* Bosch press release, *The brain of diesel injection: New Bosch EDC17 engine management system (Feb. 28,* 2006), http://www.bosch-resse.de/presseforum/details.htm?txtID=2603&locale=en.

[15] Moritz Contag, Guo Li, Andre Pawlowski, Felix Domke, Kirill Levchenko, Thorsten Holz, and Stefan Savage, *How They Did It: An Analysis of Emission Defeat Devices in Modern Automobiles* (2017), https://cseweb.ucsd.edu/~klevchen/diesel-sp17.pdf.

readings include crankshaft position, air pressure, air temperature, air mass, fuel temperature, oil temperature, coolant temperature, vehicle speed, exhaust oxygen content, as well as driver inputs such as accelerator pedal position, brake pedal position, cruise control setting, and selected gear. Based on sensor input, EDC17 controls and influences the fuel combustion process including, in particular, fuel injection timing, which affects engine power, fuel consumption, and the composition of the exhaust gas.[16]

186.    In 2010 or 2011, VM Motori announced a new diesel engine: a V6, 3.0-liter displacement engine intended for inclusion in SUVs, trucks, and large sedans. This engine had been under development for use in a General Motors automobile for the European market.[17] However, Fiat acquired 50% of VM Italy in 2011, and began working with VM Motori to develop the engine for use in FCA vehicles to be sold in the United States.

187.    As Ram Trucks' Chief Engineer said at the time, "We were fortunate at this point in time that our partners at Fiat owned half of VM Motori, who makes this diesel engine .... We combined resources and developed them together."[18]

188.    According to its website, VM Motori is deeply involved in the development and testing of all aspects of the engine: "We take care of the engines and their applications, working together with the Customers to the least detail to ensure a perfect matching between the engine and the machine, supporting our partners from A to Z, from engine- to-machine coupling up to the production."[19]

---

[16] *Id.*
[17] Chad Westfall, *An Inside Look At The Ram 1500 3.0L EcoDiesel*, Engine Labs (Jan. 11, 2015), http://www.enginelabs.com/engine-tech/an-inside-look-at-the-ram-1500-3-0l-ecodiesel/.
[18] *Id.*
[19] *Research and Development*, VM Motori, http://www.vmmotori.com/r-s/vm-motori/r-s-2.htm.

189.    In fact, VM Motori boasts of its involvement in: "Calibration development to meet specific vehicle/end user requirements, Exhaust after-treatment system development, [and] Environmental trips (hot/cold climate, high altitude, etc.)."[20] VM Motori also notes that its facilities include: "Rolling dyno for vehicle emission measurement [and] 17 engine test benches for emission/performance development."[21]

190.    The engine originally was developed for use in Europe, where standards for emission of oxides of nitrogen from diesel vehicles are less stringent than in the United States. Rather than make the engine compliant with U.S. emissions standards, FCA opted to cheat on the emission test.

191.    In January of 2013, Bosch LLC announced that its "clean diesel" technology, including the EDC Unit 17, would be featured in the new 2014 Jeep Grand Cherokee 3.0-Liter EcoDiesel®.[22] As part of that announcement, Bosch LLC stated: "The 2014 Jeep Grand Cherokee features a Bosch emission system compliant with the most stringent emission regulations in the world. From fuel tank to tailpipe, Bosch is pleased to equip this vehicle with top technologies to give consumers a great driving experience requiring fewer stops at the pump."[23] Bosch LLC also announced that the "clean diesel" system for the Jeep Grand Cherokee would be assembled at Bosch's facility in Kentwood, Michigan.

192.    In reality, Fiat Chrysler—working with VM Italy and VM America on the design of the EcoDiesel®'s engines and Bosch GmbH and Bosch LLC on the design of the EDC Unit 17—was either unable or unwilling to devise a solution within the constraints of the law. And so,

---

[20] *Id.*
[21] *Id.*
[22] *Bosch Announces Clean Diesel Technology On 2014 Jeep Grand Cherokee, supra note 5.*
[23] *Id.*

like their rivals at Volkswagen, they devised one outside of it. Instead of cutting their losses on "EcoDiesel," delaying the production of the Subject Vehicles, or coming clean, Fiat Chrysler worked closely with VM Italy and VM America and Bosch GmbH and Bosch LLC to customize the EDC Unit 17 to allow Subject Vehicles to simulate "passing" the EPA and CARB testing. Unlike during testing, the software disables or restricts certain of the emission controls during real-world driving conditions. When the emission controls are de-activated on the road, the Subject Vehicles emit up to 20 times the legal limits of NOx.

193.    These software controls designed and implemented by Bosch GmbH and Bosch LLC were concealed from regulators on COC and EO applications for the Subject Vehicles, thus deceiving the EPA and CARB into approving the Subject Vehicles for sale throughout the United States, including California. Of course, consumers, who have no way of discerning that the emission control technology de-activated during real-world driving conditions, were likewise deceived.

194.    Specifically, Bosch GmbH and Bosch LLC worked hand-in-glove with Fiat Chrysler and VM Motori to develop and implement a specific set of software algorithms for implementation in the Subject Vehicles, which enabled FCA to adjust fuel levels, exhaust gas recirculation, air pressure levels, and even urea injection rates.[24]

195.    A study recently published by researchers at the University of California, San Diego, and Ruhr-Universität Bochum in Germany revealed technical documents showing that Bosch code was used in a so-called defeat device for a Fiat vehicle. The study described the software as setting one mode for when a vehicle is being tested for emissions, but then allowing

---

[24] See generally *Engine management*, Bosch Auto Parts, http://de.bosch- automotive.com/en/parts_and_accessories /motor_and_sytems/diesel/engine_management_2/engi ne_control_unit_1/ (describing capabilities of Bosch EDC units).

tailpipe pollution to spike in real-world driving conditions.[25] The study described Bosch's role in building the electronic control unit ("ECU") hardware and developing the software running on the ECU and found there was "no evidence that automobile manufacturers write any of the code running on the ECU."[26] To the contrary: "All code we analyzed in this work was documented in documents copyrighted by Bosch and identified automakers as the intended customers."[27] The study concluded: "We find strong evidence that both defeat devices were created by Bosch and then enabled by Volkswagen and Fiat for their respective vehicles."

196.    For context, when carmakers test their vehicles against EPA emission standards, they place their cars on dynamometers (essentially large treadmills or "rollers") and then perform a series of specific maneuvers prescribed by federal regulations to simulate driving and test emissions in a controlled environment. Bosch's EDC Unit 17 gave Fiat Chrysler the ability to detect test scenarios by monitoring vehicle speed, acceleration, engine operation, air pressure, and even the position of the steering wheel. For example, given that the steering wheel cannot be turned on a dynamometer, Bosch programmed a sensor which detected whether or not the steering wheel turned. When the EDC Unit 17's detection algorithm detected an emission test was complete, the EDC Unit 17 could de-activate or reduce the emission control systems' performance, causing the Subject Vehicle to spew illegal amounts of NOx emissions when out on the road.

197.    This workaround was illegal. The CAA expressly prohibits defeat devices, defined as any auxiliary emission control device "that reduces the effectiveness of the emission control system under conditions which may reasonably be expected to be encountered in normal vehicle

---

[25] See Ryan Been, *Study of VW's Cheating on Diesels Examines Role of Bosch Code*, Bloomberg Technology (June 9, 2017), https://www.bloomberg.com/news/articles/2017-06-09/study-of-vw-s-cheating-on-diesels-examines-role-of-bosch-code.
[26] Moritz Contag, *et al.*, *How They Did It: An Analysis of Emission Defeat Devices in Modern Automobiles*, *supra* note 15.
[27] *Id.*

operation and use." 40 C.F.R. § 86.1803-01; *see also id.* § 86.1809-10 ("No new light-duty vehicle, light-duty truck, medium-duty passenger vehicle, or complete heavy-duty vehicle shall be equipped with a defeat device."). Moreover, the CAA prohibits the sale of components used as defeat devices, "where the person knows or should know that such part or component is being offered for sale or installed for such use or put to such use." 42 U.S.C. § 7522(a)(3). Finally, in order to obtain a COC, automakers must submit an application, which lists all auxiliary emission control devices installed in the vehicle, a justification for each, and an explanation of why the control device is not a defeat device.

198.    As the EPA has now alleged against Fiat, FCA, VM Italy, and VM America, Defendants did not disclose, and affirmatively concealed, the presence of performance-altering software code developed with Bosch GmbH and Bosch LLC from government regulators.  In other words, FCA lied to the government, its customers, its dealers, and the public at large.

199.    Because FCA lied on the COC and EO applications, these COCs and EOs were fraudulently obtained. And because the Subject Vehicles did not conform "in all material respects" to the specifications provided in the COC and EO applications, the Subject Vehicles were never covered by a valid COC or EO, and thus were *never* legal for sale—nor were they EPA and/or CARB compliant, as represented. With the complicity of Bosch and VM Motori, Fiat Chrysler hid these facts from the EPA, CARB, and other regulators, from FCA dealers and consumers, and FCA continued to sell and lease the Subject Vehicles to the driving public, despite their illegality.

200.    Fiat Chrysler's illegal workaround was enabled by a close partnership with Bosch, which enjoyed a sizable portion of its annual revenue from manufacturing parts used in the Subject

Vehicles and other "clean" diesel vehicles.[28] Bosch GmbH and Bosch LLC were aware that Fiat Chrysler used its emission control technology as a concealed auxiliary (or defeat) device and is specifically tailored to allow the Subject Vehicles to evade detection.

201.    Bosch GmbH and Bosch LLC worked closely with Fiat Chrysler and VM Motori to create specifications and software code for each Subject Vehicle model. Indeed, customizing a road-ready ECU is an intensive three-to five-year endeavor involving a full-time Bosch presence at an automaker's facility. VM Italy and VM America likewise worked closely with Bosch GmbH, Bosch LLC, and Fiat Chrysler in designing, installing, and calibrating the engines for the Subject Vehicles.

202.    All Bosch EDCs, including the EDC17, run on complex, highly proprietary engine management software over which Bosch exerts near-total control. In fact, the software is typically locked to prevent customers, like Fiat Chrysler, from making significant changes on their own. Accordingly, both the design and implementation are interactive processes, requiring Bosch's close collaboration with the automaker from beginning to end.

203.    Bosch GmbH and Bosch LLC's security measures further confirm that its customers cannot make significant changes to Bosch software without their involvement.  Bosch boasts that its security modules protect vehicle systems against unauthorized access in every operating phase, meaning that no alteration could have been made without either a breach of that security—and no such claims have been advanced—or Bosch's knowing participation.[29]

---

[28] Approximately 50,000 of Bosch's 375,000 employees worked in the diesel technology operations branch of Bosch. *See Bosch probes whether its staff helped VW's emissions rigging*, Automotive News (Jan.27, 2016), http://www.autonews.com/article/20160127/COPY01/ 301279955/bosch-probes-whether-its-staff-helped-vws-emissions-rigging.

[29] *Reliable Protection for ECUs*, ESCRYPT (May 12, 2016), https://www.escrypt.com/en/news-events/protection-for-ecus.

204.    Unsurprisingly, then, at least one car company engineer has confirmed that Bosch maintains absolute control over its software as part of its regular business practices:[30]

> *I've had many arguments with Bosch, and they certainly own the dataset software and let their customers tune the curves. Before each dataset is released it goes back to Bosch for its own validation.*
>
> *Bosch is involved in all the development we ever do. They insist on being present at all our physical tests and they log all their own data, so someone somewhere at Bosch will have known what was going on.*
>
> *All software routines have to go through the software verification of Bosch, and they have hundreds of milestones of verification, that's the structure ...*
>
> *The car company is never entitled by Bosch to do something on their own.*

205.    Defendants' work on the EDC17 reflected a highly unusual degree of coordination among them. As they did with Volkswagen, the units required the work of numerous Bosch coders for a period of more than ten years.[31] Although Bosch publicly introduced the EDC17 in 2006, it had started to develop the engine management system years before.[32]

206.    Bosch was concerned about getting caught in the scheme to enable diesel emissions cheating. As reported in the German newspaper, *Bild am Sonntag*, and a French publication, a Volkswagen internal inquiry found that in 2007, Bosch warned Volkswagen by letter that using the emission-altering software in production vehicles would constitute an "offense."[33] Yet, Bosch concealed the software, and its emission control functions, in various "clean" diesel vehicles, including the Subject Vehicles, from U.S. regulators and consumers.

207.    Bosch LLC worked closely with Bosch GmbH and diesel automakers, both in the

---

[30] Michael Taylor, *EPA Investigating Bosch over VW Diesel Cheater Software*, Car and Driver (Nov. 23, 2015), http://blog.caranddriver.com/epa-investigating-bosch-over-vw-diesel-cheater- software/.

[31] Again, approximately 50,000 of Bosch's 375,000 employees worked in the diesel technology operations branch of Bosch. See *Bosch Probes Whether Its Staff Helped VW's Emissions Rigging*, *supra* note 28.

[32] See *The brain of diesel injection: New Bosch EDC17 engine management system*, *supra* note 14.

[33] *Bosch warned VW about illegal software use in diesel cars, report says*, Automotive News (Sept. 27, 2015), http://www.autonews.com/article/20150927/COPY01/309279989/bosch-warned-vw about-illegal-software-use-in-diesel-cars-report-says; *see also VW Scandal: Company Warned over Test Cheating Years Ago*, BBC (Sept 27, 2015), http://www.bbc.com/news/business-34373637.

United States and in Germany, to ensure that the "clean" diesels, like the Subject Vehicles, passed emission testing. Bosch LLC employees frequently communicated with regulators in the United States and actively worked to ensure that diesel vehicles were approved for sale in the United States. For example, we now know that employees of Bosch LLC and Bosch GmbH provided specific information to regulators in the United States about how Volkswagen's vehicles functioned and unambiguously stated that the vehicles met emission standards. Bosch LLC regularly communicated to its colleagues and clients in Germany about ways to deflect and diffuse questions from regulators in the United States about those vehicles. On information and belief, Bosch LLC also assisted in concealing the true nature of the emission control technology from regulators in the United States with respect to the Subject Vehicles at issue here.

208.    Bosch not only kept this "dirty" secret safe, it went a step further and actively lobbied lawmakers to push "clean diesel" in the United States. As early as 2004, Bosch announced a push to convince U.S. automakers that its diesel technology could meet tougher 2007 emission standards in the United States.[34] Bosch engaged in a multi-year, multi-million-dollar effort involving key players from Bosch in both Germany and the United States. In its efforts to promote "clean diesel" technology in the United States, Bosch GmbH acted on behalf of its global group of affiliated companies, including Bosch LLC.

209.    Bosch's promotion of diesel technology specifically targeted the United States. For example, Bosch put on "California Diesel Days"[35] and "SAE World Congress in Detroit."[36] In 2008, Bosch LLC co-sponsored the "Future Motion Made in Germany-Second Symposium on

---

[34] Edmund Chew, *Bosch boosts US diesel lobbying*, Automotive News (Mar. 8, 2004), http://www.autonews.com/article/20040308/SUB/403080876/bosch-boosts-us-diesel-lobbying.
[35] *Bosch drives clean diesel in California*, Bosch, http://www.bosch.us/content/language1/ html/734 _4066.htm?section= 28799C0E86C147799E02226E942307F2.
[36] *See, e.g.*, *Bosch Brings Innovation, Green Technology to SAE 2009 World Congress*, Bosch, http://www.bosch.us/content/language1/html/734_7432.htm?section=CDAF31A 468D9483198ED8577060384B3.

Modern Drive Technologies" at the German Embassy in Washington, D.C., with the aim of providing a venue for "stakeholders to gain insight into the latest technology trends, and to engage in a vital dialogue with industry leaders and policymakers."[37]

210.    Bosch LLC hosted multi-day conferences open to regulators and legislators and held private meetings with regulators, in which it proclaimed extensive knowledge of the "clean" diesel technology, including the calibrations necessary for the vehicles to comply with emission regulations.

211.    In April 2009, for example, Bosch organized and hosted a two-day "California Diesel Days" event in Sacramento, California. Bosch invited a roster of lawmakers, journalists, executives, regulators and non-governmental organizations with the aim of changing perceptions of diesel from "dirty" to "clean." [38] The event featured "clean diesel" vehicles as ambassadors of "clean diesel" technology. The stated goals were to "build support for light-duty diesel as a viable solution for achieving California's petroleum and emission reduction objectives." (*Id.*)

212.    Bosch also joined in events promoting the Subject Vehicles. At one such event hosted by Ram, Jeep and Bosch in Traverse City, Michigan, Bosch made a number of statements regarding the 3.0-liter EcoDiesel V6's performance. It stated that the "Bosch emissions control system helps ensure that virtually no particulates and minimal oxides of nitrogen (NOx) exit the tailpipe" and that a Jeep Grand Cherokee or Ram 1500 diesel's engine provides a fuel economy that is "30% better than a comparable gasoline engine."[39]

---

[37] *Bosch: Clean Diesel is Key Part of Future Technology Mix*, Bosch, http://us.bosch-press.com/tbwebdb/bosch-usa/en-US/PressText.cfm?CFID=59743263&CFTOKEN=b0c61c28412924c-BCBB064E-FD22-FC33-50650318 A8803D2B&nh=00&Search=0&id=364.

[38] *Bosch drives clean diesel in California*, *supra* note 35; *see also California Diesel Days*, The U.S. Coalition for Advanced Diesel Cars, http://www.californiadieseldays.com/.

[39] Dale Jewett, *EcoDiesel: An Essential Tool for Every Outdoorsman*, Objects in the Mirror…(blog operated by FCA Digital Media) (May 22, 2015), https://blog.fcanorthamerica.com/2015/05/22/ecodiesel-an-essential-tool-for-every-outdoorsman/.

213.    In 2009, Bosch also became a founding member of the U.S. Coalition for Advanced Diesel Cars.[40] One of this "advocacy" group's purposes included "promoting the energy efficiency and environmental benefits of advanced clean diesel technology for passenger vehicles in the U.S. marketplace."[41] This group lobbies Congress, U.S. regulators, and CARB in connection with rules affecting "clean diesel" technology.[42]

### III.    FCA'S MISLEADING MARKETING
#### A.    Fiat Chrysler Identifies and Combats the "Dirty Diesel" Stigma

214.    As described above, Fiat Chrysler, VM Motori, and Bosch began investigating strategies to develop and market diesel vehicles in the North American market in at least July 2010. FCA-MDL-001184465. As early as February 2012, Chrysler had already commissioned and presented research to understand how to market the diesel vehicles to consumers. FCA-DL-001182796-821.

215.    This research confirmed that the Defendants had a significant obstacle to overcome: consumers associated diesel engines with old technology and, more importantly, with "negative images of smog and dirt." *Id.*

216.    This "dirty diesel" stigma was considerable. During Fiat Chrysler's 2012 focus group addressing "diesel perceptions," one consumer noted "[I] can't stand diesel;" another felt "[diesel] has an image problem;" another explained that "when somebody says diesel, I just think of that black smoke;" to another, diesel evoked image of "smoke, exhaust;" another associated diesel with "old images of a truck letting off all of these emissions;" and, summing it up, one focus

---

[40] Chrissie Thompson, *New Coalition Aims To Promote Diesel Cars*, Automotive News (Feb. 2, 2009), http://www.autonews.com/article/20090202/OEM06/302029728/new-coalition-aims-to promote-diesel-cars.
[41] *About the Coalition*, The U.S. Coalition for Advanced Diesel Cars (May 22, 2015), http://clean dieseldelivers.com/about/.
[42] *Id.*; *see also, e.g.*, Letter to Mary T. Nichols & the California Air Resources Board concerning a statement made about diesel technology (Jan. 8, 2016), http://cleandieseldelivers.com/ media/Mary-Nichols-Letter-01082016.pdf.

group participant noted "you just think dirty when you think diesel." FCA-MDL- 001422127.

217.    Unsurprisingly, then, Fiat Chrysler worked hard to rebut the dirty diesel stigma in communications directly with consumers and in training materials for dealers (to help the dealers persuade consumers to purchase the Subject Vehicles). In a Jeep EcoDiesel "Product Brief," for example, Fiat Chrysler noted "[b]uyers can be resistant to consider a diesel purchase due to several perceptions that are no longer true" including that "diesels are filthy . . . [and] too loud and smelly." FCA-MDL-000517246-53. The brief combats these perceptions by stating that "diesel engines are surprisingly responsible in view of ecological concerns." *Id.* It also includes "key messages" for prospective consumers including: "Diesel engines offer clean operation with typically 25% less emissions than a gasoline engine." *Id.* It also notes that the "3.0L EcoDiesel V6 uses Selective Catalyst Reduction (SCR) with DEF to help minimize exhaust emissions" and uses "NOx modules and sensors . . . to help control tailpipe emissions." *Id.*

218.    Similarly, a Ram 1500 "Targeted In-Dealership Training" guide notes that the two "most common misconceptions about diesel engines" are that "Diesels are noisy" and "Diesels are dirty." FCA-MDL-000517194-203. As to the latter, the guide instructs dealers that the "Diesel Exhaust Fluid (DEF) and Selective Catalyst Reduction lower the exhaust emissions of diesel engines." *Id.* It later explains that DEF "reduce[s] nitrous oxides coming out of the tailpipe" and "helps to create ***non-harmful*** emissions." *Id.* (emphasis in original). The guide then states that "[o]ur EcoDiesel runs extremely clean for a truck powerplant." *Id.*

219.    In a "news" document, again presumably targeting Ram and Jeep dealers, Fiat Chrysler explained that "[w]hen pitching the EcoDiesel, it may help you to keep in mind a few advantages to driving a diesel engine." FCA-MDL-000518525. One advantage was that "Diesels Are Getting Greener." *Id.* The document then explained that "[i]n the past, diesels were seen as

polluters – a hindrance to environmentally conscious customers. Today's diesels, however, run cleaner than they ever have before. For its part, the ecologically responsible EcoDiesel V6 is the cleanest light-duty engine available." *Id.*

### B. The EcoDiesel Name and Badge Communicate Environmental Friendliness and Fuel Efficiency

220.    Fiat Chrysler also understood that a key component of overcoming the diesel stigma, and of marketing the Subject Vehicles' purported environmental friendliness and fuel economy, was the naming and labeling of the diesel technology. As noted above, Fiat Chrysler conducted research in February 2012 to address this very issue.  FCA-MDL-001182796-821. That research concluded that the "[b]est names [for Fiat Chrysler's diesel engine] highlight 'green' theme." *Id.* It further concluded that "*[f]uel efficiency and environmental friendliness are important; names connected with these will be most well-received*." *Id.* (emphasis added). An excerpt from the research presentation is shown below:



221.     The highest-ranked name, in terms of both appeal and preference, was "Eco-Diesel." The research explained that "'Eco' encompasses green, efficient, and economic . . . and is strongly associated with being environmentally friendly." Similarly, the research concluded that the EcoDiesel "[n]ame [i]mplies a variety of positive meanings – green, efficient, economic, etc." Unsurprisingly, the "imagery" most associated with the name "EcoDiesel" was "Environmentally-Friendly" and "Fuel Efficient." *Id.*

222.     Although other potential names (*e.g.*, "Clean Diesel" and "Enviro Diesel") had slightly higher associations with environmental friendliness, "EcoDiesel" communicated the combination of "green" credentials and fuel economy the best. Fiat Chrysler had found its winner.

223.     Fiat Chrysler adopted and trademarked the "EcoDiesel" name and used it in virtually every advertisement for the Subject Vehicles. It also branded every single Subject Vehicle with an EcoDiesel badge. The two versions of the badge, used on Jeep Grand Cherokees and Ram 1500s, respectively, are shown below:



224.     This badging was *extremely important* to Fiat Chrysler. Jim Morrison, then the head of Jeep Brand Product marketing, gave a presentation some 20-30 times in which he explained that "consumers are immediately receptive to the EcoDiesel badging/logo" and "suggest that 'Eco-

166

diesel badging can initially change the impression of diesel vehicles." FCA- MDL-001166458-533; Morrison Dep. Tr. 131:5-6. As the notes below the slide confirm, "[c]onsumers further believe that *the word 'Eco- Diesel'* *can change the perception of a diesel engine to something denoting ecologically conscious and economical to own and operate.*" *Id.* (emphasis added). The full slide with notes is shown as follows:



225.    Mr. Morrison also confirmed the meaning and importance of the EcoDiesel name and badge in a sworn declaration he submitted in connection with a trademark dispute. There, he declared that "Chrysler decided to combine the terms 'Eco,' 'Diesel,' and '3.0L' ... to refer to the engine because the engine is an economical, fuel-efficient, more environmentally friendly 3.0 liter diesel engine." *Unitek Solvent Services, Inc. v. Chrysler Group*, LLC, No. 1:12-cv-00794, Dkt. 86-35 at ¶ 8 (June 4, 2013). He further explained that "Chrysler [also] based its decision to use the descriptive terms 'eco' and 'ecodiesel' on the fact that numerous third parties in a variety of industries use the term 'eco' to describe ecologically or environmentally friendly products or services that have been developed to reduce carbon emission, energy consumption, or otherwise preserver the environment." *Id.* at ¶ 10.

226.    Many additional documents confirm that Fiat Chrysler intended the name "EcoDiesel" and the EcoDiesel badge to convey both environmental friendliness and fuel economy. A September 2013 press release, for example, included a heading entitled "**Putting the 'Eco' in EcoDiesel**" under which it claimed that "[t]he new EcoDiesel V6 achieves 50-state emissions compliance for both tier II and BIN 5." FCA-MDL-000519022-24 (emphasis in original). In other words, the "Eco" in EcoDiesel means not just environmental friendliness, generally, but also emissions compliance, specifically.

227.    A later Ram press release entitled "Ram has 'turned up the ECO' on full-size truck MPGs . . . to 29" further demonstrates that the "Eco" in EcoDiesel also refers to fuel economy. FCA-MDL-001344885-86; FCA-MDL-001401873.

228.    Again, the EcoDiesel badge was placed prominently on every single Subject Vehicle, and the word "EcoDiesel" was used in virtually every consumer-facing communication.

That word and badge represented to consumers that the Subject Vehicles were environmentally friendly and fuel efficient. Both representations, it turns out, were based on a lie: the Subject Vehicles were not, in fact, environmentally friendly, and could achieve their fuel economy only through concealed emissions apparatuses that caused the vehicles to pollute excessively in real-world driving conditions.

### C.    FCA Misrepresents the Subject Vehicles to Consumers in a Consistent and Pervasive Marketing Campaign

229.    Fiat Chrysler's misleading representations about the Subject Vehicles, including their purported "green" credentials, superior fuel economy, and other performance characteristics were not limited to EcoDiesel badge. Indeed, FCA engaged in a full court press to market the Subject Vehicles, and to communicate to consumers the purported benefits of the EcoDiesel engine. These communication efforts included, among other things: (1) press releases aimed at generating positive news articles about the EcoDiesel attributes; (2) comprehensive dealer training materials that taught dealers how to sell the Subject Vehicles with false and misleading misrepresentations; (3) vehicle brochures disseminated at dealerships and elsewhere; (4) information and interactive features on FCA's websites and blogs; and (5) print and television marketing.

### 1.    Press Releases and Media Communications

230.    As early as 2013, FCA began issuing press releases that were sent directly to consumers and were also intended to generate consumer-facing articles and reviews about the EcoDiesel engine. There are many such examples. A representative sampling includes:

a.   A January 2013 press release announcing a "new, clean, 3.0-liter EcoDiesel V-6 engine" in the Jeep Grand Cherokee. The release touts the "30 mpg highway with driving range of more than 730 miles," and the "class- leading 240 horsepower and massive 420lb.-ft of torque." Notably, it also states that the "Selective Catalytic Reduction (SCR) help[s] the new engine" be "clean" and "50-state legal." FCA-MDL-001134988-90.

b.   An October 2013 press release notifying the media that the "[n]ew 2014 Jeep Grand Cherokee EcoDiesel wins 'Green' category" of the 2014 Active Lifestyle Vehicle Awards. The release claims the Jeep EcoDiesel includes "clean-diesel technology" and delivers "best-in-class fuel economy and driving range." FCA-MDL-000519206-07.

c.   A February 2014 press release proclaiming that the "2014 Ram 1500 EcoDiesel sets new fuel-economy benchmark of 28 MPG." The release repeatedly touts the EcoDiesel's fuel economy and claims that its SCR and EGR systems—both of which were compromised by the AECDs described herein—"contribute to 50-state compliance with Tier2/Bin 5 emissions regulations." FCA-MDL-001142520-21.

d.   A November 2014 press release announcing that the "Ram 1500 EcoDiesel [was] named 2015 Green Truck of the Year by Green Car Journal." The release states that the "Ram 1500 delivers an outstanding combination of best-in-class fuel efficiency, unsurpassed torque and a surplus of towing capacity." It also quotes the editor of Green Car Journal who noted that "[t]he Ram 1500 EcoDiesel exemplifies what a 'green' truck should be." FCA-MDL-000519290-01.

e.   A January 2015 press release announcing that the "Jeep Grand Cherokee EcoDiesel [was] named 2015 Green SUV of the Year by Green Car Journal." The release again boasts the EcoDiesel's "best-in-class" fuel economy, "untouched" range, "class-leading" horsepower, "massive" torque, and its "clean-diesel technology." FCA-MDL-001377187-88

f.   A November 2016 press release boasting "best-in-class fuel economy and longest range with exclusive EcoDiesel – 29 mpg and 754 miles with Ram 1500." FCA-MDL-001185732-34.

231.   Notably, Marchionne himself was asked to approve, and did approve, a draft press release from February 2013 announcing that "Ram [was the] first to build light-duty diesel pickup." The release promoted an "outstanding combination of best-in-class fuel efficiency, best-in-class torque and impressive capability." It also stated that the "EcoDiesel . . . emissions are 60

170

percent less than those produced by diesel powertrains 25 years ago." FCA-MDL-001367858-59.

232.   In some instances, these press releases were sent directly to consumers in "hand raiser" communications, as evidenced by a 2014 email to a prospective customer. That email "thanks [the prospective customer] for asking about the 2014 Ram 1500 EcoDiesel,"—which it says is "capable, efficient, and easy on the environment"—and links to a Ram "press release for more information." FCA-MDL-001180641.

233.   Even when not sent directly to consumers, all the press releases—and the consistent representations about environmental friendliness, fuel economy, and performance contained in them—were intended to, and did in fact, result in significant buzz and media attention for the EcoDiesel vehicles, to which Plaintiffs were exposed. The representations that resulted were false (because the vehicles contained concealed components that compromised the emissions control systems in real-world driving conditions) and deceptive (because the vehicles could not perform as represented without the concealed emission control components).

## 2.   **Dealer Training Materials**

234.   As noted above, FCA disseminated to its dealers comprehensive training materials to help them communicate the purported EcoDiesel attributes to consumers, and ultimately, to sell more Subject Vehicles. Those materials consistently emphasized the (supposed) environmental friendliness, fuel efficiency, and power of the EcoDiesel engine, among other attributes.

235.   Ram, for example, held a "targeted in-dealership training" through its dealer-focused "Chrysler Academy" and disseminated an accompanying "participant reference guide." The document explains that the training is "focuse[d] on features of Ram 1500 and will help you sell down your 2014 model year vehicles while it also helps you prepare for the 2015s." This

training document includes an entire section on EcoDiesel, and as discussed above, it addresses the "common misconception" that "[d]iesels are dirty" and instructs that "Diesel Exhaust Fluid (DEF) and Selective Catalyst Reduction lower the exhaust emissions of diesel engines."  Then, answering the question "How clean is the 3.0L EcoDiesel V6?" the guide explains that "[o]ur EcoDiesel runs extremely clean." It also states that the engine "[c]omplies with all diesel-related emissions standards," and notes that selling points of the diesel include its "Fuel efficiency," "Power (Torque)," and "Quality, Reliability and Durability (QRD)." Finally, the guide includes an "in the media section" highlighting positive reviews and articles.  FCA-MDL-000517194-245.

236.    Jeep held a similar Chrysler Academy event for dealers and also disseminated an accompanying "product reference guide" with eight pages devoted exclusively to the EcoDiesel engine. FCA-MDL-000518573-620. As with the Ram guide, the Jeep guide addresses the dirty diesel stigma, and offers selling points to rebut it. The guide explains that the EcoDiesel engine exhibits "confident power, surprisingly clean operation" and claims that "it is going to convert a host of new customers to the impressive benefits of pulse-quickening acceleration and efficient and ecological clean diesel operation." It highlights the "clean operation and effective emissions control," specifically noting that the SCR and EGR systems combine to mitigate NOx and produce "clean diesel operation." Finally, as shown below, it includes a "Key messages" section emphasizing the importance of fuel efficiency, "clean operation," and "torque":

## DIRTY POLLUTER? – EXACTLY THE OPPOSITE - CLEANER AND MORE ECOLOGICAL THAN GASOLINE ENGINES

Today's clean diesel technology is:

- 30% more fuel efficient than its gasoline counterpart
- Produces around 25% less carbon dioxide (CO2)
- Generates over 96% fewer emissions than the diesel engines of 1990s

### Key messages

1. Today's diesel engines help conserve fossil fuel resources with a **30% reduction in fuel consumption** versus a gasoline engine

2. Diesel engines offer clean operation with typically **25% less emissions** than a gasoline engine

3. Diesel engines are fun to drive by offering **50% more torque** than a comparable gasoline engine

The 3.0L EcoDiesel V6 provides all these benefits at superb levels compared to the other diesel engines available in the SUV segment!

237.    These themes are echoed almost verbatim in another, 13-page Chrysler Academy "Product Brief" focused exclusively on the EcoDiesel engine. FCA-MDL-001183753-65.  As shown below, that product brief includes almost identical "key messages for your prospects," and notes that the engine is "surprisingly responsible in view of ecological concerns."



## TODAY'S DIESEL TECHNOLOGY

Buyers can be resistant to consider a diesel purchase due to several perceptions that are no longer true with today's modern high-pressure, direct-injection diesel technology.

| OLD THOUGHT | NEW REALITY |
| --- | --- |
| **DIESELS HAVE POOR PERFORMANCE** | Actually, today's diesels with modern technology produce high torque for their displacement size compared to gasoline engines. A general industry rule of thumb is that a diesel engine of the same size will generate 50% more torque over its gasoline-powered counterpart. And, since torque is what gets the vehicle moving, diesel vehicles offer outstanding acceleration. Diesel torque output is often especially impressive for the 50-70 mph bursts that many drivers use to pass or enter freeways. |
| **DIESELS ARE TOO LOUD AND SMELLY** | With common rail, high-pressure direct injection (both pioneered by FIAT Powertrain), diesel engines now "purr" similar to gasoline power plants. In fact, the finest high-end luxury vehicles offered internationally, as well as in North America, commonly include a diesel engine option and/or model. Regarding odor, modern diesel technology has minimized the once-noticeable odors generated. |
| **DIESELS ARE FILTHY** | While strict environmentalists are not happy with any internal combustion engine, diesel engines are surprisingly responsible in view of ecological concerns. The modern diesel is typically 30% more fuel efficient than its gasoline counterpart and produces around 25% less carbon dioxide (CO2). Prospects should know that today's clean diesel engine generates over 96% fewer emissions than the diesel engine of 1990. Studies show that a modern 2.0-liter diesel engine would have to idle for 100 minutes to produce same amount of fine particulates generated by one burning cigarette. |

### KEY MESSAGES FOR YOUR PROSPECTS

1. Today's diesel engines help conserve fossil fuel resources with a 30% reduction in fuel consumption versus a gasoline engine.

2. Diesel engines offer clean operation with typically 25% less emissions than a gasoline engine.

3. Diesel engines are fun to drive by offering 50% more torque than a comparable gasoline engine.

The 3.0L EcoDiesel V6 provides all these benefits at superb levels compared to the other diesel engines available in the SUV segment!

238.    Yet another Chrysler Academy "Web Launch" training session explains that its purpose was "to help participants" better understand the vehicles and, critically, to "[u]understand elements for effective presentations to shoppers." It includes similar language about fuel economy,

power, and environmental friendliness. It also explains that "for buyers who respect the environment, they should know this is a very clean diesel ... very green without question." FCA-MDL-001183766-901.

239.    These are but a few examples that highlight the comprehensive training that FCA provided for its dealers. The objective of these trainings was to arm the dealers with selling points that they could relay to consumers—and they did just that. For the Subject Vehicles, the consistent selling point was the no-compromise combination of fuel efficiency, environmental friendliness, and power. This selling point was false (because the vehicles contained concealed components that compromised the emissions control systems in real-world driving conditions) and deceptive (because the vehicles could not perform as represented without the concealed emission control components).

### 3.    Vehicle Brochures

240.    FCA also communicated directly with consumers through its vehicle brochures, available both online and at the dealerships. These brochures are chock full of representations about the EcoDiesel engine's purported fuel economy, environmental friendliness, and power.

241.    The brochure for the 2014 Jeep Grand Cherokee, for example, devotes an entire page to the EcoDiesel engine. That page depicts the EcoDiesel badge and also an image of the engine with a green leaf on top. It states that the engine achieves "best-in class: 30 MPG fuel economy[,] 730-mile driving range[,] 420 lb-ft of torque[, and] 7400-lb maximum towing."  The document further claims that "its reduced CO2 emissions display reverence for the environment" and even goes so far as to state that "*[p]roudly, the EcoDiesel meets and even exceeds the low emissions requirements in all 50 states*." (Emphasis added.) Excerpts from the two-page brochure

spread are shown below:



Thirty miles per gallon? True story. Grand Cherokee's new, available 3.0L EcoDiesel V6 engine delivers best-in-class economies[®] that treat your fuel budget with respect, while its reduced $CO_2$ emissions display reverence for the environment. Proudly, the EcoDiesel meets and even exceeds the low emissions requirements in all 50 states. Best-in-class fuel economy[®] arrives with an estimated 22 city/30 hwy mpg,[†] and a driving range of more than 730 highway miles per tank.[¤] That's because, compared to gasoline, a gallon of diesel fuel converts to a greater amount of useable energy. So you can leave Detroit, MI, with a full tank and arrive in New York City without ever stopping to refuel. And with its command of 240 hp and a hefty 420 lb-ft of torque, the EcoDiesel provides a surge of towing strength that can haul up to 7,400 lb when properly equipped. Stats so good, they're worth repeating every chance you get.

242.    The 2015 brochure makes similar claims. It again features the EcoDiesel badge and environmental imagery. And it again boasts "best-in-class ... 30 hwy mpg fuel economy" and "a driving range of 730 highway miles." It also states that the vehicles are "clean" and 50-state compliant, and even opens with this environmentally-focused introduction: "Love the planet along with great fuel economy? Then the Jeep Brand's Diesel engine will ring true. It lets you adhere to your principles and get extra points for embracing innovative technology."



243.    The 2016 brochure also features the EcoDiesel badge, and touts best-in-class fuel economy, range, horsepower, and torque. And it too states that "[t]he EcoDiesel exceeds the low-emissions requirements in all 50-states":



244.    The Ram 1500 brochures make similar claims. Like the Jeep Brochures, the 2014 Ram 1500 brochure devotes an entire page to the EcoDiesel engine, depicts the EcoDiesel badge, and repeatedly touts the truck's "best-in-class" fuel economy and "impressive" range. It also boasts that the truck is "clean by nature" with "minimal $CO_2$ levels" and a "[t]op-notch DEF system."

245.    The 2015 brochure also advertises "top-tier mpg ratings," "superb driving range and best-in-class 28 mpg highway," and claims the truck is "clean by nature" with "minimal $CO_2$ levels" and a "zero-hassle DEF system."

246.    The 2016 brochure boasts "best-in-class 29 mpg highway fuel economy," "up to 754-mile range," "240 horsepower," "420 lb-ft of torque," "minimal $CO_2$ levels" and a "zero-hassle DEF system."

247.    The brochures are tied together by common themes and sometimes identical language. The key representations made throughout were that the Subject Vehicles delivered a no-compromise combination of fuel efficiency, environmental friendliness, and performance.  Those representations were false (because the vehicles contained concealed components that compromised the emissions control systems in real-world driving conditions) and deceptive (because the vehicles could not perform as represented without the concealed emission control components).

### 4.    FCA Websites

248.    FCA hosted a number of blogs and websites that promoted the EcoDiesel technology, including the official Ram and Jeep websites, which many named Plaintiffs visited before making their purchase/lease decisions. Both company sites reiterated FCA's consistent messaging for the Subject Vehicles—i.e., that they were clean, fuel efficient, and high performing.



249.     A February 9, 2014, capture of the Jeep website, for example, includes a diesel tab, under which it displays the EcoDiesel badge and tells viewers to "[f]orget everything you thought you knew about diesel. The all-new jeep EcoDiesel engine offers innovative technology that is efficient, increases range, and improves power – all while leaving little trace of being there."[43]

250.     The Jeep website also includes separate pages featuring its supposed "Best-in-Class maximum towing capacity," "incredible 730-mile highway driving range," and "superior fuel economy." As to fuel economy, the website also includes (and has included since at least 2014) a "savings calculator" that allows consumers to enter their miles driven per day and then calculates their annual fuel savings using "Clean Diesel."[44]

---

[43]Available at: http://web.archive.org/web/20140209113901/http://m.jeep.com/en/jeep_capabilities/eco-diesel-calculator/#introduction (last visited April 19, 2018).
[44] Available at: https://m.jeep.com/en/jeep_capabilities/eco-diesel-calculator/#savings (last visited April 19, 2018).



251.    Ram's website made similar representations, touting the fuel economy, horsepower, torque, and towing capacity of the EcoDiesel engine, and claiming that it was "[e]quipped with a diesel oxidation catalyst, diesel particulate filter and selective catalyst reduction so it is emissions-compliant in all 50-states."[45]

---

[45]Available at: http://web.archive.org/web/20160316042712/http://www.ramtrucks.com/en/ram_1500/ capability/#link-3 (March 2016 web archive); http://web.archive.org/web/20150215044120/http://www. ramtrucks.com:80/en/ram_1500/capabil ity#link-3 (Feb. 2015 web archive); http://web.archive.org/web/ 20140214053830 /http://www.ramtrucks.com:80/en/ram_1500/capabil ity/#link-3 (Feb. 2014 web archive) (all visited last on April 19, 2018).



252.    Like Jeep, Ram also included a fuel savings calculator, as well as graphics comparing the best-in-class fuel economy to the competition:[46]

---

[46]   FCA-MDL-001184455-62; *EcoDiesel – Ram 1500 HFE*, Ram Trucks (FCA), available at https://www.ram trucks.com/en/ecodiesel/ (last accessed July 19, 2017).





253.     FCA made many similar representations throughout the many websites it operated, including but not limited to the following:

a.      The EcoDiesel engine is designed for those "who want to drive an efficient, environmentally friendly truck without sacrificing capability or performance."[47]

b.      The Ram 1500 EcoDiesel is "the NAFTA market's first and only light-duty pickup powered by ***clean diesel*** technology."[48]

c.      "Thanks to advanced emissions-control technology . . . [EcoDiesel's] exhaust is ultra-clean, making this engine available in all 50 states."*(Id.)*

d.      "Equipped with a diesel oxidation catalyst, diesel particulate filter and selective catalyst reduction, the EcoDiesel® V6 engine will be emissions- compliant in all 50 states."[49]

e.      "Chrysler Group engineers adapted the engine—manufactured by Fiat- owned V.M. Motori—to meet the NAFTA region's stringent emissions and on-board diagnostic regulations. The new EcoDiesel® V-6 is Tier 2/Bin 5 compliant."[50]

f.      The emissions on the EcoDiesel® engine data sheet meet Tier2 Bin5 requirements.[51]

g.      "[T]he Bosch emissions control system helps ensure that virtually no particulates and minimal oxides of nitrogen (NOx) exit the tailpipe."[52]

254.     Many named Plaintiffs visited FCA's websites to learn about the Subject Vehicles. On those websites, as in all the other ways FCA communicated to consumers, FCA's message was clear and consistent: the EcoDiesel engine delivers a no-compromise package of fuel economy,

---

[47] *The 2014 Ram 1500 with EcoDiesel Engine, Available Soon at a Dealer Near You*, Ram Zone (Ram trucks blog operated by FCA US LLC) (July 16, 2013),https://blog.ramtrucks.com/features/the-2014-ram-1500-with-ecodiesel-engine-available-soon-at- a-dealer-near-you/.

[48] *Chrysler Group's 3.0-liter EcoDiesel V-6, 500e Battery-Electric Drive System Among Ward's 10 Best Engines for 2014*, Chrysler Group LLC (FCA) (Dec. 12, 2013), http://www.fcanorth america.com/News/ ChryslerDocuments/Chrysler GroupLLC_Sustain2013Dec12.pdf (emphasis added).

[49] *The 2014 Ram 1500 with EcoDiesel Engine, Available Soon at a Dealer Near You*, *supra* note 47.

[50] *Chrysler Group's 3.0-liter EcoDiesel V-6, 500e Battery-Electric Drive System Among Ward's 10 Best Engines for 2014*, *supra* note 48.

[51] *EcoDiesel: An Essential Tool for Every Outdoorsman*, *supra* note 39.

[52] *Id., supra* note 39.

range, performance, and environmental-friendliness.  Those representations were false (because the vehicles contained concealed components that compromised the emissions control systems in real-world driving conditions) and deceptive (because the vehicles could not perform as represented without the concealed emission control components).

### 5.   Print Media and Television

255.    FCA reiterated its consistent representations—particularly the fuel economy representations—through print media and television commercials.

256.    The print ad campaign was robust. One FCA-produced document identifies over 250 Ram print ad buys in several dozen publications from June 2014 to October 2016.  FCA-MDL-000519349. Another document shows expenditures of almost $300,000 to place Jeep EcoDiesel print ads in a variety of magazines in June through August 2013. FCA-MDL-001360559. Yet another document identifies additional ad buys for 14 newspapers across the country. FCA-MDL-000519351.

257.    Critically, virtually all of the print ads for the Subject Vehicles contain the same or similar relevant representations, including: (1) the word "EcoDiesel" and/or the EcoDiesel badge, and (2) fuel economy claims such as specific MPG ratings, "most fuel efficient," and "best-in- class" fuel economy. Three illustrative examples, one for the Jeep Grand Cherokee Subject Vehicles and two for the Ram 1500 Subject Vehicles, are shown below:







258.    The television commercial campaign was also extensive, and also conveyed consistent messages. One FCA document shows 17,595 discrete commercial buys between January 2014 and September 2016, including during prominent and widely-viewed programing. FCA-MDL-000519350.

259.    Some examples of the relevant commercials (a portion of which are not included in the chart described above) include:

a.    A commercial entitled "West" that prominently features the EcoDiesel badge, and promotes the Ram 1500 EcoDiesel's "28 highway MPG" and "9,200 lbs towing." FCA-MDL-000512961.

b.    A commercial entitled "Roar" that prominently features the EcoDiesel badge, and promotes the Ram 1500 EcoDiesel's "28 highway MPG" and "420 lb-ft torque." FCA-MDL-000512962.

c.    A commercial entitled "Runaway" that prominently features the EcoDiesel badge and promotes the Jeep Grand Cherokee EcoDiesel's "best-in-class 30 MPG hwy" and "730-mile driving range." FCA-MDL-000518756.  Per the commercial buy document described above, this commercial ran approximately 1,000 times in January 2014.

d.    A commercial entitled "Take Every Mile" that features the EcoDiesel badge and promotes the Jeep Grand Cherokee EcoDiesel's "730-mile driving range." FCA-MDL-000518759. Per the commercial buy document described above, this commercial ran approximately 400 times in two weeks in February 2016.

e.    A commercial entitled "The Truth About Diesel" that "bust[s] some myths about diesel engines," including that "all SUVs get bad gas mileage, diesel engines are dirty, and they run sluggish." All three myths were "totally busted," and the video specifically boasts the Jeep Grand Cherokee EcoDiesel's "30 MPG and a 730-mile driving range." It also depicts a man "check[ing] the data" on the emissions from the tailpipe and remarking "Wow, the greenhouse gas emissions are lower than a regular gasoline engine." FCA-MDL-001418576.

260.    Like the rest of Fiat Chrysler's consumer communications, these commercials represented that the Subject Vehicles were green (both through explicit representations and depictions of the EcoDiesel name and badge) and fuel efficient. These representations were pervasive and consistent. They were also false (because the vehicles contained concealed

components that compromised the emissions control systems in real-world driving conditions) and deceptive (because the vehicles could not perform as represented without the concealed emission control components).

* * *

261.    The Defendants saw the EcoDiesel technology as a huge opportunity to increase their sales and profits. They understood that to realize this goal, they would have to overcome the "dirty diesel" stigma, and convince consumers that the Subject Vehicles offered a no-compromise package of fuel efficiency, environmental friendliness, and power. Fiat Chrysler's efforts to communicate this message to consumers were far reaching and consistent. They were also false and deceptive.

262.    Defendants had multiple opportunities, and obligations, throughout their marketing communications to disclose the uniform truth about the Subject Vehicles—namely, that all their emissions, fuel economy, and performance claims were predicated on concealed emissions control components and software that caused the Subject Vehicles to pollute excessively in real-world driving conditions. This uniform omission and unvarying concealment prevented any and all consumers from making a purchase based on all material facts.

### D.    The Defendants Knew These Representations Were False and Misleading

263.    Unfortunately, the EcoDiesel technology did not work as represented.  In developing the Subject Vehicles, the Defendants came to understand that they could not make the vehicles environmentally friendly or "50-state compliant"—as they represented to consumers through consistent and pervasive communications—and that the vehicles could not achieve the fuel economy and performance that were central to Fiat Chrysler's marketing efforts without

190

installing components and software that de-activated or reduced the emission control system during real-world driving conditions. The Defendants concealed this fact from regulators and consumers alike, and cheated Plaintiffs of the vehicles they thought they were buying.

264.    The Defendants' scheme focused on at least two of the emissions control systems in the Subject Vehicles—both of which Fiat Chrysler pitched to consumers as enablers of the Subject Vehicles purported "clean" operation: (1) the Exhaust Gas Recirculation ("EGR") system and (2) the Selective Catalytic Reduction ("SCR") system.

265.    The EGR system reduces NOx in diesel emissions by lowering the temperature of the exhaust gas exiting the engine. The SCR system takes the NOx leftover from the EGR System and converts it into harmless nitrogen and water. Together, the EGR and SCR systems are vital to mitigating the pollution from the Subject Vehicles' diesel emissions.

266.    As identified in the EPA's NOV, the Defendants installed a number of undisclosed auxiliary emission control devices ("AECDs") in the Subject Vehicles that compromised the EGR and SCR systems and resulted in substantially increased NOx emissions during real-world driving conditions. As exemplified herein, the Defendants knew that these AECDs were not allowed, but that the Subject Vehicles could not achieve the fuel economy or performance that the Defendants marketed without them.

## 1.    EGR AECD Strategy: EGR Rate Reduction

267.    Burning diesel fuel creates NOx. The amount of NOx produced by a diesel vehicle is a function of temperature: the hotter the exhaust gas is when it exits the engine, the more NOx generated.

268.     The EGR system minimizes NOx by lowering the temperature of the engine exhaust through a recirculation process. The higher the rate of exhaust gas recirculation (the EGR rate), the lower the exhaust gas temperature. The lower the exhaust temperature, the lower the NOx. But, critically, the higher the EGR rate in a vehicle, the worse fuel economy it achieves. Defendants employed the EGR AECDs in the Subject Vehicles to either reduce the EGR rate or shut it off entirely, thereby artificially and secretly increasing the Subject Vehicles' fuel economy and drivability at the expense of increased NOx.

269.     One of the strategies Defendants used to reduce the EGR rate was through what the EPA has named AECD 5, which detects the engine temperature in the Subject Vehicles and reduces the EGR rate during the vehicles' "warm-up phase" (the phase when the engine is heating up after a cold start). The EPA described AECD 5 as "EGR rate reduction based on engine temperature model." Defendants referred to it as "T_Eng" and various derivatives thereof (e.g., "t_engine" and "tEng").

270.     VM Motori knew as early as 2010 that T_Eng was an AECD that, if concealed, would be illegal. (FCA-MDL-000456083) In April 2010, a Fiat Chrysler powertrain division employee attempted to assure VM Motori's Controls and Calibration Director, Sergio Pasini, that T_Eng did not employ "cycle detection". FCA-MDL-000452591. "Cycle detection" refers to any mechanism that allows a vehicle to detect when it is undergoing regulatory emissions testing, and modify its emissions accordingly. But Pasini knew better. Just two months later, he told his VM Motori colleagues, "the [EGR] rate will be managed mainly on t_engine which is, no matter what FIAT says, a cycle detection." *Id.* VM Motori regularly admitted that the T_Eng function employed "cycle detection" (12/2011 correspondence—FCA-MDL-000168161); "cycle recognition" (1/2012 correspondence—FCA-MDL-000377513; FCA-MDL-000377513_T001

(English translation)); and "cycle beating" (02/2013 correspondence—FCA-MDL-000430441-44; 06/2013—FCA-MDL-000295256). Pasini also understood that this AECD was not being disclosed to the EPA. FCA-MDL-000377499; FCA-MDL-000377499_T001-02 (English translation). In a May 2013 email, for example, Pasini told more than a dozen of his VM Motori colleagues that the T_Eng function was not active during emission testing and "has not been declared to regulators." *Id.*

271.    Fiat Chrysler also knew that T_Eng was at an unacceptable AECD level, and critically, all the Defendants understood that it was necessary to achieve the desired fuel economy. In December 2011, VM Motori identified T_Eng as a "sort of 'cycle detection" to increase fuel economy (FCA-MDL-000168161) and said Fiat Chrysler gave them approval to use it (FCA-MDL-000377211). In January 2012, FCA Executive Bob Lee connected T_Eng to FCA's objective of achieving greater fuel economy in a presentation entitled "Fuel Economy Status Target." FCA-MDL-000000116. In February 2012, VM Motori directed Bosch to implement T_Eng, and told Bosch that VM Motori would explain to Fiat Chrysler that *T_Eng was "what you need if you want 30 mpg*." FCA-MDL-000015652 (emphasis added). Fiat Chrysler later explored ideas to replace T_Eng with a different strategy, but it abandoned that process after *VM Motori informed* FCA's Diesel Calibration Manager that the "F[uel] E[conomy] impact [of replacing T_Eng] is *probably around 2 mpg highway*." FCA-MDL-000430044 (emphasis added). In an email sent the next day, VM Motori's Emanuele Palma told colleagues that "*Chrysler knows tEng is the only way to get to 30 mpg, so don't worry about this topic*." *Id.* (emphasis added).

272.    Like VM Motori and Fiat Chrysler, Bosch also knew that T_Eng was an AECD that likely qualified as "defeat device" under applicable regulations. FCA-MDL-000015652. In February 2012, Bosch warned VM Motori that T_Eng is an emissions "defeat device" and that

they risked "serious penalties" if regulators found T_Eng to be cycle detection. *Id.* VM Motori refused to abandon T_Eng, however, and told Bosch "we are working closely with Chrysler [and] the feedback we've had so far about [using T_Eng] is positive." *Id.* The same month, Bosch sought to limit its liability from VM Motori's use of T_Eng, and even considered asking VM Motori to sign a risk release. RBL-MDL2777-PE-300402775-78. Yet, Bosch not only incorporated T_Eng into the emissions software for the Subject Vehicles (FCA-MDL-000351953), Bosch appears to have gone so far as to have advised VM Motori not to disclose T_Eng to regulators, if it planned to use the function (*see, e.g.*, RBL-MDL2777-PE-300530521-23). Of course, this is exactly what they did.

273.     On December 2, 2015, Morrie Lee of FCA Regulatory Affairs asked FCA Senior Manager Emanuele Palma "[w]hat compelling or driving reason does a[n] [automobile manufacturer] have to reduce EGR operation in the field?" FCA-MDL-000002857.  Palma responded simply: **"Low EGR → low soot, good drivability, F[uel] E[conomy]**." *Id.* (emphasis added). Two days later, Lee told the EPA that Fiat Chrysler's failure to document T_Eng as an AECD was "an oversight of understanding." FCA-MDL-000002011. The documents cited herein show otherwise.

## 2.     SCR AECD Strategy: Dosing Disablement

274.     The SCR system uses DEF—a solution of urea and water—to convert NOx into harmless nitrogen and water after it exits the EGR system and before it is emitted from the tailpipe. The part of the emissions system where this process occurs is called the SCR catalyst. In theory, the SCR system injects or "doses" measured quantities of DEF into the exhaust stream based on a software program that injects the right amount of DEF to neutralize the amount of NOx being

emitted by the engine.

275.     However, Defendants employed the SCR AECDs to either reduce the DEF dosing amount or shut it down entirely. With the DEF dosing reduced or disabled, the Subject Vehicles emit more NOx.

276.     Reduced DEF dosing was important to Defendants for at least two reasons.  First, the more DEF the Subject Vehicles consumed, the more frequently consumers would have to refill the DEF tank—an inconvenience that would make the vehicles less marketable. Second, by the time the first Subject Vehicles hit the market, the Defendants realized that the chemicals in the DEF were breaking down the materials in the SCR catalyst and causing these components to fail prematurely, which could be mitigated by reducing DEF dosing (at the expense of increased emissions).

277.     The Defendants relied heavily on an alternative DEF dosing mode called "online dosing," which limited the injection of DEF into the SCR catalyst, thereby compromising the SCR system. The EPA identified this alternative dosing functionality as AECD 7.[53] Bosch and VM Motori first discussed "online dosing" in March 2011. FCA-MDL-000281212-14.  Both parties acknowledged that, if used, online dosing would have to be disclosed as an AECD.  *Id.* ("online dosing . . . could also be used outside cert cycle [but] needs to be declared at CARB"). Yet, in November 2012, Bosch implemented a software change to prevent online dosing from activating during EGR diagnostic monitoring (RBL-MDL2777-PE-300068645-48), and in February 2013, Kasser Jaffri of FCA's On Board Diagnostic group expressed concern to VM Motori that CARB

---

[53] Defendants also employed related strategies to reduce DEF dosing, including tying the dosing to SCR adaptation (the process by which the SCR system modifies the dosing rate based on in-use monitoring) (FCA-MDL-000383765), and the load governor (the component that controls the flow of DEF into the SCR catalyst) (FCA-MDL-000750062).

might see online dosing as "cycle beating" (FCA-MDL-000430441). Jaffri concluded that, if applied, online dosing would have to be disclosed as an AECD. FCA-MDL-000478134 ("Chrysler will request an AECD for [online dosing]"). It did not do so.

278. VM Motori then told Fiat Chrysler in March 2013 that it was not going to use the online dosing strategy. FCA-MDL-000433186. They used it anyway. In September 2013, Jaffri reported to FCA Senior Manager Dan Hennessey, head of the On Board Diagnostic group, that online dosing was (1) active in the vehicles; (2) had not been disclosed to CARB or the EPA; and (3) "reduces the conversion efficiency effectiveness," thereby resulting in increased NOx emissions. FCA-MDL-000740696. Understandably, Jaffri observed that this "continues to be an area of concern." *Id.* He also told Hennessy that when online dosing was active, diagnostic monitoring meant to track the performance of the SCR system "cannot be run," because, if active, the diagnostic monitoring would reveal that the SCR system was not functioning. *Id.*

279. In September 2014, Fiat Chrysler senior management, including March Shost and Dan Hennessey, received a presentation from Emanuele Palma entitled "WK/DS MY15 DEF dosing strategy." One slide in that presentation labeled "online dosing strategy" noted that Fiat Chrysler's competitors were using online dosing and that Fiat Chrysler could too—but, critically, that the dosing strategy needed "to be agreed with the agencies." FCA-MDL-000417114-25. No such agreement was reached, as Fiat Chrysler never disclosed the functionality.

280. In July 2015, Fiat Chrysler acknowledged that tests conducted on the Model Year 2014 Subject Vehicles showed that the vehicles were not meeting NOx emissions standards because the SCR catalysts—which Bosch provided for the Subject Vehicles (RBL-MDL2777-PE-300160491-504) were failing (FCA-MDL-000713128). In a presentation given that month entitled

"SCR Catalyst Responsibility Share," Bosch noted in its "investigation history" chronology that it began to investigate the SCR catalyst as the reason FCA development vehicles were experiencing excess NOx emissions in February 2013. RBL-MDL2777-PE-300166279-362. The investigation chronology further identified a "dosing calibration strategy change" to reduce dosing rates. *Id.* Bosch admitted that VM Motori made the change on Bosch's recommendation. *Id.*

281.    In sum, the Defendants all knew that the Subject Vehicles contained undisclosed apparatuses that reduced or disabled the emissions control systems in real-world driving conditions, and they knew that without those undisclosed apparatuses, the Subject Vehicles could not deliver the fuel economy and performance that Fiat Chrysler promised. Defendants concealed this fact from consumers and regulators and, in so doing, cheated Plaintiffs of the vehicles they thought they were buying.

### IV.    "DIESELGATE" SCANDALIZES THE GLOBAL AUTO INDUSTRY.

282.    The world was shocked to learn that Volkswagen had manufactured over 11 million diesel cars that were on the roads in violation of European emission standards, and over 565,000 vehicles operating in the United States in violation of EPA and state emission standards. But Volkswagen was not the only one.

283.    In the wake of the Volkswagen "defeat device" scandal, scientific literature and reports and testing indicate that many other so-called "clean diesel" vehicles emit far more pollution on the road than in lab tests. [54] The EPA has since widened its probe of diesel emissions

---

[54] The EPA's Sept. 18, 2015, Notice of Violation to Volkswagen Group of America, Inc., available at https://www.epa.gov/sites/production/files/2015-10/documents/vw-nov-caa-09-18-15.pdf.   As detailed therein, software detects when the vehicle is undergoing official emission testing and turns full emission controls on only during the test. But otherwise, while the vehicle is running, the emission controls are suppressed. This results in cars that meet emission standards in the laboratory or at the state testing station, but during normal operation they emit NOx at up to 40 times the standard allowed under U.S. laws and regulations. Volkswagen has admitted to installing a

to include the Subject Vehicles at issue here.

284.    In May 2015, a study conducted on behalf of the Dutch Ministry of Infrastructure and the Environment found that all sixteen (16) diesel vehicles made by different manufacturers, when tested, emitted significantly more NOx on real-world trips but nevertheless passed laboratory tests. The report concluded that "[i]n most circumstances arising in normal situations on the road, the system scarcely succeeded in any effective reduction of NOx emissions."[55]

285.    The report further remarked:

It is remarkable that the NOx emission under real-world conditions exceeds the type approval value by [so much]. It demonstrates that the settings of the engine, the EGR [(exhaust gas recirculation)] and the SCR during a real-world test trip are such that they do not result in low NOx emissions in practice. In other words:  ***In most circumstances arising in normal situations on the road, the systems scarcely succeed in any effective reduction of NOx emissions.***[56]

The lack of any "effective reduction of NOx emissions" is devastating to "clean diesel" advertising, including that for the Subject Vehicles at issue here.

286.    Other organizations are beginning to take notice of the emission deception.  The Transportation and Environment ("T&E") organization, a European group aimed at promoting sustainable transportation, compiled data from "respected testing authorities around Europe." T&E stated in September 2015 that real-world emission testing showed drastic differences from laboratory tests, such that models tested emitted more pollutants on the road than in the lab.  "For virtually every new model that comes onto the market the gap between test and real-world

---

defeat device in its diesel vehicles.

[55] *Detailed investigations and real-world emission performance of Euro 6 diesel passenger cars*, TNO innovation for life TNO Report, TNO 2015 R10702 (May 18, 2015), http://publications. tno.nl/publication/34616868/a1Ug1a/TNO-2015-R10702.pdf.

[56] *Id.* at 6 (emphasis added).

performance leaps," the report asserts.[57]

287.    In a summary report, T&E graphically depicted the widespread failure of most manufacturers to meet emission standards:[58]



[57] *VW's cheating is just the tip of the iceberg*, Transport & Environment (Sept. 21, 2015), http://www.transportenvironment.org/publications/vw%E2%80%99s-cheating-just-tip-iceberg.
[58] *Five facts about diesel the car industry would rather not tell you*, Transport & Environment (Sept. 2015), http://www.transportenvironment.org/sites/te/files/publications/2015_09_Five_facts_about_diesel_FINAL.pdf.

288.    The T&E report found that the current system for testing cars in a laboratory produces "meaningless results," because manufacturers like Fiat Chrysler can engineer their cars to "pass" the laboratory tests but emit many times as much pollution under normal driving conditions. [59]

289.    Emissions Analytics is a U.K. company formed to "overcome the challenge of finding accurate fuel consumption and emission figures for road vehicles." With regard to its recent on-road emission testing, the company explains:

> [I]n the European market, we have found that real-world emissions of the regulated nitrogen oxides are four times above the official level, determined in the laboratory. Real-world emissions of carbon dioxide are almost one-third above that suggested by official figures. For car buyers, this means that fuel economy on average is one quarter worse than advertised. This matters, even if no illegal activity is found. [60]

## V.    DEFENDANTS ARE CAUGHT CHEATING.

### A.    Testing Reveals Cheating.

290.    In late 2016 testing was done of the 2015 Ram 1500 pickup using a Portable Emissions Measurement System ("PEMS"). Testing revealed that FIAT Chrysler also cheated in that it had concealed the fact that the Ram 1500 spews more than the legal amount of emissions and fails to meet its own "no NOx" out-of-the-tailpipe promise.

291.    The applicable standard both at the federal and state level is 50 mg/mile of NOx for "FTP Style" driving: *i.e.*, city driving. Testing was conducted with a PEMS unit to simulate driving

---

[59] *Id.*
[60] Emissions Analytics Press Release, (Sept. 28, 2015), available at http://www.abvwc.com/ home/emissions-analytics. last accessed July 19, 2017).

conditions under both the FTP certification cycle and the highway certification cycle. The Ram 1500 emits an average of 159 mg/mile of NOx and a maximum of 1,283 mg/mile on flat roads, and 222 mg/mile of NOx with a maximum of 1,859 mg/mile on hills. For highway driving, the average was 232 mg/mile and a maximum of 1,615 mg/mile, compared to the 70 mg/mile standard. On hills, the numbers are 353 mg/mile and 3,240 mg/mile. Testing also revealed a device triggered by ambient revealed the presence of a device that is triggered when ascending hills, as the emission control system temperature that significantly degrades the performance of the NOx emission reduction system, with ambient threshold temperatures above approximately 95ºF and below 40-50ºF. The resulting NOx emissions increase by a factor of 10 when above or below these threshold temperatures. Testing also appears to be significantly degraded after a short period of steady driving on hills. As a result, NOx emissions increase after about 500-1000 seconds on hills with grades as low as 1%, where emissions are often 10 times the highway standard. For grades as little as 0.4%, emissions were found to be as high as 6 times the highway standard.

292.    The Ram 1500's emission software is a "Bosch EDC17," as is the Jeep Grand Cherokee's emission software. The same basic emission system is in the Grand Cherokee EcoDiesel® and the engines are identical.

293.    In separate testing, a 2014 Ram 1500 equipped with an EcoDiesel® engine and featuring SCR NOx after-treatment technology was tested on a chassis dynamometer as well as on the road. In both scenarios, gaseous exhaust emissions, including oxides of nitrogen (NOx), nitrogen oxide (NO), carbon monoxide (CO), carbon dioxide (CO2), and total hydrocarbons (THC) were measured on a continuous basis using a PEMS from Horiba®.

294.    The tests showed significantly increased NOx emissions during on-road testing as opposed to testing on a chassis dynamometer (*i.e.*, in the laboratory). On the road, over an urban/suburban route, the vehicle produced average NOx emissions that exceeded federal certification standards by approximately 15-19 times. When tested on a highway, the average NOx emissions measured **35 times** the EPA Tier 2 Bin 5 standard.

### B.    The EPA Issues A Notice of Violation to Fiat and FCA.

295.    On January 12, 2017, the EPA issued a NOV to Fiat and FCA for failing to justify or disclose defeat devices in model year 2014–2016 Ram 1500 EcoDiesel® and 2014–2016 Jeep Grand Cherokee EcoDiesel® vehicles (the Subject Vehicles at issue here). CARB also issued a Notice of Violation to Fiat and FCA. Since then, the EPA, by and through the Department of Justice, has sued Fiat, FCA, VM Italy, and VM America for violations of the CAA.

296.    The EPA's NOV and lawsuit arose in part from emission testing performed by the EPA at the National Vehicle and Fuel Emissions Laboratory. The EPA performed this testing "using driving cycles and conditions that may reasonably be expected to be encountered in normal operation and use, for the purposes of investigating a potential defeat device."

297.    The EPA identified at least eight AECDs in the Subject Vehicles that were concealed on COC applications:

- AECD 1 (Full EGR Shut-Off at Highway Speed)
- AECD 2 (Reduced EGR with Increasing Vehicle Speed)
- AECD 3 (EGR Shut-off for Exhaust Valve Cleaning)
- AECD 4 (DEF Dosing Disablement during SCR Adaptation)

- AECD 5 (EGR Reduction due to Modeled Engine Temperature)

- AECD 6 (SCR Catalyst Warm-Up Disablement)

- AECD 7 (Alternative SCR Dosing Modes)

- AECD 8 (Use of Load Governor to Delay Ammonia Refill of SCR Catalyst)

298.     The EPA testing found that "some of these AECDs appear to cause the vehicle to perform differently when the vehicle is being tested for compliance with the EPA emission standards using the Federal emission test procedure (e.g., FTP, US06) than in normal operation and use." For example:

a.    AECD 3, when combined with either AECD 7 or AECD 8, disables the EGR system without increasing the effectiveness of SCR system. Under some normal driving conditions, this disabling reduces the effectiveness of the overall emission control system. The AECD 3 uses a timer to shut off the EGR, which does not appear to the EPA to meet any exceptions to the regulatory definition of "defeat device."

b.    AECD 5 & 6 together reduce the effectiveness of the NOx emission control system, using a timer to discontinue warming of the SCR after-treatment system, which reduces its effectiveness.

c.    AECD 4, particularly when combined with AECD 8, increases emissions of tailpipe NOx during normal vehicle operation and use. The operation of AECD 1, AECD 2, and/or AECD 5 increase the frequency of occurrence of AECD 4.

d.    AECDs 7 & 8 work together to reduce NOx emissions during variable-grade and high-load conditions.

299.     The EPA further found that Fiat and FCA did not disclose or justify these control devices in their COC applications, as required by EPA regulations, and that Fiat and FCA were therefore in violation of the CAA each time they sold, offered for sale, introduced in commerce, or imported one of the approximately 103,828 Subject Vehicles. The EPA is now seeking injunctive relief and penalties.

### C.      **Bosch Software Documentation Further Verifies the Violations**

300.     Researchers have obtained Bosch software documentation describing the functions, modules, structure, variables and calibration parameters believed to be installed in Subject Vehicles. The documentation is over 10,000 pages long and contains hundreds of functions and thousands of variables developed by Bosch that describe the operation of the engine. These parameters and functions correlate with many of the violations alleged by the EPA and CARB. Critically, these functions, designed and implemented by Bosch, have elements that have no legitimate purpose in normal use. At the same time, these same elements, when enabled, allow the functions to reduce the effectiveness of emission controls in real world driving conditions, but not during an emission test cycle.

### 1.      **AECDs 1 and 2: Reducing or Disabling EGR at Highway Speeds**

301.     The function named *"AirCtl_RatDesValCalc"* described in the Bosch documentation as *"Exhaust gas recirculation control - EGR ratio setpoint calculation"* is used to calculate the desired EGR rate. The software documentation contains figures with flow diagrams describing the inputs, outputs, and calculation performed by this software function. Bosch has included vehicle speed as an input used by the EGR control function to modify the EGR rate (and, thus, NOx emission). Vehicle speed is notable because there is no legitimate reason for the EGR rate to depend directly on vehicle speed.

302.     By allowing EGR rate to depend directly on vehicle speed, Bosch provided a means by which Fiat and FCA could reduce the effectiveness of the emission control system under conditions which may reasonably be expected to be encountered in normal vehicle operation and use. This function may be, and is likely to have been, used to implement the undisclosed AECDs

1 and 2 identified in the EPA NOV to Fiat and FCA.

### 2. AECD 3: EGR Shut-Off for Exhaust Valve Cleaning

303.    AECD 3 identified in the EPA NOV has also been identified in Bosch's software documentation in the function named "*AirCtl_Mon*" described in the Bosch documentation as "*Exhaust gas recirculation control – Monitoring and shut-off.*" Bosch described this AECD as ostensibly providing a cleaning mechanism for the engine exhaust valves when the Subject Vehicle is in overrun (*i.e.*, the engine is turning without combustion, such as when the vehicle is going downhill). To accomplish this cleaning, the function created by Bosch closes the EGR valve (turning off EGR), so a "huge gush of clean air" can remove deposits. However, Bosch also programmed a software switch (named "*AirCtl_swtOvrRunOff_C*") that allowed Fiat and FCA to enable exhaust valve cleaning in normal (non-overrun) operation, effectively disabling EGR.

304.    Together with an activation delay added by Bosch—controlled by *AirCtl_tiEngRunDrvCycMin_C*, which is described as "*Calibration time after which exhaust valve cleaning routine can start*"—the *AirCrl_Mon* function can be readily used as a defeat device. To do so, Bosch would calibrate the ECU to enable valve cleaning in outside of overrun (*AirCtl_swtOvrRunOff_C* = TRUE), but only after the duration of a typical emission test cycle (*AirCtl_tiEngRunDrvCycMin_C* = 1800 seconds). This would disable EGR after an emission test cycle, resulting in increased NOx emission. This function may be, and is likely to have been, used to implement undisclosed AECD 3 identified in in the EPA and CARB NOVs.

### 3. AECD 7: Alternative SCR Dosing Modes

305.    Bosch included a timer in another function, without a legitimate purpose. The Bosch function named "*SCRFFC_Main*," described in documentation as "*Calculation of the NH3*

*precontrol quantity*" has an input variable timer entitled "*CoEng_tiNormal,*" which holds the time duration since the engine was started. This variable can be used to reduce SCR efficiency, and, therefore, increase NOx emission, after a certain time has elapsed. In particular, this timer may be set to the duration of a typical emission test cycle. There is no legitimate reason for SCR control to depend directly on the time duration since engine start. By making SCR control depend directly on time duration since engine start, however, Bosch has provided a means by which Fiat and FCA could reduce the effectiveness of the emission control system in real world driving conditions. This function may be, and is likely to have been, used to implement undisclosed AECD 7 identified in the EPA and CARB NOVs.

### D.     West Virginia University Testing of the Subject Vehicles

306.    Beginning in 2015, researchers at the West Virginia University Center for Alternative Fuels, Engines, and Emissions—the same researchers instrumental in uncovering Volkswagen's fraud—tested 5 model year 2014 and 2015 vehicles produced by FCA. The test vehicles comprised the Subject Vehicles at issue here: Jeep Grand Cherokees and Ram 1500 diesel vehicles, all equipped with the 3.0L EcoDiesel® engine and featuring SCR NOx after-treatment technology.[61]

307.    All test vehicles were evaluated on a vehicle chassis dynamometer representing the test conditions for regulatory compliance. Each vehicle was also tested over-the-road using a PEMS device during a variety of driving conditions including urban/suburban and highway

---

[61] Marc C. Besch, Sri Hari Chalagalla, and Dan Carder, *On-Road & Chassis Dynamometer Testing of Light-Duty Diesel Passenger Cars*, Center for Alternative Fuels, Engines, and Emissions, West Virginia University, available at http://www.cafee.wvu.edu/files/d/c586c1dd-b361-410d-a88d-34e8834eda6/testing-of-light-duty-diesel-passenger-cars.pdf (last accessed July 19, 2017). . .

driving.

308.    One of the Jeep Grand Cherokees and one of the Ram 1500 vehicles was tested prior to, as well as after, a mandatory vehicle recall in April 2016 – the "R69 recall" – which included a software "reflash" by FCA that concerned the vehicles' emission control systems.

309.    Results indicated that both Jeep Grand Cherokee in MY 2014 exhibited significantly increased NOx emissions during on-road operation as compared to the results observed through testing on the chassis dynamometer. For MY 2015, Jeep vehicles produced from 4 to 8 times more NOx emissions during urban/rural on-road operation than the certification standard, while Ram 1500 vehicles emitted approximately 25 times the NOx permitted by EPA Tier2-Bin5 standard for highway driving conditions.

310.    The researchers noted that for the vehicles tested post-recall using the dynamometer, NOx emissions were similar or slightly lower than that observed for vehicles tested pre-recall. But on-road emissions were still very different from emissions observed through chassis dynamometer testing, even though they were slightly improved from the levels observed during pre-recall testing.

### E.    <u>European Investigation and Testing</u>

311.    Fiat Chrysler and Bosch have both found themselves in trouble with German regulators in the wake of the Volkswagen scandal.

312.    German prosecutors have launched an investigation into Bosch, reportedly raiding Bosch's offices in Stuttgart.[62] In April 2016, Bosch GmbH representatives met with Germany's

---

[62] *See* Edward Taylor, *Stuttgart prosecutor targets Bosch in Daimler diesel investigation*, Reuters (May 26, 2017), http://www.reuters.com/article/us-daimler-emissions-bosch-idUSKBN18M172.

Federal Motor Transport Authority ("KBA") on at least two occasions. In an April 14, 2016, meeting, Bosch admitted there were a number of anomalies in the calibration of its engine control units provided to Fiat Chrysler for diesel vehicles sold in Europe. Bosch confirmed that it had delivered the control units for the vehicles as well as the associated software and that Bosch employees had integrated the emission-related applications into the software. Bosch admitted that the software reduced the EGR rate and the regeneration of NSC (NOx storage catalyst) after an elapsed period of driving time or number of cycles. Specifically, 22 minutes after the start of the engine (the estimated duration of emission testing), the software reduced the EGR rate to nearly zero and de-activated NSC regeneration. Another trigger for de-activation of the NSC regeneration occurred after the vehicle had been driven a distance of 100 kilometers.  Bosch confirmed that the NOx emissions for the vehicles exceeded the legal limits by a factor of 4-5. The KBA's takeaway from its meetings with Bosch was there is a defeat device in the vehicles and Bosch shared responsibility for the defeat device with Fiat Chrysler. Media reports have confirmed the same.[63]

313.    After the meeting with Bosch, the KBA performed testing on the Fiat diesel vehicles and confirmed that the emission controls were disabled after 22 minutes of driving time, causing the vehicles to emit more than 10 times the legal limit of NOx. The KBA concluded that the vehicles were designed to cheat on emission tests, which normally run for about 20 minutes.[64] As a result, the KBA's transport minister announced: "We will need to carry out further tests on Fiat models."[65] In August 2016, the German government formally concluded that Fiat vehicles

---

[63] Media reports similarly said that Bosch had confirmed to German regulators that certain Fiat vehicles were cheating on emission testing. *See, e.g.*, *Sueddeutsche Zeitung*, Apr. 22, 2016, "Fiat Is Next to be Accused"; *Test of Fiat diesel model shows irregular emissions: Bild am Sonntag*, Reuters (Apr. 24, 2016), http://www.reuters.com/article/us-fiat-emissions-germany- idUSKCN0XL0MT; David Tracy, *Here's How Fiat Might also be Cheating on Emissions Tests:Report,* Jalopnik (Apr. 25, 2016), http://jalopnik.com/heres-how-fiat-might-also-be-cheating-on- emissions-test-1772948181.

[64] *Test of Fiat diesel model shows irregular emissions: Bild am Sonntag*, *supra* note 61.

[65] *Here's How Fiat Might also be Cheating on Emissions Tests: Report*, *supra* note 61.

sold in the EU had used defeat devices.

314.    More recently, a 17-page long-form article published by the German weekly investigative news magazine *Der Spiegel*, on April 20, 2018, details the central role Bosch played in the "diesel scandal." The article reports that prosecutors in Germany are investigating Bosch for providing and programming illegal software for use in Fiat vehicles, among many others.[66]

### F.    Joint University of California, San Diego and German Study of the Fiat 500X

315.    The testing of European regulators has been confirmed by independent testing conducted here in the United States. A recent peer-reviewed study by researchers at the University of California, San Diego and Ruhr-Universität Bochum in Germany analyzed firmware in the EDC Unit 17 of the Fiat 500X and found a defeat device affecting the logic governing NOx storage catalyst regeneration.[67] Unlike the Volkswagen defeat device, the researchers found that the mechanism in the Fiat 500X relied on timing, reducing the frequency of NSC approximately 26 minutes and 40 seconds after the engine was started. (By reducing the frequency of NOx storage catalyst regeneration, a manufacturer can improve fuel economy and increase the service life of the diesel particulate filter, at the cost of increased NOx emissions.)

316.    According to the study, the conditions used to determine when to regenerate the NSC were duplicated, and each set of conditions could start a regeneration cycle. The researchers obtained Bosch copy-righted documentation for a Fiat vehicle, which described two sets of conditions using the terms "during homologation cycle" and "during real driving." The term

---

[66] Frank Dohmen, et al., *A Sinister Alliance: The automobile supplier Bosch is on its way to taking center stage in the Diesel scandal*, Der Spiegel, Issue 17 (April 20, 2018), https://magazin.spiegel.de/SP/2018/17/156941296/index.html?utm_source=spon&utm_campaign=vorab (paywall, German language).

[67] Moritz Contag, *et al.*, *How They Did It: An Analysis of Emission Defeat Devices in Modern Automobiles*, *supra* note 15.

"homologation" is commonly used in Europe to describe the process of testing an automobile for regulatory conformance. Bosch's authorship of the document and use of the terms "homologation [testing]" and "real driving" to describe the regeneration conditions demonstrate that it not only created the mechanism for Fiat Chrysler but was also aware of the mechanism's intended purpose of circumventing emission testing.

317.    Together, these facts reveal that Defendants have fraudulently concealed the functions of its emission control technology from regulators and consumers alike. Further, they demonstrate that Fiat Chrysler's claims about its EcoDiesel® Subject Vehicles as "clean diesel" with "ultralow emissions" and "no NOx" emitted through the tailpipe is false or misleading.

## VI.    THE DAMAGE CAUSED BY DEFENDANTS' DIRTY DIESEL SCHEME

318.    Plaintiffs paid a significant premium for the EcoDiesel features that FCA falsely advertised. Indeed, consumers paid between $3,120 and $5,000 more for the EcoDiesel option than for the comparable gasoline vehicles.[68] In return, FCA promised power, performance, fuel economy, and environmental friendliness (and vehicles that were legal to drive). FCA could not deliver on that promise. Plaintiffs suffered significant harm as a result.

319.    FCA may not be able to bring the Subject Vehicles into compliance with emissions standards. If that is the case, those vehicles will have to be removed from the road.

320.    But even if FCA can bring the Subject Vehicles into compliance with emission

---

[68] John Lamm, 2014, *Jeep Grand Cherokee EcoDiesel® V-6, First Drive* Review, Car and Driver (February 2013), http://www.caranddriver.com/reviews/2014-jeep-grand-cherokee-ecodiesel-v-6-    first-drive-review;    Andrew Wendler, 2015, *Ram 1500 EcoDiesel® 4x4, Instrumented Test*, Car and Driver (August 2015), http://www.caranddriver. com/reviews/2015-ram-1500-4x4-ecodiesel- 4x4-test-review.

standards, it will not be able to do so without substantially degrading their performance characteristics, including their horsepower and/or fuel efficiency and/or maintenance requirements. Consequently, Plaintiffs will not possess the vehicles they thought they purchased and will not have received the benefit of the bargain. This will also result in a diminution in value of every Subject Vehicle, and it will cause owners and lessees of Subject Vehicles to pay more for the use of their Subject Vehicles.

321.    Assuming, for the sake of argument, that the Subject Vehicles could be brought into compliance with emission standards without any material degradation to performance or maintenance characteristics—and if that were the case, it begs the question as to why FCA cheated in the first place—Plaintiffs would still have been deprived of the benefit of the bargain for all the years they owned and/or leased the Subject Vehicles that could not and did not deliver all of the characteristics for which Plaintiffs paid a premium, and were not compliant with U.S. law.

322.    In sum, had regulators or the public known the true facts, Plaintiffs would not have purchased or leased the Subject Vehicles (in fact, they could not have legally been sold), or would have paid substantially less for them.

**ACTION ALLEGATIONS**
**I.    DEFINITIONS**

323.    Plaintiffs seek to represent the following Plaintiffs as well as any Plaintiffs that may be added to the complaint at a later date:

**Alabama State:**

All persons or entities named herein that purchased or leased a Subject Vehicle within Alabama or that purchased or leased a Subject Vehicle and reside in Alabama.

211

**Alaska State:**

All persons or entities named herein that purchased or leased a Subject Vehicle within Alaska or that purchased or leased a Subject Vehicle and reside in Alaska.

**Arizona State:**

All persons or entities named herein that purchased or leased a Subject Vehicle within Arizona or that purchased or leased a Subject Vehicle and reside in Arizona.

**Arkansas State:**
All persons or entities named herein that purchased or leased a Subject Vehicle within Arkansas or that purchased or leased a Subject Vehicle and reside in Arkansas.

**California State:**

All persons or entities named herein that purchased or leased a Subject Vehicle within California or that purchased or leased a Subject Vehicle and reside in California.

**Colorado State:**

All persons or entities named herein that purchased or leased a Subject Vehicle within Colorado or that purchased or leased a Subject Vehicle and reside in Colorado.

**Connecticut State:**
All persons or entities named herein that purchased or leased a Subject Vehicle within Connecticut or that purchased or leased a Subject Vehicle and reside in Connecticut.

**Delaware State**:

All persons or entities named herein that purchased or leased a Subject Vehicle within Delaware or that purchased or leased a Subject Vehicle and reside in Delaware.

**District of Columbia:**

All persons or entities named herein that purchased or leased a Subject Vehicle within the District of Columbia or that purchased or leased a Subject Vehicle and reside in the District of Columbia.

**Florida State:**

All persons or entities named herein that purchased or leased a Subject Vehicle within Florida or that purchased or leased a Subject Vehicle and reside in Florida.

**Georgia State:**
All persons or entities named herein that purchased or leased a Subject Vehicle within Georgia or that purchased or leased a Subject Vehicle and reside in Georgia.

**Hawaii State:**
All persons or entities named herein that purchased or leased a Subject Vehicle within Hawaii or that purchased or leased a Subject Vehicle and reside in Hawaii.

**Idaho State:**

All persons or entities named herein that purchased or leased a Subject Vehicle within Idaho or that purchased or leased a Subject Vehicle and reside in Idaho.

**Illinois State:**

All persons or entities named herein that purchased or leased a Subject Vehicle within Illinois or that purchased or leased a Subject Vehicle and reside in Illinois.

**Indiana State:**

All persons or entities named herein that purchased or leased a Subject Vehicle within Indiana or that purchased or leased a Subject Vehicle and reside in Indiana.

**Iowa State:**

All persons or entities named herein that purchased or leased a Subject Vehicle within Iowa or that purchased or leased a Subject Vehicle and reside in Iowa.

**Kansas State:**

All persons or entities named herein that purchased or leased a Subject Vehicle within Kansas or that purchased or leased a Subject Vehicle and reside in Kansas.

**Louisiana State:**

All persons or entities named herein that purchased or leased a Subject Vehicle within Louisiana or that purchased or leased a Subject Vehicle and reside in Louisiana.

**Maine State:**

All persons or entities named herein that purchased or leased a Subject Vehicle within Maine or that purchased or leased a Subject Vehicle and reside in Maine.

**Maryland State:**

All persons or entities named herein that purchased or leased a Subject Vehicle within Maryland or that purchased or leased a Subject Vehicle and reside in Maryland.

**Massachusetts State:**

All persons or entities named herein that purchased or leased a Subject Vehicle within Massachusetts or that purchased or leased a Subject Vehicle and reside in Massachusetts.

**Michigan State:**

All persons or entities named herein that purchased or leased a Subject Vehicle within Michigan or that purchased or leased a Subject Vehicle and reside in Michigan.

**Minnesota State:**

All persons or entities named herein that purchased or leased a Subject Vehicle within Minnesota or that purchased or leased a Subject Vehicle and reside in Minnesota.

**Mississippi State:**

All persons or entities named herein that purchased or leased a Subject Vehicle within Mississippi or that purchased or leased a Subject Vehicle and reside in Mississippi.

**Missouri State:**

All persons or entities named herein that purchased or leased a Subject Vehicle within Missouri or that purchased or leased a Subject Vehicle and reside in Missouri.

**Montana State:**

All persons or entities named herein that purchased or leased a Subject Vehicle within Montana or that purchased or leased a Subject Vehicle and reside in Montana.

**Nebraska State:**

All persons or entities named herein that purchased or leased a Subject Vehicle within Nebraska or that purchased or leased a Subject Vehicle and reside in Nebraska.

**Nevada State:**

All persons or entities named herein that purchased or leased a Subject Vehicle within Nevada or that purchased or leased a Subject Vehicle and reside in Nevada.

**New Hampshire State:**

All persons or entities named herein that purchased or leased a Subject Vehicle within New Hampshire or that purchased or leased a Subject Vehicle and reside in within New Hampshire.

**New Jersey State:**

All persons or entities named herein that purchased or leased a Subject Vehicle within New Jersey or that purchased or leased a Subject Vehicle and reside in New Jersey.

**New Mexico State:**

All persons or entities named herein that purchased or leased a Subject Vehicle within New Mexico or that purchased or leased a Subject Vehicle and reside in New Mexico.

**New York State:**

All persons or entities named herein that purchased or leased a Subject Vehicle within New York or that purchased or leased a Subject Vehicle and reside in New York.

**North Carolina State:**

All persons or entities named herein that purchased or leased a Subject Vehicle within North Carolina or that purchased or leased a Subject Vehicle and reside in North Carolina.

**North Dakota State:**

All persons or entities named herein that purchased or leased a Subject Vehicle within North Dakota or that purchased or leased a Subject Vehicle and reside in North Dakota.

**Ohio State:**

All persons or entities named herein that purchased or leased a Subject Vehicle within Ohio or that purchased or leased a Subject Vehicle and reside in Ohio.

**Oklahoma State:**

All persons or entities named herein that purchased or leased a Subject Vehicle within Oklahoma or that purchased or leased a Subject Vehicle and reside in Oklahoma.

**Oregon State:**

All persons or entities named herein that purchased or leased a Subject Vehicle within Oregon or that purchased or leased a Subject Vehicle and reside in Oregon.

**Pennsylvania State:**

All persons or entities named herein that purchased or leased a Subject Vehicle within Pennsylvania or that purchased or leased a Subject Vehicle and reside in Pennsylvania.

**Rhode Island State:**

All persons or entities named herein that purchased or leased a Subject Vehicle within Rhode Island or that purchased or leased a Subject Vehicle and reside in Rhode Island.

**South Carolina State:**

All persons or entities named herein that purchased or leased a Subject Vehicle within South Carolina or that purchased or leased a Subject Vehicle and reside in South Carolina.

**South Dakota State:**

All persons or entities named herein that purchased or leased a Subject Vehicle within South Dakota or that purchased or leased a Subject Vehicle and reside in South Dakota.

**Tennessee State:**

All persons or entities named herein that purchased or leased a Subject Vehicle within Tennessee or that purchased or leased a Subject Vehicle and reside in Tennessee.

**Texas State:**

All persons or entities named herein that purchased or leased a Subject Vehicle within Texas or that purchased or leased a Subject Vehicle and reside in Texas.

**U.S. Territory:**

All persons or entities named herein that purchased or leased a Subject Vehicle within a U.S. Territory or that purchased or leased a Subject Vehicle and reside in a U.S. Territory.

**Utah State:**

All persons or entities named herein that purchased or leased a Subject Vehicle within Utah or that purchased or leased a Subject Vehicle and reside in Utah.

**Vermont State:**

All persons or entities named herein that purchased or leased a Subject Vehicle within Vermont or that purchased or leased a Subject Vehicle and reside in Vermont.

**Virginia State:**
All persons or entities named herein that purchased or leased a Subject Vehicle within Virginia or that purchased or leased a Subject Vehicle and reside in Virginia.

**Washington State:**

All persons or entities named herein that purchased or leased a Subject Vehicle within Washington or that purchased or leased a Subject Vehicle and reside in Washington.

**West Virginia State:**
All persons or entities named herein that purchased or leased a Subject Vehicle within West Virginia or that purchased or leased a Subject Vehicle and reside in West Virginia.

**Wisconsin State:**

All persons or entities named herein that purchased or leased a Subject Vehicle within Wisconsin or that purchased or leased a Subject Vehicle and reside in Wisconsin.

**Wyoming State:**
All persons or entities named herein that purchased or leased a Subject Vehicle within Wyoming or that purchased or leased a Subject Vehicle and reside in Wyoming.

## II.    ESTOPPEL

324.    Defendants were, and are, under a continuous duty to disclose to Plaintiffs the true

216

character, quality, and nature of the Subject Vehicles, including their emission systems and their compliance with applicable federal and state law, particularly given their misleading advertising statements. Instead, Defendants actively concealed the true character, quality, and nature of the Subject Vehicles and knowingly made misrepresentations about the quality, reliability, characteristics, and performance of the Subject Vehicles.

325.   Plaintiffs reasonably relied upon Defendants' active concealment of these facts that rendered their statements misleading.

326.   Based on the foregoing, Defendants are estopped from relying on any statutes of limitation in defense of this action.

## CLAIMS FOR RELIEF

### I.   CLAIMS ASSERTED ON BEHALF OF THE NATIONWIDE PLAINTIFFS

#### NATIONWIDE COUNT I
#### RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT
#### ("RICO") Violation of 18 U.S.C. § 1962(c)-(d)

327.   Plaintiffs incorporate by reference each preceding paragraph as though fully set forth herein.

328.   Plaintiffs bring this action against Defendants Fiat, FCA, Marchionne, VM Italy, VM America, Bosch GmbH, and Bosch LLC (inclusively, for purpose of this Count, Defendants are referred to as "RICO Defendants").

329.   Fiat conducts its business—legitimate and illegitimate—through various affiliates and subsidiaries, like FCA, VM Italy, and VM America, each of which is a separate legal entity. The Bosch Group also conducts its business, both legitimate and illegitimate, through hundreds of

companies, subsidiaries, and affiliates, including Bosch GmbH and Bosch LLC.[69] At all relevant times, each of the RICO Defendants has been a "person" under 18 U.S.C. § 1961(3) because each was capable of holding "a legal or beneficial interest in property."

330.    Section 1962(c) makes it "unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity." 18 U.S.C. § 1962(c).

331.    Section 1962(d) makes it unlawful for "any person to conspire to violate" Section 1962(c), among other provisions. *See* 18 U.S.C. § 1962(d).

332.    As part of a strategy to expand its North American presence, in 2009, Fiat began its acquisition of one of the "Big 3" U.S. automakers, Chrysler. In November of that year, acting CEO Marchionne unveiled an ambitious 5-year plan to, among other things, roll out "more diesel variants" of Jeep and to give Ram "Light duty (1500)" a "refresh/facelift."[70]

333.    By 2014, Fiat had become Fiat Chrysler Automobiles, Chrysler had become FCA, and VM Motori, a longtime supplier, was now part of the Fiat Chrysler sprawling family of affiliated companies. In May of that year, Marchionne announced another five-year plan at the company's Auburn Hills, Michigan, headquarters to increase Fiat Chrysler's competitiveness against global auto behemoths, such as Toyota, Volkswagen, and General Motors, by increasing annual sales to seven million vehicles by 2018, up from 4.4 million in 2013.[71] Integral to the strategy was the expansion of the "Jeep portfolio" and updates to the "bread-and-butter Ram

---

[69] *See generally* https://www.bosch.com/bosch-group/ (last accessed on July 19, 2017).

[70] *See* Todd Lassa, *Fiatapolooza! Chrysler's Five-Year Plan*, *supra* note 6.

[71] *See* Jerry Hirsch and David Undercoffler, *Fiat Chrysler Unveils Aggressive Five-Year Plan*, *supra* note 7.

1500," including "diesel engines."[72]

334.    During this same time frame, emission standards in the United States were ratcheting up. In contrast to other global automakers, like Toyota and Ford, which were focusing on developing hybrid and electric cars, Chrysler—now FCA and under the control of Fiat—took another path: "[r]eflecting its ties with Europe-based Fiat, Chrysler appears to be taking yet another route that focuses less on electrification and ***more heavily on light-duty diesels*** and compressed natural gas."[73] (Emphasis Added). In 2012, Marchionne observed, "with 2016 'just around the corner' and 2025 not far away given the auto industry's long product-development lead times, 'there are big choices to be made[.]'"[74] Marchionne explained that "Chrysler, which is starting to share platforms and powertrains with Fiat, wants to leverage the European auto maker's strengths in ***diesels*** and CNG-powered vehicles."[75] As one commenter put it at the time, "[f]uel-efficient towing remains a strong point of diesels, and Marchionne says he still is optimistic about the potential of light-duty diesels in the U.S. despite significant emissions challenges."[76]

335.    As it turned out, however, Fiat Chrysler was either unable or unwilling to devise a solution within the constraints of the law. And so, like Volkswagen, they devised one outside of it. Instead of cutting their losses, holding up the Subject Vehicle roll outs, or coming clean, they conspired with VM Italy and VM America and Bosch GmbH and Bosch LLC to install customized emission treatment software (EDCs) in the EcoDiesel®'s engine diesel controls so that the Subject Vehicles could "pass" the EPA and CARB testing. The software disabled or restricted certain

---

[72] *See* Christian Seabaugh, *Ram and Ferrari's Place in Fiat Chrysler's Five-Year Plan*, *supra* note 8.

[73] *See* Drew Winter, *Chrysler Eyes Different Path to Meeting New CAFE Standards*, *supra* note.

[74] *Id.*

[75] *Id.*

[76] *Id.*

aspects of the emission controls during real-world driving conditions, causing the Subject Vehicles to spew up to 25 times the legal limits of NOx. These software controls were concealed from regulators on COC and EO applications for the Subject Vehicles by FCA, thus deceiving the EPA and CARB into approving the Subject Vehicles for sale throughout the United States and California.

336.     To accomplish their scheme or common course of conduct, Fiat, FCA, Marchionne, VM Italy, VM America, Bosch GmbH, Bosch LLC, and Denner, along with others, had to work together to conceal the truth. Each Defendant was employed by or associated with, and conducted or participated in the affairs of, one or several RICO enterprises (defined below and referred to collectively as the "EcoDiesel® RICO Enterprise"). The purpose of the EcoDiesel® RICO Enterprise was to deceive regulators into believing that the Subject Vehicles were eligible for coverage by a COC and/or EO and compliant with emission standards.  The motivation was simple: to increase Defendants' revenues and profits and minimize their losses from the design, manufacture, distribution and sale of the Subject Vehicles and their component parts. As a direct and proximate result of their fraudulent scheme and common course of conduct, the RICO Defendants were able to extract over a billion dollars from consumers.  As explained below, their years-long misconduct violated Sections 1962(c) and (d).

### A.     Description of the EcoDiesel® RICO Enterprise

337.     In an effort to expand its market share in the United States and beyond, Fiat, a publicly-traded Italian-controlled, Dutch-registered company headquartered in London, bought then-Chrysler (now FCA), a separate Delaware company, headquartered in Michigan. Fiat uses FCA to design, market, manufacture and sell the Subject Vehicles and other vehicles under the Chrysler, Dodge, Jeep, Ram, and Fiat brands throughout the United States. FCA also submitted

the COC and EO applications for the Subject Vehicles. Fiat used VM Italy and VM America to design and manufacture the EcoDiesel® engines for the Subject Vehicles, which were calibrated in Michigan with Bosch's hidden software. Fiat, FCA, VM Italy, and VM America maintained tight control over the design, manufacture, calibration, and testing of the Subject Vehicles. Bosch also participated, either directly or indirectly, in the conduct of the enterprise's affairs by developing, writing the software code customized for the Subject Vehicles, and concealing the hidden software installed in the Subject Vehicles in order to allow them to "pass" testing but then disable or restrict certain emission controls during real-world driving conditions.

338.    At all relevant times, the RICO Defendants, along with other individuals and entities, including unknown third parties involved in the design, calibration, manufacture, testing, marketing, and sale of the Subject Vehicles or the emission controls therein, operated an association-in-fact enterprise, which was formed for the purpose of fraudulently obtaining COCs from the EPA (and EOs from CARB) in order to sell the Subject Vehicles throughout the United States (and California), and through which enterprise they conducted a pattern of racketeering activity under 18 U.S.C. § 1961(4). The enterprise is called the "EcoDiesel® RICO Enterprise."

339.    At all relevant times, the EcoDiesel® RICO Enterprise constituted a single "enterprise" or multiple enterprises within the meaning of 18 U.S.C. § 1961(4), as legal entities, as well as individuals and legal entities associated-in-fact for the common purpose of engaging in RICO Defendants' unlawful profit-making scheme.

340.    The association-in-fact EcoDiesel® RICO Enterprise consisted of at least the following entities and individuals, and likely others:

### 1.    The Fiat Chrysler Defendants

341.    Fiat Chrysler is the seventh-largest automaker in the world based on total annual

vehicle sales and is an international automotive group. Fiat is listed on the New York Stock Exchange under the symbol "FCAU" and on the Mercato Telematico Azionario under the symbol "FCA."[77] FCA is not publicly traded and thus has no SEC reporting obligations, but it does have reporting obligations, protections and responsibilities unique to the State of Delaware. FCA is a distinct legal entity, controlled and owned (indirectly) by Defendant Fiat. Marchionne was the CEO and Chairman of Fiat Chrysler and oversaw the board of directors for FCA. Along with other members of Fiat Chrysler's leadership, Marchionne played a pivotal role in the scheme, common course of conduct, and conspiracy. Marchionne set an aggressive plan for Fiat Chrysler to increase the sales and market share of FCA, relying, in part, on incorporating its diesel experience from the European to the U.S. market. FCA's day-to-day operations are managed by employees of both Fiat and FCA. Fiat's Group Executive Committee are based in FCA's Michigan headquarters. Fiat and FCA worked closely with VM Italy and VM America to develop and calibrate the EcoDiesel® engines for the Subject Vehicles and to gather information for submission to regulators in the COC and EO applications by FCA. Each of these Defendants knew or recklessly disregarded that the Subject Vehicles were unable to (and did not) comply with U.S. emission standards and yet concealed this information from regulators.

342. Working with other members of the EcoDiesel® RICO Enterprise, Fiat and FCA, with Marchionne at the helm, conspired to install and conceal emission control software in the EcoDiesel® engines to illegally circumvent stringent U.S. emission standards. Employing this technology, Fiat Chrysler fraudulently obtained COCs and EOs for the Subject Vehicles even though they emit unlawful levels of toxic pollutants into the atmosphere during normal operating conditions. Further, they concealed this information from regulators once questions were raised.

---

[77] *See About Us – FCA US LLC*, available at
http://www.fcanorthamerica.com/company/AboutUs/Pages/ AboutUs.aspx (last accessed on July 17, 2017)

### 2. The VM Motori Defendants

343.    As explained above, Fiat bought 50% of VM Italy in 2011 and the remaining 50% stake from General Motors in 2013. Fiat Chrysler used VM Italy and VM America to design, calibrate, and manufacture the EcoDiesel® engine to be used in the Subject Vehicles. Fiat and FCA worked with, and oversaw, VM Italy and VM America in the development and calibration of the engines at Michigan headquarters. Employees from VM Italy and VM America worked jointly on the manufacturing and/or assembling of the engines for the Subject Vehicles in the United States. And VM Italy and VM America performed engine calibrations, including calibrations involving the concealed emission control technology, for the Subject Vehicles. For example, VM Motori's Calibration Leader for the Subject Vehicles was based in Michigan and reported to management at both VM Italy and VM America. Finally, VM Italy and VM America provided information to FCA for inclusion in the COC and EO applications. VM Italy and VM America knew or recklessly disregarded that the EcoDiesel® engines in the Subject Vehicles were unable to comply with U.S. emission standards and yet concealed this information from regulators.

### 3. The Bosch Defendants

344.    As explained above, the Bosch Defendants supplied the emission control technology at issue—EDC Unit 17s—which were installed in the Subject Vehicles. Bosch GmbH is a multinational engineering and electronics company headquartered in Germany, which has hundreds of subsidiaries and companies, including in the United States. It wholly owns Bosch LLC, a Delaware limited liability company headquartered in Farmington Hills, Michigan. Bosch's sectors and divisions are grouped by subject matter, not location. Mobility Solutions is the Bosch sector at issue, particularly its Diesel Services division, and it encompasses employees of both Bosch GmbH and Bosch LLC. These individuals were responsible for the design, manufacture, development, customization, and supply of the EDC units for the Subject Vehicles.

345.     Denner has been Chairman and CEO of Bosch since July 2012, after decades of working in Bosch's Engine ECU Development division, managing the development and sale of automotive engine computers, such as the EDC units that were installed in the Subject Vehicles. Denner fostered Bosch's relationship with key corporate partners, such as Fiat, which brought in millions of dollars in annual revenue for Bosch.

346.     Bosch worked with Fiat and FCA to develop and implement a specific and unique set of software algorithms to surreptitiously evade emission regulations by deactivating certain controls under real-world driving conditions. Bosch was well aware that the EDC Unit 17 would be used for this purpose. Bosch was also critical to the concealment of these software functions in communications with regulators.

## B.     The EcoDiesel® RICO Enterprise Sought to Increase Defendants' Profits and Revenues.

347.     The EcoDiesel® RICO Enterprise began as early as 2009, when Fiat began to acquire FCA and later VM Motori. On information and belief, Fiat Chrysler and Bosch entered into an agreement to develop and install EDC Unit 17's into over a hundred thousand Subject Vehicles sold in the United States. It was not until September 2015 that the scheme began to unravel, when U.S. regulators uncovered Volkswagen's defeat devices provided by Bosch and questions were raised as to whether other diesel automakers were cheating, too.

348.     At all relevant times, the EcoDiesel® RICO Enterprise: (a) had an existence separate and distinct from each RICO Defendant; (b) was separate and distinct from the pattern of racketeering in which the RICO Defendants engaged; and (c) was an ongoing and continuing organization consisting of legal entities, including Fiat and FCA, their network of dealerships,

Marchionne, VM Italy, VM America, Bosch GmbH, Bosch LLC, Denner, and other entities and individuals associated for the common purpose of designing, calibrating, manufacturing, distributing, testing, marketing, and selling the Subject Vehicles to consumers as the Nationwide Plaintiffs through fraudulent COCs and EOs, false emissions tests, false or misleading sales tactics and materials, and deriving profits and revenues from those activities. Each member of the EcoDiesel® RICO Enterprise shared in the bounty generated by the enterprise, *i.e.*, by sharing the benefit derived from increased sales revenue generated by the scheme to defraud Plaintiffs nationwide.[78]

349.    The EcoDiesel® RICO Enterprise functioned by selling vehicles and component parts to the consuming public. Many of these products are legitimate, including vehicles that do not contain concealed AECDs. However, the RICO Defendants and their co-conspirators, through their illegal Enterprise, engaged in a pattern of racketeering activity, which involves a fraudulent scheme to increase revenue for Defendants and the other entities and individuals associated-in-fact with the Enterprise's activities through the illegal scheme to sell the Subject Vehicles.

350.    The EcoDiesel® RICO Enterprise engaged in, and its activities affected, interstate and foreign commerce, because it involved commercial activities across state boundaries, such as the marketing, promotion, advertisement and sale or lease of the Subject Vehicles throughout the country, and the receipt of monies from the sale of the same.

351.    Within the EcoDiesel® RICO Enterprise, there was a common communication network by which co-conspirators shared information on a regular basis. The enterprise used this common communication network for the purpose of manufacturing, marketing, testing, and selling

---

[78] Fiat and FCA sold more Subject Vehicles, and were able to charge consumers a premium price, by advertising the Subject Vehicles as "clean," "environmentally friendly," and "fuel efficient." As a result, VM Motori sold more "EcoDiesel®" engines and Bosch sold more EDC Units to equip the Subject Vehicles.

the Subject Vehicles to the general public nationwide.

352.    Each participant in the EcoDiesel® RICO Enterprise had a systematic linkage to each other through corporate ties, contractual relationships, financial ties, and continuing coordination of activities. Through the EcoDiesel® RICO Enterprise, the RICO Defendants functioned as a continuing unit with the purpose of furthering the illegal scheme and their common purposes of increasing their revenues and market share and minimizing losses.

353.    The RICO Defendants participated in the operation and management of the EcoDiesel® Enterprise by directing its affairs, as described herein. While the RICO Defendants participated in, and are members of, the enterprise, they have a separate existence from the enterprise, including distinct legal statuses, different offices and roles, bank accounts, officers, directors, employees, individual personhood, reporting requirements, and financial statements.

354.    Fiat, FCA, and Marchionne exerted substantial control over the EcoDiesel® RICO Enterprise, and participated in the affairs of the Enterprise, by:

A.    installing emission control software that deactivates or restricts one or more of the controls during real-world driving conditions;

B.    concealing these software functions from regulators;

C.    failing to correct or disable the hidden software when warned;

D.    manufacturing, distributing, and selling the Subject Vehicles that emitted greater pollution than allowable under the applicable regulations;

E.    misrepresenting and omitting (or causing such misrepresentations and omissions to be made) vehicle specifications on COC and EO applications;

F.    introducing the Subject Vehicles into the stream of U.S. commerce without a valid EPA COC and/or CARB EO;

G.    concealing the existence of the emission controls and the unlawfully high emissions from regulators and the public;

H.    persisting in the manufacturing, distribution, and sale of the Subject

Vehicles even after questions were raised about the emission testing and discrepancies concerning the same; misleading government regulators as to the nature of the emission control technology and the defects in the Subject Vehicles;

I.    misleading the driving public as to the nature of the emission control technology and the defects in the Subject Vehicles;

J.    designing and distributing marketing materials that misrepresented and/or concealed the defect in the vehicles;

K.    otherwise misrepresenting or concealing the defective nature of the Subject Vehicles from the public and regulators;

L.    illegally selling and/or distributing the Subject Vehicles;

M.    collecting revenues and profits from the sale of such products; and/or

N.    ensuring that the other RICO Defendants and unnamed co-conspirators complied with the scheme or common course of conduct.

355.    VM Italy and VM America also participated in, operated and/or directed the EcoDiesel RICO Enterprise by developing an engine that emits high levels of toxic pollutants, calibrating the emission controls to deactivate or diminish reporting during real-world driving conditions, and providing false or misleading information for purposes of supplying it to regulators on COC and/or EO applications.

356.    Bosch GmbH, Bosch LLC, and Denner also participated in, operated and/or directed the EcoDiesel® RICO Enterprise. On information and belief, Denner formed a partnership with Fiat to provide engine management and emission control technology for the Subject Vehicles. Bosch GmbH and Bosch LLC participated in the fraudulent scheme by manufacturing, installing, testing, modifying, and supplying the EDC Unit 17 for the Subject Vehicles. Bosch GmbH and Bosch LLC exercised tight control over the coding and other aspects of the software and closely collaborated with Fiat, FCA, VM Italy, and VM America to develop, customize, and calibrate the

software for the Subject Vehicles. Additionally, Bosch GmbH and Bosch LLC continuously cooperated with the other RICO Defendants to ensure that the EDC Unit 17 was fully integrated into the Subject Vehicles. Bosch GmbH and Bosch LLC also participated in the affairs of the Enterprise by concealing the software functions from U.S. regulators and actively lobbying regulators on behalf of "clean diesel." Bosch collected millions of dollars in revenues and profits from the hidden software installed in the Subject Vehicles.

357.    Without the RICO Defendants' willing participation, including Bosch GmbH and Bosch LLC's active involvement in developing and supplying the critical emission control software for the Subject Vehicles, the Enterprise's scheme and common course of conduct would have been unsuccessful.

358.    The RICO Defendants directed and controlled the ongoing organization necessary to implement the scheme at meetings and through communications of which Plaintiffs cannot fully know at present, because such information lies in the Defendants' and others' hands. Similarly, because the defendants often refer to themselves as a group (*i.e.*, "Bosch" rather than "Bosch GmbH" and "Bosch LLC"), Plaintiffs cannot fully know the full extent of each individual corporate entity's involvement in the wrongdoing prior to having access to discovery.

## C.    Mail And Wire Fraud

359.    To carry out, or attempt to carry out, the scheme to defraud, the RICO Defendants, each of whom is a person associated-in-fact with the EcoDiesel® RICO Enterprise, did knowingly conduct or participate, directly or indirectly, in the conduct of the affairs of the Enterprise through a pattern of racketeering activity within the meaning of 18 U.S.C. §§ 1961(1), 1961(5) and 1962(c), and which employed the use of the mail and wire facilities, in violation of 18 U.S.C. § 1341 (mail

fraud) and § 1343 (wire fraud).

360.    Specifically, as alleged herein, the RICO Defendants have committed and/or conspired to commit at least two predicate acts of racketeering activity (*i.e.*, violations of 18 U.S.C. §§ 1341 and 1343), within the past ten years. The multiple acts of racketeering activity that the RICO Defendants committed were related to each other, posed a threat of continued racketeering activity, and therefore constitute a "pattern of racketeering activity." The racketeering activity was made possible by the RICO Defendants' regular use of the facilities, services, distribution channels, and employees of the EcoDiesel® RICO Enterprise. The RICO Defendants participated in the scheme to defraud by using mail, telephone and the Internet to transmit mailings and wires in interstate or foreign commerce.

361.    The RICO Defendants used, directed the use of, and/or caused to be used, thousands of interstate mail and wire communications in service of their scheme through virtually uniform misrepresentations, concealments and material omissions.

362.    In devising and executing the illegal scheme, the RICO Defendants devised and knowingly carried out a material scheme and/or artifice to defraud Plaintiffs or to obtain money from Plaintiffs by means of materially false or fraudulent pretenses, representations, promises, or omissions of material facts. For the purpose of executing the illegal scheme, the RICO Defendants committed these racketeering acts, which number in the thousands, intentionally and knowingly with the specific intent to advance the illegal scheme.

363.    The RICO Defendants' predicate acts of racketeering (18 U.S.C. § 1961(1)) include, but are not limited to:

A.    <u>Mail Fraud</u>: The RICO Defendants violated 18 U.S.C. §1341 by

229

sending or receiving, or by causing to be sent and/or received, materials via U.S. mail or commercial interstate carriers for the purpose of executing the unlawful scheme to design, manufacture, market, and sell the Subject Vehicles by means of false pretenses, misrepresentations, promises, and omissions.

B.   Wire Fraud: The RICO Defendants violated 18 U.S.C. §1343 by transmitting and/or receiving, or by causing to be transmitted and/or received, materials by wire for the purpose of executing the unlawful scheme to defraud and obtain money on false pretenses, misrepresentations, promises, and omissions.

364.   The RICO Defendants' uses of the mails and wires include, but are not limited to, the transmission, delivery, or shipment of the following by the RICO Defendants or third parties that were foreseeably caused to be sent as a result of Defendants' illegal scheme:

A.   the Subject Vehicles themselves;

B.   component parts for the EcoDiesel® engines;

C.   component parts for the Bosch emission control hardware and software;

D.   false or misleading emission test results;

E.   applications for EPA COCs and CARB EOs that concealed AECDs;

F.   fraudulently-obtained EPA COCs and CARB EOs;

G.   vehicle registrations and plates as a result of the fraudulently-obtained EPA COCs and CARB EOs;

H.   documents and communications that facilitated "passing" emission tests;

I.   false or misleading communications intended to prevent regulators and the public from discovering the true nature of the emission controls and/or AECDs;

J.   sales and marketing materials, including advertising, websites, packaging, brochures, and labeling, concealing the true nature of the Subject Vehicles;

K.   documents intended to facilitate the manufacture and sale of the Subject Vehicles, including bills of lading, invoices, shipping records, reports and correspondence;

L.      documents to process and receive payment for the Subject Vehicles by unsuspecting Plaintiffs, including invoices and receipts;

M.      payments to VM Italy and VM America;

N.      payments to Bosch GmbH and Bosch LLC;

O.      millions of dollars in compensation to Marchionne and Denner;

P.      deposits of proceeds; and/or

Q.      other documents and things, including electronic communications.

R.      The RICO Defendants (or their agents), for the purpose of executing the illegal scheme, sent and/or received (or caused to be sent and/or received) by mail or by private or interstate carrier, shipments of the Subject Vehicles and related documents by mail or a private carrier affecting interstate commerce, including the items described above and alleged below:

| **From** | **To** | **Date** | **Description** |
|---|---|---|---|
| FCA | Bosch LLC | January 2013 | Documents related to agreement to purchase Bosch EDC Unit 17 for 2014 Jeep Grand Cherokee. |
| VM Motori | FCA | January 2013 | Documents related to EcoDiesel® engine for 2014 Jeep Grand Cherokee. |
| FCA, Michigan | FCA Dealerships | July 2013 | Marketing Documents for 2014 Ram 1500 Subject Vehicles. |
| EPA | FCA | September 2013 | COC and related documents for 2014 Jeep Grand Cherokee. |
| EPA | FCA | September 2014 | COC and related documents for 2015 Jeep Grand Cherokee. |
| FCA Warren Truck Assembly | Arrigo Dodge dealership, Sunrise, Florida | November 2015 | Shipment of 2016 Ram 1500 Subject Vehicles. |

365.    The RICO Defendants (or their agents), for the purpose of executing the illegal scheme, transmitted (or caused to be transmitted) in interstate commerce by means of wire

communications, certain writings, signs, signals and sounds, including those items described above and alleged below:

| From | To | Date | Description |
|---|---|---|---|
| Bosch LLC | PR Newswire, New York (and media network around United States) | January 2013 | Press release that Bosch's "clean diesel" technology will be featured in 2014 Jeep Grand Cherokee. |
| FCA, Michigan | Driving Public Throughout All 50 States | July 2013 | Ram Zone Blog: *The 2014 Ram 1500 with EcoDiesel Engine, Available Soon at a Dealer Near You.* |
| Bosch LLC | FCA | October 2013 | Software and calibration documentation for emission control technology. |
| FCA, Michigan | EPA, Michigan and CARB, California | January 2014 | Certification Summery Information Report with emission test results for 2014 Jeep Grand Cherokee and 2014 Ram 1500. |
| FCA, Michigan | EPA, Michigan and CARB, California | January 2015 | Certification Summery Information Report with emission test results for 2015 Jeep Grand Cherokee and 2015 Ram 1500. |
| FCA, Michigan | EPA, Washington, DC | February 2, 2016 | Email correspondence re: FCA lulling press release concerning compliance of diesel vehicles with applicable emission regulations. |
| EPA, Washington DC | FCA, Michigan | November 30, 2016 | Email correspondence re: conference call between EPA officials and Defendant Marchionne. |

366.    The RICO Defendants also used the internet and other electronic facilities to carry

out the scheme and conceal their ongoing fraudulent activities. Specifically, FCA, under the direction and control of Fiat and Marchionne, made misrepresentations about the Subject Vehicles on their websites, YouTube, and through ads online, all of which were intended to mislead regulators and the public about the emission standards and other performance metrics.

367.     The RICO Defendants also communicated by U.S. mail, by interstate facsimile, and by interstate electronic mail with various other affiliates, regional offices, divisions, dealerships and other third-party entities in furtherance of the scheme.

368.     The mail and wire transmissions described herein were made in furtherance of Defendants' scheme and common course of conduct to deceive regulators and consumers and lure consumers into purchasing the Subject Vehicles, which Defendants knew or recklessly disregarded as emitting illegal amounts of pollution, despite their advertising campaign that the Subject Vehicles were "clean diesel" or "clean" diesel cars.

369.     Many of the precise dates of the fraudulent uses of the U.S. mail and interstate wire facilities have been deliberately hidden and cannot be alleged without access to Defendants' books and records. However, Plaintiffs have described the types of, and in some instances, occasions on which the predicate acts of mail and/or wire fraud occurred. These include thousands of communications to perpetuate and maintain the scheme, including the things and documents described in the preceding paragraphs.

370.     The RICO Defendants have not undertaken the practices described herein in isolation, but as part of a common scheme and conspiracy. In violation of 18 U.S.C. § 1962(d), the RICO Defendants conspired to violate 18 U.S.C. § 1962(c), as described herein. Various other persons, firms and corporations, including third-party entities and individuals not named as defendants in this Complaint, have participated as co-conspirators with the RICO Defendants in

these offenses and have performed acts in furtherance of the conspiracy to increase or maintain revenues, increase market share, and/or minimize losses for the Defendants and their unnamed co-conspirators throughout the illegal scheme and common course of conduct.

371.    To achieve their common goals, the RICO Defendants hid from the general public the excessive and unlawful emissions of the Subject Vehicles and obfuscated the true nature and level of the emissions even after regulators raised concerns. The RICO Defendants suppressed and/or ignored warnings from third parties, whistleblowers, and governmental entities about the discrepancies in emissions testing and the concealed auxiliary (or defeat) devices present in the Subject Vehicles.

372.    With knowledge and intent, the RICO Defendants and each member of the conspiracy, with knowledge and intent, have agreed to the overall objectives of the conspiracy, and have participated in the common course of conduct, to commit acts of fraud and indecency in designing, manufacturing, distributing, marketing, testing, and/or selling the Subject Vehicles (and the emission control technology contained therein).

373.    Indeed, for the conspiracy to succeed, each of the RICO Defendants and their co-conspirators had to agree to implement and use the similar devices and fraudulent tactics. Specifically, the RICO Defendants committed to secrecy about the concealed AECDs in the Subject Vehicles.

374.    The RICO Defendants knew and intended that government regulators would rely on their material omissions made about the Subject Vehicles to approve them for importation, marketing, and sale in the United States and each state/territory identified herein. The RICO Defendants knew and intended that consumers would purchase the Subject Vehicles and incur costs as a result.  Plaintiffs' reliance on this ongoing concealment is demonstrated by the fact that

they purchased illegal and defective vehicles that never should have been introduced into the U.S. stream of commerce. In addition, the EPA, CARB, and other regulators relied on the misrepresentations and material concealment and omissions made or caused to be made by the RICO Defendants; otherwise, FCA could not have obtained valid COCs and EOs to sell the Subject Vehicles.

375.    As described herein, the RICO Defendants engaged in a pattern of related and continuous predicate acts for years. The predicate acts constituted a variety of unlawful activities, each conducted with the common purpose of obtaining significant monies and revenues from Plaintiffs based on their misrepresentations and omissions, while providing Subject Vehicles that were worth significantly less than the purchase price paid. The predicate acts also had the same or similar results, participants, victims, and methods of commission.  The predicate acts were related and not isolated events.

376.    The predicate acts had the purpose of generating significant revenue and profits for the RICO Defendants at the expense of Plaintiffs. The predicate acts were committed or caused to be committed by the RICO Defendants through their participation in the EcoDiesel® RICO Enterprise and in furtherance of its fraudulent scheme and were interrelated in that they involved obtaining Plaintiffs' funds and avoiding the expenses associated with remediating the Subject Vehicles.

377.    During the design, manufacture, testing, marketing and sale of the Subject Vehicles, the RICO Defendants shared among themselves technical, marketing, and financial information that revealed the existence of the AECDs contained therein. Nevertheless, the RICO Defendants chose and agreed to disseminate information that deliberately misrepresented the Subject Vehicles as legal, "clean," "environmentally friendly," and "fuel efficient" in their concerted efforts to

market and sell them to consumers.

378.    By reason of, and as a result of the conduct of the RICO Defendants, and in particular, their pattern of racketeering activity, Plaintiffs have been injured in their business and/or property in multiple ways, including but not limited to:

A.      Purchase or lease of illegal, defective Subject Vehicles;

B.      Overpayment at the time of purchase or lease for Subject Vehicles purportedly having "EcoDiesel" properties and benefits, and meeting applicable federal and state emissions standards, that did not have these properties or meet these standards;

C.      The value of the Subject Vehicles has diminished;

D.      Other, ongoing out-of-pocket and loss-of-use expenses;

E.      Payment for alternative transportation; and

F.      Loss of employment due to lack of transportation.

379.    The RICO Defendants' violations of 18 U.S.C. § 1962(c) and (d) have directly and proximately caused economic damage to Plaintiffs' business and property, and Plaintiffs are entitled to bring this action for three times their actual damages, as well as injunctive/equitable relief, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c).

**NATIONWIDE COUNT II**
**FRAUD**
**(Common Law)**

380.    Plaintiffs incorporate by reference all preceding allegations as through fully set forth herein.

**A.      <u>Affirmative Misrepresentation</u>**

381.    Plaintiffs assert this affirmative misrepresentation theory of fraud on behalf of

themselves and those Nationwide Plaintiffs to be added later, against the Fiat Chrysler and VM Motori Defendants.

382.   Fiat Chrysler branded each Subject Vehicle with the EcoDiesel badge. Through the badge, Fiat Chrysler communicated to each Plaintiffs that the Subject Vehicles were, among other things, environmentally friendly.

383.   This was a material fact, as Fiat Chrysler's own research and communications demonstrate. Fiat Chrysler's representations were false because the Subject Vehicles contain undisclosed emission cheating components that cause them to pollute excessively in real-world driving conditions.

384.   Fiat Chrysler and VM Motori knew the representations were false and intended Plaintiffs to rely on them.

385.   Each named Plaintiff decided to buy a Subject Vehicle based in part on the representations communicated through the EcoDiesel badge. Because each Subject Vehicle included the badge and each Plaintiff was exposed to it, a "plausible . . . inference of reliance" can be made for all Plaintiffs. Dkt. 290 at 103 (citing *Tobacco II Cases*, 207 P.3d 20, 40 (Cal. 2009)).

**B.   <u>Fraudulent Concealment: Fuel Economy and Performance Representations</u>**

386.   Plaintiffs assert this fraudulent concealment theory on behalf of themselves against all Defendants.

387.   Again, Fiat Chrysler branded each Subject Vehicle with the EcoDiesel badge, which communicated not only that the Subject Vehicles were environmentally friendly, but also that they were fuel efficient.

388.     The fuel economy and performance representations were also the centerpiece of Fiat Chrysler's marketing efforts and featured prominently in virtually every advertisement and consumer communication. As detailed above, through dealership training materials leading to representations at the point of sale, vehicle brochures, the manufacturer websites, print advertisements, television advertisements, and other avenues, Fiat Chrysler pervasively and consistently represented that the Subject Vehicles had best-in-class fuel economy and touted their specific MPG and range, as well as their supposedly superior torque and performance.

389.     Defendants concealed and suppressed the fact that the Subject Vehicles could achieve their fuel efficiency and power only through undisclosed cheating components that cause them to pollute excessively. This was a material fact about which the Defendants had knowledge, and that they concealed from Plaintiffs and to mislead them.

390.     Plaintiffs did not know this fact and could not have discovered it through reasonably diligent investigation.

391.     Defendants had a duty to disclose that the emission treatment technology in the Subject Vehicles is de-activated or reduced under real-world driving conditions because (1) the Defendants had exclusive knowledge of the material, suppressed facts; (2) the Defendants took affirmative actions to conceal the material facts, including by not identifying them for the EPA and CARB; and (3) Fiat Chrysler made partial representations about the environmental friendliness, fuel economy, and performance of the Subject Vehicles that were misleading without disclosure of the fact that the Subject Vehicles contained hidden emission cheating components that caused the Subject Vehicles to pollute excessively in real-world driving conditions.

392.     Each named Plaintiff decided to buy a Subject Vehicle based in part on the fuel

economy and power representations made through the EcoDiesel badge and other consumer communications to consumers. *See, e.g.*, ¶¶ 34-96. Because each Subject Vehicle included the badge and each Plaintiffs was exposed to it, and because the fuel economy and performance representations were consistent and pervasive, a "plausible . . . inference of reliance" can be made for all Plaintiffs. Dkt. 290 at 103 (citing *Tobacco II Cases*, 207 P.3d 20, 40 (Cal. 2009)).

### C.  <u>Fraudulent Concealment: Installing and Concealing the Defeat Devices</u>

393.  Plaintiffs assert this fraudulent concealment theory on behalf of themselves and those Nationwide Plaintiffs to be named later, against all Defendants.

394.  Each Defendant committed fraud by installing and calibrating emission control devices in the Subject Vehicles, which were unlawfully concealed from regulators and consumers alike. In uniform advertising and materials provided with each Subject Vehicle, the Fiat Chrysler Defendants concealed from Plaintiffs that the emission treatment technology de-activated under real-world driving conditions.

395.  The Fiat Chrysler Defendants intentionally concealed, suppressed, and failed to disclose the facts that the Subject Vehicles had defective emission controls and/or emitted unlawfully high levels of pollutants such as NOx. These Defendants, along with VM Motori and the Bosch Defendants, knew or should have known the true facts, due to their involvement in the design, installment, and calibration of the emission treatment technology in the Subject Vehicles. And yet, at no time did any of these Defendants reveal the truth to Plaintiffs. To the contrary, each Defendant concealed the truth, intending for Plaintiffs to rely—which they did.

396.  A reasonable consumer would not have expected that the emission treatment technology in the Subject Vehicles de-activated under real-world driving conditions or that the

Subject Vehicle would spew unmitigated NOx during city or highway driving. Plaintiffs did not know of the facts which were concealed from them by Defendants. Moreover, as consumers, Plaintiffs did not, and could not, unravel the deception on their own.

397.     Defendants had a duty to disclose that the emission treatment technology is de-activated under real-world driving conditions and that the Subject Vehicles spewed unmitigated NOx during real-world conditions. Defendants had such a duty because the true facts were known and/or accessible only to them and because they knew these facts were not known to or reasonably discoverable by Plaintiffs.

398.     Fiat Chrysler and VM Motori also had a duty to disclose the true nature of the emission controls in light of their statements about the qualities of the EcoDiesel® engines and the Subject Vehicles' emissions levels, which were misleading, deceptive, and incomplete without the disclosure of the fact that the emission treatment technology is de-activated under real-world driving conditions and that the Subject Vehicles spewed unmitigated NOx during real-world conditions. Fiat Chrysler held out the Subject Vehicles as *reduced emission* diesel vehicles, when in fact, they were *unlawfully high* emission vehicles. Having volunteered to provide information to Plaintiffs, Fiat Chrysler and VM Motori had the duty to disclose the whole truth. On information and belief, Fiat Chrysler has still not made full and adequate disclosures and continues to defraud Plaintiffs by concealing material information regarding the emissions qualities of the Subject Vehicles.

* * *

399.     But for Defendants' fraud, Plaintiffs would not have purchased the Subject Vehicles, or would have paid less for them. Plaintiffs have sustained damage because purchased

vehicles that were not as represented and because they own Subject Vehicles that should never have been placed in the stream of commerce and are diminished in value as a result of Defendants' fraud. Accordingly, Defendants are liable to Plaintiffs for damages in an amount to be proven at trial.

400.    Defendants' acts were done wantonly, maliciously, oppressively, deliberately, with intent to defraud; in reckless disregard of the rights of Plaintiffs; and to enrich themselves. Their misconduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, which amount shall be determined according to proof at trial.

## NATIONWIDE COUNT III
## IMPLIED AND WRITTEN WARRANTY
### Magnuson – Moss Warranty Act (15 U.S.C. §§ 2301, et seq.

401.    Plaintiffs incorporate by reference all preceding allegations as though fully set forth herein.

402.    Plaintiffs bring this action on behalf of themselves against FCA US LLC.

403.    This Court has jurisdiction to decide claims brought under 15 U.S.C. § 2301 by virtue of 28 U.S.C. § 1332 (a)-(d).

404.    Plaintiffs are "consumers" within the meaning of 15 U.S.C. § 2301(3).

405.    FCA is a "supplier" and "warrantor" within the meaning of 15 U.S.C. § 2301(4) and (5), respectively.

406.    The Subject Vehicles are "consumer products" within the meaning of 15 U.S.C. 16§ 2301(1).

407.    15 U.S.C. § 2310(d)(1) provides a cause of action for any consumer who is damaged by the failure of a warrantor to comply with a written or implied warranty.

408.    The amount in controversy of Plaintiffs' individual claims meets or exceeds $25.00

in value. In addition, the amount in controversy meets or exceeds $50,000 in value (exclusive of interest and costs) on the basis of all claims to be determined in this lawsuit.

409.    FCA provided Plaintiffs with "written warranties" and "implied warranties," as identified above, which are covered under 15 U.S.C. § 2301(6) and (7), respectively.

410.    The terms of these warranties became part of the basis of the bargain when Plaintiffs purchased their Subject Vehicles.

411.    FCA breached these written and implied warranties as described in detail above. Without limitation, the Subject Vehicles share a common design defect in that they emit more pollutants than: (a) is allowable under the applicable regulations, and (b) was revealed to regulators, consumers, and the driving public.

412.    Plaintiffs have had sufficient direct dealings with either FCA or its agents (including dealerships) to establish privity of contract between FCA, on the one hand, and Plaintiffs.  Nonetheless, privity is not required here because Plaintiffs are intended third-party beneficiaries of contracts between FCA and its dealers, and specifically, of FCA's implied warranties. The dealers were not intended to be the ultimate consumers of the Subject Vehicles and have no rights under the warranty agreements provided with the Subject Vehicles; the warranty agreements were designed for and intended to benefit consumers only.

413.    Affording FCA a reasonable opportunity to cure its breach of written warranties would be unnecessary and futile. At the time of sale or lease of each Subject Vehicle, FCA knew, or should have known, of its misrepresentations and/or material omissions concerning the Subject Vehicles' inability to perform as warranted, but nonetheless failed to rectify the situation and/or disclose the design defect. Under the circumstances, the remedies available under any informal settlement procedure would be inadequate and any requirement that Plaintiffs resort

to an informal dispute resolution procedure and/or afford FCA a reasonable opportunity to cure its breach of warranties is excused and thereby deemed satisfied.

414.    In addition, given the conduct described herein, any attempts by FCA, in its capacity as a warrantor, to limit the implied warranties in a manner that would exclude coverage of the defect is unconscionable and any such effort to disclaim, or otherwise limit, liability for the defect is null and void.

415.    As a direct and proximate result of FCA's breach of the written and implied warranties, Plaintiffs have suffered damages.

416.    Plaintiffs seek all damages permitted by law, including compensation for the monetary difference between the Subject Vehicles as warranted and as sold; compensation for the reduction in resale value; the cost of purchasing, leasing, or renting replacement vehicles, along with all other incidental and consequential damages, statutory attorney fees, and all other relief allowed by law.

417.    The warranty laws of each state, which are incorporated into this Count, are set forth below.

1.    **Alabama**

**BREACH OF EXPRESS WARRANTY**
**(Ala. Code §§ 7-2-313 and 7-2A-210)**

418.    Plaintiffs reallege and incorporate by reference all preceding allegations as though fully set forth herein.

419.    Plaintiffs, Darryl Saucier, Matthew Cole, Mark King, James and Deborah Andreasen, (for the purpose of this section, "Plaintiffs") bring this action on behalf of themselves against Fiat and FCA.

420.     Fiat and FCA are and were at all relevant times "merchants" with respect to motor vehicles under Ala. Code §§ 7-2-104(1) and 7-2A-103(3), and "sellers" of motor vehicles under § 7-2-103(1)(d).

421.     With respect to leases, Fiat and FCA are and were all relevant times "lessors" of motor vehicles under Ala. Code. § 7-2A-103(1)(p).

422.     The Subject Vehicles are and were at all relevant times "goods" within the meaning of Ala. Code §§ 7-2-105(1) and 7-2A-103(1)(h).

423.     Federal law requires manufacturers of light-duty vehicles to provide two federal emission control warranties: a "Performance Warranty" and a "Design and Defect Warranty." The Performance Warranty applies to repairs that are required during the first two years or 24,000 miles, whichever occurs first, when a vehicle fails an emissions test. Under this warranty, certain major emission control components are covered for the first eight years or 80,000 miles, whichever comes first. These major emission control components subject to the longer warranty include the catalytic converters, the electronic engine control unit (ECU), and the onboard emissions diagnostic device or computer. The Design and Defect Warranty covers repair of emission control or emission related parts which fail to function or function improperly due to a defect in materials or workmanship. This warranty provides protection for two years or 24,000 miles, whichever comes first, or, for the major emission control components, for eight years or 80,000 miles, whichever comes first.

424.     Fiat and FCA provided these warranties to Plaintiffs. These warranties formed the basis of the bargain that was reached when Plaintiffs purchased or leased their Subject Vehicles.

425.     However, Fiat and FCA knew or should have known that the warranties were false

and/or misleading. Fiat and FCA were aware that the emissions systems in the Subject Vehicles sold and leased to Plaintiffs were designed to deactivate under real-world driving conditions, and to emit oxides of nitrogen within legal limits only when undergoing emissions testing, and therefore, knew that the emission systems contained defects.

426.    Plaintiffs reasonably relied on Fiat's and FCA's express warranties concerning emissions when purchasing or leasing the Subject Vehicles. However, the Subject Vehicles did not perform as warranted. Unbeknownst to Plaintiffs, the Subject Vehicles were designed to pollute at higher than legal limits during normal driving, and could not achieve advertised performance and efficiency metrics without this cheating design. This design and the devices that effectuate it are defects. Fiat and FCA therefore breached their express warranty by providing a product containing defects that were never disclosed to Plaintiffs.

427.    Any opportunity to cure the express breach is unnecessary and futile.

428.    As a direct and proximate result of Fiat's and FCA's breach of express warranties, Plaintiffs suffered significant damages, and seek damages in an amount to be determined at trial.

## BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY
### (Ala. Code §§ 7-2-314 and 7-2A-212)

429.    Plaintiffs reallege and incorporate by reference all allegations of the preceding paragraphs as though fully set forth herein.

430.    Plaintiffs, Darryl Saucier, Matthew Cole, Mark King, James and Deborah Andreasen, (for the purpose of this section, "Plaintiffs") bring this action on behalf of themselves against Fiat and FCA.

431.    Fiat and FCA were at all relevant times "merchants" with respect to motor vehicles

245

under Ala. Code §§ 7-2-104(1) and 7-2A-103(3), and "sellers" of motor vehicles under § 7-2-6103(1)(d).

432.    With respect to leases, Fiat and FCA are and were at all relevant times "lessors" of motor vehicles under Ala. Code. § 7-2A-103(1)(p).

433.    The Subject Vehicles are and were at all relevant times "goods" within the meaning of Ala. Code §§ 7-2-105(1) and 7-2A-103(1)(h).

434.    A warranty that the Subject Vehicles were in merchantable condition and fit for the ordinary purpose for which vehicles are used is implied by law pursuant to Ala. Code §§ 7-2-314 and 7-2A-212.

435.    Fiat and FCA sold and/or leased Subject Vehicles that were not in merchantable condition and/or fit for their ordinary purpose in violation of the implied warranty. The Subject Vehicles were not in merchantable condition because their design violated state and federal laws. The Subject Vehicles were not fit for their ordinary purpose as they were built to evade state and federal emission standards.

436.    Fiat's and FCA's breaches of the implied warranty of merchantability caused damage to Plaintiffs. The amount of damages due will be proven at trial.

**2.    Alaska**

**BREACH OF EXPRESS WARRANTY**
**(Alaska Stat. Ann. §§ 45.02.313 and 45.12.210)**

437.    Plaintiffs reallege and incorporate by reference all preceding allegations as though fully set forth herein.

438.    Plaintiffs, to be named at a later date, (for purposes of this section, "Plaintiffs") bring this action on behalf of themselves against Fiat and FCA.

439.    Fiat and FCA are and were at all relevant times "merchants" with respect to motor vehicles under Alaska Stat. Ann. §§ 45.02.104(a) and 45.12.103(c)(11), and "sellers" of motor vehicles under § 45.02.103(a)(4).

440.    With respect to leases, Fiat and FCA are and were all relevant times "lessors" of motor vehicles under Alaska Stat. Ann. § 45.12.103(a)(16).

441.    The Subject Vehicles are and were at all relevant times "goods" within the meaning of Alaska Stat. Ann. §§ 45.02.105(a) and 45.12.103(a)(8)).

442.    Federal law requires manufacturers of light-duty vehicles to provide two federal emission control warranties: a "Performance Warranty" and a "Design and Defect Warranty." The Performance Warranty applies to repairs that are required during the first two years or 24,000 miles, whichever occurs first, when a vehicle fails an emissions test. Under this warranty, certain major emission control components are covered for the first eight years or 80,000 miles, whichever comes first. These major emission control components subject to the longer warranty include the catalytic converters, the electronic engine control unit (ECU), and the onboard emissions diagnostic device or computer. The Design and Defect Warranty covers repair of emission control or emission related parts which fail to function or function improperly due to a defect in materials or workmanship. This warranty provides protection for two years or 24,000 miles, whichever comes first, or, for the major emission control components, for eight years or 80,000 miles, whichever comes first.

443.    Fiat and FCA provided these warranties to Plaintiffs. These warranties formed the

basis of the bargain that was reached when Plaintiffs purchased or leased their Subject Vehicles.

444.    However, Fiat and FCA knew or should have known that the warranties were false and/or misleading. Fiat and FCA were aware that the emissions systems in the Subject Vehicles sold and leased to Plaintiffs were designed to deactivate under real-world driving conditions, and to emit oxides of nitrogen within legal limits only when undergoing emissions testing, and therefore, knew that the emission systems contained defects.

445.    Plaintiffs reasonably relied on Fiat's and FCA's express warranties concerning emissions when purchasing or leasing the Subject Vehicles. However, the Subject Vehicles did not perform as warranted. Unbeknownst to Plaintiffs, the Subject Vehicles were designed to pollute at higher than legal limits during normal driving, and could not achieve advertised performance and efficiency metrics without this cheating design. This design and the devices that effectuate it are defects. Fiat and FCA therefore breached their express warranty by providing a product containing defects that were never disclosed to Plaintiffs.

446.    Any opportunity to cure the express breach is unnecessary and futile.

447.    As a direct and proximate result of Fiat's and FCA's breach of express warranties, Plaintiffs suffered significant damages, and seek damages in an amount to be determined at trial.

### BREACH OF THE IMPLIED WARRANTY OF MERCHANTABILITY
#### (Alaska Stat. Ann. §§ 45.02.314 and 45.12.212)

448.    Plaintiffs reallege and incorporate by reference all allegations of the preceding paragraphs as though fully set forth herein.

449.    Plaintiffs, to be named at a later date, (for purposes of this section, "Plaintiffs") bring this action on behalf of themselves against Fiat and FCA.

450.     Fiat and FCA were at all relevant times "merchants" with respect to motor vehicles under Alaska Stat. Ann. §§ 45.02.104(a) and 45.12.103(c)(11), and "sellers" of motor vehicles under § 45.02.103(a)(4).

451.     With respect to leases, Fiat and FCA are and were at all relevant times "lessors" of motor vehicles under Alaska Stat. Ann. § 45.12.103(a)(16).

452.     The Subject Vehicles are and were at all relevant times "goods" within the meaning of Alaska Stat. Ann. §§ 45.02.105(a) and 45.12.103(a)(8).

453.     A warranty that the Subject Vehicles were in merchantable condition and fit for the ordinary purpose for which vehicles are used is implied by law pursuant to Alaska Stat. §§ 45.02.314 and 45.12.212.

454.     Fiat and FCA sold and/or leased Subject Vehicles that were not in merchantable condition and/or fit for their ordinary purpose in violation of the implied warranty. The Subject Vehicles were not in merchantable condition because their design violated state and federal laws. The Subject Vehicles were not fit for their ordinary purpose as they were built to evade state and federal emission standards.

455.     Fiat's and FCA's breaches of the implied warranty of merchantability caused damage to Plaintiffs. The amount of damages due will be proven at trial.

### 3.     Arizona

## BREACH OF EXPRESS WARRANTY
### (Ariz. Rev. Stat. §§ 47-2313 and 47-2A210)

456.     Plaintiffs reallege and incorporate by reference all preceding allegations as though fully set forth herein.

457.     Plaintiffs, Jeff Simmonds, Juan Carlos Soto, (for the purpose of this section, "Plaintiff") bring this action on behalf of themselves against Fiat and FCA.

458.     Fiat and FCA are and were at all relevant times "merchants" with respect to motor vehicles under Ariz. Rev. Stat. §§ 47-2104(A) and 47-2a103(c), and "sellers" of motor vehicles under § 47-2103(A)(4).

459.     With respect to leases, Fiat and FCA are and were all relevant times "lessors" of motor vehicles under Ariz. Rev. Stat. § 47-2a103(A)(16).

460.     The Subject Vehicles are and were at all relevant times "goods" within the meaning of Ariz. Rev. Stat. §§ 47-2105(A) and 47-2a103(A)(8).

461.     Federal law requires manufacturers of light-duty vehicles to provide two federal emission control warranties: a "Performance Warranty" and a "Design and Defect Warranty." The Performance Warranty applies to repairs that are required during the first two years or 24,000 miles, whichever occurs first, when a vehicle fails an emissions test. Under this warranty, certain major emission control components are covered for the first eight years or 80,000 miles, whichever comes first. These major emission control components subject to the longer warranty include the catalytic converters, the electronic engine control unit (ECU), and the onboard emissions diagnostic device or computer. The Design and Defect Warranty covers repair of emission control or emission related parts which fail to function or function improperly due to a defect in materials or workmanship. This warranty provides protection for two years or 24,000 miles, whichever comes first, or, for the major emission control components, for eight years or 80,000 miles, whichever comes first.

462.     Fiat and FCA provided these warranties to Plaintiff. These warranties formed the basis of the bargain that was reached when Plaintiff purchased or leased their Subject Vehicles.

463.     However, Fiat and FCA knew or should have known that the warranties were false and/or misleading. Fiat and FCA were aware that the emissions systems in the Subject Vehicles

250

sold and leased to Plaintiff were designed to deactivate under real-world driving conditions, and to emit oxides of nitrogen within legal limits only when undergoing emissions testing, and therefore, knew that the emission systems contained defects.

464.     Plaintiff reasonably relied on Fiat's and FCA's express warranties concerning emissions when purchasing or leasing the Subject Vehicles. however, the Subject Vehicles did not perform as warranted. Unbeknownst to Plaintiff, the Subject Vehicles were designed to pollute at higher than legal limits during normal driving, and could not achieve advertised performance and efficiency metrics without this cheating design. This design and the devices that effectuate it are defects. Fiat and FCA therefore breached their express warranty by providing a product containing defects that were never disclosed to Plaintiff.

465.     Any opportunity to cure the express breach is unnecessary and futile.

466.     As a direct and proximate result of Fiat's and FCA's breach of express warranties, Plaintiff suffered significant damages, and seek damages in an amount to be determined at trial.

## BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY
### (Ariz. Rev. Stat. §§ 47-2314 and 47-2A212)

467.     Plaintiffs reallege and incorporate by reference all allegations of the preceding paragraphs as though fully set forth herein.

468.     Plaintiffs, Jeff Simmonds, Juan Carlos Soto, (for the purpose of this section, "Plaintiff") bring this action on behalf of themselves against Fiat and FCA.

469.     Fiat and FCA were at all relevant times "merchants" with respect to motor vehicles under Ariz. Rev. Stat. §§ 47-2104(A) and 47-2a103(c), and "sellers" of motor vehicles under 12 § 47-2103(A)(4).

470.     With respect to leases, Fiat and FCA are and were at all relevant times "lessors" of motor vehicles under Ariz. Rev. Stat. § 47-2a103(A)(16).

471.     The Subject Vehicles are and were at all relevant times "goods" within the meaning of Ariz. Rev. Stat. §§ 47-2105(A) and 47-2a103(A)(8).

472.     A warranty that the Subject Vehicles were in merchantable condition and fit for the ordinary purpose for which vehicles are used is implied by law pursuant to Ariz. Rev. Stat. §§ 47-2314 and 47-2a212.

473.     Fiat and FCA sold and/or leased Subject Vehicles that were not in merchantable condition and/or fit for their ordinary purpose in violation of the implied warranty. The Subject Vehicles were not in merchantable condition because their design violated state and federal laws. The Subject Vehicles were not fit for their ordinary purpose as they were built to evade state and federal emission standards.

474.     Fiat's and FCA's breaches of the implied warranty of merchantability caused damage to the Plaintiff. The amount of damages due will be proven at trial.

### 4.     Arkansas

**BREACH OF EXPRESS WARRANTY**
**(Ark. Code Ann. §§ 4-2-313 and 4-2A-210)**

475.     Plaintiffs reallege and incorporate by reference all preceding allegations as though fully set forth herein.

476.     Plaintiffs, Dawn and Edward Nelson, Andrew Prztarski, (for the purpose of this section, "Plaintiff") brings this action on behalf of themselves against Fiat and FCA.

477.     Fiat and FCA are and were at all relevant times "merchants" with respect to motor vehicles under Ark. Code Ann. §§ 4-2-104(1) and 4-2A-103(3), and "seller[s]" of motor vehicles under § 4-2-103(1)(d).

478.     With respect to leases, Fiat and FCA are and were all relevant times "lessors" of motor vehicles under Ark. Code Ann. § 4-2A-103(1)(p).

479.    The Subject Vehicles are and were at all relevant times "goods" within the meaning of Ark. Code Ann. §§ 4-2-105(1) and 4-2A-103(1)(h).

480.    Federal law requires manufacturers of light-duty vehicles to provide two federal emission control warranties: a "Performance Warranty" and a "Design and Defect Warranty." The Performance Warranty applies to repairs that are required during the first two years or 24,000 miles, whichever occurs first, when a vehicle fails an emissions test. Under this warranty, certain major emission control components are covered for the first eight years or 80,000 miles, whichever comes first. These major emission control components subject to the longer warranty include the catalytic converters, the electronic engine control unit (ECU), and the onboard emissions diagnostic device or computer. The Design and Defect Warranty covers repair of emission control or emission related parts which fail to function or function improperly due to a defect in materials or workmanship. This warranty provides protection for two years or 24,000 miles, whichever comes first, or, for the major emission control components, for eight years or 80,000 miles, whichever comes first.

481.    Fiat and FCA provided these warranties to Plaintiff. These warranties formed the basis of the bargain that was reached when Plaintiff purchased or leased their Subject Vehicles.

482.    However, Fiat and FCA knew or should have known that the warranties were false and/or misleading. Fiat and FCA were aware that the emissions systems in the Subject Vehicles sold and leased to Plaintiffs were designed to deactivate under real-world driving conditions, and to emit oxides of nitrogen within legal limits only when undergoing emissions testing, and therefore, knew that the emission systems contained defects.

483.    Plaintiffs reasonably relied on Fiat's and FCA's express warranties concerning emissions when purchasing or leasing the Subject Vehicles. However, the Subject Vehicles did

not perform as warranted. Unbeknownst to Plaintiffs the Subject Vehicles were designed to pollute at higher than legal limits during normal driving, and could not achieve advertised performance and efficiency metrics without this cheating design. This design and the devices that effectuate it are defects. Fiat and FCA therefore breached their express warranty by providing a product containing defects that were never disclosed to Plaintiff.

484.    Any opportunity to cure the express breach is unnecessary and futile.

485.    As a direct and proximate result of Fiat's and FCA's breach of express warranties, Plaintiff suffered significant damages, and seek damages in an amount to be determined at trial.

## BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY
### (Ark. Code Ann. §§ 4-2-314 and 4-2A-212)

486.    Plaintiffs reallege and incorporate by reference all allegations of the preceding paragraphs as though fully set forth herein.

487.    Plaintiffs, Dawn and Edward Nelson, Andrew Prztarski (for the purpose of this section, "Plaintiff") brings this action on behalf of themselves against Fiat and FCA.

488.    Fiat and FCA were at all relevant times "merchants" with respect to motor vehicles under Ark. Code Ann. §§ 4-2-104(1) and 4-2A-103(3), and "seller[s]" of motor vehicles under § 4-2-103(1)(d).

489.    With respect to leases, Fiat and FCA are and were at all relevant times "lessors" of motor vehicles under Ark. Code Ann. § 4-2A-103(1)(p).

490.    The Subject Vehicles are and were at all relevant times "goods" within the meaning of Ark. Code Ann. §§ 4-2-105(1) and 4-2A-103(1)(h).

491.    A warranty that the Subject Vehicles were in merchantable condition and fit for the

ordinary purpose for which vehicles are used is implied by law pursuant to Ark. Code Ann. §§ 4-10 2-314 and 4-2A-212.

492.     Fiat and FCA sold and/or leased Subject Vehicles that were not in merchantable condition and/or fit for their ordinary purpose in violation of the implied warranty. The Subject Vehicles were not in merchantable condition because their design violated state and federal laws. The Subject Vehicles were not fit for their ordinary purpose as they were built to evade state and federal emission standards.

493.     Fiat's and FCA's breaches of the implied warranty of merchantability caused damage to Plaintiff. The amount of damages due will be proven at trial.

**5.     California**

**BREACH OF EXPRESS WARRANTY**
**(Cal. Com. Code §§ 2313 and 10210)**

494.     Plaintiffs reallege and incorporate by reference all preceding allegations as though fully set forth herein.

495.     Plaintiffs, to be named at a later date, (for the purpose of this section, "Plaintiffs") bring this action on behalf of themselves against Fiat and FCA.

496.     Fiat and FCA are and were at all relevant times "merchants" with respect to motor vehicles under Cal. Com. Code §§ 2104(1) and 10103(c), and "sellers" of motor vehicles under § 2103(1)(d).

497.     With respect to leases, Fiat and FCA are and were all relevant times "lessors" of motor vehicles under Cal. Com. Code § 10103(a)(16).

498.     The Subject Vehicles are and were at all relevant times "goods" within the meaning of Cal. Com. Code §§ 2105(1) and 10103(a)(8)).

499.     Federal law requires manufacturers of light-duty vehicles to provide two federal emission control warranties: a "Performance Warranty" and a "Design and Defect Warranty." The Performance Warranty applies to repairs that are required during the first two years or 24,000 miles, whichever occurs first, when a vehicle fails an emissions test. Under this warranty, certain major emission control components are covered for the first eight years or 80,000 miles, whichever comes first. These major emission control components subject to the longer warranty include the catalytic converters, the electronic engine control unit (ECU), and the onboard emissions diagnostic device or computer. The Design and Defect Warranty covers repair of emission control or emission related parts which fail to function or function improperly due to a defect in materials or workmanship. This warranty provides protection for two years or 24,000 miles, whichever comes first, or, for the major emission control components, for eight years or 80,000 miles, whichever comes first.

500.     Fiat and FCA provided these warranties to Plaintiffs. These warranties formed the basis of the bargain that was reached when Plaintiffs purchased or leased their Subject Vehicles.

501.     However, Fiat and FCA knew or should have known that the warranties were false and/or misleading. Fiat and FCA were aware that the emissions systems in the Subject Vehicles sold and leased to Plaintiffs were designed to deactivate under real-world driving conditions, and to emit oxides of nitrogen within legal limits only when undergoing emissions testing, and therefore, knew that the emission systems contained defects.

502.     Plaintiffs reasonably relied on Fiat's and FCA's express warranties concerning

emissions when purchasing or leasing the Subject Vehicles. However, the Subject Vehicles did not perform as warranted. Unbeknownst to Plaintiffs, the Subject Vehicles were designed to pollute at higher than legal limits during normal driving, and could not achieve advertised performance and efficiency metrics without this cheating design. This design and the devices that effectuate it are defects. Fiat and FCA therefore breached their express warranty by providing a product containing defects that were never disclosed to Plaintiffs.

503.    Any opportunity to cure the express breach is unnecessary and futile.

504.    As a direct and proximate result of Fiat's and FCA's breach of express warranties, Plaintiffs suffered significant damages, and seek damages in an amount to be determined at trial.

## BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY
### (Cal. Com. Code §§ 2314 and 10212)

505.    Plaintiffs reallege and incorporate by reference all allegations of the preceding paragraphs as though fully set forth herein.

506.    Plaintiffs, to be named at a later date, (for the purpose of this section, "Plaintiffs") bring this action on behalf of themselves against Fiat and FCA.

507.    Fiat and FCA were at all relevant times "merchants" with respect to motor vehicles under Cal. Com. Code §§ 2104(1) and 10103(c), and "sellers" of motor vehicles under § 2103(1)(d).

508.    With respect to leases, Fiat and FCA are and were at all relevant times "lessors" of motor vehicles under Cal. Com. Code § 10103(a)(16).

509.    The Subject Vehicles are and were at all relevant times "goods" within the meaning of Cal. Com. Code §§ 2105(1) and 10103(a)(8).

510.    A warranty that the Subject Vehicles were in merchantable condition and fit for the

ordinary purpose for which vehicles are used is implied by law pursuant to Cal. Com. Code §§ 2314 and 10212.

511.    Fiat and FCA sold and/or leased Subject Vehicles that were not in merchantable condition and/or fit for their ordinary purpose in violation of the implied warranty. The Subject Vehicles were not in merchantable condition because their design violated state and federal laws. The Subject Vehicles were not fit for their ordinary purpose as they were built to evade state and federal emission standards.

512.    Fiat's and FCA's breaches of the implied warranty of merchantability caused damage to the Plaintiffs. The amount of damages due will be proven at trial.

## VIOLATIONS OF SONG-BEVERLY CONSUMER WARRANTY ACT FOR BREACH OF EXPRESS WARRANTIES
### (Cal. Civ. Code §§ 1791.2 & 1793.2(d))

513.    Plaintiffs reallege and incorporate by reference all preceding allegations as though fully set forth herein.

514.    Plaintiffs, to be named at a later date, (for the purpose of this section, "Plaintiffs") bring this action on behalf of themselves against Fiat and FCA.

515.    Plaintiffs who purchased or leased the Subject Vehicles in California are "buyers" within the meaning of Cal. Civ. Code § 1791(b).

516.    The Subject Vehicles are "consumer goods" within the meaning of Cal. Civ. Code § 1791(a).

517.    Fiat Chrysler is a "manufacturer[s]" of the Subject Vehicles within the meaning of Cal. Civ. Code § 1791(j).

518.    Plaintiffs bought/leased new motor vehicles manufactured by Fiat Chrysler.

519.    Fiat Chrysler made express warranties to Plaintiffs within the meaning of Cal. Civ.

258

Code §§ 1791.2 and 1793.2, as described above.

520.    Federal law requires manufacturers of light-duty vehicles to provide two federal emission control warranties: a "Performance Warranty" and a "Design and Defect Warranty." The Performance Warranty applies to repairs that are required during the first two years or 24,000 miles, whichever occurs first, when a vehicle fails an emissions test. Under this warranty, certain major emission control components are covered for the first eight years or 80,000 miles, whichever comes first. These major emission control components subject to the longer warranty include the catalytic converters, the electronic engine control unit (ECU), and the onboard emissions diagnostic device or computer. The Design and Defect Warranty covers repair of emission control or emission related parts which fail to function or function improperly due to a defect in materials or workmanship. This warranty provides protection for two years or 24,000 miles, whichever comes first, or, for the major emission control components, for eight years or 80,000 miles, whichever comes first.

521.    Fiat and FCA provided these warranties to Plaintiffs. These warranties formed the basis of the bargain that was reached when Plaintiffs purchased or leased their Subject Vehicles.

522.    However, Fiat and FCA knew or should have known that the warranties were false and/or misleading. Fiat and FCA were aware that the emissions systems in the Subject Vehicles sold and leased to Plaintiffs were designed to deactivate under real-world driving conditions, and to emit oxides of nitrogen within legal limits only when undergoing emissions testing, and therefore, knew that the emission systems contained defects.

523.    Plaintiffs reasonably relied on Fiat's and FCA's express warranties concerning emissions when purchasing or leasing the Subject Vehicles. However, the Subject Vehicles did not perform as warranted. Unbeknownst to Plaintiffs, the Subject Vehicles were designed to

pollute at higher than legal limits during normal driving, and could not achieve advertised performance and efficiency metrics without this cheating design. This design and the devices that effectuate it are defects. Fiat and FCA therefore breached their express warranty by providing a product containing defects that were never disclosed to Plaintiffs.

524.     Any opportunity to cure the express breach is unnecessary and futile.

525.     As a direct and proximate result of Fiat's and FCA's breach of express warranties, Plaintiffs suffered significant damages, and seek damages in an amount to be determined at trial.

526.     Pursuant to Cal. Civ. Code §§ 1793.2 and 1794, CA Plaintiffs seek an order enjoining Defendants' unfair and/or deceptive acts or practices, damages, punitive damages, and any other just and proper relief available under the Song-Beverly Consumer Warranty Act.

## VIOLATIONS OF SONG-BEVERLY CONSUMER WARRANTY ACT FOR BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY
### (Cal. Civ. Code §§ 1791.1 and 1792)

527.     Plaintiffs reallege and incorporate by reference all preceding allegations as though fully set forth herein.

528.     Plaintiffs, to be named at a later date, (for the purpose of this section, "Plaintiffs") bring this action on behalf of themselves against Fiat and FCA.

529.     Plaintiffs who purchased or leased the Subject Vehicles in California are "buyers" within the meaning of Cal. Civ. Code § 1791(b).

530.     The Subject Vehicles are "consumer goods" within the meaning of Cal. Civ. Code § 1791(a).

531.     Fiat Chrysler is a "manufacturer" of the Subject Vehicles within the meaning of Cal. Civ. Code § 1791(j).

532.     Fiat Chrysler impliedly warranted to Plaintiffs that its Subject Vehicles were

"merchantable" within the meaning of Cal. Civ. Code §§ 1791.1(a) and 1792, however, the Subject Vehicles do not have the quality that a buyer would reasonably expect.

533.    Cal. Civ. Code § 1791.1(a) states: "Implied warranty of merchantability" or "implied warranty that goods are merchantable" means that the consumer goods meet each of the following:

A.    Pass without objection in the trade under the contract description.

B.    Are fit for the ordinary purposes for which such goods are used.

C.    Are adequately contained, packaged, and labeled.

D.    Conform to the promises or affirmations of fact made on the container or label.

534.    The Subject Vehicles would not pass without objection in the automotive trade because of the defects in the Subject Vehicles' "clean" diesel engine system. Because of the defects in the Subject Vehicles' EcoDiesel® engine systems, they are not in merchantable condition and thus not fit for ordinary purposes.

535.    The Subject Vehicles are not adequately labeled because the labeling fails to disclose the defects in the Subject Vehicles' diesel engine system. The Subject Vehicles do not conform to the promises and affirmations made by Fiat Chrysler.

536.    Fiat Chrysler's breach of the implied warranty of merchantability caused damage to Plaintiffs who purchased or leased the defective vehicles. The amount of damages due will be proven at trial.

537.    Pursuant to Cal. Civ. Code §§ 1791.1(d) and 1794, Plaintiffs seek an order enjoining Defendants' unfair and/or deceptive acts or practices, damages, punitive damages, and

any other just and proper relief available under the Song-Beverly Consumer Warranty Act.

## BREACH OF EXPRESS CALIFORNIA EMISSIONS WARRANTIES
### (Cal. Civ. Code § 1793.2, *et seq.*)

538.    Plaintiffs reallege and incorporate by reference all preceding allegations as though fully set forth herein.

539.    Plaintiffs, to be named at a later date, (for the purpose of this section, "Plaintiffs") bring this action on behalf of themselves against Fiat and FCA.

540.    Each Subject Vehicle is covered by express California Emissions Warranties as a matter of law. *See* Cal. Health & Safety Code § 43205; Cal. Code Regs. tit. 13, § 2037.

541.    The express California Emissions Warranties generally provide "that the vehicle or engine is…[d]esigned, built, and equipped so as to conform with all applicable regulations adopted by the Air Resources Board." This provision applies without any time or mileage limitation.

542.    The California Emissions Warranties also specifically warrant Plaintiffs against any performance failure of the emissions control system for three years or 50,000 miles, whichever occurs first, and against any defect in any emission-related part for seven years or 70,000 miles, whichever occurs first.

543.    California law imposes express duties "on the manufacturer of consumer goods sold in this state and for which the manufacturer has made an express warranty." Cal. Civ. Code § 1793.2.

544.    Among those duties, "[i]f the manufacturer or its representative in this state is unable to service or repair a new motor vehicle…to conform to the applicable express warranties

after a reasonable number of attempts, the manufacturer shall either promptly replace the new motor vehicle or promptly make restitution to the buyer" at the vehicle owner's option. *See* Cal. Civ. Code § 1793.2(d)(2).

545.     Plaintiffs are excused from the requirement to "deliver nonconforming goods to the manufacturer's service and repair facility within this state" because Fiat Chrysler is refusing to accept them and delivery of the California Vehicles "cannot reasonably be accomplished." Cal. Civ. Code § 1793.2(c).

546.     This complaint is written notice of nonconformity to Defendants and "shall constitute return of the goods." *Id.*

547.     In addition to all other damages and remedies, Plaintiffs are entitled to "recover a civil penalty of up to two times the amount of damages" for the aforementioned violation. *See* Cal. Civ. Code § 1794(e)(1). Any "third-party dispute resolution process" offered by Defendants does not relieve Defendants from the civil penalty imposed because Defendants are not offering the process to Plaintiffs for resolution of these California Emissions Warranties issues and the process is not "substantially" compliant. *See* Cal. Civ. Code 2 § 1794(e)(2); Cal. Civ. Code § 1793.22(d); 16 C.F.R. § 703.2.

**6.     Colorado**

**BREACH OF EXPRESS WARRANTY**
**(Colo. Rev. Stat. §§ 4-2-313 and 4-2.5-210)**

548.     Plaintiffs reallege and incorporate by reference all preceding allegations as though fully set forth herein.

549.     Plaintiffs, Bryan Schneider, Milburn Markle, Carlos Garcia, Klayton Costanzo,

Klayton Costanzo, Marcus Spencer, Christopher Harper, Eric Croke, (for the purpose of this section, "Plaintiffs") bring this action on behalf of themselves against Fiat and FCA.

550.    Fiat and FCA are and were at all relevant times "merchants" with respect to motor vehicles under Colo. Rev. Stat. §§ 4-2-104(1) and 4-2.5-103(3), and "sellers" of motor vehicles under § 4-2-103(1)(d).

551.    With respect to leases, Fiat and FCA are and were all relevant times "lessors" of motor vehicles under Colo. Rev. Stat. § 4-2.5-103(1)(p).

552.    The Subject Vehicles are and were at all relevant times "goods" within the meaning of Colo. Rev. Stat. §§ 4-2-105(1) and 4-2.5-103(1)(h).

553.    Federal law requires manufacturers of light-duty vehicles to provide two federal emission control warranties: a "Performance Warranty" and a "Design and Defect Warranty." The Performance Warranty applies to repairs that are required during the first two years or 24,000 miles, whichever occurs first, when a vehicle fails an emissions test. Under this warranty, certain major emission control components are covered for the first eight years or 80,000 miles, whichever comes first. These major emission control components subject to the longer warranty include the catalytic converters, the electronic engine control unit (ECU), and the onboard emissions diagnostic device or computer. The Design and Defect Warranty covers repair of emission or emission related parts which fail to function or function improperly due to a defect in materials or workmanship. This warranty provides protection for two years or 24,000 miles, whichever comes first, or, for the major emission control components, for eight years or 80,000 miles, whichever comes first.

554.    Fiat and FCA provided these warranties to Plaintiffs. These warranties formed the basis of the bargain that was reached when Plaintiffs purchased or leased their Subject Vehicles.

555.     However, Fiat and FCA knew or should have known that the warranties were false and/or misleading. Fiat and FCA were aware that the emissions systems in the Subject Vehicles sold and leased to Plaintiffs were designed to deactivate under real- world driving conditions, and to emit oxides of nitrogen within legal limits only when undergoing emissions testing, and therefore, knew that the emission systems contained defects.

556.     Plaintiffs reasonably relied on Fiat's and FCA's express warranties concerning emissions when purchasing or leasing the Subject Vehicles. However, the Subject Vehicles did not perform as warranted. Unbeknownst to Plaintiffs, the Subject Vehicles were designed to pollute at higher than legal limits during normal driving, and could not achieve advertised performance and efficiency metrics without this cheating design. This design and the devices that effectuate it are defects. Fiat and FCA therefore breached their express warranty by providing a product containing defects that were never disclosed to Plaintiffs.

557.     Any opportunity to cure the express breach is unnecessary and futile.

558.     As a direct and proximate result of Fiat's and FCA's breach of express warranties, Plaintiffs suffered significant damages, and seek damages in an amount to be determined at trial.

## BREACH OF THE IMPLIED WARRANTY OF MERCHANTABILITY
### (Colo. Rev. Stat. §§ 4-2-313 and 4-2.5-212)

559.     Plaintiffs reallege and incorporate by reference all allegations of the preceding paragraphs as though fully set forth herein.

560.     Plaintiffs, Bryan Schneider, Milburn Markle, Carlos Garcia, Klayton Costanzo, Klayton Costanzo, Marcus Spencer, Christopher Harper, Eric Croke, (for the purpose of this section, "Plaintiffs") bring this action on behalf of themselves against Fiat and FCA.

561.     Fiat and FCA were at all relevant times "merchants" with respect to motor vehicles under Colo. Rev. Stat. §§ 4-2-104(1) and 4-2.5-103(3), and "sellers" of motor vehicles under § 4-

2-103(1)(d).

562.     With respect to leases, Fiat and FCA are and were at all relevant times "lessors" of motor vehicles under Colo. Rev. Stat. § 4-2.5-103(1)(p).

563.     The Subject Vehicles are and were at all relevant times "goods" within the meaning of Colo. Rev. Stat. §§ 4-2-105(1) and 4-2.5-103(1)(h).

564.     A warranty that the Subject Vehicles were in merchantable condition and fit for the ordinary purpose for which vehicles are used is implied by law pursuant to Colo. Rev. Stat. §§ 4-2-313 and 4-2.5-212.

565.     Fiat and FCA sold and/or leased Subject Vehicles that were not in merchantable condition and/or fit for their ordinary purpose in violation of the implied warranty. The Subject Vehicles were not in merchantable condition because their design violated state and federal laws. The Subject Vehicles were not fit for their ordinary purpose as they were built to evade state and federal emission standards.

566.     Fiat's and FCA's breaches of the implied warranty of merchantability caused damage to the Plaintiffs. The amount of damages due will be proven at trial.

**7.     <u>Connecticut</u>**

**BREACH OF EXPRESS WARRANTY**
**(Conn. Gen. Stat. Ann. § 42A-2-313)**

567.     Plaintiffs reallege and incorporate by reference all preceding allegations as though fully set forth herein.

568.     Plaintiffs, to be named at a later date, (for the purpose of this section, "Plaintiff") brings this action on behalf of themselves against Fiat and FCA.

569.     Fiat and FCA are and were at all relevant times "merchants" with respect to motor

vehicles under Conn. Gen. Stat. Ann. § 42a-2-104(1).

570.    Federal law requires manufacturers of light-duty vehicles to provide two federal emission control warranties: a "Performance Warranty" and a "Design and Defect Warranty." The Performance Warranty applies to repairs that are required during the first two years or 24,000 miles, whichever occurs first, when a vehicle fails an emissions test. Under this warranty, certain major emission control components are covered for the first eight years or 80,000 miles, whichever comes first. These major emission control components subject to the longer warranty include the catalytic converters, the electronic engine control unit (ECU), and the onboard emissions diagnostic device or computer. The Design and Defect Warranty covers repair of emission control or emission related parts which fail to function or function improperly due to a defect in materials or workmanship. This warranty provides protection for two years or 24,000 miles, whichever comes first, or, for the major emission control components, for eight years or 80,000 miles, whichever comes first.

571.    Fiat and FCA provided these warranties to Plaintiff. These warranties formed the basis of the bargain that was reached when Plaintiff purchased or leased their Subject Vehicles.

572.    However, Fiat and FCA knew or should have known that the warranties were false and/or misleading. Fiat and FCA were aware that the emissions systems in the Subject Vehicles sold and leased to Plaintiff were designed to deactivate under real-world driving conditions, and to emit oxides of nitrogen within legal limits only when undergoing emissions testing, and therefore, knew that the emission systems contained defects.

573.    Plaintiff reasonably relied on Fiat's and FCA's express warranties concerning emissions when purchasing or leasing the Subject Vehicles. However, the Subject Vehicles did

not perform as warranted. Unbeknownst to Plaintiff, the Subject Vehicles were designed to pollute at higher than legal limits during normal driving, and could not achieve advertised performance and efficiency metrics without this cheating design. This design and the devices that effectuate it are defects. Fiat and FCA therefore breached their express warranty by providing a product containing defects that were never disclosed to Plaintiffs.

574.   Any opportunity to cure the express breach is unnecessary and futile.

575.   Due to Fiat and FCA's breach of warranty as set forth herein, Plaintiff assert as an additional and/or alternative remedy, as set forth in Conn. Gen. Stat. Ann. § 42a-2-711, for a revocation of acceptance of the goods and for a return to Plaintiff of the purchase price of all Subject Vehicles currently owned or leased, and for such other incidental and consequential damages as allowed under Conn. Gen. Stat. Ann. §§ 42a-2-711 and 42a-2-608.

576.   As a direct and proximate result of Fiat's and FCA's breach of express warranties, Plaintiff suffered significant damages, and seek damages in an amount to be determined at trial.

## BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY
### (Conn. Gen. Stat. Ann. § 42A-2-314)

577.   Plaintiffs reallege and incorporate by reference all allegations of the preceding paragraphs as though fully set forth herein.

578.   Plaintiffs, Christopher Barbour, (for the purpose of this section, "Plaintiff") brings this action on behalf of themselves against Fiat and FCA.

579.   Fiat and FCA were at all relevant times "merchants" with respect to motor vehicles under Conn. Gen. Stat. Ann. § 42a-2-104(1).

580.    A warranty that the Subject Vehicles were in merchantable condition and fit for the ordinary purpose for which vehicles are used is implied by law pursuant to Conn. Gen. Stat. Ann. § 42a-2-314.

581.    Fiat and FCA sold and/or leased Subject Vehicles that were not in merchantable condition and/or fit for their ordinary purpose in violation of the implied warranty. The Subject Vehicles were not in merchantable condition because their design violated state and federal laws. The Subject Vehicles were not fit for their ordinary purpose as they were built to evade state and federal emission standards.

582.    Fiat's and FCA's breaches of the implied warranty of merchantability caused damage to the Plaintiff. The amount of damages due will be proven at trial.

### 8.    Delaware

**BREACH OF EXPRESS WARRANTY**
**(6 Del. Code §§ 2-313 and 2A-210)**

583.    Plaintiffs reallege and incorporate by reference all preceding allegations as though fully set forth herein.

584.    Plaintiff, to be named at a later date, (for the purpose of this section, "Plaintiff") brings this action on behalf of themselves against Fiat and FCA.

585.    Fiat and FCA are and were at all relevant times "merchants" with respect to motor vehicles under 6 Del. C. §§ 2-104(1) and 2A-103(3), and "sellers" of motor vehicles under § 2-103(1)(d).

586.    With respect to leases, Fiat and FCA are and were all relevant times "lessors" of motor vehicles under 6 Del. C. § 2A-103(1)(p).

587.    The Subject Vehicles are and were at all relevant times "goods" within the meaning

of 6 Del. C. §§ 2-105(1) and 2A-103(1)(h).

588.    Federal law requires manufacturers of light-duty vehicles to provide two federal emission control warranties: a "Performance Warranty" and a "Design and Defect Warranty." The Performance Warranty applies to repairs that are required during the first two years or 24,000 miles, whichever occurs first, when a vehicle fails an emissions test. Under this warranty, certain major emission control components are covered for the first eight years or 80,000 miles, whichever comes first. These major emission control components subject to the longer warranty include the catalytic converters, the electronic engine control unit (ECU), and the onboard emissions diagnostic device or computer. The Design and Defect Warranty covers repair of emission control or emission related parts which fail to function or function improperly due to a defect in materials or workmanship. This warranty provides protection for two years or 24,000 miles, whichever comes first, or, for the major emission control components, for eight years or 80,000 miles, whichever comes first.

589.    Fiat and FCA provided these warranties to the Plaintiffs. These warranties formed the basis of the bargain that was reached when the Plaintiffs purchased or leased their Subject Vehicles.

590.    However, Fiat and FCA knew or should have known that the warranties were false and/or misleading. Fiat and FCA were aware that the emissions systems in the Subject Vehicles sold and leased to the Plaintiffs were designed to deactivate under real-world driving conditions, and to emit oxides of nitrogen within legal limits only when undergoing emissions testing, and therefore, knew that the emission systems contained defects.

591.    The Plaintiffs reasonably relied on Fiat's and FCA's express warranties concerning emissions when purchasing or leasing the Subject Vehicles. However, the Subject Vehicles did not

perform as warranted. Unbeknownst to the Plaintiffs, the Subject Vehicles were designed to pollute at higher than legal limits during normal driving, and could not achieve advertised performance and efficiency metrics without this cheating design. This design and the devices that effectuate it are defects. Fiat and FCA therefore breached their express warranty by providing a product containing defects that were never disclosed to the Plaintiffs.

592.    Any opportunity to cure the express breach is unnecessary and futile.

593.    As a direct and proximate result of Fiat's and FCA's breach of express warranties, the Plaintiffs suffered significant damages, and seek damages in an amount to be determined at trial.

## BREACH OF THE IMPLIED WARRANTY OF MERCHANTABILITY
### (6 Del. Code §§ 2-314 and 2A-212)

594.    Plaintiffs reallege and incorporate by reference all allegations of the preceding paragraphs as though fully set forth herein.

595.    Plaintiff, to be named at a later date, (for the purpose of this section, "Plaintiff") brings this action on behalf of themselves against Fiat and FCA.

596.    Fiat and FCA were at all relevant times "merchants" with respect to motor vehicles under 6 Del. C. §§ 2-104(1) and 2A-103(3), and "sellers" of motor vehicles under § 2-103(1)(d).

597.    With respect to leases, Fiat and FCA are and were at all relevant times "lessors" of motor vehicles under 6 Del. C. § 2A-103(1)(p).

598.    The Subject Vehicles are and were at all relevant times "goods" within the meaning of 6 Del. C. §§ 2-105(1) and 2A-103(1)(h).

599.    A warranty that the Subject Vehicles were in merchantable condition and fit for the

ordinary purpose for which vehicles are used is implied by law pursuant to 6 Del. C. §§ 2-314 and 2A-212.

600.    Fiat and FCA sold and/or leased Subject Vehicles that were not in merchantable condition and/or fit for their ordinary purpose in violation of the implied warranty. The Subject Vehicles were not in merchantable condition because their design violated state and federal laws. The Subject Vehicles were not fit for their ordinary purpose as they were built to evade state and federal emission standards.

601.    Fiat's and FCA's breaches of the implied warranty of merchantability caused damage to the Plaintiffs. The amount of damages due will be proven at trial.

### 9.    District of Columbia

**BREACH OF EXPRESS WARRANTY**
**(D.C. Code §§ 28:2-313 and 28:2A-210)**

602.    Plaintiffs reallege and incorporate by reference all preceding allegations as though fully set forth herein.

603.    This count is brought on behalf of the District of Columbia Plaintiffs against Fiat and FCA.

604.    Fiat and FCA are ad were at all relevant times "merchants: with respect to motor vehicles under D.C. Code §§ 28:2-104(1) and 28:2A-103(a)(20), and "sellers" of motor vehicles under § 28:2-103(1)(d).

605.    With respect to leases, Fiat and FCA are and were all relevant times "lessors" of motor vehicles under D.C. Code § 28:2A-103(a)(16).

606.    The Subject Vehicles are and were at all relevant times "goods" within the meaning of D.C. Code §§ 28:2-105(1) and 28:2A-103(a)(8).

607.    Federal law requires manufacturers of light-duty vehicles to provide two federal emission control warranties: a "Performance Warranty" and a "Design and Defect Warranty." The Performance Warranty applies to repairs that are required during the first two years or 24,000 miles, whichever occurs first, when a vehicle fails an emissions test. Under this warranty, certain major emission control components are covered for the first eight years or 80,000 miles, whichever comes first. These major emission control components subject to the longer warranty include the catalytic converters, the electronic engine control unit (ECU), and the onboard emissions diagnostic device or computer. The Design and Defect Warranty covers repair of emission control or emission related parts which fail to function or function improperly due to a defect in materials or workmanship. This warranty provides protection for two years or 24,000 miles, whichever comes first, or, for the major emission control components, for eight years or 80,000 miles, whichever comes first.

608.    Fiat and FCA provided these warranties to the District of Columbia Plaintiffs. These warranties formed the basis of the bargain that was reached when the District of Columbia Plaintiffs purchased or leased their Subject Vehicles.

609.    However, Fiat and FCA knew or should have known that the warranties were false and/or misleading. Fiat and FCA were aware that the emissions systems in the Subject Vehicles sold and leased to the District of Columbia were designed to deactivate under real-world driving conditions, and to emit oxides of nitrogen within legal limits only when undergoing emissions testing, and therefore, knew that the emission systems contained defects.

610.    The District of Columbia Plaintiffs reasonably relied on Fiat's and FCA's express warranties concerning emissions when purchasing or leasing the Subject Vehicles. However, the Subject Vehicles did not perform as warranted. Unbeknownst to the District of Columbia

Plaintiffs, the Subject Vehicles were designed to pollute at higher than legal limits during normal driving, and could not achieve advertised performance and efficiency metrics without this cheating design. This design and the devices that effectuate it are defects. Fiat and FCA therefore breached their express warranty by providing a product containing defects that were never disclosed to the District of Columbia Plaintiffs.

611.    Any opportunity to cure the express breach is unnecessary and futile.

612.    As a direct and proximate result of Fiat's and FCA's breach of express warranties, the District of Columbia Plaintiffs suffered significant damages, and seek damages in an amount to be determined at trial.

## BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY
### (D.C. Code §§ 28:2-314 and 28:2A-212)

613.    Plaintiffs reallege and incorporate by reference all allegations of the preceding paragraphs as though fully set forth herein.

614.    This count is brought on behalf of the District of Columbia Plaintiffs against Fiat and FCA.

615.    Fiat and FCA were at all relevant times "merchants" with respect to motor vehicles under D.C. Code §§ 28:2-104(1) and 28:2A-103(a)(20), and "sellers" of motor vehicles under § 28:2-103(1)(d).

616.    With respect to leases, Fiat and FCA are and were at all relevant times "lessors" of motor vehicles under D.C. Code § 28:2A-103(a)(16).

617.    The Subject Vehicles are and were at all relevant times "goods" within the meaning of D.C. Code §§ 28:2-105(1) and 28:2A-103(a)(8).

618.    A warranty that the Subject Vehicles were in merchantable condition and fit for the ordinary purpose for which vehicles are used is implied by law pursuant to D.C. Code §§ 28:2-

314 and 28:2A-212.

619.    Fiat and FCA sold and/or leased Subject Vehicles that were not in merchantable condition and/or fit for their ordinary purpose in violation of the implied warranty. The Subject Vehicles were not in merchantable condition because their design violated state and federal laws. The Subject Vehicles were not fit for their ordinary purpose as they were built to evade state and federal emission standards.

620.    Fiat's and FCA's breaches of the implied warranty of merchantability caused damage to the District of Columbia Plaintiffs. The amount of damages due will be proven at trial.

**10.    <u>Florida</u>**

**BREACH OF EXPRESS WARRANTY**
**(Fla. Stat. §§ 672.313 and 680.21)**

621.    Plaintiffs reallege and incorporate by reference all preceding allegations as though fully set forth herein.

622.    Plaintiffs, Shane Filipovic, Isreal Cantu, Rejean Fecteau, Edwin and Carmen Rivera, Chase Mintrone, Hector Vldes d/b/a Infinity Enterprises, Thomas Joseph Cummins, III, Chuck Six, Craig Faircloth, Tia Shubert, Matthew Trainor, (for the purpose of this section, "Plaintiffs") bring this action on behalf of themselves against Fiat and FCA.

623.    Fiat and FCA are and were at all relevant times "merchants" with respect to motor vehicles under Fla. Stat. §§ 672.104(1) and 680.1031(3)(k), and "sellers" of motor vehicles under § 672.103(1)(d).

624.    With respect to leases, Fiat and FCA are and were all relevant times "lessors" of motor vehicles under Fla. Stat. § 680.1031(1)(p).

625.    The Subject Vehicles are and were at all relevant times "goods" within the meaning of Fla. Stat. §§ 672.105(1) and 680.1031(1)(h).

626.    Federal law requires manufacturers of light-duty vehicles to provide two federal

275

emission control warranties: a "Performance Warranty" and a "Design and Defect Warranty." The Performance Warranty applies to repairs that are required during the first two years or 24,000 miles, whichever occurs first, when a vehicle fails an emissions test. Under this warranty, certain major emission control components are covered for the first eight years or 80,000 miles, whichever comes first. These major emission control components subject to the longer warranty include the catalytic converters, the electronic engine control unit (ECU), and the onboard emissions diagnostic device or computer. The Design and Defect Warranty covers repair of emission control or emission related parts which fail to function or function improperly due to a defect in materials or workmanship. This warranty provides protection for two years or 24,000 miles, whichever comes first, or, for the major emission control components, for eight years or 80,000 miles, whichever comes first.

627.    Fiat and FCA provided these warranties to Plaintiffs. These warranties formed the basis of the bargain that was reached when Plaintiffs purchased or leased their Subject Vehicles.

628.    However, Fiat and FCA knew or should have known that the warranties were false and/or misleading. Fiat and FCA were aware that the emissions systems in the Subject Vehicles sold and leased to Plaintiffs were designed to deactivate under real-world driving conditions, and to emit oxides of nitrogen within legal limits only when undergoing emissions testing, and therefore, knew that the emission systems contained defects.

629.    Plaintiffs reasonably relied on Fiat's and FCA's express warranties concerning emissions when purchasing or leasing the Subject Vehicles. However, the Subject Vehicles did not perform as warranted. Unbeknownst to Plaintiffs, the Subject Vehicles were designed to pollute at higher than legal limits during normal driving, and could not achieve advertised performance and efficiency metrics without this cheating design. This design and the devices that

effectuate it are defects. Fiat and FCA therefore breached their express warranty by providing a product containing defects that were never disclosed to Plaintiffs.

630.     Any opportunity to cure the express breach is unnecessary and futile.

631.     As a direct and proximate result of Fiat's and FCA's breach of express warranties, Plaintiffs suffered significant damages, and seek damages in an amount to be determined at trial.

### BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY
### (Fla. Stat. §§ 672.314 and 680.212)

632.     Plaintiffs reallege and incorporate by reference all allegations of the preceding paragraphs as though fully set forth herein.

633.     Plaintiffs, Shane Filipovic, Isreal Cantu, Rejean Fecteau, Edwin and Carmen Rivera, Chase Mintrone, Hector Vldes d/b/a Infinity Enterprises, Thomas Joseph Cummins, III, Chuck Six, Craig Faircloth, Tia Shubert, Matthew Trainor, (for the purpose of this section, "Plaintiffs") bring this action on behalf of themselves against Fiat and FCA.

634.     Fiat and FCA were at all relevant times "merchants" with respect to motor vehicles under Fla. Stat. §§ 672.104(1) and 680.1031(3)(k), and "sellers" of motor vehicles under § 672.103(1)(d).

635.     With respect to leases, Fiat and FCA are and were at all relevant times "lessors" of motor vehicles under Fla. Stat. § 680.1031(1)(p).

636.     The Subject Vehicles are and were at all relevant times "goods" within the meaning of Fla. Stat. §§ 672.105(1) and 680.1031(1)(h).

637.     A warranty that the Subject Vehicles were in merchantable condition and fit for the ordinary purpose for which vehicles are used is implied by law pursuant to Fla. Stat. §§ 672.314 and 680.212.

638.     Fiat and FCA sold and/or leased Subject Vehicles that were not in merchantable

condition and/or fit for their ordinary purpose in violation of the implied warranty. The Subject Vehicles were not in merchantable condition because their design violated state and federal laws. The Subject Vehicles were not fit for their ordinary purpose as they were built to evade state and federal emission standards.

639. Fiat's and FCA's breaches of the implied warranty of merchantability caused damage to the Plaintiffs. The amount of damages due will be proven at trial.

### 11. Georgia

### BREACH OF EXPRESS WARRANTY
### (Ga. Code. Ann. §§ 11-2-313 and 11-2A-210)

640. Plaintiffs reallege and incorporate by reference all preceding allegations as though fully set forth herein.

641. Plaintiffs, Dakota J. Ethriedge, James Greene, Brad Scott, Brian Schmidt, (for the purpose of this section, "Plaintiffs") bring this action on behalf of themselves against Fiat and FCA.

642. Fiat and FCA are and were at all relevant times "merchants" with respect to motor vehicles under Ga. Code Ann. §§ 11-2-104(1) and 11-2A-103(3), and "sellers" of motor vehicles 5 under § 11-2-103(1)(d).

643. With respect to leases, Fiat and FCA are and were all relevant times "lessors" of motor vehicles under Ga. Code Ann. § 11-2A-103(1)(p).

644. The Subject Vehicles are and were at all relevant times "goods" within the meaning of Ga. Code Ann. §§ 11-2-105(1) and 11-2A-103(1)(h).

645.    Federal law requires manufacturers of light-duty vehicles to provide two federal emission control warranties: a "Performance Warranty" and a "Design and Defect Warranty." The Performance Warranty applies to repairs that are required during the first two years or 24,000 miles, whichever occurs first, when a vehicle fails an emissions test. Under this warranty, certain major emission control components are covered for the first eight years or 80,000 miles, whichever comes first. These major emission control components subject to the longer warranty include the catalytic converters, the electronic engine control unit (ECU), and the onboard emissions diagnostic device or computer. The Design and Defect Warranty covers repair of emission control or emission related parts which fail to function or function improperly due to a defect in materials or workmanship. This warranty provides protection for two years or 24,000 miles, whichever comes first, or, for the major emission control components, for eight years or 80,000 miles, whichever comes first.

646.    Fiat and FCA provided these warranties to Plaintiffs. These warranties formed the basis of the bargain that was reached when Plaintiffs purchased or leased their Subject Vehicles.

647.    However, Fiat and FCA knew or should have known that the warranties were false and/or misleading. Fiat and FCA were aware that the emissions systems in the Subject Vehicles sold and leased to Plaintiffs were designed to deactivate under real-world driving conditions, and to emit oxides of nitrogen within legal limits only when undergoing emissions testing, and therefore, knew that the emission systems contained defects.

648.    Plaintiffs reasonably relied on Fiat's and FCA's express warranties concerning emissions when purchasing or leasing the Subject Vehicles. However, the Subject Vehicles did not perform as warranted. Unbeknownst to Plaintiffs, the Subject Vehicles were designed to

pollute at higher than legal limits during normal driving, and could not achieve advertised performance and efficiency metrics without this cheating design. This design and the devices that effectuate it are defects. Fiat and FCA therefore breached their express warranty by providing a product containing defects that were never disclosed to Plaintiffs.

649.    Any opportunity to cure the express breach is unnecessary and futile.

650.    As a direct and proximate result of Fiat's and FCA's breach of express warranties, Plaintiffs suffered significant damages, and seek damages in an amount to be determined at trial.

## BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY
### (Ga. Code. Ann. §§ 11-2-314 and 11-2A-212)

651.    Plaintiffs reallege and incorporate by reference all allegations of the preceding paragraphs as though fully set forth herein.

652.    Plaintiffs, Dakota J. Ethriedge, James Greene, Brad Scott, Brian Schmidt, (for the purpose of this section, "Plaintiffs") bring this action on behalf of themselves against Fiat and FCA.

653.    Fiat and FCA were at all relevant times "merchants" with respect to motor vehicles under Ga. Code Ann. §§ 11-2-104(1) and 11-2A-103(3), and "sellers" of motor vehicles under § 11-2-103(1)(d).

654.    With respect to leases, Fiat and FCA are and were at all relevant times "lessors" of motor vehicles under Ga. Code Ann. § 11-2A-103(1)(p).

655.    The Subject Vehicles are and were at all relevant times "goods" within the meaning of Ga. Code Ann. §§ 11-2-105(1) and 11-2A-103(1)(h).

656.    A warranty that the Subject Vehicles were in merchantable condition and fit for the ordinary purpose for which vehicles are used is implied by law pursuant to Ga. Code Ann. §§ 11-

2-314 and 11-2A-212.

657.    Fiat and FCA sold and/or leased Subject Vehicles that were not in merchantable condition and/or fit for their ordinary purpose in violation of the implied warranty. The Subject Vehicles were not in merchantable condition because their design violated state and federal laws. The Subject Vehicles were not fit for their ordinary purpose as they were built to evade state and federal emission standards.

658.    Fiat's and FCA's breaches of the implied warranty of merchantability caused damage to the Plaintiffs. The amount of damages due will be proven at trial.

### 12.    <u>Hawaii</u>

### BREACH OF EXPRESS WARRANTY
### (Haw. Rev. Stat. §§ 490:2-313 and 490:2A-210)

659.    Plaintiffs reallege and incorporate by reference all preceding allegations as though fully set forth herein.

660.    Plaintiffs, to be named at a later date, (for the purpose of this section, "Plaintiffs") bring this action on behalf of themselves against Fiat and FCA.

661.    Fiat and FCA are and were at all relevant times "merchants" with respect to motor vehicles under Haw. Rev. Stat. §§ 490:2-104(1) and 490:2A-103(b), and "sellers" of motor vehicles under § 490:2-103(1)(d).

662.    With respect to leases, Fiat and FCA are and were all relevant times "lessors" of motor vehicles under Haw. Rev. Stat. § 490:2A-103(a)(16).

663.    The Subject Vehicles are and were at all relevant times "goods" within the meaning of Haw. Rev. Stat. §§ 490:2-105(1) and 490:2A-103(a)(8).

664.    Federal law requires manufacturers of light-duty vehicles to provide two federal emission control warranties: a "Performance Warranty" and a "Design and Defect Warranty." The

Performance Warranty applies to repairs that are required during the first two years or 24,000 miles, whichever occurs first, when a vehicle fails an emissions test. Under this warranty, certain major emission control components are covered for the first eight years or 80,000 miles, whichever comes first. These major emission control components subject to the longer warranty include the catalytic converters, the electronic engine control unit (ECU), and the onboard emissions diagnostic device or computer. The Design and Defect Warranty covers repair of emission control or emission related parts which fail to function or function improperly due to a defect in materials or workmanship. This warranty provides protection for two years or 24,000 miles, whichever comes first, or, for the major emission control components, for eight years or 80,000 miles, whichever comes first.

665.    Fiat and FCA provided these warranties to the Plaintiffs. These warranties formed the basis of the bargain that was reached when the Plaintiffs purchased or leased their Subject Vehicles.

666.    However, Fiat and FCA knew or should have known that the warranties were false and/or misleading. Fiat and FCA were aware that the emissions systems in the Subject Vehicles sold and leased to the Plaintiffs were designed to deactivate under real-world driving conditions, and to emit oxides of nitrogen within legal limits only when undergoing emissions testing, and therefore, knew that the emission systems contained defects.

667.    The Plaintiffs reasonably relied on Fiat's and FCA's express warranties concerning emissions when purchasing or leasing the Subject Vehicles. However, the Subject Vehicles did not perform as warranted. Unbeknownst to the Plaintiffs, the Subject Vehicles were designed to pollute at higher than legal limits during normal driving, and could not achieve advertised performance and efficiency metrics without this cheating design. This design and the devices that effectuate it

are defects. Fiat and FCA therefore breached their express warranty by providing a product containing defects that were never disclosed to the Plaintiffs.

668.    Any opportunity to cure the express breach is unnecessary and futile.

669.    As a direct and proximate result of Fiat's and FCA's breach of express warranties, the Plaintiffs suffered significant damages, and seek damages in an amount to be determined at trial.

## BREACH OF THE IMPLIED
## WARRANTY OF MERCHANTABILITY
### (Haw. Rev. Stat. §§ 490:2-314 and 490:2A-212)

670.    Plaintiffs reallege and incorporate by reference all allegations of the preceding paragraphs as though fully set forth herein.

671.    Plaintiffs, to be named at a later date, (for the purpose of this section, "Plaintiffs") bring this action on behalf of themselves against Fiat and FCA.

672.    Fiat and FCA were at all relevant times "merchants" with respect to motor vehicles under Haw. Rev. Stat. §§ 490:2-104(1) and 490:2A-103(b), and "sellers" of motor vehicles under § 490:2-103(1)(d).

673.    With respect to leases, Fiat and FCA are and were at all relevant times "lessors" of motor vehicles under Haw. Rev. Stat. § 490:2A-103(a)(16).

674.    The Subject Vehicles are and were at all relevant times "goods" within the meaning of Haw. Rev. Stat. §§ 490:2-105(1) and 490:2A-103(a)(8).

675.    A warranty that the Subject Vehicles were in merchantable condition and fit for the ordinary purpose for which vehicles are used is implied by law pursuant to Haw. Rev. Stat.§§ 490:2-314 and 490:2A-212.

676.    Fiat and FCA sold and/or leased Subject Vehicles that were not in merchantable

condition and/or fit for their ordinary purpose in violation of the implied warranty. The Subject Vehicles were not in merchantable condition because their design violated state and federal laws. The Subject Vehicles were not fit for their ordinary purpose as they were built to evade state and federal emission standards.

677.     Fiat's and FCA's breaches of the implied warranty of merchantability caused damage to the Plaintiffs. The amount of damages due will be proven at trial.

### 13.     **Idaho**

### BREACH OF EXPRESS WARRANTY
### (Idaho Code §§ 28-2-313 and 28-12-210)

678.     Plaintiffs reallege and incorporate by reference all preceding allegations as though fully set forth herein.

679.     Plaintiffs, Robert Richardson, Jeffrey Francis Kernan, George Nuesse, (for the purpose of this section, "Plaintiffs") bring this action on behalf of themselves against Fiat and FCA.

680.     Fiat and FCA are and were at all relevant times "merchants" with respect to motor vehicles under Idaho Code §§ 28-2-104(1) and 28-12-103(3), and "sellers" of motor vehicles under § 28-2-103(1)(d).

681.     With respect to leases, Fiat and FCA are and were all relevant times "lessors" of motor vehicles under Idaho Code § 28-12-103(1)(p).

682.     The Subject Vehicles are and were at all relevant times "goods" within the meaning of Idaho Code §§ 28-2-105(1) and 28-12-103(1)(h)).

683.     Federal law requires manufacturers of light-duty vehicles to provide two federal emission control warranties: a "Performance Warranty" and a "Design and Defect Warranty." The

Performance Warranty applies to repairs that are required during the first two years or 24,000 miles, whichever occurs first, when a vehicle fails an emissions test. Under this warranty, certain major emission control components are covered for the first eight years or 80,000 miles, whichever comes first. These major emission control components subject to the longer warranty include the catalytic converters, the electronic engine control unit (ECU), and the onboard emissions diagnostic device or computer. The Design and Defect Warranty covers repair of emission control or emission related parts which fail to function or function improperly due to a defect in materials or workmanship. This warranty provides protection for two years or 24,000 miles, whichever comes first, or, for the major emission control components, for eight years or 80,000 miles, whichever comes first.

684.   Fiat and FCA provided these warranties to Plaintiffs. These warranties formed the basis of the bargain that was reached when Plaintiffs purchased or leased their Subject Vehicles.

685.   However, Fiat and FCA knew or should have known that the warranties were false and/or misleading. Fiat and FCA were aware that the emissions systems in the Subject Vehicles sold and leased to Plaintiffs were designed to deactivate under real-world driving conditions, and to emit oxides of nitrogen within legal limits only when undergoing emissions testing, and therefore, knew that the emission systems contained defects.

686.   Plaintiffs reasonably relied on Fiat's and FCA's express warranties concerning emissions when purchasing or leasing the Subject Vehicles. However, the Subject Vehicles did not perform as warranted. Unbeknownst to Plaintiffs, the Subject Vehicles were designed to pollute at higher than legal limits during normal driving, and could not achieve advertised performance and efficiency metrics without this cheating design. This design and the devices that effectuate it are defects. Fiat and FCA therefore breached their express warranty by providing a product containing

defects that were never disclosed to Plaintiffs.

687.    Any opportunity to cure the express breach is unnecessary and futile.

688.    As a direct and proximate result of Fiat's and FCA's breach of express warranties, Plaintiffs suffered significant damages, and seek damages in an amount to be determined at trial.


## BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY
### (Idaho Code §§ 28-2-314 and 28-12-212)

689.    Plaintiffs reallege and incorporate by reference all allegations of the preceding paragraphs as though fully set forth herein.

690.    Plaintiffs, Robert Richardson, Jeffrey Francis Kernan, George Nuesse, (for the purpose of this section, "Plaintiffs") bring this action on behalf of themselves against Fiat and FCA.

691.    Fiat and FCA were at all relevant times "merchants" with respect to motor vehicles Idaho Code §§ 28-2-104(1) and 28-12-103(3), and "sellers" of motor vehicles under § 28-2-103(1)(d).

692.    With respect to leases, Fiat and FCA are and were at all relevant times "lessors" of motor vehicles under Idaho Code § 28-12-103(1)(p).

693.    The Subject Vehicles are and were at all relevant times "goods" within the meaning of Idaho Code §§ 28-2-105(1) and 28-12-103(1)(h).

694.    A warranty that the Subject Vehicles were in merchantable condition and fit for the ordinary purpose for which vehicles are used is implied by law pursuant Idaho Code §§ 28-2-314

and 28-12-212.

695.     Fiat and FCA sold and/or leased Subject Vehicles that were not in merchantable condition and/or fit for their ordinary purpose in violation of the implied warranty. The Subject Vehicles were not in merchantable condition because their design violated state and federal laws. The Subject Vehicles were not fit for their ordinary purpose as they were built to evade state and federal emission standards.

696.     Fiat's and FCA's breaches of the implied warranty of merchantability caused damage to the Plaintiffs. The amount of damages due will be proven at trial.

### 14.     Illinois

### BREACH OF EXPRESS WARRANTY
### (810 Ill. Comp. Stat. §§ 5/2-313 and 5/2A-210)

697.     Plaintiffs reallege and incorporate by reference all preceding allegations as though fully set forth herein.

698.     Plaintiffs, David McCauley, Steve Rosenthal, Aaron O'Brien, Timothy Kawacin, (for the purpose of this section, "Plaintiff") brings this action on behalf of themselves against Fiat and FCA.

699.     Fiat and FCA are and were at all relevant times "merchants" with respect to motor vehicles under 810 Ill. Comp. Stat. §§ 5/2-104(1) and 5/2A-103(3), and "sellers" of motor vehicles under § 5/2-103(1)(d).

700.     With respect to leases, Fiat and FCA are and were all relevant times "lessors" of motor vehicles under 810 Ill. Comp. Stat. § 5/2A-103(1)(p).

701.     The Subject Vehicles are and were at all relevant times "goods" within the meaning of 810 Ill. Comp. Stat. §§ 5/2-105(1) and 5/2A-103(1)(h).

702.    Federal law requires manufacturers of light-duty vehicles to provide two federal emission control warranties: a "Performance Warranty" and a "Design and Defect Warranty." The Performance Warranty applies to repairs that are required during the first two years or 24,000 miles, whichever occurs first, when a vehicle fails an emissions test. Under this warranty, certain major emission control components are covered for the first eight years or 80,000 miles, whichever comes first. These major emission control components subject to the longer warranty include the catalytic converters, the electronic engine control unit (ECU), and the onboard emissions diagnostic device or computer. The Design and Defect Warranty covers repair of emission control or emission related parts which fail to function or function improperly due to a defect in materials or workmanship. This warranty provides protection for two years or 24,000 miles, whichever comes first, or, for the major emission control components, for eight years or 80,000 miles, whichever comes first.

703.    Fiat and FCA provided these warranties to Plaintiff. These warranties formed the basis of the bargain that was reached when Plaintiff purchased or leased their Subject Vehicles.

704.    However, Fiat and FCA knew or should have known that the warranties were false and/or misleading. Fiat and FCA were aware that the emissions systems in the Subject Vehicles sold and leased to Plaintiff were designed to deactivate under real-world driving conditions, and to emit oxides of nitrogen within legal limits only when undergoing emissions testing, and therefore, knew that the emission systems contained defects.

705.    Plaintiff reasonably relied on Fiat's and FCA's express warranties concerning emissions when purchasing or leasing the Subject Vehicles. However, the Subject Vehicles did not perform as warranted. Unbeknownst to Plaintiff, the Subject Vehicles were designed to pollute at higher than legal limits during normal driving, and could not achieve advertised performance and

efficiency metrics without this cheating design. This design and the devices that effectuate it are defects. Fiat and FCA therefore breached their express warranty by providing a product containing defects that were never disclosed to Plaintiff.

706.    Any opportunity to cure the express breach is unnecessary and futile.

707.    As a direct and proximate result of Fiat's and FCA's breach of express warranties, Plaintiff suffered significant damages, and seek damages in an amount to be determined at trial.

## BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY
### (810 Ill. Comp. Stat. §§ 5/2-314 and 5/2A-212)

708.    Plaintiffs reallege and incorporate by reference all allegations of the preceding paragraphs as though fully set forth herein.

709.    Plaintiffs, David McCauley, Steve Rosenthal, Aaron O'Brien, Timothy Kawacin, (for the purpose of this section, "Plaintiff") brings this action on behalf of themselves against Fiat and FCA.

710.    Fiat and FCA were at all relevant times "merchants" with respect to motor vehicles under 810 Ill. Comp. Stat. §§ 5/2-104(1) and 5/2A-103(3), and "sellers" of motor vehicles under § 5/2-103(1)(d).

711.    With respect to leases, Fiat and FCA are and were at all relevant times "lessors" of motor vehicles under 810 Ill. Comp. Stat. § 5/2A-103(1)(p).

712.    The Subject Vehicles are and were at all relevant times "goods" within the meaning 810 Ill. Comp. Stat. §§ 5/2-105(1) and 5/2A-103(1)(h)).

713.    A warranty that the Subject Vehicles were in merchantable condition and fit for the ordinary purpose for which vehicles are used is implied by law pursuant 810 Ill. Comp. Stat. §§ 28-2-314 and 28-12-212.

714.    Fiat and FCA sold and/or leased Subject Vehicles that were not in merchantable condition and/or fit for their ordinary purpose in violation of the implied warranty. The Subject Vehicles were not in merchantable condition because their design violated state and federal laws. The Subject Vehicles were not fit for their ordinary purpose as they were built to evade state and federal emission standards.

715.    Fiat's and FCA's breaches of the implied warranty of merchantability caused damage to the Plaintiff. The amount of damages due will be proven at trial.

**15.        <u>Indiana</u>**

**BREACH OF EXPRESS WARRANTY**
**(Ind. Code §§ 26-1-2-313 and 26-1-2.1-210)**

716.    Plaintiffs reallege and incorporate by reference all preceding allegations as though fully set forth herein.

717.    Plaintiffs, Dennis and Mary Carlson, (for the purpose of this section, "Plaintiff") brings this action on behalf of themselves against Fiat and FCA.

718.    Fiat and FCA are and were at all relevant times "merchants" with respect to motor vehicles under Ind. Code §§ 26-1-2-104(1) and 26-1-2.1-103(3), and "sellers" of motor vehicles under § 26-1-2-103(1)(d).

719.    With respect to leases, Fiat and FCA are and were all relevant times "lessors" of motor vehicles under Ind. Code § 26-1-2.1-103(1)(p).

720.    The Subject Vehicles are and were at all relevant times "goods" within the meaning of Ind. Code §§ 26-1-2-105(1) and 26-1-2.1-103(1)(h).

721.    Federal law requires manufacturers of light-duty vehicles to provide two federal emission control warranties: a "Performance Warranty" and a "Design and Defect Warranty." The Performance Warranty applies to repairs that are required during the first two years or 24,000

290

miles, whichever occurs first, when a vehicle fails an emissions test. Under this warranty, certain major emission control components are covered for the first eight years or 80,000 miles, whichever comes first. These major emission control components subject to the longer warranty include the catalytic converters, the electronic engine control unit (ECU), and the onboard emissions diagnostic device or computer. The Design and Defect Warranty covers repair of emission control or emission related parts which fail to function or function improperly due to a defect in materials or workmanship. This warranty provides protection for two years or 24,000 miles, whichever comes first, or, for the major emission control components, for eight years or 80,000 miles, whichever comes first.

722.     Fiat and FCA provided these warranties to Plaintiff. These warranties formed the basis of the bargain that was reached when Plaintiff purchased or leased their Subject Vehicles.

723.     However, Fiat and FCA knew or should have known that the warranties were false and/or misleading. Fiat and FCA were aware that the emissions systems in the Subject Vehicles sold and leased to Plaintiff were designed to deactivate under real-world driving conditions, and to emit oxides of nitrogen within legal limits only when undergoing emissions testing, and therefore, knew that the emission systems contained defects.

724.     Plaintiff reasonably relied on Fiat's and FCA's express warranties concerning emissions when purchasing or leasing the Subject Vehicles. However, the Subject Vehicles did not perform as warranted. Unbeknownst to Plaintiff, the Subject Vehicles were designed to pollute at higher than legal limits during normal driving, and could not achieve advertised performance and efficiency metrics without this cheating design. This design and the devices that effectuate it are defects. Fiat and FCA therefore breached their express warranty by providing a product containing defects that were never disclosed to Plaintiff.

725.    Any opportunity to cure the express breach is unnecessary and futile.

726.    As a direct and proximate result of Fiat's and FCA's breach of express warranties, Plaintiff suffered significant damages, and seek damages in an amount to be determined at trial.

## BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY
### (Ind. Code §§ 26-1-2-314 and 26-1-2.1-212)

727.    Plaintiffs reallege and incorporate by reference all allegations of the preceding paragraphs as though fully set forth herein.

728.    Plaintiffs, Dennis and Mary Carlson, (for the purpose of this section, "Plaintiff") brings this action on behalf of themselves against Fiat and FCA.

729.    Fiat and FCA were at all relevant times "merchants" with respect to motor vehicles under Ind. Code §§ 26-1-2-104(1) and 26-1-2.1-103(3), and "sellers" of motor vehicles under 5 § 26-1-2-03(1)(d).

730.    With respect to leases, Fiat and FCA are and were at all relevant times "lessors" of motor vehicles under Ind. Code § 26-1-2.1-103(1)(p).

731.    The Subject Vehicles are and were at all relevant times "goods" within the meaning of Ind. Code §§ 26-1-2-105(1) and 26-1-2.1-103(1)(h).

732.    A warranty that the Subject Vehicles were in merchantable condition and fit for the ordinary purpose for which vehicles are used is implied by law pursuant to Ind. Code §§ 26-1-2-314 and 26-1-2.1-212.

733.    Fiat and FCA sold and/or leased Subject Vehicles that were not in merchantable condition and/or fit for their ordinary purpose in violation of the implied warranty. The Subject

Vehicles were not in merchantable condition because their design violated state and federal laws. The Subject Vehicles were not fit for their ordinary purpose as they were built to evade state and federal emission standards.

734.    Fiat's and FCA's breaches of the implied warranty of merchantability caused damage to the Plaintiff. The amount of damages due will be proven at trial.

### 16.    Iowa
### BREACH OF EXPRESS WARRANTY
### (Iowa Code §§ 554.2313 and 554.13210)

735.    Plaintiffs reallege and incorporate by reference all preceding allegations as though fully set forth herein.

736.    Plaintiffs, Jason and Kristin Skoland, Brian Rohrig d/b/a Rohrig Farms, LLC, Jody Bergheim, (for the purpose of this section, "Plaintiff") brings this action on behalf of themselves against Fiat and FCA.

737.    Fiat and FCA are and were at all relevant times "merchants" with respect to motor vehicles under Iowa Code §§ 554.2104(1) and 554.13103(3), and "sellers" of motor vehicles under § 554.2103(1)(d).

738.    With respect to leases, Fiat and FCA are and were all relevant times "lessors" of motor vehicles under Iowa Code § 554.13103(1)(p).

739.    The Subject Vehicles are and were at all relevant times "goods" within the meaning of Iowa Code §§ 554.2105(1) and 554.13103(1)(h).

740.     Federal law requires manufacturers of light-duty vehicles to provide two federal emission control warranties: a "Performance Warranty" and a "Design and Defect Warranty." The Performance Warranty applies to repairs that are required during the first two years or 24,000 miles, whichever occurs first, when a vehicle fails an emissions test. Under this warranty, certain major emission control components are covered for the first eight years or 80,000 miles, whichever comes first. These major emission control components subject to the longer warranty include the catalytic converters, the electronic engine control unit (ECU), and the onboard emissions diagnostic device or computer. The Design and Defect Warranty covers repair of emission control or emission related parts which fail to function or function improperly due to a defect in materials or workmanship. This warranty provides protection for two years or 24,000 miles, whichever comes first, or, for the major emission control components, for eight years or 80,000 miles, whichever comes first.

### BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY
#### (Iowa Code §§ 554.2314 and 554.13212)

741.     Plaintiffs reallege and incorporate by reference all allegations of the preceding paragraphs as though fully set forth herein.

742.     Plaintiffs, Jason and Kristin Skoland, Brian Rohrig d/b/a Rohrig Farms, LLC, Jody Bergheim, (for the purpose of this section, "Plaintiff") brings this action on behalf of themselves against Fiat and FCA.

743.     Fiat and FCA were at all relevant times "merchants" with respect to motor vehicles under Iowa Code §§ 554.2104(1) and 554.13103(3), and "sellers" of motor vehicles under § 554.2103(1)(d).

744.     With respect to leases, Fiat and FCA are and were at all relevant times "lessors" of motor vehicles under Iowa Code § 554.13103(1)(p).

745.     The Subject Vehicles are and were at all relevant times "goods" within the meaning of Iowa Code §§ 554.2105(1) and 554.13103(1)(h).

746.     A warranty that the Subject Vehicles were in merchantable condition and fit for the ordinary purpose for which vehicles are used is implied by law pursuant to Iowa Code 7 §§ 554.2314 and 554.13212.

747.     Fiat and FCA sold and/or leased Subject Vehicles that were not in merchantable condition and/or fit for their ordinary purpose in violation of the implied warranty. The Subject Vehicles were not in merchantable condition because their design violated state and federal laws. The Subject Vehicles were not fit for their ordinary purpose as they were built to evade state and federal emission standards.

748.     Fiat's and FCA's breaches of the implied warranty of merchantability caused damage to Plaintiff. The amount of damages due will be proven at trial.

### 17.     <u>Kansas</u>

**BREACH OF EXPRESS WARRANTY**
**(Kan. Stat. Ann. §§ 84-2-314 and 84-2A-210)**

749.     Plaintiffs reallege and incorporate by reference all preceding allegations as though fully set forth herein.

750.     Plaintiffs, Sergio Medina, (for the purpose of this section, "Plaintiff") brings this action on behalf of themselves against Fiat and FCA.

751.     Fiat and FCA are and were at all relevant times "merchants" with respect to motor vehicles under Kan. Stat. Ann. §§ 84-2-104(1) and 84-2A-103(3), and "sellers" of motor vehicles under § 84-2-103(1)(d).

752.     With respect to leases, Fiat and FCA are and were all relevant times "lessors" of motor vehicles under Kan. Stat. Ann. § 84-2A-103(1)(p).

753.    The Subject Vehicles are and were at all relevant times "goods" within the meaning of Kan. Stat. Ann. §§ 84-2-105(1) and 84-2A-103(1)(h).

754.    Federal law requires manufacturers of light-duty vehicles to provide two federal emission control warranties: a "Performance Warranty" and a "Design and Defect Warranty." The Performance Warranty applies to repairs that are required during the first two years or 24,000 miles, whichever occurs first, when a vehicle fails an emissions test. Under this warranty, certain major emission control components are covered for the first eight years or 80,000 miles, whichever comes first. These major emission control components subject to the longer warranty include the catalytic converters, the electronic engine control unit (ECU), and the onboard emissions diagnostic device or computer. The Design and Defect Warranty covers repair of emission control or emission related parts which fail to function or function improperly due to a defect in materials or workmanship. This warranty provides protection for two years or 24,000 miles, whichever comes first, or, for the major emission control components, for eight years or 80,000 miles, whichever comes first.

755.    Fiat and FCA provided these warranties to the Plaintiffs. These warranties formed the basis of the bargain that was reached when the Plaintiffs purchased or leased their Subject Vehicles.

756.    However, Fiat and FCA knew or should have known that the warranties were false and/or misleading. Fiat and FCA were aware that the emissions systems in the Subject Vehicles sold and leased to the Plaintiffs were designed to deactivate under real-world driving conditions, and to emit oxides of nitrogen within legal limits only when undergoing emissions testing, and therefore, knew that the emission systems contained defects.

296

757.    The Plaintiffs reasonably relied on Fiat's and FCA's express warranties concerning emissions when purchasing or leasing the Subject Vehicles. However, the Subject Vehicles did not perform as warranted. Unbeknownst to the Plaintiffs, the Subject Vehicles were designed to pollute at higher than legal limits during normal driving and could not achieve advertised performance and efficiency metrics without this cheating design. This design and the devices that effectuate it are defects. Fiat and FCA therefore breached their express warranty by providing a product containing defects that were never disclosed to the Plaintiffs.

758.    Any opportunity to cure the express breach is unnecessary and futile.

759.    As a direct and proximate result of Fiat's and FCA's breach of express warranties, the Plaintiffs suffered significant damages, and seek damages in an amount to be determined at trial.

760.    Fiat and FCA provided these warranties to the Plaintiffs. These warranties formed the basis of the bargain that was reached when the Plaintiffs purchased or leased their Subject Vehicles.

761.    However, Fiat and FCA knew or should have known that the warranties were false and/or misleading. Fiat and FCA were aware that the emissions systems in the Subject Vehicles sold and leased to the Plaintiffs were designed to deactivate under real-world driving conditions, and to emit oxides of nitrogen within legal limits only when undergoing emissions testing, and therefore, knew that the emission systems contained defects.

762.    The Plaintiffs reasonably relied on Fiat's and FCA's express warranties concerning emissions when purchasing or leasing the Subject Vehicles. However, the Subject Vehicles did not perform as warranted. Unbeknownst to the Plaintiffs, the Subject Vehicles were designed to pollute

at higher than legal limits during normal driving and could not achieve advertised performance and efficiency metrics without this cheating design. This design and the devices that effectuate it are defects. Fiat and FCA therefore breached their express warranty by providing a product containing defects that were never disclosed to the Plaintiffs.

763.    Any opportunity to cure the express breach is unnecessary and futile.

764.    As a direct and proximate result of Fiat's and FCA's breach of express warranties, the Plaintiffs suffered significant damages, and seek damages in an amount to be determined at trial.

## BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY
### (Kan. Stat. Ann. §§ 84-2-314 and 84-2A-212)

765.    Plaintiffs reallege and incorporate by reference all allegations of the preceding paragraphs as though fully set forth herein.

766.    Plaintiffs, Sergio Medina, (for the purpose of this section, "Plaintiff") brings this action on behalf of themselves against Fiat and FCA.

767.    Fiat and FCA were at all relevant times "merchants" with respect to motor vehicles under Kan. Stat. Ann. §§ 84-2-104(1) and 84-2A-103(3), and "sellers" of motor vehicles under § 84-2-03(1)(d).

768.    With respect to leases, Fiat and FCA are and were at all relevant times "lessors" of motor vehicles under Kan. Stat. Ann. § 84-2A-103(1)(p).

769.    The Subject Vehicles are and were at all relevant times "goods" within the meaning 8 of Kan. Stat. Ann. §§ 84-2-105(1) and 84-2A-103(1)(h).

770.    A warranty that the Subject Vehicles were in merchantable condition and fit for the ordinary purpose for which vehicles are used is implied by law pursuant to Kan. Stat. Ann. §§ 84-

2-314 and 84-2A-212.

771.    Fiat and FCA sold and/or leased Subject Vehicles that were not in merchantable condition and/or fit for their ordinary purpose in violation of the implied warranty. The Subject Vehicles were not in merchantable condition because their design violated state and federal laws. The Subject Vehicles were not fit for their ordinary purpose as they were built to evade state and federal emission standards.

772.    Fiat's and FCA's breaches of the implied warranty of merchantability caused damage to the Plaintiffs. The amount of damages due will be proven at trial.

### 18.    Kentucky
#### BREACH OF EXPRESS WARRANTY
#### (KY. REV. STAT. §§ 335.2-313 and 355.2A-210)

773.    Plaintiffs reallege and incorporate by reference all preceding allegations as though fully set forth herein.

774.    Plaintiffs, George and Sheri Bunker, Jr., (for the purpose of this section, "Plaintiff") brings this action on behalf of themselves against Fiat and FCA.

775.    Fiat and FCA are and were at all relevant times "merchants" with respect to motor vehicles under Ky. Rev. Stat. §§ 355.2-104(1) and 355.2A-103(3), and "sellers" of motor vehicles under § 355.2-103(1)(d).

776.    With respect to leases, Fiat and FCA are and were all relevant times "lessors" of motor vehicles under Ky. Rev. Stat. § 355.2A-103(1)(p).

777.    The Subject Vehicles are and were at all relevant times "goods" within the meaning of Ky. Rev. Stat. §§ 355.2-105(1) and 355.2A-103(1)(h).

778.    Federal law requires manufacturers of light-duty vehicles to provide two federal emission control warranties: a "Performance Warranty" and a "Design and Defect Warranty." The

Performance Warranty applies to repairs that are required during the first two years or 24,000 miles, whichever occurs first, when a vehicle fails an emissions test. Under this warranty, certain major emission control components are covered for the first eight years or 80,000 miles, whichever comes first. These major emission control components subject to the longer warranty include the catalytic converters, the electronic engine control unit (ECU), and the onboard emissions diagnostic device or computer. The Design and Defect Warranty covers repair of emission control or emission related parts which fail to function or function improperly due to a defect in materials or workmanship. This warranty provides protection for two years or 24,000 miles, whichever comes first, or, for the major emission control components, for eight years or 80,000 miles, whichever comes first.

779. Fiat and FCA provided these warranties to Plaintiff. These warranties formed the basis of the bargain that was reached when Plaintiff purchased or leased their Subject Vehicles.

780. However, Fiat and FCA knew or should have known that the warranties were false and/or misleading. Fiat and FCA were aware that the emissions systems in the Subject Vehicles sold and leased to Plaintiff were designed to deactivate under real-world driving conditions, and to emit oxides of nitrogen within legal limits only when undergoing emissions testing, and therefore, knew that the emission systems contained defects.

781. Plaintiffs reasonably relied on Fiat's and FCA's express warranties concerning emissions when purchasing or leasing the Subject Vehicles. However, the Subject Vehicles did not perform as warranted. Unbeknownst to Plaintiff, the Subject Vehicles were designed to pollute at higher than legal limits during normal driving and could not achieve advertised performance and efficiency metrics without this cheating design. This design and the devices that effectuate it are defects. Fiat and FCA therefore breached their express warranty by providing a product

containing defects that were never disclosed to Plaintiff.

782.    Any opportunity to cure the express breach is unnecessary and futile.

783.    As a direct and proximate result of Fiat's and FCA's breach of express warranties, Plaintiff suffered significant damages, and seek damages in an amount to be determined at trial.

## BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY
### (KY. REV. STAT. §§ 335.2-314 and 355.2A-212)

784.    Plaintiffs reallege and incorporate by reference all allegations of the preceding paragraphs as though fully set forth herein.

785.    Plaintiffs, George and Sheri Bunker, Jr. (for the purpose of this section, "Plaintiff") brings this action on behalf of themselves against Fiat and FCA.

786.    Fiat and FCA were at all relevant times "merchants" with respect to motor vehicles under Ky. Rev. Stat. §§ 355.2-104(1) and 355.2A-103(3), and "sellers" of motor vehicles under § 355.2-103(1)(d).

787.    With respect to leases, Fiat and FCA are and were at all relevant times "lessors" of motor vehicles under Ky. Rev. Stat. § 355.2A-103(1)(p).

788.    The Subject Vehicles are and were at all relevant times "goods" within the meaning of Ky. Rev. Stat. §§ 355.2-105(1) and 355.2A-103(1)(h).

789.    A warranty that the Subject Vehicles were in merchantable condition and fit for the ordinary purpose for which vehicles are used is implied by law pursuant to Ky. Rev. Stat. §§ 335.2-314 and 355.2A-212.

790.    Fiat and FCA sold and/or leased Subject Vehicles that were not in merchantable condition and/or fit for their ordinary purpose in violation of the implied warranty. The Subject Vehicles were not in merchantable condition because their design violated state and federal laws.

The Subject Vehicles were not fit for their ordinary purpose as they were built to evade state and federal emission standards.

791.    Fiat's and FCA's breaches of the implied warranty of merchantability caused damage to the Plaintiff. The amount of damages due will be proven at trial.

19.    **Louisiana**
**BREACH OF IMPLIED WARRANTY**
**OF MERCHANTABILITY/ WARRANTY**
**AGAINST REDHIBITORY DEFECTS**
**(La. Civ. Code Art. 2520, 2524)**

792.    Plaintiffs reallege and incorporate by reference all allegations of the preceding paragraphs as though fully set forth herein.

793.    Plaintiffs, Robert B. Luper, Richard D. Kittok, John Benjamin Fox, Alton Young and Kim Daigle, (for the purpose of this section, "Plaintiffs") bring this action on behalf of themselves against Fiat and FCA.

794.    Fiat and FCA were at all relevant times "merchants" with respect to motor vehicles.

795.    A warranty that the Subject Vehicles were in merchantable condition and fit for the ordinary purpose for which vehicles are used is implied by law in the instant transactions.

796.    Fiat and FCA sold and/or leased Subject Vehicles that were not in merchantable condition and/or fit for their ordinary purpose in violation of the implied warranty. The Subject Vehicles were not in merchantable condition because their design violated state and federal laws. The Subject Vehicles were not fit for their ordinary purpose as they were built to evade state and federal emission standards.

797.   Fiat's and FCA's breaches of the implied warranty of merchantability caused damage to the Plaintiffs. The amount of damages due will be proven at trial.

### 20.   Maine
### BREACH OF EXPRESS WARRANTY
### (ME. REV. STAT. TIT. 11 §§ 2-313 and 2-1210)

798.   Plaintiffs reallege and incorporate by reference all preceding allegations as though fully set forth herein.

799.   Plaintiffs, to be named at a later date, (for the purpose of this section, "Plaintiff") brings this action on behalf of themselves against Fiat and FCA.

800.   Fiat and FCA are and were at all relevant times "merchants" with respect to motor vehicles under Me. Rev. Stat. Ann. Tit. 11 §§ 2-104(1), and 2-1103(3), and is a "seller" of motor vehicles under § 2-103(1)(d).

801.   With respect to leases, Fiat and FCA are and were all relevant times "lessors" of motor vehicles under Me. Rev. Stat. Ann. Tit. 11 § 2-1103(1)(p).

802.   The Subject Vehicles are and were at all relevant times "goods" within the meaning of Me. Rev. Stat. Ann. Tit. 11 §§ 2-105(1), and 2-1103(1)(h).

803.   Federal law requires manufacturers of light-duty vehicles to provide two federal emission control warranties: a "Performance Warranty" and a "Design and Defect Warranty." The Performance Warranty applies to repairs that are required during the first two years or 24,000 miles, whichever occurs first, when a vehicle fails an emissions test. Under this warranty, certain major emission control components are covered for the first eight years or 80,000 miles, whichever comes first. These major emission control components subject to the longer warranty include the catalytic converters, the electronic engine control unit (ECU), and the onboard emissions diagnostic device or computer. The Design and Defect Warranty covers repair of emission control

or emission related parts which fail to function or function improperly due to a defect in materials or workmanship. This warranty provides protection for two years or 24,000 miles, whichever comes first, or, for the major emission control components, for eight years or 80,000 miles, whichever comes first.

804.     Fiat and FCA provided these warranties to Plaintiff. These warranties formed the basis of the bargain that was reached when Plaintiff purchased or leased their Subject Vehicles.

805.     However, Fiat and FCA knew or should have known that the warranties were false and/or misleading. Fiat and FCA were aware that the emissions systems in the Subject Vehicles sold and leased to Plaintiffs were designed to deactivate under real-world driving conditions, and to emit oxides of nitrogen within legal limits only when undergoing emissions testing, and therefore, knew that the emission systems contained defects.

806.     Plaintiffs reasonably relied on Fiat's and FCA's express warranties concerning emissions when purchasing or leasing the Subject Vehicles. However, the Subject Vehicles did not perform as warranted. Unbeknownst to Plaintiffs and the Maine State Plaintiffs, the Subject Vehicles were designed to pollute at higher than legal limits during normal driving, and could not achieve advertised performance and efficiency metrics without this cheating design. This design and the devices that effectuate it are defects. Fiat and FCA therefore breached their express warranty by providing a product containing defects that were never disclosed to Plaintiff.

807.     Any opportunity to cure the express breach is unnecessary and futile.

808.     As a direct and proximate result of Fiat's and FCA's breach of express warranties, Plaintiffs suffered significant damages, and seek damages in an amount to be determined at trial.

## BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY
### (ME. REV. STAT. TIT. 11 §§ 2-314 and 2-1212)

809.    Plaintiffs reallege and incorporate by reference all allegations of the preceding paragraphs as though fully set forth herein.

810.    Plaintiffs, to be named at a later date, (for the purpose of this section, "Plaintiff") brings this action on behalf of themselves against Fiat and FCA.

811.    Fiat and FCA were at all relevant times "merchants" with respect to motor vehicles under Me. Rev. Stat. Ann. Tit. 11 §§ 2-104(1), and 2-1103(3), and is a "seller" of motor vehicles under § 2-103(1)(d).

812.    With respect to leases, Fiat and FCA are and were at all relevant times "lessors" of motor vehicles under Me. Rev. Stat. Ann. Tit. 11 § 2-1103(1)(p).

813.    The Subject Vehicles are and were at all relevant times "goods" within the meaning of Me. Rev. Stat. Ann. Tit. 11 §§ 2-105(1), and 2-1103(1)(h).

814.    A warranty that the Subject Vehicles were in merchantable condition and fit for the ordinary purpose for which vehicles are used is implied by law pursuant to Me. Rev. Stat. Ann. Tit. 11 §§ 2-314, and 2-1212.

815.    Fiat and FCA sold and/or leased Subject Vehicles that were not in merchantable condition and/or fit for their ordinary purpose in violation of the implied warranty. The Subject Vehicles were not in merchantable condition because their design violated state and federal laws. The Subject Vehicles were not fit for their ordinary purpose as they were built to evade state and federal emission standards.

816.   Fiat's and FCA's breaches of the implied warranty of merchantability caused damage to Plaintiff. The amount of damages due will be proven at trial.

**21.   Maryland**

### BREACH OF EXPRESS WARRANTY
### (Md. Code, Com. Law §§ 2-313 and 2a-210)

817.   Plaintiffs reallege and incorporate by reference all preceding allegations as though fully set forth herein.

818.   Plaintiffs, Felix Hernandez, Courtney Gayle Coleman, (for the purpose of this section, "Plaintiffs") bring this action on behalf of themselves against Fiat and FCA.

819.   Fiat and FCA are and were at all relevant times "merchants" with respect to motor vehicles under Md. Code Com. Law § 2-104(1) and "sellers" of motor vehicles under § 2-103(1)(d).

820.   With respect to leases, Fiat and FCA are and were all relevant times "lessors" of motor vehicles under Md. Code Com. Law § 2A-103(1)(p).

821.   The Subject Vehicles are and were at all relevant times "goods" within the meaning of Md. Code Com. Law §§ 2-105(1) and 2a-103(1)(h).

822.   Federal law requires manufacturers of light-duty vehicles to provide two federal emission control warranties: a "Performance Warranty" and a "Design and Defect Warranty." The Performance Warranty applies to repairs that are required during the first two years or 24,000 miles, whichever occurs first, when a vehicle fails an emissions test. Under this warranty, certain major emission control components are covered for the first eight years or 80,000 miles, whichever comes first. These major emission control components subject to the longer warranty include the

catalytic converters, the electronic engine control unit (ECU), and the onboard emissions diagnostic device or computer. The Design and Defect Warranty covers repair of emission control or emission related parts which fail to function or function improperly due to a defect in materials or workmanship. This warranty provides protection for two years or 24,000 miles, whichever comes first, or, for the major emission control components, for eight years or 80,000 miles, whichever comes first.

823.    Fiat and FCA provided these warranties to Plaintiffs. These warranties formed the basis of the bargain that was reached when Plaintiffs purchased or leased their Subject Vehicles.

824.    However, Fiat and FCA knew or should have known that the warranties were false and/or misleading. Fiat and FCA were aware that the emissions systems in the Subject Vehicles sold and leased to Plaintiffs were designed to deactivate under real-world driving conditions, and to emit oxides of nitrogen within legal limits only when undergoing emissions testing, and therefore, knew that the emission systems contained defects.

825.    Plaintiffs reasonably relied on Fiat's and FCA's express warranties concerning emissions when purchasing or leasing the Subject Vehicles. However, the Subject Vehicles did not perform as warranted. Unbeknownst to Plaintiffs, the Subject Vehicles were designed to pollute at higher than legal limits during normal driving and could not achieve advertised performance and efficiency metrics without this cheating design. This design and the devices that effectuate it are defects. Fiat and FCA therefore breached their express warranty by providing a product containing defects that were never disclosed to Plaintiffs.

826.    Any opportunity to cure the express breach is unnecessary and futile.

827.    As a direct and proximate result of Fiat's and FCA's breach of express warranties,

Plaintiffs suffered significant damages, and seek damages in an amount to be determined at trial.

## BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY
### (Md. Code Com. Law §§ 2-314 and 2A-212)

828.    Plaintiffs reallege and incorporate by reference all allegations of the preceding paragraphs as though fully set forth herein.

829.    Plaintiffs, Felix Hernandez, Courtney Gayle Coleman, (for the purpose of this section, "Plaintiffs") bring this action on behalf of themselves against Fiat and FCA.

830.    Fiat and FCA were at all relevant times "merchants" with respect to motor vehicles under Md. Code Com. Law § 2-104(1) and "sellers" of motor vehicles under § 2-103(1)(d).

831.    With respect to leases, Fiat and FCA are and were at all relevant times "lessors" of motor vehicles under Md. Code Com. Law § 2A-103(1)(p).

832.    The Subject Vehicles are and were at all relevant times "goods" within the meaning 25 of Md. Code Com. Law §§ 2-105(1) and 2a-103(1)(h).

833.    A warranty that the Subject Vehicles were in merchantable condition and fit for the ordinary purpose for which vehicles are used is implied by law pursuant to Md. Code Com. Law §§ 2-314 and 2a-212.

834.    Fiat and FCA sold and/or leased Subject Vehicles that were not in merchantable condition and/or fit for their ordinary purpose in violation of the implied warranty. The Subject Vehicles were not in merchantable condition because their design violated state and federal laws. The Subject Vehicles were not fit for their ordinary purpose as they were built to evade state and federal emission standards.

835.    Fiat's and FCA's breaches of the implied warranty of merchantability caused damage to the Plaintiffs. The amount of damages due will be proven at trial.

22. **Massachusetts**

## BREACH OF EXPRESS WARRANTY
### (Mass. Gen. Laws Ch. 106 §§ 2-313 and 2A-210)

836.     Plaintiffs reallege and incorporate by reference all preceding allegations as though fully set forth herein.

837.     Plaintiffs, to be named at a later date, (for the purpose of this section, "Plaintiff") brings this action on behalf of themselves against Fiat and FCA.

838.     Fiat and FCA are and were at all relevant times "merchants" with respect to motor vehicles under Mass Gen. Laws ch. 106 § 2-104(1) and is a "seller" of motor vehicles under § 2-103(1) (d).

839.     With respect to leases, Fiat and FCA are and were all relevant times "lessors" of motor vehicles under Mass Gen. Laws ch. 106 § 2A-103(1)(p).

840.     The Subject Vehicles are and were at all relevant times "goods" within the meaning of Mass. Gen. Laws ch. 106 §§ 2-105(1) and 2A-103(1)(h).

841.     Federal law requires manufacturers of light-duty vehicles to provide two federal emission control warranties: a "Performance Warranty" and a "Design and Defect Warranty." The Performance Warranty applies to repairs that are required during the first two years or 24,000 miles, whichever occurs first, when a vehicle fails an emissions test. Under this warranty, certain major emission control components are covered for the first eight years or 80,000 miles, whichever comes first. These major emission control components subject to the longer warranty include the catalytic converters, the electronic engine control unit (ECU), and the onboard emissions diagnostic device or computer. The Design and Defect Warranty covers repair of emission control

or emission related parts which fail to function or function improperly due to a defect in materials or workmanship. This warranty provides protection for two years or 24,000 miles, whichever comes first, or, for the major emission control components, for eight years or 80,000 miles, whichever comes first.

842.     Fiat and FCA provided these warranties to Plaintiff. These warranties formed the basis of the bargain that was reached when Plaintiff purchased or leased their Subject Vehicles.

843.     However, Fiat and FCA knew or should have known that the warranties were false and/or misleading. Fiat and FCA were aware that the emissions systems in the Subject Vehicles sold and leased to Plaintiffs were designed to deactivate under real-world driving conditions, and to emit oxides of nitrogen within legal limits only when undergoing emissions testing, and therefore, knew that the emission systems contained defects.

844.     Plaintiffs reasonably relied on Fiat's and FCA's express warranties concerning emissions when purchasing or leasing the Subject Vehicles. However, the Subject Vehicles did not perform as warranted. Unbeknownst to Plaintiffs, the Subject Vehicles were designed to pollute at higher than legal limits during normal driving and could not achieve advertised performance and efficiency metrics without this cheating design. This design and the devices that effectuate it are defects. Fiat and FCA therefore breached their express warranty by providing a product containing defects that were never disclosed to Plaintiffs.

845.     Any opportunity to cure the express breach is unnecessary and futile.

846.     As a direct and proximate result of Fiat's and FCA's breach of express warranties, Plaintiffs suffered significant damages, and seek damages in an amount to be determined at trial.

## BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY
### (Mass. Gen. Laws Ch. 106 §§ 2-314 and 2A-212)

847.     Plaintiffs reallege and incorporate by reference all allegations of the preceding paragraphs as though fully set forth herein.

848.     Plaintiffs, to be named at a later date, (for the purpose of this section, "Plaintiff") brings this action on behalf of themselves against Fiat and FCA.

849.     Fiat and FCA were at all relevant times "merchants" with respect to motor vehicles under Mass Gen. Laws ch. 106 § 2-104(1) and is a "seller" of motor vehicles under § 2-103(1) (d).

850.     With respect to leases, Fiat and FCA are and were at all relevant times "lessors" of motor vehicles under Mass Gen. Laws ch. 106 § 2A-103(1)(p).

851.     The Subject Vehicles are and were at all relevant times "goods" within the meaning of Mass. Gen. Laws ch. 106 §§ 2-105(1) and 2A-103(1)(h).

852.     A warranty that the Subject Vehicles were in merchantable condition and fit for the ordinary purpose for which vehicles are used is implied by law pursuant to Mass. Gen. Laws ch. 106 §§ 2-314 and 2A-212.

853.     Fiat and FCA sold and/or leased Subject Vehicles that were not in merchantable condition and/or fit for their ordinary purpose in violation of the implied warranty. The Subject Vehicles were not in merchantable condition because their design violated state and federal laws. The Subject Vehicles were not fit for their ordinary purpose as they were built to evade state and federal emission standards.

854.     Fiat's and FCA's breaches of the implied warranty of merchantability caused damage to the Plaintiff. The amount of damages due will be proven at trial.

23.   **Michigan**

**BREACH OF EXPRESS WARRANTY**
**(Mich. Comp. Laws §§ 440.2313 and 440.2860)**

855.   Plaintiffs reallege and incorporate by reference all preceding allegations as though fully set forth herein.

856.   Plaintiffs, Andrew and Ashley Malburg, Kile Matthew Lee O'Connor, Jim Laney, Michael Miller, Dwight Lindstrom, (for the purpose of this section, "Plaintiff") brings this action on behalf of themselves against Fiat and FCA.

857.   Fiat and FCA are and were at all relevant times "merchants" with respect to motor vehicles under Mich. Comp. Laws § 440.2104(1) and "sellers" of motor vehicles under § 440.2103(1)(c).

858.   With respect to leases, Fiat and FCA are and were all relevant times "lessors" of motor vehicles under Mich. Comp. Laws § 440.2803(1)(p).

859.   The Subject Vehicles are and were at all relevant times "goods" within the meaning of Mich. Comp. Laws §§ 440.2105(1) and 440.2803(1)(h).

860.   Federal law requires manufacturers of light-duty vehicles to provide two federal emission control warranties: a "Performance Warranty" and a "Design and Defect Warranty." The Performance Warranty applies to repairs that are required during the first two years or 24,000 miles, whichever occurs first, when a vehicle fails an emissions test. Under this warranty, certain major emission control components are covered for the first eight years or 80,000 miles, whichever comes first. These major emission control components subject to the longer warranty include the catalytic converters, the electronic engine control unit (ECU), and the onboard emissions diagnostic device or computer. The Design and Defect Warranty covers repair of emission control or emission related parts which fail to function or function improperly due to a defect in materials

or workmanship. This warranty provides protection for two years or 24,000 miles, whichever comes first, or, for the major emission control components, for eight years or 80,000 miles, whichever comes first.

861.    Fiat and FCA provided these warranties to Plaintiffs. These warranties formed the basis of the bargain that was reached when Plaintiff purchased or leased their Subject Vehicles.

862.    However, Fiat and FCA knew or should have known that the warranties were false and/or misleading. Fiat and FCA were aware that the emissions systems in the Subject Vehicles sold and leased to Plaintiffs were designed to deactivate under real-world driving conditions, and to emit oxides of nitrogen within legal limits only when undergoing emissions testing, and therefore, knew that the emission systems contained defects.

863.    Plaintiffs reasonably relied on Fiat's and FCA's express warranties concerning emissions when purchasing or leasing the Subject Vehicles. However, the Subject Vehicles did not perform as warranted. Unbeknownst to Plaintiff, the Subject Vehicles were designed to pollute at higher than legal limits during normal driving, and could not achieve advertised performance and efficiency metrics without this cheating design. This design and the devices that effectuate it are defects. Fiat and FCA therefore breached their express warranty by providing a product containing defects that were never disclosed to Plaintiffs.

864.    Any opportunity to cure the express breach is unnecessary and futile.

865.    As a direct and proximate result of Fiat's and FCA's breach of express warranties, Plaintiffs suffered significant damages, and seek damages in an amount to be determined at trial.

## BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY
### (Mich. Comp. Laws §§ 440.2314 and 440.2860)

866.    Plaintiffs reallege and incorporate by reference all allegations of the preceding

313

paragraphs as though fully set forth herein.

867.    Plaintiffs, Andrew and Ashley Malburg, Kile Matthew Lee O'Connor, Jim Laney, Michael Miller, Dwight Lindstrom, (for the purpose of this section, "Plaintiff") brings this action on behalf of themselves against Fiat and FCA.

868.    Fiat and FCA were at all relevant times "merchants" with respect to motor vehicles under Mich. Comp. Laws § 440.2104(1) and "sellers" of motor vehicles under § 440.2103(1)(c).

869.    With respect to leases, Fiat and FCA are and were at all relevant times "lessors" of motor vehicles under Mich. Comp. Laws § 440.2803(1)(p).

870.    The Subject Vehicles are and were at all relevant times "goods" within the meaning of Mich. Comp. Laws §§ 440.2105(1) and 440.2803(1)(h).

871.    A warranty that the Subject Vehicles were in merchantable condition and fit for the ordinary purpose for which vehicles are used is implied by law pursuant to Mich. Comp. Laws §§ 440.2314 and 440.2862.

872.    Fiat and FCA sold and/or leased Subject Vehicles that were not in merchantable condition and/or fit for their ordinary purpose in violation of the implied warranty. The Subject Vehicles were not in merchantable condition because their design violated state and federal laws. The Subject Vehicles were not fit for their ordinary purpose as they were built to evade state and federal emission standards.

873.    Fiat's and FCA's breaches of the implied warranty of merchantability caused damage to the Plaintiff. The amount of damages due will be proven at trial.

24.   **Minnesota**

### BREACH OF EXPRESS WARRANTY
### (Minn. Stat. §§ 336.2-313 and 336.2A-210)

874.   Plaintiffs reallege and incorporate by reference all preceding allegations as though fully set forth herein.

875.   Plaintiffs, Bruce Johnson, (for the purpose of this section, "Plaintiff") brings this action on behalf of themselves against Fiat and FCA.

876.   Fiat and FCA are and were at all relevant times "merchants" with respect to motor vehicles under Minn. Stat. § 336.2-104(1) and "sellers" of motor vehicles under § 336.2- 103(1)(d).

877.   With respect to leases, Fiat and FCA are and were all relevant times "lessors" of motor vehicles under Minn. Stat. § 336.2A-103(1)(p).

878.   The Subject Vehicles are and were at all relevant times "goods" within the meaning of Minn. Stat. § 336.2-105(1) and 336.2A-103(1)(h).

879.   Federal law requires manufacturers of light-duty vehicles to provide two federal emission control warranties: a "Performance Warranty" and a "Design and Defect Warranty." The Performance Warranty applies to repairs that are required during the first two years or 24,000 miles, whichever occurs first, when a vehicle fails an emissions test. Under this warranty, certain major emission control components are covered for the first eight years or 80,000 miles, whichever comes first. These major emission control components subject to the longer warranty include the catalytic converters, the electronic engine control unit (ECU), and the onboard emissions diagnostic device or computer. The Design and Defect Warranty covers repair of emission control or emission related parts which fail to function or function improperly due to a defect in materials or workmanship. This warranty provides protection for two years or 24,000 miles, whichever comes first, or, for the major emission control components, for eight years or 80,000 miles,

whichever comes first.

880.     Fiat and FCA provided these warranties to Plaintiff. These warranties formed the basis of the bargain that was reached when Plaintiffs purchased or leased their Subject Vehicles.

881.     However, Fiat and FCA knew or should have known that the warranties were false and/or misleading. Fiat and FCA were aware that the emissions systems in the Subject Vehicles sold and leased to Plaintiffs were designed to deactivate under real-world driving conditions, and to emit oxides of nitrogen within legal limits only when undergoing emissions testing, and therefore, knew that the emission systems contained defects.

882.     Plaintiffs reasonably relied on Fiat's and FCA's express warranties concerning emissions when purchasing or leasing the Subject Vehicles. However, the Subject Vehicles did not perform as warranted. Unbeknownst to Plaintiffs, the Subject Vehicles were designed to pollute at higher than legal limits during normal driving, and could not achieve advertised performance and efficiency metrics without this cheating design. This design and the devices that effectuate it are defects. Fiat and FCA therefore breached their express warranty by providing a product containing defects that were never disclosed to Plaintiffs.

883.     Any opportunity to cure the express breach is unnecessary and futile.

884.     As a direct and proximate result of Fiat's and FCA's breach of express warranties, Plaintiff suffered significant damages, and seek damages in an amount to be determined at trial.

### BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY
### (Minn. Stat. §§ 336.2-314 and 336.2A-212)

885.     Plaintiffs reallege and incorporate by reference all allegations of the preceding paragraphs as though fully set forth herein.

886.     Plaintiffs, Bruce Johnson, (for the purpose of this section, "Plaintiff") brings this action on behalf of themselves against Fiat and FCA.

887.    Fiat and FCA were at all relevant times "merchants" with respect to motor vehicles under Minn. Stat. § 336.2-104(1) and "sellers" of motor vehicles under § 336.2-103(1)(d).

888.    With respect to leases, Fiat and FCA are and were at all relevant times "lessors" of motor vehicles under Minn. Stat. § 336.2A-103(1)(p).

889.    The Subject Vehicles are and were at all relevant times "goods" within the meaning of Minn. Stat. §§ 336.2-105(1) and 336.2A-103(1)(h).

890.    A warranty that the Subject Vehicles were in merchantable condition and fit for the ordinary purpose for which vehicles are used is implied by law pursuant to Minn. Stat. §§ 336.2-314 and 336.2A-212.

891.    Fiat and FCA sold and/or leased Subject Vehicles that were not in merchantable condition and/or fit for their ordinary purpose in violation of the implied warranty. The Subject Vehicles were not in merchantable condition because their design violated state and federal laws. The Subject Vehicles were not fit for their ordinary purpose as they were built to evade state and federal emission standards.

892.    Fiat's and FCA's breaches of the implied warranty of merchantability caused damage to the Plaintiff. The amount of damages due will be proven at trial.

**25.    <u>Mississippi</u>**

**BREACH OF EXPRESS WARRANTY**
**(Miss. Code §§ 75-2-313 and 75-2A-210)**

893.    Plaintiffs reallege and incorporate by reference all preceding allegations as though fully set forth herein.

894.    Plaintiffs, Robin Simmons, Robert Heinzman, Russell Wagoner, (for the purpose of this section, "Plaintiff") brings this action on behalf of themselves against Fiat and FCA.

895.    Fiat and FCA are and were at all relevant times "merchants" with respect to motor

317

vehicles under Miss. Code § 75-2-104(1) and "sellers" of motor vehicles under § 75-2-103(1)(d).

896.    With respect to leases, Fiat and FCA are and were all relevant times "lessors" of motor vehicles under Miss. Code § 75-2A-103(1)(p).

897.    The Subject Vehicles are and were at all relevant times "goods" within the meaning of Miss. Code §§ 75-2-105(1) and 75-2A-103(1)(h).

898.    Federal law requires manufacturers of light-duty vehicles to provide two federal emission control warranties: a "Performance Warranty" and a "Design and Defect Warranty." The Performance Warranty applies to repairs that are required during the first two years or 24,000 miles, whichever occurs first, when a vehicle fails an emissions test. Under this warranty, certain major emission control components are covered for the first eight years or 80,000 miles, whichever comes first. These major emission control components subject to the longer warranty include the catalytic converters, the electronic engine control unit (ECU), and the onboard emissions diagnostic device or computer. The Design and Defect Warranty covers repair of emission control or emission related parts which fail to function or function improperly due to a defect in materials or workmanship. This warranty provides protection for two years or 24,000 miles, whichever comes first, or, for the major emission control components, for eight years or 80,000 miles, whichever comes first.

899.    Fiat and FCA provided these warranties to Plaintiff. These warranties formed the basis of the bargain that was reached when Plaintiff purchased or leased their Subject Vehicles.

900.    However, Fiat and FCA knew or should have known that the warranties were false and/or misleading. Fiat and FCA were aware that the emissions systems in the Subject Vehicles sold and leased to Plaintiffs were designed to deactivate under real-world driving conditions, and to emit oxides of nitrogen within legal limits only when undergoing emissions testing, and

therefore, knew that the emission systems contained defects.

901.    Plaintiffs reasonably relied on Fiat's and FCA's express warranties concerning emissions when purchasing or leasing the Subject Vehicles. However, the Subject Vehicles did not perform as warranted. Unbeknownst to Plaintiffs, the Subject Vehicles were designed to pollute at higher than legal limits during normal driving and could not achieve advertised performance and efficiency metrics without this cheating design. This design and the devices that effectuate it are defects. Fiat and FCA therefore breached their express warranty by providing a product containing defects that were never disclosed to Plaintiffs.

902.    Any opportunity to cure the express breach is unnecessary and futile.

903.    As a direct and proximate result of Fiat's and FCA's breach of express warranties, Plaintiff suffered significant damages, and seek damages in an amount to be determined at trial.


### BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY
#### (Miss. Code §§ 75-2-314 and 75-2A-212)

904.    Plaintiffs reallege and incorporate by reference all allegations of the preceding paragraphs as though fully set forth herein.

905.    Plaintiffs, Robin Simmons, Robert Heinzman, Russell Wagoner, (for the purpose of this section, "Plaintiff") brings this action on behalf of themselves against Fiat and FCA.

906.    Fiat and FCA were at all relevant times "merchants" with respect to motor vehicles under Miss. Code § 75-2-104(1) and "sellers" of motor vehicles under § 75-2-103(1)(d).

907.    With respect to leases, Fiat and FCA are and were at all relevant times "lessors" of motor vehicles under Miss. Code § 75-2A-103(1)(p).

908.    The Subject Vehicles are and were at all relevant times "goods" within the meaning of Miss. Code §§ 75-2-105(1) and 75-2A-103(1)(h).

909.    A warranty that the Subject Vehicles were in merchantable condition and fit for the ordinary purpose for which vehicles are used is implied by law pursuant to Miss. Code §§ 75-2-314 and 75-2A-212.

910.    Fiat and FCA sold and/or leased Subject Vehicles that were not in merchantable condition and/or fit for their ordinary purpose in violation of the implied warranty. The Subject Vehicles were not in merchantable condition because their design violated state and federal laws. The Subject Vehicles were not fit for their ordinary purpose as they were built to evade state and federal emission standards.

911.    Fiat's and FCA's breaches of the implied warranty of merchantability caused damage to Plaintiff. The amount of damages due will be proven at trial.

## 26.   **Missouri**

### BREACH OF EXPRESS WARRANTY
### (Mo. Stat. §§ 400.2-313 and 400.2A-210)

912.    Plaintiffs reallege and incorporate by reference all preceding allegations as though fully set forth herein.

913.    Plaintiffs, Robert Brinkley, Donald and Beverly Young, James Beemer, Theordore Brayfield d/b/a Carpet Plus, Steven Campbell, (for the purpose of this section, "Plaintiff") brings this action on behalf of themselves against Fiat and FCA.

914.    Fiat and FCA are and were at all relevant times "merchants" with respect to motor vehicles under Mo. Stat. § 400.2-104(1) and "sellers" of motor vehicles under § 400.2-103(1)(d).

915.    With respect to leases, Fiat and FCA are and were all relevant times "lessors" of

motor vehicles under Mo. Stat. § 400.2A-103(1)(p).

916.     The Subject Vehicles are and were at all relevant times "goods" within the meaning of Mo. Stat. § 400.2-105(1) and Mo. Stat. § 400.2A-103(1)(h).5.

917.     Federal law requires manufacturers of light-duty vehicles to provide two federal emission control warranties: a "Performance Warranty" and a "Design and Defect Warranty." The Performance Warranty applies to repairs that are required during the first two years or 24,000 miles, whichever occurs first, when a vehicle fails an emissions test. Under this warranty, certain major emission control components are covered for the first eight years or 80,000 miles, whichever comes first. These major emission control components subject to the longer warranty include the catalytic converters, the electronic engine control unit (ECU), and the onboard emissions diagnostic device or computer. The Design and Defect Warranty covers repair of emission control or emission related parts which fail to function or function improperly due to a defect in materials or workmanship. This warranty provides protection for two years or 24,000 miles, whichever comes first, or, for the major emission control components, for eight years or 80,000 miles, whichever comes first.

918.     Fiat and FCA provided these warranties to Plaintiffs. These warranties formed the basis of the bargain that was reached when Plaintiffs purchased or leased their Subject Vehicles.

919.     However, Fiat and FCA knew or should have known that the warranties were false and/or misleading. Fiat and FCA were aware that the emissions systems in the Subject Vehicles sold and leased to Plaintiff were designed to deactivate under real-world driving conditions, and to emit oxides of nitrogen within legal limits only when undergoing emissions testing, and therefore, knew that the emission systems contained defects.

920.     Plaintiffs reasonably relied on Fiat's and FCA's express warranties concerning

emissions when purchasing or leasing the Subject Vehicles. However, the Subject Vehicles did not perform as warranted. Unbeknownst to Plaintiffs, the Subject Vehicles were designed to pollute at higher than legal limits during normal driving and could not achieve advertised performance and efficiency metrics without this cheating design. This design and the devices that effectuate it are defects. Fiat and FCA therefore breached their express warranty by providing a product containing defects that were never disclosed to Plaintiffs.

921.    Any opportunity to cure the express breach is unnecessary and futile.

922.    As a direct and proximate result of Fiat's and FCA's breach of express warranties, Plaintiff suffered significant damages, and seek damages in an amount to be determined at trial.

## BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY
### (Mo. Stat. §§ 400.2-314 and 400.2A-212)

923.    Plaintiffs reallege and incorporate by reference all allegations of the preceding paragraphs as though fully set forth herein.

924.    Plaintiffs, Robert Brinkley, Donald and Beverly Young, James Beemer, (for the purpose of this section, "Plaintiff") brings this action on behalf of themselves against Fiat and FCA.

925.    Fiat and FCA were at all relevant times "merchants" with respect to motor vehicles under Mo. Stat. § 400.2-104(1) and "sellers" of motor vehicles under § 400.2-103(1)(d).

926.    With respect to leases, Fiat and FCA are and were at all relevant times "lessors" of motor vehicles under Mo. Stat. § 400.2A-103(1)(p).

927.    The Subject Vehicles are and were at all relevant times "goods" within the meaning of Mo. Stat. § 400.2-105(1) and Mo. Stat. § 400.2A-103(1)(h).5.

928.    A warranty that the Subject Vehicles were in merchantable condition and fit for the ordinary purpose for which vehicles are used is implied by law pursuant to Mo. Stat. § 400.2-314

and Mo. Stat. § 400.2A-212.

929.     Fiat and FCA sold and/or leased Subject Vehicles that were not in merchantable condition and/or fit for their ordinary purpose in violation of the implied warranty. The Subject Vehicles were not in merchantable condition because their design violated state and federal laws. The Subject Vehicles were not fit for their ordinary purpose as they were built to evade state and federal emission standards.

930.     Fiat's and FCA's breaches of the implied warranty of merchantability caused damage to Plaintiff. The amount of damages due will be proven at trial.


### 27.     Montana

### BREACH OF EXPRESS WARRANTY
### (Mont. Code §§ 30-2-313 and 30-2A-210)

931.     Plaintiffs reallege and incorporate by reference all preceding allegations as though fully set forth herein.

932.     Plaintiffs, Robert J. Reich, (for the purpose of this section, "Plaintiff") brings this action on behalf of themselves against Fiat and FCA.

933.     Fiat and FCA are and were at all relevant times "merchants" with respect to motor vehicles under Mont. Code § 30-2-104(1) and "sellers" of motor vehicles under § 30-2-103(1)(d).

934.     With respect to leases, Fiat and FCA are and were all relevant times "lessors" of motor vehicles under Mont. Code § 30-2A-103(1)(p).

935.     The Subject Vehicles are and were at all relevant times "goods" within the meaning of Mont. Code §§ 30-2-105(1) and 30-2A-103(1)(h).5.

936.     Federal law requires manufacturers of light-duty vehicles to provide two federal emission control warranties: a "Performance Warranty" and a "Design and Defect Warranty." The

Performance Warranty applies to repairs that are required during the first two years or 24,000 miles, whichever occurs first, when a vehicle fails an emissions test. Under this warranty, certain major emission control components are covered for the first eight years or 80,000 miles, whichever comes first. These major emission control components subject to the longer warranty include the catalytic converters, the electronic engine control unit (ECU), and the onboard emissions diagnostic device or computer. The Design and Defect Warranty covers repair of emission control or emission related parts which fail to function or function improperly due to a defect in materials or workmanship. This warranty provides protection for two years or 24,000 miles, whichever comes first, or, for the major emission control components, for eight years or 80,000 miles, whichever comes first.

937.    Fiat and FCA provided these warranties to Plaintiff. These warranties formed the basis of the bargain that was reached when Plaintiff purchased or leased their Subject Vehicles.

938.    However, Fiat and FCA knew or should have known that the warranties were false and/or misleading. Fiat and FCA were aware that the emissions systems in the Subject Vehicles sold and leased to Plaintiff were designed to deactivate under real-world driving conditions, and to emit oxides of nitrogen within legal limits only when undergoing emissions testing, and therefore, knew that the emission systems contained defects.

939.    Plaintiffs reasonably relied on Fiat's and FCA's express warranties concerning emissions when purchasing or leasing the Subject Vehicles. However, the Subject Vehicles did not perform as warranted. Unbeknownst to Plaintiffs and the Montana State Plaintiffs, the Subject Vehicles were designed to pollute at higher than legal limits during normal driving and could not achieve advertised performance and efficiency metrics without this cheating design. This design and the devices that effectuate it are defects. Fiat and FCA therefore breached their express

warranty by providing a product containing defects that were never disclosed to Plaintiffs.

940.     Any opportunity to cure the express breach is unnecessary and futile.

941.     As a direct and proximate result of Fiat's and FCA's breach of express warranties, Plaintiff suffered significant damages, and seek damages in an amount to be determined at trial.

### BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY
### (Mont. Code §§ 30-2-314 and 30-2A-212)

942.     Plaintiffs reallege and incorporate by reference all allegations of the preceding paragraphs as though fully set forth herein.

943.     Plaintiffs, Robert J. Reich, (for the purpose of this section, "Plaintiff") brings this action on behalf of themselves against Fiat and FCA.

944.     Fiat and FCA were at all relevant times "merchants" with respect to motor vehicles under Mont. Code § 30-2-104(1) and "sellers" of motor vehicles under § 30-2-103(1)(d).

945.     With respect to leases, Fiat and FCA are and were at all relevant times "lessors" of motor vehicles under Mont. Code § 30-2A-103(1)(p).

946.     The Subject Vehicles are and were at all relevant times "goods" within the meaning 2 of Mont. Code §§ 30-2-105(1) and 30-2A-103(1)(h).5.

947.     A warranty that the Subject Vehicles were in merchantable condition and fit for the ordinary purpose for which vehicles are used is implied by law pursuant to Mont. Code §§ 30-2-314 and 30-2A-212.

948.     Fiat and FCA sold and/or leased Subject Vehicles that were not in merchantable condition and/or fit for their ordinary purpose in violation of the implied warranty. The Subject Vehicles were not in merchantable condition because their design violated state and federal laws. The Subject Vehicles were not fit for their ordinary purpose as they were built to evade state and federal emission standards.

949.    Fiat's and FCA's breaches of the implied warranty of merchantability caused damage to Plaintiff. The amount of damages due will be proven at trial.

### 28.    Nebraska
#### BREACH OF EXPRESS WARRANTY
#### (Neb. Rev. St. U.C.C. §§ 2-313 and 2A-210)

950.    Plaintiffs reallege and incorporate by reference all preceding allegations as though fully set forth herein.

951.    Plaintiffs, to be named at a later date, (for the purpose of this section, "Plaintiffs") bring this action on behalf of themselves against Fiat and FCA.

952.    Fiat and FCA are and were at all relevant times "merchants" with respect to motor vehicles under Neb. Rev. St. U.C.C. § 2-104(1) and "sellers" of motor vehicles under § 2-103(1)(d).

953.    With respect to leases, Fiat and FCA are and were all relevant times "lessors" of motor vehicles under Neb. Rev. St. U.C.C. § 2A-103(1)(p).

954.    The Subject Vehicles are and were at all relevant times "goods" within the meaning of Neb. Rev. St. U.C.C. §§ 2-105(1) and 2A-103(1)(h).

955.    Federal law requires manufacturers of light-duty vehicles to provide two federal emission control warranties: a "Performance Warranty" and a "Design and Defect Warranty." The Performance Warranty applies to repairs that are required during the first two years or 24,000 miles, whichever occurs first, when a vehicle fails an emissions test. Under this warranty, certain major emission control components are covered for the first eight years or 80,000 miles, whichever comes first. These major emission control components subject to the longer warranty include the catalytic converters, the electronic engine control unit (ECU), and the onboard emissions diagnostic device or computer. The Design and Defect Warranty covers repair of emission control

or emission related parts which fail to function or function improperly due to a defect in materials or workmanship. This warranty provides protection for two years or 24,000 miles, whichever comes first, or, for the major emission control components, for eight years or 80,000 miles, whichever comes first.

956.    Fiat and FCA provided these warranties to Plaintiffs. These warranties formed the basis of the bargain that was reached when Plaintiffs purchased or leased their Subject Vehicles.

957.    However, Fiat and FCA knew or should have known that the warranties were false and/or misleading. Fiat and FCA were aware that the emissions systems in the Subject Vehicles sold and leased to Plaintiffs were designed to deactivate under real-world driving conditions, and to emit oxides of nitrogen within legal limits only when undergoing emissions testing, and therefore, knew that the emission systems contained defects.

958.    Plaintiffs reasonably relied on Fiat's and FCA's express warranties concerning emissions when purchasing or leasing the Subject Vehicles. However, the Subject Vehicles did not perform as warranted. Unbeknownst to Plaintiffs, the Subject Vehicles were designed to pollute at higher than legal limits during normal driving and could not achieve advertised performance and efficiency metrics without this cheating design. This design and the devices that effectuate it are defects. Fiat and FCA therefore breached their express warranty by providing a product containing defects that were never disclosed to Plaintiffs.

959.    Any opportunity to cure the express breach is unnecessary and futile.

960.    As a direct and proximate result of Fiat's and FCA's breach of express warranties, Plaintiffs suffered significant damages, and seek damages in an amount to be determined at trial.

**BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY**
**(Neb. Rev. St. U.C.C. §§ 2-314 and 2A-212)**

961.    Plaintiffs reallege and incorporate by reference all allegations of the preceding

327

paragraphs as though fully set forth herein.

962.    Plaintiffs, to be named at a later date, (for the purpose of this section, "Plaintiffs") bring this action on behalf of themselves against Fiat and FCA.

963.    Fiat and FCA were at all relevant times "merchants" with respect to motor vehicles under Neb. Rev. St. U.C.C. § 2-104(1) and "sellers" of motor vehicles under § 2-103(1)(d).

964.    With respect to leases, Fiat and FCA are and were at all relevant times "lessors" of motor vehicles under Neb. Rev. St. U.C.C. § 2A-103(1)(p).

965.    The Subject Vehicles are and were at all relevant times "goods" within the meaning of Neb. Rev. St. U.C.C. §§ 2-105(1) and 2A-103(1)(h).

966.    A warranty that the Subject Vehicles were in merchantable condition and fit for the ordinary purpose for which vehicles are used is implied by law pursuant to Neb. Rev. St. 20U.C.C.§§ 2-314 and 2A-212.

967.    Fiat and FCA sold and/or leased Subject Vehicles that were not in merchantable condition and/or fit for their ordinary purpose in violation of the implied warranty. The Subject Vehicles were not in merchantable condition because their design violated state and federal laws. The Subject Vehicles were not fit for their ordinary purpose as they were built to evade state and federal emission standards.

968.    Fiat's and FCA's breaches of the implied warranty of merchantability caused damage to Plaintiffs. The amount of damages due will be proven at trial.

29.   **Nevada**

**BREACH OF EXPRESS WARRANTY**
**(Nev. Rev. Stat. §§ 104.2313 and 104A.2210)**

969.   Plaintiffs reallege and incorporate by reference all preceding allegations as though fully set forth herein.

970.   Plaintiffs, to be named at a later date, (for the purpose of this section, "Plaintiff") brings this action on behalf of themselves against Fiat and FCA.

971.   Fiat and FCA are and were at all relevant times "merchants" with respect to motor vehicles under Nev. Rev. Stat. § 104.2104(1) and "sellers" of motor vehicles under § 04.2103(1)(c).

972.   With respect to leases, Fiat and FCA are and were all relevant times "lessors" of motor vehicles under Nev. Rev. Stat. § 104A.2103(1)(p).

973.   The Subject Vehicles are and were at all relevant times "goods" within the meaning of Nev. Rev. Stat. §§ 104.2105(1) and 104A.2103(1)(h).

974.   Federal law requires manufacturers of light-duty vehicles to provide two federal emission control warranties: a "Performance Warranty" and a "Design and Defect Warranty." The Performance Warranty applies to repairs that are required during the first two years or 24,000 miles, whichever occurs first, when a vehicle fails an emissions test. Under this warranty, certain major emission control components are covered for the first eight years or 80,000 miles, whichever comes first. These major emission control components subject to the longer warranty include the catalytic converters, the electronic engine control unit (ECU), and the onboard emissions diagnostic device or computer. The Design and Defect Warranty covers repair of emission control or emission related parts which fail to function or function improperly due to a defect in materials or workmanship. This warranty provides protection for two years or 24,000 miles, whichever

comes first, or, for the major emission control components, for eight years or 80,000 miles, whichever comes first.

975.   Fiat and FCA provided these warranties to Plaintiff. These warranties formed the basis of the bargain that was reached when Plaintiff purchased or leased their Subject Vehicles.

976.   However, Fiat and FCA knew or should have known that the warranties were false and/or misleading. Fiat and FCA were aware that the emissions systems in the Subject Vehicles sold and leased to Plaintiff were designed to deactivate under real-world driving conditions, and to emit oxides of nitrogen within legal limits only when undergoing emissions testing, and therefore, knew that the emission systems contained defects.

977.   Plaintiff reasonably relied on Fiat's and FCA's express warranties concerning emissions when purchasing or leasing the Subject Vehicles. However, the Subject Vehicles did not perform as warranted. Unbeknownst to Plaintiff, the Subject Vehicles were designed to pollute at higher than legal limits during normal driving and could not achieve advertised performance and efficiency metrics without this cheating design. This design and the devices that effectuate it are defects. Fiat and FCA therefore breached their express warranty by providing a product containing defects that were never disclosed to Plaintiff.

978.   Any opportunity to cure the express breach is unnecessary and futile.

979.   As a direct and proximate result of Fiat's and FCA's breach of express warranties, Plaintiff suffered significant damages, and seek damages in an amount to be determined at trial.

## BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY
### (Nev. Rev. Stat. §§ 104.2314 and 104A.2212)

980.   Plaintiffs reallege and incorporate by reference all allegations of the preceding paragraphs as though fully set forth herein.

981.    Plaintiffs, to be named at a later date, (for the purpose of this section, "Plaintiff") brings this action on behalf of themselves against Fiat and FCA.

982.    Fiat and FCA were at all relevant times "merchants" with respect to motor vehicles under Nev. Rev. Stat. § 104.2104(1) and "sellers" of motor vehicles under § 104.2103(1)(c).

983.    With respect to leases, Fiat and FCA are and were at all relevant times "lessors" of motor vehicles under Nev. Rev. Stat. § 104A.2103(1)(p).

984.    The Subject Vehicles are and were at all relevant times "goods" within the meaning of Nev. Rev. Stat. §§ 104.2105(1) and 104A.2103(1)(h).

985.    A warranty that the Subject Vehicles were in merchantable condition and fit for the ordinary purpose for which vehicles are used is implied by law pursuant to Nev. Rev. Stat. §§ 104.2314 and 104A.2212.

986.    Fiat and FCA sold and/or leased Subject Vehicles that were not in merchantable condition and/or fit for their ordinary purpose in violation of the implied warranty. The Subject Vehicles were not in merchantable condition because their design violated state and federal laws. The Subject Vehicles were not fit for their ordinary purpose as they were built to evade state and federal emission standards.

987.    Fiat's and FCA's breaches of the implied warranty of merchantability caused damage to the Plaintiff. The amount of damages due will be proven at trial.

30.   **New Hampshire**

## BREACH OF EXPRESS WARRANTY
### (N.H. Rev. Stat. §§ 382-A:2-313 and 2A-210)

988.   Plaintiffs reallege and incorporate by reference all preceding allegations as though fully set forth herein.

989.   Plaintiffs, to be named at a later date, (for the purpose of this section, "Plaintiff") brings this action on behalf of themselves against Fiat and FCA.

990.   Fiat and FCA are and were at all relevant times "merchants" with respect to motor vehicles under N.H. Rev. Stat. § 382-A:2-104(1) and "sellers" of motor vehicles under § 382- A:2-103(1)(d).

991.   With respect to leases, Fiat and FCA are and were all relevant times "lessors" of motor vehicles under N.H. Rev. Stat. § 382-A:2A-103(1)(p).

992.   The Subject Vehicles are and were at all relevant times "goods" within the meaning of N.H. Rev. Stat. §§ 382-A:2-105(1) and 382-A:2A-103(1)(h).

993.   Federal law requires manufacturers of light-duty vehicles to provide two federal emission control warranties: a "Performance Warranty" and a "Design and Defect Warranty." The Performance Warranty applies to repairs that are required during the first two years or 24,000 miles, whichever occurs first, when a vehicle fails an emissions test. Under this warranty, certain major emission control components are covered for the first eight years or 80,000 miles, whichever comes first. These major emission control components subject to the longer warranty include the catalytic converters, the electronic engine control unit (ECU), and the onboard emissions diagnostic device or computer. The Design and Defect Warranty covers repair of emission control or emission related parts which fail to function or function improperly due to a defect in materials or workmanship. This warranty provides protection for two years or 24,000 miles, whichever

comes first, or, for the major emission control components, for eight years or 80,000 miles, whichever comes first.

994. Fiat and FCA provided these warranties to the Plaintiffs. These warranties formed the basis of the bargain that was reached when the Plaintiffs purchased or leased their Subject Vehicles.

995. However, Fiat and FCA knew or should have known that the warranties were false and/or misleading. Fiat and FCA were aware that the emissions systems in the Subject Vehicles sold and leased to the Plaintiffs were designed to deactivate under real-world driving conditions, and to emit oxides of nitrogen within legal limits only when undergoing emissions testing, and therefore, knew that the emission systems contained defects.

996. The Plaintiffs reasonably relied on Fiat's and FCA's express warranties concerning emissions when purchasing or leasing the Subject Vehicles. However, the Subject Vehicles did not perform as warranted. Unbeknownst to the Plaintiffs, the Subject Vehicles were designed to pollute at higher than legal limits during normal driving and could not achieve advertised performance and efficiency metrics without this cheating design. This design and the devices that effectuate it are defects. Fiat and FCA therefore breached their express warranty by providing a product containing defects that were never disclosed to the Plaintiffs.

997. Any opportunity to cure the express breach is unnecessary and futile.

998. As a direct and proximate result of Fiat's and FCA's breach of express warranties, the Plaintiffs suffered significant damages, and seek damages in an amount to be determined at trial.

## BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY
### (N.H. Rev. Stat. §§ 382-A:2-314 and 2A-212)

999.    Plaintiffs reallege and incorporate by reference all allegations of the preceding paragraphs as though fully set forth herein.

1000.   Plaintiffs, to be named at a later date, (for the purpose of this section, "Plaintiff") brings this action on behalf of themselves against Fiat and FCA.

1001.   Fiat and FCA were at all relevant times "merchants" with respect to motor vehicles under N.H. Rev. Stat. §§ 382-A:2-104(1) and "sellers" of motor vehicles under §§ 382-A:2-103(1)(d).

1002.   With respect to leases, Fiat and FCA are and were at all relevant times "lessors" of motor vehicles under §§ 382-A:2-103(1)(p).

1003.   The Subject Vehicles are and were at all relevant times "goods" within the meaning of §§ 382-A:2-105(1) and §§ 382-A:2-103(1)(h).

1004.   A warranty that the Subject Vehicles were in merchantable condition and fit for the ordinary purpose for which vehicles are used is implied by law pursuant to §§ 382-A:2-314 and §§ 382-A:2A-212.

1005.   Fiat and FCA sold and/or leased Subject Vehicles that were not in merchantable condition and/or fit for their ordinary purpose in violation of the implied warranty. The Subject Vehicles were not in merchantable condition because their design violated state and federal laws. The Subject Vehicles were not fit for their ordinary purpose as they were built to evade state and federal emission standard.

1006.   Fiat's and FCA's breaches of the implied warranty of merchantability caused damage to the Plaintiffs. The amount of damages due will be proven at trial.

31.   **New Jersey**

**BREACH OF EXPRESS WARRANTY**
**(N.J. Stat. Ann. § 12A:2-313 and 2A-210)**

1007.   Plaintiffs reallege and incorporate by reference all preceding allegations as though fully set forth herein.

1008.   Plaintiffs, Greg and Lucia Dubas, (for the purpose of this section, "Plaintiffs") bring this action on behalf of themselves against Fiat and FCA.

1009.   Fiat and FCA are and were at all relevant times "merchants" with respect to motor vehicles under N.J. Stat. Ann. § 12A:2-104(1) and "sellers" of motor vehicles under 2-103(1)(d).

1010.   With respect to leases, Fiat and FCA are and were all relevant times "lessors" of motor vehicles under N.J. Stat. Ann. § 12A:2A-103(1)(p).

1011.   The Subject Vehicles are and were at all relevant times "goods" within the meaning of N.J. Stat. Ann. §§ 12A:2-105(1) and 2A-103(1)(h).

1012.   Federal law requires manufacturers of light-duty vehicles to provide two federal emission control warranties: a "Performance Warranty" and a "Design and Defect Warranty." The Performance Warranty applies to repairs that are required during the first two years or 24,000 miles, whichever occurs first, when a vehicle fails an emissions test. Under this warranty, certain major emission control components are covered for the first eight years or 80,000 miles, whichever comes first. These major emission control components subject to the longer warranty include the catalytic converters, the electronic engine control unit (ECU), and the onboard emissions diagnostic device or computer. The Design and Defect Warranty covers repair of emission control or emission related parts which fail to function or function improperly due to a defect in materials

or workmanship. This warranty provides protection for two years or 24,000 miles, whichever comes first, or, for the major emission control components, for eight years or 80,000 miles, whichever comes first.

1013.    Fiat and FCA provided these warranties to Plaintiffs. These warranties formed the basis of the bargain that was reached when Plaintiffs purchased or leased their Subject Vehicles.

1014.    However, Fiat and FCA knew or should have known that the warranties were false and/or misleading. Fiat and FCA were aware that the emissions systems in the Subject Vehicles sold and leased to Plaintiffs were designed to deactivate under real-world driving conditions, and to emit oxides of nitrogen within legal limits only when undergoing emissions testing, and therefore, knew that the emission systems contained defects.

1015.    Plaintiffs reasonably relied on Fiat's and FCA's express warranties concerning emissions when purchasing or leasing the Subject Vehicles. However, the Subject Vehicles did not perform as warranted. Unbeknownst to Plaintiffs, the Subject Vehicles were designed to pollute at higher than legal limits during normal driving and could not achieve advertised performance and efficiency metrics without this cheating design. This design and the devices that effectuate it are defects. Fiat and FCA therefore breached their express warranty by providing a product containing defects that were never disclosed to Plaintiffs.

1016.    Any opportunity to cure the express breach is unnecessary and futile.

1017.    As a direct and proximate result of Fiat's and FCA's breach of express warranties, Plaintiffs suffered significant damages, and seek damages in an amount to be determined at trial.

## BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY
### (N.J. Stat. Ann. § 12A:2-314 and 2A-212)

1018.    Plaintiffs reallege and incorporate by reference all allegations of the preceding

paragraphs as though fully set forth herein.

1019.   Plaintiffs, Greg and Lucia Dubas, (for the purpose of this section, "Plaintiffs") bring this action on behalf of themselves against Fiat and FCA.

1020.   Fiat and FCA were at all relevant times "merchants" with respect to motor vehicles under N.J. Stat. Ann. § 12A:2-104(1) and "sellers" of motor vehicles under 2-103(1)(d).

1021.   With respect to leases, Fiat and FCA are and were at all relevant times "lessors" of motor vehicles under N.J. Stat. Ann. § 12A:2A-103(1)(p).

1022.   The Subject Vehicles are and were at all relevant times "goods" within the meaning of N.J. Stat. Ann. §§ 12A:2-105(1) and 2A-103(1)(h).

1023.   A warranty that the Subject Vehicles were in merchantable condition and fit for the ordinary purpose for which vehicles are used is implied by law pursuant to N.J. Stat. Ann. §§ 12A:2-314 and 2A-212.

1024.   Fiat and FCA sold and/or leased Subject Vehicles that were not in merchantable condition and/or fit for their ordinary purpose in violation of the implied warranty. The Subject Vehicles were not in merchantable condition because their design violated state and federal laws. The Subject Vehicles were not fit for their ordinary purpose as they were built to evade state and federal emission standards.

1025.   Fiat's and FCA's breaches of the implied warranty of merchantability caused damage to the Plaintiffs. The amount of damages due will be proven at trial.

32.   **New Mexico**

**BREACH OF EXPRESS WARRANTY**
**(N.M. Stat. §§ 55-2-313 and 55-2A-210)**

1026.   Plaintiffs reallege and incorporate by reference all preceding allegations as though fully set forth herein.

1027.   Plaintiffs, to be named at a later date, (for the purpose of this section, "Plaintiffs") bring this action on behalf of themselves against Fiat and FCA.

1028.   Fiat and FCA are and were at all relevant times "merchants" with respect to motor vehicles under N.M. Stat. § 55-2-104(1) and "sellers" of motor vehicles under §55-2-103(1)(d).

1029.   With respect to leases, Fiat and FCA are and were all relevant times "lessors" of motor vehicles under N.M. Stat. § 55-2A-103(1)(p).

1030.   The Subject Vehicles are and were at all relevant times "goods" within the meaning of N.M. Stat. §§ 55-2-105(1) and 55-2A-103(1)(h).

1031.   Federal law requires manufacturers of light-duty vehicles to provide two federal emission control warranties: a "Performance Warranty" and a "Design and Defect Warranty." The Performance Warranty applies to repairs that are required during the first two years or 24,000 miles, whichever occurs first, when a vehicle fails an emissions test. Under this warranty, certain major emission control components are covered for the first eight years or 80,000 miles, whichever comes first. These major emission control components subject to the longer warranty include the catalytic converters, the electronic engine control unit (ECU), and the onboard emissions diagnostic device or computer. The Design and Defect Warranty covers repair of emission control or emission related parts which fail to function or function improperly due to a defect in materials

or workmanship. This warranty provides protection for two years or 24,000 miles, whichever comes first, or, for the major emission control components, for eight years or 80,000 miles, whichever comes first.

1032.   Fiat and FCA provided these warranties to Plaintiffs. These warranties formed the basis of the bargain that was reached when Plaintiffs purchased or leased their Subject Vehicles.

1033.   However, Fiat and FCA knew or should have known that the warranties were false and/or misleading. Fiat and FCA were aware that the emissions systems in the Subject Vehicles sold and leased to Plaintiffs were designed to deactivate under real-world driving conditions, and to emit oxides of nitrogen within legal limits only when undergoing emissions testing, and therefore, knew that the emission systems contained defects.

1034.   Plaintiffs reasonably relied on Fiat's and FCA's express warranties concerning emissions when purchasing or leasing the Subject Vehicles. However, the Subject Vehicles did not perform as warranted. Unbeknownst to Plaintiffs, the Subject Vehicles were designed to pollute at higher than legal limits during normal driving and could not achieve advertised performance and efficiency metrics without this cheating design. This design and the devices that effectuate it are defects. Fiat and FCA therefore breached their express warranty by providing a product containing defects that were never disclosed to Plaintiffs.

1035.   Any opportunity to cure the express breach is unnecessary and futile.

1036.   As a direct and proximate result of Fiat's and FCA's breach of express warranties, the Plaintiffs suffered significant damages, and seek damages in an amount to be determined at trial.

## BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY
### (N.M. Stat. §§ 55-2-314 and 55-2A-212)

1037.   Plaintiffs reallege and incorporate by reference all allegations of the preceding paragraphs as though fully set forth herein.

1038.   Plaintiffs, to be named at a later date, (for the purpose of this section, "Plaintiffs") bring this action on behalf of themselves against Fiat and FCA.

1039.   Fiat and FCA were at all relevant times "merchants" with respect to motor vehicles under N.M. Stat. § 55-2-104(1) and "sellers" of motor vehicles under § 55-2-103(1)(d).

1040.   With respect to leases, Fiat and FCA are and were at all relevant times "lessors" of motor vehicles under N.M. Stat. § 55-2A-103(1)(p).

1041.   The Subject Vehicles are and were at all relevant times "goods" within the meaning 21of N.M. Stat. §§ 55-2-105(1) and 55-2A-103(1)(h).

1042.   A warranty that the Subject Vehicles were in merchantable condition and fit for the ordinary purpose for which vehicles are used is implied by law pursuant to N.M. Stat. §§ 55-2-314 and 55-2A-212.

1043.   Fiat and FCA sold and/or leased Subject Vehicles that were not in merchantable condition and/or fit for their ordinary purpose in violation of the implied warranty. The Subject Vehicles were not in merchantable condition because their design violated state and federal laws. The Subject Vehicles were not fit for their ordinary purpose as they were built to evade state and federal emission standards.

1044.   Fiat's and FCA's breaches of the implied warranty of merchantability caused damage to Plaintiffs. The amount of damages due will be proven at trial.

33.    **New York**

## BREACH OF EXPRESS WARRANTY
### (N.Y. U.C.C. Law §§ 2-313 and 2A-210)

1045.   Plaintiffs reallege and incorporate by reference all preceding allegations as though fully set forth herein.

1046.   Plaintiffs, Sebastian Korzec, Randy Crawford, Jason Cornetto, Richard Bayly, Thomas Banks, Tom and Julie Bisselle, Joe Kralik, (for the purpose of this section, "Plaintiffs") bring this action on behalf of themselves against Fiat and FCA.

1047.   Fiat and FCA are and were at all relevant times "merchants" with respect to motor vehicles under N.Y. UCC Law § 2-104(1) and "sellers" of motor vehicles under § 2-103(1)(d).

1048.   With respect to leases, Fiat and FCA are and were all relevant times "lessors" of motor vehicles under N.Y. UCC Law § 2A-103(1)(p).

1049.   The Subject Vehicles are and were at all relevant times "goods" within the meaning of N.Y. UCC Law §§ 2-105(1) and 2A-103(1)(h).

1050.   Federal law requires manufacturers of light-duty vehicles to provide two federal emission control warranties: a "Performance Warranty" and a "Design and Defect Warranty." The Performance Warranty applies to repairs that are required during the first two years or 24,000 miles, whichever occurs first, when a vehicle fails an emissions test. Under this warranty, certain major emission control components are covered for the first eight years or 80,000 miles, whichever comes first. These major emission control components subject to the longer warranty include the catalytic converters, the electronic engine control unit (ECU), and the onboard emissions diagnostic device or computer. The Design and Defect Warranty covers repair of emission control or emission related parts which fail to function or function improperly due to a defect in materials or workmanship. This warranty provides protection for two years or 24,000 miles, whichever

341

comes first, or, for the major emission control components, for eight years or 80,000 miles, whichever comes first.

1051.   Fiat and FCA provided these warranties to Plaintiffs. These warranties formed the basis of the bargain that was reached when Plaintiffs purchased or leased their Subject Vehicles.

1052.   However, Fiat and FCA knew or should have known that the warranties were false and/or misleading. Fiat and FCA were aware that the emissions systems in the Subject Vehicles sold and leased to Plaintiffs were designed to deactivate under real-world driving conditions, and to emit oxides of nitrogen within legal limits only when undergoing emissions testing, and therefore, knew that the emission systems contained defects.

1053.   Plaintiffs reasonably relied on Fiat's and FCA's express warranties concerning emissions when purchasing or leasing the Subject Vehicles. However, the Subject Vehicles did not perform as warranted. Unbeknownst to Plaintiffs, the Subject Vehicles were designed to pollute at higher than legal limits during normal driving and could not achieve advertised performance and efficiency metrics without this cheating design. This design and the devices that effectuate it are defects. Fiat and FCA therefore breached their express warranty by providing a product containing defects that were never disclosed to Plaintiffs.

1054.   Any opportunity to cure the express breach is unnecessary and futile.

1055.   As a direct and proximate result of Fiat's and FCA's breach of express warranties, Plaintiffs suffered significant damages, and seek damages in an amount to be determined at trial.

## BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY
### (N.Y. U.C.C. Law §§ 2-314 and 2A-212)

1056.   Plaintiffs reallege and incorporate by reference all allegations of the preceding paragraphs as though fully set forth herein.

1057.   Plaintiffs, Sebastian Korzec, Randy Crawford, Jason Cornetto, Richard Bayly,

Thomas Banks, Tom and Julie Bisselle, Joe Kralik, (for the purpose of this section, "Plaintiffs") bring this action on behalf of themselves against Fiat and FCA.

1058.   Fiat and FCA were at all relevant times "merchants" with respect to motor vehicles under N.Y. UCC Law § 2-104(1) and "sellers" of motor vehicles under § 2-103(1)(d).

1059.   With respect to leases, Fiat and FCA are and were at all relevant times "lessors" of motor vehicles under N.Y. UCC Law § 2A-103(1)(p).

1060.   The Subject Vehicles are and were at all relevant times "goods" within the meaning of N.Y. UCC Law §§ 2-105(1) and 2A-103(1)(h).

1061.   A warranty that the Subject Vehicles were in merchantable condition and fit for the ordinary purpose for which vehicles are used is implied by law pursuant to N.Y. UCC Law §§ 2-314 and 2A-212.

1062.   Fiat and FCA sold and/or leased Subject Vehicles that were not in merchantable condition and/or fit for their ordinary purpose in violation of the implied warranty. The Subject Vehicles were not in merchantable condition because their design violated state and federal laws. The Subject Vehicles were not fit for their ordinary purpose as they were built to evade state and federal emission standards.

1063.   Fiat's and FCA's breaches of the implied warranty of merchantability caused damage to the Plaintiffs. The amount of damages due will be proven at trial.

## 34.   <u>North Carolina</u>

### BREACH OF EXPRESS WARRANTY
### (N.C. Gen. Stat. §§ 25-2-313 and 252A-210)

1064.   Plaintiffs reallege and incorporate by reference all preceding allegations as though fully set forth herein.

343

1065.   Plaintiffs, Kyle Wingate Underhill, Kevin Suhrie, (for the purpose of this section, "Plaintiffs") bring this action on behalf of themselves against Fiat and FCA.

1066.   Fiat and FCA are and were at all relevant times "merchants" with respect to motor vehicles under N.C. Gen. Stat. § 25-2-104(1) and "sellers" of motor vehicles under § 25-2-103(1)(d).

1067.   With respect to leases, Fiat and FCA are and were all relevant times "lessors" of motor vehicles under N.C. Gen. Stat. § 25-2A-103(1)(p).

1068.   The Subject Vehicles are and were at all relevant times "goods" within the meaning of N.C. Gen. Stat. § 25-2-105(1) and § 25-2A-103(1)(h).5.

1069.   Federal law requires manufacturers of light-duty vehicles to provide two federal emission control warranties: a "Performance Warranty" and a "Design and Defect Warranty." The Performance Warranty applies to repairs that are required during the first two years or 24,000 miles, whichever occurs first, when a vehicle fails an emissions test. Under this warranty, certain major emission control components are covered for the first eight years or 80,000 miles, whichever comes first. These major emission control components subject to the longer warranty include the catalytic converters, the electronic engine control unit (ECU), and the onboard emissions diagnostic device or computer. The Design and Defect Warranty covers repair of emission control or emission related parts which fail to function or function improperly due to a defect in materials or workmanship. This warranty provides protection for two years or 24,000 miles, whichever comes first, or, for the major emission control components, for eight years or 80,000 miles, whichever comes first.

1070.   Fiat and FCA provided these warranties to Plaintiffs. These warranties formed the

basis of the bargain that was reached when Plaintiffs purchased or leased their Subject Vehicles.

1071.   However, Fiat and FCA knew or should have known that the warranties were false and/or misleading. Fiat and FCA were aware that the emissions systems in the Subject Vehicles sold and leased to Plaintiffs were designed to deactivate under real-world driving conditions, and to emit oxides of nitrogen within legal limits only when undergoing emissions testing, and therefore, knew that the emission systems contained defects.

1072.   Plaintiffs reasonably relied on Fiat's and FCA's express warranties concerning emissions when purchasing or leasing the Subject Vehicles. However, the Subject Vehicles did not perform as warranted. Unbeknownst to Plaintiffs, the Subject Vehicles were designed to pollute at higher than legal limits during normal driving and could not achieve advertised performance and efficiency metrics without this cheating design. This design and the devices that effectuate it are defects. Fiat and FCA therefore breached their express warranty by providing a product containing defects that were never disclosed to Plaintiffs.

1073.   Any opportunity to cure the express breach is unnecessary and futile.

1074.   As a direct and proximate result of Fiat's and FCA's breach of express warranties, Plaintiffs suffered significant damages, and seek damages in an amount to be determined at trial.

### BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY
### (N.C. Gen. Stat. §§ 25-2-314 AND 252A-212)

1075.   Plaintiffs reallege and incorporate by reference all allegations of the preceding paragraphs as though fully set forth herein.

1076.   Plaintiffs, Kyle Wingate Underhill, Kevin Suhrie, (for the purpose of this section, "Plaintiffs") bring this action on behalf of themselves against Fiat and FCA.

1077.   Fiat and FCA were at all relevant times "merchants" with respect to motor vehicles under N.C. Gen. Stat. § 25-2-104(1) and "sellers" of motor vehicles under § 25-2-103(1)(d).

1078.   With respect to leases, Fiat and FCA are and were at all relevant times "lessors" of motor vehicles under N.C. Gen. Stat. § 25-2A-103(1)(p).

1079.   The Subject Vehicles are and were at all relevant times "goods" within the meaning of N.C. Gen. Stat. § 25-2-105(1) and § 25-2A-103(1)(h).

1080.   A warranty that the Subject Vehicles were in merchantable condition and fit for the ordinary purpose for which vehicles are used is implied by law pursuant to N.C. Gen. Stat. § 25-2-314 and § 25-2A-212.

1081.   Fiat and FCA sold and/or leased Subject Vehicles that were not in merchantable condition and/or fit for their ordinary purpose in violation of the implied warranty. The Subject Vehicles were not in merchantable condition because their design violated state and federal laws. The Subject Vehicles were not fit for their ordinary purpose as they were built to evade state and federal emission standards.

1082.   Fiat's and FCA's breaches of the implied warranty of merchantability caused damage to the Plaintiffs. The amount of damages due will be proven at trial.


**35.**   **North Dakota**

### BREACH OF EXPRESS WARRANTY
### (N.D. Cent. Code §§ 41-02-30 and 41-02.1-19)

1083.   Plaintiffs reallege and incorporate by reference all preceding allegations as though fully set forth herein.

1084.   Plaintiffs, Joshua and Amanda Trepl, Ron Naasz, (for the purpose of this section, "Plaintiff") brings this action on behalf of themselves against Fiat and FCA.

1085.   Fiat and FCA are and were at all relevant times "merchants" with respect to motor vehicles under N.D. Cent. Code § 41-02.04(3) and "sellers" of motor vehicles under § 41-02-03(1)(d).

1086.   With respect to leases, Fiat and FCA are and were all relevant times "lessors" of motor vehicles under N.D. Cent. Code § 41-02.1-03(1)(p).

1087.   The Subject Vehicles are and were at all relevant times "goods" within the meaning of N.D. Cent. Code §§ 41-02-05(2) and 41-02.1-03(1)(h).

1088.   Federal law requires manufacturers of light-duty vehicles to provide two federal emission control warranties: a "Performance Warranty" and a "Design and Defect Warranty." The Performance Warranty applies to repairs that are required during the first two years or 24,000 miles, whichever occurs first, when a vehicle fails an emissions test. Under this warranty, certain major emission control components are covered for the first eight years or 80,000 miles, whichever comes first. These major emission control components subject to the longer warranty include the catalytic converters, the electronic engine control unit (ECU), and the onboard emissions diagnostic device or computer. The Design and Defect Warranty covers repair of emission control or emission related parts which fail to function or function improperly due to a defect in materials or workmanship. This warranty provides protection for two years or 24,000 miles, whichever comes first, or, for the major emission control components, for eight years or 80,000 miles, whichever comes first.

1089.   Fiat and FCA provided these warranties to Plaintiff. These warranties formed the basis of the bargain that was reached when Plaintiff purchased or leased their Subject Vehicles.

1090.   However, Fiat and FCA knew or should have known that the warranties were false and/or misleading. Fiat and FCA were aware that the emissions systems in the Subject Vehicles

347

sold and leased to Plaintiffs were designed to deactivate under real-world driving conditions, and to emit oxides of nitrogen within legal limits only when undergoing emissions testing, and therefore, knew that the emission systems contained defects.

1091.   Plaintiffs reasonably relied on Fiat's and FCA's express warranties concerning emissions when purchasing or leasing the Subject Vehicles. However, the Subject Vehicles did not perform as warranted. Unbeknownst to Plaintiffs, the Subject Vehicles were designed to pollute at higher than legal limits during normal driving and could not achieve advertised performance and efficiency metrics without this cheating design. This design and the devices that effectuate it are defects. Fiat and FCA therefore breached their express warranty by providing a product containing defects that were never disclosed to Plaintiffs.

1092.   Any opportunity to cure the express breach is unnecessary and futile.

1093.   As a direct and proximate result of Fiat's and FCA's breach of express warranties, Plaintiff suffered significant damages, and seek damages in an amount to be determined at trial.

## BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY
### (N.D. Cent. Code §§ 41-02-31 and 41-02.1-21)

1094.   Plaintiffs reallege and incorporate by reference all allegations of the preceding paragraphs as though fully set forth herein.

1095.   Plaintiffs, Joshua and Amanda Trepl, Ron Naasz, (for the purpose of this section, "Plaintiff") brings this action on behalf of themselves against Fiat and FCA.

1096.   Fiat and FCA were at all relevant times "merchants" with respect to motor vehicles under N.D. Cent. Code § 41-02.04(3) and "sellers" of motor vehicles under § 41-02-03(1)(d).

1097.   With respect to leases, Fiat and FCA are and were at all relevant times "lessors" of motor vehicles under N.D. Cent. Code § 41-02.1-03(1)(p).

1098.   The Subject Vehicles are and were at all relevant times "goods" within the meaning

of N.D. Cent. Code §§ 41-02-05(2) and 41-02.1-03(1)(h).

1099.    A warranty that the Subject Vehicles were in merchantable condition and fit for the ordinary purpose for which vehicles are used is implied by law pursuant to N.D. Cent. Code §§ 41-02-31 and 41-02.1-21.

1100.    Fiat and FCA sold and/or leased Subject Vehicles that were not in merchantable condition and/or fit for their ordinary purpose in violation of the implied warranty. The Subject Vehicles were not in merchantable condition because their design violated state and federal laws. The Subject Vehicles were not fit for their ordinary purpose as they were built to evade state and federal emission standards.

1101.    Fiat's and FCA's breaches of the implied warranty of merchantability caused damage to Plaintiff. The amount of damages due will be proven at trial.

### 36.    Ohio

**BREACH OF EXPRESS WARRANTY**
**(Ohio Rev. Code § 1302.26, *et seq*.) (U.C.C. §2-313))**

1102.    Plaintiffs reallege and incorporate by reference all preceding allegations as though fully set forth herein.

1103.    Plaintiffs, William and Sherry Coomes, (for the purpose of this section, "Plaintiff") brings this action on behalf of themselves against Fiat and FCA.

1104.    Fiat and FCA are and were at all relevant times "merchants" with respect to motor vehicles under Ohio Rev. Code §§ 1302.01(5) and 1310.01(A)(20), and "sellers" of motor vehicles under § 1302.01(4).

1105.   With respect to leases, Fiat and FCA are and were all relevant times "lessors" of motor vehicles under Ohio Rev. Code § 1310.01(A)(20).

1106.   The Subject Vehicles are and were at all relevant times "goods" within the meaning of Ohio Rev. Code §§ 1302.01(8) and 1310.01(A)(8).

1107.   Federal law requires manufacturers of light-duty vehicles to provide two federal emission control warranties: a "Performance Warranty" and a "Design and Defect Warranty." The Performance Warranty applies to repairs that are required during the first two years or 24,000 miles, whichever occurs first, when a vehicle fails an emissions test. Under this warranty, certain major emission control components are covered for the first eight years or 80,000 miles, whichever comes first. These major emission control components subject to the longer warranty include the catalytic converters, the electronic engine control unit (ECU), and the onboard emissions diagnostic device or computer. The Design and Defect Warranty covers repair of emission control or emission related parts which fail to function or function improperly due to a defect in materials or workmanship. This warranty provides protection for two years or 24,000 miles, whichever comes first, or, for the major emission control components, for eight years or 80,000 miles, whichever comes first.

1108.   Fiat and FCA provided these warranties to Plaintiff. These warranties formed the basis of the bargain that was reached when Plaintiff purchased or leased their Subject Vehicles.

1109.   However, Fiat and FCA knew or should have known that the warranties were false and/or misleading. Fiat and FCA were aware that the emissions systems in the Subject Vehicles sold and leased to Plaintiffs were designed to deactivate under real-world driving conditions, and to emit oxides of nitrogen within legal limits only when undergoing emissions testing, and

therefore, knew that the emission systems contained defects.

1110.   Plaintiffs reasonably relied on Fiat's and FCA's express warranties concerning emissions when purchasing or leasing the Subject Vehicles. However, the Subject Vehicles did not perform as warranted. Unbeknownst to Plaintiffs and the Ohio State Plaintiffs, the Subject Vehicles were designed to pollute at higher than legal limits during normal driving and could not achieve advertised performance and efficiency metrics without this cheating design. This design and the devices that effectuate it are defects. Fiat and FCA therefore breached their express warranty by providing a product containing defects that were never disclosed to Plaintiffs.

1111.   Any opportunity to cure the express breach is unnecessary and futile.

1112.   As a direct and proximate result of Fiat's and FCA's breach of express warranties, Plaintiff suffered significant damages, and seek damages in an amount to be determined at trial.

## BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY
### (Ohio Rev. Code Ann. §§ 1302.27 and 1310.19)

1113.   Plaintiffs reallege and incorporate by reference all allegations of the preceding paragraphs as though fully set forth herein.

1114.   Plaintiffs, William and Sherry Coomes, (for the purpose of this section, "Plaintiff") brings this action on behalf of themselves against Fiat and FCA.

1115.   Fiat and FCA were at all relevant times "merchants" with respect to motor vehicles under Ohio Rev. Code §§ 1302.01(5) and 1310.01(A)(20), and "sellers" of motor vehicles under § 1302.01(4).

1116.   With respect to leases, Fiat and FCA are and were at all relevant times "lessors" of motor vehicles under Ohio Rev. Code § 1310.01(A)(20).

1117.   The Subject Vehicles are and were at all relevant times "goods" within the meaning

of Ohio Rev. Code §§ 1302.01(8) and 1310.01(A)(8).

1118.   A warranty that the Subject Vehicles were in merchantable condition and fit for the ordinary purpose for which vehicles are used is implied by law pursuant to Ohio Rev. Code §§ 1302.27 and 1310.

1119.   Fiat and FCA sold and/or leased Subject Vehicles that were not in merchantable condition and/or fit for their ordinary purpose in violation of the implied warranty. The Subject Vehicles were not in merchantable condition because their design violated state and federal laws. The Subject Vehicles were not fit for their ordinary purpose as they were built to evade state and federal emission standards.

1120.   Fiat's and FCA's breaches of the implied warranty of merchantability caused damage to Plaintiffs. The amount of damages due will be proven at trial.

### 37.   Oklahoma
### BREACH OF EXPRESS WARRANTY
### (Okla. Stat. Tit. 12A §§ 2-313 and 2A-210)

1121.   Plaintiffs reallege and incorporate by reference all preceding allegations as though fully set forth herein.

1122.   Plaintiffs, Don and Kathern Wells, William R. and Breia N. Willaford, Andrew Waters, Daniel Gonzales, Gerald and Christine Good, Zachary Austin Pearson, (for the purpose of this section, "Plaintiff") brings this action on behalf of themselves against Fiat and FCA.

1123.   Fiat and FCA are and were at all relevant times "merchants" with respect to motor vehicles under Okla. Stat. Tit. 12A §§ 2-104(1) and 2-1103(3), and "sellers" of motor vehicles under § 2A-103(1)(t).

1124.   With respect to leases, Fiat and FCA are and were all relevant times "lessors" of motor vehicles under Okla. Stat. Tit. 12A § 2A-103(1)(p).

1125.   The Subject Vehicles are and were at all relevant times "goods" within the meaning of Okla. Stat. Tit. 12A §§ 2-105(1) and 2A-103(1)(h).

1126.   Federal law requires manufacturers of light-duty vehicles to provide two federal emission control warranties: a "Performance Warranty" and a "Design and Defect Warranty." The Performance Warranty applies to repairs that are required during the first two years or 24,000 miles, whichever occurs first, when a vehicle fails an emissions test. Under this warranty, certain major emission control components are covered for the first eight years or 80,000 miles, whichever comes first. These major emission control components subject to the longer warranty include the catalytic converters, the electronic engine control unit (ECU), and the onboard emissions diagnostic device or computer. The Design and Defect Warranty covers repair of emission control or emission related parts which fail to function or function improperly due to a defect in materials or workmanship. This warranty provides protection for two years or 24,000 miles, whichever comes first, or, for the major emission control components, for eight years or 80,000 miles, whichever comes first.

1127.   Fiat and FCA provided these warranties to Plaintiffs. These warranties formed the basis of the bargain that was reached when Plaintiffs purchased or leased their Subject Vehicles.

1128.   However, Fiat and FCA knew or should have known that the warranties were false and/or misleading. Fiat and FCA were aware that the emissions systems in the Subject Vehicles sold and leased to Plaintiffs were designed to deactivate under real-world driving conditions, and to emit oxides of nitrogen within legal limits only when undergoing emissions testing, and therefore, knew that the emission systems contained defects.

1129.   Plaintiffs reasonably relied on Fiat's and FCA's express warranties concerning emissions when purchasing or leasing the Subject Vehicles. However, the Subject Vehicles did

not perform as warranted. Unbeknownst to Plaintiff and the Oklahoma State Plaintiffs, the Subject Vehicles were designed to pollute at higher than legal limits during normal driving, and could not achieve advertised performance and efficiency metrics without this cheating design. This design and the devices that effectuate it are defects. Fiat and FCA therefore breached their express warranty by providing a product containing defects that were never disclosed to Plaintiffs.

1130.   Any opportunity to cure the express breach is unnecessary and futile.

1131.   As a direct and proximate result of Fiat's and FCA's breach of express warranties, Plaintiffs suffered significant damages, and seek damages in an amount to be determined at trial.

## BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY
### (Okla. Stat. Tit. 12A §§ 2-314 and 2A-212)

1132.   Plaintiffs reallege and incorporate by reference all allegations of the preceding paragraphs as though fully set forth herein.

1133.   Plaintiffs, Don and Kathern Wells, William R. and Breia N. Willaford, Andrew Waters, Daniel Gonzales, Gerald and Christine Good, Zachary Austin Pearson, (for the purpose of this section, "Plaintiff") brings this action on behalf of themselves against Fiat and FCA.

1134.   Fiat and FCA were at all relevant times "merchants" with respect to motor vehicles under Okla. Stat. Tit. 12A §§ 2-104(1) and 2-1103(3), and "sellers" of motor vehicles under § 2A-103(1)(t).

1135.   With respect to leases, Fiat and FCA are and were at all relevant times "lessors" of motor vehicles under Okla. Stat. Tit. 12A § 2A-103(1)(p).

1136.   The Subject Vehicles are and were at all relevant times "goods" within the meaning of Okla. Stat. Tit. 12A §§ 2-105(1) and 2A-103(1)(h).

1137.   A warranty that the Subject Vehicles were in merchantable condition and fit for the ordinary purpose for which vehicles are used is implied by law pursuant to Okla. Stat. Tit. 12A §§

2-314 and 2A-212.

1138.   Fiat and FCA sold and/or leased Subject Vehicles that were not in merchantable condition and/or fit for their ordinary purpose in violation of the implied warranty. The Subject Vehicles were not in merchantable condition because their design violated state and federal laws. The Subject Vehicles were not fit for their ordinary purpose as they were built to evade state and federal emission standards.

1139.   Fiat's and FCA's breaches of the implied warranty of merchantability caused damage to Plaintiffs. The amount of damages due will be proven at trial.

### 38.   Oregon

### BREACH OF EXPRESS WARRANTY
### (Or. Rev. Stat. §§ 72.3130 and 72A.2100)

1140.   Plaintiffs reallege and incorporate by reference all preceding allegations as though fully set forth herein.

1141.   Plaintiffs, Arthur Alfinito, Sean McCaffery, Ronnie Vincent, (for the purpose of this section, "Plaintiffs") bring this action on behalf of themselves against Fiat and FCA.

1142.   Fiat and FCA are and were at all relevant times "merchants" with respect to motor vehicles under Or. Rev. Stat. §§ 72.1040(1) and 72A.1030(1)(t), and "sellers" of motor vehicles under § 72.1030(1)(d).

1143.   With respect to leases, Fiat and FCA are and were all relevant times "lessors" of motor vehicles under Or. Rev. Stat. § 72A.1030(1)(p).

1144.   The Subject Vehicles are and were at all relevant times "goods" within the meaning of Or. Rev. Stat. §§ 72.1050(1) and 72A.1030(1)(h).

1145.   Federal law requires manufacturers of light-duty vehicles to provide two federal emission control warranties: a "Performance Warranty" and a "Design and Defect Warranty." The

Performance Warranty applies to repairs that are required during the first two years or 24,000 miles, whichever occurs first, when a vehicle fails an emissions test. Under this warranty, certain major emission control components are covered for the first eight years or 80,000 miles, whichever comes first. These major emission control components subject to the longer warranty include the catalytic converters, the electronic engine control unit (ECU), and the onboard emissions diagnostic device or computer. The Design and Defect Warranty covers repair of emission control or emission related parts which fail to function or function improperly due to a defect in materials or workmanship. This warranty provides protection for two years or 24,000 miles, whichever comes first, or, for the major emission control components, for eight years or 80,000 miles, whichever comes first.

1146.   Fiat and FCA provided these warranties to Plaintiffs. These warranties formed the basis of the bargain that was reached when Plaintiffs purchased or leased their Subject Vehicles.

1147.   However, Fiat and FCA knew or should have known that the warranties were false and/or misleading. Fiat and FCA were aware that the emissions systems in the Subject Vehicles sold and leased to Plaintiffs were designed to deactivate under real-world driving conditions, and to emit oxides of nitrogen within legal limits only when undergoing emissions testing, and therefore, knew that the emission systems contained defects.

1148.   Plaintiffs reasonably relied on Fiat's and FCA's express warranties concerning emissions when purchasing or leasing the Subject Vehicles. However, the Subject Vehicles did not perform as warranted. Unbeknownst to Plaintiffs and the Oregon State Plaintiffs, the Subject Vehicles were designed to pollute at higher than legal limits during normal driving, and could not achieve advertised performance and efficiency metrics without this cheating design. This design and the devices that effectuate it are defects. Fiat and FCA therefore breached their express

warranty by providing a product containing defects that were never disclosed to Plaintiffs.

1149.   Any opportunity to cure the express breach is unnecessary and futile.

1150.   As a direct and proximate result of Fiat's and FCA's breach of express warranties, Plaintiffs suffered significant damages, and seek damages in an amount to be determined at trial.

## BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY
### (Or. Rev. Stat. § 72.3140 and 72A.2120)

1151.   Plaintiffs reallege and incorporate by reference all allegations of the preceding paragraphs as though fully set forth herein.

1152.   Plaintiffs, Arthur Alfinito, Sean McCaffery, Ronnie Vincent, (for the purpose of this section, "Plaintiffs") bring this action on behalf of themselves against Fiat and FCA.

1153.   Fiat and FCA were at all relevant times "merchants" with respect to motor vehicles under Or. Rev. Stat. §§ 72.1040(1) and 72A.1030(1)(t), and "sellers" of motor vehicles under § 72.1030(1)(d).

1154.   With respect to leases, Fiat and FCA are and were at all relevant times "lessors" of motor vehicles under Or. Rev. Stat. § 72A.1030(1)(p).

1155.   The Subject Vehicles are and were at all relevant times "goods" within the meaning of Or. Rev. Stat. §§ 72.1050(1) and 72A.1030(1)(h).

1156.   A warranty that the Subject Vehicles were in merchantable condition and fit for the ordinary purpose for which vehicles are used is implied by law pursuant to Or. Rev. Stat. §§ 72.3140 and 72A-2120.

1157.   Fiat and FCA sold and/or leased Subject Vehicles that were not in merchantable

357

condition and/or fit for their ordinary purpose in violation of the implied warranty. The Subject Vehicles were not in merchantable condition because their design violated state and federal laws. The Subject Vehicles were not fit for their ordinary purpose as they were built to evade state and federal emission standards.

1158.   Fiat's and FCA's breaches of the implied warranty of merchantability caused damage to the Plaintiffs. The amount of damages due will be proven at trial.

**39.   Pennsylvania**

**BREACH OF EXPRESS WARRANTY**
**(13 PA. CONS. STAT. §§ 2313 and 2A210)**

1159.   Plaintiffs reallege and incorporate by reference all preceding allegations as though fully set forth herein.

1160.   Plaintiffs, Steve Reeves, Robert and Cheryl Body, Dominick Melfi, (for the purpose of this section, "Plaintiffs") bring this action on behalf of themselves against Fiat and FCA.

1161.   Fiat and FCA are and were at all relevant times "merchants" with respect to motor vehicles under 13 Pa. Cons. Stat. §§ 2104 and 2A103(a), and "sellers" of motor vehicles under § 2103(a).

1162.   With respect to leases, Fiat and FCA are and were all relevant times "lessors" of motor vehicles under 13 Pa. Cons. Stat. § 2A103(a).

1163.   The Subject Vehicles are and were at all relevant times "goods" within the meaning of 13 Pa. Cons. Stat. §§ 2105(a) and 2A103(a).

1164.   Federal law requires manufacturers of light-duty vehicles to provide two federal emission control warranties: a "Performance Warranty" and a "Design and Defect Warranty." The

Performance Warranty applies to repairs that are required during the first two years or 24,000 miles, whichever occurs first, when a vehicle fails an emissions test. Under this warranty, certain major emission control components are covered for the first eight years or 80,000 miles, whichever comes first. These major emission control components subject to the longer warranty include the catalytic converters, the electronic engine control unit (ECU), and the onboard emissions diagnostic device or computer. The Design and Defect Warranty covers repair of emission control or emission related parts which fail to function or function improperly due to a defect in materials or workmanship. This warranty provides protection for two years or 24,000 miles, whichever comes first, or, for the major emission control components, for eight years or 80,000 miles, whichever comes first.

1165.   Fiat and FCA provided these warranties to Plaintiffs. These warranties formed the basis of the bargain that was reached when Plaintiffs purchased or leased their Subject Vehicles.

1166.   However, Fiat and FCA knew or should have known that the warranties were false and/or misleading. Fiat and FCA were aware that the emissions systems in the Subject Vehicles sold and leased to Plaintiffs were designed to deactivate under real-world driving conditions, and to emit oxides of nitrogen within legal limits only when undergoing emissions testing, and therefore, knew that the emission systems contained defects.

1167.   Plaintiffs reasonably relied on Fiat's and FCA's express warranties concerning emissions when purchasing or leasing the Subject Vehicles. However, the Subject Vehicles did not perform as warranted. Unbeknownst to Plaintiffs, the Subject Vehicles were designed to pollute at higher than legal limits during normal driving, and could not achieve advertised performance and efficiency metrics without this cheating design. This design and the devices that effectuate it are defects. Fiat and FCA therefore breached their express warranty by providing a

product containing defects that were never disclosed to Plaintiffs.

1168.   Any opportunity to cure the express breach is unnecessary and futile.

1169.   As a direct and proximate result of Fiat's and FCA's breach of express warranties, Plaintiffs suffered significant damages, and seek damages in an amount to be determined at trial.

## BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY
### (13 Pa. Cons. Stat. §§ 2314 and 2A212)

1170.   Plaintiffs reallege and incorporate by reference all allegations of the preceding paragraphs as though fully set forth herein.

1171.   Plaintiffs, Steve Reeves, Robert and Cheryl Body, Dominick Melfi, (for the purpose of this section, "Plaintiffs") bring this action on behalf of themselves against Fiat and FCA.

1172.   Fiat and FCA were at all relevant times "merchants" with respect to motor vehicles under 13 Pa. Cons. Stat. §§ 2104 and 2A103(a), and "sellers" of motor vehicles under § 2103(a).

1173.   With respect to leases, Fiat and FCA are and were at all relevant times "lessors" of motor vehicles under 13 Pa. Cons. Stat. § 2A103(a).

1174.   The Subject Vehicles are and were at all relevant times "goods" within the meaning of 13 Pa. Cons. Stat. §§ 2105(a) and 2A103(a).

1175.   A warranty that the Subject Vehicles were in merchantable condition and fit for the ordinary purpose for which vehicles are used is implied by law pursuant to 13 Pa. Cons. Stat. §§ 2314 and 2A212.

1176.   Fiat and FCA sold and/or leased Subject Vehicles that were not in merchantable condition and/or fit for their ordinary purpose in violation of the implied warranty. The Subject Vehicles were not in merchantable condition because their design violated state and federal laws. The Subject Vehicles were not fit for their ordinary purpose as they were built to evade state and

federal emission standards.

1177.   Fiat's and FCA's breaches of the implied warranty of merchantability caused damage to the Plaintiffs. The amount of damages due will be proven at trial.

40.   **Rhode Island**

**BREACH OF EXPRESS WARRANTY**
**(R.I. Gen. Laws §§ 6A-2-313 and 6A-2.1-210)**

1178.   Plaintiffs reallege and incorporate by reference all preceding allegations as though fully set forth herein.

1179.   Plaintiffs, to be named at a later date, (for the purpose of this section, "Plaintiffs") bring this action on behalf of themselves against Fiat and FCA.

1180.   Fiat and FCA are and were at all relevant times "merchants" with respect to motor vehicles under R.I. Gen. Laws §§ 6A-2-104(1) and 6A-2.1-103(1)(t), and "sellers" of motor vehicles under § 6A-2-103(a)(4).

1181.   With respect to leases, Fiat and FCA are and were all relevant times "lessors" of motor vehicles under R.I. Gen. Laws § 6A-2.1-103(1)(p).

1182.   The Subject Vehicles are and were at all relevant times "goods" within the meaning of R.I. Gen. Laws §§ 6A-2-105(1) and 6A-2.1-103(1)(h).

1183.   Federal law requires manufacturers of light-duty vehicles to provide two federal emission control warranties: a "Performance Warranty" and a "Design and Defect Warranty." The Performance Warranty applies to repairs that are required during the first two years or 24,000 miles, whichever occurs first, when a vehicle fails an emissions test. Under this warranty, certain major emission control components are covered for the first eight years or 80,000 miles, whichever comes first. These major emission control components subject to the longer warranty include the catalytic converters, the electronic engine control unit (ECU), and the onboard emissions

diagnostic device or computer. The Design and Defect Warranty covers repair of emission control or emission related parts which fail to function or function improperly due to a defect in materials or workmanship. This warranty provides protection for two years or 24,000 miles, whichever comes first, or, for the major emission control components, for eight years or 80,000 miles, whichever comes first.

1184.    Fiat and FCA provided these warranties to the Plaintiffs. These warranties formed the basis of the bargain that was reached when the Plaintiffs purchased or leased their Subject Vehicles.

1185.    However, Fiat and FCA knew or should have known that the warranties were false and/or misleading. Fiat and FCA were aware that the emissions systems in the Subject Vehicles sold and leased to the Plaintiffs were designed to deactivate under real-world driving conditions, and to emit oxides of nitrogen within legal limits only when undergoing emissions testing, and therefore, knew that the emission systems contained defects.

1186.    The Plaintiffs reasonably relied on Fiat's and FCA's express warranties concerning emissions when purchasing or leasing the Subject Vehicles. However, the Subject Vehicles did not perform as warranted. Unbeknownst to the Plaintiffs, the Subject Vehicles were designed to pollute at higher than legal limits during normal driving, and could not achieve advertised performance and efficiency metrics without this cheating design. This design and the devices that effectuate it are defects. Fiat and FCA therefore breached their express warranty by providing a product containing defects that were never disclosed to the Plaintiffs.

1187.    Any opportunity to cure the express breach is unnecessary and futile.

1188.    As a direct and proximate result of Fiat's and FCA's breach of express warranties, the Plaintiffs suffered significant damages, and seek damages in an amount to be determined at

trial.

## BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY
### (R.I. Gen. Laws §§ 6A-2-314 and 6A-2.1-212)

1189.   Plaintiffs reallege and incorporate by reference all allegations of the preceding paragraphs as though fully set forth herein.

1190.   Plaintiffs, to be named at a later date, (for the purpose of this section, "Plaintiffs") bring this action on behalf of themselves against Fiat and FCA.

1191.   Fiat and FCA were at all relevant times "merchants" with respect to motor vehicles under R.I. Gen. Laws §§ 6A-2-104(1) and 6A-2.1-103(1)(t), and "sellers" of motor vehicles under § 6A-2-103(a)(4).

1192.   With respect to leases, Fiat and FCA are and were at all relevant times "lessors" of motor vehicles under R.I. Gen. Laws § 6A-2.1-103(1)(p).

1193.   The Subject Vehicles are and were at all relevant times "goods" within the meaning of R.I. Gen. Laws §§ 6A-2-105(1) and 6A-2.1-103(1)(h).

1194.   A warranty that the Subject Vehicles were in merchantable condition and fit for the ordinary purpose for which vehicles are used is implied by law pursuant to R.I. Gen. Laws §§ 6A-2-314 and 6A-2.1-212.

1195.   Fiat and FCA sold and/or leased Subject Vehicles that were not in merchantable condition and/or fit for their ordinary purpose in violation of the implied warranty. The Subject Vehicles were not in merchantable condition because their design violated state and federal laws. The Subject Vehicles were not fit for their ordinary purpose as they were built to evade state and federal emission standards.

1196.   Fiat's and FCA's breaches of the implied warranty of merchantability caused

damage to the Plaintiffs. The amount of damages due will be proven at trial.

41.   **South Carolina**

**BREACH OF EXPRESS WARRANTY**
**(S.C. Code §§ 36-2-313 and 36-2A-210)**

1197.   Plaintiffs reallege and incorporate by reference all preceding allegations as though fully set forth herein.

1198.   Plaintiffs, William Jones, (for the purpose of this section, "Plaintiffs") bring this action on behalf of themselves against Fiat and FCA.

1199.   Fiat and FCA are and were at all relevant times "merchants" with respect to motor vehicles under S.C. Code §§ 36-2-104(1) and 36-2A-103(1)(t), and "sellers" of motor vehicles under § 36-2-103(1)(d).

1200.   With respect to leases, Fiat and FCA are and were all relevant times "lessors" of motor vehicles under S.C. Code § 36-2A-103(1)(p).

1201.   The Subject Vehicles are and were at all relevant times "goods" within the meaning of S.C. Code §§ 36-2-105(1) and 36-2A-103(1)(h).

1202.   Federal law requires manufacturers of light-duty vehicles to provide two federal emission control warranties: a "Performance Warranty" and a "Design and Defect Warranty." The Performance Warranty applies to repairs that are required during the first two years or 24,000 miles, whichever occurs first, when a vehicle fails an emissions test. Under this warranty, certain major emission control components are covered for the first eight years or 80,000 miles, whichever comes first. These major emission control components subject to the longer warranty include the

catalytic converters, the electronic engine control unit (ECU), and the onboard emissions diagnostic device or computer. The Design and Defect Warranty covers repair of emission control or emission related parts which fail to function or function improperly due to a defect in materials or workmanship. This warranty provides protection for two years or 24,000 miles, whichever comes first, or, for the major emission control components, for eight years or 80,000 miles, whichever comes first.

1203.   Fiat and FCA provided these warranties to Plaintiffs. These warranties formed the basis of the bargain that was reached when Plaintiffs purchased or leased their Subject Vehicles.

1204.   However, Fiat and FCA knew or should have known that the warranties were false and/or misleading. Fiat and FCA were aware that the emissions systems in the Subject Vehicles sold and leased to Plaintiffs were designed to deactivate under real-world driving conditions, and to emit oxides of nitrogen within legal limits only when undergoing emissions testing, and therefore, knew that the emission systems contained defects.

1205.   Plaintiffs reasonably relied on Fiat's and FCA's express warranties concerning emissions when purchasing or leasing the Subject Vehicles. However, the Subject Vehicles did not perform as warranted. Unbeknownst to Plaintiffs, the Subject Vehicles were designed to pollute at higher than legal limits during normal driving and could not achieve advertised performance and efficiency metrics without this cheating design. This design and the devices that effectuate it are defects. Fiat and FCA therefore breached their express warranty by providing a product containing defects that were never disclosed to Plaintiffs.

1206.   Any opportunity to cure the express breach is unnecessary and futile.

1207.   As a direct and proximate result of Fiat's and FCA's breach of express warranties,

Plaintiffs suffered significant damages, and seek damages in an amount to be determined at trial.

## BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY
### (S.C. Code §§ 36-2-314 and 36-2A-212)

1208.   Plaintiffs reallege and incorporate by reference all allegations of the preceding paragraphs as though fully set forth herein.

1209.   Plaintiffs, William Jones, (for the purpose of this section, "Plaintiffs") bring this action on behalf of themselves against Fiat and FCA.

1210.   Fiat and FCA were at all relevant times "merchants" with respect to motor vehicles under S.C. Code §§ 36-2-104(1) and 36-2A-103(1)(t), and "sellers" of motor vehicles under § 36-2-103(1)(d).

1211.   With respect to leases, Fiat and FCA are and were at all relevant times "lessors" of motor vehicles under S.C. Code § 36-2A-103(1)(p).

1212.   The Subject Vehicles are and were at all relevant times "goods" within the meaning of S.C. Code §§ 36-2-105(1) and 36-2A-103(1)(h).

1213.   A warranty that the Subject Vehicles were in merchantable condition and fit for the ordinary purpose for which vehicles are used is implied by law pursuant to S.C. Code §§ 36-2-314 and 36-2A-212.

1214.   Fiat and FCA sold and/or leased Subject Vehicles that were not in merchantable condition and/or fit for their ordinary purpose in violation of the implied warranty. The Subject Vehicles were not in merchantable condition because their design violated state and federal laws. The Subject Vehicles were not fit for their ordinary purpose as they were built to evade state and federal emission standards.

1215.   Fiat's and FCA's breaches of the implied warranty of merchantability caused damage to the Plaintiffs. The amount of damages due will be proven at trial.

42.   **South Dakota**

### BREACH OF EXPRESS WARRANTY
### (S.D. Codified Laws §§ 57A-2-313 and 57A-2A-210)

1216.   Plaintiffs reallege and incorporate by reference all preceding allegations as though fully set forth herein.

1217.   Plaintiffs, Thomas Gengler, Nicholas Selchert, (for the purpose of this section, "Plaintiffs") bring this action on behalf of themselves against Fiat and FCA.

1218.   Fiat and FCA are and were at all relevant times "merchants" with respect to motor vehicles under S.D. Codified Laws §§ 57A-104(1) and 57A-2A-103(1)(t), and "sellers" of motor vehicles under § 57A-104(1)(d).

1219.   With respect to leases, Fiat and FCA are and were all relevant times "lessors" of motor vehicles under S.D. Codified Laws § 57A-2A-103(1)(p).

1220.   The Subject Vehicles are and were at all relevant times "goods" within the meaning of S.D. Codified Laws §§ 57A-2-105(1) and 57A-2A-103(1)(h).

1221.   Federal law requires manufacturers of light-duty vehicles to provide two federal emission control warranties: a "Performance Warranty" and a "Design and Defect Warranty." The Performance Warranty applies to repairs that are required during the first two years or 24,000 miles, whichever occurs first, when a vehicle fails an emissions test. Under this warranty, certain major emission control components are covered for the first eight years or 80,000 miles, whichever comes first. These major emission control components subject to the longer warranty include the catalytic converters, the electronic engine control unit (ECU), and the onboard emissions diagnostic device or computer. The Design and Defect Warranty covers repair of emission control or emission related parts which fail to function or function improperly due to a defect in materials

or workmanship. This warranty provides protection for two years or 24,000 miles, whichever comes first, or, for the major emission control components, for eight years or 80,000 miles, whichever comes first.

1222.   Fiat and FCA provided these warranties to Plaintiffs. These warranties formed the basis of the bargain that was reached when Plaintiffs purchased or leased their Subject Vehicles.

1223.   However, Fiat and FCA knew or should have known that the warranties were false and/or misleading. Fiat and FCA were aware that the emissions systems in the Subject Vehicles sold and leased to Plaintiffs were designed to deactivate under real-world driving conditions, and to emit oxides of nitrogen within legal limits only when undergoing emissions testing, and therefore, knew that the emission systems contained defects.

1224.   Plaintiffs reasonably relied on Fiat's and FCA's express warranties concerning emissions when purchasing or leasing the Subject Vehicles. However, the Subject Vehicles did not perform as warranted. Unbeknownst to Plaintiffs, the Subject Vehicles were designed to pollute at higher than legal limits during normal driving, and could not achieve advertised performance and efficiency metrics without this cheating design. This design and the devices that effectuate it are defects. Fiat and FCA therefore breached their express warranty by providing a product containing defects that were never disclosed to Plaintiffs.

1225.   Any opportunity to cure the express breach is unnecessary and futile.

1226.   As a direct and proximate result of Fiat's and FCA's breach of express warranties, Plaintiffs suffered significant damages, and seek damages in an amount to be determined at trial.

### BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY
(S.D. Codified Laws §§ 57A-2-314 and 57A-2A-212)

1227.   Plaintiffs reallege and incorporate by reference all allegations of the preceding paragraphs as though fully set forth herein.

1228.   Plaintiffs, Thomas Gengler, Nicholas Selchert, (for the purpose of this section, "Plaintiffs") bring this action on behalf of themselves against Fiat and FCA.

1229.   Fiat and FCA were at all relevant times "merchants" with respect to motor vehicles under S.D. Codified Laws §§ 57A-104(1) and 57A-2A-103(1)(t), and "sellers" of motor vehicles under § 57A-104(1)(d).

1230.   With respect to leases, Fiat and FCA are and were at all relevant times "lessors" of motor vehicles under S.D. Codified Laws § 57A-2A-103(1)(p).

1231.   The Subject Vehicles are and were at all relevant times "goods" within the meaning of S.D. Codified Laws §§ 57A-2-105(1) and 57A-2A-103(1)(h).

1232.   A warranty that the Subject Vehicles were in merchantable condition and fit for the ordinary purpose for which vehicles are used is implied by law pursuant to S.D. Codified Laws §§ 57A-2-314 and 57A-2A-212.

1233.   Fiat and FCA sold and/or leased Subject Vehicles that were not in merchantable condition and/or fit for their ordinary purpose in violation of the implied warranty. The Subject Vehicles were not in merchantable condition because their design violated state and federal laws. The Subject Vehicles were not fit for their ordinary purpose as they were built to evade state and federal emission standards.

1234.   Fiat's and FCA's breaches of the implied warranty of merchantability caused damage to the Plaintiffs. The amount of damages due will be proven at trial.

43.   **Tennessee**

**BREACH OF EXPRESS WARRANTY**
**(Tenn. Code §§ 47-2-313 and 47-2A-210)**

1235.   Plaintiffs reallege and incorporate by reference all preceding allegations as though fully set forth herein.

1236.   Plaintiffs, Benjamin Matthews, (for the purpose of this section, "Plaintiffs") bring this action on behalf of themselves against Fiat and FCA.

1237.   Fiat and FCA are and were at all relevant times "merchants" with respect to motor vehicles under Tenn. Code §§ 47-2-104(1) and 47-2A-103(1)(t), and "sellers" of motor vehicles under § 47-2-103(1)(d).

1238.   With respect to leases, Fiat and FCA are and were all relevant times "lessors" of motor vehicles under Tenn. Code § 47-2A-103(1)(p).

1239.   The Subject Vehicles are and were at all relevant times "goods" within the meaning of Tenn. Code §§ 47-2-105(1) and 47-2A-103(1)(h).

1240.   Federal law requires manufacturers of light-duty vehicles to provide two federal emission control warranties: a "Performance Warranty" and a "Design and Defect Warranty." The Performance Warranty applies to repairs that are required during the first two years or 24,000 miles, whichever occurs first, when a vehicle fails an emissions test. Under this warranty, certain major emission control components are covered for the first eight years or 80,000 miles, whichever comes first. These major emission control components subject to the longer warranty include the catalytic converters, the electronic engine control unit (ECU), and the onboard emissions diagnostic device or computer. The Design and Defect Warranty covers repair of emission control or emission related parts which fail to function or function improperly due to a defect in materials or workmanship. This warranty provides protection for two years or 24,000 miles, whichever comes first, or, for the major emission control components, for eight years or 80,000 miles, whichever comes first.

1241.   Fiat and FCA provided these warranties to Plaintiffs. These warranties formed the basis of the bargain that was reached when Plaintiffs purchased or leased their Subject Vehicles.

1242.   However, Fiat and FCA knew or should have known that the warranties were false and/or misleading. Fiat and FCA were aware that the emissions systems in the Subject Vehicles sold and leased to Plaintiffs were designed to deactivate under real-world driving conditions, and to emit oxides of nitrogen within legal limits only when undergoing emissions testing, and therefore, knew that the emission systems contained defects.

1243.   Plaintiffs reasonably relied on Fiat's and FCA's express warranties concerning emissions when purchasing or leasing the Subject Vehicles. However, the Subject Vehicles did not perform as warranted. Unbeknownst to Plaintiffs, the Subject Vehicles were designed to pollute at higher than legal limits during normal driving, and could not achieve advertised performance and efficiency metrics without this cheating design. This design and the devices that effectuate it are defects. Fiat and FCA therefore breached their express warranty by providing a product containing defects that were never disclosed to Plaintiffs.

1244.   Any opportunity to cure the express breach is unnecessary and futile.

1245.   As a direct and proximate result of Fiat's and FCA's breach of express warranties, Plaintiffs suffered significant damages, and seek damages in an amount to be determined at trial.

### BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY
#### (Tenn. Code §§ 47-2-314 and 47-2A-212)

1246.   Plaintiffs reallege and incorporate by reference all allegations of the preceding paragraphs as though fully set forth herein.

1247.   Plaintiffs, Benjamin Matthews, (for the purpose of this section, "Plaintiffs") bring this action on behalf of themselves against Fiat and FCA.

1248.   Fiat and FCA were at all relevant times "merchants" with respect to motor vehicles

under Tenn. Code §§ 47-2-104(1) and 47-2A-103(1)(t), and "sellers" of motor vehicles under § 47-2-103(1)(d).

1249.   With respect to leases, Fiat and FCA are and were at all relevant times "lessors" of motor vehicles under Tenn. Code § 47-2A-103(1)(p).

1250.   The Subject Vehicles are and were at all relevant times "goods" within the meaning of Tenn. Code §§ 47-2-105(1) and 47-2A-103(1)(h).

1251.   A warranty that the Subject Vehicles were in merchantable condition and fit for the ordinary purpose for which vehicles are used is implied by law pursuant to Tenn. Code §§ 47-2-314 and 47-2A-212.

1252.   Fiat and FCA sold and/or leased Subject Vehicles that were not in merchantable condition and/or fit for their ordinary purpose in violation of the implied warranty. The Subject Vehicles were not in merchantable condition because their design violated state and federal laws. The Subject Vehicles were not fit for their ordinary purpose as they were built to evade state and federal emission standards.

1253.   Fiat's and FCA's breaches of the implied warranty of merchantability caused damage to the Plaintiffs. The amount of damages due will be proven at trial.

## 44.   Texas

### BREACH OF EXPRESS WARRANTY
### (Tex. Bus. & Com. Code §§ 2.313 and 2A.210)

1254.   Plaintiffs reallege and incorporate by reference all preceding allegations as though fully set forth herein.

1255.   Plaintiffs, Robert Thomas, Ronda and Rick Brewer, Tracena Colunga, Steven

Avery, Chris and Carrie Frank, Lindsey Smith, Robert Acevedo, Greg A. Gouker, Kressy Carlile, Antiman Salinas, Scott and Nancy Eastland, Cody and Shellie Stephens, Brian Gray, Don and Margaret Vincent, William Barnett, (for the purpose of this section, "Plaintiffs") bring this action on behalf of themselves against Fiat and FCA.

1256.   Fiat and FCA are and were at all relevant times "merchants" with respect to motor vehicles under Tex. Bus. & Com. Code § 2.104(1) and 2A.103(a)(20), and "sellers" of motor vehicles under § 2.103(a)(4).

1257.   With respect to leases, Fiat and FCA are and were all relevant times "lessors" of motor vehicles under Tex. Bus. & Com. Code § 2A.103(a)(16).

1258.   The Subject Vehicles are and were at all relevant times "goods" within the meaning of Tex. Bus. & Com. Code §§ 2.105(a) and 2A.103(a)(8).

1259.   Federal law requires manufacturers of light-duty vehicles to provide two federal emission control warranties: a "Performance Warranty" and a "Design and Defect Warranty." The Performance Warranty applies to repairs that are required during the first two years or 24,000 miles, whichever occurs first, when a vehicle fails an emissions test. Under this warranty, certain major emission control components are covered for the first eight years or 80,000 miles, whichever comes first. These major emission control components subject to the longer warranty include the catalytic converters, the electronic engine control unit (ECU), and the onboard emissions diagnostic device or computer. The Design and Defect Warranty covers repair of emission control or emission related parts which fail to function or function improperly due to a defect in materials or workmanship. This warranty provides protection for two years or 24,000 miles, whichever comes first, or, for the major emission control components, for eight years or 80,000 miles, whichever comes first.

1260.   Fiat and FCA provided these warranties to Plaintiffs. These warranties formed the basis of the bargain that was reached when Plaintiffs purchased or leased their Subject Vehicles.

1261.   However, Fiat and FCA knew or should have known that the warranties were false and/or misleading. Fiat and FCA were aware that the emissions systems in the Subject Vehicles sold and leased to Plaintiffs were designed to deactivate under real-world driving conditions, and to emit oxides of nitrogen within legal limits only when undergoing emissions testing, and therefore, knew that the emission systems contained defects.

1262.   Plaintiffs reasonably relied on Fiat's and FCA's express warranties concerning emissions when purchasing or leasing the Subject Vehicles. However, the Subject Vehicles did not perform as warranted. Unbeknownst to Plaintiffs, the Subject Vehicles were designed to pollute at higher than legal limits during normal driving, and could not achieve advertised performance and efficiency metrics without this cheating design. This design and the devices that effectuate it are defects. Fiat and FCA therefore breached their express warranty by providing a product containing defects that were never disclosed to Plaintiffs.

1263.   Any opportunity to cure the express breach is unnecessary and futile.

1264.   As a direct and proximate result of Fiat's and FCA's breach of express warranties, Plaintiffs suffered significant damages, and seek damages in an amount to be determined at trial.

### BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY
### (Tex. Bus. & Com. Code §§ 2.314 and 2A.212)

1265.   Plaintiffs reallege and incorporate by reference all allegations of the preceding paragraphs as though fully set forth herein.

1266.   Plaintiffs, Robert Thomas, Ronda and Rick Brewer, Tracena Colunga, Steven Avery, Chris and Carrie Frank, Lindsey Smith, Robert Acevedo, Greg A. Gouker, Kressy Carlile, Antiman Salinas, Scott and Nancy Eastland, Cody and Shellie Stephens, Brian Gray, Don and

Margaret Vincent, William Barnett, (for the purpose of this section, "Plaintiffs") bring this action on behalf of themselves against Fiat and FCA.

1267.   Fiat and FCA were at all relevant times "merchants" with respect to motor vehicles under Tex. Bus. & Com. Code § 2.104(1) and 2A.103(a)(20), and "sellers" of motor vehicles under § 2.103(a)(4).

1268.   With respect to leases, Fiat and FCA are and were at all relevant times "lessors" of motor vehicles under Tex. Bus. & Com. Code § 2A.103(a)(16).

1269.   The Subject Vehicles are and were at all relevant times "goods" within the meaning of Tex. Bus. & Com. Code §§ 2.105(a) and 2A.103(a)(8).

1270.   A warranty that the Subject Vehicles were in merchantable condition and fit for the ordinary purpose for which vehicles are used is implied by law pursuant to Tex. Bus. & Com. Code §§ 2.314 and 2A.212.

1271.   Fiat and FCA sold and/or leased Subject Vehicles that were not in merchantable condition and/or fit for their ordinary purpose in violation of the implied warranty. The Subject Vehicles were not in merchantable condition because their design violated state and federal laws The Subject Vehicles were not fit for their ordinary purpose as they were built to evade state and federal emission standards.

1272.   Fiat's and FCA's breaches of the implied warranty of merchantability caused damage to the Plaintiffs. The amount of damages due will be proven at trial.

### 45.    Utah

**BREACH OF EXPRESS WARRANTY**
**(Utah Code Ann. §§ 70A-2-313 and 70A-2A-210)**

1273.   Plaintiffs reallege and incorporate by reference all preceding allegations as though fully set forth herein.

1274.   Plaintiffs, Tom Sayers, Yuriy Mayurov, Robert and Darla Jones, (for the purpose of this section, "Plaintiff") brings this action on behalf of themselves against Fiat and FCA.

1275.   Fiat and FCA are and were at all relevant times "merchants" with respect to motor vehicles under Utah Code § 70A-2-104(1) and 70A-2a-103(1)(t), and "sellers" of motor vehicles under § 70A-2-103(1)(d).

1276.   With respect to leases, Fiat and FCA are and were all relevant times "lessors" of motor vehicles under Utah Code § 70A-2a-103(1)(p). 1234. The Subject Vehicles are and were at all relevant times "goods" within the meaning of Utah Code §§ 70A-2-105(1) and 70A-2a-103(1)(h).

1277.   Federal law requires manufacturers of light-duty vehicles to provide two federal emission control warranties: a "Performance Warranty" and a "Design and Defect Warranty." The Performance Warranty applies to repairs that are required during the first two years or 24,000 miles, whichever occurs first, when a vehicle fails an emissions test. Under this warranty, certain major emission control components are covered for the first eight years or 80,000 miles, whichever comes first. These major emission control components subject to the longer warranty include the catalytic converters, the electronic engine control unit (ECU), and the onboard emissions diagnostic device or computer. The Design and Defect Warranty covers repair of emission control or emission related parts which fail to function or function improperly due to a defect in materials or workmanship. This warranty provides protection for two years or 24,000 miles, whichever comes first, or, for the major emission control components, for eight years or 80,000 miles, whichever comes first.

1278.   Fiat and FCA provided these warranties to Plaintiff. These warranties formed the

376

basis of the bargain that was reached when Plaintiff purchased or leased their Subject Vehicles.

1279.   However, Fiat and FCA knew or should have known that the warranties were false and/or misleading. Fiat and FCA were aware that the emissions systems in the Subject Vehicles sold and leased to Plaintiff were designed to deactivate under real-world driving conditions, and to emit oxides of nitrogen within legal limits only when undergoing emissions testing, and therefore, knew that the emission systems contained defects.

1280.   Plaintiffs reasonably relied on Fiat's and FCA's express warranties concerning emissions when purchasing or leasing the Subject Vehicles. However, the Subject Vehicles did not perform as warranted. Unbeknownst to Plaintiffs, the Subject Vehicles were designed to pollute at higher than legal limits during normal driving, and could not achieve advertised performance and efficiency metrics without this cheating design. This design and the devices that effectuate it are defects. Fiat and FCA therefore breached their express warranty by providing a product containing defects that were never disclosed to Plaintiffs.

1281.   Any opportunity to cure the express breach is unnecessary and futile.

1282.   As a direct and proximate result of Fiat's and FCA's breach of express warranties, Plaintiff suffered significant damages, and seek damages in an amount to be determined at trial.

**BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY**
**(Utah Code Ann. §§ 70A-2-314 and 70A-2A-212)**

1283.   Plaintiffs reallege and incorporate by reference all allegations of the preceding paragraphs as though fully set forth herein.

1284.   Plaintiffs, Tom Sayers, Yuriy Mayurov, Robert and Darla Jones, (for the purpose of this section, "Plaintiff") brings this action on behalf of themselves against Fiat and FCA.

1285.   Fiat and FCA were at all relevant times "merchants" with respect to motor vehicles under Utah Code § 70A-2-104(1) and 70A-2a-103(1)(t), and "sellers" of motor vehicles under § 70A-2-103(1)(d).

1286.   With respect to leases, Fiat and FCA are and were at all relevant times "lessors" of motor vehicles under Utah Code § 70A-2a-103(1)(p).

1287.   The Subject Vehicles are and were at all relevant times "goods" within the meaning of Utah Code §§ 70A-2-105(1) and 70A-2a-103(1)(h).

1288.   A warranty that the Subject Vehicles were in merchantable condition and fit for the ordinary purpose for which vehicles are used is implied by law pursuant to Utah Code §§ 70A-2-314 and 70A-2a-212.

1289.   Fiat and FCA sold and/or leased Subject Vehicles that were not in merchantable condition and/or fit for their ordinary purpose in violation of the implied warranty. The Subject Vehicles were not in merchantable condition because their design violated state and federal laws. The Subject Vehicles were not fit for their ordinary purpose as they were built to evade state and federal emission standards.

1290.   Fiat's and FCA's breaches of the implied warranty of merchantability caused damage to Plaintiff. The amount of damages due will be proven at trial.

46.   **Vermont**

**BREACH OF EXPRESS WARRANTY**
**(Vt. Stat. Tit. Ann. 9A, §§ 2-313 and 2A-210)**

1291.   Plaintiffs reallege and incorporate by reference all preceding allegations as though fully set forth herein.

1292.   Plaintiff, to be named at a later date, (for the purpose of this section, "Plaintiff")

378

brings this action on behalf of themselves against Fiat and FCA.

1293.   Fiat and FCA are and were at all relevant times "merchants" with respect to motor vehicles under Vt. Stat. Tit. 9A, § 2-104(1) and 2A-103(1)(t), and "sellers" of motor vehicles under § 2-103(1)(d).

1294.   With respect to leases, Fiat and FCA are and were all relevant times "lessors" of motor vehicles under Vt. Stat. Tit. 9A, § 2A-103(1)(p).

1295.   The Subject Vehicles are and were at all relevant times "goods" within the meaning of Vt. Stat. Tit. 9A, §§ 2-105(1) and 2A-103(1)(h).

1296.   Federal law requires manufacturers of light-duty vehicles to provide two federal emission control warranties: a "Performance Warranty" and a "Design and Defect Warranty." The Performance Warranty applies to repairs that are required during the first two years or 24,000 miles, whichever occurs first, when a vehicle fails an emissions test. Under this warranty, certain major emission control components are covered for the first eight years or 80,000 miles, whichever comes first. These major emission control components subject to the longer warranty include the catalytic converters, the electronic engine control unit (ECU), and the onboard emissions diagnostic device or computer. The Design and Defect Warranty covers repair of emission control or emission related parts which fail to function or function improperly due to a defect in materials or workmanship. This warranty provides protection for two years or 24,000 miles, whichever comes first, or, for the major emission control components, for eight years or 80,000 miles, whichever comes first.

1297.   Fiat and FCA provided these warranties to the Plaintiffs. These warranties formed the basis of the bargain that was reached when the Plaintiffs purchased or leased their Subject Vehicles.

1298.   However, Fiat and FCA knew or should have known that the warranties were false and/or misleading. Fiat and FCA were aware that the emissions systems in the Subject Vehicles sold and leased to the Plaintiffs were designed to deactivate under real-world driving conditions, and to emit oxides of nitrogen within legal limits only when undergoing emissions testing, and therefore, knew that the emission systems contained defects.

1299.   The Plaintiffs reasonably relied on Fiat's and FCA's express warranties concerning emissions when purchasing or leasing the Subject Vehicles. However, the Subject Vehicles did not perform as warranted. Unbeknownst to the Plaintiffs, the Subject Vehicles were designed to pollute at higher than legal limits during normal driving, and could not achieve advertised performance and efficiency metrics without this cheating design. This design and the devices that effectuate it are defects. Fiat and FCA therefore breached their express warranty by providing a product containing defects that were never disclosed to the Plaintiffs.

1300.   Any opportunity to cure the express breach is unnecessary and futile.

1301.   As a direct and proximate result of Fiat's and FCA's breach of express warranties, the Plaintiffs suffered significant damages, and seek damages in an amount to be determined at trial.

## BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY
### (Vt. Stat. Ann. Tit. 9A, §§ 2-314 and 2A-212)

1302.   Plaintiffs reallege and incorporate by reference all allegations of the preceding paragraphs as though fully set forth herein.

1303.   Plaintiff, to be named at a later date, (for the purpose of this section, "Plaintiff") brings this action on behalf of themselves against Fiat and FCA.

1304.   Fiat and FCA were at all relevant times "merchants" with respect to motor vehicles under Vt. Stat. Tit. 9A, § 2-104(1) and 2A-103(1)(t), and "sellers" of motor vehicles under § 2-

103(1)(d).

1305.   With respect to leases, Fiat and FCA are and were at all relevant times "lessors" of motor vehicles under Vt. Stat. Tit. 9A, § 2A-103(1)(p).

1306.   The Subject Vehicles are and were at all relevant times "goods" within the meaning of Vt. Stat. Tit. 9A, §§ 2-105(1) and 2A-103(1)(h).

1307.   A warranty that the Subject Vehicles were in merchantable condition and fit for the ordinary purpose for which vehicles are used is implied by law pursuant to Vt. Stat. Tit. 9A, §§ 2-314 and 2A-212.

1308.   Fiat and FCA sold and/or leased Subject Vehicles that were not in merchantable condition and/or fit for their ordinary purpose in violation of the implied warranty. The Subject Vehicles were not in merchantable condition because their design violated state and federal laws. The Subject Vehicles were not fit for their ordinary purpose as they were built to evade state and federal emission standards.

1309.   Fiat's and FCA's breaches of the implied warranty of merchantability caused damage to the Plaintiffs. The amount of damages due will be proven at trial.

47.   **<u>Virginia</u>**

**BREACH OF EXPRESS WARRANTY**
**(Va. Code Ann. §§ 8.2-313 and 8.2A-210)**

1310.   Plaintiffs reallege and incorporate by reference all preceding allegations as though fully set forth herein.

1311.   Plaintiffs, Annabel and Jerry Gibson, Gary Smith, Matthew Robertson, (for the purpose of this section, "Plaintiffs") bring this action on behalf of themselves against Fiat and FCA.

1312.   Fiat and FCA are and were at all relevant times "merchants" with respect to motor

vehicles under Va. Code § 8.2-104(1) and 8.2A-103(1)(t), and "sellers" of motor vehicles under § 8.2-103(1)(d).

1313.   With respect to leases, Fiat and FCA are and were all relevant times "lessors" of motor vehicles under Va. Code § 8.2A-103(1)(p).

1314.   The Subject Vehicles are and were at all relevant times "goods" within the meaning of Va. Code §§ 8.2-105(1) and 8.2A-103(1)(h).

1315.   Federal law requires manufacturers of light-duty vehicles to provide two federal emission control warranties: a "Performance Warranty" and a "Design and Defect Warranty." The Performance Warranty applies to repairs that are required during the first two years or 24,000 miles, whichever occurs first, when a vehicle fails an emissions test. Under this warranty, certain major emission control components are covered for the first eight years or 80,000 miles, whichever comes first. These major emission control components subject to the longer warranty include the catalytic converters, the electronic engine control unit (ECU), and the onboard emissions diagnostic device or computer. The Design and Defect Warranty covers repair of emission control or emission related parts which fail to function or function improperly due to a defect in materials or workmanship. This warranty provides protection for two years or 24,000 miles, whichever comes first, or, for the major emission control components, for eight years or 80,000 miles, whichever comes first.

1316.   Fiat and FCA provided these warranties to Plaintiffs. These warranties formed the basis of the bargain that was reached when Plaintiffs purchased or leased their Subject Vehicles.

1317.   However, Fiat and FCA knew or should have known that the warranties were false and/or misleading. Fiat and FCA were aware that the emissions systems in the Subject Vehicles sold and leased to Plaintiffs were designed to deactivate under real-world driving conditions, and

to emit oxides of nitrogen within legal limits only when undergoing emissions testing, and therefore, knew that the emission systems contained defects.

1318.   Plaintiffs reasonably relied on Fiat's and FCA's express warranties concerning emissions when purchasing or leasing the Subject Vehicles. However, the Subject Vehicles did not perform as warranted. Unbeknownst to Plaintiffs, the Subject Vehicles were designed to pollute at higher than legal limits during normal driving, and could not achieve advertised performance and efficiency metrics without this cheating design. This design and the devices that effectuate it are defects. Fiat and FCA therefore breached their express warranty by providing a product containing defects that were never disclosed to Plaintiffs.

1319.   Any opportunity to cure the express breach is unnecessary and futile.

1320.   As a direct and proximate result of Fiat's and FCA's breach of express warranties, Plaintiffs suffered significant damages, and seek damages in an amount to be determined at trial.

## BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY
### (Va. Code Ann. §§ 8.2-314 and 8.2A-212)

1321.   Plaintiffs reallege and incorporate by reference all allegations of the preceding paragraphs as though fully set forth herein.

1322.   Plaintiffs, Annabel and Jerry Gibson, Gary Smith, Matthew Robertson, (for the purpose of this section, "Plaintiffs") bring this action on behalf of themselves against Fiat and FCA.

1323.   Fiat and FCA were at all relevant times "merchants" with respect to motor vehicles under Va. Code § 8.2-104(1) and 8.2A-103(1)(t), and "sellers" of motor vehicles under § 8.2-103(1)(d).

1324.   With respect to leases, Fiat and FCA are and were at all relevant times "lessors" of motor vehicles under Va. Code § 8.2A-103(1)(p).

1325.   The Subject Vehicles are and were at all relevant times "goods" within the meaning of Va. Code §§ 8.2-105(1) and 8.2A-103(1)(h).

1326.   A warranty that the Subject Vehicles were in merchantable condition and fit for the ordinary purpose for which vehicles are used is implied by law pursuant to Va. Code §§ 8.2-314 and 8.2A-212.

1327.   Fiat and FCA sold and/or leased Subject Vehicles that were not in merchantable condition and/or fit for their ordinary purpose in violation of the implied warranty. The Subject Vehicles were not in merchantable condition because their design violated state and federal laws. The Subject Vehicles were not fit for their ordinary purpose as they were built to evade state and federal emission standards.

1328.   Fiat's and FCA's breaches of the implied warranty of merchantability caused damage to Plaintiffs. The amount of damages due will be proven at trial.

**48.   <u>Washington</u>**

**BREACH OF EXPRESS WARRANTY
(Wash. Rev. Code §§ 62A.2-313 and 62A.2A-210)**

1329.   Plaintiffs reallege and incorporate by reference all preceding allegations as though fully set forth herein.

1330.   Plaintiffs, Brian Lencho, Richard and Susan Bladl, Theodore Klein, Zina Bryson, (for the purpose of this section, "Plaintiffs") bring this action on behalf of themselves against Fiat and FCA.

1331.   Fiat and FCA are and were at all relevant times "merchants" with respect to motor

vehicles under Wash. Rev. Code § 62A.2-104(1) and 62A.2A-103(1)(t), and "sellers" of motor vehicles under § 2.103(a)(4).

1332.   With respect to leases, Fiat and FCA are and were all relevant times "lessors" of motor vehicles under Wash. Rev. Code § 62A.2A-103(1)(p).

1333.   The Subject Vehicles are and were at all relevant times "goods" within the meaning of Wash. Rev. Code §§ 62A.2-105(1) and 62A.2A-103(1)(h).

1334.   Federal law requires manufacturers of light-duty vehicles to provide two federal emission control warranties: a "Performance Warranty" and a "Design and Defect Warranty." The Performance Warranty applies to repairs that are required during the first two years or 24,000 miles, whichever occurs first, when a vehicle fails an emissions test. Under this warranty, certain major emission control components are covered for the first eight years or 80,000 miles, whichever comes first. These major emission control components subject to the longer warranty include the catalytic converters, the electronic engine control unit (ECU), and the onboard emissions diagnostic device or computer. The Design and Defect Warranty covers repair of emission control or emission related parts which fail to function or function improperly due to a defect in materials or workmanship. This warranty provides protection for two years or 24,000 miles, whichever comes first, or, for the major emission control components, for eight years or 80,000 miles, whichever comes first.

1335.   Fiat and FCA provided these warranties to Plaintiffs. These warranties formed the basis of the bargain that was reached when Plaintiffs purchased or leased their Subject Vehicles.

1336.   However, Fiat and FCA knew or should have known that the warranties were false and/or misleading. Fiat and FCA were aware that the emissions systems in the Subject Vehicles sold and leased to Plaintiffs were designed to deactivate under real-world driving conditions, and

to emit oxides of nitrogen within legal limits only when undergoing emissions testing, and therefore, knew that the emission systems contained defects.

1337.   Plaintiffs reasonably relied on Fiat's and FCA's express warranties concerning emissions when purchasing or leasing the Subject Vehicles. However, the Subject Vehicles did not perform as warranted. Unbeknownst to Plaintiffs, the Subject Vehicles were designed to pollute at higher than legal limits during normal driving, and could not achieve advertised performance and efficiency metrics without this cheating design. This design and the devices that effectuate it are defects. Fiat and FCA therefore breached their express warranty by providing a product containing defects that were never disclosed to Plaintiffs.

1338.   Any opportunity to cure the express breach is unnecessary and futile.

1339.   As a direct and proximate result of Fiat's and FCA's breach of express warranties, Plaintiffs suffered significant damages, and seek damages in an amount to be determined at trial.

## BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY
### (Wash. Rev. Code §§ 62A.2-314 and 62A.2A-212)

1340.   Plaintiffs reallege and incorporate by reference all allegations of the preceding paragraphs as though fully set forth herein.

1341.   Plaintiffs, Brian Lencho, Richard and Susan Bladl, Theodore Klein, Zina Bryson, (for the purpose of this section, "Plaintiffs") bring this action on behalf of themselves against Fiat and FCA.

1342.   Fiat and FCA were at all relevant times "merchants" with respect to motor vehicles under Wash. Rev. Code § 62A.2-104(1) and 62A.2A-103(1)(t), and "sellers" of motor vehicles under § 2.103(a)(4).

1343.   With respect to leases, Fiat and FCA are and were at all relevant times "lessors" of motor vehicles under Wash. Rev. Code § 62A.2A-103(1)(p).

1344.   The Subject Vehicles are and were at all relevant times "goods" within the meaning of Wash. Rev. Code §§ 62A.2-105(1) and 62A.2A-103(1)(h).

1345.   A warranty that the Subject Vehicles were in merchantable condition and fit for the ordinary purpose for which vehicles are used is implied by law pursuant to Wash. Rev. Code §§ 62A.2-314 and 62A.2A-212.

1346.   Fiat and FCA sold and/or leased Subject Vehicles that were not in merchantable condition and/or fit for their ordinary purpose in violation of the implied warranty. The Subject Vehicles were not in merchantable condition because their design violated state and federal laws. The Subject Vehicles were not fit for their ordinary purpose as they were built to evade state and federal emission standards.

1347.   Fiat's and FCA's breaches of the implied warranty of merchantability caused damage to the Plaintiffs. The amount of damages due will be proven at trial.


49.   **West Virginia**

**BREACH OF EXPRESS WARRANTY**
**(W. Va. Code §§ 46-2-313 and 46-2A-210)**

1348.   Plaintiffs reallege and incorporate by reference all preceding allegations as though fully set forth herein.

1349. Plaintiffs, Bernice Graham, Nicholas DeJohn, Samuel Robinson, Samuel Robinson, Michael L. Goff, (for the purpose of this section, "Plaintiffs") bring this action on behalf

387

of themselves against Fiat and FCA.

1350.   Fiat and FCA are and were at all relevant times "merchants" with respect to motor vehicles under W. Va. Code §§ 46-2-104(1) and 46-2A-103(1)(t), and "sellers" of motor vehicles under § 46-2-103(1)(d).

1351.   With respect to leases, Fiat and FCA are and were all relevant times "lessors" of motor vehicles under W. Va. Code § 46-2A-103(1)(p).

1352.   The Subject Vehicles are and were at all relevant times "goods" within the meaning of W. Va. Code §§ 46-2-105(1) and 46-2A-103(1)(h).

1353.   Federal law requires manufacturers of light-duty vehicles to provide two federal emission control warranties: a "Performance Warranty" and a "Design and Defect Warranty." The Performance Warranty applies to repairs that are required during the first two years or 24,000 miles, whichever occurs first, when a vehicle fails an emissions test. Under this warranty, certain major emission control components are covered for the first eight years or 80,000 miles, whichever comes first. These major emission control components subject to the longer warranty include the catalytic converters, the electronic engine control unit (ECU), and the onboard emissions diagnostic device or computer. The Design and Defect Warranty covers repair of emission control or emission related parts which fail to function or function improperly due to a defect in materials or workmanship. This warranty provides protection for two years or 24,000 miles, whichever comes first, or, for the major emission control components, for eight years or 80,000 miles, whichever comes first.

1354.   Fiat and FCA provided these warranties to the Plaintiffs. These warranties formed the basis of the bargain that was reached when the Plaintiffs purchased or leased their Subject

Vehicles.

1355.   However, Fiat and FCA knew or should have known that the warranties were false and/or misleading. Fiat and FCA were aware that the emissions systems in the Subject Vehicles sold and leased to the Plaintiffs were designed to deactivate under real-world driving conditions, and to emit oxides of nitrogen within legal limits only when undergoing emissions testing, and therefore, knew that the emission systems contained defects.

1356.   Plaintiffs reasonably relied on Fiat's and FCA's express warranties concerning emissions when purchasing or leasing the Subject Vehicles. However, the Subject Vehicles did not perform as warranted. Unbeknownst to the Plaintiffs, the Subject Vehicles were designed to pollute at higher than legal limits during normal driving, and could not achieve advertised performance and efficiency metrics without this cheating design. This design and the devices that effectuate it are defects. Fiat and FCA therefore breached their express warranty by providing a product containing defects that were never disclosed to the Plaintiffs.

1357.   Any opportunity to cure the express breach is unnecessary and futile.

1358.   As a direct and proximate result of Fiat's and FCA's breach of express warranties, the Plaintiffs suffered significant damages, and seek damages in an amount to be determined at trial.

## BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY
### (W. Va. Code §§ 46-2-314 and 46-2A-212)

1359.   Plaintiffs reallege and incorporate by reference all allegations of the preceding paragraphs as though fully set forth herein.

1360.   Plaintiffs, Bernice Graham, Nicholas DeJohn, Samuel Robinson, Samuel

Robinson, Michael L. Goff, (for the purpose of this section, "Plaintiffs") bring this action on behalf of themselves against Fiat and FCA.

1361.   Fiat and FCA were at all relevant times "merchants" with respect to motor vehicles under W. Va. Code §§ 46-2-104(1) and 46-2A-103(1)(t), and "sellers" of motor vehicles under § 46-2-103(1)(d).

1362.   With respect to leases, Fiat and FCA are and were at all relevant times "lessors" of motor vehicles under W. Va. Code § 46-2A-103(1)(p).

1363.   The Subject Vehicles are and were at all relevant times "goods" within the meaning of W. Va. Code §§ 46-2-105(1) and 46-2A-103(1)(h).

1364.   A warranty that the Subject Vehicles were in merchantable condition and fit for the ordinary purpose for which vehicles are used is implied by law pursuant to W. Va. Code §§ 46-2-31 and 46-2A-212.

1365.   Fiat and FCA sold and/or leased Subject Vehicles that were not in merchantable condition and/or fit for their ordinary purpose in violation of the implied warranty. The Subject Vehicles were not in merchantable condition because their design violated state and federal laws. The Subject Vehicles were not fit for their ordinary purpose as they were built to evade state and federal emission standards.

1366.   Fiat's and FCA's breaches of the implied warranty of merchantability caused damage to the Plaintiffs. The amount of damages due will be proven at trial.

50.   **Wisconsin**

## BREACH OF EXPRESS WARRANTY
### (Wis. Stat. §§ 402.313 and 411.210)

1367.   Plaintiffs reallege and incorporate by reference all preceding allegations as though fully set forth herein.

1368.   Plaintiffs, Jerry Nelson, Heinz and Eleonore Daub, Doolie Molzof, (for the purpose of this section, "Plaintiffs") bring this action on behalf of themselves against Fiat and FCA.

1369.   Fiat and FCA are and were at all relevant times "merchants" with respect to motor vehicles under Wis. Stat. § 402.104(3) and 411.103(1)(t), and "sellers" of motor vehicles under § 402.103(1)(d).

1370.   With respect to leases, Fiat and FCA are and were all relevant times "lessors" of motor vehicles under Wis. Stat. § 411.103(1)(p).

1371.   The Subject Vehicles are and were at all relevant times "goods" within the meaning of Wis. Stat. §§ 402.105(1)(c) and 411.103(1)(h).

1372.   Federal law requires manufacturers of light-duty vehicles to provide two federal emission control warranties: a "Performance Warranty" and a "Design and Defect Warranty." The Performance Warranty applies to repairs that are required during the first two years or 24,000 miles, whichever occurs first, when a vehicle fails an emissions test. Under this warranty, certain major emission control components are covered for the first eight years or 80,000 miles, whichever comes first. These major emission control components subject to the longer warranty include the catalytic converters, the electronic engine control unit (ECU), and the onboard emissions diagnostic device or computer. The Design and Defect Warranty covers repair of emission control or emission related parts which fail to function or function improperly due to a defect in materials or workmanship. This warranty provides protection for two years or 24,000 miles, whichever

comes first, or, for the major emission control components, for eight years or 80,000 miles, whichever comes first.

1373.   Fiat and FCA provided these warranties to Plaintiffs. These warranties formed the basis of the bargain that was reached when Plaintiffs purchased or leased their Subject Vehicles.

1374.   However, Fiat and FCA knew or should have known that the warranties were false and/or misleading. Fiat and FCA were aware that the emissions systems in the Subject Vehicles sold and leased to Plaintiffs were designed to deactivate under real-world driving conditions, and to emit oxides of nitrogen within legal limits only when undergoing emissions testing, and therefore, knew that the emission systems contained defects.

1375.   Plaintiffs reasonably relied on Fiat's and FCA's express warranties concerning emissions when purchasing or leasing the Subject Vehicles. However, the Subject Vehicles did not perform as warranted. Unbeknownst to Plaintiffs, the Subject Vehicles were designed to pollute at higher than legal limits during normal driving, and could not achieve advertised performance and efficiency metrics without this cheating design. This design and the devices that effectuate it are defects. Fiat and FCA therefore breached their express warranty by providing a product containing defects that were never disclosed to Plaintiffs.

1376.   Any opportunity to cure the express breach is unnecessary and futile.

1377.   As a direct and proximate result of Fiat's and FCA's breach of express warranties, Plaintiffs suffered significant damages, and seek damages in an amount to be determined at trial.

### BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY
### (Wis. Stat. §§ 402.314 and 411.212)

1378.   Plaintiffs reallege and incorporate by reference all allegations of the preceding paragraphs as though fully set forth herein.

1379.   Plaintiffs, Jerry Nelson, Heinz and Eleonore Daub, Doolie Molzof, (for the purpose

of this section, "Plaintiffs") bring this action on behalf of themselves against Fiat and FCA.

1380.   Fiat and FCA were at all relevant times "merchants" with respect to motor vehicles under Wis. Stat. § 402.104(3) and 411.103(1)(t), and "sellers" of motor vehicles under § 402.103(1)(d).

1381.   With respect to leases, Fiat and FCA are and were at all relevant times "lessors" of motor vehicles under Wis. Stat. § 411.103(1)(p).

1382.   The Subject Vehicles are and were at all relevant times "goods" within the meaning of Wis. Stat. §§ 402.105(1)(c) and 411.103(1)(h).

1383.   A warranty that the Subject Vehicles were in merchantable condition and fit for the ordinary purpose for which vehicles are used is implied by law pursuant to Wis. Stat. §§ 402.314 and 411.212.

1384.   Fiat and FCA sold and/or leased Subject Vehicles that were not in merchantable condition and/or fit for their ordinary purpose in violation of the implied warranty. The Subject Vehicles were not in merchantable condition because their design violated state and federal laws. The Subject Vehicles were not fit for their ordinary purpose as they were built to evade state and federal emission standards.

1385.   Fiat's and FCA's breaches of the implied warranty of merchantability caused damage to the Plaintiffs. The amount of damages due will be proven at trial.


51.   **<u>Wyoming</u>**

**BREACH OF EXPRESS WARRANTY**
**(Wyo. Stat. § 34.1-2-313)**

1386.   Plaintiffs reallege and incorporate by reference all preceding allegations as though fully set forth herein.

1387. Plaintiffs, Raymond Croisetiere, (for the purpose of this section, "Plaintiff") brings this action on behalf of themselves against Fiat and FCA.

1388. Fiat and FCA are and were at all relevant times "merchants" with respect to motor vehicles under Wyo. Stat. §§ 34.1-2-104(a) and 34.1-2.A-103(a)(xx), and "sellers" of motor vehicles under § 34.1-2-103(a)(iv).

1389. With respect to leases, Fiat and FCA are and were all relevant times "lessors" of motor vehicles under Wyo. Stat. § 34.1-2.A-103(a)(xvi).

1390. The Subject Vehicles are and were at all relevant times "goods" within the meaning of Wyo. Stat. §§ 34.1-2-105(a) and 34.1-2.A-103(a)(viii).

1391. Federal law requires manufacturers of light-duty vehicles to provide two federal emission control warranties: a "Performance Warranty" and a "Design and Defect Warranty." The Performance Warranty applies to repairs that are required during the first two years or 24,000 miles, whichever occurs first, when a vehicle fails an emissions test. Under this warranty, certain major emission control components are covered for the first eight years or 80,000 miles, whichever comes first. These major emission control components subject to the longer warranty include the catalytic converters, the electronic engine control unit (ECU), and the onboard emissions diagnostic device or computer. The Design and Defect Warranty covers repair of emission control or emission related parts which fail to function or function improperly due to a defect in materials or workmanship. This warranty provides protection for two years or 24,000 miles, whichever comes first, or, for the major emission control components, for eight years or 80,000 miles, whichever comes first.

1392. Fiat and FCA provided these warranties to Plaintiffs. These warranties formed the basis of the bargain that was reached when Plaintiffs purchased or leased their Subject Vehicles.

1393.   However, Fiat and FCA knew or should have known that the warranties were false and/or misleading. Fiat and FCA were aware that the emissions systems in the Subject Vehicles sold and leased to Plaintiff were designed to deactivate under real-world driving conditions, and to emit oxides of nitrogen within legal limits only when undergoing emissions testing, and therefore, knew that the emission systems contained defects.

1394.   Plaintiffs reasonably relied on Fiat's and FCA's express warranties concerning emissions when purchasing or leasing the Subject Vehicles. However, the Subject Vehicles did not perform as warranted. Unbeknownst to Plaintiffs, the Subject Vehicles were designed to pollute at higher than legal limits during normal driving, and could not achieve advertised performance and efficiency metrics without this cheating design. This design and the devices that effectuate it are defects. Fiat and FCA therefore breached their express warranty by providing a product containing defects that were never disclosed to Plaintiffs.

1395.   Any opportunity to cure the express breach is unnecessary and futile.

1396.   As a direct and proximate result of Fiat's and FCA's breach of express warranties, Plaintiff suffered significant damages, and seek damages in an amount to be determined at trial.

## BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY
### (Wyo. Stat. §§ 34.1-2-314 and 34.1-2.A-212)

1397.   Plaintiffs reallege and incorporate by reference all allegations of the preceding paragraphs as though fully set forth herein.

1398.   Plaintiff, Raymond Croisetiere, (for the purpose of this section, "Plaintiff") brings this action on behalf of themselves against Fiat and FCA.

1399.   Fiat and FCA were at all relevant times "merchants" with respect to motor vehicles

under Wyo. Stat. §§ 34.1-2-104(a) and 34.1-2.A-103(a)(xx), and "sellers" of motor vehicles under § 34.1-2-103(a)(iv).

1400.   With respect to leases, Fiat and FCA are and were at all relevant times "lessors" of motor vehicles under Wyo. Stat. § 34.1-2.A-103(a)(xvi).

1401.   The Subject Vehicles are and were at all relevant times "goods" within the meaning of Wyo. Stat. §§ 34.1-2-105(a) and 34.1-2.A-103(a)(viii).

1402.   A warranty that the Subject Vehicles were in merchantable condition and fit for the ordinary purpose for which vehicles are used is implied by law pursuant to Wyo. Stat. §§ 34.1-2-10 314 and 34.1-2. A-212.

1403.   Fiat and FCA sold and/or leased Subject Vehicles that were not in merchantable condition and/or fit for their ordinary purpose in violation of the implied warranty. The Subject Vehicles were not in merchantable condition because their design violated state and federal laws. The Subject Vehicles were not fit for their ordinary purpose as they were built to evade state and federal emission standards.

1404.   Fiat's and FCA's breaches of the implied warranty of merchantability caused damage to Plaintiff. The amount of damages due will be proven at trial.

## II. STATE PLAINTIFFS CONSUMER PROTECTION CLAIMS

### VIOLATION OF ALABAMA DECEPTIVE TRADE PRACTICES ACT (Ala. Code § 8-19-1, *et seq.*)

1405.   Plaintiffs incorporate by reference each preceding paragraph as though fully set forth herein.

1406.   Plaintiffs, Darryl Saucier, Matthew Cole, Mark King, James and Deborah Andreasen, (for the purpose of this section, "Plaintiff") bring this action on behalf of themselves against all Defendants.

1407.   FCA, Fiat, VM Italy, VM America, Bosch GmbH, Bosch LLC, Sergio Marchionne, and Plaintiffs are "persons" within the meaning of Ala. Code § 8-19-3(5). Plaintiffs are "consumers" within the meaning of Ala. Code § 8-19-3(2).

1408.   The Subject Vehicles are "goods" within the meaning of Ala. Code § 8-19-3(3).

1409.   FCA, Fiat, VM Italy, VM America, Bosch GmbH, Bosch LLC, and Sergio Marchionne are engaged in "trade" or "commerce" within the meaning of Ala. Code § 8-19-3(8).

1410.   The Alabama Deceptive Trade Practices Act ("Alabama DTPA") makes unlawful several specific acts, including:"(5) Representing that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or qualities that they do not have," "(7) Representing that goods or services are of a particular standard, quality, or grade, or that goods are of a particular style or model, if they are of another," and "(27) Engaging in any other unconscionable, false, misleading, or deceptive act or practice in the conduct of trade or commerce." Ala. Code § 8-19-5.

1411.   In the course of their business, Defendants Fiat Chrysler, VM Motori, Bosch, and Sergio Marchionne, through their agents, employees, and/or subsidiaries, violated the Alabama DTPA.

1412.   As detailed in the common law fraud allegations: (1) Fiat Chrysler affirmatively misrepresented the environmental friendliness and emissions of the Subject Vehicles through the

EcoDiesel badge—a material fact that was false because the Defendants developed and installed emission cheating components in the Subject Vehicles that caused them to pollute excessively in real-world conditions; (2) Fiat Chrysler touted, through the EcoDiesel badge and uniform and pervasive consumer communications, the Subject Vehicles' fuel efficiency and performance, and the Defendants concealed that the fuel efficiency and performance could be achieved only through emission control devices in the Subject Vehicles that caused them to pollute excessively in real-world conditions; and (3) the Defendants developed and installed emission cheating components that caused the Subject Vehicles to pollute excessively in real-world conditions, and fraudulently concealed that fact from regulators and Plaintiffs alike.  In so doing, and by marketing, offering for sale, and selling the defective Subject Vehicles, Defendants engaged in one or more of the following unfair or deceptive acts or practices as defined in Ala. Code § 8-19-5:

A.  Causing likelihood of confusion or of misunderstanding as to the approval or certification of the Subject Vehicles;

B.  Representing that the Subject Vehicles have approval, characteristics, uses, benefits, or qualities that they do not have;

C.  Representing that the Subject Vehicles are of a particular standard, quality and grade when they are not; and/or

D.  Advertising the Subject Vehicles with the intent not to sell or lease them as advertised.

1413.   Defendants' scheme and concealment of the true characteristics of the EcoDiesel® emission control system were material to Plaintiffs, as Defendants intended. Had they known the truth, Plaintiffs would not have purchased or leased the Subject Vehicles, or—if the Subject Vehicles' true nature had been disclosed and mitigated, and the Vehicles rendered legal to sell— would have paid significantly less for them.

1414.   Plaintiffs had no way of discerning that Defendants' representations were false and

misleading, or otherwise learning the facts that Defendants had concealed or failed to disclose, because Defendants' emission control software was extremely sophisticated technology. Plaintiffs did not, and could not, unravel Defendants' deception on their own.

1415.   Defendants had an ongoing duty to Plaintiffs to refrain from unfair and deceptive practices under the Alabama DTPA in the course of their business. Specifically, Defendants owed Plaintiffs a duty Defendants owed Plaintiffs a duty to disclose all the material facts concerning the EcoDiesel® emission control system because they possessed exclusive knowledge, they intentionally concealed it from Plaintiffs, and/or they made misrepresentations that were rendered misleading because they were contradicted by withheld facts.

1416.   Plaintiffs suffered ascertainable loss and actual damages as a direct and proximate result of Defendants' concealment, misrepresentations, and/or failure to disclose material information.

1417.   Defendants' violations present a continuing risk to Plaintiffs, as well as to the general public. Defendants' unlawful acts and practices complained of herein affect the public interest.

1418.   Pursuant to Ala. Code § 8-19-10, Plaintiffs seek an order enjoining Defendants' unfair and/or deceptive acts or practices and awarding damages, treble damages, and any other just and proper relief available under the Alabama DTPA.

1419.   Per the State Pre-suit requirements notifications have been prepared to FCA US LLC complying with Ala. Code § 8-19-10(e). Additionally, all Defendants were provided notice of the issues raised in this count and this Complaint by the governmental investigations, the numerous complaints filed against them, and the many individual notice letters sent by Plaintiffs

within a reasonable amount of time after the allegations of Subject Vehicle defects became public. Moreover, Plaintiffs sent a second and third notice letter pursuant to Ala. Code § 8-19-10(e) to all Defendants. Because Defendants failed to remedy their unlawful conduct within the requisite time period, Plaintiffs seek all damages and relief to which Plaintiffs are entitled.

## VIOLATION OF THE ALASKA UNFAIR TRADE PRACTICES AND CONSUMER PROTECTION ACT
### (Alaska Stat. Ann. § 45.50.471, *et seq.*)

1420.   Plaintiffs incorporate by reference each preceding paragraph as though fully set forth herein.

1421.   Plaintiffs, to be named at a latter date, (for purposes of this section, "Plaintiffs") bring this action on behalf of themselves against all Defendants.

1422.   The Alaska Unfair Trade Practices and Consumer Protection Act ("Alaska CPA") declares unfair methods of competition and unfair or deceptive acts or practices in the conduct of trade or commerce unlawful, including: "(4) representing that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities that they do not have or that a person has a sponsorship, approval, status, affiliation, or connection that the person does not have;" "(6) representing that goods or services are of a particular standard, quality, or grade, or that goods are of a particular style or model, if they are of another;" "(8) advertising goods or services with intent not to sell them as advertised;" or "(12) using or employing deception, fraud, false pretense, false promise, misrepresentation, or knowingly concealing, suppressing, or omitting a material fact with intent that others rely upon the concealment, suppression or omission in connection with the sale or advertisement of goods or services whether or not a person has in fact been misled, deceived

400

or damaged." Alaska Stat. Ann. § 45.50.471.

1423.   In the course of their business, Defendants Fiat Chrysler, VM Motori, Bosch, and Sergio Marchionne, through their agents, employees, and/or subsidiaries, violated the Alaska CPA.

1424.   As detailed in the common law fraud allegations: (1) Fiat Chrysler affirmatively misrepresented the environmental friendliness and emissions of the Subject Vehicles through the EcoDiesel badge—a material fact that was false because the Defendants developed and installed emission cheating components in the Subject Vehicles that caused them to pollute excessively in real-world conditions; (2) Fiat Chrysler touted, through the EcoDiesel badge and uniform and pervasive consumer communications, the Subject Vehicles' fuel efficiency and performance, and the Defendants concealed that the fuel efficiency and performance could be achieved only through emission control devices in the Subject Vehicles that caused them to pollute excessively in real-world conditions; and (3) the Defendants developed and installed emission cheating components that caused the Subject Vehicles to pollute excessively in real-world conditions, and fraudulently concealed that fact from regulators and Plaintiffs alike. In so doing, and by marketing, offering for sale, and selling the defective Subject Vehicles, Defendants engaged in one or more of the following unfair or deceptive acts or practices as defined in Alaska Stat. Ann. § 45.50.471:

A.     Causing likelihood of confusion or of misunderstanding as to the approval or certification of the Subject Vehicles;

B.     Representing that the Subject Vehicles have approval, characteristics, uses, or benefits that they do not have;

C.     Representing that the Subject Vehicles are of a particular standard, quality and grade when they are not;

D.     Advertising the Subject Vehicles with the intent not to sell or lease them as advertised;

E.     Engaging in other conduct which created a likelihood of confusion or of

misunderstanding; and/or

F.    Using or employing deception, fraud, false pretense, false promise or misrepresentation, or the concealment, suppression or omission of a material fact with intent that others rely upon such concealment, suppression or omission, in connection with the advertisement and sale/lease of the Subject Vehicles, whether or not any person has in fact been misled, deceived or damaged thereby.

1425.   Defendants' scheme and concealment of the true characteristics of the EcoDiesel® emission control system were material to Plaintiffs, as Defendants intended. Had they known the truth, Plaintiffs would not have purchased or leased the Subject Vehicles, or—if the Subject Vehicles' true nature had been disclosed and mitigated, and the Vehicles rendered legal to sell—would have paid significantly less for them.

1426.   Plaintiffs had no way of discerning that Defendants' representations were false and misleading, or otherwise learning the facts that Defendants had concealed or failed to disclose, because Defendants' emission control software was extremely sophisticated technology. Plaintiffs did not, and could not, unravel Defendants' deception on their own.

1427.   Defendants had an ongoing duty to Plaintiffs to refrain from unfair and deceptive practices under the Alaska CPA in the course of their business. Specifically, Defendants owed Plaintiffs a duty to disclose all the material facts concerning the EcoDiesel® emission control system because they possessed exclusive knowledge, they intentionally concealed it from Plaintiffs, and/or they made misrepresentations that were rendered misleading because they were contradicted by withheld facts.

1428.   Plaintiffs suffered ascertainable loss and actual damages as a direct and proximate result of Defendants' concealment, misrepresentations, and/or failure to disclose material information.

1429.   Defendants' violations present a continuing risk to Plaintiffs, as well as to the general public. Defendants' unlawful acts and practices complained of herein affect the public interest.

## VIOLATIONS OF THE CONSUMER FRAUD ACT
### (Ariz. Rev. Stat. § 44-1521, *et seq.*)

1430.   Plaintiffs incorporate by reference each preceding paragraph as though fully set forth herein.

1431.   Plaintiffs, Jeff Simmonds, Juan Carlos Soto, (for the purpose of this section, "Plaintiff") bring this action on behalf of themselves against all Defendants.

1432.   FCA, Fiat, VM Italy, VM America, Bosch GmbH, Bosch LLC, Sergio Marchionne, Plaintiff, and Plaintiffs are "persons" within the meaning of Ariz. Rev. Stat. § 44-1521(6).

1433.   The Subject Vehicles are "merchandise" within the meaning of Ariz. Rev. Stat. § 44- 1521(5).

1434.   The Arizona Consumer Fraud Act ("Arizona CFA") provides that "[t]he act, use or employment by any person of any deception, deceptive act or practice, fraud, … misrepresentation, or concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale … of any merchandise whether or not any person has in fact been misled, deceived or damaged thereby, is declared to be an unlawful practice." Ariz. Rev. Stat. § 44-1522(A).

1435.   In the course of their business, Defendants Fiat Chrysler, VM Motori, Bosch, and Marchionne, through their agents, employees, and/or subsidiaries, violated the Arizona CFA.

1436.   As detailed in the common law fraud allegations: (1) Fiat Chrysler affirmatively misrepresented the environmental friendliness and emissions of the Subject Vehicles through the EcoDiesel badge—a material fact that was false because the Defendants developed and installed emission cheating components in the Subject Vehicles that caused them to pollute excessively in real-world conditions; (2) Fiat Chrysler touted, through the EcoDiesel badge and uniform and pervasive consumer communications, the Subject Vehicles' fuel efficiency and performance, and the Defendants concealed that the fuel efficiency and performance could be achieved only through emission control devices in the Subject Vehicles that caused them to pollute excessively in real-world conditions; and (3) the Defendants developed and installed emission cheating components that caused the Subject Vehicles to pollute excessively in real-world conditions, and fraudulently concealed that fact from regulators and Plaintiffs alike. In so doing, and by marketing, offering for sale, and selling the defective Subject Vehicles, Defendants engaged in deceptive acts or practices, as outlined in Ariz. Rev. Stat. § 44- 1522(A), including using or employing deception, fraud, false pretense, false promise or misrepresentation, or the concealment, suppression or omission of a material fact with intent that others rely upon such concealment, suppression or omission, in connection with the advertisement and sale/lease of the Subject Vehicles.

1437.   Defendants' scheme and concealment of the true characteristics of the EcoDiesel® emission control system were material to Plaintiff, as Defendants intended. Had they known the truth, Plaintiff would not have purchased or leased the Subject Vehicles, or—if the Subject Vehicles' true nature had been disclosed and mitigated, and the Vehicles rendered legal to sell— would have paid significantly less for them.

1438.   Plaintiffs had no way of discerning that Defendants' representations were false and misleading, or otherwise learning the facts that Defendants had concealed or failed to disclose,

because Defendants' emission control software was extremely sophisticated technology. Plaintiffs did not, and could not, unravel Defendants' deception on their own.

1439.   Defendants had an ongoing duty to Plaintiff to refrain from unfair and deceptive practices under the Arizona CFA in the course of their business. Specifically, Defendants owed Plaintiffs a duty to disclose all the material facts concerning the EcoDiesel® emission control system because they possessed exclusive knowledge, they intentionally concealed it from Plaintiff, and/or they made misrepresentations that were rendered misleading because they were contradicted by withheld facts.

1440.   Plaintiffs suffered ascertainable loss and actual damages as a direct and proximate result of Defendants' concealment, misrepresentations, and/or failure to disclose material information.

1441.   Defendants' violations present a continuing risk to Plaintiff, as well as to the general public. Defendants' unlawful acts and practices complained of herein affect the public interest.

1442.   Plaintiff seek an order enjoining Defendants' unfair and/or deceptive acts or practices and awarding damages and any other just and proper relief available under the Arizona CFA.

## ARKANSAS COUNT I
## VIOLATIONS OF THE DECEPTIVE TRADE PRACTICE ACT
### (Ark. Code Ann. § 4-88-101, *et seq.*)

1443.   Plaintiffs incorporate by reference each preceding paragraph as though fully set forth herein.

1444.   Plaintiffs, Dawn and Edward Nelson, Andrew Prztarski, (for the purpose of this section, "Plaintiffs") brings this action on behalf of themselves against all Defendants.

1445.   Fiat, VM Italy, VM America, Bosch GmbH, Bosch LLC, Sergio Marchionne, Plaintiff, and Plaintiffs are "persons" within the meaning of Ark. Code Ann. § 4- 88-102(5).

1446.   The Subject Vehicles are "goods" within the meaning of Ark. Code Ann. § 4-88-20 102(4).

1447.   The Arkansas Deceptive Trade Practice Act ("Arkansas DTPA") makes unlawful "[d]eceptive and unconscionable trade practices," which include, but are not limited to, a list of enumerated items, including "[e]ngaging in any other unconscionable, false, or deceptive act or practice in business, commerce, or trade[.]" Ark. Code Ann. § 4-88-107(a)(10). The Arkansas DTPA also prohibits the following when utilized in connection with the sale or advertisement of any goods: "(1) The act, use, or employment by any person of any deception, fraud, or false pretense; or (2) The concealment, suppression, or omission of any material fact with intent that others rely upon the concealment, suppression, or omission." Ark. Code Ann. § 4-88-108.

1448.   In the course of their business, Defendants Fiat Chrysler, VM Motori, Bosch, and Sergio Marchionne, through their agents, employees, and/or subsidiaries, violated the Arkansas DTPA.

1449.   As detailed in the common law fraud allegations: (1) Fiat Chrysler affirmatively misrepresented the environmental friendliness and emissions of the Subject Vehicles through the EcoDiesel badge—a material fact that was false because the Defendants developed and installed emission cheating components in the Subject Vehicles that caused them to pollute excessively in real-world conditions; (2) Fiat Chrysler touted, through the EcoDiesel badge and uniform and

pervasive consumer communications, the Subject Vehicles' fuel efficiency and performance, and the Defendants concealed that the fuel efficiency and performance could be achieved only through emission control devices in the Subject Vehicles that caused them to pollute excessively in real-world conditions; and (3) the Defendants developed and installed emission cheating components that caused the Subject Vehicles to pollute excessively in real-world conditions, and fraudulently concealed that fact from regulators and Plaintiffs alike. *See, e.g.*, ¶¶ 149-216; 337-357. In so doing, and by marketing, offering for sale, and selling the defective Subject Vehicles, Defendants engaged in one or more of the following unfair or deceptive acts or practices as defined in Ark. Code Ann. §§ 4-88-107 -108:

   A.   Representing that the Subject Vehicles have approval, characteristics, uses, or benefits that they do not have;

   B.   Representing that the Subject Vehicles are of a particular standard, quality and grade when they are not;

   C.   Advertising the Subject Vehicles with the intent not to sell or lease them as advertised; and/or

   D.   Using or employing deception, fraud, false pretense, false promise or misrepresentation, or the concealment, suppression or omission of a material fact with intent that others rely upon such concealment, suppression or omission, in connection with the advertisement and sale/lease of the Subject Vehicles, whether or not any person has in fact been misled, deceived or damaged thereby.

1450.   Defendants' scheme and concealment of the true characteristics of the EcoDiesel® emission control system were material to Plaintiff, as Defendants intended. Had they known the truth, Plaintiff would not have purchased or leased the Subject Vehicles, or—if the Subject Vehicles' true nature had been disclosed and mitigated, and the Vehicles rendered legal to sell—would have paid significantly less for them.

1451.   Plaintiffs had no way of discerning that Defendants' representations were false and misleading, or otherwise learning the facts that Defendants had concealed or failed to disclose, because Defendants' emission control software was extremely sophisticated technology. Plaintiffs did not, and could not, unravel Defendants' deception on their own.

1452.   Defendants had an ongoing duty to Plaintiffs to refrain from unfair and deceptive practices under the Arkansas DTPA in the course of their business. Specifically, Defendants owed Plaintiff a duty to disclose all the material facts concerning the EcoDiesel® emission control system because they possessed exclusive knowledge, they intentionally concealed it from the Plaintiffs, and/or they made misrepresentations that were rendered misleading because they were contradicted by withheld facts.

1453.   Plaintiffs suffered ascertainable loss and actual damages as a direct and proximate result of Defendants' concealment, misrepresentations, and/or failure to disclose material information.

1454.   Defendants' violations present a continuing risk to the Plaintiffs, as well as to the general public. Defendants' unlawful acts and practices complained of herein affect the public interest.

1455.   Plaintiffs seek an order enjoining Defendants' unfair and/or deceptive acts or practices, and awarding damages pursuant to Ark. Code Ann. § 4-88-13(f), and any other just and proper relief available under the Arkansas DTPA.

## VIOLATIONS OF THE CONSUMER LEGAL REMEDIES ACT
### (Cal. Civ. Code § 1750, *et seq.*)

1456.   Plaintiffs incorporate by reference each preceding paragraph as though fully set

forth herein.

1457.   Plaintiffs, to be named at a later date, (for the purpose of this section, "Plaintiffs") bring this action on behalf of themselves against all Defendants.

1458.   Fiat, VM Italy, VM America, Bosch GmbH, Bosch LLC, Sergio Marchionne, and Plaintiffs are "persons" within the meaning of Cal. Civ. Code § 1761(c). Plaintiffs are "consumers" within the meaning of Cal. Civ. Code § 1761(d).

1459.   The California Legal Remedies Act ("CLRA") prohibits "unfair or deceptive acts or practices undertaken by any person in a transaction intended to result or which results in the sale or lease of goods or services to any consumer[.]" Cal. Civ. Code § 1770(a).

1460.   In the course of their business, Defendants Fiat Chrysler, VM Motori, Bosch, and Marchionne, through their agents, employees, and/or subsidiaries, violated the CLRA.

1461.   As detailed in the common law fraud allegations: (1) Fiat Chrysler affirmatively misrepresented the environmental friendliness and emissions of the Subject Vehicles through the EcoDiesel badge—a material fact that was false because the Defendants developed and installed emission cheating components in the Subject Vehicles that caused them to pollute excessively in real-world conditions; (2) Fiat Chrysler touted, through the EcoDiesel badge and uniform and pervasive consumer communications, the Subject Vehicles' fuel efficiency and performance, and the Defendants concealed that the fuel efficiency and performance could be achieved only through emission control devices in the Subject Vehicles that caused them to pollute excessively in real-world conditions; and (3) the Defendants developed and installed emission cheating components that caused the Subject Vehicles to pollute excessively in real-world conditions, and fraudulently concealed that fact from regulators and Plaintiffs alike. In so doing, and by Defendants engaged in

one or more of the following unfair or deceptive acts or practices as defined in Cal. Civ. Code §
1770(a):

   A.  Representing that the Subject Vehicles have approval, characteristics, uses, or
   benefits that they do not have;

   B.  Representing that the Subject Vehicles are of a particular standard, quality and
   grade when they are not; and/or

   C.  Advertising the Subject Vehicles with the intent not to sell or lease them as
   advertised.


   1462.   Defendants' scheme and concealment of the true characteristics of the EcoDiesel®
emission control system were material to Plaintiffs, as Defendants intended. Had they known the
truth, Plaintiffs would not have purchased or leased the Subject Vehicles, or—if the Subject
Vehicles' true nature had been disclosed and mitigated, and the Vehicles rendered legal to sell—
would have paid significantly less for them.

   1463.   Plaintiffs had no way of discerning that Defendants' representations were false and
misleading, or otherwise learning the facts that Defendants had concealed or failed to disclose,
because Defendants' emission control software was extremely sophisticated technology. Plaintiffs
did not, and could not, unravel Defendants' deception on their own.

   1464.   Defendants had an ongoing duty to Plaintiffs to refrain from unfair and deceptive
practices under the California CLRA in the course of their business. Specifically, Defendants owed
Plaintiffs a duty to disclose all the material facts concerning the EcoDiesel® emission control
system because they possessed exclusive knowledge, they intentionally concealed it from
Plaintiffs, and/or they made misrepresentations that were rendered misleading because they were
contradicted by withheld facts.

1465.   Plaintiffs suffered ascertainable loss and actual damages as a direct and proximate result of Defendants' concealment, misrepresentations, and/or failure to disclose material information.

1466.   Defendants' violations present a continuing risk to Plaintiffs, as well as to the general public. Defendants' unlawful acts and practices complained of herein affect the public interest.

1467.   Pursuant to Cal. Civ. Code § 1780(a), Plaintiffs seek an order enjoining Defendants' unfair and/or deceptive acts or practices, and awarding damages, punitive damages, and any other just and proper relief available under the CLRA. Under Cal. Civ. Code § 1780(b), Plaintiffs seeks an additional award against Defendants of up to $5,000 for each member who qualifies as a "senior citizen" or "disabled person" under the CLRA. Defendants knew or should have known that their conduct was directed to one or more Plaintiff who is a senior citizens or disabled persons. Defendants' conduct caused one or more of these senior citizens or disabled persons to suffer a substantial loss of property set aside for retirement or for personal or family care and maintenance, or assets essential to the health or welfare of the senior citizen or disabled person. One or more Plaintiff who is a senior citizen or disabled person is substantially more vulnerable to Defendants' conduct because of age, poor health or infirmity, impaired understanding, restricted mobility, or disability, and each of them suffered substantial physical, emotional, or economic damage resulting from Defendants' conduct.

1468.   Plaintiffs, to be named at a later date, will send a notice letter to FCA US LLC complying with Cal. Civ. Code § 1780(b). All Defendants will be provided notice of the issues raised in this count and this Complaint by the governmental investigations, the numerous

411

complaints filed against them, and the many individual notice letters to be sent by Plaintiffs within a reasonable amount of time after the allegations of Subject Vehicle defects became public. Should Defendants fail to remedy their unlawful conduct within the requisite time period, Plaintiffs seek all damages and relief to which Plaintiffs are entitled.

## UNLAWFUL, UNFAIR, OR FRAUDULENT BUSINESS PRACTICES UNDER THE CALIFORNIA UNFAIR COMPETITION LAW (Cal. Bus. & Prof. Code § 17200, *et seq.*)

1469.   Plaintiffs incorporates by reference each preceding paragraph as though fully set forth herein.

1470.   Plaintiffs, to be named at a latter date, (for the purpose of this section, "Plaintiffs") bring this action on behalf of themselves against all Defendants.

1471.   California's Unfair Competition Law ("UCL"), Business and Professions Code § 17200, prohibits any "unlawful, unfair, or fraudulent business act or practices."

1472.   As detailed in the common law fraud allegations: (1) Fiat Chrysler affirmatively misrepresented the environmental friendliness and emissions of the Subject Vehicles through the EcoDiesel badge—a material fact that was false because the Defendants developed and installed emission cheating components in the Subject Vehicles that caused them to pollute excessively in real-world conditions; (2) Fiat Chrysler touted, through the EcoDiesel badge and uniform and pervasive consumer communications, the Subject Vehicles' fuel efficiency and performance, and the Defendants concealed that the fuel efficiency and performance could be achieved only through emission control devices in the Subject Vehicles that caused them to pollute excessively in real-world conditions; and (3) the Defendants developed and installed emission cheating components that caused the Subject Vehicles to pollute excessively in real-world conditions, and fraudulently

concealed that fact from regulators and Plaintiffs alike. In so doing, Fiat, FCA, VM Motori, Bosch

GmbH, Bosch LLC, and Marchionne have engaged in at least the following unlawful, fraudulent,

and unfair business acts and practices in violation of the UCL:

> A. By knowingly and intentionally concealing from Plaintiffs that the Subject Vehicles suffer from a design defect while obtaining money from Plaintiffs;

> B.   By marketing Subject Vehicles as possessing functional and defect-free, "clean" diesel engine systems; and

> C.   By violating both federal and California laws, including the federal RICO statute and California laws governing vehicle emissions and emission testing requirements.

1473.  Defendants' cheating scheme and concealment of the true characteristics of the

EcoDiesel emission control system were material to Plaintiffs, and Defendants misrepresented,

concealed, or failed to disclose the truth with the intention that consumers would rely on the

misrepresentations, concealments, and omissions. Had they known the truth, Plaintiffs who

purchased or leased the Subject Vehicles would not have purchased or leased them at all or—if

the Vehicles' true nature had been disclosed and mitigated, and the Vehicles rendered legal to

sell—would have paid significantly less for them.

1474.  1908. Plaintiffs suffered ascertainable loss and actual damages as a direct and

proximate result of Defendants' misrepresentations and their concealment of and failure to disclose

material information. Pursuant to Cal. Bus. & Prof. Code § 17200, Plaintiffs seek an order

enjoining Defendants' unfair and/or deceptive acts or practices, any such orders or judgments as

may be necessary to restore to Plaintiffs any money acquired by unfair competition, including

restitution and/or restitutionary disgorgement, as provided in Cal. Bus. & Prof. Code §§ 17203 and

3345, and any other just and proper relief available under the California UCL.

**FALSE ADVERTISING UNDER THE CALIFORNIA
UNFAIR COMPETITION LAW
(Cal. Bus. & Prof. Code § 17500, *et seq.*)**

1475.   Plaintiffs incorporates by reference all preceding allegations as though fully set forth herein.

1476.   Plaintiffs, to be named at a latter date, (for the purpose of this section, "Plaintiffs") bring this action on behalf of themselves against FCA, Fiat, Marchionne, Bosch LLC, Bosch GmbH, and VM Motori.

1477.   California Bus. & Prof. Code § 17500 states: "It is unlawful for any person, … corporation …or any employee thereof with intent directly or indirectly to dispose of real or personal property… or to induce the public to enter into any obligation relating thereto, to make or disseminate or cause to be made or disseminated … before the public in this state or from this state before the public in any state, in any newspaper or other publication, or any advertising device, … or in any other manner or means whatever, including over the Internet, any statement … which is untrue or misleading, and which is known, or which by the exercise of reasonable care should be known, to be untrue or misleading."

1478.   As detailed in the common law fraud allegations: (1) Fiat Chrysler affirmatively misrepresented the environmental friendliness and emissions of the Subject Vehicles through the EcoDiesel badge—a material fact that was false because the Defendants developed and installed emission cheating components in the Subject Vehicles that caused them to pollute excessively in real-world conditions; (2) Fiat Chrysler touted, through the EcoDiesel badge and uniform and pervasive consumer communications, the Subject Vehicles' fuel efficiency and performance, and

the Defendants concealed that the fuel efficiency and performance could be achieved only through emission control devices in the Subject Vehicles that caused them to pollute excessively in real-world conditions; and (3) the Defendants developed and installed emission cheating components that caused the Subject Vehicles to pollute excessively in real-world conditions, and fraudulently concealed that fact from regulators and Plaintiffs alike.

1479.   FCA, Fiat, and Marchionne; Bosch LLC and Bosch GmbH; and VM Motori, each made or caused to be made and disseminated throughout California and the United States, through advertising, marketing, and other publications, numerous statements that were untrue or misleading, and which were known, or which by the exercise of reasonable care should have been known to each Defendant, to be untrue and misleading to consumers, including Plaintiff and the other California State Plaintiffs. Numerous examples of these statements and advertisements appear throughout this Complaint.

1480.   Pursuant to Cal. Bus. & Prof. Code § 17500, Plaintiffs seek an order enjoining Defendants' false advertising, any such orders or judgments as may be necessary to restore to Plaintiffs any money acquired by unfair competition, including restitution and/or restitutionary disgorgement, and any other just and proper relief available under the false advertising provisions of the UCL.

### FAILURE TO RECALL/RETROFIT UNDER CALIFORNIA LAW
### VIOLATIONS OF THE COLORADO CONSUMER PROTECTION ACT

1481.   Plaintiffs reallege and incorporate by reference all preceding allegations as though fully set forth herein.

1482.   Plaintiffs, Bryan Schneider, Milburn Markle, Carlos Garcia, Klayton Costanzo,

Klayton Costanzo, Marcus Spencer, Christopher Harper, Eric Croke, (for the purpose of this section, "Plaintiffs") bring this action on behalf of themselves against Fiat and FCA.

1483.   Fiat Chrysler manufactured, marketed, distributed, sold, or otherwise placed into the stream of U.S. commerce the Subject Vehicles, as set forth above.

1484.   Defendants knew or reasonably should have known that the Subject Vehicles were dangerous when used in a reasonably foreseeable manner and posed an unreasonable risk.

1485.   Fiat Chrysler became aware that the Subject Vehicles were dangerous when used in a reasonably foreseeable manner and posed an unreasonable after the Vehicles were sold.

1486.   Fiat Chrysler failed to recall the Subject Vehicles in a timely manner or warn of the dangers posed by Subject Vehicles.

1487.   A reasonable manufacturer in same or similar circumstances would have timely and properly recalled the Subject Vehicles.

1488.   Plaintiffs were harmed by Fiat Chrysler's failure to recall the Subject Vehicles properly and in a timely manner and, as a result, have suffered damages, including their out-of-pocket costs, losses, and inconvenience, and caused by Fiat Chrysler's ongoing failure to properly recall, retrofit, and fully repair the Subject Vehicles.

1489.   Even in the event of a recall, Plaintiffs have suffered and continue to damages for each day that a recall is delayed.

1490.   Fiat Chrysler's failure to timely recall the Subject Vehicles was a substantial factor in causing the harm to Plaintiffs as alleged herein.

## VIOLATIONS OF THE COLORADO CONSUMER PROTECTION ACT
### (Colo. Rev. Stat. § 6-1-101, *et seq.*)

1491.   Plaintiffs incorporate by reference each preceding paragraph as though fully set forth herein.

1492.   Plaintiffs, Bryan Schneider, Milburn Markle, Carlos Garcia, Klayton Costanzo, Klayton Costanzo, Marcus Spencer, Christopher Harper, Eric Croke, (for the purpose of this section, "Plaintiffs") bring this action on behalf of themselves against all Defendants.

1493.   FCA, Fiat, VM Italy, VM America, Bosch GmbH, Bosch LLC, Sergio Marchionne, and Plaintiffs are "persons" within the meaning of § 6-1-102(6) of the Colorado Consumer Protection Act ("Colorado CPA"), Colo. Rev. Stat. § 6-1-101, *et seq*. Plaintiffs are "consumers" within the meaning of Col. Rev. Stat § 6-1-113(1)(a).

1494.   The Colorado CPA makes unlawful deceptive trade practices in the course of a person's business. Defendants engaged in deceptive trade practices prohibited by the Colorado CPA, including: (1) knowingly making a false representation as to the characteristics, uses, and benefits of the Subject Vehicles that had the capacity or tendency to deceive Plaintiffs; (2) representing that the Subject Vehicles are of a particular standard, quality, and grade even though FCA knew or should have known they are not; (3) advertising the Subject Vehicles with the intent not to sell them as advertised; and (4) failing to disclose material information concerning the Subject Vehicles that was known to FCA at the time of advertisement or sale with the intent to induce Plaintiffs to purchase, lease or retain the Subject Vehicles.

1495.   In the course of their business, Defendants Fiat Chrysler, VM Motori, Bosch, and Marchionne, through their agents, employees, and/or subsidiaries, violated the Colorado CPA.

1496.   As detailed in the common law fraud allegations: (1) Fiat Chrysler affirmatively misrepresented the environmental friendliness and emissions of the Subject Vehicles through the EcoDiesel badge—a material fact that was false because the Defendants developed and installed emission cheating components in the Subject Vehicles that caused them to pollute excessively in real-world conditions; (2) Fiat Chrysler touted, through the EcoDiesel badge and uniform and pervasive consumer communications, the Subject Vehicles' fuel efficiency and performance, and the Defendants concealed that the fuel efficiency and performance could be achieved only through emission control devices in the Subject Vehicles that caused them to pollute excessively in real-world conditions; and (3) the Defendants developed and installed emission cheating components that caused the Subject Vehicles to pollute excessively in real-world conditions, and fraudulently concealed that fact from regulators and Plaintiffs alike. In so doing, and by marketing, offering for sale, and selling the defective Subject Vehicles, Defendants engaged in one or more of the following unfair or deceptive acts or practices as defined in Colo. Rev. Stat. § 6-1-105:

> A.  Representing that the Subject Vehicles have approval, characteristics, uses, or benefits that they do not have;

> B.    Representing that the Subject Vehicles are of a particular standard, quality and grade when they are not;

> C.    Advertising the Subject Vehicles with the intent not to sell or lease them as advertised; and/or

> D.    Failing to disclose material information concerning the Subject Vehicles known to Defendants at the time of advertisement or sale, with the intention of inducing Plaintiffs to purchase or lease the vehicles.

1497.   Defendants' scheme and concealment of the true characteristics of the EcoDiesel® emission control system were material to Plaintiffs, as Defendants intended. Had they known the truth, Plaintiffs would not have purchased or leased the Subject Vehicles, or—if the Subject Vehicles' true nature had been disclosed and mitigated, and the Vehicles rendered legal to sell—

would have paid significantly less for them.

1498.   Plaintiffs had no way of discerning that Defendants' representations were false and misleading, or otherwise learning the facts that Defendants had concealed or failed to disclose, because Defendants' emission control software was extremely sophisticated technology. Plaintiffs did not, and could not, unravel Defendants' deception on their own.

1499.   Defendants had an ongoing duty to Plaintiffs to refrain from unfair and deceptive practices under the Colorado CPA in the course of their business. Specifically, Defendants owed Plaintiffs a duty Defendants owed Plaintiffs a duty to disclose all the material facts concerning the EcoDiesel® emission control system because they possessed exclusive knowledge, they intentionally concealed it from Plaintiffs, and/or they made misrepresentations that were rendered misleading because they were contradicted by withheld facts.

1500.   Plaintiffs suffered ascertainable loss and actual damages as a direct and proximate result of Defendants' concealment, misrepresentations, and/or failure to disclose material information.

1501.   Defendants' violations present a continuing risk to Plaintiffs, as well as to the general public. Defendants' unlawful acts and practices complained of herein affect the public interest.

1502.   Pursuant to Colo. Rev. Stat. § 6-1-113, Plaintiffs seek an order enjoining Defendants' unfair and/or deceptive acts or practices, and awarding damages, treble or punitive damages, and any other just and proper relief available under the Colorado CPA.

**VIOLATION OF CONNECTICUT UNLAWFUL TRADE PRACTICES ACT**
(Conn. Gen. Stat. § 42-110a, *et seq.*)

1503.   Plaintiffs incorporate by reference each preceding paragraph as though fully set forth herein.

1504.   Plaintiffs, Christopher Barbour, (for the purpose of this section, "Plaintiff") brings this action on behalf of themselves against all Defendants.

1505.   FCA, Fiat, VM Italy, VM America, Bosch GmbH, Bosch LLC, Sergio Marchionne, Plaintiff, and Plaintiffs are "persons" within the meaning of Conn. Gen. Stat. § 42-110a(3) of the Connecticut Unfair Trade Practices Act ("Connecticut UTPA"). FCA, Fiat, VM Italy, VM America, Bosch GmbH, Bosch LLC, and Marchionne are engaged in "trade" or "commerce" within the meaning of Conn. Gen. Stat. § 42- 110a(4).

1506. The Connecticut provides: "No person shall engage in unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce." Conn. Gen. Stat. § 42-110b(a).

1507.   In the course of their business, Defendants Fiat Chrysler, VM Motori, Bosch, and Sergio Marchionne, through their agents, employees, and/or subsidiaries, violated the Connecticut UTPA.

1508.   As detailed in the common law fraud allegations: (1) Fiat Chrysler affirmatively misrepresented the environmental friendliness and emissions of the Subject Vehicles through the EcoDiesel badge—a material fact that was false because the Defendants developed and installed emission cheating components in the Subject Vehicles that caused them to pollute excessively in real-world conditions; (2) Fiat Chrysler touted, through the EcoDiesel badge and uniform and

pervasive consumer communications, the Subject Vehicles' fuel efficiency and performance, and

the Defendants concealed that the fuel efficiency and performance could be achieved only through

emission control devices in the Subject Vehicles that caused them to pollute excessively in real-

world conditions; and (3) the Defendants developed and installed emission cheating components

that caused the Subject Vehicles to pollute excessively in real-world conditions, and fraudulently

concealed that fact from regulators and Plaintiffs alike. See, e.g., ¶¶ 149-216; 337-357. In so doing,

and by Defendants engaged in one or more of the following unfair or deceptive acts or practices

in violation of Conn. Gen. Stat. § 42-110b(a):

A. Causing likelihood of confusion or of misunderstanding as to the approval or
   certification of the Subject Vehicles;

B. Representing that the Subject Vehicles have approval, characteristics, uses, or
   benefits that they do not have;

C. Representing that the Subject Vehicles are of a particular standard, quality and
   grade when they are not;

D. Advertising the Subject Vehicles with the intent not to sell or lease them as
   advertised;

E. Engaging in other conduct which created a likelihood of confusion or of
   misunderstanding; and/or

F. Using or employing deception, fraud, false pretense, false promise or
   misrepresentation, or the concealment, suppression or omission of a material
   fact with intent that others rely upon such concealment, suppression or
   omission, in connection with the advertisement and sale/lease of the Subject
   Vehicles, whether or not any person has in fact been misled, deceived or
   damaged thereby.

1509.   Defendants' scheme and concealment of the true characteristics of the EcoDiesel®

emission control system were material to Plaintiff, as Defendants intended. Had they known the

truth, Plaintiff would not have purchased or leased the Subject Vehicles, or—if the Subject Vehicles' true nature had been disclosed and mitigated, and the Vehicles rendered legal to sell— would have paid significantly less for them.

1510.   Plaintiffs had no way of discerning that Defendants' representations were false and misleading, or otherwise learning the facts that Defendants had concealed or failed to disclose, because Defendants' emission control software was extremely sophisticated technology. Plaintiffs did not, and could not, unravel Defendants' deception on their own.

1511.   Defendants had an ongoing duty to Plaintiff to refrain from unfair and deceptive practices under the Connecticut UTPA in the course of their business. Specifically, Defendants owed Plaintiffs a duty to disclose all the material facts concerning the EcoDiesel® emission control system because they possessed exclusive knowledge, they intentionally concealed it from Plaintiff, and/or they made misrepresentations that were rendered misleading because they were contradicted by withheld facts.

1512.   Plaintiffs suffered ascertainable loss and actual damages as a direct and proximate result of Defendants' concealment, misrepresentations, and/or failure to disclose material information.

1513.   Defendants' violations present a continuing risk to Plaintiff, as well as to the general public. Defendants' unlawful acts and practices complained of herein affect the public interest.

1514.   Pursuant to Conn. Gen. Stat. § 42-110g, Plaintiff seek an order enjoining Defendants' unfair and/or deceptive acts or practices, and awarding damages, punitive damages, and any other just and proper relief available under the Connecticut UTPA.

**VIOLATIONS OF THE DELAWARE CONSUMER FRAUD ACT AND
DECEPTIVE TRADE PRACTICES ACT
(6 Del. Code § 2513, *et seq.*, and 6 Del. Code § 2531, *et seq.*)**

1515.   Plaintiffs incorporate by reference each preceding paragraph as though fully set forth herein.

1516.   Plaintiffs, to be named at a later date, (for the purpose of this section, "Plaintiff") brings this action on behalf of the Plaintiffs against all Defendants.

1517.   FCA Fiat, VM Italy, VM America, Bosch GmbH, Bosch LLC, Sergio Marchionne, and Plaintiffs are "persons" within the meaning of 6 Del. Code § 2511(7) and § 2531(5).

1518.   The Delaware Consumer Fraud Act ("Delaware CFA") makes unlawful the "act, use or employment by any person of any deception, fraud, false pretense, false promise, misrepresentation, or the concealment, suppression, or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale, lease or advertisement of any merchandise, whether or not any person has in fact been misled, deceived or damaged thereby." 6 Del. Code § 2513(a).

1519.   In the course of their business, Defendants Fiat Chrysler, VM Motori, Bosch, and Marchionne, through their agents, employees, and/or subsidiaries, violated the Delaware CFA.

1520.   As detailed in the common law fraud allegations: (1) Fiat Chrysler affirmatively misrepresented the environmental friendliness and emissions of the Subject Vehicles through the EcoDiesel badge—a material fact that was false because the Defendants developed and installed emission cheating components in the Subject Vehicles that caused them to pollute excessively in real-world conditions; (2) Fiat Chrysler touted, through the EcoDiesel badge and uniform and

423

pervasive consumer communications, the Subject Vehicles' fuel efficiency and performance, and the Defendants concealed that the fuel efficiency and performance could be achieved only through emission control devices in the Subject Vehicles that caused them to pollute excessively in real-world conditions; and (3) the Defendants developed and installed emission cheating components that caused the Subject Vehicles to pollute excessively in real-world conditions, and fraudulently concealed that fact from regulators and Plaintiffs alike. See, e.g., ¶¶ 149-216; 337-357. In so doing, and by Defendants engaged in one or more of the following unlawful acts or practices prohibited by 6 Del. Code § 2513(a): using or employing deception, fraud, false pretense, false promise or misrepresentation, or the concealment, suppression or omission of a material fact with intent that others rely upon such concealment, suppression or omission, in connection with the advertisement and sale/lease of the Subject Vehicles, whether or not any person has in fact been misled, deceived or damaged thereby.

1521.   Defendants also engaged in one or more of the following deceptive trade practices enumerated by the Delaware Deceptive Trade Practices Act at 6 Del. Code § 2532:

A.   Causing likelihood of confusion or of misunderstanding as to the approval or certification of the Subject Vehicles;

B. Representing that the Subject Vehicles have approval, characteristics, uses, or benefits that they do not have;

C.   Representing that the Subject Vehicles are of a particular standard, quality and grade when they are not;

D.   Advertising the Subject Vehicles with the intent not to sell or lease them as advertised; and/or

E. Engaging in other conduct which created a likelihood of confusion or of misunderstanding.

1522.   Defendants' scheme and concealment of the true characteristics of the EcoDiesel® emission control system were material to the Plaintiffs, as Defendants intended. Had they known

424

the truth, the Plaintiffs would not have purchased or leased the Subject Vehicles, or—if the Subject Vehicles' true nature had been disclosed and mitigated, and the Vehicles rendered legal to sell— would have paid significantly less for them.

1523.   Plaintiffs had no way of discerning that Defendants' representations were false and misleading, or otherwise learning the facts that Defendants had concealed or failed to disclose, because Defendants' emission control software was extremely sophisticated technology. Plaintiffs did not, and could not, unravel Defendants' deception on their own.

1524.   Defendants had an ongoing duty to the Plaintiffs to refrain from unfair and deceptive practices under the Delaware CFA in the course of their business. Specifically, Defendants owed Plaintiffs a duty to disclose all the material facts concerning the EcoDiesel® emission control system because they possessed exclusive knowledge, they intentionally concealed it from the Plaintiffs, and/or they made misrepresentations that were rendered misleading because they were contradicted by withheld facts.

1525.   Plaintiffs suffered ascertainable loss and actual damages as a direct and proximate result of Defendants' concealment, misrepresentations, and/or failure to disclose material information.

1526.   Defendants' violations present a continuing risk to the Plaintiffs, as well as to the general public. Defendants' unlawful acts and practices complained of herein affect the public interest.

1527.   The Plaintiffs seeks an order enjoining Defendants' unfair and/or deceptive acts or practices, and awarding damages, punitive or treble damages, and any other just and proper relief available under the Delaware CFA and DTPA (6 Del. Code §§ 2525 and 2533). See, e.g., Stephenson v. Capano Dev., Inc., 462 A.2d 1069, 1077 (Del. 1983).

## VIOLATION OF THE CONSUMER PROTECTION PROCEDURES ACT
### (D.C. Code § 28-3901, *et seq.*)

1528.   Plaintiffs incorporate by reference each preceding paragraph as though fully set forth herein.

1529.   Plaintiffs, to be named at a later date, (for the purpose of this section, "Plaintiff") brings this action on behalf of the District of Columbia Plaintiffs against all Defendants.

1530.   FCA, Fiat, VM Italy, VM America, Bosch GmbH, Bosch LLC, Sergio Marchionne, and the District of Columbia Plaintiffs are "persons" within the meaning of D.C. Code § 28-3901(a)(1). The District of Columbia Plaintiffs are "consumers" within the meaning of D.C. Code § 28-3901(1)(2).

1531.   FCA, Fiat, VM Italy, VM America, Bosch GmbH, Bosch LLC, and Marchionne are engaged in "trade practices" within the meaning of D.C. Code § 28-3901.

1532.   The District of Columbia Consumer Protection Procedures Act ("District of Columbia CPPA") makes unlawful unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce. D.C. Code § 28-3901, *et seq.*

1533.   In the course of their business, Defendants Fiat Chrysler, VM Motori, Bosch, and Sergio Marchionne, through their agents, employees, and/or subsidiaries, violated the District of Columbia CPPA.

1534.   As detailed in the common law fraud allegations: (1) Fiat Chrysler affirmatively misrepresented the environmental friendliness and emissions of the Subject Vehicles through the EcoDiesel badge—a material fact that was false because the Defendants developed and installed emission cheating components in the Subject Vehicles that caused them to pollute excessively in real-world conditions; (2) Fiat Chrysler touted, through the EcoDiesel badge and uniform and pervasive consumer communications, the Subject Vehicles' fuel efficiency and performance, and

426

the Defendants concealed that the fuel efficiency and performance could be achieved only through emission control devices in the Subject Vehicles that caused them to pollute excessively in real-world conditions; and (3) the Defendants developed and installed emission cheating components that caused the Subject Vehicles to pollute excessively in real-world conditions, and fraudulently concealed that fact from regulators and Plaintiffs alike. In so doing, and by Defendants engaged in one or more of the following unfair or deceptive acts or practices as defined in D.C. Code § 28-3901, *et seq.*:

> A.   Representing that the Subject Vehicles have approval, characteristics, uses, or benefits that they do not have;
>
> B.   Representing that the Subject Vehicles are of a particular standard, quality and grade when they are not; and/or
>
> C.   Advertising the Subject Vehicles with the intent not to sell or lease them as advertised.

1535.   Defendants' scheme and concealment of the true characteristics of the EcoDiesel® emission control system were material to the District of Columbia Plaintiffs, as Defendants intended. Had they known the truth, the District of Columbia Plaintiffs would not have purchased or leased the Subject Vehicles, or—if the Subject Vehicles' true nature had been disclosed and mitigated, and the Vehicles rendered legal to sell—would have paid significantly less for them.

1536.   District of Columbia Plaintiffs had no way of discerning that Defendants' representations were false and misleading, or otherwise learning the facts that Defendants had concealed or failed to disclose, because Defendants' emission control software was extremely sophisticated technology. District of Columbia Plaintiffs did not, and could not, unravel Defendants' deception on their own.

1537.   Defendants had an ongoing duty to the District of Columbia Plaintiffs to refrain

from unfair and deceptive practices under the District of Columbia CPPA in the course of their business. Specifically, Defendants owed District of Columbia Plaintiffs a duty to disclose all the material facts concerning the EcoDiesel® emission control system because they possessed exclusive knowledge, they intentionally concealed it from the District of Columbia Plaintiffs, and/or they made misrepresentations that were rendered misleading because they were contradicted by withheld facts.

1538.   District of Columbia Plaintiffs suffered ascertainable loss and actual damages as a direct and proximate result of Defendants' concealment, misrepresentations, and/or failure to disclose material information.

1539.   Defendants' violations present a continuing risk to the District of Columbia Plaintiffs, as well as to the general public. Defendants' unlawful acts and practices complained of herein affect the public interest.

1540.   Pursuant to D.C. Code § 28-3901, the District of Columbia Plaintiffs seek an order enjoining Defendants' unfair and/or deceptive acts or practices, and awarding damages, treble and/or punitive damages, and any other just and proper relief available under the District of Columbia CPPA.

## VIOLATION OF FLORIDA'S UNFAIR & DECEPTIVE
## TRADE PRACTICES ACT
### (Fla. Stat. § 501.201, *et seq.*)

1541.   Plaintiffs incorporate by reference each preceding paragraph as though fully set forth herein.

1542.   Plaintiffs, Shane Filipovic, Isreal Cantu, Rejean Fecteau, Edwin and Carmen

Rivera, Chase Mintrone, Hector Vldes d/b/a Infinity Enterprises, Thomas Joseph Cummins, III, Chuck Six, Craig Faircloth, Tia Shubert, Matthew Trainor, (for the purpose of this section, "Plaintiffs") bring this action on behalf of themselves against all Defendants.

1543.   Plaintiffs are "consumers" within the meaning of Fla. Stat. § 501.203(7).

1544.   FCA, Fiat, VM Italy, VM America, Bosch GmbH, Bosch LLC, and Sergio Marchionne are engaged in "trade" or "commerce" within the meaning of Fla. Stat. § 501.203(8).

1545.   The Florida Unfair and Deceptive Trade Practices Act ("FUDTPA") makes unlawful "[u]nfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce …" Fla. Stat. § 501.204(1).

1546.   In the course of their business, Defendants Fiat Chrysler, VM Motori, Bosch, and Marchionne, through their agents, employees, and/or subsidiaries, violated the FUDTPA.

1547.   As detailed in the common law fraud allegations: (1) Fiat Chrysler affirmatively misrepresented the environmental friendliness and emissions of the Subject Vehicles through the EcoDiesel badge—a material fact that was false because the Defendants developed and installed emission cheating components in the Subject Vehicles that caused them to pollute excessively in real-world conditions; (2) Fiat Chrysler touted, through the EcoDiesel badge and uniform and pervasive consumer communications, the Subject Vehicles' fuel efficiency and performance, and the Defendants concealed that the fuel efficiency and performance could be achieved only through emission control devices in the Subject Vehicles that caused them to pollute excessively in real-world conditions; and (3) the Defendants developed and installed emission cheating components that caused the Subject Vehicles to pollute excessively in real-world conditions, and fraudulently concealed that fact from regulators and Plaintiffs. In so doing, and by marketing, offering for sale,

429

and selling the defective Subject Vehicles, Defendants engaged in one or more of the following

unfair or deceptive acts or practices prohibited by Fla. Stat. § 501.204(1):

A.   Causing likelihood of confusion or of misunderstanding as to the approval or certification of the Subject Vehicles;

B. Representing that the Subject Vehicles have approval, characteristics, uses, or benefits that they do not have;

C. Representing that the Subject Vehicles are of a particular standard, quality and grade when they are not;

D. Advertising the Subject Vehicles with the intent not to sell or lease them as advertised;

E.   Engaging in other conduct which created a likelihood of confusion or of misunderstanding; and/or

F.   Using or employing deception, fraud, false pretense, false promise or misrepresentation, or the concealment, suppression or omission of a material fact with intent that others rely upon such concealment, suppression or omission, in connection with the advertisement and sale/lease of the Subject Vehicles, whether or not any person has in fact been misled, deceived or damaged thereby.

1548.   Defendants' scheme and concealment of the true characteristics of the EcoDiesel®

emission control system were material to Plaintiffs, as Defendants intended. Had they known the

truth, Plaintiffs would not have purchased or leased the Subject Vehicles, or—if the Subject

Vehicles' true nature had been disclosed and mitigated, and the Vehicles rendered legal to sell—

would have paid significantly less for them.

1549.   Plaintiffs had no way of discerning that Defendants' representations were false and

misleading, or otherwise learning the facts that Defendants had concealed or failed to disclose,

because Defendants' emission control software was extremely sophisticated technology. did not,

and could not, unravel Defendants' deception on their own.

1550.   Defendants had an ongoing duty to Plaintiffs to refrain from unfair and deceptive

practices under the FUDTPA in the course of their business. Specifically, Defendants owed Plaintiffs a duty to disclose all the material facts concerning the EcoDiesel® emission control system because they possessed exclusive knowledge, they intentionally concealed it from Plaintiffs, and/or they made misrepresentations that were rendered misleading because they were contradicted by withheld facts.

1551.   Plaintiffs suffered ascertainable loss and actual damages as a direct and proximate result of Defendants' concealment, misrepresentations, and/or failure to disclose material information.

1552.   Defendants' violations present a continuing risk to Plaintiffs, as well as to the general public. Defendants' unlawful acts and practices complained of herein affect the public interest.

1553.   Pursuant to Fla. Stat. §§ 501.2105(1)-(2), Plaintiffs seek an order enjoining Defendants' unfair and/or deceptive acts or practices, and awarding damages and any other just and proper relief available under the FUDTPA.

**VIOLATIONS OF GEORGIA'S UNIFORM
DECEPTIVE TRADE PRACTICES ACT
(Ga. Code Ann. § 10-1-370, *et seq.*)**

1554.   Plaintiff incorporates by reference each preceding paragraph as though fully set forth herein.

1555.   Plaintiffs, Dakota J. Ethriedge, James Greene, Brad Scott, Brian Schmidt, (for the purpose of this section, "Plaintiffs") bring this action on behalf of themselves against all Defendants.

1556.   FCA, Fiat, VM Italy, VM America, Bosch GmbH, Bosch LLC, Sergio Marchionne, and Plaintiffs are "persons" within the meaning of Georgia Uniform Deceptive Trade Practices Act ("Georgia UDTPA"), Ga. Code. Ann. § 10-1- 371(5).

1557.   The Georgia UDTPA prohibits any "deceptive trade practices," which include misrepresenting the "standard, quality, or grade" of goods or services, and engaging "in any other conduct which similarly creates a likelihood of confusion or of misunderstanding." Ga. Code. 19 Ann. § 10-1-372(a).

1558.   As detailed in the common law fraud allegations: (1) Fiat Chrysler affirmatively misrepresented the environmental friendliness and emissions of the Subject Vehicles through the EcoDiesel badge—a material fact that was false because the Defendants developed and installed emission cheating components in the Subject Vehicles that caused them to pollute excessively in real-world conditions; (2) Fiat Chrysler touted, through the EcoDiesel badge and uniform and pervasive consumer communications, the Subject Vehicles' fuel efficiency and performance, and the Defendants concealed that the fuel efficiency and performance could be achieved only through emission control devices in the Subject Vehicles that caused them to pollute excessively in real-world conditions; and (3) the Defendants developed and installed emission cheating components that caused the Subject Vehicles to pollute excessively in real-world conditions, and fraudulently concealed that fact from regulators and Plaintiffs alike. *See, e.g.*, ¶¶ 149-216; 337-357. Defendants' deceptive conduct violates the Georgia UDPTA in at least the following ways:

A.   Causing likelihood of confusion or of misunderstanding as to the approval or certification of the Subject Vehicles;

B.   Representing that the Subject Vehicles have characteristics, uses, or benefits that they do not have;

C.   Representing that the Subject Vehicles are of a particular standard, quality

and grade when they are not;

D.   Advertising the Subject Vehicles with the intent not to sell or lease them as advertised; and

E.   Engaging in other conduct which created a likelihood of confusion or of misunderstanding.

1559.   Defendants' cheating scheme and concealment of the true characteristics of the EcoDiesel emission control system were material to Plaintiffs, and Defendants misrepresented, concealed, or failed to disclose the truth with the intention that consumers would rely on the misrepresentations, concealments, and omissions. Had they known the truth, Plaintiffs who purchased or leased the Subject Vehicles would not have purchased or leased them at all or—if the Vehicles' true nature had been disclosed and mitigated, and the Vehicles rendered legal to sell—would have paid significantly less for them.

1560.   Plaintiffs suffered ascertainable loss and actual damages as a direct and proximate result of Defendants' misrepresentations and their concealment of and failure to disclose material information.

1561.   Pursuant to Ga. Code. Ann § 10-1-373, Plaintiffs seek an order enjoining Defendants' unfair and/or deceptive acts or practices and any other just and proper relief available under the Georgia UDTPA.

### VIOLATIONS OF GEORGIA'S FAIR BUSINESS PRACTICES ACT
(Ga. Code Ann. § 10-1-390, *et seq.*)

1562.   Plaintiffs incorporate by reference each preceding paragraph as though fully set forth herein.

1563.   Plaintiffs, Dakota J. Ethriedge, James Greene, Brad Scott, (for the purpose of this section, "Plaintiffs") bring this action on behalf of themselves against all Defendants.

1564.   The Georgia Fair Business Practices Act ("Georgia FBPA") declares "[u]nfair or deceptive acts or practices in the conduct of consumer transactions and consumer acts or practices in trade or commerce" to be unlawful. Ga. Code. Ann. § 10-1-393(a).

1565.   In the course of their business, Defendants Fiat Chrysler, VM Motori, Bosch, and Sergio Marchionne, through their agents, employees, and/or subsidiaries, violated the Georgia FBPA.

1566.   As detailed in the common law fraud allegations: (1) Fiat Chrysler affirmatively misrepresented the environmental friendliness and emissions of the Subject Vehicles through the EcoDiesel badge—a material fact that was false because the Defendants developed and installed emission cheating components in the Subject Vehicles that caused them to pollute excessively in real-world conditions; (2) Fiat Chrysler touted, through the EcoDiesel badge and uniform and pervasive consumer communications, the Subject Vehicles' fuel efficiency and performance, and the Defendants concealed that the fuel efficiency and performance could be achieved only through emission control devices in the Subject Vehicles that caused them to pollute excessively in real-world conditions; and (3) the Defendants developed and installed emission cheating components that caused the Subject Vehicles to pollute excessively in real-world conditions, and fraudulently concealed that fact from regulators and Plaintiffs alike. In so doing, and by marketing, offering for sale, and selling the defective Subject Vehicles, Defendants engaged in one or more of the following unfair or deceptive acts or practices as defined in Ga. Code. Ann. § 10-1-393(b):

A.   Causing confusion or of misunderstanding as to the approval or certification

434

of the Subject Vehicles;

B.   Representing that the Subject Vehicles have approval, characteristics, uses, or benefits that they do not have;

C.   Representing that the Subject Vehicles are of a particular standard, quality and grade when they are not; and/or

D.   Advertising the Subject Vehicles with the intent not to sell or lease them as advertised.

1567.   Defendants' scheme and concealment of the true characteristics of the EcoDiesel® emission control system were material to Plaintiffs, as Defendants intended. Had they known the truth, Plaintiffs would not have purchased or leased the Subject Vehicles, or—if the Subject Vehicles' true nature had been disclosed and mitigated, and the Vehicles rendered legal to sell— would have paid significantly less for them.

1568.   Plaintiffs had no way of discerning that Defendants' representations were false and misleading, or otherwise learning the facts that Defendants had concealed or failed to disclose, because Defendants' emission control software was extremely sophisticated technology. Plaintiffs did not, and could not, unravel Defendants' deception on their own.

1569.   Defendants had an ongoing duty to Plaintiffs to refrain from unfair and deceptive practices under the Georgia FBPA in the course of their business. Specifically, Defendants owed Plaintiffs a duty to disclose all the material facts concerning the EcoDiesel® emission control system because they possessed exclusive knowledge, they intentionally concealed it from Plaintiffs, and/or they made misrepresentations that were rendered misleading because they were contradicted by withheld facts.

1570.   Plaintiffs suffered ascertainable loss and actual damages as a direct and proximate result of Defendants' concealment, misrepresentations, and/or failure to disclose material

information.

1571.   Defendants' violations present a continuing risk to Plaintiffs, as well as to the general public. Defendants' unlawful acts and practices complained of herein affect the public interest.

1572.   Pursuant to Ga. Code. Ann. § 10-1-399, Plaintiffs seek an order enjoining Defendants' unfair and/or deceptive acts or practices, and awarding any other just and proper relief available under the Georgia FBPA.

1573.   Per the State Pre-suit requirements notifications have been prepared to FCA US LLC complying with Ga. Code. Ann. § 10-1-399(b). Additionally, all Defendants were provided notice of the issues raised in this count and this Complaint by the governmental investigations, the numerous complaints filed against them, and the many individual notice letters sent by Plaintiffs within a reasonable amount of time after the allegations of Subject Vehicle defects became public. Because Defendants failed to remedy their unlawful conduct within the requisite time period, Plaintiffs seek all damages and relief to which Plaintiff and the Georgia State are entitled.

### UNFAIR AND DECEPTIVE ACTS IN
### VIOLATION OF HAWAII LAW
#### (Haw. Rev. Stat. § 480, *et seq.*)

1574.   Plaintiffs incorporate by reference each preceding paragraph as though fully set forth herein.

1575.   Plaintiffs, to be named at a later date, (for the purpose of this section, "Plaintiffs") bring this action on behalf of the Plaintiffs against all Defendants.

1576.   FCA, Fiat, VM Italy, VM America, Bosch GmbH, Bosch LLC, Sergio Marchionne,

Plaintiffs are "persons" within the meaning of Haw. Rev. Stat. § 480-1. The Plaintiffs are "consumers" within the meaning of Haw. 27 Rev. Stat. § 480-1.

1577.   FCA, Fiat, VM Italy, VM America, Bosch GmbH, Bosch LLC, and Marchionne are engaged in trade or commerce.

1578.   The Hawaii Act prohibits "unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce.…" Haw. Rev. Stat. § 480-2(a).

1579.   In the course of their business, Defendants Fiat Chrysler, VM Motori, Bosch, and Sergio Marchionne, through their agents, employees, and/or subsidiaries, violated the Hawaii Act.

1580.   As detailed in the common law fraud allegations: (1) Fiat Chrysler affirmatively misrepresented the environmental friendliness and emissions of the Subject Vehicles through the EcoDiesel badge—a material fact that was false because the Defendants developed and installed emission cheating components in the Subject Vehicles that caused them to pollute excessively in real-world conditions; (2) Fiat Chrysler touted, through the EcoDiesel badge and uniform and pervasive consumer communications, the Subject Vehicles' fuel efficiency and performance, and the Defendants concealed that the fuel efficiency and performance could be achieved only through emission control devices in the Subject Vehicles that caused them to pollute excessively in real-world conditions; and (3) the Defendants developed and installed emission cheating components that caused the Subject Vehicles to pollute excessively in real-world conditions, and fraudulently concealed that fact from regulators and Plaintiffs alike. In so doing, and by marketing, offering for sale, and selling the defective Subject Vehicles, Defendants engaged in one or more of the following unfair or deceptive acts or practices in violation of § 480-2(a):

    A.   Causing likelihood of confusion or of misunderstanding as to the approval or certification of the Subject Vehicles;

B.   Representing that the Subject Vehicles have approval, characteristics, uses, or benefits that they do not have;

C.   Representing that the Subject Vehicles are of a particular standard, quality and grade when they are not;

D.   Advertising the Subject Vehicles with the intent not to sell or lease them as advertised;

E. Engaging in other conduct which created a likelihood of confusion or of misunderstanding; and/or

F. Using or employing deception, fraud, false pretense, false promise or misrepresentation, or the concealment, suppression or omission of a material fact with intent that others rely upon such concealment, suppression or omission, in connection with the advertisement and sale/lease of the Subject Vehicles, whether or not any person has in fact been misled, deceived or damaged thereby.

1581.   Defendants' scheme and concealment of the true characteristics of the EcoDiesel® emission control system were material to the Plaintiffs, as Defendants intended. Had they known the truth, the Plaintiffs would not have purchased or leased the Subject Vehicles, or—if the Subject Vehicles' true nature had been disclosed and mitigated, and the Vehicles rendered legal to sell— would have paid significantly less for them.

1582.   Plaintiffs had no way of discerning that Defendants' representations were false and misleading, or otherwise learning the facts that Defendants had concealed or failed to disclose, because Defendants' emission control software was extremely sophisticated technology. Plaintiffs did not, and could not, unravel Defendants' deception on their own.

1583.   Defendants had an ongoing duty to the Plaintiffs to refrain from unfair and deceptive practices under the Hawaii Act in the course of their business. Specifically, Defendants owed Plaintiffs a duty to disclose all the material facts concerning the EcoDiesel® emission control system because they possessed exclusive knowledge, they intentionally concealed it from the

Plaintiffs, and/or they made misrepresentations that were rendered misleading because they were contradicted by withheld facts.

1584.   Plaintiffs suffered ascertainable loss and actual damages as a direct and proximate result of Defendants' concealment, misrepresentations, and/or failure to disclose material information.

1585.   Defendants' violations present a continuing risk to the Plaintiffs, as well as to the general public. Defendants' unlawful acts and practices complained of herein affect the public interest.

1586.   Pursuant to Haw. Rev. Stat. § 480-13, the Plaintiffs seek an order enjoining Defendants' unfair and/or deceptive acts or practices, and awarding damages, punitive damages, and any other just and proper relief available under the Hawaii Act.

1587.   Under Haw. Rev. Stat. § 480-13.5, the Plaintiffs seek an additional award against Defendants of up to $10,000 for each Plaintiffs who qualifies as a Hawaiian elder under the Hawaii Act. Defendants knew or should have known that their conduct was directed to one or more Plaintiffs who are elders. Defendants' conduct caused one or more of these elders to suffer a substantial loss of property set aside for retirement or for personal or family care and maintenance, or assets essential to the health or welfare of the elder. One or more Plaintiffs who are elders are substantially more vulnerable to Defendants' conduct because of age, poor health or infirmity, impaired understanding, restricted mobility, or disability, and each of them suffered substantial physical, emotional, or economic damage resulting from Defendants' conduct.

## VIOLATIONS OF THE IDAHO CONSUMER PROTECTION ACT
### (Idaho Code § 48-601, *et seq.*)

1588.   Plaintiffs incorporate by reference each preceding paragraph as though fully set forth herein.

1589.   Plaintiffs, Robert Richardson, Jeffrey Francis Kernan, George Nuesse, (for the purpose of this section, "Plaintiffs") bring this action on behalf of themselves against all Defendants.

1590.   FCA, Fiat, VM Italy, VM America, Bosch GmbH, Bosch LLC, Sergio Marchionne, and Plaintiffs are "persons" within the meaning Idaho Code § 48-602(1).

1591.   FCA, Fiat, VM Italy, VM America, Bosch GmbH, Bosch LLC, and Marchionne are engaged in "trade" or "commerce" within the meaning of Idaho Code § 48-602(2).

1592.   The Idaho Consumer Credit and Protection Act ("Idaho CPA") makes unlawful misleading, false, or deceptive acts.

1593.   In the course of their business, Defendants Fiat Chrysler, VM Motori, Bosch, and Marchionne, through their agents, employees, and/or subsidiaries, violated the Idaho CPA.

1594.   As detailed in the common law fraud allegations: (1) Fiat Chrysler affirmatively misrepresented the environmental friendliness and emissions of the Subject Vehicles through the EcoDiesel badge—a material fact that was false because the Defendants developed and installed emission cheating components in the Subject Vehicles that caused them to pollute excessively in real-world conditions; (2) Fiat Chrysler touted, through the EcoDiesel badge and uniform and pervasive consumer communications, the Subject Vehicles' fuel efficiency and performance, and the Defendants concealed that the fuel efficiency and performance could be achieved only through emission control devices in the Subject Vehicles that caused them to pollute excessively in real-world conditions; and (3) the Defendants developed and installed emission cheating components

that caused the Subject Vehicles to pollute excessively in real-world conditions, and fraudulently concealed that fact from regulators and Plaintiffs alike. See, e.g., ¶¶ 149-216; 337-357. In so doing, and by marketing, offering for sale, and selling the defective Subject Vehicles, Defendants engaged in one or more of the following unfair or deceptive acts or practices proscribed by Idaho Code § 48-603:

    A.   Causing likelihood of confusion or of misunderstanding as to the approval or certification of the Subject Vehicles;

    B.   Representing that the Subject Vehicles have approval, characteristics, uses, or benefits that they do not have;

    C.   Representing that the Subject Vehicles are of a particular standard, quality and grade when they are not;

    D.   Advertising the Subject Vehicles with the intent not to sell or lease them as advertised; and/or

    E.   Engaging in other conduct which created a likelihood of confusion or of misunderstanding.

1595.   Defendants' scheme and concealment of the true characteristics of the EcoDiesel® emission control system were material to Plaintiffs, as Defendants intended. Had they known the truth, Plaintiffs would not have purchased or leased the Subject Vehicles, or—if the Subject Vehicles' true nature had been disclosed and mitigated, and the Vehicles rendered legal to sell—would have paid significantly less for them.

1596.   Plaintiffs had no way of discerning that Defendants' representations were false and misleading, or otherwise learning the facts that Defendants had concealed or failed to disclose, because Defendants' emission control software was extremely sophisticated technology. Plaintiffs did not, and could not, unravel Defendants' deception on their own.

1597.   Defendants had an ongoing duty to Plaintiffs to refrain from unfair and deceptive practices under the Idaho CPA in the course of their business. Specifically, Defendants owed

Plaintiffs a duty to disclose all the material facts concerning the EcoDiesel® emission control system because they possessed exclusive knowledge, they intentionally concealed it from Plaintiffs, and/or they made misrepresentations that were rendered misleading because they were contradicted by withheld facts.

1598.   Plaintiffs suffered ascertainable loss and actual damages as a direct and proximate result of Defendants' concealment, misrepresentations, and/or failure to disclose material information.

1599.   Defendants' violations present a continuing risk to Plaintiffs, as well as to the general public. Defendants' unlawful acts and practices complained of herein affect the public interest.

1600.   Pursuant Idaho Code § 48-608, Plaintiffs seek an order enjoining Defendants' unfair and/or deceptive acts or practices, and awarding damages, punitive damages, and any other just and proper relief available under the Idaho CPA.

### VIOLATION OF ILLINOIS CONSUMER FRAUD AND DECEPTIVE BUSINESS PRACTICES ACT (815 ILCS 505/1, *et seq.* and 510/2)

1601.   Plaintiffs incorporate by reference each preceding paragraph as though fully set forth herein.

1602.   Plaintiffs, David McCauley, Steve Rosenthal, Aaron O'Brien, Timothy Kawacin, (for the purpose of this section, "Plaintiff") brings this action on behalf of themselves against all Defendants.

1603.   FCA, Fiat, VM Italy, VM America, Bosch GmbH, Bosch LLC, Sergio Marchionne, and Plaintiffs are "persons" within the meaning 815 ILCS 505/1(c) and 510/1(5). Plaintiffs are "consumers" within the meaning of 815 ILCS 505/1(e).

1604.   The Illinois Consumer Fraud and Deceptive Practices Act ("Illinois CFA") makes unlawful "unfair or deceptive acts or practices, including but not limited to the use or employment of any deception, fraud, false pretense, false promise, misrepresentation or the concealment, suppression or omission of any material fact, with intent that others rely upon the concealment, suppression or omission of such material fact … in the conduct of trade or commerce … whether any person has in fact been misled, deceived or damaged thereby." 815 ILCS 505/2. The Illinois CFA further makes unlawful deceptive trade practices undertaken in the course of business. 815 ILCS 510/2.

1605.   In the course of their business, Defendants Fiat Chrysler, VM Motori, Bosch, and Marchionne, through their agents, employees, and/or subsidiaries, violated the Illinois CFA.

1606.   As detailed in the common law fraud allegations: (1) Fiat Chrysler affirmatively misrepresented the environmental friendliness and emissions of the Subject Vehicles through the EcoDiesel badge—a material fact that was false because the Defendants developed and installed emission cheating components in the Subject Vehicles that caused them to pollute excessively in real-world conditions; (2) Fiat Chrysler touted, through the EcoDiesel badge and uniform and pervasive consumer communications, the Subject Vehicles' fuel efficiency and performance, and the Defendants concealed that the fuel efficiency and performance could be achieved only through emission control devices in the Subject Vehicles that caused them to pollute excessively in real-world conditions; and (3) the Defendants developed and installed emission cheating components that caused the Subject Vehicles to pollute excessively in real-world conditions, and fraudulently concealed that fact from regulators and Plaintiffs alike. In so doing, and by marketing, offering for sale, and selling the defective Subject Vehicles, Defendants engaged in one or more of the following unfair or deceptive acts or practices prohibited by 815 ILCS 505/2 and 510/2:

A.   Causing likelihood of confusion or of misunderstanding as to the approval or certification of the Subject Vehicles;

B.   Representing that the Subject Vehicles have approval, characteristics, uses, or benefits that they do not have;

C.   Representing that the Subject Vehicles are of a particular standard, quality and grade when they are not;

D.   Advertising the Subject Vehicles with the intent not to sell or lease them as advertised;

E.   Engaging in other conduct which created a likelihood of confusion or of misunderstanding; and/or

F.   Using or employing deception, fraud, false pretense, false promise or misrepresentation, or the concealment, suppression or omission of a material fact with intent that others rely upon such concealment, suppression or omission, in connection with the advertisement and sale/lease of the Subject Vehicles, whether or not any person has in fact been misled, deceived or damaged thereby.

1607.   Defendants' scheme and concealment of the true characteristics of the EcoDiesel® emission control system were material to Plaintiff, as Defendants intended. Had they known the truth, Plaintiff would not have purchased or leased the Subject Vehicles, or—if the Subject Vehicles' true nature had been disclosed and mitigated, and the Vehicles rendered legal to sell—would have paid significantly less for them.

1608.   Plaintiffs had no way of discerning that Defendants' representations were false and misleading, or otherwise learning the facts that Defendants had concealed or failed to disclose, because Defendants' emission control software was extremely sophisticated technology. Plaintiffs did not, and could not, unravel Defendants' deception on their own.

1609.   Defendants had an ongoing duty to Plaintiff to refrain from unfair and deceptive practices under the Illinois CFA in the course of their business. Specifically, Defendants owed Plaintiffs a duty to disclose all the material facts concerning the EcoDiesel® emission control system because they possessed exclusive knowledge, they intentionally concealed it from Plaintiff,

444

and/or they made misrepresentations that were rendered misleading because they were contradicted by withheld facts.

1610. Plaintiffs suffered ascertainable loss and actual damages as a direct and proximate result of Defendants' concealment, misrepresentations, and/or failure to disclose material information.

1611. Defendants' violations present a continuing risk to Plaintiff, as well as to the general public. Defendants' unlawful acts and practices complained of herein affect the public interest.

1612. Pursuant to 815 ILCS 505/10a(a) and 510/3, Plaintiff seek an order enjoining Defendants' unfair and/or deceptive acts or practices, and awarding damages, punitive damages, and any other just and proper relief available under the Illinois CFA.

## VIOLATION OF THE INDIANA DECEPTIVE CONSUMER SALES ACT
### (Ind. Code § 24-5-0.5-3)

1613. Plaintiffs incorporate by reference each preceding paragraph as though fully set forth herein.

1614. Plaintiffs, Dennis and Mary Carlson, (for the purpose of this section, "Plaintiff") brings this action on behalf of themselves against all Defendants.

1615. FCA, Fiat, VM Italy, VM America, Bosch GmbH, Bosch LLC, Sergio Marchionne, and Plaintiffs are "persons" within the meaning of Ind. Code § 24-5-0.5-2(2) and a "supplier" within the meaning of Ind. Code § 24-5-.05-2(a)(3).

1616. Plaintiffs' purchases of the Subject Vehicles are "consumer transactions" within the meaning of Ind. Code § 24-5-.05-2(a)(1).

1617. The Indiana Deceptive Consumer Sales Act ("Indiana DCSA prohibits a person from engaging in a "deceptive act," which includes representing: "(1) That such subject of a

consumer transaction has sponsorship, approval, performance, characteristics, accessories, uses, or benefits that they do not have, or that a person has a sponsorship, approval, status, affiliation, or connection it does not have; (2) That such subject of a consumer transaction is of a particular standard, quality, grade, style or model, if it is not and if the supplier knows or should reasonably know that it is not; … (7) That the supplier has a sponsorship, approval or affiliation in such consumer transaction that the supplier does not have, and which the supplier knows or should reasonably know that the supplier does not have; … (c) Any representations on or within a product or its packaging or in advertising or promotional materials which would constitute a deceptive act shall be the deceptive act both of the supplier who places such a representation thereon or therein, or who authored such materials, and such suppliers who shall state orally or in writing that such representation is true if such other supplier shall know or have reason to know that such representation was false." Ind. Code § 24-5-0.5-3.

1618.   In the course of their business, Defendants Fiat Chrysler, VM Motori, Bosch, and Marchionne, through their agents, employees, and/or subsidiaries, violated the Indiana DCSA.

1619.   As detailed in the common law fraud allegations: (1) Fiat Chrysler affirmatively misrepresented the environmental friendliness and emissions of the Subject Vehicles through the EcoDiesel badge—a material fact that was false because the Defendants developed and installed emission cheating components in the Subject Vehicles that caused them to pollute excessively in real-world conditions; (2) Fiat Chrysler touted, through the EcoDiesel badge and uniform and pervasive consumer communications, the Subject Vehicles' fuel efficiency and performance, and the Defendants concealed that the fuel efficiency and performance could be achieved only through emission control devices in the Subject Vehicles that caused them to pollute excessively in real-world conditions; and (3) the Defendants developed and installed emission cheating components

that caused the Subject Vehicles to pollute excessively in real-world conditions, and fraudulently concealed that fact from regulators and Plaintiffs alike. In so doing, and by marketing, offering for sale, and selling the defective Subject Vehicles, Defendants engaged in one or more of the following unfair or deceptive acts or practices as defined in Ind. Code § 24-5-0.5-3:

> A.   Representing that the Subject Vehicles have approval, characteristics, uses, or benefits that they do not have;

> B.   Representing that the Subject Vehicles are of a particular standard, quality and grade when they are not; and/or

> C.   Advertising the Subject Vehicles with the intent not to sell or lease them as advertised.

1620.   Defendants' scheme and concealment of the true characteristics of the EcoDiesel® emission control system were material to Plaintiff, as Defendants intended. Had they known the truth, Plaintiff would not have purchased or leased the Subject Vehicles, or—if the Subject Vehicles' true nature had been disclosed and mitigated, and the Vehicles rendered legal to sell— would have paid significantly less for them.

1621.   Plaintiffs had no way of discerning that Defendants' representations were false and misleading, or otherwise learning the facts that Defendants had concealed or failed to disclose, because Defendants' emission control software was extremely sophisticated technology. Plaintiffs did not, and could not, unravel Defendants' deception on their own.

1622.   Defendants had an ongoing duty to Plaintiffs to refrain from unfair and deceptive practices under the Indiana DCSA in the course of their business. Specifically, Defendants owed Plaintiff a duty to disclose all the material facts concerning the EcoDiesel® emission control system because they possessed exclusive knowledge, they intentionally concealed it from Plaintiffs, and/or they made misrepresentations that were rendered misleading because they were contradicted by withheld facts.

447

1623.   Plaintiffs suffered ascertainable loss and actual damages as a direct and proximate result of Defendants' concealment, misrepresentations, and/or failure to disclose material information.

1624.   Defendants' violations present a continuing risk to Plaintiffs, as well as to the general public. Defendants' unlawful acts and practices complained of herein affect the public interest.

1625.   Pursuant to Ind. Code § 24-5-0.5-4, Plaintiff seek an order enjoining Defendants' unfair and/or deceptive acts or practices, and awarding damages, punitive damages, and any other just and proper relief available under the Indiana DCSA.

1626.   Per the State Pre-suit requirements notifications have been prepared to FCA US LLC complying with Ind. Code § 24-5-0.5-5(a). All Defendants were provided notice of the issues raised in this count and this Complaint by the governmental investigations, the numerous complaints filed against them, and the many individual notice letters sent by Plaintiffs within a reasonable amount of time after the allegations of Subject Vehicle defects became public. Because Defendants failed to remedy its unlawful conduct within the requisite time period, Plaintiffs seek all damages and relief to which Plaintiffs are entitled.

**VIOLATIONS OF THE PRIVATE RIGHT OF ACTION**
**FOR CONSUMER FRAUDS ACT**
**(Iowa Code § 714h.1, *et seq.*)**

1627.   Plaintiffs incorporate by reference each preceding paragraph as though fully set forth herein.

1628.   Plaintiffs, Jason and Kristin Skoland, Brian Rohrig d/b/a Rohrig Farms, LLC, Jody Bergheim, (for the purpose of this section, "Plaintiff") brings this action on behalf of themselves against all Defendants.

1629.   Plaintiffs, FCA, Fiat, VM Italy, VM America, Bosch GmbH, Bosch LLC, Sergio Marchionne, and Plaintiffs are "persons" within the meaning Iowa Code § 714H.2(7).

1630.   Plaintiffs are "consumers" within the meaning of Iowa Code § 714H.2(3).

1631.   The Iowa Deceptive Consumer Sales Act ("Iowa DCSA") prohibits a person from engaging in a "practice or act the person knows or reasonably should know is an unfair practice, deception, fraud, false pretense, or false promise, or the misrepresentation, concealment, suppression, or omission of a material fact, with the intent that others rely upon the unfair practice, deception, fraud, false pretense, false promise, misrepresentation, concealment, suppression, or omission in connection with the advertisement, sale, or lease of consumer merchandise." Iowa Code § 714H.3.

1632.   In the course of their business, Defendants Fiat Chrysler, VM Motori, Bosch, and Marchionne, through their agents, employees, and/or subsidiaries, violated the Iowa DCSA.

1633.   As detailed in the common law fraud allegations: (1) Fiat Chrysler affirmatively misrepresented the environmental friendliness and emissions of the Subject Vehicles through the EcoDiesel badge—a material fact that was false because the Defendants developed and installed emission cheating components in the Subject Vehicles that caused them to pollute excessively in real-world conditions; (2) Fiat Chrysler touted, through the EcoDiesel badge and uniform and pervasive consumer communications, the Subject Vehicles' fuel efficiency and performance, and the Defendants concealed that the fuel efficiency and performance could be achieved only through emission control devices in the Subject Vehicles that caused them to pollute excessively in real-world conditions; and (3) the Defendants developed and installed emission cheating components that caused the Subject Vehicles to pollute excessively in real-world conditions, and fraudulently concealed that fact from regulators and Plaintiffs alike. In so doing, and by marketing, offering for

sale, and selling the defective Subject Vehicles, Defendants violated Iowa Code § 714H.3 by using or employing deception, fraud, false pretense, false promise or misrepresentation, or the concealment, suppression or omission of a material fact with intent that others rely upon such concealment, suppression or omission, in connection with the advertisement and sale/lease of the Subject Vehicles, whether or not any person has in fact been misled, deceived or damaged thereby.

1634.   Defendants' scheme and concealment of the true characteristics of the EcoDiesel® emission control system were material to Plaintiff, as Defendants intended. Had they known the truth, Plaintiff would not have purchased or leased the Subject Vehicles, or—if the Subject Vehicles' true nature had been disclosed and mitigated, and the Vehicles rendered legal to sell— would have paid significantly less for them.

1635.   Plaintiff had no way of discerning that Defendants' representations were false and misleading, or otherwise learning the facts that Defendants had concealed or failed to disclose, because Defendants' emission control software was extremely sophisticated technology. Plaintiffs did not, and could not, unravel Defendants' deception on their own.

1636.   Defendants had an ongoing duty to Plaintiff to refrain from unfair and deceptive practices under the Iowa DCSA in the course of their business. Specifically, Defendants owed Plaintiffs a duty to disclose all the material facts concerning the EcoDiesel® emission control system because they possessed exclusive knowledge, they intentionally concealed it from Plaintiffs, and/or they made misrepresentations that were rendered misleading because they were contradicted by withheld facts.

1637.   Plaintiffs suffered ascertainable loss and actual damages as a direct and proximate result of Defendants' concealment, misrepresentations, and/or failure to disclose material information.

1638.   Defendants' violations present a continuing risk to Plaintiff, as well as to the general public. Defendants' unlawful acts and practices complained of herein affect the public interest.

1639.   Pursuant to Iowa Code § 714H.5, Plaintiff seek an order enjoining Defendants' unfair and/or deceptive acts or practices, and awarding damages, treble or punitive damages, and any other just and proper relief available under the Iowa DCSA.

1640.   Pursuant to Iowa Code § 714H.6, Plaintiffs will provide the Iowa Attorney General with a copy of the within complaint with seven (7) days of its filing.

## VIOLATIONS OF THE KANSAS CONSUMER PROTECTION ACT
### (Kan. Stat. Ann. § 50-623, *et seq.*)

1641.   Plaintiffs incorporate by reference each preceding paragraph as though fully set forth herein.

1642.   Plaintiffs, Sergio Medina, (for the purpose of this section, "Plaintiff") brings this action against all Defendants.

1643.   FCA, Fiat, VM Italy, VM America, Bosch GmbH, Bosch LLC, and Sergio Marchionne are "suppliers" within the meaning of Kan. Stat. Ann. § 50-624(l). The Plaintiffs are "consumers" within the meaning of Kan. Stat. Ann. § 50-624(b).

1644.   The sale of the Subject Vehicles to the Plaintiffs was a "consumer transaction" within the meaning of Kan. Stat. Ann. § 50-624(c).

1645.   The Kansas Consumer Credit and Protection Act ("Kansas CPA") states "[n]o supplier shall engage in any deceptive act or practice in connection with a consumer transaction." Kan. Stat. Ann. § 50-626(a).

1646.   In the course of their business, Defendants Fiat Chrysler, VM Motori, Bosch, and Marchionne, through their agents, employees, and/or subsidiaries, violated the Kansas CPA.

1647.   As detailed in the common law fraud allegations: (1) Fiat Chrysler affirmatively misrepresented the environmental friendliness and emissions of the Subject Vehicles through the EcoDiesel badge—a material fact that was false because the Defendants developed and installed emission cheating components in the Subject Vehicles that caused them to pollute excessively in real-world conditions; (2) Fiat Chrysler touted, through the EcoDiesel badge and uniform and pervasive consumer communications, the Subject Vehicles' fuel efficiency and performance, and the Defendants concealed that the fuel efficiency and performance could be achieved only through emission control devices in the Subject Vehicles that caused them to pollute excessively in real-world conditions; and (3) the Defendants developed and installed emission cheating components that caused the Subject Vehicles to pollute excessively in real-world conditions, and fraudulently concealed that fact from regulators and Plaintiffs alike. In so doing, and by marketing, offering for sale, and selling the defective Subject Vehicles, Defendants engaged in one or more of the following unfair or deceptive acts or practices as defined in Kan. Stat. Ann. § 50-627(a):

> A.   Representing that the Subject Vehicles have approval, characteristics, uses, or benefits that they do not have;

> B.   Representing that the Subject Vehicles are of a particular standard, quality and grade when they are not;

> C.   Exaggerating and providing falsehoods regarding the material facts concerning the Subject Vehicles; and/or

> D.   Failing to state, willfully concealing, suppressing, and/or omitting material facts relating to the Subject Vehicles.

1648.   Defendants' scheme and concealment of the true characteristics of the EcoDiesel® emission control system were material to the Plaintiffs, as Defendants intended. Had they known the truth, the Plaintiffs would not have purchased or leased the Subject Vehicles, or—if the Subject Vehicles' true nature had been disclosed and mitigated, and the Vehicles rendered legal to sell—

would have paid significantly less for them.

1649.   Plaintiffs had no way of discerning that Defendants' representations were false and misleading, or otherwise learning the facts that Defendants had concealed or failed to disclose, because Defendants' emission control software was extremely sophisticated technology. Plaintiffs did not, and could not, unravel Defendants' deception on their own.

1650.   Defendants had an ongoing duty to the Plaintiffs to refrain from unfair and deceptive practices under the Kansas CPA in the course of their business. Specifically, Defendants owed Plaintiffs a duty to disclose all the material facts concerning the EcoDiesel® emission control system because they possessed exclusive knowledge, they intentionally concealed it from the Plaintiffs, and/or they made misrepresentations that were rendered misleading because they were contradicted by withheld facts.

1651.   Plaintiffs suffered ascertainable loss and actual damages as a direct and proximate result of Defendants' concealment, misrepresentations, and/or failure to disclose material information.

1652.   Defendants' violations present a continuing risk to the Plaintiffs, as well as to the general public. Defendants' unlawful acts and practices complained of herein affect the public interest.

1653.   Pursuant to Kan. Stat. Ann §§ 50-634 and 50-636, the Plaintiffs seek an order enjoining Defendants' unfair and/or deceptive acts or practices, and awarding damages and any other just and proper relief available under the Kansas CPA.

## VIOLATIONS OF THE LOUISIANA UNFAIR TRADE PRACTICES AND CONSUMER PROTECTION LAW
### (La. Rev. Stat. § 51:1401, *et seq*.)

1654.   Plaintiffs incorporate by reference each preceding paragraph as though fully set

forth herein.

1655.   Plaintiffs, Robert B. Luper, Richard D. Kittok, John Benjamin Fox, Alton Young and Kim Daigle, (for the purpose of this section, "Plaintiffs") bring this action on behalf of themselves against all Defendants.

1656.   FCA, Fiat, VM Italy, VM America, Bosch GmBH, Bosch LLC, Sergio Marchionne, and Plaintiffs are "persons" within the meaning of La. Rev. Stat. § 51:1402(8). Plaintiffs are "consumers" within the meaning of La. Rev. Stat. § 51:1402(1).

1657.   FCA, Fiat, VM Italy, VM America, Bosch GmBH, Bosch LLC, and Marchionne are engaged in "trade" or "commerce" within the meaning of La. Rev. Stat. § 51:1402(10).

1658.   The Louisiana Unfair Trade Practices and Consumer Protection Law ("Louisiana CPL") makes unlawful "deceptive acts or practices in the conduct of any trade or commerce." La. Rev. Stat. § 51:1405(A).

1659.   In the course of their business, Defendants Fiat Chrysler, VM Motori, Bosch, and Marchionne, through their agents, employees, and/or subsidiaries, violated the Louisiana CPL.

1660.   As detailed in the common law fraud allegations: (1) Fiat Chrysler affirmatively misrepresented the environmental friendliness and emissions of the Subject Vehicles through the EcoDiesel badge—a material fact that was false because the Defendants developed and installed emission cheating components in the Subject Vehicles that caused them to pollute excessively in real-world conditions; (2) Fiat Chrysler touted, through the EcoDiesel badge and uniform and pervasive consumer communications, the Subject Vehicles' fuel efficiency and performance, and the Defendants concealed that the fuel efficiency and performance could be achieved only through emission control devices in the Subject Vehicles that caused them to pollute excessively in real-world conditions; and (3) the Defendants developed and installed emission cheating components

454

that caused the Subject Vehicles to pollute excessively in real-world conditions, and fraudulently concealed that fact from regulators and Plaintiffs alike. In so doing, and by marketing, offering for sale, and selling the defective Subject Vehicles, Defendants engaged in one or more of the following unfair or deceptive acts or practices as defined in La. Rev. Stat. § 51:1405(A):

A.   Causing likelihood of confusion or of misunderstanding as to the approval or certification of the Subject Vehicles;

B.   Representing that the Subject Vehicles have approval, characteristics, uses, or benefits that they do not have;

C.   Representing that the Subject Vehicles are of a particular standard, quality and grade when they are not;

D.   Advertising the Subject Vehicles with the intent not to sell or lease them as advertised;

E.   Engaging in other conduct which created a likelihood of confusion or of misunderstanding; and/or

F.   Using or employing deception, fraud, false pretense, false promise or misrepresentation, or the concealment, suppression or omission of a material fact with intent that others rely upon such concealment, suppression or omission, in connection with the advertisement and sale/lease of the Subject Vehicles, whether or not any person has in fact been misled, deceived or damaged thereby.

1661.   Defendants' scheme and concealment of the true characteristics of the EcoDiesel® emission control system were material to Plaintiffs, as Defendants intended. Had they known the truth, Plaintiffs would not have purchased or leased the Subject Vehicles, or—if the Subject Vehicles' true nature had been disclosed and mitigated, and the Vehicles rendered legal to sell— would have paid significantly less for them.

1662.   Plaintiffs had no way of discerning that Defendants' representations were false and misleading, or otherwise learning the facts that Defendants had concealed or failed to disclose, because Defendants' emission control software was extremely sophisticated technology. Plaintiffs did not, and could not, unravel Defendants' deception on their own.

1663.   Defendants had an ongoing duty to Plaintiffs to refrain from unfair and deceptive practices under the Louisiana CPL in the course of their business. Specifically, Defendants owed Plaintiffs a duty to disclose all the material facts concerning the EcoDiesel® emission control system because they possessed exclusive knowledge, they intentionally concealed it from Plaintiffs, and/or they made misrepresentations that were rendered misleading because they were contradicted by withheld facts.

1664.   Plaintiffs suffered ascertainable loss and actual damages as a direct and proximate result of Defendants' concealment, misrepresentations, and/or failure to disclose material information.

1665.   Defendants' violations present a continuing risk to Plaintiffs, as well as to the general public. Defendants' unlawful acts and practices complained of herein affect the public interest.

1666.   Pursuant to La. Rev. Stat. § 51:1409, Plaintiffs seek an order enjoining Defendants' unfair and/or deceptive acts or practices, and awarding damages, punitive damages, and any other just and proper relief available under the Louisiana CPL.

### VIOLATION OF MAINE UNFAIR TRADE PRACTICES ACT
### (Me. Rev. Stat. Ann. Tit. 5 § 205-a, *et seq.*)

1667.   Plaintiffs incorporate by reference each preceding paragraph as though fully set forth herein.

1668.   Plaintiffs, to be named at a later date, (for the purpose of this section, "Plaintiff") brings this action on behalf of themselves against all Defendants.

1669.   Plaintiff, FCA, Fiat, VM Italy, VM America, Bosch GmbH, Bosch LLC, Sergio Marchionne, and Plaintiffs are "persons" within the meaning of Me. Rev. Stat. Ann. Tit. 5 § 206(2).

1670.   FCA, Fiat, VM Italy, VM America, Bosch GmbH, Bosch LLC, and Marchionne

are engaged in "trade" or "commerce" within the meaning of Me. Rev. Stat. Ann. Tit. 5 § 206(3.

1671.   The Maine Unfair Trade Practices Act ("Maine UTPA") makes unlawful "[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce…." Me. Rev. Stat. Ann. Tit. 5 § 207.

1672.   In the course of their business, Defendants Fiat Chrysler, VM Motori, Bosch, and Marchionne, through their agents, employees, and/or subsidiaries, violated the Maine UTPA.

1673.   As detailed in the common law fraud allegations: (1) Fiat Chrysler affirmatively misrepresented the environmental friendliness and emissions of the Subject Vehicles through the EcoDiesel badge—a material fact that was false because the Defendants developed and installed emission cheating components in the Subject Vehicles that caused them to pollute excessively in real-world conditions; (2) Fiat Chrysler touted, through the EcoDiesel badge and uniform and pervasive consumer communications, the Subject Vehicles' fuel efficiency and performance, and the Defendants concealed that the fuel efficiency and performance could be achieved only through emission control devices in the Subject Vehicles that caused them to pollute excessively in real-world conditions; and (3) the Defendants developed and installed emission cheating components that caused the Subject Vehicles to pollute excessively in real-world conditions, and fraudulently concealed that fact from regulators and Plaintiffs alike. In so doing, and by marketing, offering for sale, and selling the defective Subject Vehicles, Defendants engaged in one or more of the following unfair or deceptive acts or practices as defined in Me. Rev. Stat. Ann. Tit. 5 § 207:

A.   Causing likelihood of confusion or of misunderstanding as to the approval or certification of the Subject Vehicles;

B.   Representing that the Subject Vehicles have approval, characteristics, uses, or benefits that they do not have;

C.   Representing that the Subject Vehicles are of a particular standard, quality and grade when they are not;

D.   Advertising the Subject Vehicles with the intent not to sell or lease them as advertised;

E.   Engaging in other conduct which created a likelihood of confusion or of misunderstanding; and/or

F.   Using or employing deception, fraud, false pretense, false promise or misrepresentation, or the concealment, suppression or omission of a material fact with intent that others rely upon such concealment, suppression or omission, in connection with the advertisement and sale/lease of the Subject Vehicles, whether or not any person has in fact been misled, deceived or damaged thereby.

1674.   Defendants' scheme and concealment of the true characteristics of the EcoDiesel® emission control system were material to Plaintiff, as Defendants intended. Had they known the truth, Plaintiff would not have purchased or leased the Subject Vehicles, or—if the Subject Vehicles' true nature had been disclosed and mitigated, and the Vehicles rendered legal to sell— would have paid significantly less for them.

1675.   Plaintiffs had no way of discerning that Defendants' representations were false and misleading, or otherwise learning the facts that Defendants had concealed or failed to disclose, because Defendants' emission control software was extremely sophisticated technology. Plaintiffs did not, and could not, unravel Defendants' deception on their own.

1676.   Defendants had an ongoing duty to Plaintiffs to refrain from unfair and deceptive practices under the Maine UTPA in the course of their business. Specifically, Defendants owed Plaintiffs a duty to disclose all the material facts concerning the EcoDiesel® emission control system because they possessed exclusive knowledge, they intentionally concealed it from Plaintiffs, and/or they made misrepresentations that were rendered misleading because they were contradicted by withheld facts.

1677.   Plaintiffs suffered ascertainable loss and actual damages as a direct and proximate result of Defendants' concealment, misrepresentations, and/or failure to disclose material

information.

1678.   Defendants' violations present a continuing risk to Plaintiff, as well as to the general public. Defendants' unlawful acts and practices complained of herein affect the public interest.

1679.   Pursuant to Me. Rev. Stat. Ann. Tit. 5 § 213, Plaintiff seek an order enjoining Defendants' unfair and/or deceptive acts or practices, and awarding damages and any other just and proper relief available under the Maine UTPA.

1680.   A notice letter was sent to FCA US LLC complying with Me. Rev. Stat. Ann. Tit. 5 § 213(1-A). Additionally, all Defendants were provided notice of the issues raised in this count and this Complaint by the governmental investigations, the numerous complaints filed against them, and the many individual notice letters sent by Plaintiffs within a reasonable amount of time after the allegations of Subject Vehicle defects became public. Because Defendants failed to remedy their unlawful conduct within the requisite time period, Plaintiffs seek all damages and relief to which they are entitled.

## VIOLATIONS OF THE MARYLAND CONSUMER PROTECTION ACT
### (Md. Code Com. Law § 13-101, *et seq.*)

1681.   Plaintiffs incorporate by reference each preceding paragraph as though fully set forth herein.

1682.   Plaintiffs, Felix Hernandez, Courtney Gayle Coleman, (for the purpose of this section, "Plaintiffs") bring this action on behalf of themselves against all Defendants.

1683.   FCA, Fiat, VM Italy, VM America, Bosch GmbH, Bosch LLC, Sergio Marchionne, and Plaintiffs are "persons" within the meaning of Md. Code Com. Law § 13-101(h).

1684.   The Maryland Consumer Protection Act ("Maryland CPA") provides that a person may not engage in any unfair or deceptive trade practice in the sale of any consumer good. Md.

Code Com. Law § 13-303.

1685.   In the course of their business, Defendants Fiat Chrysler, VM Motori, Bosch, and Marchionne, through their agents, employees, and/or subsidiaries, violated the Maryland CPA.

1686.   As detailed in the common law fraud allegations: (1) Fiat Chrysler affirmatively misrepresented the environmental friendliness and emissions of the Subject Vehicles through the EcoDiesel badge—a material fact that was false because the Defendants developed and installed emission cheating components in the Subject Vehicles that caused them to pollute excessively in real-world conditions; (2) Fiat Chrysler touted, through the EcoDiesel badge and uniform and pervasive consumer communications, the Subject Vehicles' fuel efficiency and performance, and the Defendants concealed that the fuel efficiency and performance could be achieved only through emission control devices in the Subject Vehicles that caused them to pollute excessively in real-world conditions; and (3) the Defendants developed and installed emission cheating components that caused the Subject Vehicles to pollute excessively in real-world conditions, and fraudulently concealed that fact from regulators and Plaintiffs alike. See, e.g., ¶¶ 149-216; 337-357. In so doing, and by marketing, offering for sale, and selling the defective Subject Vehicles, Defendants engaged in one or more of the following unfair or deceptive acts or practices as prohibited by Md. Code Com. Law § 13-303:

A.   Representing that the Subject Vehicles have approval, characteristics, uses, or benefits that they do not have;

B.   Representing that the Subject Vehicles are of a particular standard, quality and grade when they are not;

C.   Advertising the Subject Vehicles with the intent not to sell or lease them as advertised; and/or

D.   Using or employing deception, fraud, false pretense, false promise or misrepresentation, or the concealment, suppression or omission of a material fact with intent that others rely upon such concealment, suppression or omission, in

connection with the advertisement and sale/lease of the Subject Vehicles, whether or not any person has in fact been misled, deceived or damaged thereby.

1687.   Defendants' scheme and concealment of the true characteristics of the EcoDiesel® emission control system were material to Plaintiffs, as Defendants intended. Had they known the truth, Plaintiffs would not have purchased or leased the Subject Vehicles, or—if the Subject Vehicles' true nature had been disclosed and mitigated, and the Vehicles rendered legal to sell— would have paid significantly less for them.

1688.   Plaintiffs had no way of discerning that Defendants' representations were false and misleading, or otherwise learning the facts that Defendants had concealed or failed to disclose, because Defendants' emission control software was extremely sophisticated technology. Plaintiffs did not, and could not, unravel Defendants' deception on their own.

1689.   Defendants had an ongoing duty to Plaintiffs to refrain from unfair and deceptive practices under the Maryland CPA in the course of their business. Specifically, Defendants owed Plaintiffs a duty to disclose all the material facts concerning the EcoDiesel® emission control system because they possessed exclusive knowledge, they intentionally concealed it from Plaintiffs, and/or they made misrepresentations that were rendered misleading because they were contradicted by withheld facts.

1690.   Plaintiffs suffered ascertainable loss and actual damages as a direct and proximate result of Defendants' concealment, misrepresentations, and/or failure to disclose material information.

1691.   Defendants' violations present a continuing risk to Plaintiffs, as well as to the general public. Defendants' unlawful acts and practices complained of herein affect the public interest.

1692.   Pursuant to Md. Code Com. Law § 13-408, Plaintiffs seek an order enjoining

Defendants' unfair and/or deceptive acts or practices, and awarding damages and any other just and proper relief available under the Maryland CPA.

## DECEPTIVE ACTS OR PRACTICES PROHIBITED
### BY MASSACHUSETTS LAW
### (Mass. Gen. Laws Ch. 93a, § 1, *et seq.*)

1693.   Plaintiffs incorporate by reference each preceding paragraph as though fully set forth herein.

1694.   Plaintiffs, to be named at a later date, (for the purpose of this section, "Plaintiff") brings this action on behalf of themselves against all Defendants.

1695.   FCA, Fiat, VM Italy, VM America, Bosch GmbH, Bosch LLC, Sergio Marchionne, Plaintiff, and Plaintiffs are "persons" within the meaning of Mass. Gen. Laws ch. 93A, § 1(a).

1696.   FCA, Fiat, VM Italy, VM America, Bosch GmbH, Bosch LLC, and Sergio Marchionne are engaged in "trade" or "commerce" within the meaning of Mass. Gen. Laws ch. 26 93A, § 1(b).

1697.   The Massachusetts consumer protection law ("Massachusetts Act") prohibits "unfair or deceptive acts or practices in the conduct of any trade or commerce." Mass. Gen. Laws ch. 93A, § 2.

1698.   In the course of their business, Defendants Fiat Chrysler, VM Motori, Bosch, and Marchionne, through their agents, employees, and/or subsidiaries, violated the Massachusetts Act.

1699.   As detailed in the common law fraud allegations: (1) Fiat Chrysler affirmatively misrepresented the environmental friendliness and emissions of the Subject Vehicles through the EcoDiesel badge—a material fact that was false because the Defendants developed and installed emission cheating components in the Subject Vehicles that caused them to pollute excessively in real-world conditions; (2) Fiat Chrysler touted, through the EcoDiesel badge and uniform and pervasive consumer communications, the Subject Vehicles' fuel efficiency and performance, and

the Defendants concealed that the fuel efficiency and performance could be achieved only through

emission control devices in the Subject Vehicles that caused them to pollute excessively in real-

world conditions; and (3) the Defendants developed and installed emission cheating components

that caused the Subject Vehicles to pollute excessively in real-world conditions, and fraudulently

concealed that fact from regulators and Plaintiffs alike. In so doing, and by marketing, offering for

sale, and selling the defective Subject Vehicles, Defendants engaged in one or more of the

following unfair or deceptive acts or practices as prohibited by Mass. Gen. Laws ch. 93A, § 2:

> A.   Causing likelihood of confusion or of misunderstanding as to the approval or
> certification of the Subject Vehicles;
>
> B.   Representing that the Subject Vehicles have approval, characteristics, uses,
> or benefits that they do not have;
>
> C.   Representing that the Subject Vehicles are of a particular standard, quality
> and grade when they are not;
>
> D.   Advertising the Subject Vehicles with the intent not to sell or lease them as
> advertised;
>
> E.   Engaging in other conduct which created a likelihood of confusion or of
> misunderstanding; and/or
>
> F.   Using or employing deception, fraud, false pretense, false promise or
> misrepresentation, or the concealment, suppression or omission of a material fact
> with intent that others rely upon such concealment, suppression or omission, in
> connection with the advertisement and sale/lease of the Subject Vehicles, whether
> or not any person has in fact been misled, deceived or damaged thereby.

1700.   Defendants' scheme and concealment of the true characteristics of the EcoDiesel®

emission control system were material to Plaintiff, as Defendants intended. Had they known the

truth, Plaintiff would not have purchased or leased the Subject Vehicles, or—if the Subject

Vehicles' true nature had been disclosed and mitigated, and the Vehicles rendered legal to sell—

would have paid significantly less for them.

1701.   Plaintiffs had no way of discerning that Defendants' representations were false and

misleading, or otherwise learning the facts that Defendants had concealed or failed to disclose, because Defendants' emission control software was extremely sophisticated technology. Plaintiffs did not, and could not, unravel Defendants' deception on their own.

1702.   Defendants had an ongoing duty to Plaintiff to refrain from unfair and deceptive practices under the Massachusetts Act in the course of their business. Specifically, Defendants owed Plaintiff a duty to disclose all the material facts concerning the EcoDiesel® emission control system because they possessed exclusive knowledge, they intentionally concealed it from Plaintiff, and/or they made misrepresentations that were rendered misleading because they were contradicted by withheld facts.

1703.   Plaintiffs suffered ascertainable loss and actual damages as a direct and proximate result of Defendants' concealment, misrepresentations, and/or failure to disclose material information.

1704.   Defendants' violations present a continuing risk to Plaintiff, as well as to the general public. Defendants' unlawful acts and practices complained of herein affect the public interest.

1705.   Plaintiffs seek an order pursuant to Mass. Gen. Laws ch. 93A § 9 enjoining Defendants' unfair and/or deceptive acts or practices, and awarding damages, punitive damages, and any other just and proper relief available under the Massachusetts Act.

1706.   A notice letter was sent to FCA US LLC pursuant to Mass. Gen. Laws ch. 93A, § 9(3).  Additionally, all Defendants were provided notice of the issues raised in this count and this Complaint by the governmental investigations, the numerous complaints filed against them, and the many individual notice letters sent by Plaintiffs within a reasonable amount of time after the allegations of Subject Vehicle defects became public. Because Defendants failed to remedy their

unlawful conduct within the requisite time period, Plaintiffs seek all damages and relief to which Plaintiff are entitled.

## VIOLATION OF THE MICHIGAN CONSUMER PROTECTION ACT
### (Mich. Comp. Laws § 445.903, *et seq.*)

1707.   Plaintiffs incorporate by reference each preceding paragraph as though fully set forth herein.

1708.   Plaintiffs, Andrew and Ashley Malburg, Kile Matthew Lee O'Connor, Jim Laney, Michael Miller, Dwight Lindstrom, (for the purpose of this section, "Plaintiff") brings this action on behalf of themselves against all Defendants.

1709.   FCA, Fiat, VM Italy, VM America, Bosch GmbH, Bosch LLC, Sergio Marchionne, Plaintiff, and Plaintiffs are "persons" within the meaning of Mich. Comp. Laws § 445.902(1)(d).

1710.   FCA, Fiat, VM Italy, VM America, Bosch GmbH, Bosch LLC, and Sergio Marchionne are engaged in "trade" or "commerce" within the meaning of Mich. Comp. Laws § 445.902(1)(g).

1711.   The Michigan Consumer Protection Act ("Michigan CPA") makes unlawful "[u]nfair, unconscionable, or deceptive methods, acts, or practices in the conduct of trade or commerce …." Mich. Comp. Laws § 445.903(1).

1712.   In the course of their business, Defendants Fiat Chrysler, VM Motori, Bosch, and Marchionne, through their agents, employees, and/or subsidiaries, violated the Michigan CPA.

1713.   As detailed in the common law fraud allegations: (1) Fiat Chrysler affirmatively misrepresented the environmental friendliness and emissions of the Subject Vehicles through the EcoDiesel badge—a material fact that was false because the Defendants developed and installed emission cheating components in the Subject Vehicles that caused them to pollute excessively in real-world conditions; (2) Fiat Chrysler touted, through the EcoDiesel badge and uniform and

pervasive consumer communications, the Subject Vehicles' fuel efficiency and performance, and the Defendants concealed that the fuel efficiency and performance could be achieved only through emission control devices in the Subject Vehicles that caused them to pollute excessively in real-world conditions; and (3) the Defendants developed and installed emission cheating components that caused the Subject Vehicles to pollute excessively in real-world conditions, and fraudulently concealed that fact from regulators and Plaintiffs alike. In so doing, and by marketing, offering for sale, and selling the defective Subject Vehicles, Defendants engaged in one or more of the following unfair or deceptive acts or practices as defined in Mich. Comp. Laws § 445.903(1):

    A.   Causing likelihood of confusion or of misunderstanding as to the approval or certification of the Subject Vehicles;

    B.   Representing that the Subject Vehicles have approval, characteristics, uses, or benefits that they do not have;

    C.   Representing that the Subject Vehicles are of a particular standard, quality and grade when they are not;

    D.   Advertising the Subject Vehicles with the intent not to sell or lease them as advertised; and/or

    E.   Engaging in other conduct which created a likelihood of confusion or of misunderstanding.

    1714.   Defendants' scheme and concealment of the true characteristics of the EcoDiesel® emission control system were material to Plaintiff, as Defendants intended. Had they known the truth, Plaintiff would not have purchased or leased the Subject Vehicles, or—if the Subject Vehicles' true nature had been disclosed and mitigated, and the Vehicles rendered legal to sell—would have paid significantly less for them.

    1715.   Plaintiffs had no way of discerning that Defendants' representations were false and misleading, or otherwise learning the facts that Defendants had concealed or failed to disclose, because Defendants' emission control software was extremely sophisticated technology. Plaintiffs

did not, and could not, unravel Defendants' deception on their own.

1716.   Defendants had an ongoing duty to Plaintiffs to refrain from unfair and deceptive practices under the Michigan CPA in the course of their business. Specifically, Defendants owed Plaintiffs a duty to disclose all the material facts concerning the EcoDiesel® emission control system because they possessed exclusive knowledge, they intentionally concealed it from Plaintiffs, and/or they made misrepresentations that were rendered misleading because they were contradicted by withheld facts.

1717.   Plaintiffs suffered ascertainable loss and actual damages as a direct and proximate result of Defendants' concealment, misrepresentations, and/or failure to disclose material information.

1718.   Defendants' violations present a continuing risk to Plaintiffs, as well as to the general public. Defendants' unlawful acts and practices complained of herein affect the public interest.

1719.   Pursuant to Mich. Comp. Laws § 445.911, Plaintiff seek an order enjoining Defendants' unfair and/or deceptive acts or practices, and awarding damages, punitive damages, and any other just and proper relief available under the Michigan CPA.

### VIOLATIONS OF THE MINNESOTA PREVENTION OF CONSUMER FRAUD ACT
#### (Minn. Stat. § 325f.68, *et seq.*)

1720.   Plaintiffs incorporate by reference each preceding paragraph as though fully set forth herein.

1721.   Plaintiffs, Bruce Johnson, (for the purpose of this section, "Plaintiff") brings this action on behalf of themselves against all Defendants.

1722.   The Subject Vehicles constitute "merchandise" within the meaning of Minn. Stat. § 325F.68(2).

1723.   The Minnesota Prevention of Consumer Fraud Act ("Minnesota CFA") prohibits "[t]he act, use, or employment by any person of any fraud, false pretense, false promise, misrepresentation, misleading statement or deceptive practice, with the intent that others rely thereon in connection with the sale of any merchandise, whether or not any person has in fact been misled, deceived, or damaged thereby …." Minn. Stat. § 325F.69(1).

1724.   In the course of their business, Defendants Fiat Chrysler, VM Motori, Bosch, and Sergio Marchionne, through their agents, employees, and/or subsidiaries, violated the Minnesota CFA.

1725.   As detailed in the common law fraud allegations: (1) Fiat Chrysler affirmatively misrepresented the environmental friendliness and emissions of the Subject Vehicles through the EcoDiesel badge—a material fact that was false because the Defendants developed and installed emission cheating components in the Subject Vehicles that caused them to pollute excessively in real-world conditions; (2) Fiat Chrysler touted, through the EcoDiesel badge and uniform and pervasive consumer communications, the Subject Vehicles' fuel efficiency and performance, and the Defendants concealed that the fuel efficiency and performance could be achieved only through emission control devices in the Subject Vehicles that caused them to pollute excessively in real-world conditions; and (3) the Defendants developed and installed emission cheating components that caused the Subject Vehicles to pollute excessively in real-world conditions, and fraudulently concealed that fact from regulators and Plaintiffs alike. See, e.g., ¶¶ 149-216; 337-357. In so doing, and by marketing, offering for sale, and selling the defective Subject Vehicles, Defendants engaged in one or more of the following unfair or deceptive acts or practices as prohibited by Minn. Stat. § 325F.69(1): using or employing deception, fraud, false pretense, false promise or misrepresentation, or the concealment, suppression or omission of a material fact with intent that

others rely upon such concealment, suppression or omission, in connection with the advertisement and sale/lease of the Subject Vehicles, whether or not any person has in fact been misled, deceived or damaged thereby.

1726.   Defendants' scheme and concealment of the true characteristics of the EcoDiesel® emission control system were material to Plaintiff, as Defendants intended. Had they known the truth, Plaintiff would not have purchased or leased the Subject Vehicles, or—if the Subject Vehicles' true nature had been disclosed and mitigated, and the Vehicles rendered legal to sell— would have paid significantly less for them.

1727.   Plaintiffs had no way of discerning that Defendants' representations were false and misleading, or otherwise learning the facts that Defendants had concealed or failed to disclose, because Defendants' emission control software was extremely sophisticated technology. Plaintiffs did not, and could not, unravel Defendants' deception on their own.

1728.   Defendants had an ongoing duty to Plaintiffs to refrain from unfair and deceptive practices under the Minnesota CFA in the course of their business. Specifically, Defendants owed Plaintiffs a duty to disclose all the material facts concerning the EcoDiesel® emission control system because they possessed exclusive knowledge, they intentionally concealed it from Plaintiffs, and/or they made misrepresentations that were rendered misleading because they were contradicted by withheld facts.

1729.   Plaintiffs suffered ascertainable loss and actual damages as a direct and proximate result of Defendants' concealment, misrepresentations, and/or failure to disclose material information.

1730.   Defendants' violations present a continuing risk to Plaintiffs, as well as to the general public. Defendants' unlawful acts and practices complained of herein affect the public

469

interest.

1731.  Pursuant to Minn. Stat. §§ 8.31(3a) and 549.20(1)(a), Plaintiff seek an order enjoining Defendants' unfair and/or deceptive acts or practices and any other just and proper relief available under the Minnesota CFA.

## VIOLATIONS OF THE MINNESOTA UNIFORM DECEPTIVE TRADE PRACTICES ACT (Minn. Stat. § 325d.43, *et seq.*)

1732.  Plaintiffs incorporate by reference each preceding paragraph as though fully set forth herein.

1733.  Plaintiffs, Bruce Johnson, (for the purpose of this section, "Plaintiffs") brings this action on behalf of themselves against all Defendants.

1734.  The Minnesota Deceptive Trade Practices Act ("Minnesota DTPA") prohibits deceptive trade practices. Minn. Stat. § 325D.44.

1735.  In the course of their business, Defendants Fiat Chrysler, VM Motori, Bosch, and Sergio Marchionne, through their agents, employees, and/or subsidiaries, violated the Minnesota DTPA.

1736.  As detailed in the common law fraud allegations: (1) Fiat Chrysler affirmatively misrepresented the environmental friendliness and emissions of the Subject Vehicles through the EcoDiesel badge—a material fact that was false because the Defendants developed and installed emission cheating components in the Subject Vehicles that caused them to pollute excessively in real-world conditions; (2) Fiat Chrysler touted, through the EcoDiesel badge and uniform and pervasive consumer communications, the Subject Vehicles' fuel efficiency and performance, and the Defendants concealed that the fuel efficiency and performance could be achieved only through emission control devices in the Subject Vehicles that caused them to pollute excessively in real-world conditions; and (3) the Defendants developed and installed emission cheating components

470

that caused the Subject Vehicles to pollute excessively in real-world conditions, and fraudulently concealed that fact from regulators and Plaintiffs alike. In so doing, and by marketing, offering for sale, and selling the defective Subject Vehicles, Defendants engaged in one or more of the following unfair or deceptive acts or practices as defined in Minn. Stat. § 325D.44:

A.   Causing likelihood of confusion or of misunderstanding as to the approval or certification of the Subject Vehicles;

B.   Representing that the Subject Vehicles have approval, characteristics, uses, or benefits that they do not have;

C.   Representing that the Subject Vehicles are of a particular standard, quality and grade when they are not;

D.   Advertising the Subject Vehicles with the intent not to sell or lease them as advertised; and/or

E.   Engaging in other conduct which created a likelihood of confusion or of misunderstanding.

1737.   Defendants' scheme and concealment of the true characteristics of the EcoDiesel® emission control system were material to Plaintiff, as Defendants intended. Had they known the truth, Plaintiff would not have purchased or leased the Subject Vehicles, or—if the Subject Vehicles' true nature had been disclosed and mitigated, and the Vehicles rendered legal to sell—would have paid significantly less for them.

1738.   Plaintiffs had no way of discerning that Defendants' representations were false and misleading, or otherwise learning the facts that Defendants had concealed or failed to disclose, because Defendants' emission control software was extremely sophisticated technology. Plaintiffs did not, and could not, unravel Defendants' deception on their own.

1739.   Defendants had an ongoing duty to Plaintiffs to refrain from unfair and deceptive practices under the Minnesota DTPA in the course of their business. Specifically, Defendants owed Plaintiffs a duty to disclose all the material facts concerning the EcoDiesel® emission control

system because they possessed exclusive knowledge, they intentionally concealed it from Plaintiffs, and/or they made misrepresentations that were rendered misleading because they were contradicted by withheld facts.

1740.   Plaintiffs suffered ascertainable loss and actual damages as a direct and proximate result of Defendants' concealment, misrepresentations, and/or failure to disclose material information.

1741.   Defendants' violations present a continuing risk to Plaintiffs, as well as to the general public. Defendants' unlawful acts and practices complained of herein affect the public interest.

1742.   Pursuant to Minn. Stat. §§ 8.31(3a), 325D.45, and 549.20(1)(a), Plaintiff seek an order enjoining Defendants' unfair and/or deceptive acts or practices, and awarding damages, and any other just and proper relief available under the Minnesota DTPA.

## VIOLATION OF MISSISSIPPI CONSUMER PROTECTION ACT
### (Miss. Code. Ann. § 75-24-1, *et seq.*)

1743.   Plaintiffs incorporate by reference each preceding paragraph as though fully set forth herein.

1744.   Plaintiffs, Robin Simmons, Robert Heinzman, Russell Wagoner, (for the purpose of this section, "Plaintiff") brings this action on behalf of themselves against all Defendants.

1745.   The Mississippi Consumer Protection Act ("Mississippi CPA") prohibits "unfair or deceptive trade practices in or affecting commerce." Miss. Code. Ann. § 75-24-5(1).

1746.   In the course of their business, Defendants Fiat Chrysler, VM Motori, Bosch, and Sergio Marchionne, through their agents, employees, and/or subsidiaries, violated the Mississippi CPA.

1747.   As detailed in the common law fraud allegations: (1) Fiat Chrysler affirmatively

misrepresented the environmental friendliness and emissions of the Subject Vehicles through the EcoDiesel badge—a material fact that was false because the Defendants developed and installed emission cheating components in the Subject Vehicles that caused them to pollute excessively in real-world conditions; (2) Fiat Chrysler touted, through the EcoDiesel badge and uniform and pervasive consumer communications, the Subject Vehicles' fuel efficiency and performance, and the Defendants concealed that the fuel efficiency and performance could be achieved only through emission control devices in the Subject Vehicles that caused them to pollute excessively in real-world conditions; and (3) the Defendants developed and installed emission cheating components that caused the Subject Vehicles to pollute excessively in real-world conditions, and fraudulently concealed that fact from regulators and Plaintiffs alike. In so doing, and by marketing, offering for sale, and selling the defective Subject Vehicles, Defendants engaged in one or more of the following unfair or deceptive acts or practices as defined in Miss. Code. Ann. § 75-24-5(1):

    A.   Representing that the Subject Vehicles have approval, characteristics, uses, or benefits that they do not have;

    B.   Representing that the Subject Vehicles are of a particular standard, quality and grade when they are not; and/or

    C.   Advertising the Subject Vehicles with the intent not to sell or lease them as advertised.

    1748.   Defendants' scheme and concealment of the true characteristics of the EcoDiesel® emission control system were material to Plaintiff, as Defendants intended. Had they known the truth, Plaintiff would not have purchased or leased the Subject Vehicles, or—if the Subject Vehicles' true nature had been disclosed and mitigated, and the Vehicles rendered legal to sell—would have paid significantly less for them.

    1749.   Plaintiffs had no way of discerning that Defendants' representations were false and misleading, or otherwise learning the facts that Defendants had concealed or failed to disclose,

because Defendants' emission control software was extremely sophisticated technology. Plaintiffs did not, and could not, unravel Defendants' deception on their own.

1750.   Defendants had an ongoing duty to Plaintiff to refrain from unfair and deceptive practices under the Mississippi CPA in the course of their business. Specifically, Defendants owed Plaintiffs a duty to disclose all the material facts concerning the EcoDiesel® emission control system because they possessed exclusive knowledge, they intentionally concealed it from Plaintiff, and/or they made misrepresentations that were rendered misleading because they were contradicted by withheld facts.

1751.   Plaintiffs suffered ascertainable loss and actual damages as a direct and proximate result of Defendants' concealment, misrepresentations, and/or failure to disclose material information.

1752.   Defendants' violations present a continuing risk to Plaintiff, as well as to the general public. Defendants' unlawful acts and practices complained of herein affect the public interest.

1753.   Plaintiffs have made, and continues to make, a reasonable attempt to resolve their claims under the Mississippi CPA through an informal dispute program approved by the Mississippi Attorney General. Miss. Code. Ann. § 75-24-15(2). Plaintiffs have contacted the Office of the Attorney General and followed the procedures prescribed by the Consumer Protection Division. Per the State Pre-suit requirements notifications have been prepared to Defendants a Letter of Complaint (Pre Suite Notice). Defendants did not respond within ten days. Accordingly, Plaintiffs prepared their Complaints to the Mississippi Attorney General. The Office of the Attorney General has three weeks to review the Complaint from the date it was filed, after which time, a mediator will be assigned. If the Attorney General can give formal approval if that

mediation fails.

1754.  Plaintiffs seek an order under Miss. Code Ann. § 75-25-9 enjoining Defendants'

unfair and/or deceptive acts or practices and awarding damages, including restitution under § 75-

24-11, and any other just and proper relief available under the Mississippi CPA.

### VIOLATION OF MISSOURI MERCHANDISING PRACTICES ACT
### (Mo. Rev. Stat. § 407.010, *et seq.*)

1755.  Plaintiffs incorporate by reference each preceding paragraph as though fully set

forth herein.

1756.  Plaintiffs, Robert Brinkley, Donald and Beverly Young, James Beemer, Theodore

Brayfield d/b/a Carpet Plus, Stephen Campbell, (for the purpose of this section, "Plaintiff") brings

this action on behalf of themselves against all Defendants.

1757.  FCA, Fiat, VM Italy, VM America, Bosch GmbH, Bosch LLC, Sergio Marchionne,

and Plaintiffs are "persons" within the meaning of Mo. Rev. Stat. § 407.010(5).

1758.  FCA, Fiat, VM Italy, VM America, Bosch GmbH, Bosch LLC, and Marchionne

are engaged in "trade" or "commerce" within the meaning of Mo. Rev. Stat. § 407.010(7).

1759.  The Missouri Merchandising Practices Act ("Missouri MPA") makes unlawful the

"act, use or employment by any person of any deception, fraud, false pretense, misrepresentation,

unfair practice, or the concealment, suppression, or omission of any material fact in connection

with the sale or advertisement of any merchandise. Mo. Rev. Stat. § 407.020.

1760.  In the course of their business, Defendants Fiat Chrysler, VM Motori, Bosch, and

Marchionne, through their agents, employees, and/or subsidiaries, violated the Missouri MPA.

1761.  As detailed in the common law fraud allegations: (1) Fiat Chrysler affirmatively

misrepresented the environmental friendliness and emissions of the Subject Vehicles through the

EcoDiesel badge—a material fact that was false because the Defendants developed and installed

emission cheating components in the Subject Vehicles that caused them to pollute excessively in real-world conditions; (2) Fiat Chrysler touted, through the EcoDiesel badge and uniform and pervasive consumer communications, the Subject Vehicles' fuel efficiency and performance, and the Defendants concealed that the fuel efficiency and performance could be achieved only through emission control devices in the Subject Vehicles that caused them to pollute excessively in real-world conditions; and (3) the Defendants developed and installed emission cheating components that caused the Subject Vehicles to pollute excessively in real-world conditions, and fraudulently concealed that fact from regulators and Plaintiffs alike. In so doing, and by marketing, offering for sale, and selling the defective Subject Vehicles, Defendants engaged in the following unfair or deceptive acts or practices prohibited by Mo. Rev. Stat. § 407.020: using or employing deception, fraud, false pretense, false promise or misrepresentation, or the concealment, suppression or omission of a material fact with intent that others rely upon such concealment, suppression or omission, in connection with the advertisement and sale/lease of the Subject Vehicles, whether or not any person has in fact been misled, deceived or damaged thereby.

1762.  By failing to disclose these defects or facts about the defects described herein known to it or that were available to Defendants upon reasonable inquiry, Defendants deprived consumers of all material facts about the safety and functionality of their vehicles. By failing to release material facts about the defect, Defendants curtailed or reduced the ability of consumers to take notice of material facts about their vehicle, and/or it affirmatively operated to hide or keep those facts from consumers. 15 Mo. Code of State Reg. § 60-9.110.

1763.  Defendants' scheme and concealment of the true characteristics of the EcoDiesel® emission control system were material to Plaintiff, as Defendants intended. Had they known the truth, Plaintiff would not have purchased or leased the Subject Vehicles, or—if the Subject

Vehicles' true nature had been disclosed and mitigated, and the Vehicles rendered legal to sell—would have paid significantly less for them.

1764.   Plaintiffs had no way of discerning that Defendants' representations were false and misleading, or otherwise learning the facts that Defendants had concealed or failed to disclose, because Defendants' emission control software was extremely sophisticated technology. Plaintiffs did not, and could not, unravel Defendants' deception on their own.

1765.   Defendants had an ongoing duty to Plaintiffs to refrain from unfair and deceptive practices under the Missouri MPA in the course of their business. Specifically, Defendants owed Plaintiffs a duty to disclose all the material facts concerning the EcoDiesel® emission control system because they possessed exclusive knowledge, they intentionally concealed it from Plaintiff, and/or they made misrepresentations that were rendered misleading because they were contradicted by withheld facts.

1766.   Plaintiffs suffered ascertainable loss and actual damages as a direct and proximate result of Defendants' concealment, misrepresentations, and/or failure to disclose material information.

1767.   Defendants' violations present a continuing risk to Plaintiffs, as well as to the general public. Defendants' unlawful acts and practices complained of herein affect the public interest.

1768.   Pursuant to Mo. Rev. Stat. § 407.025, Plaintiff seek an order enjoining Defendants' unfair and/or deceptive acts or practices, and awarding damages, punitive damages, and any other just and proper relief available under the Missouri MPA.

## VIOLATION OF MONTANA UNFAIR TRADE PRACTICES AND CONSUMER PROTECTION ACT OF 1973
## (Mont. Code Ann. § 30-14-101, *et seq.*)

1769.   Plaintiffs incorporate by reference each preceding paragraph as though fully set forth herein.

1770.   Plaintiffs, Robert J. Reich, (for the purpose of this section, "Plaintiff") brings this action on behalf of themselves and the Montana State against all Defendants.

1771.   FCA, Fiat, VM Italy, VM America, Bosch GmbH, Bosch LLC, Sergio Marchionne, Plaintiffs are "persons" within the meaning of Mont. Code Ann. § 30-14-102(6). Plaintiffs are "consumers" within the meaning of Mont. Code Ann. § 30-14-102(1).

1772.   FCA, Fiat, VM Italy, VM America, Bosch GmbH, Bosch LLC, and Marchionne are engaged in "trade" or "commerce" within the meaning of Mont. Code Ann. § 30-14-102(8).

1773.   The Montana Unfair Trade Practices and Consumer Protection Act ("Montana CPA") makes unlawful any "unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce." Mont. Code Ann. § 30-14-103.

1774.   In the course of their business, Defendants Fiat Chrysler, VM Motori, Bosch, and Marchionne, through their agents, employees, and/or subsidiaries, violated the Montana CPA.

1775.   As detailed in the common law fraud allegations: (1) Fiat Chrysler affirmatively misrepresented the environmental friendliness and emissions of the Subject Vehicles through the EcoDiesel badge—a material fact that was false because the Defendants developed and installed emission cheating components in the Subject Vehicles that caused them to pollute excessively in real-world conditions; (2) Fiat Chrysler touted, through the EcoDiesel badge and uniform and pervasive consumer communications, the Subject Vehicles' fuel efficiency and performance, and the Defendants concealed that the fuel efficiency and performance could be achieved only through emission control devices in the Subject Vehicles that caused them to pollute excessively in real-

478

world conditions; and (3) the Defendants developed and installed emission cheating components that caused the Subject Vehicles to pollute excessively in real-world conditions, and fraudulently concealed that fact from regulators and Plaintiffs alike. In so doing, and by marketing, offering for sale, and selling the defective Subject Vehicles, Defendants engaged in one or more of the following unfair or deceptive acts or practices as prohibited by Mont. Code Ann. § 30-14-103:

A.  Causing likelihood of confusion or of misunderstanding as to the approval or certification of the Subject Vehicles;

B.  Representing that the Subject Vehicles have approval, characteristics, uses, or benefits that they do not have;

C.  Representing that the Subject Vehicles are of a particular standard, quality and grade when they are not;

D.  Advertising the Subject Vehicles with the intent not to sell or lease them as advertised;

E.  Engaging in other conduct which created a likelihood of confusion or of misunderstanding; and/or

F. Using or employing deception, fraud, false pretense, false promise or is representation, or the concealment, suppression or omission of a material fact with intent that others rely upon such concealment, suppression or omission, in connection with the advertisement and sale/lease of the Subject Vehicles, whether or not any person has in fact been misled, deceived or damaged thereby.

1776.  Defendants' scheme and concealment of the true characteristics of the EcoDiesel® emission control system were material to Plaintiffs, as Defendants intended. Had they known the truth, Plaintiffs would not have purchased or leased the Subject Vehicles, or—if the Subject Vehicles' true nature had been disclosed and mitigated, and the Vehicles rendered legal to sell— would have paid significantly less for them.

1777.  Plaintiffs had no way of discerning that Defendants' representations were false and misleading, or otherwise learning the facts that Defendants had concealed or failed to disclose, because Defendants' emission control software was extremely sophisticated technology. Plaintiffs

did not, and could not, unravel Defendants' deception on their own.

1778.   Defendants had an ongoing duty to Plaintiff to refrain from unfair and deceptive practices under the Montana CPA in the course of their business. Specifically, Defendants owed Plaintiffs a duty to disclose all the material facts concerning the EcoDiesel® emission control system because they possessed exclusive knowledge, they intentionally concealed it from Plaintiffs, and/or they made misrepresentations that were rendered misleading because they were contradicted by withheld facts.

1779.   Plaintiffs suffered ascertainable loss and actual damages as a direct and proximate result of Defendants' concealment, misrepresentations, and/or failure to disclose material information.

1780.   Defendants' violations present a continuing risk to Plaintiffs, as well as to the general public. Defendants' unlawful acts and practices complained of herein affect the public interest.

1781.   Pursuant to Mont. Code Ann. § 30-14-133, Plaintiffs seek an order enjoining Defendants' unfair and/or deceptive acts or practices, and awarding damages, punitive damages, and any other just and proper relief available under the Montana CPA.

## VIOLATION OF THE NEBRASKA CONSUMER PROTECTION ACT
### (Neb. Rev. Stat. § 59-1601, *et seq.*)

1782.   Plaintiffs incorporate by reference each preceding paragraph as though fully set forth herein.

1783.   Plaintiffs, to be named at a later date, (for the purpose of this section, "Plaintiffs") bring this action on behalf of themselves against all Defendants.

1784.   FCA, Fiat, VM Italy, VM America, Bosch GmbH, Bosch LLC, Sergio Marchionne, and Plaintiffs are "persons" within the meaning of Neb. Rev. Stat. § 59-1601(1).

1785.   FCA, Fiat, VM Italy, VM America, Bosch GmbH, Bosch LLC, and Marchionne are engaged in "trade" or "commerce" within the meaning of Neb. Rev. Stat. § 59-1601(2).

1786.   The Nebraska Consumer Protection Act ("Nebraska CPA") makes unlawful "unfair or deceptive acts or practices in the conduct of any trade or commerce." Neb. Rev. Stat. § 59-1602.

1787.   In the course of their business, Defendants Fiat Chrysler, VM Motori, Bosch, and Marchionne, through their agents, employees, and/or subsidiaries, violated the Nebraska CPA.

1788.   As detailed in the common law fraud allegations: (1) Fiat Chrysler affirmatively misrepresented the environmental friendliness and emissions of the Subject Vehicles through the EcoDiesel badge—a material fact that was false because the Defendants developed and installed emission cheating components in the Subject Vehicles that caused them to pollute excessively in real-world conditions; (2) Fiat Chrysler touted, through the EcoDiesel badge and uniform and pervasive consumer communications, the Subject Vehicles' fuel efficiency and performance, and the Defendants concealed that the fuel efficiency and performance could be achieved only through emission control devices in the Subject Vehicles that caused them to pollute excessively in real-world conditions; and (3) the Defendants developed and installed emission cheating components that caused the Subject Vehicles to pollute excessively in real-world conditions, and fraudulently concealed that fact from regulators and Plaintiffs alike. In so doing, and by marketing, offering for sale, and selling the defective Subject Vehicles, Defendants engaged in one or more of the following unfair or deceptive acts or practices as prohibited by Neb. Rev. Stat. § 59-1602:

A.  Causing likelihood of confusion or of misunderstanding as to the approval or certification of the Subject Vehicles;

B.  Representing that the Subject Vehicles have approval, characteristics, uses, or benefits that they do not have;

C.  Representing that the Subject Vehicles are of a particular standard, quality and grade when they are not;

D.  Advertising the Subject Vehicles with the intent not to sell or lease them as advertised;

E.  Engaging in other conduct which created a likelihood of confusion or of misunderstanding; and/or

F.  Using or employing deception, fraud, false pretense, false promise or misrepresentation, or the concealment, suppression or omission of a material fact with intent that others rely upon such concealment, suppression or omission, in connection with the advertisement sale/lease of the Subject Vehicles, whether or not any person has in fact been misled, deceived or damaged thereby

1789.   Defendants' scheme and concealment of the true characteristics of the EcoDiesel® emission control system were material to Plaintiffs, as Defendants intended. Had they known the truth, Plaintiffs would not have purchased or leased the Subject Vehicles, or—if the Subject Vehicles' true nature had been disclosed and mitigated, and the Vehicles rendered legal to sell—would have paid significantly less for them.

1790.   Plaintiffs had no way of discerning that Defendants' representations were false and misleading, or otherwise learning the facts that Defendants had concealed or failed to disclose, because Defendants' emission control software was extremely sophisticated technology. Plaintiffs did not, and could not, unravel Defendants' deception on their own.

1791.   Defendants had an ongoing duty to Plaintiffs to refrain from unfair and deceptive practices under the Nebraska CPA in the course of their business. Specifically, Defendants owed Plaintiffs a duty to disclose all the material facts concerning the EcoDiesel® emission control system because they possessed exclusive knowledge, they intentionally concealed it from Plaintiffs, and/or they made misrepresentations that were rendered misleading because they were contradicted by withheld facts.

1792.   Plaintiffs suffered ascertainable loss and actual damages as a direct and proximate result of Defendants' concealment, misrepresentations, and/or failure to disclose material information.

1793.   Defendants' violations present a continuing risk to Plaintiffs, as well as to the general public. Defendants' unlawful acts and practices complained of herein affect the public interest.

1794.   Pursuant to Neb. Rev. Stat. § 59-1609, Plaintiffs seek an order enjoining Defendants' unfair and/or deceptive acts or practices, and awarding damages and any other just and proper relief available under the Nebraska CPA.

**VIOLATION OF THE NEVADA DECEPTIVE TRADE PRACTICES ACT**
**(Nev. Rev. Stat. § 598.0903, *et seq*.)**

1795.   Plaintiffs incorporate by reference each preceding paragraph as though fully set forth herein.

1796.   Plaintiffs, to be named at a later date, (for the purpose of this section, "Plaintiff") brings this action on behalf of themselves against all Defendants.

1797.   The Nevada Deceptive Trade Practices Act ("Nevada DTPA"), Nev. Rev. Stat. § 598.0903, et seq. prohibits deceptive trade practices.

1798.   In the course of their business, Defendants Fiat Chrysler, VM Motori, Bosch, and Sergio Marchionne, through their agents, employees, and/or subsidiaries, violated the Nevada DTPA.

1799.   As detailed in the common law fraud allegations: (1) Fiat Chrysler affirmatively misrepresented the environmental friendliness and emissions of the Subject Vehicles through the EcoDiesel badge—a material fact that was false because the Defendants developed and installed emission cheating components in the Subject Vehicles that caused them to pollute excessively in real-world conditions; (2) Fiat Chrysler touted, through the EcoDiesel badge and uniform and pervasive consumer communications, the Subject Vehicles' fuel efficiency and performance, and

the Defendants concealed that the fuel efficiency and performance could be achieved only through emission control devices in the Subject Vehicles that caused them to pollute excessively in real-world conditions; and(3) the Defendants developed and installed emission cheating components that caused the Subject Vehicles to pollute excessively in real-world conditions, and fraudulently concealed that fact from regulators and Plaintiffs alike. In so doing, and by marketing, offering for sale, and selling the defective Subject Vehicles, Defendants engaged in one or more of the following unfair or deceptive acts or practices as defined in Nev. Rev. Stat. §§ 598.0915, 598.0923, and 598.0925:

A.  Representing that the Subject Vehicles have approval, characteristics, uses, or benefits that they do not have;

B.  Representing that the Subject Vehicles are of a particular standard, quality and grade when they are not;

C.  Advertising the Subject Vehicles with the intent not to sell or lease them as advertised;

D.  Violating state and federal statutes and regulations relating to the sale of the Subject Vehicles; and/or

E.  Intending to injure competitors and destroy or substantially lessen competition.

1800.   Defendants' scheme and concealment of the true characteristics of the EcoDiesel® emission control system were material to Plaintiffs, as Defendants intended. Had they known the truth, Plaintiff would not have purchased or leased the Subject Vehicles, or—if the Subject Vehicles' true nature had been disclosed and mitigated, and the Vehicles rendered legal to sell— would have paid significantly less for them.

1801.   Plaintiffs had no way of discerning that Defendants' representations were false and misleading, or otherwise learning the facts that Defendants had concealed or failed to disclose,

because Defendants' emission control software was extremely sophisticated technology. Plaintiffs did not, and could not, unravel Defendants' deception on their own.

1802.   Defendants had an ongoing duty to Plaintiffs to refrain from unfair and deceptive practices under the Nevada DTPA in the course of their business. Specifically, Defendants owed Plaintiffs a duty to disclose all the material facts concerning the EcoDiesel® emission control system because they possessed exclusive knowledge, they intentionally concealed it from Plaintiffs, and/or they made misrepresentations that were rendered misleading because they were contradicted by withheld facts.

1803.   Plaintiffs suffered ascertainable loss and actual damages as a direct and proximate result of Defendants' concealment, misrepresentations, and/or failure to disclose material information.

1804.   Defendants' violations present a continuing risk to Plaintiff, as well as to the general public. Defendants' unlawful acts and practices complained of herein affect the public interest.

1805.   Pursuant to Nev. Rev. Stat. §§ 41.600 and 598.0977, Plaintiff seek an order enjoining Defendants' unfair and/or deceptive acts or practices, and awarding damages and any other just and proper relief available under the Nevada DTPA.

### VIOLATION OF N.H. CONSUMER PROTECTION ACT
### (N.H. Rev. Stat. Ann. § 358-a:1, *et seq.*)

1806.   Plaintiffs incorporate by reference each preceding paragraph as though fully set forth herein.

1807.   Plaintiffs, Jeremy Delong, (for the purpose of this section, "Plaintiff") brings this action on behalf of the Plaintiffs against all Defendants.

1808.   FCA, Fiat, VM Italy, VM American, Bosch GmbH, Bosch LLC, Sergio

Marchionne, Plaintiff, and Plaintiffs are "persons" within the meaning of N.H. Rev. Stat. § 358-A:1.

1809.   FCA, Fiat, VM Italy, VM America, Bosch GmbH, Bosch LLC, and Marchionne are engaged in "trade" or "commerce" within the meaning of N.H. Rev. Stat. § 358-A:1.

1810.   The New Hampshire Consumer Protection Act ("New Hampshire CPA") makes unfair or deceptive trade practices unlawful. N.H. Rev. Stat. Ann. § 358-A:2.

1811.   In the course of their business, Defendants Fiat Chrysler, VM Motori, Bosch, and Marchionne, through their agents, employees, and/or subsidiaries, violated the New Hampshire CPA.

1812.   As detailed in the common law fraud allegations: (1) Fiat Chrysler affirmatively misrepresented the environmental friendliness and emissions of the Subject Vehicles through the EcoDiesel badge—a material fact that was false because the Defendants developed and installed emission cheating components in the Subject Vehicles that caused them to pollute excessively in real-world conditions; (2) Fiat Chrysler touted, through the EcoDiesel badge and uniform and pervasive consumer communications, the Subject Vehicles' fuel efficiency and performance, and the Defendants concealed that the fuel efficiency and performance could be achieved only through emission control devices in the Subject Vehicles that caused them to pollute excessively in real-world conditions; and (3) the Defendants developed and installed emission cheating components that caused the Subject Vehicles to pollute excessively in real-world conditions, and fraudulently concealed that fact from regulators and Plaintiffs alike. *See, e.g.,* ¶¶ 149-216; 337-357. In so doing, and by marketing, offering for sale, and selling the defective Subject Vehicles, Defendants engaged in one or more of the following unfair or deceptive acts or practices as defined in N.H. Rev. Stat. § 358-A:2:

A.  Representing that the Subject Vehicles have approval, characteristics, uses, or benefits that they do not have;

B.  Representing that the Subject Vehicles are of a particular standard, quality and grade when they are not;

C.  Advertising the Subject Vehicles with the intent not to sell or lease them as advertised;

D.  Violating state and federal statutes and regulations relating to the sale of the Subject Vehicles; and/or

E.  Intending to injure competitors and destroy or substantially lessen competition.

F.  Causing likelihood of confusion or of misunderstanding as to the approval or certification of the Subject Vehicles;

1813.   Defendants' scheme and concealment of the true characteristics of the EcoDiesel® emission control system were material to the Plaintiffs, as Defendants intended. Had they known the truth, the Plaintiffs would not have purchased or leased the Subject Vehicles, or—if the Subject Vehicles' true nature had been disclosed and mitigated, and the Vehicles rendered legal to sell—would have paid significantly less for them.

1814.   Plaintiffs had no way of discerning that Defendants' representations were false and misleading, or otherwise learning the facts that Defendants had concealed or failed to disclose, because Defendants' emission control software was extremely sophisticated technology. Plaintiffs did not, and could not, unravel Defendants' deception on their own.

1815.   Defendants had an ongoing duty to the Plaintiffs to refrain from unfair and deceptive practices under the New Hampshire CPA in the course of their business. Specifically, Defendants owed Plaintiffs a duty to disclose all the material facts concerning the EcoDiesel® emission control system because they possessed exclusive knowledge, they intentionally concealed it from the Plaintiffs, and/or they made misrepresentations that were rendered misleading because they were contradicted by withheld facts.

487

1816.   Plaintiffs suffered ascertainable loss and actual damages as a direct and proximate result of Defendants' concealment, misrepresentations, and/or failure to disclose material information.

1817.   Defendants' violations present a continuing risk to the Plaintiffs, as well as to the general public. Defendants' unlawful acts and practices complained of herein affect the public interest.

1818.   Pursuant to N.H. Rev. Stat. § 358-A:10, the Plaintiffs seek an order enjoining Defendants' unfair and/or deceptive acts or practices, and awarding damages, punitive damages, and any other just and proper relief available under the New Hampshire CPA.

## VIOLATIONS OF THE NEW JERSEY CONSUMER FRAUD ACT
### (N.J. Stat. Ann. § 56:8-1, *et seq.*)

1819.   Plaintiffs incorporate by reference each preceding paragraph as though fully set forth herein.

1820.   Plaintiffs, Greg and Lucia Dubas, (for the purpose of this section, "Plaintiffs") bring this action on behalf of themselves against all Defendants.

1821.   FCA, Fiat, VM Italy, VM America, Bosch GmbH, Bosch LLC, Sergio Marchionne, and Plaintiffs are "persons" within the meaning of N.J. Stat. Ann. § 56:8-1(d).

1822.   FCA, Fiat, VM Italy, VM America, Bosch GmbH, Bosch LLC, and Sergio Marchionne are engaged in "sales" of "merchandise" within the meaning of N.J. Stat. Ann. § 56:8-1(c), (e).

1823.   The New Jersey Consumer Fraud Act ("New Jersey CFA") makes unlawful "[t]he act, use or employment by any person of any unconscionable commercial practice, deception, fraud, false pretense, false promise, misrepresentation, or the knowing concealment, suppression,

or omission of any material fact with the intent that others rely upon such concealment, suppression or omission, in connection with the sale or advertisement of any merchandise or real estate, or with the subsequent performance of such person as aforesaid, whether or not any person has in fact been misled, deceived or damaged thereby…" N.J. Stat. Ann. § 56:8-2.

1824.   In the course of their business, Defendants Fiat Chrysler, VM Motori, Bosch, and Marchionne, through their agents, employees, and/or subsidiaries, violated the New Jersey CFA.

1825.   As detailed in the common law fraud allegations: (1) Fiat Chrysler affirmatively misrepresented the environmental friendliness and emissions of the Subject Vehicles through the EcoDiesel badge—a material fact that was false because the Defendants developed and installed emission cheating components in the Subject Vehicles that caused them to pollute excessively in real-world conditions; (2) Fiat Chrysler touted, through the EcoDiesel badge and uniform and pervasive consumer communications, the Subject Vehicles' fuel efficiency and performance, and the Defendants concealed that the fuel efficiency and performance could be achieved only through emission control devices in the Subject Vehicles that caused them to pollute excessively in real-world conditions; and (3) the Defendants developed and installed emission cheating components that caused the Subject Vehicles to pollute excessively in real-world conditions, and fraudulently concealed that fact from regulators and Plaintiffs alike. In so doing, and by marketing, offering for sale, and selling the defective Subject Vehicles, Defendants engaged in the following unfair or deceptive acts or practices as prohibited by N.J. Stat. Ann. § 56:8-2: using or employing deception, fraud, false pretense, false promise or misrepresentation, or the concealment, suppression or omission of a material fact with intent that others rely upon such concealment, suppression or omission, in connection with the advertisement and sale/lease of the Subject Vehicles, whether or not any person has in fact been misled, deceived or damaged thereby.

1826.   Defendants' scheme and concealment of the true characteristics of the EcoDiesel® emission control system were material to Plaintiffs, as Defendants intended. Had they known the truth, Plaintiffs would not have purchased or leased the Subject Vehicles, or—if the Subject Vehicles' true nature had been disclosed and mitigated, and the Vehicles rendered legal to sell— would have paid significantly less for them.

1827.   Plaintiffs had no way of discerning that Defendants' representations were false and misleading, or otherwise learning the facts that Defendants had concealed or failed to disclose, because Defendants' emission control software was extremely sophisticated technology. Plaintiffs did not, and could not, unravel Defendants' deception on their own.

1828.   Defendants had an ongoing duty to Plaintiffs to refrain from unfair and deceptive practices under the New Jersey CFA in the course of their business. Specifically, Defendants owed Plaintiffs a duty to disclose all the material facts concerning the EcoDiesel® emission control system because they possessed exclusive knowledge, they intentionally concealed it from Plaintiffs, and/or they made misrepresentations that were rendered misleading because they were contradicted by withheld facts.

1829.   Plaintiffs suffered ascertainable loss and actual damages as a direct and proximate result of Defendants' concealment, misrepresentations, and/or failure to disclose material information.

1830.   Defendants' violations present a continuing risk to Plaintiffs, as well as to the general public. Defendants' unlawful acts and practices complained of herein affect the public interest.

1831.   Pursuant to N.J. Stat. Ann. § 56:8-19, Plaintiffs seek an order enjoining Defendants' unfair and/or deceptive acts or practices, and awarding damages, punitive damages,

and any other just and proper relief available under the New Jersey CFA.

**VIOLATIONS OF THE NEW MEXICO UNFAIR PRACTICES ACT**
**(N.M. Stat. Ann. §§ 57-12-1, *et seq.*)**

1832. Plaintiffs incorporate by reference each preceding paragraph as though fully set forth herein.

1833. Plaintiffs, to ne named at a later date, (for the purpose of this section, "Plaintiffs") bring this action on behalf of themselves against all Defendants.

1834. FCA, Fiat, VM Italy, VM America, Bosch GmbH, Bosch LLC, Sergio Marchionne, and Plaintiffs are "persons" within the meaning of N.M. Stat. Ann. § 57-12-2.

1835. FCA, Fiat, VM Italy, VM America, Bosch GmbH, Bosch LLC, and Marchionne are engaged in trade or commerce within the meaning of N.M. Stat. Ann. § 57-12-2.

1836. The New Mexico Unfair Trade Practices Act ("New Mexico UTPA") makes unlawful "a false or misleading oral or written statement, visual description or other representation of any kind knowingly made in connection with the sale, lease, rental or loan of goods or services … by a person in the regular course of the person's trade or commerce, that may, tends to or does deceive or mislead any person," including but not limited to "failing to state a material fact if doing so deceives or tends to deceive." N.M. Stat. Ann. § 57-12-2(D).

1837. In the course of their business, Defendants Fiat Chrysler, VM Motori, Bosch, and Marchionne, through their agents, employees, and/or subsidiaries, violated the New Mexico UTPA.

1838. As detailed in the common law fraud allegations: (1) Fiat Chrysler affirmatively misrepresented the environmental friendliness and emissions of the Subject Vehicles through the EcoDiesel badge—a material fact that was false because the Defendants developed and installed emission cheating components in the Subject Vehicles that caused them to pollute excessively in

real-world conditions; (2) Fiat Chrysler touted, through the EcoDiesel badge and uniform and pervasive consumer communications, the Subject Vehicles' fuel efficiency and performance, and the Defendants concealed that the fuel efficiency and performance could be achieved only through emission control devices in the Subject Vehicles that caused them to pollute excessively in real-world conditions; and (3) the Defendants developed and installed emission cheating components that caused the Subject Vehicles to pollute excessively in real-world conditions, and fraudulently concealed that fact from regulators and Plaintiffs alike. In so doing, and by marketing, offering for sale, and selling the defective Subject Vehicles, Defendants engaged in one or more of the following unfair or deceptive acts or practices as prohibited by N.M. Stat. Ann. § 57-12-2(D) and § 57-12-2(E):

> A.  Causing likelihood of confusion or of misunderstanding as to the approval or certification of the Subject Vehicles;

> B.  Representing that the Subject Vehicles have approval, characteristics, uses, or benefits that they do not have;

> C.  Representing that the Subject Vehicles are of a particular standard, quality and grade when they are not;

> D. Using exaggeration as to a material fact and/or failing to state the material facts concerning the Subject Vehicles in a way that tended to deceive; and/or

> E.  Acting in a manner that resulted in a gross disparity between the true value of the Subject Vehicles and the price paid.

1839.   Defendants' scheme and concealment of the true characteristics of the EcoDiesel® emission control system were material to Plaintiffs, as Defendants intended. Had they known the truth, Plaintiffs would not have purchased or leased the Subject Vehicles, or—if the Subject Vehicles' true nature had been disclosed and mitigated, and the Vehicles rendered legal to sell— would have paid significantly less for them.

1840.   Plaintiffs had no way of discerning that Defendants' representations were false and

misleading, or otherwise learning the facts that Defendants had concealed or failed to disclose, because Defendants' emission control software was extremely sophisticated technology. Plaintiffs did not, and could not, unravel Defendants' deception on their own.

1841.   Defendants had an ongoing duty to Plaintiffs to refrain from unfair and deceptive practices under the New Mexico UTPA in the course of their business. Specifically, Defendants owed Plaintiffs a duty to disclose all the material facts concerning the EcoDiesel® emission control system because they possessed exclusive knowledge, they intentionally concealed it from Plaintiffs, and/or they made misrepresentations that were rendered misleading because they were contradicted by withheld facts.

1842.   Plaintiffs suffered ascertainable loss and actual damages as a direct and proximate result of Defendants' concealment, misrepresentations, and/or failure to disclose material information.

1843.   Defendants' violations present a continuing risk to Plaintiffs, as well as to the general public. Defendants' unlawful acts and practices complained of herein affect the public interest.

1844.   Pursuant to N.M. Stat. Ann. § 57-12-10, Plaintiffs seek an order enjoining Defendants' unfair and/or deceptive acts or practices, and awarding damages, punitive damages, and any other just and proper relief available under the New Mexico UTPA.

### VIOLATION OF NEW YORK GENERAL BUSINESS LAW § 349
#### (N.Y. Gen. Bus. Law § 349)

1845.   Plaintiffs incorporate by reference each preceding paragraph as though fully set forth herein.

1846.   Plaintiffs, Sebastian Korzec, Randy Crawford, Jason Cornetto, Richard Bayly, Thomas Banks, Tom and Julie Bisselle, Joe Kralik, (for the purpose of this section, "Plaintiffs")

bring this action on behalf of themselves against all Defendants.

1847.   FCA, Fiat, VM Italy, VM America, Bosch GmbH, Bosch LLC, Sergio Marchionne, and Plaintiffs are "persons" within the meaning of N.Y. Gen. Bus. Law § 349(h).

1848.   The New York Deceptive Acts and Practices Act ("NY DAPA") makes unlawful "[d]eceptive acts or practices in the conduct of any business, trade or commerce." N.Y. Gen. Bus Law § 349.

1849.   In the course of their business, Defendants Fiat Chrysler, VM Motori, Bosch, and Sergio Marchionne, through their agents, employees, and/or subsidiaries, violated the New York DAPA.

1850.   As detailed in the common law fraud allegations: (1) Fiat Chrysler affirmatively misrepresented the environmental friendliness and emissions of the Subject Vehicles through the EcoDiesel badge—a material fact that was false because the Defendants developed and installed emission cheating components in the Subject Vehicles that caused them to pollute excessively in real-world conditions; (2) Fiat Chrysler touted, through the EcoDiesel badge and uniform and pervasive consumer communications, the Subject Vehicles' fuel efficiency and performance, and the Defendants concealed that the fuel efficiency and performance could be achieved only through emission control devices in the Subject Vehicles that caused them to pollute excessively in real-world conditions; and (3) the Defendants developed and installed emission cheating components that caused the Subject Vehicles to pollute excessively in real-world conditions, and fraudulently concealed that fact from regulators and Plaintiffs alike. In so doing, and by marketing, offering for sale, and selling the defective Subject Vehicles, Defendants engaged in one or more of the following unfair or deceptive acts or practices as prohibited by N.Y. Gen. Bus. Law § 349:

   A.  Causing likelihood of confusion or of misunderstanding as to the approval or certification of the Subject Vehicles;

B.  Representing that the Subject Vehicles have approval, characteristics, uses, or benefits that they do not have;

C.  Representing that the Subject Vehicles are of a particular standard, quality and grade when they are not;

D.  Advertising the Subject Vehicles with the intent not to sell or lease them as advertised;

E.  Engaging in other conduct which created a likelihood of confusion or of misunderstanding; and/or

F.  Using or employing deception, fraud, false pretense, false promise or misrepresentation, or the concealment, suppression or omission of a material fact with intent that others rely upon such concealment, suppression or omission, in connection with the advertisement and sale/lease of the Subject Vehicles, whether or not any person has in fact been misled, deceived or damaged thereby.

1851.  Defendants' scheme and concealment of the true characteristics of the EcoDiesel® emission control system were material to Plaintiffs, as Defendants intended. Had they known the truth, Plaintiffs would not have purchased or leased the Subject Vehicles, or—if the Subject Vehicles' true nature had been disclosed and mitigated, and the Vehicles rendered legal to sell—would have paid significantly less for them.

1852.  Plaintiffs had no way of discerning that Defendants' representations were false and misleading, or otherwise learning the facts that Defendants had concealed or failed to disclose, because Defendants' emission control software was extremely sophisticated technology. Plaintiffs did not, and could not, unravel Defendants' deception on their own.

1853.  Defendants had an ongoing duty to Plaintiffs to refrain from unfair and deceptive practices under the New York DAPA in the course of their business. Specifically, Defendants owed Plaintiffs a duty to disclose all the material facts concerning the EcoDiesel® emission control system because they possessed exclusive knowledge, they intentionally concealed it from Plaintiffs, and/or they made misrepresentations that were rendered misleading because they were contradicted by withheld facts.

495

1854.   Plaintiffs suffered ascertainable loss and actual damages as a direct and proximate result of Defendants' concealment, misrepresentations, and/or failure to disclose material information.

1855.   Defendants' violations present a continuing risk to Plaintiffs, as well as to the general public. Defendants' unlawful acts and practices complained of herein affect the public interest.

1856.   Plaintiffs seek an order enjoining Defendants' unfair and/or deceptive acts or practices, and awarding damages, punitive damages, and any other just and proper relief available under the New York DAPA.

## VIOLATIONS OF NEW YORK GENERAL BUSINESS LAW § 350
### (N.Y. Gen. Bus. Law § 350)

1857.   Plaintiffs incorporate by reference each preceding paragraph as though fully set forth herein.

1858.   Plaintiffs, Sebastian Korzec, Randy Crawford, Jason Cornetto, Richard Bayly, Thomas Banks, Tom and Julie Bisselle, Joe Kralik, (for the purpose of this section, "Plaintiffs") bring this action on behalf of themselves against all Defendants.

1859.   FCA, Fiat, VM Italy, VM America, Bosch GmbH, Bosch LLC, and Sergio Marchionne are engaged in the "conduct of business, trade or commerce," within the meaning of N.Y. Gen. Bus. Law § 350.

1860.   The New York False Advertising Act ("NY FAA") makes unlawful "[f]alse advertising in the conduct of any business, trade or commerce." N.Y. Gen. Bus. Law § 350. False advertising includes "advertising, including labeling, of a commodity . . . if such advertising is misleading in a material respect," taking into account "the extent to which the advertising fails to reveal facts material in light of … representations [made] with respect to the commodity …." N.Y.

Gen. Bus. Law § 350-a.

1861.   Defendants caused to be made or disseminated through New York and the United States, through advertising, marketing, and other publications, statements that were untrue or misleading, and which were known, or which by the exercise of reasonable care should have been known to Defendants, to be untrue and misleading to consumers, including Plaintiffs.

1862.   As detailed in the common law fraud allegations: (1) Fiat Chrysler affirmatively misrepresented the environmental friendliness and emissions of the Subject Vehicles through the EcoDiesel badge—a material fact that was false because the Defendants developed and installed emission cheating components in the Subject Vehicles that caused them to pollute excessively in real-world conditions; (2) Fiat Chrysler touted, through the EcoDiesel badge and uniform and pervasive consumer communications, the Subject Vehicles' fuel efficiency and performance, and the Defendants concealed that the fuel efficiency and performance could be achieved only through emission control devices in the Subject Vehicles that caused them to pollute excessively in real-world conditions; and (3) the Defendants developed and installed emission cheating components that caused the Subject Vehicles to pollute excessively in real-world conditions, and fraudulently concealed that fact from regulators and Plaintiffs alike. *See, e.g.*, ¶¶ 149-216; 337-357.

1863.   Defendants violated the NY FAA by: representing that the Subject Vehicles had characteristics, uses, benefits, and qualities which they do not have; representing that the Subject Vehicles are of a particular standard, quality and grade when they are not; advertising Subject Vehicles with the intent not to sell or lease them as advertised; engaging in other conduct creating a likelihood of confusion or of misunderstanding; and employing concealment, suppression, or omission of material facts in connection with the advertisement and sale of the Subject Vehicles. Defendants knew or should have known that their conduct violated the NY FAA.

1864.   Plaintiffs suffered ascertainable loss and actual damages as a direct and proximate result of Defendants' misrepresentations, deceptions, and their concealment of and failure to disclose material information.

1865.   All of the wrongful conduct alleged herein occurred, and continues to occur, in the conduct of Defendants' business. Defendants' wrongful conduct is part of a pattern or generalized course of conduct that is still perpetuated and repeated, both in the State of New York and nationwide.

1866.   Pursuant to the NY FAA, Plaintiffs seek injunctive relief, as well as monetary relief against Defendants measured as the greater of (a) actual damages in an amount to be determined at trial, and (b) statutory damages in the amount of $500 each for Plaintiffs. Because Defendants' conduct was committed willingly and knowingly, Plaintiffs are entitled to recover three times actual damages, up to $10,000.

## VIOLATIONS OF THE NORTH CAROLINA
## UNFAIR AND DECEPTIVE TRADE PRACTICES ACT
### (N.C. Gen. Stat. §§ 75-1.1, *et seq.*)

1867.   Plaintiffs incorporate by reference each preceding paragraph as though fully set forth herein.

1868.   Plaintiffs, Kyle Wingate Underhill, Kevin Suhrie, (for the purpose of this section, "Plaintiffs") bring this action on behalf of themselves against all Defendants.

1869.   FCA, Fiat, VM Italy, VM America, Bosch GmbH, Bosch LLC, Sergio Marchionne, and Plaintiffs are "persons" within the meaning of N.C. Gen. Stat. § 75-1.1, *et seq*.

1870.   FCA's, Fiat's, VM Italy's, VM America's, Bosch GmbH's, Bosch LLC's, and Sergio Marchionne's acts and practices complained of herein were performed in the course of their trade or business and thus occurred in or affected "commerce," as defined in N.C. Gen. Stat. § 75-

1.1(b).

1871.   The North Carolina Unfair and Deceptive Trade Practices Act ("North Carolina UDTPA") makes unlawful "[u]nfair methods of competition in or affecting commerce, and unfair or deceptive acts or practices in or affecting commerce[,]" and the North Carolina UDTPA provides a private right of action for any person injured "by reason of any act or thing done by any other person, firm or corporation in violation of" the law. N.C. Gen. Stat. § 75-16.

1872.   In the course of their business, Defendants Fiat Chrysler, VM Motori, Bosch, and Marchionne, through their agents, employees, and/or subsidiaries, violated the North Carolina UDTPA.

1873.   As detailed in the common law fraud allegations: (1) Fiat Chrysler affirmatively misrepresented the environmental friendliness and emissions of the Subject Vehicles through the EcoDiesel badge—a material fact that was false because the Defendants developed and installed emission cheating components in the Subject Vehicles that caused them to pollute excessively in real-world conditions; (2) Fiat Chrysler touted, through the EcoDiesel badge and uniform and pervasive consumer communications, the Subject Vehicles' fuel efficiency and performance, and the Defendants concealed that the fuel efficiency and performance could be achieved only through emission control devices in the Subject Vehicles that caused them to pollute excessively in real-world conditions; and (3) the Defendants developed and installed emission cheating components that caused the Subject Vehicles to pollute excessively in real-world conditions, and fraudulently concealed that fact from regulators and Plaintiffs alike. *See, e.g.*, ¶¶ 149-216; 337-357. In so doing, and by marketing, offering for sale, and selling the defective Subject Vehicles, Defendants engaged in one or more of the following unfair or deceptive acts or practices prohibited by the North Carolina UDTPA:

A.  Causing likelihood of confusion or of misunderstanding as to the approval or certification of the Subject Vehicles;

B.  Representing that the Subject Vehicles have approval, characteristics, uses, or benefits that they do not have;

C.  Representing that the Subject Vehicles are of a particular standard, quality and grade when they are not;

D.  Advertising the Subject Vehicles with the intent not to sell or lease them as advertised;

E.  Engaging in other conduct which created a likelihood of confusion or of misunderstanding; and/or

F.  Using or employing deception, fraud, false pretense, false promise or misrepresentation, or the concealment, suppression or omission of a material fact with intent that others rely upon such concealment, suppression or omission, in connection with the advertisement and sale/lease of the Subject Vehicles, whether or not any person has in fact been misled, deceived or damaged thereby.

1874.   Defendants' scheme and concealment of the true characteristics of the EcoDiesel® emission control system were material to Plaintiffs, as Defendants intended. Had they known the truth, Plaintiffs would not have purchased or leased the Subject Vehicles, or—if the Subject Vehicles' true nature had been disclosed and mitigated, and the Vehicles rendered legal to sell— would have paid significantly less for them.

1875.   Plaintiffs had no way of discerning that Defendants' representations were false and misleading, or otherwise learning the facts that Defendants had concealed or failed to disclose, because Defendants' emission control software was extremely sophisticated technology. Plaintiffs did not, and could not, unravel Defendants' deception on their own.

1876.   Defendants had an ongoing duty to Plaintiffs to refrain from unfair and deceptive practices under the North Carolina UDTPA in the course of their business. Specifically, Defendants owed Plaintiffs a duty to disclose all the material facts concerning the EcoDiesel® emission control system because they possessed exclusive knowledge, they intentionally concealed it from Plaintiffs, and/or they made misrepresentations that were rendered misleading

500

because they were contradicted by withheld facts.

1877.   Plaintiffs suffered ascertainable loss and actual damages as a direct and proximate result of Defendants' concealment, misrepresentations, and/or failure to disclose material information.

1878.   Defendants' violations present a continuing risk to Plaintiffs, as well as to the general public. Defendants' unlawful acts and practices complained of herein affect the public interest.

1879.   Pursuant to N.C. Gen. Stat. § 75-16, Plaintiffs seek an order enjoining Defendants' unfair and/or deceptive acts or practices, and awarding damages, punitive damages, and any other just and proper relief available under the North Carolina UDTPA.

## VIOLATION OF THE NORTH DAKOTA CONSUMER FRAUD ACT
### (N.D. Cent. Code § 51-15-02)

1880.   Plaintiffs incorporate by reference each preceding paragraph as though fully set forth herein.

1881.   Plaintiffs, Joshua and Amanda Trepl, Ron Naasz,  (for the purpose of this section, "Plaintiff") brings this action on behalf of themselves against all Defendants.

1882.   FCA, Fiat, VM Italy, VM America, Bosch GmbH, Bosch LLC, Sergio Marchionne, Plaintiff, and Plaintiffs are "persons" within the meaning of N.D. Cent. Code § 51-15-02(4).

1883.   FCA, Fiat, VM Italy, VM America, Bosch GmbH, Bosch LLC, and Sergio Marchionne are engaged in the "sale" of "merchandise" within the meaning of N.D. Cent Code 22§§ 51-15-02(3), (5).

1884.   The North Dakota Consumer Fraud Act ("North Dakota CFA") makes unlawful "[t]he act, use, or employment by any person of any deceptive act or practice, fraud, false pretense, false promise, or misrepresentation, with the intent that others rely thereon in connection with the

sale or advertisement of any merchandise…." N.D. Cent. Code § 51-15-02.

1885.   In the course of their business, Defendants Fiat Chrysler, VM Motori, Bosch, and Marchionne, through their agents, employees, and/or subsidiaries, violated the North Dakota CFA.

1886.   As detailed in the common law fraud allegations: (1) Fiat Chrysler affirmatively misrepresented the environmental friendliness and emissions of the Subject Vehicles through the EcoDiesel badge—a material fact that was false because the Defendants developed and installed emission cheating components in the Subject Vehicles that caused them to pollute excessively in real-world conditions; (2) Fiat Chrysler touted, through the EcoDiesel badge and uniform and pervasive consumer communications, the Subject Vehicles' fuel efficiency and performance, and the Defendants concealed that the fuel efficiency and performance could be achieved only through emission control devices in the Subject Vehicles that caused them to pollute excessively in real-world conditions; and (3) the Defendants developed and installed emission cheating components that caused the Subject Vehicles to pollute excessively in real-world conditions, and fraudulently concealed that fact from regulators and Plaintiffs alike. *See, e.g.*, ¶¶ 149-216; 337-357. In so doing, and by marketing, offering for sale, and selling the defective Subject Vehicles, Defendants engaged in one or more of the following unfair or deceptive acts or practices prohibited by N.D. Cent. Code § 51-15-02: using or employing deception, fraud, false pretense, false promise or misrepresentation, with intent that others rely thereon, in connection with the advertisement and sale/lease of the Subject Vehicles, whether or not any person has in fact been misled, deceived or damaged thereby.

1887.   Defendants' scheme and concealment of the true characteristics of the EcoDiesel® emission control system were material to Plaintiff, as Defendants intended. Had they known the truth, Plaintiff would not have purchased or leased the Subject Vehicles, or—if the Subject

Vehicles' true nature had been disclosed and mitigated, and the Vehicles rendered legal to sell—would have paid significantly less for them.

1888.   Plaintiffs had no way of discerning that Defendants' representations were false and misleading, or otherwise learning the facts that Defendants had concealed or failed to disclose, because Defendants' emission control software was extremely sophisticated technology. Plaintiffs did not, and could not, unravel Defendants' deception on their own.

1889.   Defendants had an ongoing duty to Plaintiff to refrain from unfair and deceptive practices under the North Dakota CFA in the course of their business. Specifically, Defendants owed Plaintiffs a duty to disclose all the material facts concerning the EcoDiesel® emission control system because they possessed exclusive knowledge, they intentionally concealed it from Plaintiffs, and/or they made misrepresentations that were rendered misleading because they were contradicted by withheld facts.

1890.   Plaintiffs suffered ascertainable loss and actual damages as a direct and proximate result of Defendants' concealment, misrepresentations, and/or failure to disclose material information.

1891.   Defendants' violations present a continuing risk to Plaintiff, as well as to the general public. Defendants' unlawful acts and practices complained of herein affect the public interest.

1892.   Pursuant to N.D. Cent. Code Ann. §§ 51-15-07 and 51-15-09, Plaintiff seek an order enjoining Defendants' unfair and/or deceptive acts or practices and awarding damages, treble damages, and any other just and proper relief available under the North Dakota CFA.

### VIOLATIONS OF THE OHIO CONSUMER SALES PRACTICES ACT
#### (Ohio Rev. Code §§ 1345.01, *et seq.*)

1893.   Plaintiffs incorporate by reference each preceding paragraph as though fully set

forth herein.

1894.   Plaintiffs, William and Sherry Coomes, (for the purpose of this section, "Plaintiff") brings this action on behalf of themselves against all Defendants.

1895.   FCA, Fiat, VM Italy, VM America, Bosch GmbH, Bosch LLC, Sergio Marchionne, Plaintiff, and Plaintiffs are "persons" within the meaning of Ohio Rev. Code § 1345.01(B). Defendants are so "supplier[s]" as defined by Ohio Rev. Code 2 § 1345.01(C).

1896.   Plaintiff are "consumers" within the meaning of Ohio Rev. Code § 1345.01(D), and their purchase and leases of the Subject Vehicles are "consumer transactions" within the meaning of Ohio Rev. Code § 1345.01(A).

1897.   The Ohio Consumer Sales Practices Act ("Ohio CSPA") prohibits unfair or deceptive acts or practices in connection with a consumer transaction. Ohio Rev. Code § 1345.02.

1898.   In the course of their business, Defendants Fiat Chrysler, VM Motori, Bosch, and Marchionne, through their agents, employees, and/or subsidiaries, violated the Ohio CSPA.

1899.   As detailed in the common law fraud allegations: (1) Fiat Chrysler affirmatively misrepresented the environmental friendliness and emissions of the Subject Vehicles through the EcoDiesel badge—a material fact that was false because the Defendants developed and installed emission cheating components in the Subject Vehicles that caused them to pollute excessively in real-world conditions; (2) Fiat Chrysler touted, through the EcoDiesel badge and uniform and pervasive consumer communications, the Subject Vehicles' fuel efficiency and performance, and the Defendants concealed that the fuel efficiency and performance could be achieved only through emission control devices in the Subject Vehicles that caused them to pollute excessively in real-world conditions; and (3) the Defendants developed and installed emission cheating components that caused the Subject Vehicles to pollute excessively in real-world conditions, and fraudulently

concealed that fact from regulators and Plaintiffs alike. *See, e.g.*, ¶¶ 149-216; 337-357. In so doing, and by marketing, offering for sale, and selling the defective Subject Vehicles, Defendants engaged in one or more of the following unfair or deceptive acts or practices as prohibited by Ohio Rev. Code § 1345.02:

> A.  Representing that the Subject Vehicles have approval, characteristics, uses, or benefits that they do not have; and/or

> B.  Representing that the Subject Vehicles are of a particular standard, quality and grade when they are not.

1900.   Defendants' scheme and concealment of the true characteristics of the EcoDiesel® emission control system were material to Plaintiff, as Defendants intended. Had they known the truth, Plaintiff would not have purchased or leased the Subject Vehicles, or—if the Subject Vehicles' true nature had been disclosed and mitigated, and the Vehicles rendered legal to sell— would have paid significantly less for them.

1901.   Plaintiffs had no way of discerning that Defendants' representations were false and misleading, or otherwise learning the facts that Defendants had concealed or failed to disclose, because Defendants' emission control software was extremely sophisticated technology. Plaintiffs did not, and could not, unravel Defendants' deception on their own.

1902.   Defendants had an ongoing duty to Plaintiffs to refrain from unfair and deceptive practices under the Ohio CSPA in the course of their business. Specifically, Defendants owed Plaintiffs a duty to disclose all the material facts concerning the EcoDiesel® emission control system because they possessed exclusive knowledge, they intentionally concealed it from Plaintiff, and/or they made misrepresentations that were rendered misleading because they were contradicted by withheld facts.

1903.   Plaintiffs suffered ascertainable loss and actual damages as a direct and proximate

result of Defendants' concealment, misrepresentations, and/or failure to disclose material information.

1904.   Defendants' violations present a continuing risk to Plaintiff, as well as to the general public. Defendants' unlawful acts and practices complained of herein affect the public interest.

1905.   Pursuant to Ohio Rev. Code § 1345.09, Plaintiff seek an order enjoining Defendants' unfair and/or deceptive acts or practices, and awarding damages, punitive damages, and any other just and proper relief available under the Ohio CSPA.

### VIOLATIONS OF THE OHIO DECEPTIVE TRADE PRACTICES ACT
(Ohio Rev. Code § 4165.01, *et seq.*)

1906.   Plaintiffs incorporate by reference each preceding paragraph as though fully set forth herein.

1907.   Plaintiffs, William and Sherry Coomes, (for the purpose of this section, "Plaintiff") brings this action on behalf of themselves against all Defendants.

1908.   FCA, Fiat, VM Italy, VM America, Bosch GmbH, Bosch LLC, Sergio Marchionne, Plaintiff, and Plaintiffs are "persons" within the meaning of Ohio Rev. Code § 4165.01(D).

1909.   FCA, Fiat, VM Italy, VM America, Bosch GmbH, Bosch LLC, and Sergio Marchionne are engaged in "the course of [their] business" within the meaning of Ohio Rev. Code § 4165.02(A).

1910.   The Ohio Deceptive Trade Practices Act ("Ohio DTPA") makes unlawful deceptive trade practices. Ohio Rev. Code § 4165.02(A).

1911.   In the course of their business, Defendants Fiat Chrysler, VM Motori, Bosch, and Marchionne, through their agents, employees, and/or subsidiaries, violated the Ohio DTPA.

1912.   As detailed in the common law fraud allegations: (1) Fiat Chrysler affirmatively misrepresented the environmental friendliness and emissions of the Subject Vehicles through the EcoDiesel badge—a material fact that was false because the Defendants developed and installed emission cheating components in the Subject Vehicles that caused them to pollute excessively in real-world conditions; (2) Fiat Chrysler touted, through the EcoDiesel badge and uniform and pervasive consumer communications, the Subject Vehicles' fuel efficiency and performance, and the Defendants concealed that the fuel efficiency and performance could be achieved only through emission control devices in the Subject Vehicles that caused them to pollute excessively in real-World conditions; and (3) the Defendants developed and installed emission cheating components that caused the Subject Vehicles to pollute excessively in real-world conditions, and fraudulently concealed that fact from regulators and Plaintiffs alike. *See, e.g.*, ¶¶ 149-216; 337-357. In so doing, and by marketing, offering for sale, and selling the defective Subject Vehicles, Defendants engaged in one or more of the following unfair or deceptive acts or practices as defined in Ohio Rev. Code § 4165.02(A):

A.  Causing likelihood of confusion or of misunderstanding as to the approval or certification of the Subject Vehicles;

B.  Representing that the Subject Vehicles have approval, characteristics, uses, or benefits that they do not have;

C.  Representing that the Subject Vehicles are of a particular standard, quality and grade when they are not; and/or

D.  Advertising the Subject Vehicles with the intent not to sell or lease them as advertised.

1913.   Defendants' scheme and concealment of the true characteristics of the EcoDiesel® emission control system were material to Plaintiff, as Defendants intended. Had they known the truth, Plaintiff would not have purchased or leased the Subject Vehicles, or—if the Subject Vehicles' true nature had been disclosed and mitigated, and the Vehicles rendered legal to sell—

would have paid significantly less for them.

1914.   Plaintiffs had no way of discerning that Defendants' representations were false and misleading, or otherwise learning the facts that Defendants had concealed or failed to disclose, because Defendants' emission control software was extremely sophisticated technology. Plaintiffs did not, and could not, unravel Defendants' deception on their own.

1915.   Defendants had an ongoing duty to the Plaintiffs to refrain from unfair and deceptive practices under the Ohio DTPA in the course of their business. Specifically, Defendants owed Plaintiffs a duty to disclose all the material facts concerning the EcoDiesel® emission control system because they possessed exclusive knowledge, they intentionally concealed it from Plaintiff, and/or they made misrepresentations that were rendered misleading because they were contradicted by withheld facts.

1916.   Plaintiffs suffered ascertainable loss and actual damages as a direct and proximate result of Defendants' concealment, misrepresentations, and/or failure to disclose material information.

1917.   Defendants' violations present a continuing risk to Plaintiff, as well as to the general public. Defendants' unlawful acts and practices complained of herein affect the public interest.

1918.   Pursuant to Ohio Rev. Code §§ 2727.02 and 4165.03, Plaintiff seek an order enjoining Defendants' unfair and/or deceptive acts or practices, and awarding damages, punitive damages, and any other just and proper relief available under the Ohio DTPA.

### VIOLATION OF OKLAHOMA CONSUMER PROTECTION ACT
#### (Okla. Stat. Tit. 15 § 751, *et seq.*)

1919.   Plaintiffs incorporate by reference each preceding paragraph as though fully set forth herein.

1920. Plaintiffs, Don and Kathern Wells, William R. and Breia N. Willaford, Andrew Waters, Daniel Gonzales, Gerald and Christine Good, Zachary Austin Pearson, (for the purpose of this section, "Plaintiff") brings this action on behalf of themselves against all Defendants.

1921. FCA, Fiat, VM Italy, VM America, Bosch GmbH, Bosch LLC, Sergio Marchionne, Plaintiff, and Plaintiffs are "persons" within the meaning of Okla. Stat. Tit. 15 § 752.1.

1922. At all relevant times, FCA, Fiat, VM Italy, VM America, Bosch GmbH, Bosch LLC, and Sergio Marchionne are and were engaged in "the course of business" within the meaning of Okla. Stat. Tit. 15 § 753.

1923. The Oklahoma Consumer Protection Act ("Oklahoma CPA") prohibits numerous unlawful acts, including misleading representations, false advertisements, and false statements. Okla. Stat. Tit. 15 § 753.

1924. In the course of their business, Defendants Fiat Chrysler, VM Motori, Bosch, and Marchionne, through their agents, employees, and/or subsidiaries, violated the Oklahoma CPA.

1925. As detailed in the common law fraud allegations: (1) Fiat Chrysler affirmatively misrepresented the environmental friendliness and emissions of the Subject Vehicles through the EcoDiesel badge—a material fact that was false because the Defendants developed and installed emission cheating components in the Subject Vehicles that caused them to pollute excessively in real-world conditions; (2) Fiat Chrysler touted, through the EcoDiesel badge and uniform and pervasive consumer communications, the Subject Vehicles' fuel efficiency and performance, and the Defendants concealed that the fuel efficiency and performance could be achieved only through emission control devices in the Subject Vehicles that caused them to pollute excessively in real-world conditions; and (3) the Defendants developed and installed emission cheating components that caused the Subject Vehicles to pollute excessively in real-world conditions, and fraudulently

509

concealed that fact from regulators and Plaintiffs alike. *See, e.g.*, ¶¶ 149-216; 337-357. In so doing, and by marketing, offering for sale, and selling the defective Subject Vehicles, Defendants engaged in one or more of the following unfair or deceptive acts or practices as defined in Okla. Stat. Tit. 15 § 753:

A.  Representing that the Subject Vehicles have approval, characteristics, uses, or benefits that they do not have;

B.  Representing that the Subject Vehicles are of a particular standard, quality and grade when they are not; and/or

C.  Advertising the Subject Vehicles with the intent not to sell or lease them as advertised.

1926.   Defendants' scheme and concealment of the true characteristics of the EcoDiesel® emission control system were material to Plaintiff, as Defendants intended. Had they known the truth, Plaintiff would not have purchased or leased the Subject Vehicles, or—if the Subject Vehicles' true nature had been disclosed and mitigated, and the Vehicles rendered legal to sell— would have paid significantly less for them.

1927.   Plaintiffs had no way of discerning that Defendants' representations were false and misleading, or otherwise learning the facts that Defendants had concealed or failed to disclose, because Defendants' emission control software was extremely sophisticated technology. Plaintiffs did not, and could not, unravel Defendants' deception on their own.

1928.   Defendants had an ongoing duty to Plaintiff to refrain from unfair and deceptive practices under the Oklahoma CPA in the course of their business. Specifically, Defendants owed Plaintiffs a duty to disclose all the material facts concerning the EcoDiesel® emission control system because they possessed exclusive knowledge, they intentionally concealed it from Plaintiff, and/or they made misrepresentations that were rendered misleading because they were contradicted by withheld facts.

1929.   Plaintiffs suffered ascertainable loss and actual damages as a direct and proximate result of Defendants' concealment, misrepresentations, and/or failure to disclose material information.

1930.   Defendants' violations present a continuing risk to Plaintiff, as well as to the general public. Defendants' unlawful acts and practices complained of herein affect the public interest.

1931.   Pursuant to Okla. Stat. Tit. 15 § 761.1, Plaintiff seek an order enjoining Defendants' unfair and/or deceptive acts or practices, and awarding damages, punitive damages, and any other just and proper relief available under the Oklahoma CPA.

### VIOLATIONS OF THE OREGON UNLAWFUL TRADE PRACTICES ACT
(Or. Rev. Stat. §§ 646.605, *et seq.*)

1932.   Plaintiffs incorporate by reference each preceding paragraph as though fully set forth herein.

1933.   Plaintiffs, Arthur Alfinito, Sean McCaffery, Ronnie Vincent, (for the purpose of this section, "Plaintiffs") bring this action on behalf of themselves against all Defendants.

1934.   FCA, Fiat, VM Italy, VM America, Bosch GmbH, Bosch LLC, Sergio Marchionne, and Plaintiffs are "persons" within the meaning of Or. Rev. Stat. § 646.605(4).

1935.   FCA, Fiat, VM Italy, VM America, Bosch GmbH, Bosch LLC, and Sergio Marchionne are engaged in "trade" or "commerce" within the meaning of Or. Rev. Stat. § 646.605(8).

1936.   The Oregon Unfair Trade Practices Act ("Oregon UTPA") prohibits "unlawful practice . . . in the course of . . . business." Or. Rev. Stat. § Ann. 646.608(1).

1937.   In the course of their business, Defendants Fiat Chrysler, VM Motori, Bosch, and Marchionne, through their agents, employees, and/or subsidiaries, violated the Oregon UTPA.

1938.   As detailed in the common law fraud allegations: (1) Fiat Chrysler affirmatively misrepresented the environmental friendliness and emissions of the Subject Vehicles through the EcoDiesel badge—a material fact that was false because the Defendants developed and installed emission cheating components in the Subject Vehicles that caused them to pollute excessively in real-world conditions; (2) Fiat Chrysler touted, through the EcoDiesel badge and uniform and pervasive consumer communications, the Subject Vehicles' fuel efficiency and performance, and the Defendants concealed that the fuel efficiency and performance could be achieved only through emission control devices in the Subject Vehicles that caused them to pollute excessively in real-world conditions; and (3) the Defendants developed and installed emission cheating components that caused the Subject Vehicles to pollute excessively in real-world conditions, and fraudulently concealed that fact from regulators and Plaintiffs alike. *See, e.g.*, ¶¶ 149-216; 337-357. In so doing, and by marketing, offering for sale, and selling the defective Subject Vehicles, Defendants engaged in one or more of the following unlawful practices as defined in 21 Or. Rev. Stat. § 646.608(1):

> A.  Causing likelihood of confusion or of misunderstanding as to the approval or certification of the Subject Vehicles;

> B.  Representing that the Subject Vehicles have approval, characteristics, uses, or benefits that they do not have;

> C.  Representing that the Subject Vehicles are of a particular standard, quality and grade when they are not; and/or

> D.  Advertising the Subject Vehicles with the intent not to sell or lease them as advertised.

1939.   Defendants' scheme and concealment of the true characteristics of the EcoDiesel® emission control system were material to Plaintiffs, as Defendants intended. Had they known the truth, Plaintiffs would not have purchased or leased the Subject Vehicles, or—if the Subject Vehicles' true nature had been disclosed and mitigated, and the Vehicles rendered legal to sell— would have paid significantly less for them.

1940.   Plaintiffs had no way of discerning that Defendants' representations were false and misleading, or otherwise learning the facts that Defendants had concealed or failed to disclose, because Defendants' emission control software was extremely sophisticated technology. Plaintiffs did not, and could not, unravel Defendants' deception on their own.

1941.   Defendants had an ongoing duty to Plaintiffs to refrain from unfair and deceptive practices under the Oregon UTPA in the course of their business. Specifically, Defendants owed Plaintiffs a duty to disclose all the material facts concerning the EcoDiesel® emission control system because they possessed exclusive knowledge, they intentionally concealed it from Plaintiffs, and/or they made misrepresentations that were rendered misleading because they were contradicted by withheld facts.

1942.   Plaintiffs suffered ascertainable loss and actual damages as a direct and proximate result of Defendants' concealment, misrepresentations, and/or failure to disclose material information.

1943.   Defendants' violations present a continuing risk to Plaintiffs, as well as to the general public. Defendants' unlawful acts and practices complained of herein affect the public interest.

1944.   Pursuant to Or. Rev. Stat. § 646.638, Plaintiffs seek an order enjoining Defendants' unfair and/or deceptive acts or practices, and awarding damages, punitive damages, and any other just and proper relief available under the Oregon UTPA.

### VIOLATION OF THE PENNSYLVANIA UNFAIR TRADE PRACTICES AND CONSUMER PROTECTION LAW (73 Pa. Stat. Ann. § 201-1, *et seq.*)

1945.   Plaintiffs incorporate by reference each preceding paragraph as though fully set forth herein.

1946.   Plaintiffs, Steve Reeves, Robert and Cheryl Body, Dominick Melfi, (for the purpose of this section, "Plaintiffs") bring this action on behalf of themselves against all Defendants.

1947.   FCA, Fiat, VM Italy, VM America, Bosch GmbH, Bosch LLC, Sergio Marchionne, and Plaintiffs are "persons" within the meaning of 73 Pa. Stat. Ann. § 201-2. (2).

1948.   FCA, Fiat, VM Italy, VM America, Bosch GmbH, Bosch LLC, and Sergio Marchionne are engaged in "trade" or "commerce" within the meaning of 73 Pa. Stat. Ann. § 201-2(3).

1949.   The Pennsylvania Unfair Trade Practices Act ("Pennsylvania UTPA") prohibits "unfair or deceptive acts or practices in the conduct of any trade or commerce …." 73 Pa. Stat. Ann. § 201 3.

1950.   In the course of their business, Defendants Fiat Chrysler, VM Motori, Bosch, and Marchionne, through their agents, employees, and/or subsidiaries, violated the Pennsylvania UTPA.

1951.   As detailed in the common law fraud allegations: (1) Fiat Chrysler affirmatively misrepresented the environmental friendliness and emissions of the Subject Vehicles through the EcoDiesel badge—a material fact that was false because the Defendants developed and installed emission cheating components in the Subject Vehicles that caused them to pollute excessively in real-world conditions; (2) Fiat Chrysler touted, through the EcoDiesel badge and uniform and pervasive consumer communications, the Subject Vehicles' fuel efficiency and performance, and the Defendants concealed that the fuel efficiency and performance could be achieved only through emission control devices in the Subject Vehicles that caused them to pollute excessively in real-world conditions; and (3) the Defendants developed and installed emission cheating components

that caused the Subject Vehicles to pollute excessively in real-world conditions, and fraudulently concealed that fact from regulators and Plaintiffs alike. *See, e.g.*, ¶¶ 149-216; 337-357. In so doing, and by marketing, offering for sale, and selling the defective Subject Vehicles, Defendants engaged in one or more of the following unfair or deceptive acts or practices in violation of 73 Pa. Stat. Ann. § 201-3:

A.  Causing likelihood of confusion or of misunderstanding as to the approval or certification of the Subject Vehicles;

B.  Representing that the Subject Vehicles have approval, characteristics, uses, or benefits that they do not have;

C.  Representing that the Subject Vehicles are of a particular standard, quality and grade when they are not;

D.  Advertising the Subject Vehicles with the intent not to sell or lease them as advertised;

E.  Engaging in other conduct which created a likelihood of confusion or of misunderstanding; and/or

F.  Using or employing deception, fraud, false pretense, false promise or misrepresentation, or the concealment, suppression or omission of a material fact with intent that others rely upon such concealment, suppression or omission, in connection with the advertisement and sale/lease of the Subject Vehicles, whether or not any person has in fact been misled, deceived or damaged thereby.

1952.   Defendants' scheme and concealment of the true characteristics of the EcoDiesel® emission control system were material to Plaintiffs, as Defendants intended. Had they known the truth, Plaintiffs would not have purchased or leased the Subject Vehicles, or—if the Subject Vehicles' true nature had been disclosed and mitigated, and the Vehicles rendered legal to sell— would have paid significantly less for them.

1953.   Plaintiffs had no way of discerning that Defendants' representations were false and misleading, or otherwise learning the facts that Defendants had concealed or failed to disclose, because Defendants' emission control software was extremely sophisticated technology. Plaintiffs

did not, and could not, unravel Defendants' deception on their own.

1954.   Defendants had an ongoing duty to Plaintiffs to refrain from unfair and deceptive practices under the Pennsylvania UTPA in the course of their business. Specifically, Defendants owed Plaintiffs a duty to disclose all the material facts concerning the EcoDiesel® emission control system because they possessed exclusive knowledge, they intentionally concealed it from Plaintiffs, and/or they made misrepresentations that were rendered misleading because they were contradicted by withheld facts.

1955.   Plaintiffs suffered ascertainable loss and actual damages as a direct and proximate result of Defendants' concealment, misrepresentations, and/or failure to disclose material information.

1956.   Defendants' violations present a continuing risk to Plaintiffs, as well as to the general public. Defendants' unlawful acts and practices complained of herein affect the public interest.

1957.   Pursuant to 73 Pa. Stat. Ann. § 201-9.2(a), Plaintiffs seek an order enjoining Defendants' unfair and/or deceptive acts or practices, and awarding damages, punitive and/or treble damages, and any other just and proper relief available under the Pennsylvania UTPA.

## VIOLATION OF THE RHODE ISLAND DECEPTIVE
## TRADE PRACTICES ACT
### (R.I. Gen. Laws § 6-13.1, *et seq.*)

1958.   Plaintiffs incorporate by reference each preceding paragraph as though fully set forth herein.

1959.   Plaintiffs, to be named at a later date, (for the purpose of this section, "Plaintiffs") bring this action on behalf of Plaintiffs against all Defendants.

1960.   FCA, Fiat, VM Italy, VM America, Bosch GmbH, Bosch LLC, Sergio Marchionne, and Plaintiffs are "persons" within the meaning of R.I. Gen. Laws § 6-13.1-1(3).

1961.   FCA, Fiat, VM Italy, VM America, Bosch GmbH, Bosch LLC, and Sergio Marchionne are engaged in "trade" or "commerce" within the meaning of R.I. Gen. Laws § 6-13.1-1(5).

1962.   The Rhode Island Deceptive Trade Practices Act ("Rhode Island DTPA") prohibits "unfair or deceptive acts or practices in the conduct of any trade or commerce." R.I. Gen. Laws § 6-13.1-2.

1963.   In the course of their business, Defendants Fiat Chrysler, VM Motori, Bosch, and Marchionne, through their agents, employees, and/or subsidiaries, violated the Rhode Island DTPA.

1964.   As detailed in the common law fraud allegations: (1) Fiat Chrysler affirmatively misrepresented the environmental friendliness and emissions of the Subject Vehicles through the EcoDiesel badge—a material fact that was false because the Defendants developed and installed emission cheating components in the Subject Vehicles that caused them to pollute excessively in real-world conditions; (2) Fiat Chrysler touted, through the EcoDiesel badge and uniform and pervasive consumer communications, the Subject Vehicles' fuel efficiency and performance, and the Defendants concealed that the fuel efficiency and performance could be achieved only through emission control devices in the Subject Vehicles that caused them to pollute excessively in real-world conditions; and (3) the Defendants developed and installed emission cheating components that caused the Subject Vehicles to pollute excessively in real-world conditions, and fraudulently concealed that fact from regulators and Plaintiffs alike. *See, e.g.*, ¶¶ 149-216; 337-357. In so doing, and by marketing, offering for sale, and selling the defective Subject Vehicles, Defendants engaged in one or more of the following unfair or deceptive acts or practices as defined in R.I. Gen. Laws § 6-13.1-1(6):

517

A.  Causing likelihood of confusion or of misunderstanding as to the approval or certification of the Subject Vehicles;

B.  Representing that the Subject Vehicles have approval, characteristics, uses, or benefits that they do not have;

C.  Representing that the Subject Vehicles are of a particular standard, quality and grade when they are not;

D.  Advertising the Subject Vehicles with the intent not to sell or lease them as advertised; and/or

E.  Engaging in other conduct which created a likelihood of confusion or of misunderstanding.

1965.   Defendants' scheme and concealment of the true characteristics of the EcoDiesel® emission control system were material to the Plaintiffs, as Defendants intended. Had they known the truth, Plaintiffs would not have purchased or leased the Subject Vehicles, or—if the Subject Vehicles' true nature had been disclosed and mitigated, and the Vehicles rendered legal to sell— would have paid significantly less for them.

1966.   Plaintiffs members had no way of discerning that Defendants' representations were false and misleading, or otherwise learning the facts that Defendants had concealed or failed to disclose, because Defendants' emission control software was extremely sophisticated technology. Plaintiffs did not, and could not, unravel Defendants' deception on their own.

1967.   Defendants had an ongoing duty to the Plaintiffs to refrain from unfair and deceptive practices under the Rhode Island DTPA in the course of their business. Specifically, Defendants owed Plaintiffs a duty to disclose all the material facts concerning the EcoDiesel® emission control system because they possessed exclusive knowledge, they intentionally concealed it from the Plaintiffs, and/or they made misrepresentations that were rendered misleading because they were contradicted by withheld facts.

1968.   Plaintiffs suffered ascertainable loss and actual damages as a direct and proximate

result of Defendants' concealment, misrepresentations, and/or failure to disclose material information.

1969.   Defendants' violations present a continuing risk to the Plaintiffs, as well as to the general public. Defendants' unlawful acts and practices complained of herein affect the public interest.

1970.   Pursuant to R.I. Gen. Laws § 6-13.1-5.2(a), Plaintiffs seek an order enjoining Defendants' unfair and/or deceptive acts or practices, and awarding damages, punitive damages, and any other just and proper relief available under the Rhode Island DTPA.

### VIOLATIONS OF THE SOUTH CAROLINA UNFAIR TRADE PRACTICES ACT
### (S.C. Code Ann. § 39-5-10, *et seq.*)

1971.   Plaintiffs incorporate by reference each preceding paragraph as though fully set forth herein.

1972.   Plaintiffs, William Jones (for the purpose of this section, "Plaintiffs") bring this action on behalf of themselves against all Defendants.

1973.   FCA, Fiat, VM Italy, VM America, Bosch GmbH, Bosch LLC, Sergio Marchionne, and Plaintiffs are "persons" within the meaning of S.C. Code § 39-5-10(a).

1974.   FCA, Fiat, VM Italy, VM America, Bosch GmbH, Bosch LLC, and Sergio Marchionne are engaged in "trade" or "commerce" within the meaning of S.C. Code § 39-5- 10(b).

1975.   The South Carolina Unfair Trade Practices Act ("South Carolina UTPA") prohibits "unfair or deceptive acts or practices in the conduct of any trade or commerce." S.C. Code § 39-5-20(a).

1976.   In the course of their business, Defendants Fiat Chrysler, VM Motori, Bosch, and Marchionne, through their agents, employees, and/or subsidiaries, violated the South Carolina UTPA.

1977.   As detailed in the common law fraud allegations: (1) Fiat Chrysler affirmatively misrepresented the environmental friendliness and emissions of the Subject Vehicles through the EcoDiesel badge—a material fact that was false because the Defendants developed and installed emission cheating components in the Subject Vehicles that caused them to pollute excessively in real-world conditions; (2) Fiat Chrysler touted, through the EcoDiesel badge and uniform and pervasive consumer communications, the Subject Vehicles' fuel efficiency and performance, and the Defendants concealed that the fuel efficiency and performance could be achieved only through emission control devices in the Subject Vehicles that caused them to pollute excessively in real-world conditions; and (3) the Defendants developed and installed emission cheating components that caused the Subject Vehicles to pollute excessively in real-world conditions, and fraudulently concealed that fact from regulators and Plaintiffs alike. *See, e.g.*, ¶¶ 149-216; 337-357. In so doing, and by marketing, offering for sale, and selling the defective Subject Vehicles, Defendants engaged in one or more of the following unfair or deceptive acts or practices in violation of S.C. Code § 39-5-20(a):

> A.   Causing likelihood of confusion or of misunderstanding as to the approval or certification of the Subject Vehicles;
>
> B.   Representing that the Subject Vehicles have approval, characteristics, uses, or benefits that they do not have;
>
> C.   Representing that the Subject Vehicles are of a particular standard, quality and grade when they are not;
>
> D.   Advertising the Subject Vehicles with the intent not to sell or lease them as advertised;
>
> E.   Engaging in other conduct which created a likelihood of confusion or of misunderstanding; and/or
>
> F.   Using or employing deception, fraud, false pretense, false promise or misrepresentation, or the concealment, suppression or omission of a material fact with intent that others rely upon such concealment, suppression or omission, in connection with the advertisement and sale/lease of the Subject Vehicles, whether

or not any person has in fact been misled, deceived or damaged thereby.

1978.   Defendants' scheme and concealment of the true characteristics of the EcoDiesel®
emission control system were material to Plaintiffs, as Defendants intended. Had they known the
truth, Plaintiffs would not have purchased or leased the Subject Vehicles, or—if the Subject
Vehicles' true nature had been disclosed and mitigated, and the Vehicles rendered legal to sell—
would have paid significantly less for them.

1979.   Plaintiffs had no way of discerning that Defendants' representations were false and
misleading, or otherwise learning the facts that Defendants had concealed or failed to disclose,
because Defendants' emission control software was extremely sophisticated technology. Plaintiffs
did not, and could not, unravel Defendants' deception on their own.

1980.   Defendants had an ongoing duty to Plaintiffs to refrain from unfair and deceptive
practices under the South Carolina UTPA in the course of their business. Specifically, Defendants
owed Plaintiffs a duty to disclose all the material facts concerning the EcoDiesel® emission control
system because they possessed exclusive knowledge, they intentionally concealed it from
Plaintiffs, and/or they made misrepresentations that were rendered misleading because they were
contradicted by withheld facts.

1981.   Plaintiffs suffered ascertainable loss and actual damages as a direct and proximate
result of Defendants' concealment, misrepresentations, and/or failure to disclose material
information.

1982.   Defendants' violations present a continuing risk to Plaintiffs, as well as to the
general public. Defendants' unlawful acts and practices complained of herein affect the public
interest.

1983.   Pursuant to S.C. Code § 39-5-140(a), Plaintiffs seek an order enjoining Defendants'

unfair and/or deceptive acts or practices, and awarding damages, treble and/or punitive damages, and any other just and proper relief available under the South Carolina UTPA.

## VIOLATIONS OF THE SOUTH CAROLINA REGULATION OF MANUFACTURERS, DISTRIBUTORS, AND DEALERS ACT
### (S.C. Code Ann. § 56-15-10, *et seq*.)

1984.   Plaintiffs incorporate by reference each preceding paragraph as though fully set forth herein.

1985.   Plaintiffs, William Jones, (for the purpose of this section, "Plaintiffs") bring this action on behalf of themselves against FCA, Fiat, VM Italy, and VM America.

1986.   FCA, Fiat, VM Italy, and VM America are "manufacturer[s]" as set forth in S.C. Code Ann. § 56-15-10(b), as they were engaged in the business of manufacturing or assembling new and unused motor vehicles. FCA and Fiat are also "distributors" and/or "wholesalers" as set forth in S.C. Code Ann. § 56-15-10(g), (p).

1987.   The South Carolina Regulation of Manufacturers, Distributors, and Dealers Act ("Manufacturers Act") prohibits "unfair or deceptive acts or practices" as defined in S.C. Code Ann. § 56-15-40. S.C. Code Ann. § 56-15-30(a). Accordingly, the Manufacturers Act prohibits any manufacturer from engaging in bad faith and unconscionable actions that cause damage to the parties or the public; it also prohibits manufacturers from using false or misleading advertising in connection with their business. S.C. Code Ann. § 56-15-40(1), (3)(d).

1988.   FCA, Fiat, VM Italy, and VM America committed unfair or deceptive acts or practices that violated the Manufacturers Act.

1989.   As detailed in the common law fraud allegations: (1) Fiat Chrysler affirmatively misrepresented the environmental friendliness and emissions of the Subject Vehicles through the

EcoDiesel badge—a material fact that was false because the Defendants developed and installed emission cheating components in the Subject Vehicles that caused them to pollute excessively in real-world conditions; (2) Fiat Chrysler touted, through the EcoDiesel badge and uniform and pervasive consumer communications, the Subject Vehicles' fuel efficiency and performance, and the Defendants concealed that the fuel efficiency and performance could be achieved only through emission control devices in the Subject Vehicles that caused them to pollute excessively in real-world conditions; and (3) the Defendants developed and installed emission cheating components that caused the Subject Vehicles to pollute excessively in real-world conditions, and fraudulently concealed that fact from regulators and Plaintiffs alike. *See, e.g.*, ¶¶ 149-216; 337-357.

1990.   In so doing, Defendants committed bad faith and unconscionable actions including but not limited to: misrepresenting, concealing, and/or failing to disclose the true emissions and performance characteristics of the Subject Vehicles, and failing to disclose the Subject Vehicles' defective emissions control systems.

1991.   Defendants also violated the Manufacturers' Act by using false and misleading advertisements in connection with the sale and lease of Subject Vehicles. As alleged above, Defendants made numerous material statements about the safety, cleanliness, efficiency and reliability of the Subject Vehicles that were either false or misleading. Each of these statements— and the failure to disclose the truth—contributed to the deceptive context of Defendants' unlawful advertising and representations as a whole. Had they known the truth, Plaintiffs would not have purchased or leased the Subject Vehicles, or—if the Subject Vehicles' true nature had been disclosed and mitigated, and the Vehicles rendered legal to sell— would have paid significantly less for them.

1992.   Pursuant to S.C. Code Ann. § 56-15-110(2), Plaintiff brings this action on behalf

of themselves, as the action is one of common or general interest to many persons and the parties are too numerous to bring them all before the court.

1993.   Plaintiffs suffered ascertainable loss and actual damages as a direct and proximate result of Defendants' concealment, misrepresentations, and/or failure to disclose material information.

1994.   Plaintiffs are entitled to double their actual damages, the cost of the suit, attorney's fees pursuant to S.C. Code Ann. § 56-15-110. Plaintiff also seeks injunctive relief under S.C. Code Ann. § 56-15-110. Plaintiff also seeks treble damages because the Defendants acted maliciously.

### VIOLATION OF THE SOUTH DAKOTA DECEPTIVE TRADE PRACTICES AND CONSUMER PROTECTION LAW (S.D. Codified Laws § 37-24-6)

1995.   Plaintiffs incorporate by reference each preceding paragraph as though fully set forth herein.

1996.   Plaintiffs, Thomas Gengler, Nicholas Selchert, (for the purpose of this section, "Plaintiffs") bring this action on behalf of themselves against all Defendants.

1997.   FCA, Fiat, VM Italy, VM America, Bosch GmbH, Bosch LLC, Sergio Marchionne, and Plaintiffs are "persons" within the meaning of S.D. Codified Laws § 37-24-1(8).

1998.   FCA, Fiat, VM Italy, VM America, Bosch GmbH, Bosch LLC, and Sergio Marchionne are engaged in "trade" or "commerce" within the meaning of S.D. Codified Laws § 37-24-1(13).

1999.   The South Dakota Deceptive Trade Practices and Consumer Protection ("South Dakota CPA") prohibits "deceptive acts or practices, which are defined to include "[k]nowingly act, use, or employ any deceptive act or practice, fraud, false pretense, false promises, or misrepresentation or to conceal, suppress, or omit any material fact in connection with the sale or

advertisement of any merchandise, regardless of whether any person has in fact been misled, deceived, or damaged thereby." S.D. Codified Laws § 37-24-6(1).

2000.   In the course of their business, Defendants Fiat Chrysler, VM Motori, Bosch, and Marchionne, through their agents, employees, and/or subsidiaries, violated the South Dakota CPA.

2001.   As detailed in the common law fraud allegations: (1) Fiat Chrysler affirmatively misrepresented the environmental friendliness and emissions of the Subject Vehicles through the EcoDiesel badge—a material fact that was false because the Defendants developed and installed emission cheating components in the Subject Vehicles that caused them to pollute excessively in real-world conditions; (2) Fiat Chrysler touted, through the EcoDiesel badge and uniform and pervasive consumer communications, the Subject Vehicles' fuel efficiency and performance, and the Defendants concealed that the fuel efficiency and performance could be achieved only through emission control devices in the Subject Vehicles that caused them to pollute excessively in real-world conditions; and (3) the Defendants developed and installed emission cheating components that caused the Subject Vehicles to pollute excessively in real-world conditions, and fraudulently concealed that fact from regulators and Plaintiffs alike. *See, e.g.*, ¶¶ 149-216; 337-357. In so doing, and by marketing, offering for sale, and selling the defective Subject Vehicles, Defendants used or employed deception, fraud, false pretense, false promise or misrepresentation, or the concealment, suppression or omission of a material fact with intent that others rely upon such concealment, suppression or omission, in connection with the advertisement and sale/lease of the Subject Vehicles.

2002.   Defendants' scheme and concealment of the true characteristics of the EcoDiesel® emission control system were material to Plaintiffs, as Defendants intended. Had they known the truth, Plaintiffs would not have purchased or leased the Subject Vehicles, or—if the Subject

Vehicles' true nature had been disclosed and mitigated, and the Vehicles rendered legal to sell—would have paid significantly less for them.

2003.   Plaintiffs had no way of discerning that Defendants' representations were false and misleading, or otherwise learning the facts that Defendants had concealed or failed to disclose, because Defendants' emission control software was extremely sophisticated technology. Plaintiffs did not, and could not, unravel Defendants' deception on their own.

2004.   Defendants had an ongoing duty to Plaintiffs to refrain from unfair and deceptive practices under the South Dakota CPA in the course of their business. Specifically, Defendants owed Plaintiffs a duty to disclose all the material facts concerning the EcoDiesel® emission control system because they possessed exclusive knowledge, they intentionally concealed it from Plaintiffs, and/or they made misrepresentations that were rendered misleading because they were contradicted by withheld facts.

2005.   Plaintiffs suffered ascertainable loss and actual damages as a direct and proximate result of Defendants' concealment, misrepresentations, and/or failure to disclose material information.

2006.   Defendants' violations present a continuing risk to Plaintiffs, as well as to the general public. Defendants' unlawful acts and practices complained of herein affect the public interest.

2007.   Pursuant to S.D. Codified Laws § 37-24-31, Plaintiffs seek an order enjoining Defendants' unfair and/or deceptive acts or practices, and awarding damages and any other just and proper relief available under the South Dakota CPA.

**VIOLATIONS OF TENNESSEE CONSUMER
PROTECTION ACT OF 1977
(Tenn. Code Ann. § 47-18-101, *et seq.*)**

526

2008.   Plaintiffs incorporate by reference each preceding paragraph as though fully set forth herein.

2009.   Plaintiffs, Bejamin Matthews, (for the purpose of this section, "Plaintiffs") bring this action on behalf of themselves against all Defendants.

2010.   Plaintiffs are "natural persons" and "consumers" within the meaning of Tenn. Code § 47-18-103(2).

2011.   FCA, Fiat, VM Italy, VM America, Bosch GmbH, Bosch LLC, and Sergio Marchionne are engaged in "trade" or "commerce" or "consumer transactions" within the meaning Tenn. Code § 47-18-103(9).

2012.   The Tennessee Consumer Protection Act ("Tennessee CPA") prohibits "unfair or deceptive acts or practices affecting the conduct of any trade or commerce." Tenn. Code § 47-18-104.

2013.   In the course of their business, Defendants Fiat Chrysler, VM Motori, Bosch, and Marchionne, through their agents, employees, and/or subsidiaries, violated the Tennessee CPA.

2014.   As detailed in the common law fraud allegations: (1) Fiat Chrysler affirmatively misrepresented the environmental friendliness and emissions of the Subject Vehicles through the EcoDiesel badge—a material fact that was false because the Defendants developed and installed emission cheating components in the Subject Vehicles that caused them to pollute excessively in real-world conditions; (2) Fiat Chrysler touted, through the EcoDiesel badge and uniform and pervasive consumer communications, the Subject Vehicles' fuel efficiency and performance, and the Defendants concealed that the fuel efficiency and performance could be achieved only through emission control devices in the Subject Vehicles that caused them to pollute excessively in real-world conditions; and (3) the Defendants developed and installed emission cheating components

that caused the Subject Vehicles to pollute excessively in real-world conditions, and fraudulently concealed that fact from regulators and Plaintiffs alike. *See, e.g.*, ¶¶ 149-216; 337-357. In so doing, and by marketing, offering for sale, and selling the defective Subject Vehicles, Defendants engaged in one or more of the following unfair or deceptive acts or practices as defined in Tenn. Code § 47-18-104:

    A.  Causing likelihood of confusion or of misunderstanding as to the approval or certification of the Subject Vehicles;

    B.  Representing that the Subject Vehicles have approval, characteristics, uses, or benefits that they do not have;

    C.  Representing that the Subject Vehicles are of a particular standard, quality and grade when they are not;

    D.  Advertising the Subject Vehicles with the intent not to sell or lease them as advertised; and/or

    E.  Engaging in other conduct which created a likelihood of confusion or of misunderstanding.

2015.   Defendants' scheme and concealment of the true characteristics of the EcoDiesel® emission control system were material to Plaintiffs, as Defendants intended. Had they known the truth, Plaintiffs would not have purchased or leased the Subject Vehicles, or—if the Subject Vehicles' true nature had been disclosed and mitigated, and the Vehicles rendered legal to sell— would have paid significantly less for them.

2016.   Plaintiffs had no way of discerning that Defendants' representations were false and misleading, or otherwise learning the facts that Defendants had concealed or failed to disclose, because Defendants' emission control software was extremely sophisticated technology. Plaintiffs did not, and could not, unravel Defendants' deception on their own.

2017.   Defendants had an ongoing duty to Plaintiffs to refrain from unfair and deceptive practices under the Tennessee CPA in the course of their business. Specifically, Defendants owed

Plaintiffs a duty to disclose all the material facts concerning the EcoDiesel® emission control system because they possessed exclusive knowledge, they intentionally concealed it from Plaintiffs, and/or they made misrepresentations that were rendered misleading because they were contradicted by withheld facts.

2018.   Plaintiffs suffered ascertainable loss and actual damages as a direct and proximate result of Defendants' concealment, misrepresentations, and/or failure to disclose material information.

2019.   Defendants' violations present a continuing risk to Plaintiffs, as well as to the general public. Defendants' unlawful acts and practices complained of herein affect the public interest.

2020.   Pursuant to Tenn. Code §§ 47-18-109, 47-18-109, and 47-18-109(a)(3), Plaintiffs seek an order enjoining Defendants' unfair and/or deceptive acts or practices, and awarding damages, treble or punitive damages, and any other just and proper relief available under the Tennessee CPA.

## VIOLATIONS OF THE DECEPTIVE TRADE PRACTICES ACT – CONSUMER PROTECTION ACT
### (Tex. Business & Commercial Code §§ 17.41, *et seq.*)

2021.   Plaintiffs incorporate by reference each preceding paragraph as though fully set forth herein.

2022.   Plaintiffs, Robert Thomas, Ronda and Rick Brewer, Tracena Colunga, Steven Avery, Chris & Carrie Frank, Lindsey Smith, Robert Acevedo, Greg A. Gouker, Kressy Carlile, Antiman Salinas, Scott and Nancy Eastland, Cody and Shellie Stephens, Brian Gray, Don and Margaret Vincent, William Barnett, (for the purpose of this section, "Plaintiffs") bring this action on behalf of themselves against all Defendants.

2023.   Plaintiffs are individuals, partnerships, or corporations with assets of less than $25 million (or are controlled by corporations or entities with less than $25 million in assets), see Tex. Bus. & Com. Code § 17.41, and are therefore "consumers" pursuant to Tex. Bus. & Com. Code § 17.45(4).

2024.   FCA, Fiat, VM Italy, VM America, Bosch GmbH, Bosch LLC, and Sergio Marchionne are "person[s]" within the meaning of Tex. Bus. & Com. Code § 17.45(3).

2025.   FCA, Fiat, VM Italy, VM America, Bosch GmbH, Bosch LLC, and Sergio Marchionne are engaged in "trade" or "commerce" or "consumer transactions" within the meaning Tex. Bus. & Com. Code § 17.46(a).

2026.   The Texas Deceptive Trade Practices – Consumer Protection Act ("Texas DTPA") prohibits "false, misleading, or deceptive acts or practices in the conduct of any trade or commerce," Tex. Bus. & Com. Code § 17.46(a), and an "unconscionable action or course of action," which means "an act or practice which, to a consumer's detriment, takes advantage of the lack of knowledge, ability, experience, or capacity of the consumer to a grossly unfair degree." Tex. Bus. & Com. Code §§ 17.45(5) and 17.50(a)(3).

2027.   In the course of their business, Defendants Fiat Chrysler, VM Motori, Bosch, and Marchionne, through their agents, employees, and/or subsidiaries, violated the Texas DTPA.

2028.   As detailed in the common law fraud allegations: (1) Fiat Chrysler affirmatively misrepresented the environmental friendliness and emissions of the Subject Vehicles through the EcoDiesel badge—a material fact that was false because the Defendants developed and installed emission cheating components in the Subject Vehicles that caused them to pollute excessively in real-world conditions; (2) Fiat Chrysler touted, through the EcoDiesel badge and uniform and pervasive consumer communications, the Subject Vehicles' fuel efficiency and performance, and

the Defendants concealed that the fuel efficiency and performance could be achieved only through emission control devices in the Subject Vehicles that caused them to pollute excessively in real-world conditions; and (3) the Defendants developed and installed emission cheating components that caused the Subject Vehicles to pollute excessively in real-world conditions, and fraudulently concealed that fact from regulators and Plaintiffs alike. *See, e.g.*, ¶¶ 149-216; 337-357. In so doing, and by marketing, offering for sale, and selling the defective Subject Vehicles, Defendants engaged in one or more of the following unfair or deceptive acts or practices as defined in Tex. Bus. & Com. Code § 17.46(a):

> A.  Causing likelihood of confusion or of misunderstanding as to the approval or certification of the Subject Vehicles;
>
> B.  Representing that the Subject Vehicles have approval, characteristics, uses, or benefits that they do not have;
>
> C.  Representing that the Subject Vehicles are of a particular standard, quality and grade when they are not; and/or
>
> D.  Advertising the Subject Vehicles with the intent not to sell or lease them as advertised.

2029.   Defendants' scheme and concealment of the true characteristics of the EcoDiesel® emission control system were material to Plaintiffs, as Defendants intended. Had they known the truth, Plaintiffs would not have purchased or leased the Subject Vehicles, or—if the Subject Vehicles' true nature had been disclosed and mitigated, and the Vehicles rendered legal to sell—would have paid significantly less for them.

2030.   Plaintiffs had no way of discerning that Defendants' representations were false and misleading, or otherwise learning the facts that Defendants had concealed or failed to disclose, because Defendants' emission control software was extremely sophisticated technology. Plaintiffs did not, and could not, unravel Defendants' deception on their own.

2031.   Defendants had an ongoing duty to Plaintiffs to refrain from unfair and deceptive

practices under the Texas DTPA in the course of their business. Specifically, Defendants owed Plaintiffs a duty to disclose all the material facts concerning the EcoDiesel® emission control system because they possessed exclusive knowledge, they intentionally concealed it from Plaintiffs, and/or they made misrepresentations that were rendered misleading because they were contradicted by withheld facts.

2032.   Plaintiffs suffered ascertainable loss and actual damages as a direct and proximate result of Defendants' concealment, misrepresentations, and/or failure to disclose material information.

2033.   Defendants' violations present a continuing risk to Plaintiffs, as well as to the general public. Defendants' unlawful acts and practices complained of herein affect the public interest.

2034.   Pursuant to Tex. Bus. & Com. Code §§ 17.50 and 17.50(b)(1), Plaintiffs seek an order enjoining Defendants' unfair and/or deceptive acts or practices, and awarding damages, punitive damages, and any other just and proper relief available under the Texas DTPA.

2035.   Per the State Pre-suit requirements notifications have been prepared to FCA US LLC complying with Tex. Bus. & Com. Code § 17.505(a). All Defendants were provided notice of the issues raised in this count and this Complaint by the governmental investigations, the numerous complaints filed against them, and the many individual notice letters sent by Plaintiffs within a reasonable amount of time after the allegations of Subject Vehicle defects became public. Because Defendants failed to remedy their unlawful conduct within the requisite time period, Plaintiffs seek all damages and relief to which Plaintiffs are entitled.

### VIOLATION OF UTAH CONSUMER SALES PRACTICES ACT
#### (Utah Code Ann. § 13-11-1, *et seq.*)

2036.   Plaintiffs incorporate by reference each preceding paragraph as though fully set

forth herein.

2037. Plaintiffs, Tom Sayers, Yuriy Mayurov, Robert and Darla Jones, (for the purpose of this section, "Plaintiff") brings this action on behalf of themselves against Fiat and FCA.

2038. FCA and FIAT are "supplier[s]" within the meaning of Utah Code § 13-11-3(6).

2039. Plaintiff are "persons" under Utah Code § 13-11-3(5).

2040. The sales and leases of the Subject Vehicles to the Plaintiffs were "consumer transactions" within the meaning of Utah Code § 13-11-3(2).

2041. The Utah Consumer Sales Practices Act ("Utah CSPA") makes unlawful any "deceptive act or practice by a supplier in connection with a consumer transaction." Utah Code § 13-11-4. "An unconscionable act or practice by a supplier in connection with a consumer transaction" also violates the Utah CSPA. Utah Code § 13-11-5.

2042. In connection with a consumer transaction, Fiat and FCA, through their agents, employees, and/or subsidiaries, violated the Utah CSPA.

2043. As detailed in the common law fraud allegations: (1) Fiat Chrysler affirmatively misrepresented the environmental friendliness and emissions of the Subject Vehicles through the EcoDiesel badge—a material fact that was false because the Defendants developed and installed emission cheating components in the Subject Vehicles that caused them to pollute excessively in real-world conditions; (2) Fiat Chrysler touted, through the EcoDiesel badge and uniform and pervasive consumer communications, the Subject Vehicles' fuel efficiency and performance, and the Defendants concealed that the fuel efficiency and performance could be achieved only through emission control devices in the Subject Vehicles that caused them to pollute excessively in real-world conditions; and (3) the Defendants developed and installed emission cheating components that caused the Subject Vehicles to pollute excessively in real-world conditions, and fraudulently

concealed that fact from regulators and Plaintiffs alike. *See, e.g.*, ¶¶ 149-216; 337-357. In so doing, Fiat and FCA engaged in one or more of the following unfair or deceptive acts or practices as defined in Utah Code § 13-11-4:

    A.  Indicating that the Subject Vehicles have approval, characteristics, uses, or benefits that they do not have;

    B.  Indicating that the Subject Vehicles are of a particular standard, quality and grade when they are not; and/or

    C.  Indicating that the Subject Vehicles were supplied in accordance with Defendants' prior representations, although they were not as represented.

2044.   Plaintiffs suffered ascertainable loss and actual damages as a direct and proximate result of Defendants' concealment, misrepresentations, and/or failure to disclose material information.

2045.   Defendants' violations present a continuing risk to Plaintiff, as well as to the general public. Defendants' unlawful acts and practices complained of herein affect the public interest.

2046.   Plaintiffs seek an order enjoining Defendants' unfair and/or deceptive acts or practices, and awarding damages and any other just and proper relief available under the Utah CSPA.

## VIOLATION OF UTAH TRUTH IN ADVERTISING LAW
### (Utah Code Ann. § 13-11a-1, *et seq.*)

2047.   Plaintiffs incorporate by reference each preceding paragraph as though fully set forth herein.

2048.   Plaintiff, Tom Sayers, Yuriy Mayurov, (for the purpose of this section, "Plaintiff") brings this action on behalf of themselves against all Defendants.

2049.   Plaintiffs, FCA, Fiat, VM Italy, VM America, Bosch GmbH, Bosch LLC, and

Sergio Marchionne are "person[s]" within the meaning of Utah Code § 13-11a- 1(7).

2050.   Utah's Truth In Advertising law makes unlawful any deceptive practice undertaken in the course of a person's business. Utah Code § 13-11a-3.

2051.   In the course of their business, FCA, Fiat, VM Italy, VM America, Bosch GmbH, Bosch LLC, and Sergio Marchionne, through their agents, employees, and/or subsidiaries, violated Utah Truth In Advertising Law.

2052.   As detailed in the common law fraud allegations: (1) Fiat Chrysler affirmatively misrepresented the environmental friendliness and emissions of the Subject Vehicles through the EcoDiesel badge—a material fact that was false because the Defendants developed and installed emission cheating components in the Subject Vehicles that caused them to pollute excessively in real-world conditions; (2) Fiat Chrysler touted, through the EcoDiesel badge and uniform and pervasive consumer communications, the Subject Vehicles' fuel efficiency and performance, and the Defendants concealed that the fuel efficiency and performance could be achieved only through emission control devices in the Subject Vehicles that caused them to pollute excessively in real-world conditions; and (3) the Defendants developed and installed emission cheating components that caused the Subject Vehicles to pollute excessively in real-world conditions, and fraudulently concealed that fact from regulators and Plaintiffs alike. *See, e.g.*, ¶¶ 149-216; 337-357. In so doing, and by marketing, offering for sale, and selling the defective Subject Vehicles, Defendants engaged in one or more of the following unfair or deceptive acts or practices as defined in Utah Code § 13-11a-3:

A.  Causing likelihood of confusion or of misunderstanding as to the approval or certification of the Subject Vehicles;

B.  Representing that the Subject Vehicles have approval, characteristics, uses, or benefits that they do not have;

C.  Representing that the Subject Vehicles are of a particular standard, quality and grade when they are not;

D.  Advertising the Subject Vehicles with the intent not to sell or lease them as advertised; and/or

E.  Engaging in other conduct which created a likelihood of confusion or of misunderstanding about the true characteristics of the Subject Vehicles.

2053.   Defendants' scheme and concealment of the true characteristics of the EcoDiesel® emission control system were material to Plaintiff, as Defendants intended. Had they known the truth, Plaintiff would not have purchased or leased the Subject Vehicles, or—if the Subject Vehicles' true nature had been disclosed and mitigated, and the Vehicles rendered legal to sell— would have paid significantly less for them.

2054.   Plaintiffs had no way of discerning that Defendants' representations were false and misleading, or otherwise learning the facts that Defendants had concealed or failed to disclose, because Defendants' emission control software was extremely sophisticated technology. Plaintiffs did not, and could not, unravel Defendants' deception on their own.

2055.   Defendants had an ongoing duty to Plaintiffs to refrain from unfair and deceptive practices in the course of their business. Specifically, Defendants owed Plaintiffs a duty to disclose all the material facts concerning the EcoDiesel® emission control system because they possessed exclusive knowledge, they intentionally concealed it from Plaintiff, and/or they made misrepresentations that were rendered misleading because they were contradicted by withheld facts.

2056.   Plaintiffs suffered ascertainable loss and actual damages as a direct and proximate result of Defendants' concealment, misrepresentations, and/or failure to disclose material information.

2057.   Defendants' violations present a continuing risk to Plaintiff, as well as to the

536

general public. Defendants' unlawful acts and practices complained of herein affect the public interest.

2058.   Plaintiffs seek an order enjoining Defendants' unfair and/or deceptive acts or practices pursuant to Utah Code Ann. § 13-11a-4, and awarding damages, punitive damages, and any other just and proper relief available under the Utah Truth In Advertising law.

## VIOLATION OF VERMONT CONSUMER PROTECTION ACT
### (Vt. Stat. Ann. Tit. 9, § 2451 *et seq.*)

2059.   Plaintiffs incorporate by reference each preceding paragraph as though fully set forth herein.

2060.   Plaintiffs, to be named at a later date, (for the purpose of this section, "Plaintiff") brings this action on behalf of the Plaintiffs against all Defendants.

2061.   FCA, Fiat, VM Italy, VM America, Bosch GmbH, Bosch LLC, and Sergio Marchionne and Plaintiffs are "persons" within the meaning of Vt. Stat. Tit. 9, § 2451a(a). Plaintiffs are "consumers" within the meaning of Vt. Stat. Tit. 9, § 2451a(a).

2062.   FCA, Fiat, VM Italy, VM America, Bosch GmbH, Bosch LLC, and Sergio Marchionne are engaged in "commerce" within the meaning of Vt. Stat. Tit. 9, § 2453(a).

2063.   The Vermont Consumer Protection Act ("Vermont CPA") prohibits "[u]nfair methods of competition in commerce and unfair or deceptive acts or practices in commerce…." Vt. Stat. Tit. 9, § 2453(a).

2064.   In the course of their business, Defendants Fiat Chrysler, VM Motori, Bosch, and Marchionne, through their agents, employees, and/or subsidiaries, violated the Vermont CPA.

2065.   As detailed in the common law fraud allegations: (1) Fiat Chrysler affirmatively misrepresented the environmental friendliness and emissions of the Subject Vehicles through the EcoDiesel badge—a material fact that was false because the Defendants developed and installed

537

emission cheating components in the Subject Vehicles that caused them to pollute excessively in real-world conditions; (2) Fiat Chrysler touted, through the EcoDiesel badge and uniform and pervasive consumer communications, the Subject Vehicles' fuel efficiency and performance, and the Defendants concealed that the fuel efficiency and performance could be achieved only through emission control devices in the Subject Vehicles that caused them to pollute excessively in real-world conditions; and (3) the Defendants developed and installed emission cheating components that caused the Subject Vehicles to pollute excessively in real-world conditions, and fraudulently concealed that fact from regulators and Plaintiffs alike. *See, e.g.*, ¶¶ 149-216; 337-357. In so doing, and by marketing, offering for sale, and selling the defective Subject Vehicles, Defendants engaged in one or more of the following unfair or deceptive acts or practices in violation of Vt. Stat. Tit. 9, § 2453(a):

A.  Causing likelihood of confusion or of misunderstanding as to the approval or certification of the Subject Vehicles;

B.  Representing that the Subject Vehicles have approval, characteristics, uses, or benefits that they do not have;

C.  Representing that the Subject Vehicles are of a particular standard, quality and grade when they are not;

D.  Advertising the Subject Vehicles with the intent not to sell or lease them as advertised;

E.  Engaging in other conduct which created a likelihood of confusion or of misunderstanding; and/or

F.  Using or employing deception, fraud, false pretense, false promise or misrepresentation, or the concealment, suppression or omission of a material fact with intent that others rely upon such concealment, suppression or omission, in connection with the advertisement and sale/lease of the Subject Vehicles, whether or not any person has in fact been misled, deceived or damaged thereby.

2066.   Defendants' scheme and concealment of the true characteristics of the EcoDiesel® emission control system were material to the Plaintiffs, as Defendants intended. Had they known

the truth, the Plaintiffs would not have purchased or leased the Subject Vehicles, or—if the Subject Vehicles' true nature had been disclosed and mitigated, and the Vehicles rendered legal to sell—would have paid significantly less for them.

2067.   Plaintiffs had no way of discerning that Defendants' representations were false and misleading, or otherwise learning the facts that Defendants had concealed or failed to disclose, because Defendants' emission control software was extremely sophisticated technology. Plaintiffs did not, and could not, unravel Defendants' deception on their own.

2068.   Defendants had an ongoing duty to the Plaintiffs to refrain from unfair and deceptive practices under the Vermont CPA in the course of their business. Specifically, Defendants owed Plaintiffs a duty to disclose all the material facts concerning the EcoDiesel® emission control system because they possessed exclusive knowledge, they intentionally concealed it from the Plaintiffs, and/or they made misrepresentations that were rendered misleading because they were contradicted by withheld facts.

2069.   Plaintiffs suffered ascertainable loss and actual damages as a direct and proximate result of Defendants' concealment, misrepresentations, and/or failure to disclose material information.

2070.   Defendants' violations present a continuing risk to the Plaintiffs, as well as to the general public. Defendants' unlawful acts and practices complained of herein affect the public interest.

2071.   Pursuant to Vt. Stat. Tit. 9, § 2461(b), the Plaintiffs seek an order enjoining Defendants' unfair and/or deceptive acts or practices, and awarding damages, exemplary damages, and any other just and proper relief available under the Vermont CPA.

### VIOLATIONS OF THE VIRGINIA CONSUMER PROTECTION ACT
#### (Va. Code Ann. §§ 59.1-196, *et seq.*)

2072.   Plaintiffs incorporate by reference each preceding paragraph as though fully set forth herein.

2073.   Plaintiffs, Annabel and Jerry Gibson, Gary Smith, Matthew Robertson, (for the purpose of this section, "Plaintiffs") bring this action on behalf of themselves against all Defendants.

2074.   FCA, Fiat, VM Italy, VM America, Bosch GmbH, Bosch LLC, Sergio Marchionne, and Plaintiffs are "persons" within the meaning of Va. Code § 59.1-198.

2075.   FCA, Fiat, VM Italy, VM America, Bosch GmbH, Bosch LLC, and Marchionne are "supplier[s]" within the meaning of Va. Code § 59.1-198.

2076.   The Virginia Consumer Protection Act ("Virginia CPA") makes unlawful "fraudulent acts or practices." Va. Code § 59.1-200(A).

2077.   In the course of their business, Defendants Fiat Chrysler, VM Motori, Bosch, and Marchionne, through their agents, employees, and/or subsidiaries, violated the Virginia CPA.

2078.   As detailed in the common law fraud allegations: (1) Fiat Chrysler affirmatively misrepresented the environmental friendliness and emissions of the Subject Vehicles through the EcoDiesel badge—a material fact that was false because the Defendants developed and installed emission cheating components in the Subject Vehicles that caused them to pollute excessively in real-world conditions; (2) Fiat Chrysler touted, through the EcoDiesel badge and uniform and pervasive consumer communications, the Subject Vehicles' fuel efficiency and performance, and the Defendants concealed that the fuel efficiency and performance could be achieved only through emission control devices in the Subject Vehicles that caused them to pollute excessively in real-world conditions; and (3) the Defendants developed and installed emission cheating components that caused the Subject Vehicles to pollute excessively in real-world conditions, and fraudulently

concealed that fact from regulators and Plaintiffs alike. *See, e.g.*, ¶¶ 149-216; 337-357. In so doing, and by marketing, offering for sale, and selling the defective Subject Vehicles, Defendants engaged in one or more of the following unfair or deceptive acts or practices as defined in Va. Code § 59.1-200(A):

> A.  Representing that the Subject Vehicles have approval, characteristics, uses, or benefits that they do not have;
>
> B.  Representing that the Subject Vehicles are of a particular standard, quality and grade when they are not; and/or
>
> C.  Advertising the Subject Vehicles with the intent not to sell or lease them as advertised.

2079.   Defendants' scheme and concealment of the true characteristics of the EcoDiesel® emission control system were material to Plaintiffs, as Defendants intended. Had they known the truth, Plaintiffs would not have purchased or leased the Subject Vehicles, or—if the Subject Vehicles' true nature had been disclosed and mitigated, and the Vehicles rendered legal to sell— would have paid significantly less for them.

2080.   Plaintiffs had no way of discerning that Defendants' representations were false and misleading, or otherwise learning the facts that Defendants had concealed or failed to disclose, because Defendants' emission control software was extremely sophisticated technology. Plaintiffs did not, and could not, unravel Defendants' deception on their own.

2081.   Defendants had an ongoing duty to Plaintiffs to refrain from unfair and deceptive practices under the Virginia CPA in the course of their business. Specifically, Defendants owed Plaintiffs a duty to disclose all the material facts concerning the EcoDiesel® emission control system because they possessed exclusive knowledge, they intentionally concealed it from Plaintiffs, and/or they made misrepresentations that were rendered misleading because they were contradicted by withheld facts.

2082.   Plaintiffs suffered ascertainable loss and actual damages as a direct and proximate result of Defendants' concealment, misrepresentations, and/or failure to disclose material information.

2083.   Defendants' violations present a continuing risk to Plaintiffs, as well as to the general public. Defendants' unlawful acts and practices complained of herein affect the public interest.

2084.   Pursuant to Va. Code § 59.1-204(A)–(B), Plaintiffs seek an order enjoining Defendants' unfair and/or deceptive acts or practices, and awarding damages, punitive damages, and any other just and proper relief available under the Virginia CPA.

## VIOLATIONS OF THE WASHINGTON CONSUMER PROTECTION ACT
### (Wash. Rev. Code Ann. §§ 19.86.010, et seq.)

2085.   Plaintiffs incorporate by reference each preceding paragraph as though fully set forth herein.

2086.   Plaintiffs, Brian Lencho, Richard and Susan Bladl, Theodore Klein, Zina Bryson, (for the purpose of this section, "Plaintiffs") bring this action on behalf of themselves against all Defendants.

2087.   FCA, Fiat, VM Italy, VM America, Bosch GmbH, Bosch LLC, Sergio Marchionne, and Plaintiffs are "persons" within the meaning of Wash. Rev. Code §19.86.010(2).

2088.   FCA, Fiat, VM Italy, VM America, Bosch GmbH, Bosch LLC, and Marchionne are engaged in "trade" or "commerce" within the meaning of Wash. Rev. Code § 19.86.010(1).

2089.   The Washington Consumer Protection Act ("Washington CPA") makes unlawful "[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce." Wash. Rev. Code § 19.86.020.

2090.   In the course of their business, Defendants Fiat Chrysler, VM Motori, Bosch, and

542

Marchionne, through their agents, employees, and/or subsidiaries, violated the Washington CPA.

2091.   As detailed in the common law fraud allegations: (1) Fiat Chrysler affirmatively misrepresented the environmental friendliness and emissions of the Subject Vehicles through the EcoDiesel badge—a material fact that was false because the Defendants developed and installed emission cheating components in the Subject Vehicles that caused them to pollute excessively in real-world conditions; (2) Fiat Chrysler touted, through the EcoDiesel badge and uniform and pervasive consumer communications, the Subject Vehicles' fuel efficiency and performance, and the Defendants concealed that the fuel efficiency and performance could be achieved only through emission control devices in the Subject Vehicles that caused them to pollute excessively in real-world conditions; and (3) the Defendants developed and installed emission cheating components that caused the Subject Vehicles to pollute excessively in real-world conditions, and fraudulently concealed that fact from regulators and Plaintiffs alike. *See, e.g.*, ¶¶ 149-216; 337-357. In so doing, and by marketing, offering for sale, and selling the defective Subject Vehicles, Defendants engaged in one or more of the following unfair or deceptive acts or practices in violation of Wash. Rev. Code § 19.86.020:

> A.   Causing likelihood of confusion or of misunderstanding as to the approval or certification of the Subject Vehicles;
>
> B.   Representing that the Subject Vehicles have approval, characteristics, uses, or benefits that they do not have;
>
> C.   Representing that the Subject Vehicles are of a particular standard, quality and grade when they are not;
>
> D.   Advertising the Subject Vehicles with the intent not to sell or lease them as advertised;
>
> E.   Engaging in other conduct which created a likelihood of confusion or of misunderstanding; and/or
>
> F.   Using or employing deception, fraud, false pretense, false promise or misrepresentation, or the concealment, suppression or omission of a material fact

with intent that others rely upon such concealment, suppression or omission, in connection with the advertisement and sale/lease of the Subject Vehicles, whether or not any person has in fact been misled, deceived or damaged thereby.

2092.   Defendants' scheme and concealment of the true characteristics of the EcoDiesel® emission control system were material to Plaintiffs, as Defendants intended. Had they known the truth, Plaintiffs would not have purchased or leased the Subject Vehicles, or—if the Subject Vehicles' true nature had been disclosed and mitigated, and the Vehicles rendered legal to sell— would have paid significantly less for them.

2093.   Plaintiffs had no way of discerning that Defendants' representations were false and misleading, or otherwise learning the facts that Defendants had concealed or failed to disclose, because Defendants' emission control software was extremely sophisticated technology. Plaintiffs did not, and could not, unravel Defendants' deception on their own.

2094.   Defendants had an ongoing duty to Plaintiffs to refrain from unfair and deceptive practices under the Washington CPA in the course of their business. Specifically, Defendants owed Plaintiffs a duty to disclose all the material facts concerning the EcoDiesel® emission control system because they possessed exclusive knowledge, they intentionally concealed it from Plaintiffs, and/or they made misrepresentations that were rendered misleading because they were contradicted by withheld facts.

2095.   Plaintiffs suffered ascertainable loss and actual damages as a direct and proximate result of Defendants' concealment, misrepresentations, and/or failure to disclose material information.

2096.   Defendants' violations present a continuing risk to Plaintiffs, as well as to the general public. Defendants' unlawful acts and practices complained of herein affect the public interest.

2097.   Pursuant to Wash. Rev. Code § 19.86.090, Plaintiffs seek an order enjoining Defendants' unfair and/or deceptive acts or practices, and awarding damages, treble damages, and any other just and proper relief available under the Washington CPA.

## VIOLATIONS OF THE CONSUMER CREDIT AND PROTECTION ACT
### (W. Va. Code § 46A-1-101, *et seq*.)

2098.   Plaintiffs incorporate by reference each preceding paragraph as though fully set forth herein.

2099.   Plaintiffs, Bernice Graham, Nicholas DeJohn, Samuel Robinson, Samuel Robinson, Michael L. Goff, (for the purpose of this section, "Plaintiffs") bring this action on behalf of the Plaintiffs against all Defendants.

2100.   FCA, Fiat, VM Italy, VM America, Bosch GmbH, Bosch LLC, Sergio Marchionne, and Plaintiffs are "persons" within the meaning of W. Va. Code § 46A-1-102(31). The Plaintiffs are "consumers" within the meaning of W. Va. Code §§ 46A-6-102(2) and 46A-1-102(12).

2101.   FCA, Fiat, VM Italy, VM America, Bosch GmbH, Bosch LLC, and Sergio Marchionne are engaged in "trade" or "commerce" within the meaning of W. Va. Code § 46A-6-102(6).

2102.   The West Virginia Consumer Credit and Protection Act ("West Virginia CCPA") makes unlawful "[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce." W. Va. Code § 46A-6-104.

2103.   In the course of their business, Defendants Fiat Chrysler, VM Motori, Bosch, and Sergio Marchionne, through their agents, employees, and/or subsidiaries, violated the West Virginia CCPA.

2104.   As detailed in the common law fraud allegations: (1) Fiat Chrysler affirmatively misrepresented the environmental friendliness and emissions of the Subject Vehicles through the

545

EcoDiesel badge—a material fact that was false because the Defendants developed and installed emission cheating components in the Subject Vehicles that caused them to pollute excessively in real-world conditions; (2) Fiat Chrysler touted, through the EcoDiesel badge and uniform and pervasive consumer communications, the Subject Vehicles' fuel efficiency and performance, and the Defendants concealed that the fuel efficiency and performance could be achieved only through emission control devices in the Subject Vehicles that caused them to pollute excessively in real-world conditions; and (3) the Defendants developed and installed emission cheating components that caused the Subject Vehicles to pollute excessively in real-world conditions, and fraudulently concealed that fact from regulators and Plaintiffs alike. *See, e.g.*, ¶¶ 149-216; 337-357. In so doing, and by marketing, offering for sale, and selling the defective Subject Vehicles, Defendants engaged in one or more of the following unfair or deceptive acts or practices as defined in W. Va. Code § 46A-6-102(7):

A.  Causing likelihood of confusion or of misunderstanding as to the approval or certification of the Subject Vehicles;

B.  Representing that the Subject Vehicles have approval, characteristics, uses, or benefits that they do not have;

C.  Representing that the Subject Vehicles are of a particular standard, quality and grade when they are not;

D.  Advertising the Subject Vehicles with the intent not to sell or lease them as advertised;

E.  Engaging in other conduct which created a likelihood of confusion or of misunderstanding; and/or

F.  Using or employing deception, fraud, false pretense, false promise or misrepresentation, or the concealment, suppression or omission of a material fact with intent that others rely upon such concealment, suppression or omission, in connection with the advertisement and sale/lease of the Subject Vehicles, whether or not any person has in fact been misled, deceived or damaged thereby.

2105.   Defendants' scheme and concealment of the true characteristics of the EcoDiesel®

emission control system were material to the Plaintiffs, as Defendants intended. Had they known the truth, the Plaintiffs would not have purchased or leased the Subject Vehicles, or—if the Subject Vehicles' true nature had been disclosed and mitigated, and the Vehicles rendered legal to sell— would have paid significantly less for them.

2106.   Plaintiffs had no way of discerning that Defendants' representations were false and misleading, or otherwise learning the facts that Defendants had concealed or failed to disclose, because Defendants' emission control software was extremely sophisticated technology. Plaintiffs did not, and could not, unravel Defendants' deception on their own.

2107.   Defendants had an ongoing duty to the Plaintiffs to refrain from unfair and deceptive practices under the West Virginia CCPA in the course of their business. Specifically, Defendants owed Plaintiffs a duty to disclose all the material facts concerning the EcoDiesel® emission control system because they possessed exclusive knowledge, they intentionally concealed it from the Plaintiffs, and/or they made misrepresentations that were rendered misleading because they were contradicted by withheld facts.

2108.   Plaintiffs suffered ascertainable loss and actual damages as a direct and proximate result of Defendants' concealment, misrepresentations, and/or failure to disclose material information.

2109.   Defendants' violations present a continuing risk to the Plaintiffs, as well as to the general public. Defendants' unlawful acts and practices complained of herein affect the public interest.

2110.   Pursuant to W. Va. Code § 46A-6-106(a), the Plaintiffs seek an order enjoining Defendants' unfair and/or deceptive acts or practices, and awarding damages and any other just and proper relief available under the West Virginia CCPA.

2111.   On November 28, 2017, a notice letter was sent to FCA US LLC complying with W. Va. Code § 46A-6-106(c). A second notice letter was sent to FCA US LLC and Fiat Chrysler complying with W. Va. Code § 46A-6-106(c) on January 17, 2017. Additionally, all Defendants were provided notice of the issues raised in this count and this Complaint by the governmental investigations, the numerous complaints filed against them, and the many individual notice letters sent by Plaintiffs within a reasonable amount of time after the allegations of Subject Vehicle defects became public. Because Defendants failed to remedy their unlawful conduct within the requisite time period, Plaintiff seek all damages and relief to which the West Virginia State Plaintiffs are entitled.

**VIOLATIONS OF THE WISCONSIN
DECEPTIVE TRADE PRACTICES ACT
(Wis. Stat. § 100.18)**

2112.   Plaintiffs incorporate by reference each preceding paragraph as though fully set forth herein.

2113.   Plaintiffs, Jerry Nelson, Heinz and Eleonore Daub, Doolie Molzof, (for the purpose of this section, "Plaintiffs") bring this action on behalf of themselves against all Defendants.

2114.   Plaintiffs are members of "the public" and Plaintiffs are "persons" within the meaning of Wis. Stat. § 100.18(1).

2115.   FCA, VM Italy, VM America, Bosch GmbH, Bosch LLC, and Sergio Marchionne are a "person, firm, corporation or association" within the meaning of Wis. Stat. § 100.18(1).

2116.   The Wisconsin Deceptive Trade Practices Act ("Wisconsin DTPA") makes unlawful any "representation or statement of fact which is untrue, deceptive or misleading." Wis. Stat. § 100.18(1).

2117.   In the course of their business, Defendants Fiat Chrysler, VM Motori, Bosch, and Sergio Marchionne, through their agents, employees, and/or subsidiaries, violated the Wisconsin

548

DTPA.

2118.   As detailed in the common law fraud allegations: (1) Fiat Chrysler affirmatively misrepresented the environmental friendliness and emissions of the Subject Vehicles through the EcoDiesel badge—a material fact that was false because the Defendants developed and installed emission cheating components in the Subject Vehicles that caused them to pollute excessively in real-world conditions; (2) Fiat Chrysler touted, through the EcoDiesel badge and uniform and pervasive consumer communications, the Subject Vehicles' fuel efficiency and performance, and the Defendants concealed that the fuel efficiency and performance could be achieved only through emission control devices in the Subject Vehicles that caused them to pollute excessively in real-world conditions; and (3) the Defendants developed and installed emission cheating components that caused the Subject Vehicles to pollute excessively in real-world conditions, and fraudulently concealed that fact from regulators and Plaintiffs alike. *See, e.g.*, ¶¶ 149-216; 337-357. In so doing, and by marketing, offering for sale, and selling the defective Subject Vehicles, Defendants engaged in one or more of the following unfair or deceptive acts or practices as defined in Wis. Stat. § 100.18(1):

A.  Representing that the Subject Vehicles have approval, characteristics, uses, or benefits that they do not have;

B.  Representing that the Subject Vehicles are of a particular standard, quality and grade when they are not; and/or

C.  Advertising the Subject Vehicles with the intent not to sell or lease them as advertised.

2119.   Defendants' scheme and concealment of the true characteristics of the EcoDiesel® emission control system were material to Plaintiffs, as Defendants intended. Had they known the truth, Plaintiffs would not have purchased or leased the Subject Vehicles, or—if the Subject Vehicles' true nature had been disclosed and mitigated, and the Vehicles rendered legal to sell—

would have paid significantly less for them.

2120.  Defendants had an ongoing duty to Plaintiffs to refrain from unfair and deceptive practices under the Wisconsin DTPA in the course of their business. Specifically, Defendants owed Plaintiffs a duty to disclose all the material facts concerning the EcoDiesel® emission control system because they possessed exclusive knowledge, they intentionally concealed it from Plaintiffs, and/or they made misrepresentations that were rendered misleading because they were contradicted by withheld facts.

2121.  Plaintiffs suffered ascertainable loss and actual damages as a direct and proximate result of Defendants' concealment, misrepresentations, and/or failure to disclose material information.

2122.  Plaintiffs had no way of discerning that Defendants' representations were false and misleading, or otherwise learning the facts that Defendants had concealed or failed to disclose, because Defendants' emission control software was extremely sophisticated technology. Plaintiffs did not, and could not, unravel Defendants' deception on their own.

2123.  Defendants' violations present a continuing risk to Plaintiffs, as well as to the general public. Defendants' unlawful acts and practices complained of herein affect the public interest.

2124.  Pursuant to Wis. Stat. § 100.18(11)(b)(2), Plaintiffs seek an order enjoining Defendants' unfair and/or deceptive acts or practices, and awarding damages, punitive damages, and any other just and proper relief available under the Wisconsin DTPA.

## VIOLATION OF THE WYOMING CONSUMER PROTECTION ACT
### (Wyo. Stat. §§ 40-12-101, *et seq.*)

2125.  Plaintiffs incorporate by reference each preceding paragraph as though fully set forth herein.

2126.   Plaintiffs, Raymond Croisetiere, (for the purpose of this section, "Plaintiff") brings this action on behalf of themselves against all Defendants.

2127.   FCA, Fiat, VM Italy, VM America, Bosch GmbH, Bosch LLC, Sergio Marchionne, Plaintiff, members and Plaintiffs are "persons" within the meaning of Wyo. Stat. § 40-12-102(a)(i).

2128.   The Subject Vehicles are "merchandise" pursuant to Wyo. Stat. § 40-12-102(a)(vi).

2129.   Each sale or lease of a Subject Vehicle to a Plaintiff was a "consumer transaction" as defined by Wyo. Stat. § 40-12-102(a)(ii). These consumer transactions occurred "in the course of [Defendants'] business" under Wyo. Stat. § 40-12-105(a).

2130.   The Wyoming Consumer Protection Act ("Wyoming CPA") prohibits deceptive trade practices. Wyo. Stat. § 40-12-105(a).

2131.   In the course of their business, Defendants Fiat Chrysler, VM Motori, Bosch, and Marchionne, through their agents, employees, and/or subsidiaries, violated the Wyoming CPA.

2132.   As detailed in the common law fraud allegations: (1) Fiat Chrysler affirmatively misrepresented the environmental friendliness and emissions of the Subject Vehicles through the EcoDiesel badge—a material fact that was false because the Defendants developed and installed emission cheating components in the Subject Vehicles that caused them to pollute excessively in real-world conditions; (2) Fiat Chrysler touted, through the EcoDiesel badge and uniform and pervasive consumer communications, the Subject Vehicles' fuel efficiency and performance, and the Defendants concealed that the fuel efficiency and performance could be achieved only through emission control devices in the Subject Vehicles that caused them to pollute excessively in real-world conditions; and (3) the Defendants developed and installed emission cheating components that caused the Subject Vehicles to pollute excessively in real-world conditions, and fraudulently concealed that fact from regulators and Plaintiffs alike. *See, e.g.*, ¶¶ 149-216; 337-357. In so doing,

and by marketing, offering for sale, and selling the defective Subject Vehicles, Defendants engaged

in one or more of the following unfair or deceptive acts or practices as defined in Wyo. Stat. §§

40-12-105(a):

> A.  Representing that the Subject Vehicles have approval, characteristics, uses, or
> benefits that they do not have;
>
> B.  Representing that the Subject Vehicles are of a particular standard, quality and
> grade when they are not;
>
> C.  Advertising the Subject Vehicles with the intent not to sell or lease them as
> advertised; and/or
>
> D.  Engaging in other conduct which created a likelihood of confusion or of
> misunderstanding.

2133.   Defendants' scheme and concealment of the true characteristics of the EcoDiesel®

emission control system were material to Plaintiff, as Defendants intended. Had they known the

truth, Plaintiff would not have purchased or leased the Subject Vehicles, or—if the Subject

Vehicles' true nature had been disclosed and mitigated, and the Vehicles rendered legal to sell—

would have paid significantly less for them.

2134.   Plaintiffs had no way of discerning that Defendants' representations were false and

misleading, or otherwise learning the facts that Defendants had concealed or failed to disclose,

because Defendants' emission control software was extremely sophisticated technology. Plaintiffs

did not, and could not, unravel Defendants' deception on their own.

2135.   Defendants had an ongoing duty to Plaintiff to refrain from unfair and deceptive

practices under the Wyoming CPA in the course of their business. Specifically, Defendants owed

Plaintiffs a duty to disclose all the material facts concerning the EcoDiesel® emission control

system because they possessed exclusive knowledge, they intentionally concealed it from Plaintiff,

and/or they made misrepresentations that were rendered misleading because they were

contradicted by withheld facts.

2136.  Plaintiffs suffered ascertainable loss and actual damages as a direct and proximate result of Defendants' concealment, misrepresentations, and/or failure to disclose material information.

2137.  Defendants' violations present a continuing risk to Plaintiff, as well as to the general public. Defendants' unlawful acts and practices complained of herein affect the public interest.

2138.  Pursuant to Wyo. Stat. §§ 40-12-108(a) and 40-12-108(b), Plaintiff seek an order enjoining Defendants' unfair and/or deceptive acts or practices, and awarding damages, punitive damages, and any other just and proper relief available under the Wyoming CPA.

2139.  Per the State Pre-suit requirements notifications have been prepared to FCA US LLC complying with Wyo. Stat. § 40-12-109. All Defendants were provided notice of the issues raised in this count and this Complaint by the governmental investigations, the numerous complaints filed against them, and the many individual notice letters sent by Plaintiffs within a reasonable amount of time after the allegations of Subject Vehicle defects became public. Because Defendants failed to remedy their unlawful conduct within the requisite time period, Plaintiff seek all damages and relief to which Plaintiffs are entitled.

### III.   PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that the Court enter judgment in their favor and against Defendants, as follows:

A.   A declaration that any applicable statutes of limitation are tolled due to the fraudulent concealment alleged in this complaint, and that Defendants are estopped from relying on any statutes of limitations in defense;

B.   An order enjoining Defendants from continuing the unlawful, deceptive, fraudulent, and unfair business practices alleged in this Complaint;

C.     Injunctive and equitable relief in the form of a comprehensive program to repair, modify, and/or buy back all Subject Vehicles, and to fully reimburse and make whole all Plaintiffs for all costs and economic losses, and degradation of mileage performance, durability, and reliability that the Subject Vehicles could incur by being brought into compliance with federal and state law;

D.     Environmental reparations, mitigation, and remediation to offset the harm caused by the Subject Vehicles, based on the mileage driven by all Subject Vehicles and/or other appropriate measures of environmental harm;

E.     Costs, restitution, compensatory damages for economic loss and out-of-pocket costs, treble damages under Civil RICO, multiple damages under applicable states' laws, punitive and exemplary damages under applicable law;

F.     As a result of Defendants' conduct, all Plaintiffs have suffered actual damages, including direct, consequential and incidental damages.  All Plaintiffs seek to recover any diminishment in value (the difference at the time and place of acceptance between the value of their vehicles as and when accepted and the value as warranted or represented) and additional damages under available State law for Defendant's knowing and intentional violations;

G.     As a result of Defendants' conduct, all Plaintiffs have suffered actual damages, including direct, consequential and incidental damages in an amount within the jurisdictional limited of this Court.  Moreover, FCA has been unjustly enriched by profiting from their fraudulent and deceptive practices which led to the purchase.  All Plaintiffs seek to recover the fraudulently obtained profits earned by FCA on each sale, and additional damages available under the State laws for FCA's said knowing and intentional violations;

H.     Rescission of all Subject Vehicle purchases or leases, including reimbursement and/or compensation of the full purchase price of all Subject Vehicles, including taxes, licenses, and other fees;

I.     A determination that Defendants are financially responsible for all Plaintiffs notice and administration of Plaintiffs relief;

J.     Any and all applicable statutory and civil penalties;

K.     An order requiring Defendants to pay both pre- and post-judgment interest on any amounts awarded;

L.     An award of costs and attorneys' fees;

M.      Leave to amend this Complaint to conform to the evidence produced in discovery and at trial; and

N.      Such other or further relief as the Court may deem appropriate, just, and equitable.

## DEMAND FOR JURY TRIAL

The Plaintiffs herein demand a trial by jury on all Counts and as to all issues.

Dated: January 23, 2019                  Respectfully submitted,

STERN LAW, PLLC

/s/ Kenneth A. Stern
Kenneth A. Stern
Attorney for All Plaintiffs
41850 West 11 Mile Road, Suite 121
Novi, Michigan 48375
(248) 347-7300 – Main
(248) 305-3250 - Fax
ken@sternlawonline.com
Michigan Bar No. P30722